# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CITY OF EL CENIZO, *et al.*, | § | Civil Action No.: 5:17-CV-00404-OLG |
| | § | (Lead Case) |
| EL PASO COUNTY; RICHARD WILES, | § | |
| SHERIFF OF EL PASO COUNTY; JO ANN | § | |
| BERNAL, EL PASO COUNTY ATTORNEY in | § | Civil Action No: 5:17-CV-00459-OLG |
| their official capacity; TEXAS ORGANIZING | § | (Consolidated case) |
| PROJECT EDUCATION FUND; and MOVE | § | |
| SAN ANTONIO, | § | |
| | § | |
| CITY OF SAN ANTONIO, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | Civil Action No: 5:17-CV-00489-OLG |
| | § | (Consolidated case) |
| v. | § | |
| | § | |
| THE STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

---

### MEMORANDUM IN SUPPORT OF PLAINTIFFS EL PASO COUNTY, ET AL.'S APPLICATION FOR PRELIMINARY INJUNCTION

**Table of Contents**

BACKGROUND ......................................................................................................................... 2

   A.  The Operation of SB 4 ................................................................................................ 2
   B.  Standard for Preliminary Injunction ........................................................................ 3

ARGUMENT ........................................................................................................................... 3

   I.  Plaintiffs are Substantially Likely To Prevail On The Merits ................................. 3

      A.  SB 4 Violates the Equal Protection Guarantees of the Fourteenth Amendment ............ 4

         1.  Disparate Impact ................................................................................................ 5
         2.  Historical Background Leading to the Adoption of SB 4 ........................................ 9
         3.  Sequence and Legislative History of SB 4 ............................................................ 11
         4.  Departures from Normal Procedure in the Consideration of SB 4 ........................... 16
         5.  Substantive Departure in the Adoption of SB 4 ..................................................... 19

      B.  SB 4 Impermissibly Burdens First Amendment Rights ................................................. 21

         1.  SB 4 Censors Speech About Important Public Issues ............................................. 21
         2.  SB 4 Chills Protected Activities with Threat of Government-Sponsored Retaliation 22

      C.  SB 4 Violates the Fourteenth Amendment Due Process Clause ..................................... 25

      D.  SB 4 Requires Unreasonable Seizures That Violate the Fourth Amendment ................ 29

   II.  SB 4 will Irreparably Harm the Plaintiffs ............................................................. 31

   III.  The Balance of Hardships and the Public Interest Favor the Issuance of a Preliminary Injunction ............................................................................................................... 32

   IV.  No Rule 65(C) Surety is Required ....................................................................... 32

CONCLUSION ........................................................................................................................ 33

As set forth by Plaintiffs below, and by the other plaintiffs in the consolidated action, the recently adopted Senate Bill 4 ("SB 4")—also known as the "show me your papers" law—suffers from a litany of flaws. It violates the Constitution of the United States, federal law, and the Texas Constitution, and should be immediately enjoined.

SB 4 is the sad manifestation of the hateful politics of our current time. There was little doubt that SB 4, if passed, would have a targeted, adverse impact upon people of Mexican and Central American descent in Texas, collectively referred to here as "Latino," who make up the vast majority of foreign-born individuals in the Lone Star State. Lawmakers struggled to articulate any justification for SB 4—particularly in the face of evidence that it would undermine public safety—and instead rammed the bill through the process, overriding wide-scale concerns voiced by the public and disregarding normal legislative rules. Indeed, the best available evidence shows that lawmakers passed SB 4 not just in spite of its expected impact upon the Latino community, but *because of* it.

The resulting law cannot pass muster when judged by our U.S. Constitution and federal law. As described below, the discriminatory intent that motivated SB 4 and its certain disparate impact violates the Equal Protection Clause. SB 4 seeks to censor the speech of local leaders and chills First Amendment-protected activities of grassroots community organizing groups, like the Texas Organizing Project Education Fund ("TOPEF") and MOVE San Antonio ("MOVE"), threatening to undermine the very fabric of our democracy. Plus, the law is impermissibly vague, leaves too much discretion to local officials, and mandates the unconstitutional detention of individuals in violation of the Fourth Amendment. For all of these reasons, set forth more fully below, SB 4 is causing irreparable injury to the Plaintiffs and the people of Texas. It must be enjoined.

**BACKGROUND**

## A.     The Operation of SB 4

SB 4 creates a complicated statutory scheme, with five substantive sections. Together, as explored below, the law's provisions are deeply flawed and cannot pass constitutional scrutiny.

Under Section 1, local entities—a term that includes local governmental bodies, local leaders and employees, and local law enforcement agents, including attorneys, *see* Tex. Gov. Code § 752.051(5)—are prohibited from adopting, enforcing, or endorsing a policy that prohibits or materially limits the enforcement of "immigration laws," as demonstrated by "pattern or practice." Tex. Gov. Code § 752.053. SB 4 prohibits local entities from adopting policies that prohibit or materially limit a police officer—including safety officers on college campuses— from inquiring into the immigration status of a person under lawful detention or under arrest, Tex. Gov. Code § 752.053(b); inquiring into the detainee's place of birth; sending that information to United States Citizenship and Immigration Services ("USCIS"), Immigration Customs Enforcement ("ICE"), or any other federal agency, *id.*; assisting or cooperating with a federal immigration officer, *id.*; and/or allowing the federal government access to a jail to enforce federal immigration law. *Id.*

Section 2 prohibits law enforcement agencies from refusing to comply with any immigration detainer request issued by the federal government, even if there is no probable cause and no underlying criminal charges to justify continued detention. Tex. Code Crim. P. § 2.251 (effective Sep. 1, 2017). Section 3 provides that the Attorney General shall defend an entity sued for complying with an immigration detainer request under certain circumstances. Tex. Gov. Code § 402.0241. Section 5 creates a new crime—failure to comply with an immigration detainer request is a Class A misdemeanor, which is punishable by up to a year in jail. Tex. Penal

Code § 39.07; Tex. Penal Code Ann. § 12.21. Section 6 provides that police officers may inquire into the nationality or immigration status of a crime victim or witness if the officer determines, among other things, that the inquiry is necessary to investigate the offense. Tex. Code Crim. P. § 2.13.

Local governmental bodies, local leaders and employees, and local law enforcement agents who violate SB 4 face severe, escalating civil penalties, including exorbitant fines of between $1,000.00 and $1,500.00 on the first day of a violation, and thereafter between $25,000 and $25,500 *per day* for every subsequent violation. Tex. Gov. Code § 752.056. Individual law enforcement officers who fail to comply with SB 4 may be criminally liable. Tex. Penal Code, § 39.07. Public officials who do not comply face removal from office. Tex. Gov. Code § 752.0565.

## B.      Standard for Preliminary Injunction

To succeed in a request for a preliminary injunction, the movants must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Speaks v. Kruse*, 445 F.3d 396, 400 (5th Cir. 2006). Plaintiffs meet each of these requirements, and this Court should preliminarily enjoin SB 4.

## ARGUMENT

## I.      Plaintiffs are Substantially Likely To Prevail On The Merits

Plaintiffs have a substantial likelihood of success on the merits on each of their claims: that SB 4 (1) violates the Fourteenth Amendment's Equal Protection Clause because it was adopted with discriminatory intent and affects Latinos disparately; (2) violates the First

Amendment in at least two ways; (3) is unconstitutionally vague in violation of the Due Process Clause; (4) will lead to rampant unlawful seizures in violation of the Fourth Amendment; (5) is preempted by federal law;[1] and (6) violates the Texas Constitution.[2] As the preliminary evidence discussed below indicates, and as evidence at trial will show, SB 4 is unconstitutional on various grounds.

In the interest of judicial economy and efficiency, Plaintiffs will not repeat arguments and case law that has already been entered into the record, *see, e.g.*, Dkt. No. 24-1, and focus here on adding new arguments and evidence for the Court's consideration.

### A.     SB 4 Violates the Equal Protection Guarantees of the Fourteenth Amendment

SB 4 was motivated, at least partially, by an illicit discriminatory purpose to "disadvantage a suspect class" in violation of the Equal Protection Clause. *Plyler v. Doe*, 457 U.S. 202, 216 (1982). To be sure, "[l]egislative motivation or intent is a paradigmatic fact question," *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 612 (2017) (internal citation omitted), that often requires extensive factual discovery to resolve. Here, even at this preliminary stage, when the available evidence is viewed through the *Arlington Heights* framework for evaluating discriminatory legislative intent, there is at least a "sufficient

---

[1] Accordingly, rather than rehash arguments already on the record, Plaintiffs agree with and join in full the preemption arguments made by the El Cenizo, *et al.* Plaintiffs in their Request for a Preliminary Injunction. Dkt. No. 24-1, pp. 22-29.

[2] SB 4 violates the separation of powers provision of Article II of the Texas Constitution, section 1, by interfering with El Paso County Sheriff's constitutional duty as the county's final policymaker in the area of law enforcement, and by infringing upon the El Paso County Attorney's prosecutorial function. *See Hill Cnty. v. Sheppard*, 178 S.W.2d 261, 264 (Tex. 1944) ("Where certain duties are imposed or specific powers are conferred upon a designated officer, the Legislature cannot withdraw them nor confer them upon others nor abridge them or interfere with the officer's right to exercise them unless the Constitution expressly so provides.") (citation and internal quotations omitted)). Plaintiffs have a substantial likelihood of success on their Texas Constitution claim.

likelihood" that Plaintiffs will ultimately prevail. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).

*Arlington Heights* sets out five non-exhaustive factors to determine whether a decision was made with a discriminatory purpose, and courts perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266-68. The factors include: (1) the historical background of the law, (2) the specific sequence of events leading up to its adoption, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, "especially where there are contemporary statements by members of the decision-making body." *Veasey*, 830 F.3d at 231 (citing *Overton v. City of Austin,* 871 F.2d 529, 540 (5th Cir. 1989) and *Arlington Heights,* 429 U.S. at 267-68). If Plaintiffs show that racial or ethnic discrimination was a "substantial" or "motivating factor behind enactment of the law," "the burden [then] shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Veasey,* 830 F.3d at 231 (internal quotations omitted). Importantly, "[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur." *Id*. at 230 (citing *United States v. Brown,* 561 F. 3d 420, 433 (5th Cir. 2009)). Courts may consider "both circumstantial and direct evidence of intent as may be available." *Veasey*, 830 F.3d at 235 (citing *Arlington Heights*, 429 U.S. at 266).

### 1. *Disparate Impact*

The "legislators' awareness of a disparate impact on a protected group is not enough," by itself, to find a violation, but it informs the analysis of the *Arlington Heights* factors. *Veasey*, 830 F.3d at 235 (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Here, SB 4 will unquestionably have a disparate impact on Latinos in Texas who descend from Mexico and

Central America, regardless of their immigration status, and the evidence will show this was the intended effect.[3] *See Hernandez v. Texas*, 347 U.S. 475, 479-80 (1954) (holding that people of Mexican descent are a protected class under the Fourteenth Amendment). SB 4 will also disparately impact the family members of Latino immigrants and other people who "look foreign," including those born in the United States. *See Plyler*, 457 U.S. at 230 (invalidating Texas statute that withheld state funds from local school districts for the education of children who were not "legally admitted" into the United States on Equal Protection grounds); *Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000) (recognizing successful equal protection where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment).

That the law will impact this protected class can hardly be disputed. Under SB 4, jurisdictions must allow law enforcement officers to inquire about the immigration status of any person under "lawful detention or arrest"—including any person briefly stopped and questioned by the police or campus safety personnel. Tex. Gov. Code §752.053. Such inquiries will, of course, concern the person's place of birth and, impliedly, their race, particularly since local officials lack training into the intricacies of immigration law.[4] Given the demographics of the

---

[3] In Texas, the vast majority of foreign-born people are of Mexican or Latin American descent. Renee Stepler, *Texas immigrant population now rivals New York's in size,* Pew Research Center (April 1, 2016), *available at*: http://www.pewresearch.org/fact-tank/2016/04/21/texas-immigrant-population-now-rivals-new-yorks-in-size/ (last visited June 18, 2017). In 2015, the foreign born population of Texas was estimated at 4,671,295; the number of those who were born in Latin America was estimated at 3,207,913. U.S. Census: Selected Characteristics of The Foreign-Born Population by Region of Birth: Latin America 2015, American Community Survey 1-Year Estimates, SO 506. *Available at*:
https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S0506&prodType=table.

[4] *See* Dkt. 24-1, pp. 22-29. In an exchange with House Representative René O. Oliveira, Chairman Geren admitted that law enforcement officers are not trained to perform these immigration inquiries: "OLIVEIRA: …You would agree that local law enforcement is not

immigrant population in Texas, further fueled by the environment of animus toward Latinos more generally, as set forth below, there is little doubt that Latinos will be profiled and disparately affected. *Veasey*, 830 F.3d at 236 (examining evidence that legislators were aware of the law's likely disparate effect on racial and ethnic minorities).

A full examination of the legislative record shows the widespread understanding that Latino immigrants (and thus any person who looks like they could be a Latino immigrant) would be disproportionately affected. Consider, for instance, an exchange between House of Representatives Chairman Charlie Geren, the House sponsor of SB 4, and Representative Eddie Rodriguez. When Rep. Rodriguez asked "Mr. Chairman, what race or nationality are most immigrants in Texas?," the Chairman stated: "I would assume that they're Hispanic." 85 H.J. S13 (57th Legislative Day). Chairman Geren went on to directly connect SB 4's Latino targets with a broader animus toward undocumented immigrants:

> "GEREN: … [M]y constituents reached out to me and think [illegal immigration] is a concern.
> E. RODRIGUEZ: Do you mind sharing with us briefly what their concern is?
> GEREN: **They're concerned with crimes that are being committed in their communities by illegals, and they think that they need to go home**. They're concerned about crimes being committed in their community by people that are here illegally, and they want them to go to jail."
> 85 H.J. S15 (57th Legislative Day) (emphasis added).

Moreover, the harsh penalties imposed upon local entities for non-compliance are designed to lead to over-enforcement. *See* Tex. Gov. Code § 752.054. Indeed, it's no secret that in communities with large immigrant populations of Mexican and Central American descent,

---

trained in immigration law. GEREN: I would agree with that. Yes, sir. OLIVEIRA: In fact, they do not know about the 165 different types of visas that are out there. GEREN: That is probably correct. OLIVEIRA: And they do not know the difference between an investor visa, a student visa, or anything like that. GEREN: That is probably correct, sir." 85 H.J. S4-5 (57th Legislative Day).

such as El Paso, law enforcement leaders prefer not to engage in immigration status-related questions to sustain community trust. Exh. A, Decl. of Jo Anne Bernal, ¶¶ 14-19.[5] But under SB 4, Police Chiefs and other leaders been stripped of their seasoned oversight, and individual "[o]fficers will start inquiring about the immigration status of every person they come in contact with, or worse, only inquire about the immigration status of individuals based on their appearance."[6]

Official racial profiling of Latinos in Texas has, in fact, already occurred in connection with SB 4. On the last day of the Legislative Session, Representative Matt Rinaldi bragged about calling immigration enforcement agents to "report" Latino protesters in the Texas Capitol opposing SB 4.[7] Rep. Rinaldi, of course, based his "reporting" solely on the protesters' appearance, which was the information readily available to him. As the *Veasey* court repeatedly pointed out in its disparate impact analysis, "context matters." 830 F.3d at 236-37. As the incident with Rep. Rinaldi illustrates, SB 4 creates a perfect storm for racial profiling, elevating animus into law, placing untrained police offers in the untenable position of having little information other than appearance to enforce "immigration laws," and preventing seasoned local leaders from taking any steps to mitigate the damage.

---

[5] *See also* Art Acevedo and James McLaughlin, "Polie chiefs: SB 4 is a 'lose-lose' for Texas," Houston Chronicle (April 30, 2017) (last visited June 19, 2017), available at: http://www.houstonchronicle.com/opinion/outlook/article/Police-chiefs-SB-4-is-a-lose-lose-for-Texas-11110336.php.

[6] *Id*.

[7] Matthew Watkins, Alexa Ura and Julián Aguilar, "Republican lawmaker: I called immigration authorities on Capitol protesters," The Texas Tribune (May 29, 3017), *available at*: https://www.texastribune.org/2017/05/29/protesters-disrupt-house-proceedings-raise-opposition-sanctuary-cities/

## 2. Historical Background Leading to the Adoption of SB 4

SB 4 cannot be divorced from the cultural context from which it grew. In recent years, when the spike in the number of refugees and asylum-seekers from Central America arriving in South Texas drew public sympathy and political attention, Lt. Governor Dan Patrick has referred to the situation as an "invasion."[8] Then, the 2016 presidential election was infamously marred by anti-immigration and racially discriminatory appeals,[9] and those sentiments seeped into Texas' 2016 election as well. The 85th Legislative Session was marked by aggressive efforts to "crack down" on immigration, particularly from Mexico and Central America.[10] During the debate on the General Appropriations Act, for instance, several amendments were considered that targeted both immigrants and the Latino population—immigrants from Mexico and Central America— more specifically.[11] In addition, the House considered a reform bill for the Department of Family and Protective Services, in which Representative Mark Keogh sought an amendment that would have disallowed monetary remuneration for caregivers if the caregiver was undocumented.[12]

---

[8] W. Gardner Selby, "Politifact: Patrick has referred to 'invasion' of immigrants," Austin-American Statesman (June 22, 2014), available at http://www.mystatesman.com/news/local-govt--politics/politifact-patrick-has-referred-invasion-immigrants/uaEt4nemiFGDXaKhEk0j0I/ (last visited June 17, 2017).

[9] *See* Am. Compl. ¶¶ 46-47; Charlie May*, Tex. Gov. Greg Abbot Signs Law Banning Sanctuary Cities*, as Trump Voters Lament Mass Immigration Powers, SALON, May 8, 2017, *available at* http://www.salon.com/2017/05/08/texas-gov-greg-abbott-signs-law-banning-sanctuary-cities-as-trump-voters-lament-mass-immigration-powers/

[10] "REP. OLIVEIRA: I first do want to thank you for listening to some of our concerns and addressing some of them in the bill. But having said that, I d like to go through some of the provisions that I think are problematic. First, let's start with your premise under the bill, as you stated, is to go after bad people. GEREN: Yes, sir. That's correct. OLIVEIRA: I think President Trump said 'bad hombres.' You all are kind of speaking the same language there, I guess. GEREN: No, sir. If they're a bad person, whether a male or a female. I'm not going to address just the males." 85 H.J. S13 Supplement (57th Legislative Day) at S3.

[11] For instance, bills were offered to defund higher educational institutions that offered in-state tuition for undocumented students. *See also* Exh. B, Decl. of Rep. E. Rodriguez.

[12] *See* 85 H.J. 518-522 (25th Legislative Day).

Moreover, the racial animus against Mexican Americans and other Latino immigrants has infected recent policies enacted by the Texas Legislature. In the past six months alone, three legislative enactments passed in 2011 were found to be motivated by intentional discrimination in violation of the Fourteenth Amendment and federal law. *Perez, et al. v. Perry*, 11-cv-00360-OLG-JES-XR, Dkts. 1339, 1365 (W.D. Tex. 2017) (orders finding intentional discrimination against Hispanics and other minorities in the enactment of the 2011 Texas House and Texas Congressional plans); *Veasey v. Perry*, 13-cv-00193, Dkt. 1023 (S.D. Tex. 2017) (finding the Texas Voter ID law intentionally discriminated against racial and ethnic minorities). In addition, local jurisdictions have been found to violate the rights of Latino immigrants detained beyond the expiration of a state offense pursuant to so-called "ICE detainers." *Trujillo Santoyo v. United States, et al.,* 16-CV-00855-OLG, Dkt. 36 (W.D. Tex. June 5, 2017) (order granting in part Plaintiff's motion for summary judgment for the detention of an immigrant on an ICE detainer without probable cause); *Mercado et al v. Dallas County, Texas et al,* No. 3:2015-cv-03481, Dkt. 53 (N.D. Tex. 2017) (denying the defendants' motion to dismiss based on the policy of adhering to ICE detainers for individuals who had been detained passed their state bond). Finally, after the litigation was allowed to proceed to discovery, the State settled a case last year alleging that officials refused to provide birth certificates to the Texas-born children of undocumented mothers from Mexico and Central America. *See Perales Serna et al v. Texas Department of State Health Services, et al.*, No.1:15-cv-00446-RP (W.D. Tex. 2015).

In short, the history of racially discriminatory laws and official anti-immigrant action in Texas is long, and unfortunately extends up until the present day.[13] As explained above, and as

---

[13] *See* Susan Gamboa, *History of Racism Against Mexican-Americans Clouds Texas Immigration Law*, NBC News, Jun. 3, 2017, *available at* http://www.nbcnews.com/news/latino/history-racism-against-mexican-americans-clouds-texas-immigration-law-n766956.

will be more thoroughly detailed during discovery and at trial, SB 4 was poisoned by the hateful rhetoric and politics of hate that have defined recent times.

### 3. *Sequence and Legislative History of SB 4*

SB 4 offers a "solution" in search of a problem, underscoring that official rationales offered to support the law were pretextual and meant to disguise the law's true intent. *See Veasey*, 830 F.3d at 236 (noting that failure to adopt ameliorative amendments can be circumstantial evidence of discriminatory intent). Accordingly, while there is ample evidence of national origin animus by Texas lawmakers during the 2017 Legislative Session—which Plaintiffs intend to fully present at trial—there is no credible legitimate policy rationale that would justify SB 4's intrusions into the civil rights of immigrant and non-immigrant Latinos.

Lawmakers denied that any one inciting event led to SB 4's adoption.[14] Instead, in the debate on SB 4, Chairman Geren provided four main reasons to support SB 4: (i) to force jurisdictions to comply with ICE detainers; (ii) to uphold the rule of law; (iii) to ensure public safety, and (iv) to remove "bad people" from Texas streets. *See generally* 85 H.J. S20 (57th Legislative Day). As explained below, a careful review of the legislative record belies each of these stated rationales.

#### (i) *Forcing compliance with ICE detainers*

Lawmakers had evidence that Texas jurisdictions comply with 99.78% of ICE detainer requests. 85 H.J. S20 (57th Legislative Day).[15] While a "Legislature is entitled to set whatever

---

[14] "E. RODRIGUEZ: … Was there any particular event that led you to seek out sponsorship of this bill or filing a bill which is similar to this bill? GEREN: There is no particular event, no, sir." 85 H.J. S13 (57th Legislative Day).

[15] "ANCHIA: … [T]he Texas Tribune did its study of ICE detainers in the State of Texas, it was determined that over 99 percent of all ICE detainers were complied with in this state."

priorities it wishes," "one might expect that when the Legislature places a bill on an expedited schedule and subjects it to such an extraordinary degree of procedural irregularities, as was the case with SB [4], such a bill would address a problem of great magnitude." *Veasey*, 830 F.3d at 238. Less than a quarter of a percentage point is hardly a "great magnitude." In fact, the House sponsor of SB 4 could not name one single jurisdiction that does not fully comply with ICE detainer requests and that would justify the need for SB 4 on that basis:

> "OLIVEIRA: Can you name one sanctuary city in Texas?
> GEREN: At this time, I cannot. Earlier in the session, I would have said that Travis County was.
> OLIVEIRA: And I appreciate your concern about Travis County, but in fact that has been corrected, and currently the sheriff has been cooperating with ICE.
> GEREN: She currently is, yes.
> OLIVEIRA: In fact, the commander of the region that governs Texas has told you and us that everyone is cooperating with the federal government in Texas, and he knows of no city, county, constable, sheriff, or police chief that is not cooperating.
> GEREN: That is correct."
> 85 H.J. S4 (57th Legislative Day).

Subsequently, the Texas House *rejected* an amendment that would have focused SB 4 solely on compliance with all ICE detainers. Exhibit B, Decl. of Rep. Eddie Rodriguez, ¶ 45. The need to comply with ICE detainers thus did not and cannot justify SB 4's enactment.

### (ii)  *Upholding the "Rule of Law"*

The federal courts have been clear: Compliance with ICE detainer requests must be voluntary to avoid Fourth Amendment concerns. *Trujillo Santoyo v. United States*, No. 5:16-CV-00855-OLG, at 12 (June 5, 2017); *Galarza v. Szalczyk*, 745 F.3d 634, 638 (3rd Cir. 2014). Proclaiming to require actions that must be voluntary pursuant to U.S. constitutional mandates cannot plausibly be characterized as upholding "the rule of law," particularly given the certainty that unconstitutional detentions will result. *See* Section XX below. Tellingly, amendments that

would have maintained a locality's discretion regarding detainer requests were rejected by the House. Exh. B, Decl. of E. Rodriguez, ¶¶ 46-47. The House also rejected amendments that would have prevented Texas law enforcement personnel from enforcing federal immigration laws without training, as well as amendments that would have clarified that detentions pursuant to ICE detainers require probable cause. *Id.*, ¶¶ 49-50.

SB 4's double standards further evidence that the bill is not actually aimed at preserving the rule of law. For instance, the bill allows the Attorney General (AG) to seek mandamus or injunctions against entities that violate SB 4, and to defend local entities sued for complying with a detainer request (*e.g.*, for detaining someone without probable cause). Tex. Gov. Code §§ 752.055, 752.0565, 402.0241. By contrast, and despite the inclusion of boilerplate non-discrimination language, Tex. Gov. Code 752.054, SB 4 provides no new authorization for the AG to prosecute incidents of racial profiling that will arise under its scheme.[16] Again, tellingly, the House rejected amendments that would have granted the litigants the ability to enforce SB 4's non-discrimination provision. Exh. B, Decl. of E. Rodriguez, ¶¶ 51, 52.

Finally, El Paso County long ago agreed, pursuant to a federal court settlement, not to enforce federal civil immigration laws. The County made it clear to the bill's authors that SB 4 may require a breach of that settlement. Exh. A, Decl. of J. Bernal, ¶ 9. Representative Evelina Ortega proposed an amendment that would have exempted El Paso County from SB 4, but that amendment was not considered. Exh. B, Decl. of E. Rodriguez, ¶ 53. The blatant disregard for El Paso's settlement agreement further confirms that SB 4 was not enacted to uphold the rule of law.

---

[16] In truth, the anti-discrimination language proves little more than that "discriminatory motives are often 'cleverly cloaked in the guise of propriety.'" *Veasey*, 830 F.3d at 230, n. 12 (citing *Lodge v. Buxton*, 639 F.2d 1358 (5th Cir. Unit B Mar. 1981)).

(iii) *Ensuring Public Safety*

SB 4 proponents argued the bill was necessary to address public safety concerns. However, the Legislature was presented with credible evidence that crime rate among immigrants is lower than among the non-immigrant population. 85 H.J. S8 Supplement (57th Legislative Day), at S8; Exh. C, Decl. of Senator José Rodríguez, ¶ 30(c). When opponents argued that public safety would actually *suffer* under SB 4 if immigrants and their families stopped cooperating with law enforcement, Chairman Geren argued that the chilling effect would be minimal because SB 4 targeted people upon arrest. 85 H.J. S8 (57th Legislative Day) ("GEREN: I understand the chilling effect of some of the ICE enforcement. This is not ICE enforcement. This is when someone is arrested.").[17] Of course, however, the version of SB 4 that was enacted is not limited to people who are arrested, but rather to all individuals under "lawful detention." Tex. Gov. Code § 752.053.

The "chilling effect" that Chairman Geren recognized is fed by SB 4. Already, it is cutting off victims of crimes from law enforcement and the courthouse, to the detriment of public safety. In El Paso, as in Bexar and Dallas Counties and other jurisdictions across Texas with large Mexican and Central American immigrant populations, there has been a substantial decline in protective orders sought because of the fear of deportation by undocumented victims of

---

[17] The full exchange is here:

"OLIVEIRA: … But the chilling effect of your bill—the word's out there right now in all these communities. They don't know about that language. They aren't going to know about that language, and they're not going to cooperate with law enforcement when there's a murder, when there's a drug deal, when there's a rape, when there's a sexual assault, or any of these things for fear of deportation."

GEREN: I disagree with you, and I think that this is about public safety. And I would disagree that they wouldn't cooperate. I understand the chilling effect of some of the ICE enforcement. This is not ICE enforcement. This is when someone is arrested. This bill says 'arrested.'" 85 H.J. S8 (57th Legislative Day).

domestic violence. Exh. A, Decl. of J. Bernal, ¶¶ 15-18. The House rejected amendments that would have offered further protection to victims of family violence or sexual assault, as well as an amendment that would have made Texas courthouses safe from immigration enforcement, and an amendment that focused SB 4 on individuals accused of committing felonies. Exh. B, Decl. of E. Rodriguez, ¶¶ 50, 53-55, 57-58. The known chilling effect of SB 4 has already made Texas less safe; appeals to public safety were pre-textual and belied an invidious purpose.

(iv)  *Targeting "Bad People"*

The final purported policy rationale for the adoption of SB 4 was the need to "get at bad people." 85 H.J. S8 Supplement (57th Legislative Day) at S8. Such an amorphous policy rationale necessarily begs the question of the true purpose behind SB 4: Who are these "bad people"? After all, if "bad people" refers to persons convicted of, or even merely accused of, committing a crime, why don't the existing federal and state criminal justice systems suffice? Chairman Geren's explanation was telling: The "bad people" SB 4 targets are "illegals" who "need to go home." 85 H.J. S15 (57th Legislative Day). Accordingly, the House rejected amendments that would have focused SB 4's prohibitions on criminals who commit felonies. Exh. B, Decl. of E. Rodriguez, ¶¶ 55-56. Thus, SB 4 does not target "bad people," nor was it meant to: it targets any person of Mexican and Central American descent who happens to be stopped by law enforcement, U.S. citizens and immigrants alike, regardless of actual status.

### 4. Departures from Normal Procedure in the Consideration of SB 4

Significant departures from the ordinary legislative procedure can be evidence of discriminatory intent, *Veasey*, 830 F.3d at 238, and SB 4 suffered a multitude.[18] Core procedural irregularities are highlighted below and would be confirmed through discovery and at trial.

#### (i) The Senate Process

Right out of the gate, SB 4 was treated as an exceptionally important and urgent bill. Senator Charles Perry filed SB 4 in November 2016 as a pre-filed bill. Exh B., Decl. of E. Rodríguez, ¶ 5; Exh. C, Decl. of Sen. José Rodríguez, ¶ 16. The bill's low number designation meant that it was a priority for the Lt. Governor, Dan Patrick—the same person who had accused immigrants of bringing malaria and leprosy to Texas.[19] On January 31, 2017, Governor Greg Abbott declared banning so-called "sanctuary cities" an emergency item. Matters declared an emergency by the Governor may be considered during the first thirty days of the Legislature. *See* Tex. Const. Art. 3 § 5.

---

[18] *Veasey* considered the following to be "numerous and radical" departures from the regular process in the adoption of SB 14, and relevant evidence of potential discriminatory intent: "(1) getting special permission to file the bill under a low number reserved for the Lieutenant Governor's legislative priorities; (2) Governor Perry's decision to designate the bill as emergency legislation so that it could be considered during the first sixty days of the legislative session; (3) suspending the two-thirds rule regarding the number of votes required to make SB 14 a 'special order'; (4) allowing the bill to bypass the ordinary committee process in the Texas House and Senate; (5) passing SB 14 with an unverified $2 million fiscal note despite the prohibition on doing so in the 2011 legislative session due to a $27 million budget shortfall; (6) cutting debate short to enable a three-day passage through the Senate; and (7) passing resolutions to allow the conference committee to add provisions to SB 14, contrary to the Legislature's rules and normal practice." *Veasey*, 830 F.3d at 238. Many similar aspects marked SB 4's legislative process.

[19] W. Gardner Selby, "Politifact: Patrick has referred to 'invasion' of immigrants," Austin-American Statesman (June 22, 2014), available at http://www.mystatesman.com/news/local-govt--politics/politifact-patrick-has-referred-invasion-immigrants/uaEt4nemiFGDXaKhEk0j0I/ (last visited June 17, 2017); Paul Sweeney, "Party Crasher: Can Houston's king of right-wing talk radio bust into the Texas Senate?," The Texas Observer (Feb. 24, 2006), available at https://www.texasobserver.org/2143-party-crasher-can-houstons-king-of-right-wing-talk-radio-bust-into-the-texas-senate/ (last visited June 17, 2017).

On February 2, 2017, the Senate State Affairs Committee held a daylong committee hearing in which hundreds of people testified. Exh. C, Decl. of J. Rodríguez, ¶¶ 20-22. Despite the volume of testimony, only a few people testified in favor of the bill. *Id*. At the hearing, Senators who opposed the bill were denied a seat at the hearing table—departing from the Senate's typical practice—and the debate was cut short. *Id.*, ¶ 23-27. Tellingly, the Senate had also changed its long-standing "two thirds rule," which had previously required the support of two thirds of the Senate to bring a bill to the floor. *Id.*, ¶¶ 14, 15. Once the rule was eliminated, it effectively eliminated any attempt by minority members to block a bill, including SB 4, from coming to the Senate floor. *Id.*, ¶ 15; *see Veasey*, 830 F.3d at 238.

(ii)  *The House of Representatives Process*

On February 7, 2017, SB 4 was passed to engrossment and sent to the House. SB 4 was referred to the House Committee on State Affairs and was heard on March 15, 2017. Hundreds of people testified in person against the bill. Again, only a few testified in favor of the bill. Exh. B, Decl. of E. Rodríguez, ¶¶ 13. Despite the strength of the opposition, on April 12, 2017, the bill was voted out of the House State Affairs Committee as substituted and sent to Calendars on April 20, 2017, at 2:22 PM. A mere 48 minutes later, the bill was placed on the Emergency Calendar. It is rare for a bill with this much opposition to get out of committee; there is no bill in recent history that spent only 48 minutes in the Calendars Committee this early in the Legislative Session. Exh. B, Decl. of E. Rodríguez, ¶¶ 20-24.

The serious departures from the regular legislative process continued thereafter. On April 24, 2017, the Chairman of the Calendars Committee sought a so-called "calendar rule" for SB 4,

in an attempt to cut-off meaningful policy discussions regarding the bill.[20] *Id.*, ¶¶ 37-38. The vote failed.[21] *Id.* The vote was reconsidered, and it failed again. *Id.* The second vote was verified using a procedure in which the House Clerk goes through the names of each of the voting members of the House and authenticates his or her vote. The vote still failed. It is rare for a calendar rule to fail, but rarer still is the reconsideration of that vote when the outcome was not in doubt. Exh. B, Decl. of E. Rodriguez, ¶¶ 25-36.

On April 26, 2017, the House considered SB 4 on the floor of the chamber. The emotional debate extended until 4:30 AM on April 27, 2017, with 145 amendments submitted. Exh. B, Decl. of E. Rodriguez, Attachment 1; Exh. , Decl. of J. Rodríguez, Attachment 3. Again, the debate contained numerous and radical deviations from normal procedure. First, several points of order were overruled that under normal operating procedures would have been sustained. Exh. B, Decl. of E. Rodriguez, ¶¶ 39-45. This included a point of order concerning the validity of a witness affirmation, which is the same category of point of order that was sustained against a previous "sanctuary cities" bill in 2011. *Id.* Two other points of order pertaining to the bill analysis were also overruled. *Id.* Second, rather than cut off debate utilizing the House rules to move to the previous question, the House moved to use the vote for "Record Vote 456" to be used for all amendments that remained on the Speaker's desk. *Id.* The House has not used this rule suspension for any legislation other than bills on the local and consent calendars. *Id.* This alteration effectively cut-off debate without consideration of Amendments numbered 76 to 145. *Id.* As mentioned above, failure to *adopt* ameliorative amendments can be

---

[20] A "calendar rule" is typically sought to control and prepare for debate of the bill in question, as well as to pre-select amendments and their order.

[21] The calendar rule requires two-thirds to pass, and in both instances failed to garner the necessary votes.

evidence of discriminatory intent; here, dozens of ameliorative amendments were not even *considered*. *See Veasey*, 830 F.3d at 236.

The tenor of the debate was also a major departure from the normal practices of the Texas House. SB 4 proponents repeatedly used pejorative terms such as "illegals" to describe the targets of the legislation. Legislators were repeatedly heard laughing at the demise of ameliorative amendments, which lead to one lawmaker commenting about the disrespectful behavior during the debate. Exh. B, Decl. of E. Rodriguez, ¶ 40. Throughout debate, opposition legislators were heckled by proponents of SB 4. Exh. B, Decl. of E. Rodriguez, ¶ 41; Exh. C, Decl. of J. Rodríguez, ¶ 33.

### 5. *Substantive Departure in the Adoption of SB 4*

In addition to the procedural deviations from the regular process, the consideration of the so-called "Schaeffer amendment" was a substantive deviation from the practice of the Texas House of Representatives. *See Arlington Heights*, 429 U.S. at 267. An amendment proposed by Representative Matt Schaffer became the turning point of the debate. The Schaeffer amendment would have re-drafted the House version of the bill to be much closer to the Senate bill in substance, therefore diminishing the chances of a conference committee. Exh. B, Decl. of E. Rodriguez, ¶ 59. Most importantly, Chairman Geren had made it clear that the House version of the bill applied only to individuals who were arrested; by contrast, the "Schaeffer amendment" would allow immigration inquiries at any "lawful detention." *Id*.

House Leadership proposed a deal to the opposing caucuses and internal debate began about its benefits. Exh. B, Decl. of E. Rodriguez, ¶ 60. The deal offered to remove the Schaeffer amendment from consideration and allow multiple other amendments to be considered. *Id*. After much internal debate amongst the caucuses, negotiations ensued. However, the supposed deal

was never really a genuine possibility, as Rep. Schaeffer ultimately refused to remove his amendment from consideration under any circumstances. Exh. B, Decl. of E. Rodriguez, ¶ 61. The Schaeffer amendment itself was subject to a point of order on germaneness and that it reversed the purpose of the bill. Exh. B, Decl. of E. Rodriguez, ¶ 60. Importantly, under longstanding rules, the Schaeffer amendment should have been considered a substantial substitute and, thus, should have been pre-filed. *Id*. But, compounding the deluge of irregularities that marked the SB 4 process, none of these questions of order were meaningfully considered by the House leadership or acted upon.

In sum, SB 4 was subject to tremendous public opposition, and nonetheless passed out of both committees with unprecedented swiftness. Typically, a bill spends weeks in the Calendar's Committee, but SB 4 spent less than an hour. Points of order that had been honored in previous legislatures were disregarded. Nearly every single amendment offered by legislators who are themselves racial minorities was rejected. And, a deeply controversial, poorly vetted amendment was adopted in disregard of the normal procedural rules. Throughout, the SB 4 debate was typified by name-calling, hateful rhetoric and derision. All of these deviations from the normal procedure evidence that the Legislature leadership was committed to passing SB 4, at all costs, without meaningful deliberation or input from the opposition, including and especially Latino lawmakers.

At trial, Plaintiffs intend to present additional evidence of these departures from normal procedure and substance. Plaintiffs have a substantial likelihood of success on the merits in their argument that, under the *Arlington Heights* factors, SB 4 was adopted with an impermissible, discriminatory intent and therefore violates the Equal Protection Clause of the Fourteenth Amendment.

**B.** **SB 4 Impermissibly Burdens First Amendment Rights**

Plaintiffs are also substantially likely to succeed on their First Amendment claims.

*1. SB 4 Censors Speech About Important Public Issues*

By banning local governing bodies, local law enforcement agents, district attorneys and campus police departments from "endors[ing]" any policy that "prohibits or materially limits the enforcement of immigration laws," *see* Tex. Gov't Code § 753.053(a)(1), SB 4 seeks to censor speech about issues of great concern to the public in Texas. Backed by significant civil penalties and the possibility of removal, *see id.* §§ 752.056; 752.0565, this "Endorsement Ban" has already chilled speech of top officials in El Paso County. Exh. A, Decl. of J. Bernal, ¶¶ 9-11.

The Supreme Court has warned against any "'highly paternalistic approach' limiting what people may hear" because it threatens to undermine the very fabric of our representative democracy. *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 223 (1989).[22] Accordingly, efforts to control speech by local leaders, particularly an "elected official's speech to his constituency," are viewed with great suspicion; such regulation is only permitted if "narrowly tailored to address a compelling governmental interest." *Jenevein v. Willing*, 493 F.3d 551, 558 (5th Cir. 2007); *see also Republican Party of Minnesota v. White*, 536 U.S. 765, 775 (2002) ("to show that [a speech ban] is narrowly tailored, [the government] must demonstrate that it does not unnecessarily circumscribe protected expression" (citation and internal quotations omitted)). The Endorsement Ban—which is overly broad,[23] vague,[24] and discriminates based on viewpoint[25]—cannot satisfy this heavy burden and must be struck down.

---

[22] *Accord Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994) ("At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal.").

[23] "[T]he constitutional defect of an overbroad restraint on speech lies in the risk that the wide sweep of the restraint may chill protected expression." *Serafine v. Branaman*, 810 F.3d 354, 364

TOPEF and MOVE each engage in community organizing activities in San Antonio, focused on giving voice to and building power for underrepresented communities of color. Exh. D, Decl. of M. Tremillo, ¶ 7; Exh. E Decl. of D. Golloway, ¶ 4. There is no doubt that the activities of TOPEF and MOVE—including educating members and the public about critical issues of the day, sponsoring protests and other large public events, and encouraging active civil participation—are entitled to the highest degree of First Amendment protection. *See, e.g.*, *Meyer v. Grant*, 486 U.S. 414, 421 (1988) (organizing to "achieve political change" constitutes "core political speech"); *Cox v. Louisiana*, 379 U.S. 536, 552 (1965) ("Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy."). But the toxic combination of the racially enflamed context in which SB 4 was passed, the unbridled discretion permitted to law enforcement under SB 4 and a retaliatory lawsuit brought by the State, has created an unconstitutional drag on their First Amendment-protected rights to freely associate, assemble and petition. U.S. Const. amend I.

TOPEF and MOVE reasonably fear not just retaliation from the State directly, but the prospect of emboldened local officials using SB 4 as a shield to seek "papers" from TOPEF and

---

(5th Cir. 2016) (citation and internal quotations omitted). Here, as there is no sign that the Endorsement Ban has *any* legitimate application, at least a "substantial number of its applications are unconstitutional." *Id*. at 364-370.

[24] SB 4 offers no explanation for exactly what it means for a local official to "endorse" a policy that "materially limits" the enforcement of "immigration laws." *See* Tex. Gov't Code § 753.053(a)(1). "[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms," improperly chilling expression. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972); *see generally Long v. State*, 931 S.W.2d 285 (Tex. Crim. App. 1996) (striking down anti-"stalking" provision for being unconstitutionally vague).

[25] "Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes this essential right." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

MOVE members *because* they are engaged in litigation, protests and other organizing activities.[26] Already, staff and volunteers from TOPEF and MOVE have voiced concerns about appearing in the public sphere for fear of being targeted by local law enforcement or state officials. Exh. D, Decl. of M. Tremillo, ¶¶ 12-14; Exh. E, Decl. of D. Golloway, ¶ 21. This fear is amplified given each organization's racially and ethnically diverse membership, which includes citizens and non-citizens alike. *Id*. Even worse, the threat of official retribution for speaking out is no longer hypothetical. Just days after challenging SB 4 in this Court, the State of Texas retaliated by suing TOPEF, complaining that the community organizing group "characterizes SB 4 as a cruel and racially animated law." First Amended Complaint, ¶ 223, *Texas, et al. v. Travis County, et al.*, 5:17-CV-00425-SS (W.D. Tex.—Austin Division).[27]

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). As access to the courts is protected by the First Amendment,[28] federal courts have specifically held that retaliatory lawsuits, like that brought by Texas against TOPEF, are unlawful. *See, e.g.*, *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997) ("numerous claims brought under *Mt. Healthy*—both in this Circuit and in others—have involved fact patterns in which the government took retaliatory action in response to an

---

[26] In fact, there is record evidence that Immigration and Customs Enforcement conducted raids in Central Texas in February to retaliate against Austin residents for certain immigration-related policies and statements made by local officials. *See* City of Austin's Complaint in Intervention at ¶¶13-20 (ECF No. 37).

[27] Texas offers no other explanation for why TOPEF should be a named defendant, other than that TOPEF sought to vindicate the rights of itself and its members in federal court. *See id.* ¶¶ 16, 111-12, 223.

[28] It is well established that "[t]he right of access to the courts is . . . one aspect of the right of petition." *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Jackson v. Procunier*, 789 F.2d 307, 310 (5th Cir. 1986).

individual's filing of a lawsuit"); *Harrison v. Springdale Water & Sewer Commission*, 780 F.2d 1422, 1428 (8th Cir. 1986) ("state officials may not take retaliatory action against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future").

The Supreme Court has found that the reasonable *expectation* of government-sponsored retaliation to First Amendment-protected activities—with retaliation being broadly defined across different contexts—can create an impermissible chilling effect. *See, e.g.*, *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 739 (2011) (requiring political group to "change its message" or "refrain from speaking" to avoid award of public funds to political adversary, allowing state-funded response, created "inherent" chill upon speech); *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 198 (1999) (striking down name badge requirement for paid canvassers because heightened threat of "heat of the moment' harassment" in public square necessarily "discourages participation in the petition circulation process"); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (forcing NAACP to disclose membership list would chill freedom of association, given threat of government retaliation in hostile political environment and likelihood that members would withdraw). This threat is compounded here, as SB 4 grants local officials unbridled discretion to target speakers of certain viewpoints, thereby "sanction[ing] a device for the suppression of the communication of ideas and permit[ting] the official to act as a censor." *Cox*, 379 U.S. at 557; *see also Bourgeois v. Peters*, 387 F.3d 1303, 1317 (11th Cir. 2004) (striking down "preemptive" search policy granting local officers "unbridled discretion" to target unpopular protesters).

These First Amendment burdens upon TOPEF, MOVE and their members are not likely to withstand strict scrutiny and are already causing irreparable injury, providing yet another reason SB 4 must be immediately enjoined.

## C. SB 4 Violates the Fourteenth Amendment Due Process Clause

"Laws that regulate persons or entities"—such as SB 4—"must be sufficiently clear 'that those enforcing the law do not act in an arbitrary or discriminatory way.'" *Beckles v. United States*, 137 S.Ct. 886, 894 (2017) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012); *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926).

The void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way. *Grayned*, 408 U.S. at 108–109. Accordingly, a law should be struck down if it either does not give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited," or fails to provide "explicit standards" so as to prevent "arbitrary and discriminatory applications." *Grayned*, 408 U.S. at 108–109. Moreover, because SB 4 inhibits the exercise of constitutionally protected rights—including the right to free speech and of association—and contains both civil and criminal provisions, it is subject to a "more stringent" vagueness test.[29] *Beckles*, 137 S.Ct. at 894*; Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 99 (1982).

---

[29] SB 4 is also subject to a stringent vagueness test because it contains "quasi-criminal" provisions, most notably the potential removal of elected officials from office. SB 4, Sec. 752.056. A provision is "quasi-criminal" if it imposes "significant civil and administrative penalties, including fines and license revocation." *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 420 (5th Cir. 2001). Section 752.056 of SB 4 contemplates the potential removal of elected officials from office—sheriffs, mayors, and city council members, to name a few. The

SB 4 fails both prongs of the void for vagueness test. *First,* SB 4 contains several vague terms and provisions that leave those subject to its mandates guessing as to their meaning and infects the entire statutory scheme. To illustrate:

- SB 4 provides that cities, counties, and university police departments may not "endorse" a policy of not cooperating with immigration authorities, yet fails to define what it means by "endorse," *see* Tex. Gov't Code 752.053(a)(1).

- Local governmental bodies, local leaders and employees, and local law enforcement agents, including attorneys, may not "materially limit the enforcement of immigration laws," yet the law fails to define what it means to "materially limit," *see id.* § 753.053(a)(1).

- Localities may not have a "pattern or practice" that demonstrates a prohibition or material limitation of immigration enforcement, yet entities are not given notice of what constitutes such, *see id.* § 753.053(a)(2).

- The term "policy" is defined in a way that is circular and confusing: Under § 752.051(6), "'Policy' includes a formal, written rule, order, ordinance, or *policy* and an informal, unwritten *policy*" (emphasis added).

- Although formal detainer requests are typically made through Immigration Form I-247, SB 4 takes their scope to an unprecedented level and requires that all law enforcement agencies in the State comply with *any* "federal government request to a local entity to maintain temporary custody of an alien, including a United States Department of Homeland Security Form I-247 document or a similar or successor form," without defining or at all cabining the phrase "request," *see id.* § 772.0073(a)(2).

---

bill also imposes financial penalties exceeding $25,000 per day. SB 4, Sec. 752.056(a)(1)-(2). These extraordinary penalties are "quasi-criminal" sanctions. *See Women's Med. Ctr.*, 248 F.3d at 422.

- Local entities must allow federal immigration officers to enter jails to "conduct enforcement activities," but there is no explanation of what precisely those "activities" include, *see id.* § 752.053(b)(4).

- Local entities may refuse to assist or cooperate with immigration officials if the assistance or cooperation sought "occurs at a place of worship," yet there is no definition of what constitutes a "place of worship," *see id.* § 752.053(c).

In full, Plaintiffs El Paso County, Sheriff Wiles, and County Attorney Bernal—and indeed all law enforcement entities and officers subject to SB 4's harsh penalties—have no reasonable way of knowing what they can and cannot do under SB 4's complex and vaguely defined scheme.

*Second*, SB 4 is also devoid of the "explicit standards" necessary to prevent "arbitrary and discriminatory applications," particularly of the new detainer rules. *Grayned*, 408 U.S. at 108–109. SB 4 provides that if a person who is detained provides "proof that the person is a citizen of the United States or that the person has lawful immigration status," Tex. Code Crim. P. § 2.251(b), they are entitled to release—an exception that, as written, is nearly impossible to administer in practice. Accordingly, the Fourth Amendment concerns discussed below are exacerbated by the lack of any workable standards to understand when a person held unlawfully must be released.

"Lawful immigration status" is not a term defined in SB 4, the Immigration and Nationality Act, 8 U.S.C. § 1255, *et seq.* ("INA"), or any of the immigration laws and regulations. *See* Dkt. No. 24-1, pp. 27-28. Law enforcement officers will simply not be able to know whether a person may have "lawful immigration status" or otherwise be authorized to be in the country because whether a person has immigration authorization to be in the country is a

factually and legally complex determination. There are over 180 different types of visas that may grant authorization to be in the country. *See, e.g.*, 9 FAM 402.1-2, Introduction to Non-Immigration Visa Classification; 8 U.S.C. § 1101(a)(15)(C); 8 U.S.C. § 1182(d)(4)(C); 8 U.S.C. § 1223); 8 U.S.C. § 1258. A person may be in the process of applying for one or more forms of immigration relief, but not yet have received such relief. *See, e.g.*, 8 U.S.C. § 1158(d)(2); 8 C.F.R. § 208.7, § 274a.12(c)(8)). A person may have "deferred action" for a number of reasons and be authorized to reside or reside and work in the United States. 8 C.F.R. §274a.12(c)(14); Instructions for USCIS Form I-765, Application for Employment Authorization, *"Who May File Form I-765?*," 8.E "Deferred Action--(c)(14)." A person born outside the United States may be have acquired U.S. citizenship for a number of reasons and may not have a document to prove it. 8 U.S.C. §§ 1401(c)-(h).

Further, a person may be a United States citizen or have authorization to be in the country but not have a document to prove it—and SB 4 provides no explanation for what local officials are supposed to do in that situation. SB 4 lists "a Texas driver's license or similar government-issued identification" as "proof" of a person's United States citizenship or lawful immigration status. Tex. Code Crim. P. § 2.251(b). Under immigration law, however, it is not the document that grants immigration status or authorization. For instance, a person may be a Legal Permanent Resident and simply be waiting for the "green card" to arrive in the mail; a person who lost or had their certificate of citizenship, green card, or visa stolen may still retain his or her immigration status. *See, e.g.,* USCIS Form I-90, Application to Replace Permanent Resident Card, Part 1, "Reason for Application" (providing for replacement of legal permanent resident card that has been lost, stolen, misplaced, or otherwise contains incorrect or inaccurate data).

There is simply no way for the more than 76,000 licensed peace officers in Texas, including Plaintiff Sheriff Wiles and his subordinates, to be able to enforce this vague provision of SB 4 adequately.[30] By failing to provide clear standards of implementation, SB 4 "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 109.

Because all these vague and undefined terms render implementation of SB 4 either practically impossible or raise a serious risk of arbitrary and discriminatory applications, SB 4 is substantially likely to be held unconstitutionally vague.

### D. SB 4 Requires Unreasonable Seizures That Violate the Fourth Amendment

Similarly, Plaintiffs have a high likelihood of success on the merits of their Fourth Amendment claim. By requiring compliance with all immigration detainers, SB 4 will—unless enjoined by this court—necessarily result in unconstitutional seizures in violation of the Fourth Amendment. Tex. Code Crim. P. § 2.251; *Arizona v. United States*, 567 U.S. 387 (2012); *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015).

Under long-standing Fourth Amendment jurisprudence, there must be particular determination that probable cause exists to support detaining of an individual. *Arizona*, 132 S. Ct. at 2509; *Chadbourne*, 793 F.3d at 217. Continuing custody of an individual in response to a detainer request is a new "seizure" for purposes of the Fourth Amendment and must be supported by probable cause. *Chadbourne*, 793 F.3d at 217, n.3 ("courts have uniformly held that probable cause is required" for an immigration detainer) *accord Mercado v. Dallas Cty.*,

---

[30] According to the Texas Commission on Law Enforcement, there are currently 76,821 licensed peace officers in the state, employed at 2,659 active TCOLE agencies. Texas Commission on Law Enforcement, Current Statistics, *available at*: https://www.tcole.texas.gov/content/current-statistics (last visited June 11, 2017).

2017 WL 169102, at *5-6 (N.D. Tex. Jan 17, 2017). Immigration detainers must additionally comply with the INA, which requires that warrantless arrests be made only when an immigration officer has reason to believe that the arrestee is "likely to escape before a warrant is obtained." 8 U.S.C. 1357(a)(2); *Moreno v. Napolitano*, 213 F.Supp. 3d 999, 1005-06 (N.D. Ill. 2016).

Accordingly, multiple federal courts—including in the Western District of Texas—have held that a local entity's compliance with an ICE detainer request is voluntary, not mandatory. *See Mercado v. Dallas Cnty., Tex.*, 15-CV-34831-D WL 169102 (N.D. Tex. Jan. 17, 2017), at *9; *Trujillo Santoyo v. Bexar Cnty., Tex., et a.*, No. 5:16-CV-00855-OLG, at 12 (June 5, 2017). *See also Galarza v. Szalczyk*, 745 F.3d 634,638 (3rd Cir. 2014) (holding that law enforcement agencies have no obligation to comply with ICE detainers); *Chadbourne*, 793 F.3d at 217-19 (explaining that independent probable cause determination is necessary to detain a person pursuant to an ICE detainer request); *Santos v. Frederick Cnty. Bd. Of Comm'rs*, 725 F.3d 451, 464 (4th Cir. 2013) (state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law).

But, SB4 removes the localities' discretion and makes compliance with *all* ICE detainers mandatory (with only some narrow exceptions[31]), and in fact makes failure to comply a Class A misdemeanor. Tex. Code Crim. P. §§ 2.251, 5.02(b).[32] Contrary to well-established precedent, SB 4 requires that local law enforcement honor *any* "request" from the federal government to

---

[31] The only exception is if the person subject to the detainer "has provided proof that the person is a citizen of the United States or that the person has lawful immigration status in the United States, such as a Texas driver's license or similar government-issued identification." Tex. Code Crim. P. § 2.251(b). *See* Section I.C, *supra*, for an explanation as to why this exception is unconstitutionally vague and thus unworkable.

[32] In Texas, law enforcement agencies comply with the vast majority of ICE detainers. In fact, as of 2016, Texas led the country in terms of compliance with ICE detainers. TRAC Immigration, *Has cooperation by State and Local Law Enforcement Agencies Improved ICE's Apprehension Numbers?*, August 12, 2016, *available at*: http://trac.syr.edu/immigration/reports/433/ (last visited June 13, 2017).

keep any "alien" in custody without regard to constitutional protections. Tex. Code Crim. P. §
2.251; Tex. Gov't Code Sec. 772.0073(a)(2). Therefore, SB 4 will result in seizures that are not
supported by probable cause.[33]

Before SB 4, local entities were free to decide whether to honor specific ICE detainer
requests based on their own local public safety priorities, or what policy or practice to follow
regarding such compliance (e.g., whether the detainer request is supported by *criminal* probable
cause). By requiring *all* law enforcement agencies in Texas to honor *all* ICE detainer requests,
SB 4 would make the unconstitutional "obvious consequence" noted by this Court the official
law of this State. *Trujillo Santoyo v Bexar Cnty., Tex., et al.*, No. 5:16-CV-00855-OLG, at 12
(June 5, 2017). Entities would be forced to implement a policy that necessarily will result in
constitutional violations almost on a daily basis. *See Chadbourne*, 793 F.3d at 217. This Court
should not let that happen.

## II.  SB 4 will Irreparably Harm the Plaintiffs

The violation of Plaintiffs' rights are substantial, and the injuries caused by SB 4 are
irreparable. As described above, SB 4 violates constitutional rights protected by the First, Fourth
and Fourteenth Amendments, which constitutes irreparable injury in and of itself. *Elrod v. Burns*,
427 U.S. 347, 373 (1976) (plurality opinion). It is settled law that a violation of constitutional

---

[33] Of course, ICE detainers do not always meet Fourth Amendment requirements of probable
cause. In fact, this court has found a detention pursuant to a warrantless ICE detainer to be
unconstitutional. *Trujillo Santoyo v. Bexar Cnty., Tex., et al.*, No. 5:16-CV-00855-OLG, at 12
(June 5, 2017). In its analysis of whether Mr. Santoyo's detention by Bexar County officials
raised constitutional concerns, this Court explained that an "obvious consequence" of Bexar
County's practice of honoring ICE detainer requests "is that individuals who are the subjects of
ICE detainers will be detained by County officials who make no assessment, and have no
knowledge, regarding whether probable cause exists that those individuals have committed any
crime." SB 4 seeks to make such practices of honoring ICE detainer requests without any
assessment of probable cause the law of the land in Texas. *See* Tex. Code Crim. P. § 2.251.

rights, "for even minimal periods of time," satisfies the requirement of irreparable injury for purposes of a preliminary injunction. *Id.*; *Laredo Rd. Co. v. Maverick Cnty.*, 389 F.Supp. 2d 729, 748, n. 20 (W.D. Tex. 2005) ("any harm[s] to the Plaintiff's constitutional rights do rise to the level of an irreparable harm"). Beyond constitutional deprivations caused by SB 4, it also causes a distinct irreparable harm to the El Paso County Plaintiffs through confinement, removal from office, and substantial monetary penalties. *See generally* Exh. A, Decl. of J. Bernal, ¶ 11.

## III. The Balance of Hardships and the Public Interest Favor the Issuance of a Preliminary Injunction

Unlike the irreparable harm that Plaintiffs will suffer if an injunction is not granted, Texas cannot reasonably argue harm if the injunction is granted. By maintaining the *status quo*, the chilling effect on TOPEF and MOVE will be lessened, local governing bodies and officials can continue to choose how and when to use their scarce resources to assist in the enforcement of federal immigration law, and all parties will have time to engage in a deliberative process. By contrast, allowing hasty enforcement of a statute with so many threats to the public—and particularly to a historically marginalized group like Latinos—undermines the greater good. *See generally, Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 623-27 (5th Cir. 1985).[34]

## IV. No Rule 65(C) Surety is Required

Although Fed. R. Civ. P. 65(c) contemplates the posting of security by the parties seeking a preliminary injunction, courts have long recognized that there are exceptions when the balance of the equities weighs in favor of the parties seeking the injunction, or where the

---

[34] Because SB 4 contains interdependent sections and provisions, it should be enjoined in its entirety, its severability clause notwithstanding. *See Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 537 (5th Cir. 2013).

nature of the action precludes monetary harm to defendants. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996); *see also Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3rd Cir. 2010); *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins.*, 714 F.3d 424, 431 (6th Cir. 2013). Here, given the nature of the relief requested, no security is necessary. Plaintiffs respectfully request the Court not to require the posting of security.

## CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin SB 4 in its entirety.

Respectfully submitted,

By: *Efrén C. Olivares*

Efrén C. Olivares
Texas Bar No. 24065844
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
T: (956) 787-8171
efren@texascivilrightsproject.org

Mimi Marziani
State Bar No. 24091906
Texas Civil Rights Project
1405 Montopolis Drive
Austin, Texas 78741
T: (512) 474-5073
mimi@texascivilrightsproject.org

Attorneys for Plaintiffs TEXAS ORGANIZING PROJECT EDUCATION FUND and MOVE SAN ANTONIO

GARZA GOLANDO MORAN

Jose Garza
Attorney-In-Charge
garzpalm@aol.com

Texas Bar No. 07731950
Michael Moran
michael@ggmtx.com
State Bar No. 2409285
Martin Golando
Martin.golando@gmail.com
State Bar No. 24059153
115 E. Travis St., Ste. 1235
San Antonio, Texas 78205
(210) 892-8543
Attorneys for Plaintiffs EL PASO COUNTY;
RICHARD WILES, SHERIFF OF EL PASO
COUNTY; and JO ANNE BERNAL, COUNTY
ATTORNEY OF EL PASO COUNTY

## CERTIFICATE OF SERVICE

I certify that, on June 19, 2017, I filed the foregoing Memorandum in Support of Plaintiffs'
Request for a Preliminary Injunction via the Court's ECF/CM system, which will serve a copy
on all counsel of record.

*Efrén C. Olivares*

Efrén C. Olivares