**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| CITY OF EL CENIZO, TEXAS, *et al.*; | § | |
|     Plaintiffs, | § | |
| | § | |
| CITY OF AUSTIN, *et al.*, | § | |
|     Plaintiff-Intervenors, | § | CIVIL ACTION NO. 5:17-cv-404-OLG |
| v. | § | |
| | § | |
| STATE OF TEXAS, *et al.*, | § | |
|     Defendants. | § | |

## CITY OF AUSTIN'S OPPOSED MOTION FOR PRELIMINARY INJUNCTION

TO THE HONORABLE JUDGE ORLANDO L. GARCIA:

    The City of Austin ("Austin") files this motion for preliminary injunction, and provides the following evidence and argument in support. In addition, Austin joins the application for preliminary injunction filed by plaintiffs City of El Cenizo, *et al.* (Docs. 24 through 24-8).

## INTRODUCTION

    1.    Senate Bill No. 4 threatens the fundamental liberties of Texans and their local governments. By seeking to turn police into immigration agents, the law destabilizes the work of cities and counties to provide for the public health, public safety, and general welfare of their constituents. By telling the people of the world that Texas law enforcement officers may investigate and detain them for purposes of federal immigration enforcement, the State has threatened irreparable harm to local, state, and even national economy. Because SB 4 contradicts established law and will likely impose tremendous negative impacts on the local community, Austin seeks immediate injunctive relief to preserve the status quo before a trial on the merits can be conducted.

2.     Like El Cenizo, Maverick County, and Texas LULAC, Austin argues that SB 4 violates the Constitution's Supremacy Clause, the First Amendment, the right to Equal Protection, and the right to Due Process. Austin joins with the El Cenizo motion in regard to these arguments, and incorporates those arguments as summarized in Doc. 24-1. Austin writes separately to make additional legal arguments under state and federal law, and to emphasize that the balance of harms favors immediate injunctive relief to prevent SB 4 from taking effect.

## ADDITIONAL EVIDENCE

Austin attaches and hereby incorporates the following exhibits in support of its motion for a preliminary injunction:

| | |
|---|---|
| Exhibit 1: | Declaration of Gregorio Casar |
| Ex. 1-A: | Declaration of Giovanni Mondragon |
| Ex. 1-B: | Declaration of Jassary Rico Herrera |
| Ex. 1-C: | Declaration of Jordy Balderas |
| Ex. 1-D: | Declaration of Regina Rogoff |
| Ex. 1-E: | Declaration of Kelly White |
| Ex. 1-F: | Declaration of Susanna Vivanco |
| Ex. 1-G: | Declaration of Shoshana Krieger |
| Exhibit 2: | Declaration of Delia Garza |
| Ex. 2-A: | Declaration of Larkin Tackett |
| Ex. 2-B: | Declaration of Cristopher Rubio |
| Exhibit 3: | Declaration of Steve Adler |
| Exhibit 4: | Declaration of Brian Manley |
| Exhibit 5: | Declaration of Sabino Renteria |
| Exhibit 6: | Declaration of Jacqueline Watson |
| Exhibit 7: | Declaration of Roland Swenson |
| Exhibit 8: | Declaration of Ben Johnson |
| Exhibit 9: | Public Statements by Governor Greg Abbott |
| Exhibit 10: | 2016 ICE Enforcement and Removal Operations Report |
| Exhibit 11: | Attorney General Memo Re: Sanctuary Jurisdictions |
| Exhibit 12: | Transcript: Judge Austin Describing Retaliatory Raids |
| Exhibit 13: | ICE "Fact Sheet" (Feb. 13, 2017) |

Austin relies upon and hereby incorporates the following exhibits filed in support of the El Cenizo Plaintiffs' application for a preliminary injunction:

| | |
|---|---|
| Doc. 24-2: | Declaration of Roxana C. Bacon |

Finally, Austin hereby seeks judicial notice of the 2014 Pew Research Center Report, "Overall Number of U.S. Unauthorized Immigrants Holds Steady Since 2009," pursuant to the Federal Rules of Evidence, Rule 201, and as described separately in a concurrently filed motion.

## ADDITIONAL FACTS

### I.          The Legacy of Anti-Hispanic Discrimination in Texas

3.          The State Legislature has utilized its power over electoral districts to subjugate and repress Hispanic and African-American Texans, to the benefit of white voters. As one Court found, Texas has a "history of failures to comply" with the Voting Rights Act; "in the last four decades, Texas has found itself in court every redistricting cycle, and each time it has lost." *See Texas v. U.S.*, 887 F.Supp.2d 133, 161 (D.D.C. 2012).

4.          Texas has repeatedly drawn electoral maps to disadvantage Hispanic and African-American voters. For example, after the 2010 Census showed that Texas had grown by approximately 4.3 million people over a decade, and that approximately 89% of that growth was due to a growing population of Hispanic, African-American, and Asian-American residents, the Texas Legislature re-drew the electoral maps for State House, State Senate, and Congressional districts. *Texas v. U.S.*, 887 F.Supp.2d at 156 (noting that Hispanic Texans constituted 65% of the population growth). Instead of drawing the maps to reflect the increased share of Hispanic, African-American and Asian-American constituencies, however, the Texas Legislature drew a map that actually decreased the voting power of African-American and Hispanic Texans. *Id.* at 158.

5.          The discriminatory impact of Texas's redistricting plans was not an unintended consequence of a legitimate attempt to re-draw the maps, but the result of discriminatory intent.

For example, the Legislature systematically withdrew major economic institutions—such as stadiums, transportation centers, and universities—from the districts of Black and Hispanic congressional representatives, while maintaining similar institutions in the districts of white representatives. *Id.*, 887 F.Supp.2d at 160. Although at trial the State argued that this disparate impact was a "coincidence," the District Court found the argument entirely unconvincing, ruling that the redistricting was performed with a discriminatory intent. *Id.* at 161 ("we are … persuaded by the totality of the evidence that the plan was enacted with discriminatory intent").

6.    In addition to racially discriminatory gerrymandering, the State has effectuated discriminatory voter identification laws with the specific intent of disempowering Hispanic and African-American Texans. *See Veasey v. Abbott*, ___ F.Supp.3d ___, 2017 WL 1315593 at *5 (S.D.Tex. Apr. 10, 2017) ("*Veasey III*"). Specifically, the Southern District of Texas found that a 2013 Texas voter identification law imposed specific burdens on Texans living in poverty and disproportionately impacted African-American and Hispanic residents. *See Veasey v. Abbott*, 830 F.3d 216, 264-65 (5th Cir. 2016) ("*Veasey II*") (upholding findings of fact). As the Fifth Circuit later summarized, the restrictions imposed by the voter identification rules are especially pernicious in the context of "Texas's legacy of state-sponsored discrimination." *Id.* at 265. The Fifth Circuit summarized this legacy, from the 1970s to the present:

> As late as 1975, Texas attempted to suppress minority voting through purging the voter rolls, after its former poll tax and re-registration requirements were ruled unconstitutional. It is notable as well that in every redistricting cycle since 1970, Texas has been found to have violated the Voting Rights Act with racially gerrymandered districts. Furthermore, record evidence establishes that the Department of Justice objected to at least one of Texas's statewide redistricting plans for each period between 1980 and the present, while Texas was covered by Section 5 of the Voting Rights Act. Texas is the only state with this consistent record of objections to such statewide plans. Finally, the same Legislature that passed SB 14 also passed two laws found to be passed with discriminatory purpose.

*Veasey II*, 830 F.3d at 239-340 (citations omitted).

7.     Similar to the holdings of discrimination in redistricting and voter identification, federal courts have also noted that anti-sanctuary city legislation is "racially charged." *See Veasey v. Perry*, 71 F.Supp.3d 627, 702 (S.D.Tex. 2014) ("*Veasey I*"). In 2011, in response to the 2010 census and substantial population gains by Hispanic Texans, the Texas Legislature introduced a number of anti-Hispanic laws, including an unsuccessful effort to abolish sanctuary cities. *Id.*

**II.     SB 4 Targets Hispanic Foreign Nationals Who Cross the Texas Border**

8.     On January 31, 2017, Governor Greg Abbott made the passage of an anti-sanctuary city law one of his priorities for the 2017 legislative session. *See* Ex. 9-A at 4-5 (State of the State address). In his prepared remarks, the governor complained that the federal government was not preventing undocumented immigrants from crossing the Texas border and claimed that some law enforcement officials "are openly refusing to enforce existing law." *Id.* at 4. He announced that "this is the session we will ban sanctuary cities." *Id.* at 5.

9.     In the first week of February 2017, Governor Abbott participated in a radio interview with nationally-syndicated host Mark Levin. *See* Ex. 9-C. Abbott specifically identified Austin and Travis County as the source of "offensive" "sanctuary city policies." *Id.* Abbott also reiterated his concern about immigrants who physically walk across the Texas border. *Id.*

10.     On May 7, 2017, after signing SB 4 into law, Governor Abbott issued a press release stating that he had "banned sanctuary cities." Ex. 9-D. The following day, Governor Abbott appeared on *Fox & Friends* and reiterated that the targets of SB 4 are "people … coming into the United States, especially across the border in Texas." Ex. 9-E.

11.     The people who walk across the Texas border with Mexico are overwhelmingly of Hispanic descent. The Department of Homeland Security reports that in 2016, over 96% of persons apprehended while crossing the southern border of the United States were from Hispanic nations,

including foreign nationals from Mexico, Guatemala, Honduras, El Salvador, the Dominican Republic, Columbia, Ecuador, and Nicaragua. *See* Ex. 10 at 12. In general, Mexicans make up approximately one-half of the undocumented immigrants in the United States, and Hispanic immigrants from Central and South America and the Caribbean make up another 25% of the undocumented immigrant population. *See* Motion for Judicial Notice, Ex. A (Pew Research Center Report at 14).

### III. Texas and ICE Collaborated to Punish Austin and Travis County

12. On January 20, 2017, newly elected Travis County Sheriff Sally Hernandez issued a written policy describing when the Travis County Sheriff's Office would honor an Immigration and Customs Enforcement (ICE) civil detainer request. *See* Doc. 35-2 ¶¶ 8-9; *see also* Doc. 33-2 ("Travis County Sheriff's Office Policy on Cooperation with U.S. Immigration and Customs Enforcement"). Instead of a blanket policy of fulfilling or denying such requests, Sheriff Hernandez announced that she would fulfill requests if supported by a judicial warrant or court order; if an individual was convicted of certain felonies; or if justice would be served by continued detention. Doc. 35-2 ¶ 8; *see also* Doc. 33-2 ¶¶ 2, 5.

13. Immediately thereafter, Governor Greg Abbott announced that he would withhold grant funding for Travis County in retaliation for Sheriff Hernandez's public statements. Ultimately, Texas denied Travis County $1.5 million in previously awarded funds that would have supported programs for victims of domestic violence, veterans, and other at-risk communities. Doc. 35-2 ¶ 10.

14. On February 2, 2017, Governor Abbott announced that "Texas will hammer Travis County" because of perceived "sanctuary" policies. Ex. 9-C. He made similar "hammer" threats on a radio broadcast. Ex. 9-B (also stating, "This is offensive what is going on in Austin").

15.     On or about February 6, 2017, ICE began a series of raids in Central Texas that sent waves of terror through immigrant communities in Austin and beyond. *See* Ex. 13 (Feb. 13, 2017 ICE "Fact Sheet"); *see also* Ex. 1-A ¶¶ 5-9; Ex. 1-B ¶¶ 4-8; Ex. 1-C ¶¶ 5-11; Ex. 1-D ¶¶ 4-5; Ex. 1-E ¶¶ 4-5, 19-50; Ex. 1-F ¶ 6; Ex. 1-G ¶ 7.

16.     Over one month later, ICE officials admitted in open court in front of United States Magistrate Judge Andrew W. Austin of the Western District of Texas, that the February ICE raids were conducted, in part, to retaliate against Sheriff Hernandez and her new policy of  not automatically complying with an ICE detainer request. Ex. 12 at 26:9-26:21.

### IV.     The February ICE Raids Inflicted Grievous Injuries on Texas Residents

17.     The February ICE raids impacted every aspect of life for undocumented immigrants and their family members. Many members of the Austin community felt they needed to minimize their public exposure. As a result, sick children missed essential health appointments. Ex. 1-C ¶ 9. Students were withdrawn from school. Ex. 2-A ¶ 5; Ex. 2-B ¶¶ 2-3. Tenants declined to complain about uninhabitable conditions. Ex. 1-G ¶ 7. Parishioners stopped attending church. Ex. 5 ¶¶ 4-6. Victims of domestic violence and sexual abuse declined to seek protection. Ex. 1-E ¶¶ 24, 29, 37, 38, 39 ,40.

18.     As three young people who are part of mixed-status families bravely testify, the enhanced immigration enforcement operations in Austin neighborhoods inflicted a heavy toll on the psyche and well-being of a large portion of the community. Giovanni Mondragon is a teen mentor who saw participation in after-school teen programs drop from thirty students to two. Ex. 1-A ¶ 6. Jassary Rico Herrera is bound for Stanford University in the fall but could not enjoy the second semester of her senior year due to the impact of the raids on her family. Ex. 1-B ¶¶ 2-3, 7. Her family even made the terrible choice to give up their dogs due to fear that untimely barking

could lead to contact with ICE. *Id.* ¶ 6. Jordy Balderas is a U.S. citizen but found himself anything but free, unable to go to the grocery store or focus academically so long as immigration enforcement actions threatened to break up his family. Ex. 1-C ¶¶ 3-8.

19.     At local high schools serving predominantly Hispanic students, school leaders report that the February ICE raids and public discussion of SB 4 led to deep anxiety and fear. Ex. 2-A ¶ 5; Ex. 2-B ¶¶ 2-3. One student called her principal to report that she would not be able to attend school because ICE was outside her home, and had already captured her father. Ex. 2-B ¶ 2. Other families chose to attend schools closer to home, even though they have less successful academic programs, in order to avoid the risk of encountering immigration authorities en route to and from school. Ex. 2-A ¶ 5; Ex. 2-B ¶ 3.

### V.     SB 4 Will Inflict Terrible Social and Economic Impacts on Texas[1]

20.      If SB 4 takes effect, Texas and Austin residents will suffer substantial negative social impacts, including injuries akin to those suffered as a result of the February ICE raids as well as involuntary, fundamental changes to the manner in which Austin provides for public health and safety. *See* Ex. 1 ¶¶ 20, 23; Ex. 1-C ¶¶ 11, 14; Ex. 1-D ¶¶ 6-8; Ex. 1-F ¶¶ 5, 7-8; Ex. 2-A ¶¶ 6-7; Ex. 2-B ¶ 6; Ex. 3 ¶¶ 5-9, 12; Ex. 4 ¶¶ 13-14, 19-28; Ex. 5 ¶¶ 4-6.

21.     Texas will also suffer severe economic consequences. Already, a major national organization has withdrawn its 2018 convention from Grapevine, Texas, due to the pending enforcement of SB 4. *See* Ex. 8. The American Immigration Lawyers Association conference would have brought over 3,000 individuals to Texas, with an anticipated economic impact between three million and five million dollars. *Id.*, ¶ 8.

---

[1] In addition to the evidence attached and cited herein, the City of Austin anticipates filing two expert reports in advance of the hearing set for June 26, 2017: one report summarizing negative social impacts, and one report summarizing negative economic impacts.

22.      In Austin, major international events such as South by Southwest (SXSW) have also expressed their concern that SB 4 will impact their ability to attract talent and customers. *See* Ex. 7. In 2016, SXSW brought an economic benefit of $325.3 million to the Austin community, including the economic impact of attendance, consumer participation, and operations. *Id.*, ¶¶ 4-10; Ex. 7-A. SXSW alone attracts tens of thousands of foreign nationals as registrants and participating speakers, artists, showcase presenters, and filmmakers. Ex. 7 ¶ 11. SXSW believes that if SB 4 takes effect, it will negatively impact the diversity and quality of its programming as well as the willingness of foreign and domestic customers to attend the festival. *Id.* ¶¶ 12, 14. Two United States Senators have already called on SXSW to withdraw from the State of Texas. Ex. 7-B.

## VI.      SB 4 Will Inevitably Lead to Extended Detentions

23.      SB 4 authorizes individual police officers to conduct investigations of immigration status. *See* Tex. Gov't Code §§ 752.053(b)(1)-(3) (effective Sept. 1, 2017). Local police are not trained or qualified to make status determinations, however. *See* Doc. 24-2 (Roxana Bacon Declaration); Ex. 4, ¶ 21.

24.      SB 4 requires law enforcement agencies to determine whether custodial detainees are subject to an ICE detainer request. *See* Tex. Code Crim. Proc., Art. 2.251(a) (effective Sept. 1, 2017). This requirement is only excused if a custodial detainee can present governmental identification. *Id.*, Art. 2.251(b). Many people are lawfully present within the State but do not have governmental identification, however. *See* Ex. 6 (Jacqueline Watson Declaration). These individuals will nevertheless be subject to extended detention for purposes of communication with ICE.  Although the Austin Police Department does not currently receive ICE detainer requests, it has no method determine whether people it detains may be the subject of such requests.  *See* Ex.

4, ¶¶ 18-19.  Therefore, Austin has no method of ensuring compliance with this aspect of SB 4.
*Id.*

**ARGUMENT AND AUTHORITIES**

I.    **The Supremacy Clause Bars Enforcement of Senate Bill No. 4**

        **A.  The City joins the City of El Cenizo's preemption arguments.**

25.    City reiterates that it joins with the El Cenizo arguments in support of injunctive relief, including the El Cenizo arguments that SB 4 is preempted by federal immigration law and conflicts with the First, Fourth, and Fourteenth Amendments. *See* Doc. 24-1 at 22-29, 37-47. In addition, the City offers the following supplemental arguments.

        **B.  SB 4 conflicts with the First Amendment**

26.    SB 4 threatens to punish any local official who "endorses" a policy that "materially limits" the enforcement of immigration laws." TEX. GOV'T CODE § 752.053(a)(1). In a related action, to address plaintiffs' free speech concerns, Texas argues that elected officials such as Austin's Mayor and City Council do not have First Amendment-protected rights. *See Texas v. Travis County*, Case No. 1:17-cv-425-SS, Doc. 23, ¶ 312 (W.D.Tex. May 31, 2017) ("The First Amendment does not protect speech by the government or government officials acting in their official capacities."). This assertion is entirely without merit. *See Bond v. Floyd*, 385 U.S. 116 (1966).

27.    SB 4 violates the First Amendment rights of every City of Austin employee, including (especially) Austin's elected and appointed officials.[2] SB 4 prohibits Austin's employees and Austin's elected and appoint officials from endorsing any formal policy, rule, or

---

[2] The sweep of SB 4 is so broad because it defines a "local entity" to include a municipality's governing body, as well as every officer or employee.  TEX. GOV'T CODE § 752.051(5).

ordinance, as well as any informal, unwritten policy that would prohibit or materially limit the enforcement of immigration laws. TEX. GOV'T CODE § 752.053(a). The punishments for violating these provisions include sizeable civil fines as well as removal from office for elected and appointed officials. *Id.* at 752.056, 752.0565. These draconian penalties impose a prior restraint on thousands of Austin employees and officials. Perhaps more disturbingly, SB 4—by targeting elected and appointed officials who express unwanted viewpoints—undermines a free and robust public discussion of the important topic of whether local government and its resources should be enforcing federal immigration laws.

28.     Austin's elected and appointed officials have consistently exercised their constitutionally-protected rights of speech, association, and petition to oppose SB 4 and its pending implementation. *See* Ex. 1 ¶¶ 4-9; Ex. 2 ¶¶ 10-14; Ex. 3 ¶¶ 4-12; Ex. 4 ¶¶ 29-31; Ex. 5 ¶¶ 4-6.

29.     The Supreme Court has held that infringing on the rights of legislators by punishing them for speech on political topics is particularly invidious. In *Bond v. Floyd*, the Georgia House of Representatives refused to seat Julian Bond—who had been duly elected by the voters in his district—because of public comments he had made against the Vietnam War.  385 U.S. at 118-124.  In support of this action, the state argued that even if private citizens would enjoy protection for similar comments, it could require a higher degree of loyalty from a legislator.  *Id.* at 135. The Court flatly rejected this argument, holding: "The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude on issue of policy."  *Id.* at 136.

30.     Here, SB 4 muzzles any dissenting voices from employees, officials, and local legislators alike by prohibiting them from endorsing a policy that would prevent or limit the municipality from enforcing immigration laws. Thus, for example, even if the City of Austin police

chief were to enact written policies fully in compliance with SB 4, but he were to speak out at a community event that such policies were wrongheaded, and that officers should not be assisting ICE, the City could be fined and he could be removed from office. Moreover, if a member of the City Council initiated even a non-binding resolution against local enforcement of immigration law, and if the City Council adopted such a resolution after a vigorous debate, all of the City Council members (even those who opposed the resolution) could be subject to removal from office. *See Central Power & Light Co.*, *City of San Juan*, 962 S.W.2d 602, 612-13 (Tex. App.—Corpus Christi 1998, pet. dism'd w.o.j.) ("The only way that a political subdivision of the state can act is by and through its governing body."). Accordingly, SB 4 stifles political debate on an important topic, and thwarts the will of the people by removing from office the representatives they elected when those representatives dare to express viewpoints outlawed by SB 4.

### C. SB 4 conflicts with the Fourth Amendment.

31.     SB 4 violates the Supremacy Clause because it conflicts with the Fourth Amendment of the United States Constitution in at least two fundamental respects. First, SB 4 requires the City to allow its officers to extend detention for purposes of civil immigration investigations. TEX. GOV'T CODE §§ 752.053(b)(1)-(3). Because civil immigration violations are not crimes, extended detention for such investigations is unlawful. *See Trujillo Santoyo v. U.S.*, Case No. 5:16-CV-855-OLG, Doc. 36 at 10-16 (W.D.Tex. June 5, 2017) (discussing applicable precedent). Second, SB 4 imposes a duty on the City to delay release of anyone in custody unless ICE confirms that a person is not subject to a detainer request or unless the person produces governmental identification. *See* TEX. CODE CRIM. PROC., Art. 2.251. Because many lawful Texas residents do not possess governmental identification (*see* Ex. 6), SB 4 will inevitably subject custodial detainees to unreasonable detention.

32.     SB 4's requirement that local law enforcement agencies give their officers nearly complete discretion on whether and when to inquire into a detainee's or arrestee's immigration status violates the Fourth Amendment's protection against unreasonable seizures.[3] Although Austin will not itself be subject to unreasonable seizures under SB 4, Austin cannot "materially limit" its officers from conducting inquiries into immigration status. *See* TEX. GOV'T CODE § 752.053(b)(1). This aspect of SB 4 harms Austin in at least two ways. First, because Austin will not be able to limit how and when its officers inquire into immigration status, APD officers will inevitably violate a person's Fourth Amendment rights—with taxpayers holding the bag under 42 U.S.C. § 1983.[4] Second, Austin's police chief will lose the ability to control his officers' time and resources. *See* Ex. 4, ¶¶ 22-27.

33.     While it is true that facial challenges to a statute are difficult to win, and while it is also true that it is unusual for a party that will not face a direct constitutional harm under the statute to argue that the statute violates the Constitution, it is also true that SB 4 is a most unusual law. *See Los Angeles, Calif. v. Patel*, 135 S,Ct. 2443, 2449-56 (2015) (noting that facial challenges to a statute are difficult for plaintiffs, but upholding a facial challenge to a city ordinance that permitted police to search hotel registries). Specifically, it is unusual (if not unprecedented) for a state government to forbid local law enforcement agencies from exercising control over peace

---

[3] SB 4 also provides that officers may not, except in limited circumstances, inquire into a detainee's immigration status if the sole reason for that person's detention is that he is the victim of or a witness to a crime.  TEX. GOV'T CODE § 752.051(4); TEX. CODE OF CRIM. P. ART. 2.13 (d), (e).

[4] Indeed, to comply with SB 4 Austin may have to implement a policy permitting officers to inquire into a detainee's immigration status and to assist ICE. Such a policy might well be necessary to insulate Austin from claims that it has an informal policy preventing such conduct, or that it has a pattern or practice of prohibiting such conduct. *See* Ex. 4, ¶ 23.  Moreover, Austin could be found liable for having a policy that proximately causes constitutional violations.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (holding that a city may be found liable under § 1983 if a formally adopted policy is the proximate cause of violation of a person's constitutional rights.

officers by prohibiting or "materially limiting" them from engaging in unconstitutional conduct. It is because of the unusual nature of SB 4, and the inevitable Fourth Amendment violations it will cause, that Austin faces imminent harm.

34.     It is a "seizure" under the Fourth Amendment for an officer to conduct a brief investigatory detention of a person, including by stopping a motorist. *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). An officer will violate the Fourth Amendment if his actions during the stop are not "reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506. During a traffic stop, for example, officers can ask for a driver's license, proof of insurance, run a computer check for warrants or other pertinent information, and issue a citation. *United States v. Santiago*, 310 F.3d 336, 341 (5th Cir. 2004). During this time, an officer can question the detainee, but a court will scrutinize those questions if they do not relate to the purpose of the stop. *Id.* Moreover, any extension of the stop beyond the time needed for the officer to determine whether to write a citation, or whether criminal activity is afoot, is an unreasonable seizure that violates the Fourth Amendment. *Id.* at 341-42.

35.     The Austin Police Department conducts many thousands of investigatory detentions a year, including thousands of traffic stops. *See* Ex. 4 ¶ 25. SB 4, as it applies to Austin, prohibits the police chief from enacting a policy that would "materially limit" how and when officers inquire into a detainee's immigration status. *See Patel*, 135 S.Ct. at 2452 (holding that when addressing a facial challenge to the statute, a reviewing court must focus on how the law will actually restrict those it affects). Accordingly, Austin or its police chief could not, without risk of running afoul of SB 4, prohibit officers from inquiring into a detainee's immigration status in all

cases except where such an inquiry is relevant to the purpose of the stop.[5]  Similarly, the police

also could not prohibit officers from prolonging a stop by inquiring into immigration status after

the officer has written a citation, or determined that the detainee was not involved in any criminal

activity.

36.     Unfortunately, in the absence of such sensible policies, and with thousands of

detentions and 1,900 police officers, this provision of SB 4 will inevitably lead to Austin police

officers violating the constitutional rights of individuals who are detained by the police.

Accordingly, SB 4 leaves Austin (and every locality in Texas) between the hammer[6] and the

anvil—face punishment under SB 4 for enacting a sensible policy, or face paying damages for

civil rights violations.[7] Austin respectfully asks the Court to enjoin the enforcement of SB 4 and,

in particular, Texas Government Code section 751.053(b)(1) and Texas Code of Criminal

Procedure articles 2.251 and 6.01(e)(2).

### D.  SB 4 conflicts with the Equal Protection Clause.

37.      To demonstrate that SB 4 conflicts with the Equal Protection Clause of the 14th

Amendment, Austin must show that the law was passed with a discriminatory purpose. *See Village

of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-66 (1977); *see also Veasey

II*, 830 F.3d at 229-231.

> In *Arlington Heights*, the Supreme Court set out five nonexhaustive factors to
> determine whether a particular decision was made with a discriminatory purpose,

---

[5] Indeed, such a circumstance is difficult to imagine, as there are very few crimes that APD
investigates for which immigration status is an element or relevant to the crime.  *See* Ex. 4 ¶ 25.

[6] This metaphor is particularly apt given Governor Abbot's promise to "hammer" jurisdictions
who impose "sanctuary city" policies. *See* Ex. 9.

[7] For these reasons, Austin's pre-enforcement challenge of SB 4 is ripe under the factors identified
in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). Specifically, the question of whether
SB 4 will inevitably lead to the Fourth Amendment violations does not require additional factual
development, and Austin (not to mention the citizens detained by its police) will face considerable
hardship is SB 4 is allowed to go into effect on September 1, 2017.

and courts must perform a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Those factors include: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decisionmaking body. Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed because of that disparate impact. The challengers bear the burden to show that racial discrimination was a substantial or motivating' factor behind enactment of the law; if they meet that burden, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor.

*Veasey II*, 830 F.3d at 229-231 (citations and punctuation omitted).

38.     Here, in regard to the historical background, the Texas Legislature has passed an extended series of discriminatory and unconstitutional laws targeting the Hispanic community. *Veasey II*, 830 F.3d at 239-340; *Veasey I*, 71 F.Supp.3d at 702 (S.D.Tex. 2014); *Texas v. U.S.*, 887 F.Supp.2d at 161.

39.     Leading up to the beginning of the legislative session, and continuing through the passage and signing of SB 4, Governor Abbott repeatedly emphasized that this law is targeted at immigrants who cross the Texas-Mexico border. *See* Ex. 9. These immigrants are overwhelmingly Hispanic. Ex. 10 (over 96% of immigrants apprehended by DHS are Hispanic).

40.     In addition to the historical background and the Governor's statements during the consideration of SB 4, the El Paso County plaintiffs have identified numerous other details that indicate the anti-Hispanic intent of SB 4. *See* Doc. 51 ¶¶ 46-68.

41.     SB 4 is also certain to have a disproportionate impact on Hispanic Texans and Hispanic visitors. As the El Cenizo plaintiffs have argued, the law provides no guidance to police officers on how to constitutionally apply the provision permitting investigation of immigration status. *See* Doc. 24-1 at 43-47. The El Paso County plaintiffs also describe the discriminatory effect of SB 4. Doc. 51 ¶¶ 69-79. The City's expert on driver's license issues, Jacqueline Watson,

describes how the provisions of SB 4 that excuse compliance with ICE detainer requests when a custodial detainee can present government identification impose a disproportionate impact on Hispanic Texans. *See* Ex. 6.

42. In sum, given the historical background, the events leading up to the enactment of SB 4, and the certain disproportionate impact of SB 4 enforcement, SB 4 conflicts with the Fourteenth Amendment and thus violates the Supremacy Clause of the United States Constitution.

## E. SB 4 conflicts with Executive Branch policy.

43. SB 4 also conflicts with the federal definition of an impermissible "sanctuary jurisdiction." This year, the Department of Justice has issued multiple statements defining what an impermissible "sanctuary" is. For example, in *City of Richmond v. Trump*, Case No. 3:17-cv-01535-WHO, United States District Court for the Northern District of California, the Department of Justice argued a municipality is only a "sanctuary" if it willfully refuses to comply with 8 U.S.C. § 1373, an immigration reporting statute. Case No. 3:17-cv-01535-WHO, Doc. 16 at 19-21 (filed Apr. 18, 2017). Attorney General Sessions reiterated this policy by a memorandum issued May 22, 2017. *See* Ex. 11. Specifically, Sessions wrote:

> After consultation with the Secretary of Homeland Security, I have determined that, for purposes of enforcing the Executive Order, the term "sanctuary jurisdiction" will refer only to jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373." A jurisdiction that does not willfully refuse to comply with section 1373 is not a "sanctuary jurisdiction" as that term is used in section 9(a).

Ex. 11 at 2.

44. 8 U.S.C. § 1373 is a federal immigration law that requires governmental entities to share citizenship and immigration status information with ICE. 8 U.S.C. § 1373(a). The law does not impose any obligations on local authorities to affirmatively collect such information.

45.     SB 4, on the other hand, would denominate as impermissible "sanctuaries" any city or county that declines civil detainer requests (that are otherwise voluntary under 8 U.S.C. § 1357) or that adopts, enforces, or endorses a policy that "materially limits" immigration enforcement. Further, SB 4 would penalize municipalities with fines, remove elected officials from office, and criminalize police chiefs who fail to follow SB 4 mandates. Because SB 4 defines "sanctuary" in a manner inconsistent with federal definitions, and because SB 4 imposes sanctions far beyond the carefully-calibrated measures permitted by Congress and the Department of Justice, the law violates the Supremacy Clause of the U.S. Constitution.

### III. The Texas Constitution Home Rule Amendment Bars Enforcement of SB 4

46.     SB 4 violates the Home Rule Amendment to the Texas Constitution because it invades Austin's police power authority and attempts to assert authority over civil immigration enforcement, a matter over which the people of Texas have given the State no authority.

47.     The Texas Constitution exemplifies the desire of Texas citizens to restrict governmental powers. *See, e.g., LeCroy v. Hanlon*, 713 S.W.2d 335, 339 (Tex. 1986); TEX. CONST. art. I, § 29. The Texas Supreme Court regards "as axiomatic" that "a state constitution is in no manner a grant of power," but instead operates solely as a limitation on power. *Satterfield v. Crown Cork & Seal Co.*, 268 S.W.3d 190, 202 (Tex.App.—Austin 2008, no pet.). "All power which is not limited by the constitution inheres in the people, and a legislative act is valid only when the constitution contains no prohibition against it." *Id.*

48.     The people of Texas have expressly reserved to charter cities, such as the City of Austin, the power of self-government. *See* TEX. CONST. art. XI, § 5. "These cities look to the acts of the legislature not for grants of power but only for limitations on their power." *City of Univ. Park v. Van Doren*, 65 S.W.3d 240, 247-48 (Tex.App.—Dallas 2001, pet. denied).

49.     Here, SB 4 seeks to preempt local authority and require Austin police to participate in civil immigration enforcement actions. Although this might be construed as general law imposing a limitation on local power, the Legislature has no authority to legislate in the area of the civil immigration. The people of Texas have granted the State no such authority. Accordingly, SB 4 invades Austin's home rule authority—and in particular its exercise of its police power for the benefit of the public welfare—in violation of the Texas Constitution.

### IV. The Balance of Harms Favors Issuance of Immediate Injunctive Relief

50.     Ordinarily, a plaintiff may obtain a preliminary injunction only if the court finds that it meets four factors: (1) a substantial likelihood they will prevail on the merits, (2) a substantial threat that plaintiffs will suffer irreparable injury in the absence of injunctive relief, (3) that the threatened injuries outweigh any possible harm to the State, and (4) issuance of injunctive relief will serve the public interest. *See Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 456-57 (5th Cir. 2016) (stating standard). However, to the extent a case involves preemption under the Supremacy Clause, a finding of a substantial likelihood of success on the merits may implicitly carry with it a determination that the other three requirements have been satisfied. *See Trans World Airlines, Inc. v. Mattox,* 897 F.2d 773, 783 (5th Cir. 1990). Regardless, in this case, Austin meets all of the elements for obtaining a preliminary injunction.

51.     As the El Cenizo plaintiffs argue, the plaintiffs meet the first requirement for injunctive relief because SB 4 will violate their constitutional rights which, "for even minimal periods of time, unquestionably constitutes irreparable injury." Doc. 24-1 at 50 (citing cases).

52.     In addition to the El Cenizo evidence, Austin presents evidence of substantial harm in the absence of injunctive relief. The likely harms include injuries to student learning, public health, public safety, and the exercise of protected rights of free speech, association, and petition.

53.     The State cannot show that it will suffer any injuries that outweigh the threats to plaintiffs. The State is not authorized by the people of Texas to legislate in the area of immigration. The State will not be injured by maintaining the status quo: i.e., permitting cities and counties to continue to operate without new, unfunded civil immigration mandates.

54.     Finally, the balance of the hardships and the public interest favor injunctive relief. If SB 4 is allowed to go into effect, immigrant communities in Austin and across Texas will be subject to a new reign of terror, and the negative impacts will extend to their family members, their schools, their places of employment, and to the community and economy as a whole. Texas cannot establish any threatened harms that would outweigh plaintiffs' injuries.

## CONCLUSION

The City of Austin requests that the Court protect the people of Texas from the unconstitutional deprivations threatened by the State's pending enforcement of SB 4 by issuing a preliminary injunction.

Respectfully submitted,

ANNE L. MORGAN, CITY ATTORNEY
MEGHAN L. RILEY, CHIEF, LITIGATION

*/s/* Michael Siegel
MICHAEL SIEGEL
State Bar No. 24093148
CHRISTOPHER COPPOLA
State Bar No. 24036401
Assistant City Attorneys
City of Austin – Law Department
P. O. Box 1546
Austin, Texas 78767-1546
Telephone: (512) 974-2888
Facsimile: (512) 974-1311
michael.siegel@austintexas.gov
christopher.coppola@austintexas.gov

## CERTIFICATE OF CONFERENCE

This is to certify that the City of Austin conferred with Texas and the Texas attorneys confirmed the State opposes this motion.

/s/ Michael Siegel
MICHAEL SIEGEL

## CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the foregoing pleading on all parties, or their attorneys of record, via the Court's ECF/CM system, in compliance with the Federal Rules of Civil Procedure, this 19th day of June, 2017.

/s/ Michael Siegel
MICHAEL SIEGEL