IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **CITY OF EL CENIZO, TEXAS,** *et al.* | § | **CIVIL Action No. 5:17-CV-00404-OLG** |
| *Plaintiffs,* | § | **(Lead Case)** |
| | § | |
| **V.** | § | |
| | § | |
| **THE CITY OF HOUSTON, TEXAS** | § | **CIVIL Action No. 5:17-CV-00459-OLG** |
| *Intervenor* | § | **(Consolidated Case)** |
| | § | |
| **V.** | § | |
| | § | |
| **THE STATE OF TEXAS,** *et. al.* | § | **CIVIL Action No. 5:17-CV-00489-OLG** |
| *Defendants.* | § | **(Consolidated Case)** |

## CITY OF HOUSTON'S COMPLAINT IN INTERVENTION

The CITY OF HOUSTON ("Houston") files this its Complaint in Intervention against the State of Texas ("Texas"), pursuant to Fed. R. Civ. P. 24(b). In support, Houston states as follows:

### INTRODUCTION

1.     Because human progress is neither automatic nor inevitable, Houston is compelled to join these consolidated lawsuits to ensure that this court finds that Texas' new "show me your papers" law, Senate Bill 4 ("SB4"), unconstitutionally restricts the freedom and diminishes the civil rights and dignity of Latinos who live in and visit Houston, mandates that local police officers act as United States Immigration and Customs Enforcement ("ICE") officers and empowers them to engage in unconstitutional detentions, and abrogates the rights of Texas voters and their elected and appointed officials by penalizing those officials and even removing them from office

when they merely express views or advocate for policies at odds with those SB4 embodies.

2.     SB4's many constitutional transgressions do not advance any defensible, let alone compelling, state interest. Instead, it targets Latinos. While Governor Abbott, like SB4's other proponents in the Legislature, has claimed that the law is intended to target only undocumented immigrants who cross the Texas/Mexico border and that these individuals come "[f]rom around the entire globe," the Department of Homeland Security ("DHS") reports that, between 2014 and 2016, *95%* of all persons apprehended by DHS came from Mexico, Guatemala, Honduras, or El Salvador.

3.     SB4 also fails to enhance public safety. Instead, it puts the public at greater risk. The law actively impedes the effective utilization of precious and limited public safety resources that would otherwise be used to combat serious crimes. This has been the consistent and persistent message of law enforcement leaders across the State who opposed SB4 from the start. Without any legitimate reason, the State of Texas has put all Texans in harm's way.

4.     Although SB4 will not reduce crime, it will increase human misery, the likelihood of an economic boycott of the State, and barriers to investment, tourism, and economic growth without any corresponding benefit to the State. By turning local police into a rump federal immigration force, and weighing down any engagement that undocumented immigrants have with city government with the potential for catastrophic detention and deportation, SB4 will also irrevocably damage the community bonds Houston has long forged with all who arrive there humbly but with

a strong work ethic, Houston-sized dreams, and the vision, heart, and audacity to make them a reality. This pact is Houston's soul and essence. SB4 would rip it apart.

5.     It did not have to be this way. Texas could easily have encouraged cities, through grants, cost-sharing, or other enticements, to enter into voluntary agreements with the federal government to enforce the federal immigration laws with a well-trained, tightly-managed group of local law enforcement officers pursuant to existing law. Instead of choosing this narrowly-tailored option, however, the State chose to coerce its cities to force their local police officers to serve as ICE officers and to empower them to target Latinos.

6.     Although SB4 does not become effective until September 1, 2017, Houston seeks to intervene now, before the law can do irreparable harm, to obtain declaratory and injunctive relief from SB4 under the Supremacy Clause, the First and Fourth Amendments, and Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution, the Delegation Doctrine, and the Due Course of Law, Free Speech, Search and Seizure, and Home-Rule provisions of the Texas Constitution.

## INTERVENOR

7.     Intervenor Houston is a Texas constitutional home-rule city, governed by a city charter. As demonstrated below, Houston and Houstonians will suffer injury-in-fact from the implementation and enforcement of SB4.

8.      Houston is the most diverse city in the nation.[1] Immigrant Houstonians, therefore, play a critical role in driving Houston's economy, enriching its culture, and feeding its soul. The City of Houston's website reports that ninety languages are spoken in Houston and it is home to more than 92 consular offices. Houston is also a major destination for resettlement of refugees from all over the world.[2] Nearly 1.4 million Houstonians, more than 25% of its population, are foreign born.[3] Forty percent of Houstonians under the age of 18—more than 650,000 children—have at least one foreign-born parent. In this regard, more unaccompanied immigrant children have been reunified with family members in Houston than any other city, due to its proximity to the South Texas border region and substantial Central American immigrant communities.[4] From 400,000 to 575,000 of all Houston's immigrants are undocumented.[5]

---

[1] *See, e.g.*, Michael O, Emerson, *et al.*, *Houston Region Grows More Racially/ Ethnically Diverse with Small Declines in Segregation, A Joint Report Analyzing Census Data from 1990, 2000, and 2010*, at 5, Kinder Institute for Urban Research and Hobby Center for the Study of Texas (2012), *available at* http://kinder.rice.edu/uploadedFiles/Urban_Research_Center.Media/Houston%20Region%20Grows%20More%20Ethically%20Diverse%202-13.pdf.

[2] Corrie MacLaggan, *Share of Foreign-Born Texans Growing*, Texas Tribune (Jan. 2, 2014).

[3] *Id.*; Randy Capps, *et al.*, *A Profile of Immigrants in Houston, the Nation's Most Diverse Metropolitan Area*, Migration Policy Institute (March 2015).

[4] U.S. Office of Refugee Resettlement (ORR), *Unaccompanied Children Released to Sponsors by Country*, accessed Jan. 29, 2014, www.acf.hhs.gov/programs/orr/unaccompanied-children-released-to-sponsors-by-country, *quoted in* Capps, *supra*, note 3, at 5-6, n.10.

[5] *Compare* Capps, *supra*,note 3, at 2 *with* Pew Research Center, *Estimates of unauthorized immigrant population, by metro area, 2014* (Feb. 13, 2017).

9.     In particular, Houston's vibrant Latino population numbers 1.73 million, the second largest in the United States.[6] Nearly 37 percent of Houstonians are Latino and 41 percent of those are foreign-born. *Id.*

10.    Houston has approximately 20,000 city employees. Many of them are police officers. The Houston Police Department ("HPD") is headed by a chief of police appointed by the mayor and confirmed by the city council. The current Chief of Police is Hubert "Art" Acevedo. His sworn declaration is attached and incorporated herein as Exhibit 1. His position is aided by two executive assistant chiefs, ten assistant chiefs, forty-four captains, approximately two hundred twenty lieutenants, and nine hundred sergeants. HPD divides the city into 13 patrol divisions and employs 5,200 sworn law enforcement officers and 1,200 civilian support personnel to protect the city. On average, HPD annually responds to 1.2 million calls for service, makes 400,000 traffic stops and actively investigates 150,000 crimes. *Id.* at ¶ 5.

11.    In this connection, Houston runs two jails and a lock-up facility for those who have been arrested by HPD and other local law enforcement entities. They are managed by a classified captain and other classified supervisors. Although most detainees are released within 48 hours, half of all prisoners are charged with county or district court charges and sent to the Harris County jail within the first 24 hours.

12.    Houston has standing to challenge the constitutionality of SB4 because Houston is charged with implementing a statute that is unconstitutional. *See, e.g., Nootsie, Ltd. v.*

---

[6] Josh Mitelman, *Harris County has the 2d Largest Hispanic Population in U.S.*, Houston Business Journal (Sept. 4, 2013).

*Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996). In addition, Houston also has representative standing to challenge SB4 on behalf of its elected and appointed officials, law enforcement officers, and other employees, residents, and visitors who will be directly affected by SB4 should it be implemented in September.

## ORIGINAL LAWSUIT

13.     Plaintiffs, City of El Cenizo, *et al.*, originally filed suit in this court against defendants Texas, its Governor, Greg Abbott, and Texas Attorney General Ken Paxton, seeking declaratory and injunctive relief to prevent implementation of SB4. *See* Complaint for Declaratory Judgment and Injunctive Relief, filed May 8, 2017 (Doc. 1). El Cenizo's lawsuit has now been consolidated with San Antonio's and El Paso's challenges to SB4. Austin has been permitted to intervene. Each city has asserted complementary, but not identical claims. Plaintiffs in the El Cenizo lawsuit, for example, allege that SB4 violates the United States Constitution and other federal constitutional and statutory provisions by invading local sovereignty, encouraging racial profiling, threatening local municipalities with fines and local officials with removal from office for perceived non-compliance with state and federal immigration law. *Id.* at ¶¶ 67-78. These plaintiffs also allege that El Cenizo, Maverick County officials, and their residents—along with organizational plaintiffs League of United Latin American Citizens ('LULAC")—will suffer substantial harm if the State is permitted to implement SB4. *Id.* at ¶¶ 56-66.

14.     Defendant, the State of Texas, has appeared in this case.

## JURISDICTION AND VENUE

15.     This court has subject matter jurisdiction over Houston's claim under 28 U.S.C. §§ 1331 and 1343(a). In addition, this court has subject matter jurisdiction over Houston's action for declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202. Venue is proper in this District because at least one defendant resides in this District and all defendants are residents of the State of Texas. 28 U.S.C. § 1391(b)(2). Venue is also proper in this District because a substantial part of the events or omissions giving rise to the claim occurred or will occur in this District, including but not limited to SB4's pervasive impact across the state, especially in cities with large Latino populations like San Antonio. 28 U.S.C. § 1391(b)(2). Venue is also proper in this District under the doctrine of pendent venue because Houston's claims and those asserted by the consolidated plaintiffs and intervenors share a common nucleus of operative facts. The exercise of jurisdiction and venue over Houston's claims thus furthers the goals of judicial economy, convenience, and fairness to the litigants.

## HOUSTON'S FACTUAL ALLEGATIONS

### *SB4 Improperly and Unconstitutionally Makes Local Immigration Enforcement Mandatory and Threatens to Penalize Municipalities and Policymakers Who Decline to Follow the State's Unconstitutional Mandates*

16.     SB4 improperly and unconstitutionally alters the obligations of municipalities under federal immigration law. Under current law, 8 U.S.C. § 1357, local authorities retain the discretion to decide whether to comply with ICE civil detainer *requests* (which are not orders or mandates), and whether they will enter into written agreements with ICE to be trained and certified to enforce the federal immigration

laws. Although Houston has not entered into such an agreement, Harris County, which encompasses Houston, had entered into a voluntary agreement with ICE but ended it as SB4 was being debated. Such an agreement represents a narrowly-tailored alternative to SB4 in the Houston area. In addition, under 8 U.S.C. § 1373, local authorities maintain discretion regarding what type of immigration status information to collect, if any.

17.     Under SB4, however, local authorities may not prohibit their officers from investigating and determining the immigration status of any person who is "in custody," "lawfully detained," or arrested, except in limited situations. It requires that any person in custody must produce a Texas driver's license or "similar government-issued identification" in order to avoid extended detention for purposes of an immigration status check. That person must be detained if he or she fails to produce the required documentation upon demand.

18.     SB4 also prohibits any municipality or local official from adopting, enforcing, or endorsing any policy that would prohibit or limit such enforcement of federal immigration law.

19.     If a municipality does not comply with SB4, it may be subject to fines up to $25,500 for each day of non-compliance after the first day. The Texas Attorney General may also bring an action seeking equitable relief if the municipality's police department fails to comply with SB4.

21.     If a police chief, sheriff, constable, or jail administrator refuses to comply with SB4 by knowingly failing to honor an ICE detainer request, he or she is subject to criminal prosecution for a Class A misdemeanor.

22.     Worse, if an individual holding elective or appointive office refuses to comply with SB4—for example, by "endorsing" a policy that would "materially limit" the enforcement of federal immigration law—he or she will be subjected to a *quo warranto* proceeding, brought by the Texas Attorney General, resulting in forfeiture of and removal from such office. Under the express terms of SB4, § 752.0565(b) [Gov't Code], evidence sufficient to justify forfeiture and removal need only be a *statement* made by that official in opposition to SB4 or the policies it embodies.

### The State of Texas Has a History, Pattern, and Practice of Enacting Unconstitutional Laws Targeting and Disfavoring Latino Texans

23.     In recent years, the federal courts have repeatedly held that the State of Texas has intentionally discriminated against and Latino and African-American Texans.

24.     In *Texas v. U.S.*, 887 F. Supp. 2d 133 (D.D.C. 2012), for example, a federal court ruled that Texas had drawn its congressional and state senate districts with discriminatory intent and to the detriment of African-American and Latino voters. In reaching its conclusion, the court took note of "Texas's history of failures to comply" with the federal Voting Rights Act. *Id.* at 161.

25.     In *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016), the Fifth Circuit held that the voter identification law enacted by the Texas Legislature and signed by Governor Abbott was racially discriminatory under the Voting Rights Act, 52 U.S.C. § 10301

(West 2013). The Court specifically ruled that Texas' history of racially gerry-mandered districts supported a finding of discrimination. *Veasey*, 830 F.3d at 257-58.

26.     Finally, in *Perez v. Abbott*, 2017 WL 1798454 (W.D. Tex. May 2, 2017), another federal court recently ruled that Texas had drawn Congressional districts with discriminatory intent and to the detriment of Latino voters.

27.     The Texas Legislature has also attempted on multiple occasions to pass laws that would punish so-called "sanctuary" jurisdictions, including failed bills in 2011 and 2015. As the federal courts have noted, these laws are "racially charged" and target Latino Texans for disfavor. *Veasey v. Perry*, 71 F. Supp. 3d 627, 702 (S.D. Tex. 2014), *aff'd*, 830 F.3d 216 (5th Cir. 2016). SB4 is another such law.

### *SB4 Improperly and Unconstitutionally Targets Immigrants Who Cross the Texas/Mexico Border, Most of Whom are of Latino Descent*

28.     SB4 targets Latinos. That is its point. As set forth above, DHS' Customs & Border Protection Division reports that, between 2014 and 2016, 95% of persons apprehended by DHS came from Mexico, Guatemala, Honduras, or El Salvador.[7]

29.     In addition, according to the Pew Research Center,[8] Mexican nationals made up *one-half* of the undocumented immigrant population in the United States in 2016. An additional one-quarter of undocumented immigrants are Latino peoples from

---

[7] *See, e.g.*, Dep't of Homeland Security, Customs & Border Protection Division, *Fiscal Year 2015 Border Security Report*, at 1-2 (Dec. 22, 2015); Jens Manuel Krogstad & Jeffrey S. Passel, *U.S. border apprehensions of Mexicans fall to historic lows*, Pew Research Center (Dec. 30, 2014).

[8] Jens Manuel Krogstad, *et al*, *5 Facts about illegal immigration in the U.S.*, Pew Research Center (Apr. 27, 2017).

Central America, South America, and the Caribbean.[9] In all, as many as 71-one percent of all undocumented immigrants in the United States are from Latino nations.[10]

***Residents of and Visitors to Houston Who Are in Texas Lawfully But Cannot Produce the Forms of Identification Required by SB4 Will Be Subjected to Unconstitutional Detention***

30.     To avoid detention under SB4, a Houston visitor or resident must produce proof of citizenship or lawful immigration status by showing a Texas driver's license "or similar government-issued identification" upon the demand by any police officer, functioning as an ICE officer, during any kind of "lawful detention." Unfortunately, many residents of and visitors to Houston lawfully do not possess such government-issued identification.

31.     Persons lawfully present in the United States range from citizens, to students, to physicians and scientists, to CEOs and others here on business, to tourists. United States citizens are not required to carry identification to prove their status despite the possibility that a citizen may be mistaken for a foreign national by a local police officer. Some United States citizens are not even aware of their status, given that they may have derived citizenship from other family members.

32.     In addition, many students, professionals, and migrant workers, among others, are lawfully present within the United States but are not issued its government

---

[9] Jeffrey S. Passel and D'Vera Cohn, *Overall Number of U.S. Unauthorized Immigrants Holds Steady Since 2009*, Pew Research Center (Sept. 20, 2016).

[10] Jie Zong and Jeanne Batalova, *Frequently Requested Statistics on Immigrants and Immigration in the United States*, Migration Policy Institute (March 8, 2017).

identification. In some cases, the documentation indicating their status consists of passport stamps, receipts from the State Department, or court records from an immigration proceeding, none of which are currently required by law to be carried at all, much less at all times. Texas now demands that they do so just to be able to attempt to comply with "papers, please" demands by random police officers.

33.     Indeed, *anyone* can be required to produce his or her "papers." This problem is potentially enormous because, between 2008 and 2012, ICE placed approximately 29,323 detainers on legal permanent residents and U.S. citizens.[11]

34.     Under SB4, local police officers without direct supervision by federal immigration authorities will be permitted to subject lawfully-present individuals to detention for purposes of a status check, in violation of state and federal law. SB4 thus incentivizes such local immigration enforcement—even if such enforcement violates the law—by offering grants and indemnity to compliant jurisdictions and punishing severely those officials and municipalities that do not enable or collude in such abusive actions. It is little wonder that the American Civil Liberties Union issued, in May 2017, a travel advisory for *Americans* travelling to Texas because of its passage of SB4.

---

[11] *See* Transactional Records Clearing House, *ICE Detainers Placed on U.S. Citizens and Legal Permanent Residents*, (Feb. 20, 2013), http://trac.syr.edu/immigration/reports/311/, *cited in* Shareef Omar, *Breaking the Ice: Reforming State and Local Government Compliance with ICE Detainer Requests*, 40 Seton Hall Legis. J. 159, 186 (2015).

### *SB4 Has and Will Irreparably Harm Houston's Trade, Tourism, Investment, International Relations, Growth, and Prosperity*

35.     As discussed above, Houston is home to more than 92 consular offices and has, the nation's second largest port, by tonnage.[12] Thus, Houston and, through Houston, Texas benefits tremendously from trade with Mexico and other nations in Central and South America and the Caribbean.

36.     The United States has entered into numerous treaties that govern its relations with Mexico and other nations in Central and South America, and the Caribbean. Among relevant treaties, the North American Free Trade Agreement ("NAFTA") provides for the free passage of business professionals across borders. Pursuant to this treaty, the United States is required to provide temporary entry to foreign nationals from Canada and Mexico.

37.     Under SB4, foreign nationals working in the United States under such trade treaties will be subject to increased status checks and status determinations, and may be exposed to increased risk of detention, arrest, and other deprivations.

38.     Because it will foreseeably result in the improper detention of foreign nationals working in the United States under trade treaties, Texas' enactment of SB4 violates the United States' treaty obligations.

39.     Texas and Houston also benefit enormously from tourist visits from foreign nationals. Houston has held multiple events with international participation each year,

---

[12] U.S. Army Corps of Engineers, Waterborne Commerce of the United States, Part 5, National Summaries (New Orleans, LA; Annual Issues) tables 1-1 and 5-2, *available at* http://www.navigationdatacenter.us/wcsc/wcsc.htm.

including three Super Bowls, the NCAA "Final Four," Olympic Festivals, the Houston Livestock Show & Rodeo, and related sporting events. In addition, Houston hosts other large events, academic symposia at its 14 major institutions of higher learning and NASA, and international conventions, including the mammoth annual off-shore technology conference, focused on culture, business, science, and technology. Thousands of international patients visit the Houston Medical Center annually for treatment and consultation. These events and visits generate substantial income for the local, regional, and national economies. Many of them will be lost because Texas enacted SB4.

40.     When other states have enacted laws that have similarly stigmatized groups of people, state and local tourism has suffered greatly. When Arizona passed Senate Bill 1070, which required state police to participate in enhanced immigration enforcement activities, it was the subject of an international boycott. Although the U.S. Supreme Court ultimately struck down several aspects of the law, and Arizona later agreed to not enforce other problematic portions, that boycott—including decisions by national organizations to not conduct major conventions in the state—caused Arizona to suffer hundreds of millions of dollars in direct and indirect losses.

41.     More recently, the State of North Carolina suffered an economic boycott after its legislature adopted a law discriminating against transgender individuals. Major national organizations withdrew events from the state, including the National Basketball Association All-Star Game and the NCAA "Final Four" Men's Basketball Tournament. In addition to hundreds of millions of dollars in lost event revenue, the Associated

Press estimated the boycott caused the state to lose new business, including a PayPal facility that would have added an estimated $2.66 billion to the state's economy. [13] Overall, the cost of North Carolina's boycott was $ 3.76 billion. *Id.*

42.     Several national organizations have already threatened to boycott Texas based upon the State's threatened implementation of SB4. Such a boycott would likely cause substantial and irreparable damage to Texas' and Houston's economy and Houston's hard-earned reputation as a diverse, welcoming city.

43.     Further, the implementation of SB4 will discourage foreign national tourists from visiting Houston because they may fear that they will be subject to immigration enforcement measures despite their status.

44.     In addition, Texas and Houston benefit greatly from investment by foreign nationals. Foreign nationals invest in local businesses, buy land, participate in educational programs, and generally contribute to the short-term and long-term growth of the local, state and national economies. According to the Greater Houston Partnership, Houston is home to 21 foreign banks, representing 12 nations, 750 foreign-owned firms, more than 430 companies with branches in 144 countries, and more than 3,440 area firms, foreign government offices and nonprofit organizations involved in international business.

45.     Implementation of SB4 will discourage investment by foreign nationals in Houston because they will fear that they will be subject to immigration enforcement

---

[13] Emery P. Dalesio & Jonathan Drew, *AP Exclusive: Price tag of North Carolina's LGBT law: $3.76B,* Associated Press (Mar. 27, 2017).

measures despite their status. Worse, they may not invest in Houston or Texas because association with a state, like Texas, that is perceived to target immigrants and, in particular, Latino immigrants, will simply be bad for business.

46.     Houston has also benefitted greatly from the influx of foreign nationals who have settled in Houston and have either brought their special skills and education with them or been educated at local colleges and universities. Should they or potential Houstonians like them begin to view Houston and Texas as unwelcoming, Houston would suffer a considerable "brain drain" as highly-educated immigrants leave or simply do not settle in Texas.

47.     Finally, Houston and, through Houston, Texas have prospered because of the contributions of immigrants. According to the Center for Public Policy Priorities, immigrants make up 29 percent of Houston's workforce, 31 percent of its business owners, and 21 percent of its total economic output. Moreover, even undocumented immigrants often pay taxes. The Institute on Taxation and Economic Policy estimates that undocumented immigrants paid $ 1.5 billion in Texas state and local taxes in 2010. Indeed, a 2006 report by the Texas Comptroller estimated that undocumented immigrants paid $424.7 million *more* to the State of Texas than the state spent on them in education, health care, and incarceration.[14] Undocumented immigrants also often pay Social Security and Medicare taxes that they never recover.

---

[14] *See* Liz Austin Peterson, *Texas Report: Immigrants Help Economy,* The Washington Post (Dec.15, 2006).

***SB4 Has Already Harmed the Houston Community and Threatens to Damage It
Irreparably***

48.     The passage of SB4 has *already* caused a severe detrimental impact on the local

Houston community. Its implementation will only multiply and deepen that harm. In

recent months, the HPD has encountered crime victims and their relatives who are

unwilling to engage with the criminal justice system because they fear that they or their

relatives and friends may be detained and deported. Indeed, Houston Police Chief

Acevedo reported this spring, as SB4 was being debated, that reports of sexual assaults

in immigrant communities had already dropped by a startling 43%, while reporting in

such communities for all violent crime had dropped by 13%. *See* Exh. 1 at ¶ 13. That

is compared to an 8.2 percent increase in non-Hispanic victims reporting rapes and an

11.7 percent increase in non-Hispanics reporting other violent crime. *Id.*

49.     Because of his grave concerns about the effect SB4 has already had and will

continue to have on violent crime and law enforcement across the State of Texas,

particularly in immigrant communities, Chief Acevedo joined the Texas Major Cities

Chiefs, consisting of Austin, Arlington, Dallas, Fort Worth, Houston, San Antonio,

and the Texas Police Chiefs Association to oppose SB4 while it was being debated in

the Legislature.

50.     The Houston Independent School District ("HISD") likewise reports that

students have missed class because they fear that ICE agents will detain them or their

parents on the way to or from school. These concerns prompted HISD to pass a

resolution opposing SB4 and supporting its students. It states, in relevant part:

The Board has serious concerns regarding legislation that has been filed at the state level which exacerbates growing insecurity among some of our families, specifically Senate Bill 4, which authorizes state law enforcement officers to take an active role in immigration enforcement, as well as other proposed legislation that may repeal the DREAM Act, which allows students, regardless of immigration status, to qualify for instate tuition at state colleges and universities;

NOW, THEREFORE, BE IT RESOLVED that the Board of Education of the Houston Independent School District hereby expresses its support of members of the HISD Community who are negatively impacted by travel restrictions, as well as proposed state legislation, and reaffirms its commitment to be an education-focused environment, free of insecurity and fear, for all its students.

51.    Across Houston, community organizations that provide for the needs of immigrant communities also find themselves assisting families that are afraid to leave their homes. These volunteers make grocery runs to ensure that these children, many of whom are American citizens, have diapers and milk. Organizations that serve Latino clients report a sharp drop in people showing up for services to which they are entitled or have earned. This drop will have serious ramifications for the whole Houston community. For example, because residents are declining to access preventative health care resources, they are more likely to access emergency room services when they become sick, which will impose an increased burden on local and regional health care providers. The one thing that SB4 has increased, however, is human misery. On Sundays in Houston, volunteer lawyers gather in immigrant communities to grimly discuss, with terrified undocumented immigrant parents, drafting guardianships to attempt to prevent their American-born minor children's ending up in foster care, as wards of the State, if that parent is detained and deported.

52.     In addition, Houston authorities report that undocumented women are now too afraid to report domestic abuse or seek help for themselves and their children for fear that their spouse or boyfriend will retaliate by calling ICE. Indeed, in February 2017, federal immigration agents went to the El Paso County Courthouse and arrested an undocumented woman who had just received a protective order alleging that she was a          victim          of          domestic          violence.          *See* http://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (video of her detention at the courthouse).

53.     The result of even the potential implementation of SB4 has been a breakdown in public trust, as affected individuals feel they cannot contact municipal and non-governmental agencies without risking falling victim to draconian and unconstitutional immigration enforcement.

54.     SB4's "community outreach" provisions cannot overcome the loss of trust. If undocumented immigrants are too afraid to report violent crime or access food for their children, they are highly unlikely to attend a seminar on SB4 sponsored by the very law enforcement agencies that must detain and deliver them to ICE. Thus, § 752.057 [Gov't Code] will be cruelly ineffective in overcoming SB4's many constitutional infirmities.

55.     SB4's amendment of Art. 2.13 [Code of Criminal Procedure] likewise fails to protect crime victims or witnesses. Instead, it allows police officers to turn on crime victims and witnesses and to detain them for ICE retrieval on almost any pretext once they show up to report or testify about a crime.

56.     These existing problems will only be exacerbated because SB4 would eliminate the ability of local police chiefs and City Councils to allocate resources to fund their police departments according to the cities' own priorities and needs. Instead, particularly in those cities and towns with large Latino populations or those located near the Mexican border, officers would be required to spend time and resources to determine whether any person held in custody is subject to a request from ICE and to retain that person and such information. In addition, SB4 would require the Chief of Police to permit HPD officers to conduct other civil immigration investigations and to participate in ICE raids and other activities. The city will receive no compensation for these additional activities. Instead, officer time devoted to such tasks will be diverted from investigating and reducing violent crime and attempting to make up for the demonstrable loss of support and assistance from immigrant communities. As Chief Acevedo put it, "violent crime is on the rise across our Nation [and] some would rather men [and] women in blue go after cooks [and] nannies, instead of hardened criminals."

57.     Under 8 C.F.R. § 287.7(e) (2011), the federal government is precluded from paying for the costs of cities' compliance with its detainer requests: "No detainer issued as a result of a determination made under this chapter shall incur any fiscal obligation on the part of the Department, until actual assumption of custody by the Department ..." These unfunded mandates and requirements then will add to Houston's cost of policing, and prevent it from pursuing other law enforcement priorities, including the investigation and prosecution of serious crimes.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION: FEDERAL PREEMPTION

58.     Houston incorporates by reference preceding paragraphs 1 through 57.

59.     SB4 violates the Supremacy Clause of the United States Constitution because it directly conflicts with multiple federal laws and regulations promulgated by Congress, the President, and the Department of Homeland Security.

60.     In particular, SB4 directly conflicts with 31 U.S.C. § 1342 and 8 U.S.C. § 1357(g). Subsection 1342 provides, in relevant part, that an "officer or employee of the United States Government … *may not accept voluntary* [free] *services for either government or employ personal services exceeding that authorized by law* except for emergencies involving the safety of human life or the protection of property." *Id.* (emphasis supplied). Routine immigration enforcement and, in particular, enforcement of ICE detainer requests, which are addressed to individuals who have *already* been "detained" by law enforcement or are already in "custody" does not constitute such an emergency.

61.     Subsection 1357(g)(1) provides that, "notwithstanding section 1342 of Title 31, *the Attorney General may enter into a written agreement with a State, or any political subdivision of a State*, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer … may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law." Subsection 1357(g)(9), provides, however, that "*nothing in this subsection shall be*

*construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection.*" *Id.* (emphasis supplied). Thus, the only circumstances in which local police officers may be utilized to "perform a function of an immigration officer" under federal law is when such a voluntary contract is in place. No city may be forced to enter into such a contract and, without such a contract, the federal government is prohibited by law from accepting such services from local governments without compensation.

62.     The primary reason for this limitation is because the federal government may ultimately be held liable for those who act as its immigration officers. The use of contracts necessarily identifies and limits the universe of those for whom the federal government may become responsible. To that end, Subsection 1357(g) requires that any local police officer carrying out such functions, not only "be knowledgeable in federal immigration law," but the contract "shall contain a *written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws.*" *Id.* at § 1357(g)(2) (emphasis supplied). Indeed, such officer "*shall be subject to the direction and supervision of the Attorney General*" who "*is required to supervise and direct the individual*" per specific provisions in the agreement. *Id.* at § 1357(g)(3) & (5). These provisions make clear that, although such police officers will be acting under color of federal law, he or she "shall not be treated as a Federal employee for any purpose other than for purposes of chapter 81 of Title 5 (relating to compensation for injury) and sections 2671 through 2680 of Title 28 (relating to tort claims)." *Id.* at § 1357(g)(7) & (8). Finally, no such police

officer may displace a federal employee, such as a current or future employee of ICE. *Id.* at § 1357(g)(6). In other words, the federal government is not permitted to use borrowed local police officers to avoid hiring the ICE and DHS employees it needs.

63.     By contrast, since Houston is not the federal government, Houston does not currently provide training to its elected or appointed officials, or employees, including its police officers, regarding federal immigration laws or their enforcement. Houston does provide training and policies regarding probable cause, warrants, and lawful searches and seizures unrelated to federal immigration law.

64.     Nothing in 8 U.S.C. §§ 1357(g)(10) or 1373 can be read to authorize the State of Texas to *mandate,* through civil and criminal penalties or forfeiture of office, "communicat[ion] with the Attorney General regarding the immigration status of any individual"… or "cooperat[ion] with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," or require strict compliance with every ICE request, or that local law enforcement officers acquire information on the immigration status of any detained individual. *See Mercado v. Dallas Cty.,* 2017 WL 169102, at *16 (N.D. Tex. Jan. 17, 2017) (ICE detainer request is voluntary, not mandatory).

65.     SB4 directly conflicts with the listed provisions by 1) mandating that local police officers perform immigration officer functions even though it is a violation of federal law for ICE, DHS, or any other federal government agency to accept such services without paying for them; 2) creating an unfunded mandate in violation of 31 U.S.C.A. § 1342; 3) mandating that local police officers and cities provide services federal law

expressly makes voluntary; 3) punishing civilly, criminally, and with forfeiture of office the failure to provide services federal law expressly makes voluntary; 4) subjecting the federal government, without its permission or authorization, to liability by forcing local police officers to act under color of federal law without providing the training or supervision required by federal law from federal law enforcement agencies; 5) eliminating the knowledge, training, and supervision requirements mandated for those acting as federal immigration officers under federal law; and 6) in violation of federal law, displacing federal workers who ICE and DHS might otherwise have hired in Texas to enforce the federal immigration laws.

66.     In addition, the President of the United States has inherent authority to conduct foreign affairs. To that end, the President recently issued Executive Order 13,768, which purports to define and penalize "sanctuary jurisdictions." Although that order has been preliminary enjoined by a federal district court in California, in recent court filings and guidance memoranda, the Department of Justice has confirmed that a city such as Houston may be punished as an impermissible "sanctuary" only if it fails to comply with existing federal immigration law and, in particular, 8 U.S.C. § 1373, which addresses only voluntary communication and cooperation with ICE and DHS. Houston is and has been complying with federal immigration law and Section 1373 and is, therefore, not a "sanctuary jurisdiction" under the federal definition of that term. SB4 would, however, penalize Houston and its officials even though Houston is complying with existing federal law.

67.     It is, therefore, impossible for Houston to comply with *both* SB4 and federal law. In the alternative, SB4 frustrates the purpose of these federal laws by unleashing upon a terrified immigrant population thousands of untrained (in federal immigration law), and largely unsupervised (by ICE or the U.S. Attorney General) law enforcement personnel and others who will lose their jobs, forfeit their offices, or be subject to fines and criminal prosecution if they are even seen not to enforce or to oppose the enforcement of federal immigration law as envisioned by Texas. On either basis, Art. 2.251 [Code of Criminal Procedure], § 39.07 [Texas Penal Code], § 87.031 [Local Gov't Code], and §§ 752.053(a), (b)(1), (b)(2)(B), 752.055, 752.056, 752.0565 [Gov't Code] of SB4 are preempted by federal law and of no effect.

68.     In the alternative, for the same reasons, SB4 and, in particular, the listed provisions of SB4, upset the delicate balance of statutory objectives of §§ 1342 and 1357 to utilize only certified-trained, knowledgeable, closely-supervised (by federal officials) immigration officers to enforce federal immigration law. To that extent, Art. 2.251 [Code of Criminal Procedure], § 39.07 [Texas Penal Code], § 87.031 [Local Gov't Code], and §§ 752.053(a), (b)(1), (b)(2)(B). 752.055, 752.056, 752.0565 [Gov't Code] of SB4 are preempted by federal law and of no effect. *See Buckman Co. v. Plaintiffs Legal Comm.*, 531 U.S. 341, 348 (2001).

### SECOND CAUSE OF ACTION: FIRST AMENDMENT/ART. I, § 8

69.     The City hereby incorporates by reference the preceding paragraphs 1 through 68.

70.     SB4, and, in particular, §§ 752.053(a)(1),752.055-56, 752.0565 [Gov't Code] of SB4, violate the First Amendment, as applied to the States through the Fourteenth Amendment, and art. I, § 8 of the Texas Constitution by penalizing the protected speech of local officials who "endorse" a "policy," even an "informal, unwritten policy," that would contradict SB4's mandates. SB4 makes clear that they may forfeit their offices based on their merely making such a statement.

71.     SB4 is a content-based restriction because it only outlaws speech that is critical of SB4 and mandatory federal immigration enforcement and not speech that supports SB4 and such enforcement.

72.     In addition, because § 752.0565 would punish elected officials who criticize SB4 and its policies, SB4 restricts and chills political speech. SB4, therefore, should be subjected to the highest level of constitutional scrutiny.

73.     In the alternative, because it includes vague terms, such as "materially limit," "custody," "endorse," "informal or unwritten policy," and the like, SB4 is unconstitutionally overbroad because it is unclear whether it regulates a substantial amount of protected speech or not. Under federal law, any such statute restricting protected speech is deemed to be unconstitutionally overbroad and invalid in all of its applications.

### THIRD CAUSE OF ACTION: FOURTH AMENDMENT/ ART. I, § 9/14TH AMENDMENT PROCEDURAL DUE PROCESS

74.     The City hereby incorporates by reference the preceding paragraphs 1 through 73.

75.     SB4 violates the Fourth Amendment of the United States Constitution, applied to the States through the Fourteenth Amendment, and art. I, § 9 of the Texas Constitution. Immigration detainers are central to SB4 and, in particular, to Art. 2.251 [Code of Crim. Procedure] of SB4. Because such detainers seek to detain individuals without a warrant and without making a particularized determination that the individual is likely to escape before a warrant can be obtained, they have been held to exceed ICE's statutory authority to make warrantless arrests granted by 8 U.S.C. §§ 1226(a) and 1357(a)(2) in violation of 5 U.S.C. § 706(2)(C). *See, e.g., Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1009 (N.D. Ill. 2016). By requiring local police officers to enforce to the letter ICE detainer requests, obtained without a showing of probable cause or that the detainee is likely to escape, SB4 requires Houston to choose between compliance with SB4 and violation of its detainees' Fourth Amendment and Texas constitutional rights. SB4 thus subjects Houston and its officials and police officers to such detainees' claims of unconstitutional detention. On that basis, Art. 2.251 [Code of Criminal Procedure], § 39.07 [Texas Penal Code], and §§ 752.053,752.055-56, 752.0565 [Gov't Code] and other relevant provisions of SB4 are unconstitutional and of no effect.

76.     For the same reasons, SB4 would force Houston to deprive individuals of their liberty without due process of law if Houston is required to comply with every ICE detainer request without question. In this fashion, SB4 also violates the Due Process Clause of the Fourteenth Amendment and renders the listed and other relevant provisions of SB4 unconstitutional and of no effect.

77.     Finally, by forcing Houston officials to detain persons subject to ICE detainer requests even when the original, non-immigration grounds for their detention have expired or disappeared, SB4 violates the Fourth Amendment and Texas constitution.

### FOURTH CAUSE OF ACTION: 14TH AMENDMENT SUBSTANTIVE DUE PROCESS/ ART. I, § 19 DUE COURSE OF LAW

78.     Houston incorporates by reference the preceding paragraphs 1 through 77.

79.     Because it imposes criminal penalties and forfeiture for its violation, SB4 is analyzed under the heightened scrutiny of a criminal statute. Judged by those standards, SB4 violates the Due Process Clause of the Fourteenth Amendment and the Due Course of Law clause of the Texas Constitution by failing to "define a violation of that statute with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005). Put another way, SB4 fails to "provide definite standards for those who apply them." *Beckerman v. Tupelo*, 664 F.2d 502, 511 (5th Cir. 1981).

80.     SB4 is unconstitutionally vague because it attempts to make highly subjective discretionary decisions—concerning "assistance," "communication," and "cooperation" with ICE operations—mandatory requirements. *See* § 752.053 [Gov't Code]. SB4 would also punish any local official who "endorses" a policy, even an "informal unwritten" one, that "materially limits" immigration enforcement without providing any manageable standards. *See id.* at §§ 752.051(6), 752.053. SB4 imposes criminal penalties on police chiefs and sheriffs who knowingly fail to comply with

immigration detainer requests for persons in their "custody," *see id* at art. 2.251(a) [Code Crim. Proc.], even though SB4 fails to define the term "custody" and may hold law enforcement chiefs liable if they release a person based on a reasonable belief they have provided adequate proof of citizenship or lawful immigration status. Finally, SB4 fails to identify any constitutional means by which local police can decide whether or not to check the status of detainees or arrestees.

81.     In addition, SB4 violates the Due Course of Law provision contained within the Texas Constitution, as well as substantive due process rights protected by the Fourteenth Amendment of the United States Constitution by granting complete discretion to individual police officers and prohibiting any attempt to guide or control those officers in the enforcement of federal immigration laws.

82.     SB4 also violates the Due Process and Due Course of Law clauses because it takes away Houston's discretion to decide when to comply with ICE detainers in order to ensure compliance with those clauses. This withdrawal of discretion requires that that Houston honor detainer requests even when it concludes that doing so would violate the United States and Texas Constitutions.

83.     Finally, by arbitrarily imposing unduly burdensome and oppressive harms on Houston, its officials, its employees, and its residents, and by substantially restricting protected conduct including freedoms of expression, association, and travel, SB4 is not rationally related to any legitimate governmental interest.

**FIFTH CAUSE OF ACTION: 14TH AMENDMENT EQUAL PROTECTION/ART. I, §3**

84. The City hereby incorporates by reference the preceding paragraphs 1 through 83.

85. The Fourteenth Amendment to the United States Constitution and art. I, § 3 of the Texas Constitution provide for equal protection under law.

86. SB4 was enacted with the intention and as part of the State of Texas' pattern and practice of enacting unconstitutional laws, including at least six laws that, according to federal courts, have discriminated against Latino Texans in violation of these equal protection clauses. Just as federal courts have found that Texas drew congressional and legislative districts with the specific intent of disenfranchising Latino voters and imposed "voter ID" requirements with the specific intent of disenfranchising Latino voters and voters from other protected classes, Texas has enacted SB4 with the specific intent of threatening, harassing, and intimidating Latino residents of Texas and depriving such residents of their civil liberties.

87. SB4 and, in particular, § 752.053(b) [Gov't Code] of SB4, impermissibly invites police officers to engage in unconstitutional investigative practices, including profiling based upon race, ethnicity, national origin, and perceived status. SB4 prevents all legislative, executive, or judicial action at the local level that is designed to protect or even guide individual police officers in enforcing laws affecting immigrants as such. Because SB4 fails to present any cognizable guidelines for enforcement of suspected civil immigration violations, SB4's purported "savings clause," *id.* at § 752.059, is illusory. SB4 cannot be constitutionally applied and should be enjoined in its entirety.

88.     Further, SB4's citizen reporting provision, § 752.055, treats citizens and lawful immigrants differently, according privileges to citizens alone. There is no constitutional basis for this discriminatory treatment.

89.     State-compelled enforcement of federal immigration laws is not a compelling interest that justifies such race-based discrimination. SB4 is not narrowly-tailored, and is not the least restrictive means of achieving the requisite governmental interest, if any.

90.     There is likewise no rational basis for removing immigration enforcement from any control or guidance by police, chiefs, sheriffs, other local leaders, ICE itself, or the U.S. Attorney General as provided by contract by federal law. *See* 8 U.S.C. § 1357(g).

## SIXTH CAUSE OF ACTION: DELEGATION DOCTRINE

91.     Houston hereby incorporates by reference the preceding paragraphs 1 through 90.

92.     As set forth above, 8 U.S.C. § 1357(g) requires that any local police officer, in carrying out the functions of a federal immigration officer, not only "be knowledgeable in federal immigration law but that the federal government *certify* "[t]hat the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws." *Id.* at § 1357(g)(2). Indeed, such officer "shall be subject to the direction and supervision of the [U.S.] Attorney General," who "is required to supervise and direct the individual" per specific, required provisions in the voluntary agreements between the local and federal governments. *Id.* at § 1357(g)(3) & (5).

93.     By circumventing these contract, training, and certification requirements;
empowering local police officers to act as immigration officers with no special training
or federal direction, or federal supervision at all; effectively making mandatory the
performance by local police officers of the duties of federal immigration officers by
penalizing severely those who would prevent or refuse such performance; and by
prohibiting the adoption or endorsement of policies that would prevent such
performance, SB4 has destroyed § 1357's otherwise proper delegation of limited
federal immigration authority to local officers. SB4's usurpation of federal delegation
of such authority is, therefore, improper, standard-less, and void under the delegation
doctrine. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001); *Yakus v. United
States*, 321 U.S. 414, 426 (1944).

### SEVENTH CAUSE OF ACTION: HOME RULE

94.     Houston hereby incorporates by reference the preceding paragraphs 1 through
93.

95.     Houston is a home-rule city. Its charter describes the procedure under which
local officials, including a Mayor and City Council, are elected and removed from
office. It also reserves to Houston and its governing body all constitutional home-rule
authority, including the discretion to allocate resources and determine its own
priorities in promoting the welfare, health, prosperity, comfort, public safety, and
convenience of all Houstonians.

96.     Under the Texas Constitution, art. XI, § 5, home-rule cities such as Houston
possess the full power of self-government and "look to the Legislature not for grants of

power, but only for limitations on their power." *See Dallas Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490–91 (Tex. 1993). Unlike the federal Supremacy clause, however, the State of Texas, under art. XI, § 5, may not simply legislate and expect cities to defer. *City of Richardson v. Responsible Dog Owners*, 794 S.W.2d 17, 19 (Tex.1990). Instead, a city must defer only to the extent that its law conflicts with the state statute.

97.     The State of Texas has imposed no regulations of its own that conflict with those imposed by municipalities. Instead, the State of Texas now purports to tell municipalities *how to exercise power* that was conferred on them by the federal government and the State Constitution *that the cities still retain*. The Texas Constitution's home-rule provision does not permit such micro-management.

98.     SB4 and, in particular, § 752.0565 [Gov't Code] of SB4, entitled "Removal from Office," violates the Home Rule provision of the Texas Constitution, art. XI, § 5, by improperly denying Houston the power of self-government, including the right to elect and remove local officials, by misusing and misapplying *quo warranto* proceedings in a situation for which they were never intended or suited.

99.     SB4 also violates art. XI, § 5, by improperly infringing Houston's right to determine for itself how to exercise its own police power. Under the Houston City Charter, art. 16, § 1: "The City of Houston shall have power by ordinance duly passed to establish and maintain the City Police Department, prescribe the duties of policemen and regulate their conduct." In addition, art. VI, § 7a gives Houston's mayor the power to appoint and remove heads of departments.

100.   Pursuant to that provision, § 34-22 of Houston's Code of Ordinances states: "There is hereby created the office of the chief of police in the police department of the city. The chief of police shall be appointed by the mayor and confirmed by the city council. Subject only to the orders and actions of the city council and mayor, the chief of police shall be the executive officer and director of the police department. He shall have management of the department, shall exercise all of the functions assigned to the department, and shall carry out the provisions of law and of ordinances with respect to such functions."

101.   Finally, neither the United States nor Texas Constitutions grant the Texas Legislature any authority to regulate the immigration status of foreign nationals. To the extent that SB4 seeks to regulate the manner in which Houston provides for the public health and safety of all of its residents and visitors, including foreign nationals, SB4 is an unconstitutional violation of Houston's home-rule authority.

## COMMON QUESTIONS OF LAW AND FACT

102.   Houston's claims arise from common questions of fact and law asserted by the consolidated plaintiffs and intervenors in their lawsuits seeking to invalidate SB4. Common questions of law include the extent to which 1) SB4 intrudes on federal authority to regulate the status of foreign nationals within U.S. borders and cooperation and communication with local government and is thus preempted; 2) SB4 is vague; and 3) SB4 impedes the protected First Amendment conduct of local officials, violates the Fourth and 14th Amendments to the U.S. Constitution and corresponding provisions of the Texas Constitution; 4) improperly and unconstitutionally infringes

34

both cities' constitutional home-rule authority. Common questions of fact include the manner in which SB4 will impact local law enforcement activities and how it will negatively harm both local communities.

## PRAYER FOR RELIEF

The City of Houston respectfully seeks the following relief: allowing Houston to intervene in the consolidated lawsuits; a declaration that the referenced provisions of SB4 are preempted and/or unconstitutional; a preliminary and permanent injunction barring Texas from enforcing SB4 in whole or in part; such further relief as to which the Court may find Houston entitled.

Respectfully submitted,

CITY OF HOUSTON LEGAL DEPARTMENT

By: _____
RONALD C. LEWIS **
City Attorney
State Bar No. 12305450
ronald.lewis@houstontx.gov
Judith L. Ramsey
Chief, General Litigation Section
State Bar No. 16519550
judith.ramsey@houstontx.gov
Patricia L. Casey **
Senior Assistant City Attorney
State Bar No. 03959075
pat.casey@houstontx.gov
Connica Lemond **
Senior Assistant City Attorney
State Bar No. 24031937
connica.lemond@houstontx.gov
Collyn A. Peddie
Senior Assistant City Attorney
State Bar No. 15707300
collyn.peddie@houstontx.gov
Fernando De Leon **
Senior Assistant City Attorney
State Bar No. 24025325
fernando.deleon2@houstontx.gov
900 Bagby, 4th Floor
Houston, Texas 77002
Telephone: 832.393.6462
Facsimile: 832.393.6259

*Attorneys for Intervenor, City of Houston*

*** - Pending Pro Hac Vice Permission*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2017, I served the following attorneys with a true and correct copy of the foregoing document in accordance with *Rule 5(b) of the Federal Rules of Civil Procedure.*

Collyn Peddie

*Via Electronic Mail*

**ATTORNEYS FOR EL CENIZO PLAINTIFFS:**

Andre I. Segura      asegura@aclu.org
Omar C. Jadwat      ojadwat@aclu.org
Spencer Amdur      samdur@aclu.org
Lee Gelernt      lgelernt@aclu.org
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, New York 10004
212.549.2676 – Telephone
212.549.2654 – Facsimile

Cody Wofsy      cwofsy@aclu.org
Stephen B. Kang
Cecillia D. Wang      cwang@aclu.org
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, California 94111
415.343.0785 – Telephone
415.395.0950 – Facsimile

Edgar Saldivar      esaldivar@aclutx.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS
P.O. Box 8306
Houston, Texas 77288
713.325.7011 – Telephone
713.942.8966 – Facsimile

Max Renea Hicks      rhicks@renea-hicks.com
LAW OFFICE OF MAX RENEA HICKS
P.O. Box 303187
Austin, Texas 78703
512.480.8231 – Telephone

Luis Roberto Vera, Jr.          lrvlaw@sbcglobal.net
LAW OFFICES OF LUIS ROBERTO VERA & ASSOCIATES, P.C.
111 Soledad, Suite 1325
San Antonio, Texas 78205-2260
210.225.3300 – Telephone
210.225.2060 – Facsimile

**ATTORNEYS FOR THE EL PASO COUNTY PLAINTIFFS:**

Jo Anne Bernal          joanne.bernal@ca.epcounty.com
EL PASO COUNTY ATTORNEY
El Paso County Bldg.
500 E. San Antonio St., Room 203
El Paso, Texas 79901-2419
915.546.2083 – Telephone
915.546.2133 – Facsimile

Jose Garza          jgarza@trla.org
LAW OFFICE OF JOSE GARZA
7414 Robin Rest Dr.
San Antonio, Texas 78209
210.392.2856 – Telephone

Michael Patrick Moran          michael@ggmtx.com
GARZA GOLANDO MORAN, PLLC
115 E. Travis Street, Suite 1235
San Antonio, Texas 78205
210.892.8543 – Telephone

**ATTORNEYS FOR SAN ANTONIO PLAINTIFFS:**

Deborah L. Klein          Deborah.klein@sanantonio.gov
OFFICE OF THE CITY ATTORNEY, LITIGATION DIVISION
Frost Bank tower
100 West Houston Street, 18th Floor
San Antonio, Texas 78205-3966
210.207.8919 – Telephone
210.207.4357 – Facsimile

Andrea E. Senteno          asenteno@maldef.org
Celina Y. Moreno          cmoreno@maldef.org
Marisa Bono          mbono@maldef.org
Nina Perales          nperales@maldef.org
Tanya g. Pellegrini          tpellegrini@maldef.org
John Paul Salmon          jsalmon@maldef.org
MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND (MALDEF)

110 Broadway, Suite 300
San Antonio, Texas 78205
202.293.2828 – Telephone
202.293.2849 – Facsimile

**ATTORNEYS FOR CITY OF AUSTIN INTERVENORS:**

Christopher J. Coppola          christopher.coppola@austintexas.gov
Michael J. Siegel               michael.siegel@austintexas.gov
CITY OF AUSTIN
P.O. Box 1546
Austin, Texas 78767
512.974.2161 – Telephone
512.974.1311 – Facsimile

**ATTORNEYS FOR TRAVIS COUNTY INTERVENORS:**

Anthony J. Nelson               tony.nelson@traviscountytx.gov
Laurie R. Eiserloh              laurie.eiserloh@traviscountytx.gov
Sharon Talley                   sharon.talley@traviscountytx.gov
Sherine E. Thomas               sherine.thomas@traviscountytx.gov
Tim Labadie                     tim.labadie@traviscountytx.gov
TRAVIS COUNTY ATTORNEY
314 West 11th Street, Room 590
Austin, Texas 78701
512.854.4801 – Telephone
512.854.4808 – Facsimile

**ATTORNEYS FOR DEFENDANTS:**

Andrew D. Leonie, III           leonie@texasattorneygeneral.gov
David J. Hacker                 david.hacker@oag.texas.gov
David A. Nimocks                austin.nimocks@oag.texas.gov
Joel Stonedale                  joel.stonedale@oag.texas.gov
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
209 W. 14th St., 8th Floor
Austin, Texas 78701
512.475.3281 – Telephone

Darren L. McCarty               darren.mccarty@oag.texas.gov
OFFICE OF TEXAS ATTORNEY GENERAL
Executive Administration
240 W. 14th Street, 7th Floor
Austin, Texas 78701
512.936.0594 – Telephone
512.936.0545 – Facsimile

Exh. 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| City of El Cenizo, Texas, *et al.* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| Travis County, *et al.* | § | **Civil Case No. 5:17-cv-404-OG** |
| | § | |
| Plaintiff-Intervenors, | § | |
| v. | § | |
| | § | |
| State of Texas, *et al.* | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF ART ACEVEDO

### Background on Houston and Chief Acevedo

1.     My name is Art Acevedo, and I am currently the Chief of Police for the City of

Houston, Texas. I was sworn in as Chief of Police for the City of Houston on November

30, 2016.

2.     I have over 30 years of law enforcement experience. Prior to my appointment as

Houston's Chief of Police, I served as the Chief of Police for the City of Austin in 2007.

I began my law enforcement career in 1986 as a field patrol officer in East Los Angeles

with the California Highway Patrol.  I rose through those ranks and was named Chief of

the California Highway Patrol in 2005.

3.      I have a Bachelor's of Science Degree in Public administration from the University of La Verne in California.

4.      The City of Houston is the fourth most populous city in the nation with a population of over 2.3 million residents.  Its population is comprised of citizens, non-citizens, legal residents, visitors and nondocumented immigrants.

5.      The safety of the people of Houston is paramount. To that end, the Houston Police Department ("HPD") works extremely hard to build and maintain trust, communication, and strong relationships with the communities it is sworn to serve.  As Chief, I lead a department of 5,200 sworn law enforcement officers and 1,200 civil support personnel. On average, HPD annually responds to 1.2 million calls for service, makes 400,000 traffic stops and actively investigates 150,000 crimes.   HPD works tirelessly to make our community safer by arresting those who commit criminal actions that threaten our community—regardless of their immigration status.

6.      HPD works cooperatively with our federal partners, including Immigration and Customs Enforcement, to disrupt violent street gangs that threaten our communities.  We work in conjunction with all federal agencies to arrest those who are involved in human trafficking.  If federal agencies file criminal charges on any person, HPD will arrest the subject regardless of immigration status.

### SB 4

7.      I have read Texas Senate Bill 4 ("SB 4"), and based on my extensive experience in law enforcement, I have many concerns regarding this law, some of which I put forth before the state legislature prior to SB4 becoming law.

8. I believe that all the City of Houston is safer when everyone, regardless of immigration status, feels safe interacting with law enforcement. Broad rules, such as those imposed by SB4, that push local law enforcement to take a more active role in immigration enforcement will further strain the relationship between local law enforcement and the diverse communities in Houston.

9. I am proud of the hard work that HPD does to keep the City of Houston safe. I am concerned that SB4 will lead to officers inquiring about the immigration status of every person they encounter, or worse, only inquiring about the immigration status of persons based on their appearance. And if it does, it will deter witnesses and victims from assisting our officers in apprehending those who commit crimes, as I explain in more detail below.

10. In addition, law enforcement professionals must be able to direct the efforts of its officers to meet the needs of the community it serves. SB4 prohibits policies that would allow law enforcement professionals from determining the best use of its limited manpower. This bill would take away the ability of police chiefs to prioritize their enforcement efforts, which impedes HPD in its mission to make the community safer. For example, SB4 states that a law enforcement agency may not "prohibit or discourage" an employee from taking certain actions in detaining someone to further inquire about immigration status, or contacting ICE. Therefore, with the language of the bill, a police chief will be potentially violating the law if he or she deploys that officer to address a burglary in progress rather than investigating a purely civil offense of illegal presence in the country. While both are important, it needs to be the chief of police that addresses the resources of the department.

2

**SB 4 Undermines Public Safety by Making Victims Afraid to Report Crimes and Witnesses Afraid to Cooperate in Prosecution of Those Crimes**

11.    Law enforcement agencies such as HPD have worked extremely hard to build trust and a spirit of cooperation with immigration groups through community based policing and outreach programs.  Broad mandates for local law enforcement to take a more active role in immigration enforcement will further strain the relationship between local law enforcement and the diverse communities they serve.  This will lead to less cooperation from members of the community and foster a belief that these communities cannot seek assistance from police for fear of being subjected to immigration status investigation.

12.    SB4 will harm the community policing efforts of my office. Officers may start inquiring about the immigration status of every person they encounter, or worse, inquire about the immigration status of people based on their appearance.  An undocumented immigrant will not come forward and provide needed assistance and cooperation if he or she is concerned that they will be deported or subject to an immigration status investigation. Distrust and fear of contacting or assisting the police has already become evident among even legal immigrants. Legal immigrants are beginning to avoid contact with the police for fear that they themselves or undocumented family members or friends may become subject to immigration enforcement.

13.    Such a divide between the local police and immigrant groups will result in increased crime against immigrants and in the broader community, create a class of silent victims, and eliminate the potential for assistance from immigrants in solving crimes or

preventing crime.    If we don't arrest criminals who victimize our immigrant communities, we allow them to remain free to victimize every one of us.  HPD has found that the number of Hispanics reporting rapes has dropped 43 percent compared to the same time last year, with a 13 percent drop in other violent crimes.  That's compared to an 8.2 percent increase in non-Hispanic victims reporting rapes and an 11.7 percent increase in non-Hispanics reporting other violent crime.    When undocumented immigrants are afraid to report a crime for fear of police handing them over to ICE, that means a criminal goes free to prey on more people.

14.    When it comes to crime, we are in this together, regardless of race, sex, religion or national origin.    SB4 will make our communities more dangerous, not safer.    It's concerning for me that the state, seeks to criminalize leadership in our cities and seeks to control our police departments.

### Required Immigration Enforcement Activities and Impact on HPD Officers Who are Not Trained in Immigration Law or Immigration Enforcement

16.    To the extent that SB4 seeks to address immigration enforcement in the state of Texas, forcing local law enforcement agents to become immigration agents is not the solution.  HPD officers are very well trained on the laws that they enforce.  Our department's requirements for training even go above the Texas Commission on Law Enforcement (TCOLE) standards.  However, HPD does not train on immigration law.

17.    Because HPD officers are not trained in determining a person's immigration status, which in my experience is a very complicated determination, I believe that officers may inevitably rely on race and ethnicity, and will unlawfully prolong detentions because of

this practice. Even if trained, there will be an increase in the risk of these kinds of violations, and members of the community will still fear interaction with law enforcement.

18.    Because of the mandates of SB4, HPD will be forced to expend additional resources, that are already stretched as it is, to train officers on immigration law and supervising officers on those aspects of the job.  HPD should be committing itself and its resources to training officers in laws and responsibilities to stop the violent crimes happening in our communities and protecting those who cannot protect themselves.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on this _23rd_ day of June, 2017.



Art Acevedo
Chief of Police, Houston Police Department

Exh. 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| City of El Cenizo, Texas, *et al.* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| Travis County, *et al.* | § | **Civil Case No. 5:17-cv-404-OG** |
| | § | |
| Plaintiff-Intervenors, | § | |
| v. | § | |
| | § | |
| State of Texas, *et al.* | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF ART ACEVEDO

### Background on Houston and Chief Acevedo

1.     My name is Art Acevedo, and I am currently the Chief of Police for the City of

Houston, Texas. I was sworn in as Chief of Police for the City of Houston on November

30, 2016.

2.     I have over 30 years of law enforcement experience. Prior to my appointment as

Houston's Chief of Police, I served as the Chief of Police for the City of Austin in 2007.

I began my law enforcement career in 1986 as a field patrol officer in East Los Angeles

with the California Highway Patrol.  I rose through those ranks and was named Chief of

the California Highway Patrol in 2005.

3.    I have a Bachelor's of Science Degree in Public administration from the University of La Verne in California.

4.    The City of Houston is the fourth most populous city in the nation with a population of over 2.3 million residents.   Its population is comprised of citizens, non-citizens, legal residents, visitors and nondocumented immigrants.

5.    The safety of the people of Houston is paramount. To that end, the Houston Police Department ("HPD") works extremely hard to build and maintain trust, communication, and strong relationships with the communities it is sworn to serve.  As Chief, I lead a department of 5,200 sworn law enforcement officers and 1,200 civil support personnel. On average, HPD annually responds to 1.2 million calls for service, makes 400,000 traffic stops and actively investigates 150,000 crimes.   HPD works tirelessly to make our community safer by arresting those who commit criminal actions that threaten our community—regardless of their immigration status.

6.    HPD works cooperatively with our federal partners, including Immigration and Customs Enforcement, to disrupt violent street gangs that threaten our communities.  We work in conjunction with all federal agencies to arrest those who are involved in human trafficking.  If federal agencies file criminal charges on any person, HPD will arrest the subject regardless of immigration status.

### SB 4

7.    I have read Texas Senate Bill 4 ("SB 4"), and based on my extensive experience in law enforcement, I have many concerns regarding this law, some of which I put forth before the state legislature prior to SB4 becoming law.

8.    I believe that all the City of Houston is safer when everyone, regardless of immigration status, feels safe interacting with law enforcement. Broad rules, such as those imposed by SB4, that push local law enforcement to take a more active role in immigration enforcement will further strain the relationship between local law enforcement and the diverse communities in Houston.

9.    I am proud of the hard work that HPD does to keep the City of Houston safe. I am concerned that SB4 will lead to officers inquiring about the immigration status of every person they encounter, or worse, only inquiring about the immigration status of persons based on their appearance. And if it does, it will deter witnesses and victims from assisting our officers in apprehending those who commit crimes, as I explain in more detail below.

10.    In addition, law enforcement professionals must be able to direct the efforts of its officers to meet the needs of the community it serves. SB4 prohibits policies that would allow law enforcement professionals from determining the best use of its limited manpower. This bill would take away the ability of police chiefs to prioritize their enforcement efforts, which impedes HPD in its mission to make the community safer. For example, SB4 states that a law enforcement agency may not "prohibit or discourage" an employee from taking certain actions in detaining someone to further inquire about immigration status, or contacting ICE. Therefore, with the language of the bill, a police chief will be potentially violating the law if he or she deploys that officer to address a burglary in progress rather than investigating a purely civil offense of illegal presence in the country. While both are important, it needs to be the chief of police that addresses the resources of the department.

**SB 4 Undermines Public Safety by Making Victims Afraid to Report Crimes and
Witnesses Afraid to Cooperate in Prosecution of Those Crimes**

11.     Law enforcement agencies such as HPD have worked extremely hard to build trust and a spirit of cooperation with immigration groups through community based policing and outreach programs. Broad mandates for local law enforcement to take a more active role in immigration enforcement will further strain the relationship between local law enforcement and the diverse communities they serve. This will lead to less cooperation from members of the community and foster a belief that these communities cannot seek assistance from police for fear of being subjected to immigration status investigation.

12.     SB4 will harm the community policing efforts of my office. Officers may start inquiring about the immigration status of every person they encounter, or worse, inquire about the immigration status of people based on their appearance. An undocumented immigrant will not come forward and provide needed assistance and cooperation if he or she is concerned that they will be deported or subject to an immigration status investigation. Distrust and fear of contacting or assisting the police has already become evident among even legal immigrants. Legal immigrants are beginning to avoid contact with the police for fear that they themselves or undocumented family members or friends may become subject to immigration enforcement.

13.     Such a divide between the local police and immigrant groups will result in increased crime against immigrants and in the broader community, create a class of silent victims, and eliminate the potential for assistance from immigrants in solving crimes or

preventing crime.     If we don't arrest criminals who victimize our immigrant communities, we allow them to remain free to victimize every one of us.  HPD has found that the number of Hispanics reporting rapes has dropped 43 percent compared to the same time last year, with a 13 percent drop in other violent crimes.  That's compared to an 8.2 percent increase in non-Hispanic victims reporting rapes and an 11.7 percent increase in non-Hispanics reporting other violent crime.     When undocumented immigrants are afraid to report a crime for fear of police handing them over to ICE, that means a criminal goes free to prey on more people.

14.     When it comes to crime, we are in this together, regardless of race, sex, religion or national origin.   SB4 will make our communities more dangerous, not safer.   It's concerning for me that the state, seeks to criminalize leadership in our cities and seeks to control our police departments.

### Required Immigration Enforcement Activities and Impact on HPD Officers Who are Not Trained in Immigration Law or Immigration Enforcement

16.     To the extent that SB4 seeks to address immigration enforcement in the state of Texas, forcing local law enforcement agents to become immigration agents is not the solution.  HPD officers are very well trained on the laws that they enforce.   Our department's requirements for training even go above the Texas Commission on Law Enforcement (TCOLE) standards.  However, HPD does not train on immigration law.

17.     Because HPD officers are not trained in determining a person's immigration status, which in my experience is a very complicated determination, I believe that officers may inevitably rely on race and ethnicity, and will unlawfully prolong detentions because of

this practice. Even if trained, there will be an increase in the risk of these kinds of violations, and members of the community will still fear interaction with law enforcement.

18.    Because of the mandates of SB4, HPD will be forced to expend additional resources, that are already stretched as it is, to train officers on immigration law and supervising officers on those aspects of the job. HPD should be committing itself and its resources to training officers in laws and responsibilities to stop the violent crimes happening in our communities and protecting those who cannot protect themselves.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on this _23rd_ day of June, 2017.


_____
Art Acevedo
Chief of Police, Houston Police Department