```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3   CITY OF EL CENIZO, TEXAS, ET AL,)
          Plaintiffs,                )
 4                                   )
     CITY OF AUSTIN, ET AL,          ) No. 5:17-CV-404-OLG
 5        Plaintiff-Intervenors,     ) Consolidated Lead Case
     vs.                             )
 6                                   ) San Antonio, Texas
     STATE OF TEXAS, ET AL,          ) June 26, 2017
 7        Defendants.                )
     ------------------------------
 8
                TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
 9              BEFORE THE HONORABLE ORLANDO L. GARCIA
                    UNITED STATES DISTRICT JUDGE
10
     A P P E A R A N C E S :
11
     FOR THE CITY OF EL CENIZO, TEXAS, ET AL:
12
     Law Office of Max Renea Hicks
13   Max Renea Hicks, Esquire
     P.O. Box 303187
14   Austin, Texas 78703

15   Law Offices of Luis Roberto Vera & Associates
     Luis Roberto Vera, Jr., Esquire
16   111 Soledad, Suite 1325
     San Antonio, Texas 78205
17
     American Civil Liberties Union
18   Lee Gelernt, Esquire
     125 Broad Street, 18th Floor
19   New York, New York 10004

20   American Civil Liberties Union of Texas
     Edgar Saldivar, Esquire
21   P.O. Box 8306
     Houston, Texas 77288
22
     FOR EL PASO COUNTY, ET AL:
23
     Jose Garza, Esquire
24   Attorney at Law
     1111 North Main Street
25   San Antonio, Texas 78212
```

```
 1    Texas Civil Rights Project
      Efren Carlos Olivares, Esquire
 2    1017 West Hackberry
      Alamo, Texas 78516
 3
      Texas Civil Rights Project
 4    Mimi M.D. Marziani, Esquire
      1405 Montopolis Drive
 5    Austin, Texas 78741

 6    FOR THE CITY OF SAN ANTONIO, ET AL:

 7    Mexican American Legal Defense & Educational Fund
      Nina Perales, Esquire
 8    John Paul "Jack" Salmon, Esquire
      Celina Ysela Moreno, Esquire
 9    110 Broadway Street, Suite 300
      San Antonio, Texas 78205
10
      Office of the City Attorney, Litigation Division
11    Deborah Lynne Klein
      Frost Bank Tower
12    100 West Houston Street, 18th Floor
      San Antonio, Texas 78205-3966
13
      Sidley Austin, LLP
14    Yolanda Cornejo Garcia, Esquire
      Cory D. Szczepanik, Esquire
15    2021 McKinney Avenue, Suite 2000
      Dallas, Texas 75201
16
      Sidley Austin, LLP
17    Jose F. Sanchez, Esquire
      555 West Fifth Street
18    Los Angeles, California 90013

19    FOR TRAVIS COUNTY, ET AL:

20    Travis County Attorney's Office
      David A. Escamilla, Esquire
21    Sherine E. Thomas, Esquire
      Sharon Talley, Esquire
22    Tony Nelson, Esquire
      314 West 11th Street
23    Granger Building, Suite 500
      P.O. Box 1748
24    Austin, Texas 78767

25
```

```
1    FOR THE CITY OF AUSTIN:

2    City of Austin Law Department
     Michael Siegel, Esquire
3    301 West 2nd Street
     Austin, Texas 78701
4
     City of Austin
5    Christopher J. Coppola, Esquire
     P.O. Box 1546
6    Austin, Texas78767

7    FOR THE TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND
     COMMISSIONERS:
8
     Law Offices of Rolando L. Rios
9    Rolando L. Rios, Esquire
     115 East Travis Street, Suite 1645
10   San Antonio, Texas 78205

11   FOR THE CITY OF DALLAS:

12   City Attorney's Office
     Charles S. Estee, Esquire
13   1500 Marilla Street, 7BN
     Dallas, Texas 75201
14
     FOR THE CITY OF HOUSTON:
15
     City of Houston Legal Department
16   Collyn Ann Peddie, Esquire
     Patricia L. Casey, Esquire
17   Connica Lemond, Esquire
     900 Bagby, 4th Floor
18   Houston, Texas 77002

19   James Edward Maloney, PLLC
     James Edward Maloney, Esquire
20   The Esperson Buildings
     815 Walker Street, Suite 1150
21   Houston, Texas 77002

22

23

24

25
```

```
 1    FOR THE STATE OF TEXAS, ET AL:

 2    Attorney General's Office
      Darren L. McCarty, Esquire
 3    Brantley Starr, Esquire
      William T. Deane, Esquire
 4    Eric A. White, Esquire
      P.O. Box 12548
 5    Austin, Texas 78711-2548

 6    FOR THE UNITED STATES OF AMERICA:

 7    United States Attorney's Office
      Gary Anderson, Esquire
 8    601 N.W. Loop 410, Suite 600
      San Antonio, Texas 78216
 9
      U.S. Department of Justice
10    Civil Division
      Erez Reuveni, Esquire
11    Liberty Square Building
      450 5th Street, NW
12    Washington, D.C. 20530

13    COURT REPORTER:

14    Karl H. Myers, CSR, RMR, CRR
      Official Court Reporter
15    655 E. Cesar Chavez Blvd., Rm. 315
      San Antonio, Texas 78206
16    Telephone:  (210) 244-5037
      Email:   karlcsr@yahoo.com
17
      Proceedings reported by stenotype, transcript produced by
18    computer-aided transcription.

19

20

21

22

23

24

25
```

```
 1                (June 26, 2017.)
 2           THE COURT:  Thank you.  You may be seated.  Good
 3   morning, everyone.  I will call the City of Cenizo and others
 4   v. the State of Texas and Governor Abbott and others, Cause
 5   No. 17-Civil-404.  I will have some announcements now.  We
 6   will begin with the plaintiffs.
 7           MR. VERA:  Announcements as far as the plaintiffs
 8   are concerned, on El Cenizo v. State of Texas, we are ready,
 9   and we have allocated the times we --
10           THE COURT:  I understand.  Who are the lawyers here?
11           MR. VERA:  Do you want individually or myself,
12   just --
13           THE COURT:  Introduce them all on your side.
14           MR. VERA:  Yes, Your Honor.  I am Luis Vera.  I
15   represent El Cenizo, with the League of United Latin American
16   Citizens.  Seated to my left is Lee Gelernt, with the American
17   Civil Liberties Union, also representing El Cenizo.  To the
18   left of him is Jose Garza --
19           MS. PERALES:  We will do our own appearances.
20           MR. VERA:  Oh.  Just my people?  Okay.
21           THE COURT:  Right.
22           MR. GARZA:  Jose Garza for the El Paso County
23   plaintiffs.  And with me is Efren Olivares and Mimi Marziani.
24           THE COURT:  Okay.
25           MS. PERALES:  Good morning, Your Honor.  Nina
```

1    Perales for the San Antonio plaintiffs, et al.  With me today

2    are Celina Moreno and Jack Salmon of MALDEF; Jose Sanchez,

3    Yolanda Garcia, Robin Wechkin and Cory Szczepanik of Sidley

4    Austin for San Antonio and Councilman Saldana.  Also with me

5    are Deborah Klein and Elizabeth Provincio from the San Antonio

6    City Attorney's Office for San Antonio and Councilman Saldana.

7    I also have with me today in the courtroom City Councilman Rey

8    Saldana and Bexar County Judge Nelson Wolff.

9              Thank you.

10             THE COURT:  All right.  Thank you.

11             Anyone else?

12             MS. THOMAS:  Your Honor, Sherine Thomas on behalf of

13   Travis County.  I have with me Travis County Attorney David

14   Escamilla, assistant County Attorney Tony Nelson, and

15   assistant County Attorney Sharon Talley.

16             THE COURT:  All right.

17             MR. SIEGEL:  Good morning, Your Honor.  Michael

18   Siegel for the City of Austin, along with Christopher Coppola.

19             THE COURT:  All right.

20             MR. RIOS:  Good morning, Your Honor.  Rolando Rios

21   on behalf of the Texas Association of Hispanic County

22   Judges and Commissioners.

23             THE COURT:  All right.  Anybody else?

24             MR. ESTEE:  Charles Estee for the City of Dallas.

25             THE COURT:  All right.

```
1              MS. PEDDIE:  Collyn Peddie for the City of Houston,
2    and I am joined by Pat Casey, Connica Lemond from the City
3    Attorney's office, and Jim Maloney, who is our cocounsel.
4              THE COURT:  All right.  Thank you.
5              Anyone else from the plaintiff's side?  And for the
6    State of Texas?
7              MR. MCCARTY:  Good morning, Your Honor.  Darren
8    McCarty for the State of Texas, Governor Abbott and Attorney
9    General Paxton and Director McCraw.  With me today, Brantley
10   Starr with the State of Texas, Bill Deane from the State of
11   Texas, and Eric White from the State of Texas.
12             THE COURT:  All right.  And for the United States?
13             MR. REUVENI:  Good morning, Your Honor.  Erez
14   Reuveni.  With me is Gary Anderson.
15             THE COURT:  All right.  Thank you, sir.
16             Okay.  We will begin with -- who is going to make
17   their first argument?
18             MR. GARZA:  Your Honor, I have --
19             THE COURT:  I understand --
20             MR. GARZA:  Your Honor, I have a request of the
21   Court to be allowed to put a witness out of order, the County
22   Attorney Jo Anne Bernal, for travel and medical purposes.
23             THE COURT:  Okay.  I will make this exception this
24   time --
25             MR. GARZA:  I understand.
```

```
 1                    THE COURT:  -- for the circumstances you have raised
 2    in your pleading.  Is she here now?
 3                    MR. GARZA:  She is, Your Honor.
 4                    THE COURT:  Okay.  Let's bring her up now.
 5                    MR. GARZA:  Yes, Your Honor.
 6                    COURTROOM DEPUTY:  Please raise your right hand.
 7                    (Oath administered to the witness.)
 8                    COURTROOM DEPUTY:  Thank you.  Have a seat.
 9                    THE COURT:  And, Mr. Garza, you will have a time not
10    to exceed 15 minutes.
11                    MR. GARZA:  Thank you, Your Honor.
12                    THE COURT:  Let's go.
13                              *-*-*-*-*-*-*-*
14                         DIRECT EXAMINATION
15    BY MR. GARZA:
16    Q.  Ms. Bernal, would you -- where do you reside?
17    A.  El Paso County.
18    Q.  And how long have you lived in El Paso County?
19    A.  I was born and raised there.  I lived there most of my 56
20    years.
21    Q.  And you went to school in El Paso County?
22    A.  Yes, I did.
23    Q.  And where did you attend college?
24    A.  Undergraduate, University of Texas.
25    Q.  And law school?
```

```
1    A.   Also the University of Texas.
2    Q.   Could you describe for the Court briefly the demographic
3    circumstances in El Paso County?
4    A.   Yes.  El Paso is a largely Hispanic, over 80 percent
5    population Hispanic.  Almost 900,000 residents reside in a
6    lower socioeconomic population.
7    Q.   What is your current occupation?
8    A.   I am the elected county attorney of El Paso.
9    Q.   And how long have you been the elected county attorney in
10   El Paso?
11   A.   I was originally appointed in 2009 and subsequently
12   elected in 2010, 2012 and 2016.
13   Q.   And what does the county attorney in El Paso County do?
14   A.   I have various statutory responsibilities.  I am the
15   primary legal advisor to the County Commissioners Court, to
16   the Hospital District, to the Mental Health Authority, as well
17   as to elected officials in El Paso County.
18            I also perform various statutory duties, including
19   obtaining civil protective orders for victims of domestic
20   violence, sexual assault, harassment and stalking.  I
21   represent the State of Texas in civil child abuse cases and I
22   also obtain protection for victims of elder abuse and mental
23   health consumers.
24   Q.   And, Ms. Bernal, are you familiar with SB 4?
25   A.   I am familiar with it.
```

1   Q.  What is the current -- well, let me call your attention to

2   Plaintiff's Exhibit 216.

3            MR. GARZA:  Your Honor, we have provided copies of

4   the exhibits.

5            THE COURT:  Okay.

6   BY MR. GARZA:

7   Q.  It is toward the end of the notebook, Ms. Bernal.

8   A.  216?

9   Q.  Yes.

10  A.  Yes.  Okay.

11  Q.  And what is -- can you describe for the Court what that

12  exhibit is?

13  A.  Yes.  This is the El Paso County Attorney's Office

14  investigators manual of policies and directives.

15  Q.  Okay.  And what is the current -- is the current policy of

16  the County Attorney's Office regarding the interaction with

17  the community and with victims regarding immigration status

18  included in this --

19  A.  Yes, it is.  The County Attorney's Office has a strict

20  written policy that prohibits the involvement of its personnel

21  in the enforcement of civil immigration law.

22  Q.  And can you describe for the Court how this policy came to

23  be created?

24  A.  Approximately ten years ago, El Paso County was sued in

25  federal court basically over racial profiling.  Sheriff's

```
 1   officers had pulled over a bus and were asking the immigration
 2   status of people that were riding on the bus.  We were sued in
 3   federal court.
 4          We entered into a settlement agreement.  As a part
 5   of the settlement agreement, El Paso County agreed that it
 6   would not enforce civil immigration law, so as part of our
 7   settlement agreement, we also agreed to adopt a written
 8   policy.  So the El Paso County Sheriff's Department has a
 9   written policy to that effect and the County Attorney's Office
10   has a similar policy which prohibits the enforcement of
11   immigration law.  I employ five peace officers, all of whom
12   are bound by this policy.
13          THE COURT:  And let me ask you, ma'am, what is the
14   rationale for that policy?  In other words, you are telling me
15   that the sheriff or sheriff deputies cannot ask immigration
16   status questions?
17          THE WITNESS:  (Witness nods head.)
18          THE COURT:  Go ahead.
19          THE WITNESS:  Correct.  El Paso County Sheriff
20   Richard Wiles, myself, as a community strongly believe in both
21   community policing and community prosecution.  I do not
22   believe, El Paso County does not believe that it can
23   effectively protect the citizens of El Paso if local law
24   enforcement is involved in enforcing immigration law.
25          For example, what we see is that the immigrant
```

1   community, the undocumented community, in particular, is

2   reluctant to come forward as a witness, as a victim, to report

3   crime if their interaction with local law enforcement will

4   subject them to separation from their family or deportation.

5           So what happens is it creates, frankly, a less safe

6   community.  It empowers those people that are committing

7   crimes against immigrants and it makes El Paso a less safe

8   community, and that was the basis for entering into both the

9   settlement agreement and the adoption of the written policies.

10          THE COURT:  And is that interest greater than

11  determining the immigrant status of a person?

12          THE WITNESS:  I think it is greater for El Paso

13  County, for myself and for those people who are not charged

14  with enforcing immigration law.  For the federal government,

15  obviously, they are interested and enforcing federal

16  immigration law is a greater interest perhaps to them than our

17  local concerns.  Our local concerns, however, are front-line

18  community safety.  That is not the same concern that the

19  federal government shares, I believe.

20          THE COURT:  All right.  Go ahead, Mr. Garza.

21  BY MR. GARZA:

22  Q.  As the policies are currently written for both the county

23  attorney and the sheriff, do you view those as inconsistent

24  with the requirements of SB 4?

25  A.  I do.  I do not believe that, as an elected official, that

1    I can comply with the provisions of Senate Bill 4 and at the

2    same time have this policy in effect in my office and abide by

3    the terms of our settlement agreement.

4    Q.  Ms. Bernal, I call now your attention to Exhibit 215 in

5    the notebook and ask if you would describe that for the Court.

6    A.  Exhibit 215 is a chart titled Application for Protective

7    Orders in El Paso County for the years 2015, '16 and '17.

8    This is --

9    Q.  And -- go ahead.

10   A.  This is a chart that demonstrates the number of

11   applications for protective orders, the number of people that

12   have applied for protective orders in our county.

13   Q.  And can you describe what it shows to the Court?

14   A.  This chart shows a dramatic decrease in the number of

15   individuals who have come into the County Attorney's Office

16   seeking protection from family violence, sexual assault, abuse

17   and stalking.

18   Q.  All right.

19          THE COURT:  And what percentage of these, for

20   example, in August -- if I am reading this correctly, from

21   August of 2016, what percentage of those persons who sought a

22   protective order were immigrants?

23          THE WITNESS:  In the County Attorney's Office, Your

24   Honor, we do not expressly ask for the immigration status of

25   any victim that comes into our office seeking help.  In my 23

1    years in the office, however, my estimation is that

2    approximately 50 percent of mostly women who come into the

3    County Attorney's Office seeking protective orders are either

4    undocumented or have what we consider undetermined

5    documentation.  It is not clear whether or not they are in the

6    country clearly illegally or not.

7              THE COURT:  All right.  Go ahead, Mr. Garza.

8              MR. GARZA:  Thank you.

9    BY MR. GARZA:

10   Q.  Now, from the chart, it has a red line running along the

11   left-hand side.  What does that indicate?

12   A.  The red line indicates a reference to an incident which

13   occurred in the El Paso County Courthouse in February of this

14   year.

15   Q.  And what was that incident?

16   A.  As was reported nationally, ICE agents entered the El Paso

17   County Courthouse and specifically entered a courtroom called

18   the protective order courtroom designated specifically for

19   victims of domestic violence and they detained and led from

20   the courthouse an undocumented woman who had just obtained a

21   protective order.

22   Q.  And it seems that up until that point, your 2017 numbers

23   were, in fact, exceeding, in terms of the number of protective

24   orders that you were trying to secure, exceeding the other two

25   years that are represented on the chart?

1    A.  That is correct.

2    Q.  And so -- but this was an ICE intervention into the

3    courtroom.  What does that have to do with SB 4?

4    A.  Well, for years, public officials and prosecutors such as

5    myself have argued that bills similar to Senate Bill 4 will

6    have a chilling effect on victims coming to the courthouse.

7    For me, this is direct evidence of what happens when

8    immigration issues get intermixed at the local level in the

9    criminal justice system.

10        What we had in February were -- ICE agents, and I

11   believe what Senate Bill 4 will give us are just different

12   officers of the courthouse frightening away victims and

13   witnesses who will not want to participate in the criminal

14   justice system because of fear of the provisions of Senate

15   Bill 4 and the many officers that they will encounter in the

16   state courthouse.

17   Q.  If you have an investigator with your office or Sheriff

18   Wiles has a deputy sheriff in his office inquiring at the

19   courthouse about the status, immigration status of people that

20   are there, is there anything that you would be able to do

21   about that with the strictures of SB 4?

22   A.  No.  There is nothing that I would be able to do.  In El

23   Paso, as in other courthouses, all people that walk through

24   the courthouse, whether witnesses or victims or lawyers, they

25   go through security and they go through many sheriff's

1   employees.

2          Under Senate Bill 4, I would be prohibited as an

3   elected official essentially from speaking out against such a

4   practice, because the bill, in my opinion, prohibits me from

5   taking any action or speaking out against it or it prohibits

6   me from endorsing any conduct which is contrary to the

7   provisions of the bill.

8   Q.  What do you see, then, beyond that?  Or how does this

9   impact you and your office?  Is there any way to repair any of

10  the damage that would be caused by those sorts of restrictions

11  on your office?

12  A.  There really is no way to repair it.  As an elected

13  official, I am duty bound to protect all victims in El Paso,

14  regardless of their immigration status.  We don't pick and

15  choose.  We don't offer protective orders or protection for

16  children that are abused based on their immigration status.

17  My oath of office is anyone who comes to my office for

18  assistance.

19          As an elected official, I would be prohibited from

20  stopping my investigators from acting in accordance with the

21  policy.  I think I would be prohibited from still even having

22  this policy, and it would effectively limit my duties of

23  office.

24          Additionally, as the county attorney, one of my jobs

25  is to provide defense representation when El Paso County is

```
 1    sued.  I expect and would anticipate that we will be seeing

 2    more 1983 lawsuits.  I think Senate Bill 4 lends itself to

 3    racial profiling and we can expect that will have a financial

 4    impact on El Paso County as well.

 5               MR. GARZA:  Pass the witness.

 6               THE COURT:  All right.  Anything from the State of

 7    Texas?

 8               MR. DEANE:  Thank you, Your Honor.  Bill Deane

 9    representing the Attorney General's Office.

10                         *-*-*-*-*-*-*-*

11                         CROSS EXAMINATION

12    BY MR. DEANE:

13    Q.  Ms. Bernal, we just met this morning; is that correct?

14    A.  Yes, sir.

15    Q.  Okay.  And I don't want to go over a lot of this, but

16    let's start where you started, at the settlement agreement.

17    Tell the Court, please, the circumstances of that case that

18    precipitated that agreement.

19    A.  It was a situation in a rural part of El Paso County where

20    a county bus was pulled over for -- I believe it was a light,

21    headlight or park -- brake light that was out.  The sheriff's

22    deputy pulled the bus over and proceeded to board the bus and

23    then walked down the aisle asking the passengers on the bus

24    their -- for identification.  He pulled from the bus those

25    Mexican-looking citizens that were unable to produce
```

```
 1    identification, took them off the bus and held them for
 2    immigration officials.
 3    Q.  Okay.  And have you read House Bill 4 in terms of how it
 4    would apply if it had been in effect -- I am sorry -- Senate
 5    Bill 4, if it had been effect at that time?
 6    A.  I have.
 7    Q.  And, in fact, you would not be able to inquire into the
 8    immigration status unless the person was in detention or under
 9    arrest; isn't that correct?
10    A.  That is correct, unless they were lawfully detained.
11    Q.  So Senate Bill 4 is not impacted by anything that you have
12    told the Court about the settlement agreement, correct?
13    A.  Well, Senate Bill 4 would prohibit, essentially, what the
14    settlement agreement agreed to, and part of that was to enact
15    a policy that prohibits El Paso County from enforcing
16    immigration law.  I think that is prohibited under Senate Bill
17    4, as well as I think it would prohibit Sheriff Wiles from
18    telling that deputy that what he was doing was unlawful,
19    pursuant to a policy.
20    Q.  Okay.  In terms of the Senate Bill 4, if we look at
21    752.053 of Senate Bill 4 --
22    A.  Is that one of the exhibits?
23            MR. GARZA:  It is not in the exhibit notebook.
24            THE WITNESS:  Okay.  I don't have it memorized.
25            MR. DEANE:  It is Defendant's Number 9.
```

```
 1                MR. GARZA:  Your Honor, may the witness be shown a
 2      copy of the exhibit?
 3                THE COURT:  Go ahead.
 4                MR. DEANE:  Oh, I am sorry.  May I approach, Your
 5      Honor?
 6                THE COURT:  Yes, you may.
 7                THE WITNESS:  Number 9?
 8                MR. DEANE:  Number 9.
 9                THE COURT:  Counselor, what was your question again?
10      BY MR. DEANE:
11      Q.  We are looking at Section 752.053 of Senate Bill 4.
12      A.  053?
13      Q.  Yes, ma'am.
14      A.  Okay.
15      Q.  Okay.  And looking specifically at B-1, it says that you
16      can inquire into the immigration status of a person under
17      lawful detention or under arrest; is that correct?
18      A.  That is correct.
19      Q.  Okay.  And just so we are clear, if the officer -- did you
20      view the deputy on the bus as racially profiling those
21      individuals?
22      A.  That was -- the lawsuit alleged that he had racially
23      profiled those persons that were on the bus.
24      Q.  Okay.  And we know, of course, under the Code of Criminal
25      Procedure, that was also illegal, correct?
```

1    A.   That was illegal at the time, yes, sir.

2    Q.   Okay.  And that provisions of racially profiling is also

3    continued in Senate Bill 4 in Section 752.054; is that

4    correct?

5    A.   That is correct.

6    Q.   And, in fact, it says the local entity or police

7    department or anyone under their control may not consider

8    race, color, religion, language or national origin while

9    enforcing immigration laws, except to the extent permitted by

10   the United States or the Texas Constitution?

11   A.   That's what it says, yes.

12   Q.   And your allegations today is that the settlement

13   agreement is somehow violated by that provision?

14   A.   My suggestion is is that the settlement agreement would be

15   violated because other provisions of Senate Bill 4 prohibit

16   the endorsement, adoption, creation of a policy that prohibits

17   an elected official from drafting the policy.  Part of the

18   settlement agreement was the agreement that such a policy

19   would be drafted.

20   Q.   And actually, ma'am, in the Exhibit No. 216, Plaintiff's

21   Exhibit 216 that you were addressing to the Court a moment

22   ago, the second paragraph on page 27, which is the civil

23   immigration laws portion of the county policies -- I will give

24   you a minute.

25   A.   Okay.  I am sorry.  What was your question?

1    Q.  Yes.  Page 27, your civil immigration laws, the portion of

2    the policy that you testified a moment ago about, do you

3    recall that?

4    A.  Yes.

5    Q.  Okay.  What it actually says is that the El Paso County

6    investigators are therefore prohibited from making inquiries

7    into citizenship or residency status for the purpose of

8    determining whether an individual has violated the civil

9    immigration laws or for the purpose of enforcing those laws.

10              Do you see that language?

11   A.  I do.

12   Q.  Okay.  And what we read in Senate Bill 4 was, unless they

13   are under arrest or detainer, detained, you cannot ask for

14   immigration status?

15   A.  Yes, sir.

16   Q.  So explain to the Court, please, why you think those are

17   in any way in conflict.

18   A.  Well, I think we are talking about two different sections

19   of Senate Bill 4.  There is a section which specifically

20   prohibits the adoption, the endorsement, the creation of

21   policies which interfere with peace officers and that prohibit

22   them from engaging in -- if I can read the exact language --

23   from being involved in the enforcement of immigration law.  It

24   subjects elected officials who violate that provision, such as

25   myself, to possible criminal penalties.  It subjects the

1    entity to daily fines.

2           What you are talking about are the specific

3    provision of what happened in the settlement agreement.  Now,

4    I would agree with counsel that that is what the policy says,

5    but if you look at the sentence above that, the policy

6    prohibits the involvement of its personnel in the enforcement

7    of civil immigration laws.

8           I believe the adoption, the creation and the

9    adherence to that policy is in direct conflict with the

10   provision of Senate Bill 4 that prohibits elected officials

11   and governmental bodies from adopting or creating such

12   policies.

13          THE COURT:  But isn't that settlement agreement

14   subservient to state law?

15          THE WITNESS:  Well, I think that it is true that we

16   can't by private agreement violate the law, but we are subject

17   to contract law under state law.  We have already been

18   notified by the plaintiff in that case that if Senate Bill

19   4 goes into effect, El Paso County can be expected to be sued

20   for enforcement of this contractual provision.  He, of course,

21   is alleging as well that Senate Bill 4 is unconstitutional.

22   BY MR. DEANE:

23   Q.  Okay.  And you are also aware of Section 402.0241 of

24   Senate Bill 4 that says in the event you are making good faith

25   efforts to enforce Senate Bill 4 you will have not only

1    representation by the finest attorneys of the Attorney

2    General's Office, you will, in addition, have a key to the

3    State treasury which will pay any judgment, attorney's fees,

4    costs and so forth.

5              Are you aware of that now?

6    A.  I am aware.  However, that section that you have just

7    cited to the Court is limited to two matters.  The Attorney

8    General has discretion to determine whether that

9    representation will be provided.  He decides in good faith --

10   that the local entity's actions were in good faith.  But

11   secondly, that only applies to lawsuits against local entities

12   as it involves detainers.  It doesn't involve 1983 racial

13   profiling lawsuits and other sections of the bill, as I

14   interpret the language of that section.

15   Q.  But, of course, racial profiling, we both agreed a moment

16   ago, is still illegal under the Code of Criminal Procedure?

17   A.  That has been illegal for a very long time and yet it

18   continues.

19   Q.  Okay.  And, in fact, in Section 38 of the penal code, if

20   an officer should obtain evidence illegally, that is

21   inadmissible in any criminal prosecution of that defendant,

22   correct?

23   A.  As it should be, yes, sir.

24   Q.  Okay.  And if we look at the policies -- let me go back to

25   752.051 of Senate Bill 4.

1    A.   051.   Okay.

2    Q.   And you will see there under Section B, Number 4 for a

3    lawful detention, where it is defining that term.  Do you see

4    that?

5    A.   Yes, sir.

6    Q.   And there are two exceptions in Senate Bill 4 which would

7    not allow a peace officer to ask immigration status, and the

8    first one under 4-A is if the person is a victim of or witness

9    to a criminal offense.  Do you see that?

10   A.   I do.

11   Q.   And the second exception is a person who is reporting a

12   criminal offense.  Do you see that?

13   A.   Yes, sir.

14   Q.   So if Senate Bill 4 were in effect, no officer could do

15   what your INS agents allegedly did in February of this year by

16   entering the courthouse and randomly checking people, correct?

17   A.   No.  I don't believe that is correct.  If you look at the

18   end of the bill, however, Senate Bill 4 provides for

19   exceptions to the rule involving the witness and the victim,

20   and it provides that peace officers may -- a peace officer may

21   ask immigration questions on the nationality -- immigration or

22   nationality questions of a crime victim or a witness under

23   certain circumstances, and those exceptions are -- include

24   conducting a separate investigation of any other alleged

25   criminal offense or inquiring as to the nationality or

1    immigration status of a victim or a witness to a criminal

2    offense if the officer has probable cause to believe that the

3    victim or witness has engaged in specific conduct constituting

4    a separate criminal offense.

5              So there is a big, wide open exception that leaves

6    the officer so much discretion that, in my opinion, it doesn't

7    protect the victim or the witness at all.

8    Q.  Okay.  But that exception has been in the Code of Criminal

9    Procedure for a number of years, has it not?

10   A.  It has.

11   Q.  And officers for the last ten years, if they are

12   investigating a crime and they come across a witness who was

13   apparently very necessary, certainly have the right under

14   state law before Senate Bill 4 to inquire about the

15   immigration status of a witness that is material to the

16   prosecution of their case, correct?

17   A.  Well, yes.  I think so.

18   Q.  Okay.  Thank you.  Now, in Senate Bill 4, it also has

19   language about having public education to advise the public

20   about the exceptions for witnesses and victims of crimes not

21   being included?

22   A.  Correct.

23   Q.  Has El Paso County taken any steps to begin that program?

24   A.  After the incident that happened with the ICE agents in

25   the El Paso County Courthouse, several public officials have

```
 1   done their very best to reach out to the immigrant community
 2   to assure them, according to ICE, that this was an isolated
 3   incident.
 4           Unfortunately, the provisions of Senate Bill 4 are
 5   so complicated and, in my opinion, so convoluted that it would
 6   be next to impossible to try to explain to victims, to
 7   undocumented victims and witnesses that there is still
 8   protection.
 9           I mean, it doesn't seem reasonable to me that any
10   kind of community education program is going to alleviate the
11   real fear of being separated, you know, from your family.
12   Q.  Okay.  And who, in your opinion, has the responsibility to
13   meet that need to educate the public in your county of what
14   the law is and how the law applies?
15   A.  Absolutely, the local officials, yes, sir.
16   Q.  That would --
17   A.  Including myself, yes, sir.
18   Q.  That was my next question.
19   A.  Yes, sir.
20   Q.  And just so we are clear, you are here today in your
21   official capacity for the county?
22   A.  Yes, I am.
23   Q.  You are not asserting any claims individually?
24   A.  I am not.
25   Q.  And you are a plaintiff in the lawsuit?
```

1   A.  Yes, sir.

2   Q.  And you are being paid your hotel, your expenses and

3   everything to be here today?

4           MR. GARZA:  Objection, Your Honor.  This is

5   irrelevant and it is harassing the witness.

6           THE COURT:  I will sustain it.  Let's go.

7   BY MR. DEANE:

8   Q.  Okay.  In terms of your analysis, I noticed that you did

9   not testify about 8 United States Code Section 1373, and you

10  are familiar with that, correct?

11  A.  I am.

12  Q.  And what does it provide?

13  A.  It provides that local law enforcement, that information

14  sharing provision under federal law -- just signed a

15  certification three days ago certifying in a grant application

16  for the Sheriff's Department that El Paso County is compliant

17  in sharing information with the federal government.  I think

18  that's the same one.

19  Q.  Yes, it is.  Good memory.  And is your policy consistent

20  with that federal law?

21  A.  I believe so.

22  Q.  Okay.  And are you aware of the counselor notification

23  requirements of the -- Convention relating to aliens arrested

24  in the state of Texas?

25  A.  I am not.

```
1    Q.  Are you aware that a peace officer, if they arrest someone

2    who is identified as a citizen of Mexico, for example, is

3    required by that Convention to alert -- they call it the --

4    alert them and advise them and send them to the Mexican

5    Consulate?

6             Are you aware of those requirements?

7    A.  I am not, and I guarantee the Sheriff's Department

8    deputies are not either.

9    Q.  Okay.  And you are saying the Sheriff's Department, when a

10   person is arrested for a felony in El Paso County, is not

11   advised of their right as a citizen of Mexico --

12   A.  Oh, no --

13   Q.  -- to get in touch with the El Paso Consulate of the

14   nation of Mexico?

15   A.  Absolutely, they are trained for Mexican nationals as well

16   as -- that training comes from the District Attorney's Office

17   and, yes, they are compliant.

18   Q.  Okay.  And you have not told the Court anything about that

19   up until this point; is that correct?

20   A.  I have not.

21   Q.  Okay.

22             THE COURT:  Counselor, you have two more minutes.

23   Do you need them?

24             MR. DEANE:  Okay.  I didn't realize there was a time

25   limit.  I'm sorry.
```

1          THE COURT:  Well, the other side used 12 and you are

2     now close to 15, but I will permit you two minutes.

3          MR. DEANE:  I understand, Judge.  I will hurry.

4          THE COURT:  Thank you.

5     BY MR. DEANE:

6     Q.  Okay.  And just for the record, that we are clear, it is

7     2.131 of the Code of Criminal Procedure that forbids racial

8     profiling by police.  Is that your memory also?

9     A.  Without looking at it, I will take your word for it.

10         MR. DEANE:  I believe that's all I have, Judge.

11    Thank you.

12         THE COURT:  Thank you.

13         Any quick redirect?

14         MR. GARZA:  Nothing further, Your Honor.

15         THE COURT:  Let me ask you, Ms. Bernal, since Senate

16    Bill 4 is scheduled to go into effect on September 1, have you

17    or the county already begun the process of developing a policy

18    that would be consistent with Senate Bill 4?

19         THE WITNESS:  No, Your Honor, we have not.  We have

20    begun internally having our auditor look at how much it would

21    cost in training to be compliant with the statute.  In

22    anticipation that -- if the statute goes into effect, we would

23    anticipate providing significant training on immigration laws

24    to all of the peace officers in the Sheriff's Department, my

25    investigators, constables and other elected peace officers.

1    So to that extent, we have been looking and anticipating how

2    it would affect the county.

3               THE COURT:  Okay.  But do you understand whatever

4    costs are involved to the county or otherwise is irrelevant to

5    the constitutionality of the statute?

6               THE WITNESS:  Yes, sir.

7               THE COURT:  Though it may cost the county a whole

8    bunch of money?

9               THE WITNESS:  Yes, sir.

10              THE COURT:  Which we don't know or I don't know?

11              THE WITNESS:  Right.

12              THE COURT:  Okay.  Thank you, ma'am.

13              THE WITNESS:  Thank you.  I appreciate you letting

14   me go out of order, Your Honor.

15              THE COURT:  You are excused.

16              Okay.  Now, who is going to be the first plaintiff

17   to begin?

18              MR. VERA:  El Cenizo, Your Honor.

19              THE COURT:  Okay.  And you will have 45 minutes.

20              MR. VERA:  Thank you, your Honor.  And, Your Honor,

21   I will only take about 12 minutes, and then Mr. Lee Gelernt

22   will use the rest of the time.

23              THE COURT:  Is he with your plaintiff?

24              MR. VERA:  We are the same plaintiff, El Cenizo, the

25   city of El Cenizo, Your Honor.

1          THE COURT:  Okay.  But what you are telling me is

2    you are going to use the 45 minutes?

3          MR. VERA:  Yes, Your Honor.  We will use the time --

4          THE COURT:  Okay.  Then let's start.

5          MR. VERA:  Thank you, Judge.

6          SB 4 is blatantly unconstitutional because Texas has

7    created a law of immigration enforcement without a federal

8    mandate from the United States Congress.  I mean, this Court

9    is well aware that since the Chinese Exclusionary Acts of

10   1882, Congress took upon itself the responsibility and sole

11   responsibility of immigration, and the United States Supreme

12   Court and every court since then has held that that province

13   belongs to the federal government with very limited exceptions

14   to the states.

15         And I can go through a whole list of cases, Your

16   Honor, but I think the Court is well aware of those cases.

17   The bottom line is, Congress in enacting not only Section 1373

18   of the Immigration and Naturalization Act in there created, in

19   the Immigration and Naturalization Act, created these

20   volunteer programs for the states, whether it is 287-G or the

21   Secure Communities Act, it was pure voluntary.

22         The courts were never mandated to do anything.

23   Congress has never ceded that authority to any state except by

24   agreement.  And even under the 287-G programs and Secure

25   Communities Programs, the federal government supervises those

1    programs, trains those officers locally to ensure that federal

2    law is followed.

3                    THE COURT:  Section 1373 is voluntary; is that

4    correct?

5                    MR. VERA:  The provisions to the locals are

6    voluntary, Your Honor.

7                    THE COURT:  In other words, if the local entity or

8    official chose not to share information with the federal

9    government, they can do that?

10                   MR. VERA:  They can do that, Judge --

11                   THE COURT:  And there is no sanction if they don't

12   do that?

13                   MR. VERA:  There is no sanction, Judge, under

14   federal law.  Under state law now, the State of Texas has

15   criminalized what is federal civil law with the most harsh,

16   harshest, coercive actions of the State of Texas.

17                   THE COURT:  You are talking about the removal from

18   office provision and the financial penalties?

19                   MR. VERA:  They are both, Your Honor.

20                   THE COURT:  All right.

21                   MR. VERA:  There is the removal from office for any

22   elected or appointed official.  And Ms. Bernal, who testified,

23   the fines can range anywhere from $1,000 for the first

24   offense --

25                   THE COURT:  Right.  I am aware of that.

1           MR. VERA:  Okay, Judge.  And, of course, the

2    criminal jail time that nobody seems to talk about.  For

3    example, what are we going to do with a sheriff who has worked

4    hard all of his life and now Mr. Ken Paxton, the Attorney

5    General, decides that he has not complied with SB 4?  They are

6    going to jail that sheriff or that police officer or Ms.

7    Bernal.  That is why SB 4 is unconstitutional, Your Honor.

8           SB 4 is unconstitutional because it is so vague.

9    Here we were just arguing --

10          THE COURT:  How is it vague?

11          MR. VERA:  An example, your Honor, is when the State

12   talks about legal detention.  This bus was stopped --

13          THE COURT:  Well, we are not talking about the bus

14   anymore.

15          MR. VERA:  Any --

16          THE COURT:  We are talking about the statute

17   provides that when someone is lawfully detained or arrested --

18          MR. VERA:  Right.

19          THE COURT:  -- that the officer may make an inquiry

20   as to the immigration status and place of birth of the

21   individual.

22          MR. VERA:  That is correct.

23          THE COURT:  How is that vague?

24          MR. VERA:  It is vague, Judge, because as the

25   argument was just going back and forth between Ms. Bernal and

1    the State, the State was alluding that that stop or that

2    person was not legally detained.  That was a traffic stop.

3    That is a legal detention.

4             So where is the line and where is the exact

5    definition of what exactly is going to be a legal detention?

6    If I am walking down the sidewalk, Judge, and I accidentally

7    throw my gum on the sidewalk and I have committed a violation

8    of some city ordinance, I can be detained.

9             The Terry stops, Judge, under Terry v. Ohio, that is

10   a legal detention.  That is a legal stop.  So under SB 4 now,

11   any individual can now be questioned.  And here is the --

12            THE COURT:  But he can only be questioned if they

13   are like in a traffic stop.  He can only be questioned if

14   there was a bases for the stop.

15            MR. VERA:  Well, that's the question, Judge.  The

16   basis for the stop is one thing, but then the law says if he

17   has reasonable suspicion to believe.  Okay.  What is

18   reasonable suspicion now?  Because if there has been no crime

19   committed -- I am talking about a crime worth investigating --

20            THE COURT:  Well, even a traffic stop is an offense.

21            MR. VERA:  It is.  That is exactly the problem with

22   this law, Judge, because what is left to do -- say you have

23   passengers in a car, as a passenger in a bus.  That person,

24   that passenger has committed no crime, so the only thing left

25   to do is you question them.  If no crime has been committed,

```
 1    and there is no reason other than the way he speaks, the way
 2    she looks, or the way they dress --
 3              THE COURT:  Well, that raises a good point.  Let's
 4    say there is a traffic stop because the driver was speeding.
 5              MR. VERA:  Yes, sir.
 6              THE COURT:  And there are six passengers -- let's
 7    say four or five passengers in the car.
 8              (Laughter.)
 9              THE COURT:  Now, the officer can ask the driver
10    immigration status and place of birth; is that correct?  At
11    least pursuant to the law?
12              MR. VERA:  Well --
13              THE COURT:  My real question is, would that officer
14    be permitted to make that inquiry of the passengers?
15              MR. VERA:  Judge, under SB 4, it is not clear,
16    number one.  But number two, in reality, those of us who also
17    work with criminal law, it happens all the time.  They
18    question the passengers --
19              THE COURT:  Well, we are not going to speculate or
20    whatever, but go ahead.
21              MR. VERA:  SB 4 is unclear of that.  It doesn't
22    mention that at all.  It just says that a legal detention is
23    made.  It opens up the door, Judge.  Even that driver, even
24    that driver, it is going to boil down to the way he speaks,
25    the way he looks, the color of his skin, or the way she is
```

1    dressed.

2              THE COURT:  Well, the way I have read the statute,

3    and I have read it several times, I don't think the officer

4    who makes the stop, unless I missed that part in the statute,

5    would be able to make an inquiry of the passengers.

6              MR. VERA:  I don't see that anywhere in SB 4, Judge.

7              THE COURT:  Okay.

8              MR. VERA:  And it is unclear on that, and I think

9    that is part of the vagueness, because, again, the way the

10   reality works now under the law in Texas is, they question the

11   passenger -- I mean, the driver, the passengers and everyone

12   concerned, and under SB 4, they would be able to go into the

13   immigration status of even the passengers, in our opinion.

14             SB 4, Judge, what SB 4 has done, and going into

15   this, straight into the face of the Congress's authority, and

16   congressional mandate, and every case that has followed down

17   the road, even up through Arizona, and three of the four major

18   issues, of course, were thrown out by the United States

19   Supreme Court for various constitutional reasons.  It boiled

20   down to that the Congress and the United States Supreme Court

21   have said repeatedly:  If you are going to do immigration, you

22   have to work with us.  You have got to be trained.  We have

23   got to supervise.  We are not giving a blanket authority.  And

24   the Supreme Court speaks about that because of the chaos that

25   is going to happen across the country if every state does

1    this.

2            THE COURT:  But in the Arizona case, didn't the

3    statute provide that the officer can make an inquiry or was

4    required to make that inquiry versus SB 4?

5            MR. VERA:  They were -- they were allowed to and it

6    was upheld if a crime had been committed, and they didn't say

7    a legal detention.  If a crime had been committed, and that's

8    what the U.S. Supreme Court held up.

9            And to go forward, Your Honor, I guess what is

10   important here, and I keep harping on this federal mandate by

11   Congress to the states.  This has happened repeatedly, Judge.

12   In a more recent time, in the last few years, they tried it in

13   Hazleton, Pennsylvania.

14           And there was a particular problem in that case

15   because Mrs. Perales' father, Nina Perales', was executive

16   director of the -- League -- Fund, and that group

17   successfully -- successfully found that unconstitutional.

18           And then it came to Farmers Branch, Texas and tried

19   to do it again.  And in that case, MALDEF, with Ms. Perales,

20   successfully defended and found that to be unconstitutional.

21   And, of course, I am very proud of LULAC in LULAC v. Wilson in

22   California, where it was found unconstitutional what the State

23   of California was doing to the immigrants there and trying to

24   deny them all of these benefits.

25           And all for the same reason, Judge, because the

```
1    localities in the state of California continue to go into the
2    province of the congressional, of the Congress of the United
3    States, against the Chinese Exclusionary forward.  Every time
4    they do this, the courts say you cannot do it.
5             Texas had no permission in this case whatsoever or
6    no mandate from Congress to do what it has done.  I am going
7    to have Mr. Gelernt -- I will yield the rest of my time to the
8    American Civil Liberties Union.
9             THE COURT:  Thank you.
10            MR. VERA:  Thank you.
11            MR. GELERNT:  Good morning, Your Honor.  Lee Gelernt
12   for the American Civil Liberties Union.
13            THE COURT:  All right.
14            MR. GELERNT:  Let me just address the question you
15   asked my co-counsel about passengers just very quickly, to get
16   that out of the way.  I think if the passengers are not free
17   to leave, then they would also be detained and, therefore,
18   their immigration status could be inquired into.
19            THE COURT:  Why wouldn't they be free to leave?
20            MR. GELERNT:  Well, if they were not free to leave.
21   If they were free to leave, then maybe they couldn't be
22   questioned, so I think it would depend on the circumstances
23   and how the police officer was treating it.
24            Let me just, I think, spend a couple of minutes
25   before I get into the details framing what I think Texas is
```

```
 1    trying to do here.  Texas is painting the law as a very modest
 2    law that does very little.
 3              We don't think that is correct.  I mean, as Your
 4    Honor knows, there can be jail time for police officers.
 5    Right there, that is not a modest law.  I also think that
 6    Texas is not trying to actually defend this statute as
 7    written, but trying to narrow it through litigation here.  And
 8    as Your Honor knows, the Texas Supreme Court has said that the
 9    AG cannot walk into court, of course, and narrow the statute,
10    that the words of the statute have to mean something and that
11    is what governs.
12              And just a few quick examples.  They are saying that
13    line officers are not under any obligation under SB 4, but if
14    you look at the definition of "local entity," that is
15    definition 5 in the definitional section in 051, it includes
16    employee.
17              They are also saying that SB 4 doesn't reach
18    informal detainers, but if you look at the definition of a
19    detainer request, it says all detainer requests, including the
20    official forms.  So they are reading the word "including" now
21    and just talking about the official forms.
22              THE COURT:  The statute says "any retainer."
23              MR. GELERNT:  Exactly.
24              THE COURT:  Okay.  Go ahead.
25              MR. GELERNT:  And there are a number of other
```

```
 1    examples.  So I think what we are talking about is not a
 2    modest provision.  And in terms of vagueness, which I want to
 3    get into in more detail later, I think the overriding point is
 4    the penalties are so harsh that it is simply unrealistic for
 5    any police officer in this state to take a chance.  No one is
 6    going to take a chance on $25,000 worth of fines per day.  No
 7    one is going to take a chance when there is jail time.  No one
 8    is going to take a chance when there is the possibility of
 9    removal.
10         And I think Texas must know what they are doing.
11    They are setting up a statute that incentivizes people to
12    enforce immigration law to the maximum.
13         And, you know, the final sort of introductory point
14    I want to make is, obviously, if this Court upholds SB 4 and
15    SB 4 is upheld, that means all 50 states can enact SB 4s.
16         THE COURT:  I am sorry.  Say that again.
17         MR. GELERNT:  I am sorry, Your Honor.  I am sorry
18    for speaking so fast.  If SB 4 were upheld by this Court, it
19    obviously means that other states may pass SB 4s.  And so what
20    Texas is saying is, we could have SB 4s in all 50 states.  And
21    that would set up, essentially, a country of an immigration
22    police state, where every official around the country, no
23    matter how local, is looking at immigration law, and that is
24    not what Congress meant.
25         So that's why I want to turn to what we think is the
```

1    overriding claim in this case, at least for us, and that is

2    the preemption claim.  Just to clarify, one thing that Your

3    Honor asked of my colleague about 1373, 1373 is the one

4    mandatory provision, and I think it is critical to look at

5    that provision, because what Congress did is say:  We are

6    going to have one mandatory obligation, the sharing of

7    information.

8            It doesn't mandate that any line officer at a

9    benefit station share information, or any particular cop, but

10   it does say it can't be prohibited.  So it is, in that sense,

11   a mandatory provision.

12           But I think what is critical about that is that

13   Congress didn't make anything else obligatory.  So not

14   investigating immigration, not asking about immigration -- and

15   on page 14 of our brief, we set forth multiple provisions in

16   which Congress has directed themselves to local officials, and

17   so Texas' claim is that:  Well, what does Congress care

18   whether it is the state or a local official?  I mean, that is

19   Texas' overriding position.

20           Congress doesn't care whether the state mandates

21   local, and that's all our internal business.  Well, Congress

22   was very clear about, in all of these provisions listed on

23   page 14 of our brief, mentioning both the state and local

24   subdivisions.

25           So Congress was aware that localities may have

1    different views than the state about immigration enforcement

2    and decided only information sharing in 1373 was going to be

3    obligatory.  And even more than that, over the past years,

4    there have been multiple bills, which we list in our brief,

5    that have tried to expand 1373 to cover the types of things SB

6    4 has covered.

7            Each time, they were rejected.  So this is not an

8    issue that Congress has not had on its mind.  It has

9    ultimately decided that things need to be voluntary, and for

10   good reason.

11           You know, as my colleague mentioned in 8 USC 1357,

12   it talks about training, supervision and the complexity of

13   immigration law.  And we have put in multiple affidavits.  We

14   have -- and my co-counsel -- have talked about the complexity

15   of immigration.

16           And I would just ask the Court, if it wants to, to

17   look at the Bacon declaration we submitted, where a very

18   high-level former Immigration person details how complex

19   immigration is and the fact that people don't always have

20   documentation from the government showing their status,

21   because there are so many different statuses, and there seems

22   to be some misconception I think out there that it is sort of

23   lawful, not lawful and there is one immigration status.

24           So Congress has addressed all of this and decided,

25   they are not going to make everything mandatory.  Texas is

        1    really doing an end run around Congress's decision by now

        2    mandating more than information sharing.  And even as to the

        3    information sharing provision that --

        4            THE COURT:  How are they mandating more?

        5            MR. GELERNT:  Well, for example, Your Honor, as I

        6    think the State will get up and admit, they are supposed to

        7    make immigration inquiries.  They are not allowed to prohibit

        8    immigration inquiries.  Well, 1373 does not mention

        9    immigration inquiries.  1373 is very limited.  It says, if

       10    someone happens to have the information, if a locality happens

       11    to have the information, the supervisor cannot say, "Don't

       12    share it."  It is up to that individual to share the

       13    information.

       14            Well, SB 4 goes beyond that, of course, and says:

       15    When you make a stop, a traffic stop or any other type of

       16    stop, you ask about immigration.  And if a local cop wants to

       17    ask about immigration, he has to be allowed to.  And we

       18    believe that is a mandate on the line cop, because local

       19    entity includes employee.

       20            But even beyond that, you might -- this SB 4 is

       21    setting up a situation where you now have a county or a town

       22    or a city where the sheriff has to stand by and say two of my

       23    officials are going to set up and start asking about

       24    immigration inquiries every time they detain someone.  These

       25    two over here are not going to.  So on a different street,

```
1    people are asking about immigration inquiries and the sheriff

2    has lost complete control to stop that.

3              THE COURT:  Why wouldn't the two, to your right,

4    those officers not ask?

5              MR. GELERNT:  Well, Your Honor, that is a good

6    question.  We think they would be obligated to under SB 4.  I

7    am simply pointing out that if Your Honor accepts Texas'

8    reading of SB 4, even that limited exception that says the

9    line officer can make his own choice, it still means the

10   sheriff has to live with that disparity in his city, but we

11   very much think SB 4 is an obligation on the line officer,

12   because "local entity" means "employee."

13             THE COURT:  Let me ask you, would the statute or

14   does the statute require every officer when he stops a vehicle

15   to make the inquiry or may he make the inquiry?

16             MR. GELERNT:  Right.  I think that is the central

17   question, Your Honor.  Let me be as clear as possible on that.

18   We think it does, because it says local entities cannot have a

19   policy or practice of not making -- doing immigration

20   inquiries.

21             The State reads that as only applying to the

22   supervisor stopping the line, the line officer on the ground

23   who may choose to do it or not to do it.  We think that is an

24   incorrect reading, because "local entity" very clearly in the

25   definition applies to every employee in the state and every
```

```
1    employee at a local level and, therefore, a line officer is an

2    employee.

3         I -- we do believe that every line officer is now

4    obligated to make that immigration inquiry.  I am simply

5    making the further point that if Your Honor didn't accept our

6    reading and accepted the State's reading, that the line

7    officer has a choice whether to make it, it may be even a

8    worse situation, because then the sheriff is looking at where

9    he can't say to his officers:  We want some consistency.  The

10   town is saying, if I am on this street I am being asked about

11   immigration but if I am on this side of the street I am not

12   being asked about immigration, depending on the local

13   preference.

14        That cannot be what Congress wanted is that kind of

15   disparity, and all over the country, people -- all over the

16   state people being asked about immigration or not depending on

17   the druthers of the particular line officer.

18        But, again, Your Honor, just to be clear, not to

19   belabor the point, we do think because "local entity" includes

20   every employee, we do think that local police officer must ask

21   about immigration.

22        THE COURT:  And let me ask you, let's assume someone

23   is stopped for speeding and the officer asks for immigrant

24   status or place of birth, and the person, the driver says:  I

25   was born in Mexico City 40 years ago, but 25 years ago I
```

1     obtained my -- I am now a naturalized citizen.

2             Would the officer then go in further and ask:  Well,

3     do you have your naturalization papers on you?

4             MR. GELERNT:  Your Honor, that is a great question,

5     and I think it also gets to the heart of one of the problems

6     of SB 4, about how vague it is.  There is no direction.  It

7     says "make an immigration inquiry."

8             We don't know whether that is going to allow

9     officers -- and I think what is going to happen is that

10    individual officers are going to take it upon themselves how

11    much to ask about it.

12            And what it does, I think, is contrast with the

13    provision that you mentioned in the Arizona case, which was

14    Section 2-B, which the Supreme Court upheld.  And I actually

15    think in upholding 2-B, it shows why the immigration inquiries

16    under SB 4 are actually unlawful.

17            In Arizona, in the terms of the statute itself, it

18    said you had to have reasonable suspicion, only do it when it

19    is practical, call the Immigration Service.  All of these

20    qualifications plus, plus it did not have penalties, much less

21    these kinds of severe penalties.

22            SB 4 just simply says:  Make an immigration inquiry.

23    So we don't know whether the officer is supposed to follow up

24    with all of these detailed questions, whether the officer is

25    supposed to pocket the information and leave people anxious

1    about what he is going to do with it, whether he is supposed

2    to call the federal government.

3          And what I think is going to happen is, immigration

4    officers, and I think this is borne out by all of the

5    declarations -- I mean, not immigration officers.  Excuse

6    me -- local police are going to enforce it to the hilt,

7    because why take a chance?

8          Why take a chance of having these penalties hit you?

9    A supervisor who hears that his officials -- that his line

10   officers are not enforcing, not asking about immigration, not

11   asking the follow-up questions Your Honor raised, I don't see

12   how a supervisor is not going to continue to say:  Ask more.

13   Ask more.  Do all of these things.

14         Because the only obligation he has is to not

15   materially -- to not prohibit or materially limit.  Well, who

16   knows what "materially limit" means, and that goes to the

17   vagueness question Your Honor asked.

18         THE COURT:  And let me further ask you, so the

19   traffic stop, the officer gives him a citation for speeding,

20   then he makes the immigrant inquiry and place of birth, and

21   let's say the person was born in Mexico City and is not

22   naturalized.  Let's say he is illegally here.

23         Does the officer, after writing the citation, write

24   this information down that Jose Rodriguez, his place of birth,

25   Mexico City, here illegally, does he write it down in his

```
 1   offense report and then go back to the station and what?  What
 2   does he do with that?
 3            And let's say a person says, "I live at 116 Woodlawn
 4   here in San Antonio."  What does he do with that?
 5            MR. GELERNT:  Your Honor, I wish I had thought of
 6   all of those questions.  The truth is --
 7            THE COURT:  Well, what did you do this weekend?
 8            (Laughter.)
 9            MR. GELERNT:  Exactly.  Exactly, Your Honor.  It is
10   on me completely.
11            THE COURT:  Right.
12            MR. GELERNT:  Your Honor, I have no idea.  SB
13   4 gives no direction, and I think that is why all of these
14   affidavits, including the affidavit we have put in for
15   Ms. Gupta, Vanita Gupta, who is the head of the Civil Rights
16   Division in the Department of Justice said, it is inevitably
17   going to lead to distrust in the community, profiling, because
18   no one knows what that information -- no one knows where that
19   information is going to go, how the officer is going to use
20   it.
21            And when you say to an officer, "Don't materially
22   limit immigration enforcement," or the sheriff, I mean, all of
23   these declarations -- the State can come in and say, "We as
24   lawyers have parsed it and we think it means this."
25            But you have declaration after declaration from the
```

```
 1    sheriffs and police chiefs of the littlest cities and counties

 2    to the biggest, Houston, Dallas; they are saying, "We don't

 3    know exactly what this means."

 4            For example, if an immigration -- if a line officer

 5    were to say, "I am going to now do my traffic stops in an area

 6    where I think there are day laborers, because I think I am

 7    going to catch a lot of undocumented immigrants."  And the

 8    sheriffs say, "No, that is not where you should do the traffic

 9    stops, because that is not where the most traffic accidents

10    are occurring," or is that materially limiting federal

11    immigration enforcement?

12            There is just -- the State has come in and said,

13    "Look, don't worry about any of that.  It is easy to

14    understand the statute."  But I think the reality is on the

15    ground, we are going to have maximum enforcement.

16            And as all of the declarations have said, from

17    people who study these issues and work on these issues, it is

18    inevitably going to devolve into some type of profiling.

19    There is just no way around it, because the training required

20    to do immigration is extensive.

21            And as Your Honor asked the witness, "Are you going

22    to do the training?"  I think everyone is going to have to

23    try.  They are not going to have the money.  They are not

24    going to have the know-how.  SB 4 is not providing that.  And

25    as the Bacon declaration we submitted shows, there are dozens,
```

1    dozens of complex immigration statuses.

2          And people, contrary to what the State is

3    suggesting, well, people can just whip out a document.  There

4    is no one document that has lawful immigration status on it,

5    and many times, the federal government will not give you a

6    document either because it is slow in coming or there is no

7    particular document or it doesn't exactly show the expiration

8    date of your lawful status.

9          So I think for all of those reasons, SB 4 is

10   preempted and vague.

11         I just want to quickly touch on two other claims,

12   Your Honor, if that is okay.

13         THE COURT:  Of course.

14         MR. GELERNT:  One is the First Amendment claim.  We

15   think that is easy.  I don't think the State seriously defends

16   that they can stop elected officials from expressing their

17   view that localities shouldn't enforce immigration law.

18         What the State comes in and says is:  Look,

19   "endorse" doesn't really go to speech.  But it has to go to

20   speech, because it is one of several provisions that talk

21   about not prohibiting, not enforcing, adopting policies,

22   informal or not, pattern and practice.  There is nothing left

23   for -- yes.

24         THE COURT:  So let's say the word "endorse" is

25   removed from the statute.  Does that make the statute then

```
 1    okay?

 2              MR. GELERNT:  Well, it clears up that First

 3    Amendment problem, yes, Your Honor.  And I think, ultimately,

 4    that is all the State is saying.  They don't have a sort of

 5    full-throated defense of the word "endorse" under the First

 6    Amendment.

 7              What they are simply saying is, you can excise that.

 8    So we think that is a fairly limited claim but an important

 9    one, for you to excise out the word "endorse," so that elected

10    officials can still express their view.

11              The last claim I would touch -- there are two last

12    claims I would touch on quickly, the Fourth Amendment and

13    equal protection.

14              THE COURT:  Let me go back to the First Amendment.

15              MR. GELERNT:  Yes, Your Honor.

16              THE COURT:  Let's say the statute goes into effect.

17    Can a county judge or police chief six months down the road

18    say, "You know, this statute just isn't working for us and it

19    is costing us a whole bunch of money."

20              Can he then go out into the public domain, the

21    public circuit and speak ill about Senate Bill 4?

22              MR. GELERNT:  We don't think under the law as

23    written he would be able to.  Now, I know the State is coming

24    in, as I said, and saying, "Well, 'endorse' doesn't really

25    mean that."
```

1          But I think the clear language of the statute would

2     prohibit that, and I don't think anybody would take a chance.

3     So, obviously, their viewpoint is going to be stifled.  I

4     think that is why ultimately the State falls back on Your

5     Honor should just excise that word, if it finds a First

6     Amendment violation.

7          THE COURT:  Well, let's say the county judge says,

8     "You know, this is not working.  When the legislature

9     reconvenes two years from now, I am going to urge them to

10    repeal or modify Senate Bill 4."

11         Can he do that?

12         MR. GELERNT:  We don't think so, Your Honor.  I

13    mean, not under sort of what a proper understanding of endorse

14    is.  I mean, "endorse" is one of those terms that, you know,

15    you are talking about it.  You want -- and it is a viewpoint.

16    It is a viewpoint discriminatory law.

17         I mean, if you are saying -- if they wanted to come

18    out and talk, I guess they could come out and talk about SB

19    4 being the greatest thing since sliced bread but, you know, I

20    am not even sure about that, but they certainly cannot be

21    criticizing it.

22         And so that is why I don't think the State tries to

23    defend the word "endorse" if it applies to the speech of an

24    elected official.  I think what the State is really just

25    trying to say is, it is just another word for not authorizing

1    a policy.

2         But the statute is replete with terms to cover

3    adopting a policy, enforcing a policy, having a pattern and

4    practice, so "endorse" must have meant something else, and I

5    think the clear understanding of the term "endorse" would

6    apply to speech, and that is why I think it has to be struck

7    down.

8         And, you know, if Your Honor believes "endorse" goes

9    to speech, I don't think the State is seriously claiming it

10   can survive First Amendment scrutiny and would have to be

11   excised.  And we agree, at least as to that term and under the

12   First Amendment, you can excise it because there is a

13   severability clause.

14        Let me, with Your Honor's permission, turn to the

15   Fourth Amendment.

16        THE COURT:  Go ahead.

17        MR. GELERNT:  So the Fourth Amendment is principally

18   about the detainer issue.  And this Court, obviously, has a

19   recent detainer decision that talks about meeting probable

20   cause of a crime.  Texas, for its part, basically just says

21   that decision is incorrect.

22        I mean -- and to step back a second.  I apologize,

23   Your Honor.  SB 4 obviously doesn't require probable cause of

24   a crime.  It doesn't even require -- it doesn't even allow the

25   localities to assess probable cause to an immigration -- civil

1    immigration violation, and there is no requirement that there

2    be probable cause of a crime.

3              So Texas comes in and says:  Well, your decision is

4    wrong.  The U.S. tries -- also says it is wrong.  We,

5    obviously, don't agree with that, but the U.S. tries to

6    distinguish these facts and sort of offers two principal

7    distinctions, none of which we think are correct.

8              One is, well, this detention lasted 75 days.  But

9    Your Honor's opinion was very careful to segregate out its

10   discussion between the 75 days and then a separate discussion

11   about the first 48 hours, which is what federal detainers

12   usually apply to and what the current detainer form that the

13   U.S. government uses applies to, 48 hours.

14             And so I think that distinction is absolutely wrong.

15   Your Honor recognized that the first 48 hours may be different

16   than the next 73 days, and so that is not a proper

17   distinction.

18             The other distinction the government, the U.S.

19   offers is, well, the current form talks about probable cause,

20   whereas the prior form didn't talk about probable cause.  But

21   that is not responsive to Your Honor's opinion, because Your

22   Honor said there needs to be probable cause of a criminal

23   offense.

24             I think the U.S., when they get up, will admit the

25   current form doesn't talk about probable cause of a crime.  It

1    just talks about probable cause of a civil immigration

2    violation.  So I think those are the answers on the detainer

3    under your recent decision.

4           I would say, Your Honor, that even if, for the sake

5    of argument, it doesn't need to be probable cause of a crime,

6    but only probable cause of a civil immigration violation, SB

7    4 would still violate the Fourth Amendment.

8           THE COURT:  How is that?

9           MR. GELERNT:  Okay.  Your Honor, I am going to be as

10   clear as possible on this.  Even if the federal government

11   claims, and claims it was probable cause, SB 4 prohibits the

12   locality from making its own determination about whether there

13   is probable cause of a civil immigration violation, and that

14   is critical, because the locality needs to have that ability.

15   Otherwise, they may subject themselves to a Fourth Amendment

16   problem.

17          They need to have the ability to make that

18   determination.  They are prohibited from making that

19   determination.  So if they have any -- if they know the person

20   and they think the person may have lawful status or may have

21   recently got lawful status or have some reason to believe the

22   person has lawful status or there is some uncertainty, they

23   are prohibited from not honoring the detainer.  They must

24   honor that detainer.

25          And, therefore, as Your Honor pointed out in a

1    recent decision, they are making -- that is a seizure by the

2    locality.  That is a separate seizure, and they are worried

3    they don't have probable cause, even of a civil immigration

4    violation, yet they must honor it.

5            Now, SB 4 tries to make some attempt to get around

6    that by saying:  Well, if the detainee himself pulls out a

7    document proving he has lawful immigration status, then in

8    that case, the local official doesn't have to honor it.  But

9    that actually makes matters worse because, to begin with,

10   under the Fifth Circuit's Farmers Branch case and U.S. v.

11   Arizona case, that means they are going to have to make a

12   determination about immigration status.

13           They are not equipped to do that nor are the states

14   allowed to do that.  And, again, the Bacon declaration spells

15   out why localities will not be able to make that immigration

16   status.

17           Moreover, as many of the declarations point out,

18   many people will not have documents, either a Texas driver's

19   license or any type of immigration document to show, and it

20   just means that the burden is also on the detainee to prove

21   it.

22           That is not the way the Fourth Amendment works.

23   There has to be probable cause.  It is not up to the detainee

24   to prove it.

25           Now, the State's response is:  Well, just take out

1     the exception.  It was just to help the detainee.  Well, that

2     actually makes matters worse, because then you have a

3     situation where no matter how much uncertainty the local

4     official has about whether there is probable cause that the

5     person is unlawful, he still has to honor the detainer.

6          And so that is why I think Your Honor could, if he

7     wants to, offer two rationales for the detainer provision in

8     SB 4, depending on whether, you know, the Circuit is going to

9     want both rationales or want to go broadly or narrowly.

10         We think Your Honor's decision was right that there

11    needs to be probable cause of a crime, but Your Honor can also

12    offer an alternative rationale which is narrower and just say:

13    Well, even if you only need probable cause of an immigration

14    violation, the localities have to be able to make that

15    determination on their own.

16         If they -- I mean, the fellow officer rule only

17    allows them to trust if it is 100-percent clear.  If they have

18    any doubt about it, they need to be able to make that

19    determination and SB 4 doesn't allow them to deny a detainer

20    even if they have some doubt about whether the person has

21    lawful immigration status or whether the federal government

22    has sent them enough information, and that is problematic,

23    given the penalties.

24         We are talking about jail time.  We are talking

25    about removal from office.  And so there has to be that

1    ability to make that determination.

2          THE COURT:  And they don't have to -- the local

3    official doesn't have to make that determination since the

4    statute says "any detainer"?

5          MR. GELERNT:  Right.  And they are prohibited from

6    making that determination, so, I mean, that is the problem.

7    Our claim, to simplify it, is -- that claim is, look, you have

8    a local entity and they are getting a detainer request, and

9    maybe, because they are local, they know the person.  They

10   think maybe he just got immigration status or they are not

11   sure or there is some question.

12         Well, SB 4 says you need to honor that detainer

13   anyway.  So then the locality is in the position of having a

14   Fourth Amendment violation because the State is telling

15   them -- and, critically, the federal government has never made

16   detainers mandatory, so you have the State now making

17   localities have to apply with detainers no matter how much

18   doubt the locality may have about whether there is an actual

19   immigration violation.

20         And back to my earlier point about the State saying,

21   "Well, this only applies to formal detainers," I mean, this

22   applies to informal detainers, and that's the definition of

23   detainer request, which says all detainer requests, as Your

24   Honor pointed out, including, including the official form.

25         So you could get a call from ICE saying, "Please

hold this person."  Well, then the sheriff really has no idea
exactly what the basis for probable cause is, yet he is saying
to himself:  Okay.  I can honor this detainer and maybe I am
committing a Fourth Amendment violation or maybe I am holding
someone wrong for 48 hours, or I can take a chance of losing
my office or going to jail.

        Your Honor, Texas knew what it was doing by having
these kind of harsh penalties.  I have been doing this work
for a long time.  I have never seen a statute like this that
imposes this type of penalties on anyone, and I think there is
no question that nobody is going to -- that people are not
going to take a chance when there are these kind of harsh
penalties at stake.

        And I will just close up with the protection claim.
There are two equal protection claims, essentially.  We are
only making one in this preliminary injunction motion, and my
co-counsel for other plaintiffs will be making additional.

        They are going to make the claim that SB 4 was
racially motivated and needs to be struck down for that
reason, and they have addressed that at length and they have
affidavits, and I think they will be addressing it.

        We are making a different equal protection claim, a
somewhat more modest claim, and that comes from the cases, the
Michigan case recently, the Seattle school district case,
which is that if cities want to take preventative measures to

```
1     stop discrimination, because there is, in Justice Kennedy's
2     words, there is a serious risk that there will be
3     discrimination, cities have to be allowed to do that, and the
4     states can't stop them because, otherwise, the state is
5     stopping a measure that would prevent discrimination and
6     essentially condoning discrimination.
7              And I think what you see from the declarations and
8     may hear more in live testimony is that because immigration is
9     so complex, inevitably, it is going to devolve into some type
10    of profiling.  It is just too complicated and the history of
11    these types of immigration inquiries at the local level has
12    resulted in discrimination.
13             So a lot of these cities and our plaintiffs have
14    said:  Look, we are going prevent it at the outset.  We are
15    not just going to subject ourself to lawsuits and reprimand
16    our line officers every time they do it.  We are going to
17    prevent it at the outset from having policies that don't get
18    us into the immigration field.
19             SB 4 now comes in and says:  You cannot take those
20    preventative measures.  So that separate line of equal
21    protection claim cases, sort of sometimes called the political
22    process cases, says a state cannot stop a locality from
23    enacting preventative measures where there is quote, unquote a
24    serious risk that there will be discrimination.
25             And I think there is -- you know, Texas can say:
```

```
1     Well, there is the boiler plate provision about no racial

2     profiling.  That's all well and good, but if those types of

3     provisions were enough to always defeat lawsuits like this,

4     then no lawsuit would ever succeed.

5              I think the reality is, Texas is not going to be

6     able to put in, counter evidence to suggest that there won't

7     be profiling.  There is just too much evidence of it.  There

8     are too many experts who are testifying that there is quote,

9     unquote a serious risk.

10             And that is why these localities are permitted to

11    enact preventative measures and the state can't come in, any

12    more than Seattle could stop local -- local -- in the Seattle

13    Supreme Court decision, the state stopping localities from

14    preventing race discrimination, any more than the Romer case

15    from stopping discrimination against gays and lesbians, any

16    more than all of these cases that allow the localities to take

17    measures that are tailored to their own communities, knowing

18    what is going to happen in their own communities.

19             Your Honor, unless there are further questions -- I

20    know that it is going to be a long day, so I will stop there.

21             THE COURT:  Okay.

22             MR. GELERNT:  Thank you, Your Honor.

23             THE COURT:  Thank you.

24             MR. GARZA:  Your Honor, El Paso, for the most part,

25    will reserve argument for closing.
```

```
 1              THE COURT:  You will reserve --
 2              MR. GARZA:  -- argument for closing.  I would rise
 3    only for the purpose of informing the Court that we will have
 4    one more witness in the afternoon, hopefully, that will
 5    discuss the legislative process and our argument that the law
 6    was enacted with a discriminatory purpose.
 7              THE COURT:  Is that your only witness for your side?
 8              MR. GARZA:  Besides Ms. Bernal, that is the only
 9    witness.
10              THE COURT:  Right.  Okay.  All right.
11              MR. GARZA:  Thank you, Your Honor.
12              THE COURT:  So who is -- yes, Ms. Perales.
13              MS. PERALES:  Thank you, Your Honor.  I just need a
14    minute to sort myself.
15              THE COURT:  Okay.  You will have until 11:30, which
16    is 45 minutes.
17              MS. PERALES:  I won't take the full 45 minutes, Your
18    Honor, but I do have to take a moment to fix your microphone.
19              THE COURT:  Well, it is not mine.  It is the
20    government's.
21              (Laughter.)
22              MS. PERALES:  (Turning toward photograph of Judge
23    Hipolito Garcia) Your microphone is broken.
24              (Laughter.)
25              THE COURT:  Okay.  Go ahead.
```

```
 1              MS. PERALES:  Thank you, Your Honor.
 2              I am here on behalf of the City of San Antonio.  We
 3    also represent Bexar County and will be taking the opportunity
 4    this week to amend our complaint to add Bexar County as a
 5    plaintiff, along with San Antonio.  We also represent
 6    Councilman Rey Saldana, the Texas Association of Chicanos in
 7    Higher Education, which is a professional and membership
 8    organization, TACHE; as well as two grassroot organizations,
 9    La Union del Pueblo Unido, LUPE, out of the Rio Grande Valley;
10    and the Workers Defense Project, based in Austin, Texas.
11              I would like to only briefly touch on a few issues
12    related to likelihood of success on the merits, because the
13    Court has already heard oral argument on a number of those
14    points.
15              I would simply add that despite the assertions of
16    Texas and the federal government that the essence of the
17    federal system involving local and federal cooperation
18    involves federal supervision and federal training.
19              The INA and its regulations simply does not
20    contemplate local actors acting unilaterally or using their
21    own judgment about when and how to enforce immigration law
22    outside of a structure of supervision and training and
23    requests, all of those things.
24              The INA authorizes federal agents to enforce
25    immigration law.  It talks about when federal agents require a
```

```
1    warrant and can effectuate warrantless arrests.  Federal law

2    does not say that local officials can do this thing as well

3    whenever they want and even if the federal government doesn't

4    ask or is completely unaware of what is happening at the local

5    level.

6              For this reason, SB 4 is field preempted.  SB

7    4 enters into a field already occupied by Congress with a

8    system that involves whenever there is collaboration, either

9    federal asking for it or federal supervision and training of

10   it.

11             SB 4 is also conflict preempted, Your Honor, because

12   it does run counter to federal law and thwarts federal

13   objectives in a number of respects.  Federal law makes

14   compliance with ICE detainers voluntary and there are no

15   penalties for noncompliance.

16             On the other hand, SB 4 makes compliance with ICE

17   detainers mandatory and the penalties are severe.  And you

18   have heard Mr. Gelernt speak at some length regarding these

19   detainer policies.  And Mr. Gelernt mentioned the Trujillo

20   Santoyo case.

21             Our client, Bexar County, is in the process right

22   now of evaluating its practices because of the direction

23   received from this Court regarding compliance with the Fourth

24   Amendment.

25             SB 4 puts Bexar County in an impossible position by
```

1    requiring the county to comply 100 percent of the time with

2    detainer requests.  And even the new form, which is not the

3    subject of the Trujillo case, but is the new form that came

4    out -- that started to be used in April, does not provide

5    probable cause that a criminal offense has been committed.

6              It is roughly the same check boxes that communicate

7    that the federal government believes that an individual is

8    subject to removal proceedings.  It simply does not satisfy

9    the requirements of the Fourth Amendment as recognized by this

10   Court and Trujillo.

11             And Bexar County officials, the jailer, the sheriff

12   will face up to a one year in jail penalty under SB 4 for not

13   complying with what he understands to be his obligations under

14   the Fourth Amendment.  So that is one type of conflict

15   preemption.

16             Another one that we would like to point out, Mr.

17   Gelernt talked about what happens when you place jail

18   officials in the shoes of immigration agents, as SB 4 does by

19   requiring them to review immigration documents produced by the

20   detainee to make a required determination under SB 4, whether

21   to release this person anyway, even if they are subject to a

22   detainer.

23             And one of those things is a driver's license and

24   then it is just sort of a wide open category of whatever the

25   person is going to try to interpret.  And, yes, Farmers Branch

1    in Arizona v. U.S. says that local officials cannot perform

2    these functions of reviewing immigration documents and making

3    immigration determinations, because they don't necessarily

4    understand them.

5              I would like to talk for a moment about the flip

6    side of the problem.  Your Honor is familiar with the

7    situation where somebody might come in to a jail, a legal

8    permanent resident with a green card, with a driver's license,

9    and ICE places a detainer because ICE has concluded that the

10   person is subject to removal proceedings, despite the fact

11   that they have all of this paperwork.  Under SB 4, the jailer

12   is required to release the individual.

13             THE COURT:  Because he has a license?

14             MS. PERALES:  Because he has a driver's license and

15   a green card.  Now, ICE may have determined that he has

16   committed an offense that renders him removable and intends to

17   place him into proceedings, which is why ICE has sent the

18   detainer over, but SB 4 says:  No, this person must be

19   released.

20             So SB 4 is conflict preempted running in two

21   directions, Your Honor.  It forces local jailers to hang on to

22   people when they shouldn't, but it also forces local jailers

23   to release people when the federal government would otherwise

24   want to have them kept in custody for that 48 hours, and that

25   thwarts federal objectives and creates a conflict preemption

1    problem.

2              Moving quickly to the Fourth Amendment, I wanted to

3    note for Your Honor that passengers in a car that has been

4    stopped for a traffic violation or something else by a local

5    officer are detained, and the case is Brendlin v. California,

6    B-r-e-n-d-l-i-n v. California, 551 U.S. 249, 251.

7              That's a 2007 decision of the U.S. Supreme Court

8    saying that at a traffic stop, the driver and the passengers

9    are detained, and that case upheld the ability of the

10   passenger to challenge the constitutionality of the stop,

11   because the passenger as well as the driver was seized.

12             THE COURT:  So that's 551 U.S. 241?

13             MS. PERALES:  249 --

14             THE COURT:  Okay.

15             MS. PERALES:  -- comma 251.

16             THE COURT:  Oh.  Okay.

17             MS. PERALES:  So they get right to the point in that

18   one, Your Honor.

19             THE COURT:  All right.  Go ahead.

20             MS. PERALES:  Thank you.  SB 4 violates the Fourth

21   Amendment in two important ways.  One involves this detainer

22   issue of holding people on detainers without probable cause

23   that a criminal offense has been committed.

24             And then the second one involves this issue that

25   Your Honor was exploring earlier about the questioning into

1    immigration status that local officers are now permitted to

2    do.  And, of course, it is not just police officers.  It is

3    employees of these entities as well, any local entity.

4            Putting aside the detainer issue, which we believe

5    is largely dealt with through Trujillo, and not to subtract in

6    any way from El Cenizo's additional argument regarding the

7    Fourth Amendment issue, that local jurisdictions are deprived

8    of the ability to make their own determinations, but putting

9    aside the detainers for a moment, it is proper to focus on the

10   constitutional train wreck that occurs under the Fourth

11   Amendment when you have a local officer attempting not just to

12   make an immigration inquiry, but under SB 4 to provide

13   enforcement assistance to the federal government.

14           We have focused a lot on the questioning piece, but

15   SB 4 does more than just prohibit local entities from

16   restraining their officers from questioning.  There is a piece

17   that follows after that in Section B-3 that says a local

18   entity may also not prevent its officers from providing

19   immigration enforcement assistance, and this decision is going

20   to be made by the individual officer unguided, unsupervised by

21   either the federal government or the local government, because

22   the local government's hands are tied.

23           And thus, the traffic stop that turns into the

24   immigration inquiry, that then turns into the enforcement

25   assistance, which can be holding somebody by the side of the

1    road, because ICE has been called and the officer wants to

2    wait.

3            It could be prolonging the questioning itself past

4    the time that the ticket would issue or past the time that the

5    officer concludes there is no longer probable cause to suspect

6    that there is something illegal going on.

7            This could even turn into the officer, in an attempt

8    to provide enforcement assistance, loading up an individual,

9    even a passenger of the car, in the back of the police car to

10   convey that individual either to the jail or somewhere else,

11   because SB 4 permits officers to question and provide

12   enforcement assistance and prohibits the local entity from

13   materially limiting that behavior.

14           Finally, a moment on the First Amendment, Your

15   Honor.  It is viewpoint discrimination.  I don't think there

16   is any other way to read the statute.  It says you cannot

17   advocate for -- you cannot endorse a policy that would

18   prohibit or materially limit the enforcement of immigration

19   laws.

20           And it is also unconstitutionally over broad.  My

21   colleagues who represent El Cenizo are right.  The State does

22   very little to try to defend itself, other than to say the

23   word "endorse" doesn't mean the word "endorse."

24           And so I brought the dictionary definition from the

25   Oxford English Dictionary.  "Endorse" means "to confirm,

1   sanction, countenance or vouch for."  There is simply no way

2   to understand the word "endorse" to mean the word "adopt,"

3   especially because the word "adopt" is right nearby, and the

4   way that we conduct statutory interpretation is not to say

5   that two different words mean the same thing.

6           It is also unconstitutionally over broad because

7   this part of SB 4 applies not just to the governing body of

8   local governments.  It doesn't just apply to community college

9   trustees or members of city council or county commissions.  It

10  also applies to all of the employees of those entities and

11  reaches as far as perhaps an individual that cleans classrooms

12  at a community college.  It reaches a municipal judge here in

13  San Antonio.  It reaches all of these individuals.

14          THE COURT:  How would the college district employee

15  be impacted or liable under Senate Bill 4?  That person is

16  several miles away from a police officer on the streets.

17          MS. PERALES:  So far, Your Honor, yes, that

18  individual is covered by SB 4; first, because community

19  colleges are local entities under the statute, because the

20  statute applies to cities, counties and special districts, and

21  the law is clear in Texas that community college districts,

22  like Alamo Colleges here in San Antonio, which is a special

23  district, are covered by SB 4, and "local entity" includes the

24  members of the governing body, the department heads and all of

25  the employees.

 1           THE COURT:  But how would a college district

 2    employee be impacted?  I mean, the college district employee

 3    goes about doing his business.  How -- are you saying only if

 4    that college district employee were to -- what would he do --

 5    what would he have to do or may do or possibly do to come

 6    within the purview of the statute?

 7           MS. PERALES:  The community college employee -- and

 8    let's take a professor conducting a class, Your Honor.  That

 9    professor is a community college employee.  Under Section

10    752.053 of the statute, this person is a local entity.  That's

11    how "local entity" is defined, as the employees of.  Cannot

12    adopt, enforce or endorse a policy under which the entity or

13    department prohibits or materially limits the enforcement of

14    immigration laws.

15           THE COURT:  Okay.  Let's take the word "endorse" out

16    of it.  How would that college district employee adopt or

17    enforce a policy?

18           MS. PERALES:  The professor may not.  The trustee

19    may; the administrator may as well at the community college

20    district.  A trustee -- Alamo Community Colleges recently

21    passed a resolution intended to protect those individuals

22    known as "dreamers" or persons who are undocumented, brought

23    to this country by their parents.

24           If an Alamo Community College trustee or

25    administrator adopts or enforces a policy, for example, that

1    says, "We are not going to help ICE locate students if ICE

2    comes on to campus," that would violate SB 4.

3            Even taking out the "endorse" provision, you have

4    adopt and enforce a type of policy that could be seen as

5    materially limiting the enforcement of immigration law.

6            THE COURT:  In fact, they could not adopt that kind

7    of policy, the policy they now have in place.  Let's say they

8    didn't have it in place now, but they couldn't adopt it after

9    September 1?

10           MS. PERALES:  That is correct.  And just to be

11   clear, the Alamo College does not have a policy now.  The

12   Alamo College's policy now is to support and protect their

13   dreamers.

14           And, of course, we know that over 20,000 individuals

15   in Texas are paying in-state tuition pursuant to what is known

16   as House Bill 1403, which permits undocumented persons to pay

17   in-state tuition under certain circumstances.

18           We know there are over 20,000 people in Texas doing

19   this.  Lots of them go to community colleges.  If Alamo

20   College wanted to take that next step, pass the resolution to

21   say, "We want to support and protect our dreamers," the next

22   step is, if ICE comes calling, we are not going to

23   affirmatively assist them in locating students on our campus.

24   That would violate SB 4.

25           One can even imagine a community college professor

1   who says, "I am going to set classroom rules at the beginning

2   of the semester.  In this classroom, if ICE were to enter, we

3   are not going to assist."

4           THE COURT:  We are not going to what?

5           MS. PERALES:  Assist ICE.

6           THE COURT:  Okay.

7           MS. PERALES:  Even if the professor were doing that

8   for the purpose of fomenting debate, anybody can file a

9   complaint and say that person was adopting or enforcing a

10  policy that would materially limit immigration enforcement.

11          I would like to touch on in my final moments, Your

12  Honor, on irreparable harm, because it is part of the

13  standards --

14          THE COURT:  Right.

15          MS. PERALES:  -- under the preliminary injunction.

16  As the Court has heard, SB 4 strips local governments of their

17  ability to adopt policies that conserve their resources and

18  that they believe protect public safety.

19          This relates to the preemption claim and this

20  relates also to the Fourth Amendment claim.  And so the loss

21  of resources doesn't necessarily itself give rise to an

22  independent cause of action, but it does demonstrate

23  irreparable harm, and that's why the Court will see it

24  discussed, loss of control over officers, loss of control over

25  how officer time and energy is spent.

1          So, for example, under this provision that restrains

2     local governments from telling their officers not to engage in

3     immigration enforcement activities, it is not just

4     questioning, but it is also assisting in enforcement

5     activities, five police officers could start their shift

6     together and decide they would like to conduct an immigration

7     raid.

8          Maybe they know of an apartment complex where they

9     think lots of undocumented people live or they know --

10          THE COURT:  How could they do that?

11          MS. PERALES:  Because the San Antonio Police

12     Department can no longer tell its officers, "We don't want you

13     spending your time enforcing immigration law."

14          THE COURT:  Well, you are telling me that five

15     police officers on their own can decide, "We are going to do

16     this"?

17          MS. PERALES:  Yes, Your Honor, because the decision

18     is unilateral by the officer.  There is no requirement of

19     federal request, federal supervision or federal involvement in

20     any way when you read SB 4, except for the detainer provision,

21     but on the provision "adopt, enforce and endorse a policy that

22     prohibits or materially limits the enforcement of immigration

23     law."

24          And then under Section B below:  Officers can

25     conduct inquiries.  Officers can conduct enforcement

1    activities to assist the federal government.  It doesn't say

2    "at the federal government's request."

3              THE COURT:  And they could do that on their own

4    without the federal government's request?

5              MS. PERALES:  Yes.  The statute is silent.  The

6    statute does not say "at the federal government's request" or

7    "under the federal government's supervision," or "after having

8    been trained by the federal government."

9              We know there is a federal statute, 1357(g), that

10   does talk about such a program, but SB 4 has officers making

11   these decisions unilaterally on their own.  Chief McManus

12   cannot tell an officer:  You have six calls piled up.  If you

13   are going to stay here by the side the road and spend time

14   inquiring about somebody's immigration status, you are going

15   to be taking time away from an elderly person calling because

16   there is somebody with a gun outside the house, a victim

17   calling because there is a sexual assault in progress.

18             Chief McManus cannot stop that officer from making

19   inquiries and whatever flows after that that the officer in

20   his own individual judgment believes will assist or form

21   cooperation with the federal government, and that is a very

22   severe threat of irreparable injury.

23             El Paso mentioned that it has a policy as a result

24   of a settlement.  I just wanted to note for the Court, San

25   Antonio also has a policy about not inquiring into immigration

1    status, not arresting people on the basis of their immigration

2    status and not asking for proof of legal residency, San

3    Antonio policy 618, which is Exhibit 303-A in our -- in your

4    joint exhibit binder.

5              San Antonio will not be able to enforce its policy

6    beginning on September 1, and this is a policy --

7              THE COURT:  Well, isn't the policy subservient to

8    the state law?

9              MS. PERALES:  It can unless there is a preemption

10   issue, Your Honor, and here, there is a preemption issue.

11   Yes, the state can make laws that cities have to follow.  The

12   state can say, can't have a 17-year-old driving, riding in the

13   back of a pickup truck.

14             We make that illegal and, of course, the cities have

15   to follow, but that is squarely within the police powers

16   historically reserved.  Here, we have the State of Texas

17   stepping way outside of its historic police powers into the

18   area of immigration, opening the door to a preemption analysis

19   that would override the state law in this context.

20             So the answer is, generally, yes, but not here, Your

21   Honor, because there is a preemption problem with this

22   regulation and, as we contend, it cannot override San

23   Antonio's policy which it enacted to conserve its officer

24   resources and to protect public safety.

25             The Court will see in some of the evidence that has

1    been provided that there is lost revenue from tourism in San

2    Antonio and in Bexar County and it is already occurring.

3    Also --

4              THE COURT:  Now, how is that a constitutional

5    violation?

6              MS. PERALES:  It is a harm, Your Honor.  It is not

7    related -- it is related to the causes of action under the

8    Fourth Amendment and preemption, but it is a harm that we are

9    presenting to you as you make your decision whether there is a

10   threat of irreparable harm flowing from this statute going

11   into effect on September 1.

12             So some of the things that we are talking about are

13   harms or injuries that will be suffered that don't necessarily

14   independently give rise to a cause of action.  Causes of

15   action are preemption, Fourth Amendment, First Amendment,

16   Fourteenth Amendment.  But right now, just for the moment, we

17   are focusing on the threat of irreparable harm.

18             And then finally, of course, the Court has already

19   explored the impairment of free speech, which even if

20   threatened for a short period constitutes irreparable harm.

21             I will reserve the rest of my time.  Thank you, Your

22   Honor.

23             THE COURT:  For when?  For when you have oral

24   argument at the end?

25             MS. PERALES:  My understanding, Your Honor, is that

1    there are 20 minutes allotted for rebuttal.

2              THE COURT:  Right.  Okay.  If you will keep that,

3    note that time.

4              MS. PERALES:  We have that.  Thank you, Your Honor.

5              THE COURT:  Okay.  Who is next, the next plaintiff?

6              If you will tell me your name and who you represent.

7              MR. SIEGEL:  Yes, Your Honor.  Michael Siegel for

8    the City of Austin.

9              THE COURT:  Okay.

10             MR. SIEGEL:  Senate Bill 4, like the City of San

11   Antonio, would deny Austin control over its own police force.

12   The law interrupts the chain of command, empowers individual

13   officers to conduct ad hoc immigration investigations,

14   threatens police chiefs and public officials who seek to

15   promote community-based and constitutional policing, and will

16   lead to the terrorization of our communities, to sabotage our

17   economies, the disruption of foreign relations and lasting

18   damage to public health, public education and public safety.

19             No law permits Texas to regulate immigration in this

20   manner.  In the U.S. Constitution, the American people created

21   a strictly federal power to regulate immigration.  Congress

22   enacted a comprehensive scheme designed to protect national

23   interests, but no authority has given Texas the unilateral

24   power to conscript local police in federal immigration

25   operations.

 1          The Texas Constitution does not give the State this

 2     power.  The people of Texas created a government of limited

 3     powers and the governor and the legislature only have the

 4     powers explicitly given to them.

 5          The State constitution is silent on the question of

 6     immigration.  In fact, in Senate Bill 4, the legislature

 7     attempted to rewrite this issue, giving itself an immigration

 8     power and redefining what immigration law means, to include

 9     state laws, but the State doesn't have that authority.

10          On the other hand, the city of Austin, the city of

11     San Antonio, the city of Dallas are home rule cities, and we

12     are protected by this home rule amendment of the Texas

13     Constitution, in which the people gave us the power of

14     self-government.

15          The home rule amendment guarantees that Austin can

16     exercise its police power and make its own decisions to

17     protect public health, safety, morals and the general welfare.

18     It is this right of self-determination that Austin seeks to

19     vindicate today.

20          We stand here with admiration and respect with

21     municipalities' elected officials from San Antonio, El Paso,

22     Travis, El Cenizo, Maverick, Dallas and Houston, community

23     representatives from LULAC, TACHE, Workers Defense and LUPE.

24     Each of us brings a different perspective to SB 4 and its

25     threatened impact on our communities.

1          We have combined to establish a diverse and deep

2     factual record showing how SB 4 will injure our children, our

3     schools, our economies, our public safety, our public health

4     and the very fabric of our communities.

5          In response, Texas has very little to say about how

6     SB 4 will actually affect ordinary Texans.  Instead, Texas

7     argues that it can force cities to do anything simply by

8     uttering the phrase "public safety," and that we do not even

9     have standing to challenge this law, even though it forces us

10    to violate constitutional rights.

11         They have gone even further in regard to all of the

12    evidence in this case to say that it is simply not relevant

13    and, unfortunately, this response is consistent.  It is

14    consistent with a governor who proudly shares his disdain for

15    Austin and local control and it is consistent with the

16    legislature that completely disregarded SB 4's terrible and

17    discriminatory impact.

18         I want to briefly address the standing argument.  Of

19    course, Texas cities and counties may sue the State in this

20    case.  The supremacy clause provides the mechanism by which we

21    can challenge a state law that violates federal law, and there

22    are three circuit decisions I would note.

23         The Fifth Circuit and the Tenth Circuit have held

24    that a political subdivision has standing to bring a

25    constitutional claim against its creating state when the

1    substance of this claim relies upon the supremacy clause and a

2    controlling federal law.

3            The Tenth Circuit in Brandon School District v.

4    Romer, 161 F.3d 619, and there, school districts can sue the

5    state under the supremacy clause when there is apparent

6    conflict between a new Colorado constitutional amendment and

7    in federal law.

8            In the Fifth Circuit, Rogers v. Brockette, 588 F.2d

9    1057, the Circuit Court held that a school district can sue

10   the state and challenge the constitutionality of a state

11   statute that required participation in subsidized school

12   breakfast programs.

13           And the Seventh Circuit says that a city can sue as

14   the organizational representative of its citizens.  That's the

15   city of Milwaukee v. Saxbe, 546 F.2d 693.

16           So Austin may sue under the supremacy clause because

17   it is forced to choose, on the one hand, between obeying the

18   mandates of SB 4 and, on the other hand, respecting the will

19   of Congress and the will of the American people as expressed

20   through federal laws and constitutional amendments.

21           And under state law, we also have the right to sue,

22   to challenge unconstitutional law that we are charged with

23   implementing.  The State's standing objections are without

24   merit, but more concerning, perhaps, is the State's argument

25   that every single piece of evidence is irrelevant.

```
 1              Texas is apparently hoping for a ruling on SB 4 that
 2    will completely ignore what happens in the real world.  The
 3    record shows that this law will inflict harm on countless
 4    Texans.  Students will suffer.  Patients will suffer.  Schools
 5    will suffer.  Organizations will suffer.  Businesses and our
 6    economy will suffer.
 7              THE COURT:  How will patients suffer if hospital
 8    districts are excluded from the statute?
 9              MR. SIEGEL:  Your Honor, the city has provided
10    multiple layers of evidence that address that issue.  Several
11    nonprofit organizations that are not hospital districts --
12              THE COURT:  Okay.  All right.  Go ahead.
13              MR. SIEGEL:  Yes.  So our evidence is relevant to
14    the balancing of harms in terms of the issuance of injunctive
15    relief.  It is relevant to the supremacy clause claims and it
16    is relevant to our home rule claim.
17              In Arizona v. U.S., which the State relies upon in
18    some ways, the Supreme Court made clear why immigration is
19    preempted.  It stated immigration policy can affect trade,
20    investment, tourism and diplomatic relations for the entire
21    nation.  That's at page 2498.  And also, the mistreatment of
22    aliens in the United States may lead to harmful reciprocal
23    treatment of U.S. citizens abroad.
24              The plaintiffs' evidence shows that these national
25    interests are at stake in regard to SB 4.  In regard to
```

1    economic impacts, Austin's economic expert, Angela Angelou,

2    outlines numerous economic threats, including the fact that SB

3    4 will create a perception that Texas is anti-immigrant, and

4    that will discourage travel to Texas.  That will discourage

5    businesses from relocating here and, in fact, one major

6    national convention has already canceled, causing the city of

7    Grapevine, Texas to lose millions of dollars.

8         SB 4 will also inhibit the flow of foreign nationals

9    to Texas, due to the negative anti-immigrant perception, which

10   will hurt employers, universities, consumer spending and

11   economic development.

12        South By Southwest is an enormously important event

13   that Austin holds each year in March, attracting participants

14   from around the world.  The chief executive officer of the

15   organization has testified in his declaration how SB 4 will

16   negatively impact the event that contributes hundreds of

17   millions of dollars to the economy each year.

18        Other witnesses, including a bank director, in

19   support of the San Antonio motion, as well as small business

20   owners, in support of Austin's motion, have provided

21   representative evidence of how SB 4 will negatively impact our

22   workforce, our tax base and our economic success.

23        In regard to international diplomacy, the evidence

24   shows the need for preemption.  When our state governor

25   targets Mexican and Central American nationals for additional

1     immigration enforcement, that impacts U.S. interests.

2             When our state legislature passes a law that deters

3     foreign nationals from enrolling their children in school,

4     accessing health services or cooperating with the police, that

5     impacts our country's relations with our neighbors to the

6     south.

7             As discussed, Roxanne Bacon's declaration explains

8     how complicated status determinations are and how local police

9     are unqualified.  One issue she mentions is that under NAFTA,

10    a trilateral international treaty, Canadian and Mexican

11    professionals can work in the United States, but they will not

12    have a stamp on their passport that is decipherable to local

13    police.

14            So under SB 4, we will not only be injuring

15    constitutional rights but we could be abrogating treaty

16    responsibilities.

17            The evidence is also important to show how SB

18    4 conflicts with the First, Fourth, and Fourteenth Amendments.

19    Austin's elected officials have provided statements showing

20    how they speak out against SB 4 and how they would be injured

21    by prohibition of endorsement for the anti-sanctuary policies

22    or sanctuary policies.

23            In regard to the Fourth Amendment, immigration law

24    expert Jackie Watson explains how problematic the driver's

25    license aspects of SB 4 are and how the reliance upon a

```
1    driver's license as proof of status will lead to

2    unconstitutional detentions.

3               For example, many immigrants who are authorized to

4    be here cannot qualify for a driver's license, because the

5    Texas Department of Public Safety relies upon a federal

6    database that is often incomplete.

7               And as documented in the motor ID litigation, many

8    natural born Texans who are U.S. citizens do not have

9    identification for reasons of cost, time and geographic

10   proximity to DPS offices.

11              Because these people are here lawfully, but they

12   would be detained extra time due to SB 4 mandates, that

13   requires us to violate the Fourth Amendment and creates a

14   conflict.

15              In regard to the Fourteenth Amendment, our evidence

16   shows that Governor Abbott specifically targeted immigrants

17   who crossed the Texas-Mexico border.  This is evidence of

18   discriminatory intent.

19              Ninety-six percent of those apprehended crossing the

20   border are Mexican and Central American, according to the

21   Department of Homeland Security statistics.

22   Seventy-five percent of unauthorized immigrants in this

23   country are Mexican and Central American, so this evidence

24   challenges the credibility of state officials who deny they

25   enacted SB 4 with an intent to target Hispanic peoples.
```

1          All of this evidence also goes to the city's home

2     rule claims.  We have the right of self-government and our

3     evidence shows that SB 4 will violate our police power.

4          The executive director of the SAFE Alliance in an

5     affidavit at Docket 57-1, page 24 recounts how victims of

6     domestic violence and sexual abuse have been harmed by ICE

7     raids that occurred in February in retaliation for the Travis

8     County sheriff's policy and these are emblematic of what will

9     happen under SB 4.

10          The victims are not reporting their injuries to

11     police.  They are not seeking legal protection from abusers.

12     They are afraid to accept health services because of enhanced

13     immigration enforcement.

14          Our police chief Brian Manley describes how SB

15     4 will undermine trust between the community and the police,

16     that it will disrupt the chain of command and will divert

17     police resources from major crime investigations.

18          And several students who are U.S. citizens living in

19     mixed status families have described how SB 4 will impact

20     their learning as well as their family health and public

21     safety.

22          These families can no longer call the police for

23     assistance and instead must make terrible decisions; for

24     example, missing a three-year-old's necessary medical

25     appointment or giving up their family dogs because they are

```
 1    scared to leave their homes and attract the attention of

 2    authorities.

 3              These are all highlights from our filings and,

 4    thanks to all of the participants in this litigation, we have

 5    established a representative sample of what life under SB

 6    4 would be like.

 7              THE COURT:  You are talking about irreparable harm?

 8              MR. SIEGEL:  Yes, Your Honor.  And also for the need

 9    to apply preemption because these national interests are at

10    stake.  That's something that the record in Arizona does not

11    clearly show, but here, at the outset, because of the threat

12    of boycott, with the threat of lost economic activity, it

13    strengthens the case for preemption.

14              THE COURT:  But could not the legislature have known

15    all of these things and just made a determination that the

16    enforcement or implementation or assistance in the immigration

17    area, could not the legislature have said, "Yes, we

18    understand"?  For example, the tourism factor, could they not

19    have said, "We understand that, but we are going to make this

20    call and we want this and it is a greater priority for us, us,

21    the people of Texas, or the state of Texas, than losing some

22    tourism"?

23              MR. SIEGEL:  They are not authorized to make that

24    determination, Your Honor, because these are national

25    interests.  When you are talking about something that impacts
```

```
 1    the national economy, investment in the country, trade,

 2    tourism and our relationship with foreign nations, Texas does

 3    not have the authority to intrude in that area.

 4              If we mistreat Mexican nationals that come to this

 5    country, the President of Mexico needs to know that to resolve

 6    this issue, they can call the White House.  They don't have to

 7    search for the number for a particular statehouse and that's

 8    why preemption should apply.

 9              THE COURT:  All right.  If you will keep track of

10    your time.

11              And who is the next plaintiff?

12              MS. THOMAS:  Travis County, Your Honor.

13              THE COURT:  And you represent?

14              MS. THOMAS:  Travis County.

15              THE COURT:  Oh.  Travis County.  Yes.

16              MS. THOMAS:  Good morning, Your Honor.  My name is

17    Sherine Thomas and I represent Travis County, Travis County

18    Sheriff Sally Hernandez and Travis County Judge Sarah

19    Eckhardt.  And I am only going to take a few moments of the

20    Court's time to go over some facts that I think will be

21    important in your decision about the granting of a preliminary

22    injunction, in particular, some of the irreparable harm that

23    we think comes into play, specifically as it applies to Travis

24    County.

25              Because the statute has these criminal components
```

1    and the ability to remove an elected official, we believe that

2    it is very much at the forefront for this analysis for

3    irreparable harm, specifically as it comes to Travis County,

4    because the Governor has made a promise to punish Travis

5    County for its opinions on SB 4 and sanctuary cities and

6    detainers and has begun to implement a plan specifically as to

7    Travis County and as to the state of Texas.

8              On more -- and how do we know this?  Because on more

9    than one occasion, he has specifically said he intends to

10   hammer Travis County and --

11             THE COURT:  Does he not have that prerogative?

12             MS. THOMAS:  Your Honor, this is going to -- he does

13   have the prerogative to say that.  The part is that the law

14   can't go further than the Constitution, but also, it goes to

15   the likelihood of his process and what will happen to Travis

16   County and to the Travis County Sheriff Sally Hernandez, and

17   the important importance of the statute being clear and not

18   vague.

19             The first thing he did was take away $1.5 million in

20   grant funds that had nothing to do with the sheriff's office

21   but, rather, had to do with programs dealing with domestic

22   violence and veterans boards and had nothing to do with

23   immigration.

24             Then we see from the evidence attached to the City

25   of Austin's preliminary injunction motion that there was an

increase in ICE raids.  We also saw that within hours of the

Governor signing SB 4, a lawsuit being filed in Travis County

against Travis County, the City of Austin and numerous elected

officials, including Sheriff Hernandez.

And in that pleading, the position is that based on

previous policies that she is currently violating SB 4, and

that is pertinent to the discussion about what the next step

is and the likelihood of the State pursuing criminal action or

removal when a statute is so vague that an elected official

cannot determine what steps are possible and what steps

aren't.

One example would be, she can't adopt a policy to

materially limit immigration enforcement.  She can also not do

that specifically with an officer.  The problem is, can she

limit overtime so that an officer can no longer participate on

their own accord in a federal apprehension situation on

federal immigration?

That guidance isn't there, and if she did that, she

might be in violation of SB 4, and if she was, we know that

the Governor has every intent to go forward, even when there

is not a violation currently in place.

We also know, Judge, that, through that pleading,

the State of Texas believes that Sheriff Hernandez is hostile

to the cooperation because of previous public statements, and

it is questionable whether the way it is drafted currently she

1   can even participate in this trial after September 1st because

2   we can't endorse a policy.

3           In that regard, the statute should be enjoined

4   because of its vagueness and because there will be so much

5   confusion in play because the statute, they tie -- the

6   provisions tie together.  We can't just take out the word

7   "endorsement" and be done with it.

8           The material limits goes towards the federal

9   enforcement and then you can't tell an officer how or when to

10  do something.  There is a problem that the statute needs to

11  be -- so otherwise, we are going to have problems and we know

12  the State intends to pursue them, criminal and removal.  Those

13  are very high and serious repercussions for a statute that is

14  so vague.

15          With that, Judge, we will save time for rebuttal.

16          THE COURT:  All right.

17          Who is the next plaintiff?

18          MR. ESTEE:  If I can speak on behalf of the City of

19  Dallas, Your Honor.

20          THE COURT:  Yes.  Okay.  Go ahead.

21          MR. ESTEE:  Charles Estee on behalf of the City of

22  Dallas.  Thank you for the opportunity to speak, and I will

23  try to give the Court back most of its time.

24          The City of Dallas joins the other plaintiffs in

25  support of the injunction to prevent the implementation of SB

```
1   4 until there is a final judgment.  There are a host of

2   reasons for that injunction, but I just want to emphasize one.

3          We, as a society, already make too many demands on

4   our peace officers.  In Dallas, we are approaching the

5   one-year anniversary of a loss of four officers and a DART

6   officer to hate-based racial mistrust.

7          Instead of providing additional tools to help our

8   peace officers, SB 4 deprives them of training, discretion and

9   the ability to build trust and cooperation.  Currently, the

10  City of Dallas police force is understaffed and stretched thin

11  trying to perform traditional law enforcement duties.  They

12  certainly do not need to be labeled with also acting as

13  federal immigration officers.

14         I also would like to briefly touch on two legal

15  points.  First as to the First Amendment claim, everybody has

16  been focusing on "endorse," but there is another provision in

17  SB 4.  Subsection 565 provides that the Attorney General is to

18  file petitions for removal if, quote, presented with evidence,

19  including evidence of a statement by a public official,

20  establishing probable cause that the public officer engaged in

21  conduct violating the anti-sanctuary provisions.

22         SB 4 specifically identifies free speech as evidence

23  to justify removal from office.

24         Finally, as to the preemption, the preemption

25  analysis requires comparison to federal law and state law.
```

```
1    The anti-sanctuary provision of SB 4 provides that the local
2    government shall not adopt, enforce, endorse a policy
3    prohibiting or materially limiting the enforcement of
4    immigration law.
5            SB 4 creates a variety of punitive measures in the
6    event of such a violation.  But huge chunks of immigration law
7    have already been found to be preemptive of state law.  SB
8    4 elected to include all of immigration law in its term.  On
9    its face, SB 4 is preempted.
10           Unless the Court has any specific questions of the
11   City --
12           THE COURT:  No, I don't.  Thank you.
13           MR. ESTEE:  -- I will give you back your time.
14           THE COURT:  Thank you.
15           And the next plaintiff?  What is your name, ma'am?
16           MS. PEDDIE:  My name is Collyn Peddie and I am from
17   the City of Houston.
18           THE COURT:  All right.  Go ahead.
19           MS. PEDDIE:  Your Honor, there are three things I
20   would like to do with the limited time and limited role that
21   the City of Houston has in this case.  The first one is to
22   join in the motions for preliminary injunction filed by the
23   intervenors and the plaintiffs in this case, as I understand
24   the Court has permitted us to do.
25           And second, I would like to take just one of the
```

1  legal theories that Houston has advanced that extends upon the

2  preemption theories that the other plaintiffs and intervenors

3  have tried to make and make it concrete for the Court and

4  respond specifically to the DOJ's statement on Friday.

5          And finally, if there is time, I would like to talk

6  briefly about Houston's unique role in this case and unique

7  injury under Senate Bill 4.

8          Houston believes that Senate Bill 4 presents this

9  Court with a buffet of preemption theories from which it could

10  choose to find statute preemption.  But one, I think, is

11  particularly appropriate for this proceeding where the Court

12  is dealing with preenactment and facial challenges, and that

13  is the preemption theory under a case called Buckman v.

14  Plaintiffs' Legal Committee, and we have attached a copy of

15  that at tab 4 of our notebook.

16          Buckman was a medical device case and there was a

17  claim involved against a group of consultants that had been

18  involved in the approval of a drug they had allegedly lied to

19  the FDA to get the approval.

20          They were sued in state court and the U.S. Supreme

21  Court said that that case could not go forward, and it

22  explained that that claim was preempted, and their language is

23  instructive in this case.

24          The conflict here stems from the fact that the

25  statutory scheme -- in that case, the FDA, but in this case,

```
 1    the immigration scheme -- amply empowers the FDA to punish and

 2    deter fraud against it, and this authority is used to achieve

 3    a delicate balance of statutory objectives that can be skewed

 4    by allowing such claims to go forward.

 5              This is a frustration of purpose type of preemption.

 6    It is particularly strong in the Fifth Circuit.  Buckman has

 7    been cited in a number of cases and, in fact, there are

 8    statutes from the State of Texas that are currently held

 9    preempted based on this principle.

10              Now, if there is anything that Senate Bill 4 does,

11    it is that it skews the relationship between the federal

12    government and immigration enforcement and the local

13    governments that are regulated by them.  It has gone from

14    voluntary to draconian.

15              That is exactly what Buckman is directed to, and I

16    think you can see that if you look at a statute that others

17    have talked about, but not the provisions that I am going to

18    talk about, and this is 1357(g).

19              Congress enacted 1357(g) to allow state and local

20    authorities to enforce immigration laws.  Now, if you look at

21    the legislative history of this provision -- and I have made

22    that available to the Court, if the Court wants to take

23    judicial notice of it.  We don't have any evidence, but it is

24    in the Court's notebook.

25              The concern at the time was that they didn't have
```

```
1    the ability to do that, that this was an allocation of that

2    authority for the first time to state and local governments.

3    To that end, it allows local governments to enter into these

4    contracts, which you talked about, to perform some of the

5    functions of immigration agents, immigration officers after

6    not just training but certified training, certified training

7    and ongoing supervision by the Attorney General.  Contracts

8    are voluntary and cannot be compelled.

9            Now, 1357, if you notice, there is a little phrase

10   at the beginning of it.  1357 is an exception to 31 USC 1342,

11   which we have also put in the notebook at tab 6, which

12   generally precludes the federal government from accepting free

13   or voluntary services, and this is the relevant language, in

14   performance of ongoing regular functions of government.

15           So the ongoing regular functions of government, like

16   enforcing the immigration laws, cannot be performed by

17   somebody for free and accepted by the federal government.

18   That is a violation of that law.

19           And, in fact, under 1357(g), the Attorney General,

20   in this very provision, cannot accept services under the

21   subsection if they will be used to displace federal employees.

22   And so under this, under SB 4, where you have this mass

23   deputization of local law enforcement people, that cannot be

24   used under federal law to displace hiring more ICE agents.

25   You can't substitute local people shanghaied by the state for
```

1    hiring ICE agents.

2            Now, under 1357-G-10, you can have the cooperation

3    and everybody is focused on that, but they can cooperate on an

4    as-needed basis, and that is certainly something that 1373

5    talks about as well, although that is really limited to

6    communication, but you cannot have a systematic, regular

7    performance of duties of immigration officers that the federal

8    government can accept.  It is a violation of federal law.

9            And there are good reasons for 1357-G's restriction

10   on training, on certification, et cetera.  The federal

11   government is on hook for these guys.  If you are performing

12   these duties of an immigration officer, you are acting under

13   color of federal law.  And, in fact, 1357-G-7 and 8 talk about

14   cases in which the federal government is going to be liable

15   for these people.

16           Second, and equally important, and this is another

17   argument that we made in our brief, is that when Congress

18   delegated the authority to enforce laws to the executive

19   branch, it did so with all of these standards.  You had to

20   have certified training.  You had to have contracts and all of

21   that sort of thing.  Senate Bill 4 wipes those away.  And so

22   without them, it would be an improper delegation.

23           So in sum, what 1357 does is, the only way that a

24   local officer can perform the routine functions of a federal

25   immigration officer on an ongoing basis is through a contract,

1    and it is illegal for the federal government to accept

2    anything.

3              Now, the State of Texas and the federal government

4    are in lockstep on one issue, and they are saying:  Look, all

5    we are doing is mandating cooperation.  We are not having them

6    perform any functions of an immigration officer.  We are just

7    mandating cooperation.

8              And I think, frankly, that mandatory cooperation is

9    an oxymoron and, frankly, so does 1357(g), because 1357(g)

10   lists specifically the duties of an immigration officer.  And

11   guess what?  They are exactly the same duties that are

12   performed under SB 4.

13             So, for example, 1357(a)1 says that an immigration

14   officer has the power to interrogate regarding an alien's

15   status.  The power to interrogate.  1357(g)1 also lists the

16   functions of an immigration officer, detention of aliens in

17   the United States.

18             When you look at SB 4, SB 4 requires local police to

19   perform immigration officer functions under 1357(g) without a

20   contract, without certified training, or without the active

21   supervision of the federal law.

22             753.053(b)1:  Says cities can't prohibit or

23   materially limit their officers from inquiring into that

24   immigration status.  Now, here is where the federal government

25   and the State try to pull a fast one.  They say:  Oh, no, no,

```
1    no, no.  That's not what we are doing.  This is all
2    cooperation.
3            But SB 4 specifically separates this inquiry, this
4    power to interrogate from cooperation because it puts the
5    prohibition on inquiry in Section B-1 and the cooperation and
6    assistance in B-3.  They don't regard them, the Texas
7    legislature didn't regard them as the same thing.
8            Then second, the local law enforcement has to comply
9    and fill detainer requests.  In other words, the local
10   officers have to detain, which is a power of an immigration
11   officer, which they can't do on a regular basis without a
12   contract.  And so we think that that creates preemption
13   problems.
14           Now, the first one is conflict preemption problems,
15   which others have talked about, but I think particularly here,
16   it skews this delicate balance that the objectives that the
17   federal government tried to do when they wanted
18   highly-trained, certified, tightly supervised immigration
19   enforcement.
20           And that is, I think, where Buckman comes in, and
21   this is a good facial preenactment way to declare the statute
22   to be preempted.  I think I have exceeded my time.
23           THE COURT:  Thank you.
24           Any other plaintiffs?
25           MR. RIOS:  Thank you, Your Honor.  May it please the
```

1    Court.  My name is Rolando Rios and I am here on behalf of the

2    Texas Association of Hispanic County Judges and Commissioners.

3    We seek intervention pursuant to 24-A-2 or, in the

4    alternative, Rule 24-B-1.

5             The courts have granted intervention where the

6    following situations exist.  It is timely filed.  This case is

7    barely six weeks old.  The applicant has an interest.  We are

8    a statewide association of county officials who will be

9    greatly affected by SB 4 because it affects their duties and

10   rights as policymakers.

11            This position of the legality of SB 4 will impact

12   our membership as elected officials.  Indeed, SB 4 authorizes

13   the removal from office if they do not comply with the

14   requirements of the act.

15            Our association is the only statewide organization

16   in this case comprised solely of county-elected officials

17   whose responsibilities as elected officials will be greatly

18   impacted by SB 4.

19            Texas is a huge state, Your Honor, 254 very diverse

20   counties.  We have members from small border counties, like

21   Willacy and Zapata County, with a very limited budget and high

22   concentration of undocumented persons.  SB 4 will impact the

23   bottom line.

24            Also, we have members from counties like Lubbock and

25   Ward Counties in West Texas, where xenophobic, racial

1   attitudes towards Latino immigrants are prevalent.  I have

2   done over 200 lawsuits in that area, civil rights lawsuits.

3   SB 4 provides a weapon that state and local officials can use

4   to harass and terrorize the Latino community.

5          Finally, Your Honor, Latino elected officials may

6   have relatives who are targets of SB 4.  This law would cause

7   family members to turn against one another.  We believe we

8   qualify for intervention under 24-A-2.

9          However, in the alternative, we seek intervention

10  pursuant to 24-B-1, under which this Court has broad

11  discretion to grant intervention where the application is

12  timely, the intervenors have common issues of fact and law

13  with the plaintiffs and also that granting intervention will

14  not unduly delay or prejudice the original proceedings.

15         Thank you, Your Honor, for your attention, and we

16  hope the Court looks favorably on our request.

17         THE COURT:  Thank you.

18         Any other plaintiff?  If not, then we will reconvene

19  at 12:45 to begin with the State of Texas, and they will be

20  permitted an hour and a half, followed by the United States

21  for 30 minutes.

22         And if there are any witnesses in the courtroom who

23  do not wish to be here for oral argument, they can be here at

24  2:00 o'clock or thereabouts.

25         Okay.  We will be in recess.  Thank you.

```
 1                    (Lunch recess.)

 2              THE COURT:  All right.  We may begin with the State

 3    of Texas.

 4              MR. MCCARTY:  Good afternoon, Your Honor.  Darren

 5    McCarty for the State of Texas.  Just a couple of housekeeping

 6    matters before we get started.  My co-counsel, Brantley Starr,

 7    and I will be splitting the issues, generally, on argument.

 8              THE COURT:  Okay.

 9              MR. MCCARTY:  I am going to discuss preemption and

10    Tenth Amendment, are my primary issues.  His primary issues

11    will be Fourth Amendment and Fourteenth Amendment.

12              THE COURT:  Okay.

13              MR. MCCARTY:  And I know there are some subsidiary

14    issues which the Court may have questions about.

15              THE COURT:  Okay.

16              MR. MCCARTY:  And we can take those as we need to.

17              THE COURT:  All right.  Thank you.

18              MR. MCCARTY:  Your Honor, thank you for the

19    opportunity to explain the State of Texas' position on this.

20    And as a preliminary matter, it is important respecting this

21    Court's order holding venue in abeyance that we do believe

22    venue is a preliminary issue and predicate issue that the

23    Court must decide before entering an order on this injunction.

24    I am prepared to talk about it today, but I am certainly going

25    to respect the Court's order, unless the Court would like to
```

1    hear about that.

2              THE COURT:  No.  You may proceed to another matter.

3              MR. MCCARTY:  Okay.  Thank you, Your Honor.

4              Senate Bill 4 was passed specifically in response to

5    a number of Texas localities expressing their will and not

6    only their will but incorporating policies preventing law

7    enforcement from cooperating with the federal government in

8    its pursuit of a uniform immigration policy.

9              In response to that, the State of Texas and the

10   Texas legislature, as is its historical right to govern its

11   own municipalities and some local officials, passed Senate

12   Bill 4.

13             And Senate Bill 4 essentially does one thing in its

14   entirety, and it ensures or it helps to ensure that there is a

15   complete uniformity in application of immigration law.  To

16   borrow from the City of Austin's argument, it is important

17   that foreign governments know where their nationals stand in

18   the United States.

19             They should be able to make one call to Washington,

20   D.C.  They shouldn't have to call a statehouse, and they won't

21   under SB 4, and they certainly shouldn't have to call City

22   Hall.

23             What Texas wanted to do, Your Honor, is to ensure

24   that there is not a patchwork of immigration policies across

25   the state of Texas.  That is fair.  The United States Supreme

1    Court and the Texas Supreme Court have both recognized the

2    historical right of the state to police its own local

3    officials and municipalities.  They are creatures and

4    creations of the state, nothing more and nothing less.

5            Your Honor, there were a number of statements about

6    Senate Bill 4 this morning that I will get into specifically,

7    but I think the important overall understanding of Senate Bill

8    4 is this.  It does exactly what Arizona v. U.S. suggested

9    that the law should do and the state should do, and that is,

10   the consultation between federal and state officials is an

11   important feature of the immigration system.

12           It is the embodiment of what Congress suggested in

13   1373 and 1644, and most of the questions, if not all of the

14   questions, concerning whether Senate Bill 4 is preempted by

15   federal law are answered by Arizona v. U.S.

16           And I will take those one by one, and I am sure Your

17   Honor may have questions about that, but we heard far too

18   little about Arizona v. U.S. this morning, even though that is

19   a 2012 pronouncement by the United States Supreme Court

20   essentially concerning the very same issues that this Court is

21   addressing today.

22           Senate Bill 4 essentially does two things.  It

23   prohibits localities from adopting policies, practices, et

24   cetera that prohibit officers and officials from passively

25   refusing to enforce immigration laws.

1          It does not mandate anything other than prohibiting

2    local officials from doing that very thing, and one more

3    thing.  It mandates compliance with federal requests under ICE

4    detainers.  It is a hand in the glove of federal immigration

5    enforcement.

6          That is what it is.  It does not allow, for

7    instance, the parade of horribles that we heard this morning,

8    under which a local police officer could, for instance, decide

9    on his own that he wants to assist in the enforcement of

10   federal immigration law and start conducting immigration

11   raids.

12         It absolutely prohibits that and there is nothing in

13   Senate Bill 4 that would suggest that they could do that.  It

14   is not a show-your-papers law.  And this is an interesting

15   point, Your Honor.  Senate Bill 4, although it certainly does

16   provide for localities being restricted from prohibiting the

17   enforcement of immigration law, it does not mandate that

18   police officers or any other local official request

19   immigration papers.

20         I will suggest to Your Honor that what we have in

21   the U.S. v. Arizona was a far more aggressive policy and a far

22   more aggressive piece of legislation under Section 2-B, which

23   was upheld by the United States Supreme Court.

24         I also would like to talk about in just a moment the

25   division of what the United States Supreme Court says was okay

1  under the Arizona law and what it says wasn't okay under the

2  Arizona law, because there is an important distinction there.

3          Your Honor, there is an ongoing debate in this

4  country about federal immigration law, how it should be

5  enforced, who it should be enforced against, et cetera.  That

6  is a healthy, appropriate debate, and it should be decided in

7  the legislative houses, and particularly in Congress.

8          Where it is not appropriate to decide it,

9  respectfully, Your Honor, is by litigating policy issues

10  again.  As you have seen, Your Honor, we have objected to most

11  of their affidavits in evidence as irrelevant, and the reason

12  it is irrelevant, Your Honor, is because it mostly talks about

13  policy.  It doesn't talk about the constitutionality.  It is

14  not evidence of the constitutionality or lack thereof of

15  Senate Bill 4.

16          With that, Your Honor, let me start and let me talk

17  about Arizona v. U.S., because there were three provisions in

18  Arizona v. U.S. that were found unconstitutional and those

19  provisions specifically and expressly all dealt with one

20  thing.  They dealt with the regulation by the state of aliens

21  and immigration.

22          The first one really was a show-me-your-papers

23  statute, and it said that an alien would be criminally

24  prosecuted if they didn't have the registration papers on

25  them.

 1            Obviously, there was no such penalty under U.S. law,

 2   and even whatever penalty there was under U.S. law certainly,

 3   Your Honor, was not to be added to by the State of Arizona,

 4   because it was a direct regulation of immigration, an alien

 5   and his status.

 6            The second thing in U.S. v. Arizona that the Court

 7   held was inappropriate was the idea that Arizona could make

 8   laws about aliens seeking work and whether that could be

 9   penalized, et cetera.

10            Your Honor, what the United States Supreme Court

11   upheld was Arizona's regulation of their own officials and

12   whether those officials could inquire based on reasonable

13   suspicion about immigration status.

14            And interestingly enough, Your Honor, there was no

15   discussion in that law, the Supreme Court did hold that an

16   extended detention could implicate constitutional concerns,

17   but in Arizona's law facially, it did not suggest that there

18   had to be a lawful detention of an individual to inquire about

19   immigration status.

20            If I could, Your Honor, I would like to read from

21   Section 2-B, which was upheld by the United States Supreme

22   Court.  For any lawful contact made by a law enforcement

23   official -- lawful contact.  It could be a witness interview.

24   It could be anything, not a detention -- or agency of the

25   state or county, et cetera, where reasonable suspicion exists

1    that the person is an alien who is unlawfully present in the

2    United States, a reasonable attempt shall be made when

3    practical to determine the immigration status of that person.

4    Mandatory.

5              Texas does not have a mandatory counterpart.  The

6    person's immigration status shall be verified with the federal

7    government pursuant to 8 USC Section 1373(c).  Your Honor,

8    that and, importantly, because this came up earlier today,

9    there is a penalty under Arizona's law for failing to comply,

10   and that penalty is found in Section 2(g) and specifically

11   2(g) and 2(g)2 and says this:  A person may bring an action in

12   Superior Court to challenge any official or agency of the

13   state or county, city, town or other political subdivision

14   that adopts or implements a policy that limits or restricts

15   the enforcement of federal immigration law.

16             And it goes on to talk about attorney's fees and

17   civil fines, civil penalties.  Your Honor, so the idea that

18   there was no enforcement behind immigration law or the Section

19   2(b) that the Supreme Court upheld, et cetera in Arizona is

20   simply untrue.

21             Texas, Your Honor, has also exercised its police

22   power to penalize localities and local officials who implement

23   policies against the voluntary inspection of a person's

24   immigration status.

25             Texas does not require it like Arizona did, but it

1    is quite clear that if Texas did require it that it would be

2    constitutional under any fair reading of U.S. v. Arizona.  And

3    so I think that is an important distinction and I think it is

4    important for this Court, when it is considering SB 4, to

5    remember the very plain distinction that the U.S. Supreme

6    Court made between Arizona's ability to control its local

7    officials and their conduct versus the state of Arizona's

8    ability to control and regulate alienage and immigration

9    status.

10            Your Honor, as you will hear, I am sure, later today

11    from the United States, the federal government believes

12    unquestionably that Texas's law does not conflict in any way,

13    shape or form with federal immigration policy.  It does not.

14    The United States government is certainly the most appropriate

15    party to comment on that, and it has done so and it will do

16    so.

17            But, Your Honor, to talk about conflict preemption

18    and to talk about field preemption, we know, based on reading

19    U.S. v. Arizona, that there is no -- that there is certainly

20    no field preemption here, because the U.S. Supreme Court

21    upheld Section 2(b) and 2(b), of course, is quite close to,

22    although it goes further than Texas Senate Bill 4.

23            I would also suggest, Your Honor, that there is no

24    fair reading of Senate Bill 4 that would allow a Texas law

25    enforcement officer to do anything beyond -- or I should say

1    it differently.

2          There is nothing in Senate Bill 4 that would allow

3    for or condone a Texas law enforcement officer from doing

4    anything more than inquiring into immigration status, not to

5    arrest based on immigration status or anything else.

6          And, in fact, there is much made of the idea that,

7    how could Texas law enforcement possibly know how to enforce

8    immigration laws or know how to determine whether a person is

9    an alien or not?

10         Well, U.S. v. Arizona actually addressed that very

11   issue, and that is, the Law Enforcement Service Center

12   operates 365 days a year, 24 hours a day, and that is the

13   mechanism -- and it is talked about in Section 1373 of the

14   U.S. Code -- for a local or state official to contact the

15   federal government to determine whether an alien or any person

16   is, in fact, an alien or they are a United States citizen.

17         That's a perfectly legitimate way, of course, of

18   making that determination and the U.S. government has made

19   that mandatory that they respond to those inquiries.  In other

20   words, the U.S. government itself has made an overture, a very

21   clear overture to the states and law enforcement to determine

22   whether or not an alien is present within the United States,

23   and if they are, maybe they are here lawfully; maybe they are

24   not here lawfully, but that is for the U.S. government to

25   decide.

1              It is not for Texas law enforcement to decide and it

2    is certainly not inappropriate for Texas law enforcement to

3    look at driver's licenses, for instance, to determine whether

4    a person might be here legally and not detain them based on

5    the possession of a driver's license.

6              It is not an immigration -- SB 4 does not suggest

7    that that is an immigration determination.  Instead, all SB 4

8    does is suggest that if there is a driver's license or if

9    there is another form of government ID that they don't have to

10   honor a federal ICE detainer.

11             If anything, it favors letting individuals go, but

12   it certainly does not suggest that there is a unilateral

13   determination of immigration status.

14             And I think that is important, because in U.S. v.

15   Arizona, Your Honor, the United States Supreme Court found

16   that that was a limitation and an appropriate limitation in

17   Arizona's law.

18             In fact -- and I am reading from the case now -- it

19   says:  Three limits are built into the state provision.

20   First, a detainee is presumed not to be an alien unlawfully

21   present in the United States if he or she provides a valid

22   Arizona driver's license or similar identification.  Exactly

23   what Senate Bill 4 does.

24             It was approved by the United States Supreme Court

25   in 2012.  Your Honor, respectfully, the idea that Senate Bill

```
 1    4 engenders a policy whereby a police officer could ignore a

 2    report of violent crime or should ignore a report of violent

 3    crime in favor of conducting an immigration inquiry is frankly

 4    not only not found anywhere within the text of Senate Bill 4,

 5    which mandates nothing, but it sort of questions the common

 6    sense of any state law enforcement officer.

 7              It is somewhat insulting to think that a law

 8    enforcement officer would continue conducting an immigration

 9    inquiry with an individual because they had to under Senate

10    Bill 4 versus responding to an outcry of some violent assault.

11              Nothing in Senate Bill 4 would require that and it

12    wouldn't happen, frankly, Your Honor, and no police department

13    would ever be prosecuted, no police official would ever be

14    prosecuted for leaving the scene of a lawful detention to

15    respond to a more pressing inquiry or situation.

16              Your Honor, the ACLU, in representing the City of El

17    Cenizo today, suggested that Senate Bill 4 required mandatory

18    cooperation and others repeated that refrain.  It does not.

19    All it suggests is that cities and localities cannot engender

20    policies of mandatory noncooperation, because that is what

21    those sanctuary city policies do, and that's all Senate Bill

22    4 does, other than federal ICE detainers, which is a separate

23    question.

24              Your Honor, I would also suggest that, you know,

25    some of the parade of horribles about what would happen, the
```

```
1    harm that would occur if Senate Bill 4 was upheld is, from an
2    evidentiary standpoint, irrelevant to this Court.
3            The State of Texas concedes, Your Honor, that if
4    Senate Bill 4 is unconstitutional or a provision of it is
5    severed by this Court or this Court finds it unconstitutional,
6    if it is, and it would violate the constitutional rights of
7    the public, then there is irreparable harm.
8            Equally, Your Honor, if any of the parade of
9    horribles we have heard about today, including racial
10   profiling, which I want to get to next, occurred under Senate
11   Bill 4, or could occur under Senate Bill 4, that's not the
12   question before this Court, respectfully.
13           Certainly, any law could be misinterpreted,
14   deliberately misinterpreted, deliberately misused by law
15   enforcement.  Law enforcement can have pretextual stops under
16   various traffic violations, et cetera.  We all know that can
17   happen and has happened.
18           But, your Honor, that is not important.  What is
19   important is, is there a way, is there a constitutional way
20   that Senate Bill 4 can be implemented and conducted?  And if
21   there is one way in which it can be, under a facial challenge,
22   it must be upheld.
23           We also heard a great deal this morning about racial
24   profiling.  The Texas legislature, the same legislature -- I
25   guess a predecessor of the Texas legislature today that
```

1    enacted Senate Bill 4, has enacted countless laws against

2    racial profiling.

3          Not only is it outlawed in the state of Texas, not

4    only is it outlawed by the Texas Senate Bill 4 itself, but

5    municipalities have to report every year annually to the State

6    of Texas all of its data concerning potential incidents of

7    racial profiling.

8          Local law enforcement is well aware of the

9    prohibitions against racial profiling.  Local law enforcement

10   has been trained for years against racial profiling.  There is

11   simply no reason why there should be any concern that Senate

12   Bill 4 somehow impacts or lessens the prohibitions against

13   racial profiling.  It is simply not to be found.

14         Your Honor, we also heard a lot today about the

15   training necessary and the cooperation that the federal

16   government requires under 1357 for assistance in cooperating

17   with the federal government and the enforcement of federal

18   immigration laws.

19         And again, Your Honor, I don't want to beat a dead

20   horse, but there is nothing in Senate Bill 4 that suggests

21   that Texas police officers are going to enforce immigration

22   laws.  They may make -- they may not be prohibited from making

23   immigration inquiries.  There is no suggestion that they can

24   make arrests or detentions based on those inquiries.  All they

25   can do is make the inquiry.

1              THE COURT:  Well, pardon me, Counselor.

2              MR. MCCARTY:  Sure.

3              THE COURT:  After they make that inquiry and they

4      determine that a person is here illegally because he says he

5      was born somewhere else and he was not naturalized here, what

6      does that officer have to do then?  Or what is he required to

7      do, or is he required not to do anything?

8              MR. MCCARTY:  1373 suggests that that information

9      should be shared with the federal government.

10             THE COURT:  And if he or she, the officer doesn't do

11     that, then what?  What happens to that officer?  Or what

12     happens to the information that he or she has gathered?

13             MR. MCCARTY:  Nothing.  If there is a policy against

14     sharing that information, if a police chief walks in one day

15     and says to the meeting of all of the officers on that

16     particular day, "Officers, you are not to report immigration

17     status to the federal government," that's a violation of SB 4.

18             If, for some reason, the officer gets busy, he

19     doesn't report the immigration status, et cetera to the

20     federal government, that is certainly not a policy or practice

21     prohibiting the exchange of information with the federal

22     government.

23             THE COURT:  But what, if anything, happens then to

24     the officer who acquires that information and doesn't do

25     anything with it?

1          MR. MCCARTY:  Nothing.

2          THE COURT:  Well, then -- okay.  Go ahead,

3   Counselor.

4          MR. MCCARTY:  And it is also important, Your Honor,

5   to remember that 1357(g), the provision that has been pointed

6   to so often today, Your Honor, as requiring all kinds of

7   training, et cetera, related to federal immigration law, that

8   very provision, 1357(g), says:  Nothing in the subsection

9   shall be construed to require an agreement under the

10  subsection -- which is the agreement concerning training and

11  essentially deputizing local law enforcement as immigration

12  officials -- under this subsection in order for any officer or

13  employee of a state or political subdivision of a state to

14  communicate with the Attorney General regarding the

15  immigration status of any individual, including reporting

16  knowledge that a particular alien is not lawfully present in

17  the United States or, B, otherwise to cooperate with the

18  Attorney General in the identification, apprehension,

19  detention or removal of aliens not lawfully present in the

20  United States.

21          Now, I think it is important, Your Honor, to think

22  again about the text and the proper reading of Senate Bill

23  4 concerning assistance in immigration enforcement.  And they

24  suggested this morning that assistance in immigration

25  enforcement under Senate Bill 4 could be allowed such that

```
 1   local officers could conduct immigration raids.  I think any
 2   fair reading of Senate Bill 4 would do away with that thought.
 3   And so I am looking right now at Section 752.053.
 4             THE COURT:  053?
 5             MR. MCCARTY:  Yes, Your Honor.
 6             THE COURT:  Okay.  Go ahead.
 7             MR. MCCARTY:  And specifically (b)3.  And (b)3
 8   says -- this is the assistance clause.  It is on page -- I
 9   don't know what copy you have, but I will let you get to it.
10             THE COURT:  Okay.
11             MR. MCCARTY:  Assisting or cooperating with a
12   federal immigration officer as reasonable or necessary,
13   including providing enforcement assistance.  Cooperating or
14   assisting a federal immigration officer as reasonable or
15   necessary.
16             That's not Officer Smith in Midland deciding he
17   wants to go conduct an immigration raid in the local apartment
18   complex.  I don't think there is any reading of that provision
19   that would sanction that type of activity.
20             THE COURT:  Well, what does the reading then mean?
21             MR. MCCARTY:  It means that local officials,
22   municipalities, et cetera, cannot prohibit their officers from
23   assisting a federal immigration officer in the enforcement of
24   federal immigration law.
25             That's all it means.  It doesn't condone unilateral
```

```
 1     activities of local law enforcement.  Senate Bill 4 doesn't
 2     condone local law enforcement asking about immigration status
 3     either of somebody that they encounter on the street unless
 4     that person is lawfully detained.
 5              THE COURT:  Right.
 6              MR. MCCARTY:  And Senate Bill 4, as would any fair
 7     reading would be under Arizona v. United States, does not
 8     allow for local law enforcement to continue to detain a person
 9     for any amount of time beyond their state lawful detention for
10     a continued inquiry on federal immigration status.  It is
11     actually a mod -- it is a very moderate provision.
12              We have heard a lot about the penalties in Senate
13     Bill 4 and all of these sorts of thing.  Certainly, the State
14     legislature thinks it is quite important to keep criminal
15     aliens off the street if the federal government, if the
16     federal government makes a determination that they should be
17     deported and should be detained under federal law.  It is not
18     for Texas, it is not for Texas officials, it is not for local
19     law enforcement to make a decision about the continued
20     detention, arrest or deportation of any alien under Senate
21     Bill 4.
22              Your Honor, I also would like to talk just a little
23     bit about 1373 and the idea that there is some sort of
24     conflict preemption with 1373.  1373, as Your Honor probably
25     knows, 8 USC 1373, to be clear, is a provision that does some
```

```
1    of what Senate Bill 4 does, in that it suggests that any

2    state, federal or local policy that impedes the voluntary

3    exchange of information with the federal government concerning

4    immigration status is essentially prohibited.  It is

5    preempted, et cetera.

6              1373, Your Honor, much like 1357, talks in terms of

7    voluntary cooperation, and that certainly is appropriate.  The

8    Tenth Amendment is an important issue.  It is an important

9    issue to the State of Texas and every other state.  And the

10   federal government, as this Court certainly knows, is limited

11   in its power to coop or commandeer state officials for the

12   conduct of federal business.  They can't.

13             They cannot say, "Local official, you must do this

14   under penalty of federal law."  They cannot say, "Local law

15   enforcement official, you must go conduct immigration raids."

16   It cannot do that.  It cannot commandeer.

17             Immigration law is a creature of federal authority

18   and nothing in Senate Bill 4 challenges that.  But the federal

19   government is limited in its direction, and so 1373 not having

20   penalties, not contemplating penalties, et cetera, is nothing

21   more than a recognition of the preservation of the Tenth

22   Amendment and the State's authority under the Tenth Amendment

23   without encroaching into a gray area, where it gets very fuzzy

24   about what the federal government can and can't do.

25             We know that the Second Circuit in the City of New
```

1    York v. the United States determined that 1373's preemption

2    provisions were appropriate, they were constitutional.  The

3    Supreme Court actually has never ruled on that because that

4    case never made it, but that is the highest court to rule on

5    1373.

6            Arizona's Senate Bill 1070, that was reviewed by

7    U.S. v. Arizona, took the next step and said:  You must share

8    information.  You must inquire when it is reasonable into the

9    immigration status of an individual when they are in contact

10   with law enforcement, as was Arizona's right as a state.

11           Texas law occupies the middle.  Texas, as a state,

12   could have done what Arizona did.  They could have said there

13   must be mandatory inquiries into immigration status.  If Texas

14   had done that and Texas had repeated what Arizona did under

15   Section 2(b), there would be no question whatsoever that that

16   would have been constitutional under Arizona v. the United

17   States.

18           Texas took a more modest step into the middle ground

19   where it said merely, sanctuary city policies are unlawful.

20   Nothing more, nothing less.

21           1373 said you can't, much like Senate Bill 4, you

22   can't, under sanctuary city policies, prevent the sharing of

23   information with the United States government -- enact

24   penalties.  Arizona, mandatory penalties.  Federal government,

25   voluntary, no penalties.  Texas, in the middle, voluntary with

```
 1    penalties.

 2            It is a moderate law and falls well within the

 3    confines of Arizona v. U.S.  It certainly fits hand in glove

 4    with federal immigration policy.  It does not leave any

 5    policy-making decisions concerning alienage or immigration

 6    with the State of Texas or local officials.

 7            If Your Honor doesn't have any questions on those

 8    issues, I will yield the rest of my time to my colleague.

 9            THE COURT:  All right.  Thank you, sir.

10            MR. STARR:  Brantley Starr, also for the defendants,

11    Your Honor.  I have got the Fourth Amendment, First Amendment,

12    Fourteenth Amendment and then two state -- on sheriffs and

13    cities --

14            THE REPORTER:  Slow down.  Slow down.  I didn't get

15    that.  Keep going.

16            MR. STARR:  Fourth Amendment should be their most

17    interesting claim, Your Honor, especially in light of your

18    Santoyo ruling from a few weeks ago.  They make several

19    arguments, I think three main arguments on the Fourth

20    Amendment.

21            The first they are arguing is that state and local

22    officers simply can't enforce federal immigration law.  They

23    can't act on federal information that flows down to them.

24    Their second argument is that there is no probable cause in a

25    civil context.  And then the third argument is that there
```

1    could be ICE detainers in the future that are defective.

2          Before we hit those in turn, there is a very

3    important point that is fatal to their claim, Your Honor, and

4    that is that the Fifth Circuit has said that the Fourth

5    Amendment, it has personal rights.  They can't be vicariously

6    asserted by someone else, and that is what they are attempting

7    to do today, so they don't have standing actually asserting

8    the Fourth Amendment claims on behalf of someone else.

9          Even if we overlooked that and assume they had

10   standing, all three arguments they make are flawed.  The first

11   argument is that state and local officers can't take that

12   information from the federal government and use it to make an

13   arrest at their request or use it to make a detention at their

14   request.

15         But in Santoyo, you brought up the collective

16   knowledge doctrine, and that doctrine is that there is a

17   sharing of information between agencies, even the federal down

18   to local.  That information can pass from the federal officer,

19   who makes the investigation, down to the officer at the local

20   level who is making the detention, and that flow of

21   information is constitutionally permissible.

22         The problem you found in Santoyo was an accurate

23   one.  It is that the information never actually flowed.  The

24   information that supported the probable cause never flowed

25   from the federal government down to Bexar County, but the

1    collective knowledge doctrine stands in the way of the

2    argument that they are making.

3         The second argument they are making is, there can't

4    actually be probable cause in the civil context.  When we look

5    at the foundation of this argument, it is the Fourth

6    Amendment, saying that in order to have a seizure of a person,

7    you have to have probable cause or a warrant, but it never

8    says it has to be a probable cause for a crime or a warrant

9    for a crime.

10        The thing that stands in the way of their argument,

11   Your Honor -- in Abel v. the United States in 1960, the

12   Supreme Court had a case where it was considering a federal

13   administrative detention pending deportation.

14        The person who was being detained in that case had

15   actually admittedly below that that detention was a lawful

16   one, and as it made its way up to the U.S. Supreme Court, they

17   stopped and paused and commented on whether that was

18   constitutionally permissible or not.

19        And they said, quote, that these administrative

20   sanctions had the sanction of time.  Another quote from that

21   case was that they have overwhelming historical legislative

22   recognition of the proprietary of administrative arrests for

23   deportable aliens.

24        So what we saw in 1960 from the U.S. Supreme Court

25   was that you can have probable cause for a civil offense like

 1    deportation.  It hasn't just been used in deportation, Your

 2    Honor.

 3              There are other contexts that Congress and our State

 4    legislators have said that we want to confine or seize a

 5    person for a civil offense, because that is the softer of the

 6    available remedies, other than making it a crime.

 7              We have three on the state level that we can bring

 8    to your attention.  Incapacitation for intoxication, the

 9    officer could arrest that person for public intoxication, but

10    the softer approach to handling it is putting the person out

11    of danger.

12              Arrest for the mentally ill pending a mental

13    adjudication, so that they don't harm themselves or others,

14    but without making them subject to a crime is the softer way

15    of handling it.  Returning juveniles to their parents without

16    arresting them for the commission of a crime is the softer way

17    of handling that.

18              And if we remove Congress's softer way of handling

19    deportation and make an initial unlawful entry a crime, that

20    is something that no one in this courtroom wants.

21              Even if these arguments fail, they still have fatal

22    flaws because they are bringing a facial pre-enforcement

23    challenge, Your Honor, and I would like to point to one

24    example in which there can be a constitutional application

25    that sinks all of their Fourth Amendment claims.

```
 1           From Senate Bill 4 we know that local law
 2   enforcement in complying with an ICE detainer doesn't just
 3   have to release them after their state detention is over.
 4   They move the timeline up, up to a seven-day early release.
 5   If that happens once and just once, there is no second
 6   detention for which probable cause is needed.
 7           So the Fourth Amendment claim is destroyed on a
 8   facial pre-enforcement challenge because of the early release
 9   mechanism in Senate Bill 4.  There is no second detention and
10   no Fourth Amendment trigger.
11           Your Honor, if you have no Fourth Amendment
12   questions, I would like to move to the First Amendment test.
13   Their key claim is on the word "endorsement," Your Honor, and
14   they bring up several points, but the ones I want to handle at
15   the same time is the viewpoint discrimination and over
16   breadth.
17           Basically, they are claiming it is viewpoint
18   discrimination to suppress one side of the debate through this
19   word "endorsement" but not to suppress the other side of the
20   debate.
21           They basically said we conceded that "endorsement"
22   means nothing, and I wouldn't say that.  I would say that the
23   Supreme Court has admonished us that we are to consider two
24   guideposts when we are construing words in a statute.  One is
25   common meaning.  Two is context.
```

1          You can't pull a word and isolate it from its

2    statutory moorings and expect that it would withstand any form

3    of scrutiny at all.  If you look at a common meaning of the

4    word, and Counsel Perales said this earlier, it's to sanction,

5    to authorize, to confirm, when you take that dictionary

6    definition and look at it in the context of what that one

7    sentence that contains the word "endorsement" is doing, there

8    are aspects of relevance and causation --

9          That endorsement actually has to cause the officers

10   to mandate a policy of noncooperation.  We can take a couple

11   of hypos, Your Honor, and just walk through what endorsement

12   does and doesn't do.

13         Let's say the sheriff is running for office.  Maybe

14   the sheriff has already been elected and is running as an

15   incumbent and says, "I have seen what SB 4 did.  I don't like

16   it, and I will lobby for its appeal in the legislature."

17         That is not forbidden by SB 4 by that policy of

18   endorsement.  At the Attorney General's Office, we would not

19   go after that sheriff for violating SB 4, and there are some

20   perfectly good reasons.  That is not even an official

21   communication in that sheriff's official capacity.  It is

22   speaking within their First Amendment rights as an individual.

23         If you shift the hypo and make it an official

24   communication, we can see what "endorse" does cover and it

25   still has meaning.  Let's say the same sheriff musters the

1    deputies every morning and says:  Now, you know we don't have

2    a written policy on this, but everyone knows what I think

3    about sanctuary cities and I think that the policy that San

4    Francisco has is the one that is best for that community and

5    for ours and today I expect you to act accordingly.

6           Is that forbidden by SB 4?  Absolutely, because what

7    that is doing is it is a functional equivalent of adopting a

8    policy of nonenforcement or enforcing a policy of

9    nonenforcement.  It is one and the same.

10           It was speech and only speech, so it might not fit

11    under the words -- or enforcement but encompasses the same

12    idea, Your Honor.  So properly understood, "endorse" has a

13    meaning, but its meaning is contextual.  It is common sense.

14    It is not expansive.

15           Second, even if we were wrong and it has got a more

16    expansive definition, you are constrained under the doctrine

17    of constitutional avoidance to narrow the word yourself.  And

18    even if your narrowing doesn't fix the constitutional issues,

19    then the object is to strike it from the statute.

20           That proper contextual meaning also solves their

21    over breath claim as well.  You had asked earlier about the

22    junior college professor.  Well, when they pull a word out of

23    the statute of "endorse," they are forgetting that there is

24    causation and relevance there.

25           Is the professor causing all of the campus police to

```
 1    not somehow engage in enforcement of immigration law?  There

 2    is simply no causation there.  If you have a board of trustees

 3    policy, that could be different.  If the trustees say, "We

 4    have an absolute policy of noncooperation with ICE," then,

 5    yes, that could be different.

 6          But thinking through this, if there are actual

 7    individual discrete reasons why someone can make a decision on

 8    a particular day, that wouldn't violate SB 4.  We had the

 9    example of a sheriff who said in the affidavits filed by the

10    plaintiffs that they have said no to ICE for a request on --

11    enforcement actions that day because their officers were busy

12    on critical matters.

13          That would be fine with SB 4.  It is not a policy

14    that prevents noncooperation.  It is an isolated decision

15    based on the best evidence they have at the time that doesn't

16    result in a policy of material noncooperation with the federal

17    government.

18          THE COURT:  Where does it say that in the statute?

19          MR. STARR:  Your Honor, it is from the sentence in

20    053 -- 053(a)1, "adopt, enforce or endorse a policy under

21    which the entity or department prohibits or materially limits

22    the enforcement of immigration laws."

23          So the Attorney General's Office, we wouldn't view

24    an isolated decision on a day that the officers are too busy

25    on critical matters to be a policy from which flows a
```

 1    noncooperation decision.

 2            Now, if that sheriff instead said, "I don't like

 3    helping on ICE raids because I don't like what ICE is doing to

 4    our community.  Therefore, we are never going to cooperate

 5    with ICE on these raids."  That's a policy of noncooperation.

 6            So, Your Honor, we have touched on what the outer

 7    bounds of what this law covers and doesn't.  There are a

 8    million gray area hypotheticals that we could get into.  Every

 9    time we ask a hypothetical, that walks back into the notion

10    that this is a facial pre-enforcement challenge.  Any time we

11    have a hypothetical, we know that their facial challenge must

12    lose because we have already laid out the areas the statute

13    does cover and can constitutionally apply.

14            Your Honor, I would like to address briefly the

15    Fourteenth Amendment claims.  And we have claims on vagueness,

16    political process, animus and then pretext.  I will try to

17    very briefly touch on them.

18            The vagueness claim is the one we have touched on

19    already.  One thing I would like to highlight is that there is

20    an actual standard under the Fifth Circuit for when you can

21    bring an action like this.

22            We know that the test is, "Is it vague in every

23    application?" from the U.S. Supreme Court.  That is the facial

24    test.  A pre-enforcement test, the posture that we are in, the

25    Fifth Circuit said in Roark that those challenges are

1    difficult, perhaps impossible, because facts are generally

2    scarce.

3           Here, we don't have the facts.  We don't know how SB

4    4 will actually be enforced.  We have given you our guidance

5    as to how we think constitutionally it could be enforced, but

6    because they don't have the facts for an enforcement

7    challenge, we have to wait for the enforcement action, and if

8    you have a winning claim, you bring an as-applied challenge.

9           Even if we assume that is the wrong standard and get

10   into their hypos on vagueness, the real question here is

11   whether or not they can satisfy the standard the Supreme Court

12   articulated, that they didn't give to you this morning.  The

13   standard for vagueness is whether the statute specifies,

14   quote, no standard of conduct at all.

15          So the question on vagueness, when they talk about

16   materially limit, pattern and practice, policy, do those

17   provide any standard at all?  And the answer has to be that

18   they do.

19          When you look at the plain contextual meaning of the

20   terms, we just talked about materially limit, having a

21   causation or relevance aspect.  It is not just making an

22   internal decision as a supervisor.  If you are going to have a

23   policy of noncooperation, that actually has to manifest itself

24   in noncooperation by the department.

25          Other phrases like "pattern of practice" have a

1    clear meaning in the law, Your Honor.  That is fully embedded

2    into Title VII, and if pattern of practice is vague and

3    unconstitutional, then so is Title VII.

4           In other words, they challenge policy.  You

5    addressed policy in Santoyo three weeks ago.  You quoted from

6    the U.S. Supreme Court and you quoted from the Fifth Circuit

7    in saying exactly what policy means, and there was no

8    vagueness in Santoyo three weeks ago.

9           The last thing they challenged for vagueness is

10   under the ICE detainer practice.  Obviously, SB 4 requires

11   them to detain, subject to an ICE detainer, and then has the

12   safety valve that we talked about this morning.  You can

13   release this person without violating SB 4 if they have proof

14   of lawful immigration status.

15          So what does that phrase means, "lawful immigration

16   status"?  Well, they come up with three examples in their

17   briefing:  Formal, lawful permanent resident status, informal

18   lawful authorization, deferred action.  All three would

19   suffice, Your Honor.

20          We are not trying to assess immigration law for the

21   purpose of enforcing immigration law.  What we are allowing is

22   a safety valve for sheriffs, that when they arrest someone, a

23   person is subject to a detainer, the person's state time has

24   ended but a detainer comes in, and that person says, "Sheriff,

25   I am a citizen.  I have proof.  I have a driver's license in

1    my wallet."

2            If there is an isolated case of mistaken identity,

3    the safety valve lets the sheriff let that person go without

4    facing any repercussions under Senate Bill 4.  It is simply

5    not vague.

6            Your Honor, there are political process cases that

7    the ACLU brought up earlier today.  These are the Schuette

8    line of cases.  And it is an interesting line of cases,

9    because in Schuette, the Supreme Court knew that there would

10   be days like today when litigants would draw their line of

11   cases out of context.

12           And Schuette analyzed all of the Supreme Court cases

13   and put a very important limit on them.  The Supreme Court

14   said in Schuette that that line of cases only governs state

15   actions, quote, with a racial focus.

16           There is no racial focus in SB 4, Your Honor.  The

17   only mention of race is to prohibit unconstitutional racial

18   discrimination.  That is it.  It doesn't create any other

19   group.  It doesn't define a group.  It leaves that up to the

20   federal government.

21           If the only racial focus is prohibiting

22   unconstitutional racial discrimination, it can't violate the

23   Schuette line of cases, Your Honor.  There is a Romer claim,

24   animus.  But we know from Romer, the same defect applies.

25   Romer only applies if a law is impermissibly targeting a group

1    of individuals.

2         SB 4 doesn't define a target, Your Honor.  It

3    basically says that the federal government is the only one who

4    can actually enforce federal immigration law and that we are

5    not going to stand in their way as they enforce that law.

6    There is not a class of persons that SB 4 defines, and because

7    of that, the Romer case simply can't attach to it.

8         Their last equal protection claim, Your Honor, is an

9    Arlington Heights claim, and these are some of the most

10   difficult claims to decide, but fortunately here, there are

11   two key reasons before you ever get to that six-part test in

12   Arlington Heights.

13        What Arlington Heights does is it allows on very

14   limited circumstances for a court to infer racial pretext from

15   a bill that wasn't passed referring to racial pretext, but

16   there are two critical points.

17        The first is that the Supreme Court has repeatedly

18   upheld laws if the face of the law itself doesn't have a

19   racial classification or obvious pretext for one.  That's what

20   we just addressed here.  There is no classification that SB

21   4 actually draws, and so necessarily there can't be a racial

22   classification that SB 4 provides.

23        The Supreme Court said this another way in the

24   Palmer case.  It said:  Without invidious legislative

25   classification of individuals, courts can't nullify state

1    laws, quote, solely because of the motivations of the

2    legislators who voted for it.

3          Because SB 4 doesn't discriminate on race and

4    doesn't define any particular class, their Arlington Heights

5    claim necessarily fails.

6          Just touching briefly on two quick points on the

7    six-factor test in Arlington Heights.  One of the factors is,

8    what is the specific sequence of events that led to the law's

9    passage?  We know that in past sessions, the legislature had

10   tried and failed to pass a sanctuary cities law.

11         After that happened, we saw the Kate Steinle murder

12   in San Francisco.  Once that happened, the legislature put in

13   an interim charge to study the issue.  They collected data

14   from Texas agencies and found that there were 176,000 criminal

15   aliens -- in the Texas jails in a four-year period, that they

16   have been convicted of 211,000 offenses, 383 homicides.

17         It was against that backdrop that we had Sheriff

18   Hernandez for Travis County who had announced her intention

19   for Travis County to be a sanctuary jurisdiction if she was

20   elected, and then once elected, she followed through on that

21   promise.

22         This was not some sort of discrimination based on

23   race that was pretextual and in their minds whenever they were

24   passing a law that had no classification.  They were acting to

25   protect the public safety, because of the important public

```
 1    debate on compliance with ICE detainers.

 2           The last thing to touch on for Arlington Heights.

 3    The plaintiffs claim that the Senate basically changed its

 4    rule, that it watered down the two-thirds rule to a

 5    three-fifths rule in order to be able take up and pass the

 6    Senate Bill 4.  That happened two years ago, Your Honor.

 7           THE COURT:  It happened what?

 8           MR. STARR:  Two years ago.

 9           THE COURT:  Right.

10           MR. STARR:  It was a campaign promise of the

11    Lieutenant Governor.  It wasn't designed and targeted for SB

12    4.  Your Honor, for these reasons, we think that you don't

13    even really get into the six-factor test of Arlington Heights

14    to know that this law doesn't draw any racial distinctions.

15           Lastly, we have two state law claims.  One is on

16    cities and one on sheriffs.  The City of Austin points out

17    accurately there is a description in the Constitution that

18    home rule cities derive their power from the Constitution, but

19    they omit the last half of that sentence, which is that even

20    home rule cities can't violate general and state law.

21           SB 4 is that general and state law.  It was enacted

22    with the state's police power to protect the public safety of

23    its citizens, which goes back to that interim report, where

24    they were looking at crime rates among those who were subject

25    to an ICE detainer.
```

1          There is a similar claim from the sheriffs.  They

2     are claiming that they are constitutional officers and,

3     indeed, they are.

4          THE REPORTER:  Counsel, slow down just a bit.  If

5     someone coughs, I miss like five words.

6          MR. STARR:  I apologize.

7          THE COURT:  They are claiming what?

8          MR. STARR:  The sheriffs are claiming that because

9     they are constitutional officers that it would violate the

10    state separation of powers provision for SB 4 to actually

11    mandate duties on them, like it does with a detainer

12    requirement or to prevent them from adopting anti -- to

13    prevent them from adopting sanctuary policies.

14         There is a provision in the Texas Constitution

15    saying no one branch of government can exercise the powers

16    more properly attached to --

17         There is a problem with that argument.  The problem

18    is that the Constitution isn't what lays out the in-depth job

19    description of the sheriffs.  At least since 1925, the Texas

20    appellate courts have observed, and quite accurately, that the

21    job description for sheriffs actually comes from the state

22    legislature.

23         It is in the local government code.  And because of

24    that, they can change the job description to require things

25    like complying with ICE detainers or prevent policies of

1    noncooperation.

2             Your Honor, if you have no further questions, we

3    will reserve our time.

4             THE COURT:  Okay.  If you will keep track of your

5    time, which is about 35 minutes.

6             Okay.  And on behalf of the United States.

7             MR. REUVENI:  Thank you, Your Honor.  May it please

8    the Court.  Erez Reuveni on behalf of the United States.

9             If I may do one housekeeping matter before I

10   proceed.  I know you have allowed all of the other parties to

11   reserve some time for their rebuttal.  With the Court's

12   indulgence, I would like to reserve five minutes just to

13   respond --

14            THE COURT:  Sure.

15            MR. REUVENI:  -- in case anything comes up.

16            THE COURT:  Of course.

17            MR. REUVENI:  Thank you.

18            Your Honor, I am here today really to address two

19   core issues raised by this litigation of great and serious

20   interest to the executive, and that is whether the information

21   sharing provisions and the detainer provisions of Senate Bill

22   4, SB 4 somehow violate either the supremacy clause or the

23   Tenth Amendment.  And we submit, as we did in our papers, they

24   do not.

25            And second, whether the mandatory detainer provision

1    in SB 4, which effectively sets up a system by which state and
2    local officers, when requested by the federal government to
3    hold someone temporarily because they are wanted on an
4    immigration charge by the federal government, respond to that
5    by, in fact, doing so.
6            And we submit under Arizona this is a lawful
7    exercise of the State's authority and not violative of the
8    Fourth Amendment.
9            Just at the outset, I think -- and the parties are
10   just dancing around this issue, but there are two real strands
11   here that give the State the authority to do what it has done
12   here.
13           One, there is the INA itself, which establishes a
14   floor, an invitation of cooperation.  It doesn't establish the
15   ceiling for what a state or locality can or cannot do.  It
16   simply provides through 8 USC 1357(g)10 and through 1373(a),
17   (b) and (c), we would ask you to participate to the extent you
18   would like to in immigration enforcement, where we have asked
19   you to do so.
20           In Arizona, in Arizona, the Supreme Court took this
21   Court, I think, about 85 percent of the ways -- direction it
22   needs to go to uphold this.  It essentially upheld a mandatory
23   state requirement, Section 2(b) of SB 1070, to routinely, as a
24   statutory matter, conduct immigration checks where reasonable
25   and to reach out to ICE to inquire as to an individual's

1    immigration status.

2            So the Supreme Court has already told us -- and this

3    is why, for example, the United States following Arizona went

4    through this preemption argument in cases in Utah, South

5    Carolina and Alabama, to a certain extent, where you have a

6    state statute that routinely requires contact from the United

7    States, there is no preemption issue.

8            So I think that really addresses the majority of the

9    SB 4 issues, the information-sharing provisions.  One of the

10   plaintiffs' counsel, Mr. Gelernt, earlier indicated that 8 USC

11   1373 somehow is a mandatory provision, and that is absolutely

12   not the position of the U.S. government.

13           It is a position inviting the states to participate,

14   and then, what Texas has done, to inquire about information

15   concerning immigration enforcement.  And what Texas has done

16   is accepted that invitation, and it is just simply, in a

17   sense, not even going any further that 1373.

18           It said:  Any officer in the state of Texas or its

19   subdivisions may not forbid an officer from making certain

20   inquiries.  So that, I think, takes care of the cooperation

21   issue.

22           And the second issue that Arizona raises, that none

23   of the parties have really discussed, Arizona doesn't hold

24   that states lack inherent authority to cooperate with

25   immigration enforcement.  That is really contrary to what

1    Arizona held.

2              Arizona simply held that state authority to do so

3    and, as I understand it, Texas has indicated that its state

4    and local officers have authority to make civil immigration

5    arrests, at least in response to the federal government's

6    request that they do so.

7              What Arizona does is say inherent state authority to

8    participate, to cooperate is preempted so long as it is done

9    unilaterally but where -- and I am quoting from the Supreme

10   Court, or at least I am paraphrasing -- it is done at the

11   request, direction or authorization of the federal government,

12   or in the Supreme Court's words, the request, invitation,

13   authorization or other direction or instruction; it is

14   perfectly legitimate.

15             So the state authority to act in that area, once the

16   request is proffered, which it has been here, is not

17   preempted.  So, really, Arizona controls both the inquiries.

18   I will talk for a minute about information sharing and then

19   get to the detainer issue, because that has separate Fourth

20   Amendment issues.

21             Arizona, as counsel for Texas indicated, SB 1070 had

22   a provision with penalties directed at state officers, as

23   opposed to aliens.  Really, the key issue in Arizona is, are

24   the states criminalizing the acts of alienage?  Are they

25   augmenting what the federal government has already done?

1          They can't do that, but no one here is doing that,

2     and that's really in the cases following Arizona, where the

3     distinction lays, cases in Utah, Alabama, South Carolina,

4     where the states are criminalizing simply the act of alienage

5     and presence.

6          That is the federal government's business.  The

7     states can't do that.  But where the states are requiring

8     their officers to respond to invitations to cooperate with the

9     federal government, states absolutely can do that.

10          So I think this penalty issue is really a red

11    herring.  The state can direct its subdivisions, its officers

12    to take actions as a state, as a sovereign, and the federal

13    government really has no position on the dispute between Texas

14    and the localities on the extent of that direction; just the

15    federal government can't tell the states to do that, but the

16    state absolutely can tell the subdivisions to do so.

17          On the detainer point, and I think this is an issue

18    that some of the parties are alluding to but haven't really

19    brought to the Court's attention.  A detainer is a request.

20    The government through -- the U.S. government through a

21    detainer is requesting, to quote again the Supreme Court,

22    requesting that a state or local law enforcement official do

23    one of two things:  Inform Immigration and Customs Enforcement

24    that -- when this individual is released and to detain that

25    person up to but no more than 48 hours, based on the probable

1   cause that exists in the detainer and in the administrative

2   warrant that now accompanies the detainer that the individual

3   in question is removable from the United States.

4           So the detainer, in fact, communicates to the

5   states, to the localities the direction, the supervision, the

6   requests for cooperation.

7           THE COURT:  But it is a request, right?

8           MR. REUVENI:  So far as the federal government is

9   concerned, it is a request.

10          THE COURT:  And prior to SB 4, the local government

11  could say:  We can't do it.  No, thank you.  We understand

12  your concerns, but we have other people to house in our jail

13  facilities.  And now SB 4 says they shall honor all detainers;

14  is that correct?

15          MR. REUVENI:  Well, as I understand it, that is a

16  matter of state law.  So let's assume SB 4 doesn't exist, and

17  as I understand it, a number of localities here today have

18  policies in which they do cooperate with federal immigration

19  detainers in certain contexts.

20          I think Travis County's policy was raised earlier.

21  Travis County has a policy where if they will not cooperate

22  with detainers, unless the individual in question is convicted

23  of murder charges, convicted or charged, I should say, certain

24  aggravated sexual offenses or human trafficking.

25          So even there, Travis County is saying:  In these

1    situations, we will cooperate on a blanket basis.

2         But that doesn't -- that Travis County has done that

3    doesn't mean the State can't then come in and say:  Okay.

4    Actually, you will be cooperating as a matter of state policy

5    on these other bases whenever a detainer is submitted to you

6    as a request from ICE.

7         And I just want to, for a moment here, because I

8    mentioned Travis County, a number of the plaintiffs earlier

9    argued that -- they seem to try to have it both ways.  They

10   tell Your Honor that SB 4 is preempted because it requires

11   state and local officers to make immigration status

12   determinations, which we don't think it does.

13        The detainer tells you, the federal government

14   believes the individual is removable, explains the basis for

15   it and asks for the temporary hold.  But then at the same

16   time -- I believe this was El Cenizo's counsel who mentioned

17   this -- they say the Fourth Amendment is violated because they

18   do not have independent discretion to determine for themselves

19   the issue of immigration status.

20        I am not sure how they can have it both ways here.

21   Really, the detainer, and now post April 2nd, accompanied by

22   an administrative warrant -- and this is a warrant that is

23   sanctioned by 8 USC 1226(a) and 1231.

24        This is a statute that I don't believe any party

25   here is contesting is unconstitutional, particularly as a

1    facial matter.  So if the administrative warrant system that

2    Congress established for communicating the basis for arrests

3    of any alien who is unlawfully present in the United States

4    and which the government wishes to either pick up for removal

5    proceedings or execute a final order of removal, that now

6    accompanies the detainer -- so it is unclear to me why the

7    plaintiffs take the position that the localities have to make

8    an immigration assessment, that they are improperly being

9    required to do that.

10           They are not.  The federal government is doing that

11   for them in making the request.

12           Just the issue of the driver's license that a number

13   of plaintiffs have raised.  This isn't really -- this isn't a

14   preemption issue, and this is already an issue that Arizona,

15   the Arizona statute, Section 2(b), included similar provisions

16   that was upheld where it was mandatory.

17           We didn't cite these cases in our briefs.  Just for

18   the sake of the full picture, according to Utah, after

19   Arizona, a similar conclusion.  And, as I mentioned before,

20   the Department of Justice itself withdrew some of its

21   objections on preemption grounds to the statute, similar to

22   Section 2(b) after Arizona, because Arizona told us we were

23   wrong.  Arizona controls.

24           Someone else earlier mentioned that there is no way

25   really to communicate the information from the federal

```
1    government and the detainer and the administrative warrant to

2    the state officers unless there is evidence of a crime.

3           I think that really -- that misses the bigger

4    picture and certainly it's wrong in our view as well,

5    particularly where Texas has authorized its officers to make

6    civil immigration arrests and where the federal government has

7    requested that Texas and other states do so through the

8    detainer form.

9           There are two ways, I think, that the probable cause

10   and the administrative warrant and the detainer can sort of

11   flow, to use Mr. Starr's words, to the states and localities.

12   One, already, Arizona seemed to implicitly assume this

13   authority exists.  It's at the direction or request of the

14   federal government.

15          And Your Honor's decision in Santoyo relied on a

16   Fourth Circuit case, Santos, which itself, its holding was --

17   and, actually, it's right here -- Arizona makes it clear that

18   under Section 1357(g)10, local law enforcement officers cannot

19   arrest aliens for civil immigration violations -- there is the

20   key part -- absent direction or authorization by the federal

21   officials.

22          So that is one way the information goes from the

23   federal government to the state or local officers in a way

24   that is permissible.

25          The other is the fellow officer rule, which sort of
```

```
1    gives you the same result.  I don't understand any of the

2    parties to be suggesting that the fact that an immigration

3    arrest warrant is civil means that state or local officers

4    cannot rely on it.

5              That is a nonargument, particularly given that every

6    plaintiff here, in fact, honors detainers to some extent.  So

7    it can't be that when they do it on an ad hoc basis, case by

8    case, at the local level they don't violate the Fourth

9    Amendment because there is no evidence of a crime, but that

10   all of a sudden when it becomes systematic on a statewide

11   basis, now there is a Fourth Amendment violation.

12             Either it violates the Fourth Amendment or it

13   doesn't, and the systematic/ad hoc issue is another red

14   herring that the Court in Arizona rejected.

15             I think maybe it might be helpful also just to

16   address a couple of other points that the plaintiffs raised.

17             Ms. Perales, I believe, used the phrase

18   "constitutional train wreck" to refer to what SB 4 will cause.

19   And, again, I would say just to that, Arizona, the Supreme

20   Court will be surprised to hear that they have brought a

21   constitutional train wreck.  The result flows from Arizona.

22             Mr. Siegel indicated or invoked the executive's

23   interest in foreign affairs.  I mean, I am here on behalf of

24   the executive and the executive has indicated that he takes no

25   issue with whatever impact this may have on foreign affairs.
```

1    He supports the two specific provisions as to SB 4.

2         The counsel from Houston raised an interesting

3    argument concerning the Antideficiency Act, which I believe

4    has really no place in the discussion here.  It is true 8 USC

5    1357 says "notwithstanding," and then it cites the

6    Antideficiency Act, 31 USC, whatever it is.

7         And then it says:  Only if there is training through

8    a 1357(g) agreement can this Antideficiency Act issue not

9    exist.  This argument is entirely irrelevant.  1357(g)10 says

10   nothing about the Antideficiency Act.  What it does say is:

11   Notwithstanding any other provision within the statute, states

12   and localities can cooperate, both systemically or on a

13   case-by-case basis.

14        I would, just as an example, under Houston's theory,

15   someone might call the FBI and say, "Hey, I have got Osama bin

16   Laden sitting right here with me at the table.  Come get him."

17   They could not, in fact, react to that.  That is an absurd

18   result that I don't think flows at all from this theory that

19   Houston advances.

20        Again, on the issue of whether the sheriff himself,

21   him or herself can decide local policy and that doesn't

22   violate the Fourth Amendment, but when the state does it, it

23   somehow violates the Fourth Amendment, this can't be what

24   plaintiffs mean.

25        It would expose them to civil liability in every

1    instance of a detainer they have honored, where there hasn't

2    been evidence of a crime.  They don't say that.  They don't

3    mean to say that.  I don't read them to be saying that, but if

4    that is what they are saying, well --

5             One other point on this race issue that came up,

6    just as a point of clarity.  Again, I don't understand SB 4 to

7    be authorizing rogue state or local officers to wake up in the

8    morning and say, "I am going to raid this house today."

9             I mean, if they did say that, that would be

10   preempted, because that is not at the direction or request of

11   the federal government.  That being said, if the federal

12   government reaches out and says, "Here is a detainer for this

13   specific individual; we would like to know when he is

14   released; we would like to know -- we would like you to hold

15   him for us temporarily," when they respond to that, that is

16   absolutely permissible.

17            Just one other point on the Fourth Amendment, if I

18   may.  So as Mr. Starr mentioned, the Abel case from 1960, I

19   think really just sort of resolves the issue.  There is really

20   not much more to say about whether administrative warrants,

21   the system of administrative warrants that Congress set up is

22   lawful or unlawful.

23            It is lawful.  It has, quote, the sanction of time.

24   Congress, going back to 1790s, have statutes allowing for

25   administrative arrests of aliens.

1            And I don't understand the argument that is being

2    proposed by some on the plaintiff's side that the federal

3    government can make an arrest based on an administrative

4    warrant based on probable cause to believe an alien is

5    unlawfully present in the United States, but then a state

6    can't do it or a state officer can't do it.

7            It doesn't make any sense that the Fourth Amendment

8    means two different things in this context.  Either, again, it

9    does or it doesn't.

10            And just perhaps one other point on Santoyo, since I

11    think that case should be addressed, as it did find the

12    detainer policy that existed in the context of San Antonio was

13    unlawful.

14            One, there is a new policy.  Again, that was no

15    policy.  Two, I think absolutely critical, San Antonio made

16    the decision -- or the county, I should say, made the decision

17    to assume as a blanket matter that every detainer is supported

18    by evidence of a crime, either a felony or multiple

19    misdemeanors; as I think you pointed out in your decision, I

20    mean, that is wrong.

21            Not every ICE detainer will be supported by evidence

22    of probable cause of a crime.  In fact, the vast majority of

23    ICE detainers just simply support probable cause of a civil

24    violation.

25            THE COURT:  Right.

1          MR. REUVENI:  So right there, we have a distinction.

2     And because Congress has set up a system of administrative

3     warrants -- and, again, no one is disputing that the system --

4     (coughing in background) -- is unconstitutional.

5          I think, I believe San Antonio said in its brief at

6     page 44:  This is not to suggest -- and I am paraphrasing

7     this -- not to suggest that every application of SB 4 with

8     regard to the detainer policy will violate the Fourth

9     Amendment.

10          That right there is an implicit concession that

11     their claim fails, at least as a facial matter.  It may have

12     applied challenges in the future, when the law is in effect,

13     but that is a conversation for another time.

14          As a facial matter, as the State pointed out, a

15     large number of individuals who are in state custody pursuant

16     to a criminal sentence, the law is set up in such a way that

17     the State can reach out to ICE and say:  Hey, we have got this

18     person.  They are finishing their sentence.  Would you like to

19     take custody of this person?

20          And right there, you already have a large subset of

21     individuals subject to SB 4.  There will be no new seizure.

22     There is no Fourth Amendment issue at all.

23          Even without that, there still is not going to be a

24     Fourth Amendment issue, where it is a temporary, short,

25     48-hour hold pursuant to the administrative warrant.

```
 1              If there are no further questions, Your Honor, I
 2     reserve the remainder of my time to respond.
 3              THE COURT:  Okay.
 4              MR. REUVENI:  Thank you.
 5              THE COURT:  Thank you, Counselor.
 6              Now I believe -- how many witnesses do the
 7     plaintiffs have?
 8              MR. GARZA:  So, Your Honor, I believe that remaining
 9     are five witnesses.
10              THE COURT:  Remaining what?
11              MR. GARZA:  Remaining among all of the plaintiffs
12     would be five additional witnesses.
13              THE COURT:  What do you mean, "five additional"?
14              MR. GARZA:  So we had one this morning.
15              THE COURT:  Right.
16              MR. GARZA:  And five more.
17              THE COURT:  For all of you?
18              MR. GARZA:  Yes.
19              THE COURT:  Okay.  Let's begin.
20              MR. GARZA:  Yes, Your Honor.
21              Jose Garza for El Paso County calls Representative
22     Ana Hernandez.
23              COURTROOM DEPUTY:  Please raise your right hand.
24              (Oath administered to the witness.)
25              COURTROOM DEPUTY:  You can have a seat.  Thank you.
```

```
 1              MR. GARZA:  Your Honor, may I approach the witness a
 2    moment to clear the --
 3              THE COURT:  Yes, you may.  Go ahead.
 4                        *-*-*-*-*-*-*-*
 5                      DIRECT EXAMINATION
 6    BY MR. GARZA:
 7    Q.  Representative Hernandez, would you inform the Court of
 8    the county in which you reside?
 9    A.  Harris County.
10    Q.  I'm sorry?
11              THE REPORTER:  I'm sorry?
12              THE WITNESS:  Harris County.
13              THE REPORTER:  Try to use the microphone.  Thank
14    you.
15    BY MR. GARZA:
16    Q.  And, Representative, how long have you lived in Harris
17    County?
18    A.  About 37 years.
19    Q.  Are you a United States citizen?
20    A.  Yes.
21    Q.  Have you always been a United States citizen?
22    A.  No.
23    Q.  And when did you become a United States citizen?
24    A.  When I was 18 years old.
25    Q.  And was there ever a time in which you were here without
```

1   documentation?

2   A.  Yes.

3   Q.  Did you attend schools in Harris County?

4   A.  Yes.  Public schools, from kindergarten to the fourth

5   grade.

6   Q.  And you went to high school in Harris County?

7   A.  Yes.

8   Q.  And how old were you when you graduated?

9   A.  Sixteen.

10  Q.  And where did you go to college?

11  A.  University of Houston for my bachelor's degree and the

12  University of Texas School of Law for my law degree.

13  Q.  Can you describe for the Court briefly the demographic

14  characteristics of Harris County?

15  A.  Harris County has over 4 million people in population.

16  About 40 percent are Latino.

17  Q.  And you are currently an attorney?

18  A.  Correct.

19  Q.  But you are also an elected official in Texas; is that

20  right?

21  A.  Yes.

22  Q.  And what position do you hold?

23  A.  State representative, District 143.

24  Q.  And how long have you been a state representative?

25  A.  This is my twelfth year.

1    Q.  And do you recall how many sessions you have been a state

2    representative?  How many sessions of the legislature have you

3    been involved in?

4    A.  Six regular sessions and six special sessions.

5    Q.  So about 12 sessions during your term in office?

6    A.  Yes.

7    Q.  We are going to talk a little bit about SB 4 and the way

8    it was adopted.  Can you describe for the Court a little bit

9    about the legislative consideration of SB 4?

10   A.  SB 4 was prefiled, and that is allowed under the rules for

11   legislation to be prefiled.  It was filed in November of 2016

12   prior to the last legislative session.  And in the Governor's

13   state address at the end of January, he declared an emergency

14   item, meaning the matter could be taken up before the sixtieth

15   day, where all other bills are prohibited from being discussed

16   and debated on the House floor, the Senate floor before the

17   sixtieth day.

18   Q.  Now, we are going to talk a little bit about the

19   atmosphere, as you detected it, during that session.  Can you

20   give the Court a general, brief description of the atmosphere

21   in which you found yourself?

22   A.  Throughout the session?

23        MR. STARR:  Objection, Your Honor.  It could call

24   for lack of personal knowledge.

25        THE COURT:  Only if she has knowledge.  Thank you,

1    Counselor.

2    BY MR. GARZA:

3    Q.  You were in the legislature during the enactment of SB 4,

4    were you not?

5    A.  Yes.

6    Q.  And you were a part of the floor debates and all of the

7    matters that were considered --

8    A.  Yes.

9    Q.  -- by the legislature?  Would you go ahead and describe

10   the atmosphere?

11   A.  That day or throughout the session?

12   Q.  Throughout the session.

13   A.  Throughout the session, early on in the session, CPS and

14   child welfare had been identified as a priority for the

15   legislature.  And in debating one of the CPS bills, the topic

16   of immigration came up as well, and this was a matter in which

17   they were discussing kinship care, placing children that are

18   in foster care with family members.

19          And an amendment was offered, and one that kind of

20   caught us by surprise.  We weren't expecting the issue of

21   immigration to be injected into the topic of CPS.  And the

22   amendment proposed would prohibit any kinship care funds from

23   being given to family members that were undocumented.

24   Q.  Did this kind -- this focus of the legislature continue?

25   A.  Yes.  And that day, it escalated to where the proponent of

 1    the amendment was at the front microphone in the House chamber

 2    and surrounded by other Anglo members.  In the back of the

 3    microphone, another colleague, a Latino colleague, surrounded

 4    by Latino and African-American members.  So it created a

 5    racial tension during that debate.

 6    Q.  Let me call your attention to Exhibit 210 in the red

 7    notebook that is in front of you there.

 8         Representative Hernandez, would you describe that

 9    exhibit to the Court?

10    A.  House Journal for the 85th Legislature, House Debate on

11    Senate Bill 4.

12    Q.  And what does this document contain?

13    A.  It is the House Journal for the debate that took place on

14    Wednesday, April 26 in consideration of -- Senate Bill 4.

15         THE REPORTER:  Ma'am, if you could please speak up

16    and project a little bit.  In consideration of --

17         THE WITNESS:  The Committee Substitute for Senate

18    Bill 4.

19         THE REPORTER:  Thank you, ma'am.

20    BY MR. GARZA:

21    Q.  So, essentially, this was the debate on SB 4 in the House?

22    A.  Yes.

23    Q.  The floor debate?

24    A.  Yes.

25    Q.  Let me call your attention to page 1.  At the bottom, they

 1   are Bates stamped.  It says El Paso and then it has a number.

 2   If you could turn to page El Paso 194.

 3            MR. STARR:  Your Honor, we don't have a copy in our

 4   binder of this exhibit.

 5            (Counsel conferring.)

 6            MR. MCCARTY:  Just as a courtesy.  If you don't have

 7   an extra copy --

 8            MR. GARZA:  We don't have any extra binders, Your

 9   Honor.

10            THE COURT:  Okay.  Go ahead.

11   BY MR. GARZA:

12   Q.  So if you could refer, then, to page 194.  And do you see

13   that?

14   A.  Yes.

15   Q.  And if you could briefly review the discussion -- you

16   won't have to read it to the Court, but if you can review from

17   about a third up from the bottom of the page, where it begins

18   with Representative Lucio, and through the end of the page.

19   A.  (Indicating.)

20   Q.  So at the end of Representative Lucio's comment, he

21   referred to how emotionally charged the atmosphere was in the

22   legislature during this process.  Do you see that?

23   A.  Yes.

24   Q.  And what is he referring to?

25            MR. STARR:  Objection, Your Honor.  Calls for

```
 1    speculation.
 2              MR. GARZA:  Your Honor, she was in the chamber --
 3              THE COURT:  I will permit it.  Go ahead.
 4              THE WITNESS:  At the time, this was during the
 5    layout of Senate Bill 4, in where all the Latino legislators
 6    and African-American legislators were at the front microphone
 7    and Representative Lucio was at the back asking questions of
 8    Representative Anchia.
 9              And it was a very emotional day and, as
10    Representative Lucio expressed, an emotionally charged session
11    up to that point.
12    BY MR. GARZA:
13    Q.  Now, would you read for the Court the entry by
14    Representative Lucio at the very bottom of the page ending
15    with the first line on the next page?
16    A.  "Aside from the fact that we take this bill personally,
17    that we feel that there is a racist undertone to this bill,
18    this bill is flawed.  I would caution all of the colleagues
19    that are heckling me that we are very emotionally charged.  Do
20    not mess with us today.  I don't want to be heckled.  I don't
21    want to be threatened.  I am cautioning you."
22    Q.  What was Representative Lucio referring to?
23    A.  As he was standing at the back microphone -- at that time,
24    I was in the front.  I couldn't hear what was being said, but
25    it was apparent that some of the members that were around him
```

1    in the back were heckling him.

2    Q.  And were those other colleagues of his, Mexican-American

3    colleagues?

4    A.  No.

5    Q.  How would you describe them?

6    A.  Anglo.

7    Q.  Do you recall during the discussions on SB 4 and in the

8    debate on the House floor the term "illegal" or "illegals" or

9    "the illegals" being referenced in the focus of this bill?

10   A.  Yes.

11   Q.  Was this a common occurrence?

12   A.  Yes.

13   Q.  Let me call your attention to Exhibit 210, page 197.  At

14   the bottom of the page is a presentation that you made at the

15   mike during this debate.  Do you recall that?

16          You begin your statement by telling your colleagues

17   that you make that presentation with a heavy heart.  What did

18   you mean?

19   A.  This issue is a very personal issue for me as a former

20   undocumented immigrant, and so it was very emotional that day,

21   and I felt it was important to share my personal story with my

22   colleagues.

23   Q.  Did you feel hurt by the tenor of the debate and the

24   discussion?

25   A.  I did.  I felt like the term "illegal" was used in a

1    negative way to portray immigrants in a negative manner, and

2    that was probably my motivation for sharing my story, to share

3    the fact that not all immigrants are criminals and not all

4    immigrants should be deported as bad people.

5            And that morning, we had been outside during a press

6    conference, and there were two little girls that were a part

7    of that program.  And as they spoke, they were pleading for

8    this law not to pass because they were afraid of their parents

9    being deported, and that struck home for me, because my sister

10   and I were in that situation at one time.

11   Q.  And the next page, Representative, you refer to the term

12   "illegals."  How did you mean that?

13   A.  I meant that to stress the point that their view of an

14   illegal being a drain to society, a criminal in our community

15   is not what I represent, that I am the undocumented immigrant,

16   and there are many other families that are in a situation that

17   my family was once in.

18   Q.  As you think back on all of the sessions that you have

19   been in the legislature, Representative, has there ever been a

20   time when you have had this kind of rancor on a racial level

21   between your colleagues?

22   A.  Previously in 2011, the last time they considered the

23   sanctuary cities bill.

24   Q.  So only --

25   A.  I shared my story at that time as well.  Since then, we

```
 1    have had new members join the body.  So as I started my story,

 2    I expect that some of them had heard my story before, but many

 3    had not, and I thought it was important to share it again.

 4    Q.  So we are going to move on.  You described very eloquently

 5    the atmosphere under which this bill was considered.  Let's

 6    talk a little bit about other things that happened as well.

 7            During the committee hearings, were there witnesses

 8    that came to the legislature to testify either for or against

 9    the bill?

10    A.  Yes.

11            MR. STARR:  Objection, Your Honor.  Calls for lack

12    of personal knowledge, speculation, lack of foundation.

13            THE COURT:  If she has personal knowledge.

14            THE WITNESS:  Yes.  I witnessed the witnesses that

15    came to the Capitol to testify.

16    BY MR. GARZA:

17    Q.  You have reviewed the list of witnesses that came and

18    testified at the legislature on this --

19    A.  I also reviewed them, yes.

20    Q.  Let me call your attention to Plaintiff's Exhibit 208.

21    Have you reviewed this exhibit, Representative?

22    A.  I have.

23    Q.  And how would you describe, in terms of quantity, the

24    number of people that testified for the bill and against the

25    bill?
```

1   A.   It was an overwhelming number of individuals that

2   testified against the bill.

3   Q.   So it was something like 600 against and ten or 11 for?

4   A.   I believe so.

5   Q.   It was in that range, correct?

6   A.   Correct.

7   Q.   Had you ever been involved in a legislature when a bill

8   that unpopular passed with such speed in the legislative

9   process?

10   A.   No.

11   Q.   Do you recall how long SB 4 lingered on calendars before

12   it was brought to the floor?

13   A.   It was less than an hour.

14   Q.   Have you ever been involved with a major -- with a piece

15   of legislation of this magnitude that lasted less than an hour

16   on calendars before being brought to the House floor?

17   A.   I do not recall any other.

18   Q.   During the process of the debate on the House floor, were

19   amendments offered to SB 4?

20   A.   Yes.

21   Q.   Were there ameliorative amendments offered by members of

22   the Mexican-American Legislative Caucus?

23   A.   Yes.

24   Q.   And what was their -- what was the reaction to those

25   amendments?

1   A.   The majority of them were defeated.   Probably less than

2   ten were adopted.

3   Q.   Do you recall some of the salient amendments that were

4   offered through a modified SB 4?

5   A.   That were adopted or defeated?

6   Q.   That were rejected.

7   A.   There was one authored by Representative Ina Minjares that

8   would have exempted the FPS.

9   Q.   And would you describe for the Court what that amendment

10  would have done?

11  A.   It would have exempted the FPS, and the importance is that

12  we want, again, to protect the child's best interests and want

13  people to report child abuse or sexual assault on a child

14  without fear that they would be put into deportation

15  proceedings.

16  Q.   And just so the record is clear, what do the initials

17  stand for?

18  A.   The Department of Family and Protective Services.

19  Q.   And do you recall how that amendment, that particular

20  amendment was defeated?

21  A.   That amendment was part of a group of amendments that were

22  lumped in at the end of the debate and were defeated all by a

23  record vote that previously had been considered.

24  Q.   So there was no specific debate on that particular

25  amendment?

1  A.  That is correct.  The amendment was never laid out or

2  debated.

3  Q.  Do you know how many amendments were treated in that

4  fashion?

5  A.  There were about 145 amendments that were filed and we

6  considered about 75 of them, and the rest of them were lumped

7  in together for that record vote.

8  Q.  So about 75 amendments were summarily defeated with one

9  vote and none of them were specifically debated?

10  A.  Approximately, yes.

11  Q.  And had you ever seen an instance of that sort, in your

12  legislative experience, dealing with a significant piece of

13  legislation?

14  A.  I have never seen that procedure utilized before.

15          THE COURT:  Let me ask you, who decides to cut off

16  the number of amendments to consider?

17          THE WITNESS:  At the time of the debate, a motion

18  can be made that we limit the amendments to those that are on

19  the Speaker's desk, meaning those that have already been

20  filed.  That can be made by a motion.  There is also another

21  way, which was considered in this matter, is adopting a

22  prefiled amendment calendar rule that would require members to

23  prefile their amendments.

24          THE COURT:  And how was it decided in this

25  particular matter not to consider the 75 amendments?

```
 1                THE WITNESS:  By that motion.

 2                THE COURT:  A motion?

 3                THE WITNESS:  Yes.

 4                THE COURT:  All right.  Go ahead.

 5     BY MR. GARZA:

 6     Q.  Were there points of order raised during the debate?

 7     A.  Multiple.

 8     Q.  Were there any that you were familiar with that had been

 9     raised in prior sessions dealing with other legislation?

10     A.  One point of order that was raised early on in the debate

11     was one by Representative Eddie Rodriguez regarding the

12     witness affirmation form.

13                And the witness affirmation form requires that those

14     witnesses that are going to committee and testify provide

15     contact information, name, address and telephone number.  In

16     the past, points of order have been sustained when that

17     information was incomplete, because the purpose of the

18     information is if a legislator wishes to contact that witness

19     to ask them more about their testimony, their position on the

20     bill, they are able to do so.

21                So Representative Rodriguez raised a point of order.

22     There was a witness affirmation form that was incomplete.  It

23     included only a street name without the street number.  It did

24     not have a telephone number.

25     Q.  So when a point of order is sustained, what is the impact
```

1    of that?

2    A.   The bill is sent back to committee to correct that report.

3    Q.   And you testified that that exact point of order had been

4    raised in prior sessions in other bills and had been

5    sustained?

6    A.   Yes.

7    Q.   And what happened to Representative Rodriguez's point of

8    order with regard to SB 4?

9    A.   It was overruled.

10   Q.   Was there a purpose to the bill articulated by the

11   sponsors of the bill?

12   A.   When Representative Charlie Geren laid out the bill, as

13   the author of the bill, he articulated that the purpose of the

14   bill was to force compliance with ICE detainers, to uphold the

15   rule of law, to ensure public safety and to remove bad people.

16   But as the debate continued and it was brought to his

17   attention that over 99 percent of the ICE detainers are

18   honored and that law enforcement has testified that this bill

19   would make communities less safe and not more safe, those

20   points were dismissed.

21   Q.   Was there any evidence presented, that you recall, that

22   established that officers in Texas were not compliant with

23   cooperation with federal immigration officials?

24   A.   Not that I recall.

25   Q.   One of the sponsors of an amendment that was accepted,

1    under Representative Schaefer, was, in fact, quizzed about

2    submitting evidence of noncompliance.

3           Do you recall that exchange?

4    A.  Yes.

5    Q.  Let me refer or have you review page 245 of Exhibit 210.

6    So about a third of the way up, Representative Anchia is

7    discussing this with him.  And do you see six exchanges from

8    the bottom where Representative Schaefer responds to an

9    inquiry from Representative Anchia?  Do you see that?

10   A.  Yes.

11   Q.  What is Mr. Schaefer's, Representative Schaefer's

12   response, if there is no evidence of noncompliance about what

13   the purpose or what the need for this bill would be?  Where he

14   says, "So, Mr. Anchia."

15   A.  "We wouldn't be here today if we did not know that there

16   have been problems in the state of Texas with law enforcement

17   officials honoring federal law when it comes to immigration."

18   Q.  And finally, Representative, with regard to the debate,

19   was there an exchange with Representative Geren regarding who

20   this would focus on, who the impact of this -- the enforcement

21   of this law would focus on?

22   A.  Yes.

23   Q.  And isn't it true that Representative Geren admitted that

24   this was going to be -- would fall on the Hispanic community

25   of Texas?

1   A.  Yes.

2   Q.  As you reflect now on your experience in the process, the

3   atmosphere, the rationale offered for rejecting amendments,

4   the manner in which points of order were treated, the manner

5   in which opponents of the bill were treated, do you have an

6   opinion about the motivation behind the enactment of SB 4?

7           MR. STARR:  Objection, Your Honor.  Calls for

8   speculation.

9           THE COURT:  I will permit it.  Go ahead.

10          THE WITNESS:  I can't speak to what was in their

11  heart and why -- what motivated them to file this legislation,

12  but I can speak to the fact that we raised concerns about its

13  impact on the Latino community and they were disregarded.

14          MR. GARZA:  Pass the witness, Your Honor.

15          THE COURT:  All right.

16              *-*-*-*-*-*-*-*

17              CROSS EXAMINATION

18  BY MR. STARR:

19  Q.  Representative, thank you for being here today.  I know

20  sharing your story is not easy.  I would like to ask you a few

21  questions about the legislative process that you helped to

22  illuminate earlier.

23          We were talking about amendments -- (coughing in

24  background.)

25          THE REPORTER:  Counsel, if you will speak up and

```
1    slow down.  Thank you.

2    BY MR. STARR:

3    Q.  The amendment that you discussed in depth was by Minjares

4    for the Department of Family and Protective Services; is that

5    correct?

6    A.  Yes.

7    Q.  You said that that amendment actually ultimately carried

8    forward a record vote, instead of getting the vote on its own;

9    is that correct?  Did that amendment get a vote on its own?

10   A.  Yes.

11   Q.  It did?  What was the vote on that amendment?

12   A.  I don't recall the exact number, 90 to 52.

13   Q.  It was voted down?

14   A.  It was voted down.

15   Q.  If you could, I believe Plaintiff's Exhibit 9.  Sorry.

16   It's referring to Senate Bill 4.  We will find the number for

17   you.  Okay.  So Exhibit 9, Senate Bill 4.

18   A.  Plaintiff's Exhibit 9?

19   Q.  Yes.  Do you have Senate Bill 4 in front of you?  Is it

20   Defendant's 9 or Plaintiff's 9?  My binder is Defendant's 9.

21   My question is on page 4 of the bill, Section 752.053.

22           So your complaint earlier was that the House did not

23   adopt an amendment that would have protected the Department of

24   Family and Protective Services from this bill, correct?

25   A.  Correct.
```

1   Q.  When the language of the bill covers a local entity or

2   campus police, which one is the Department of Family and

3   Protective Services?

4   A.  It is the reporting of child abuse, in that they cooperate

5   with law enforcement in investigating that reporting.

6   Q.  The reporting of child -- or the reporting of child abuse?

7   A.  Yes.

8   Q.  Let's talk about other amendments.  There were amendments

9   that were adopted, is that correct, that were offered by

10  opponents of the bill?

11  A.  That is correct.

12  Q.  Let's talk through some of those quickly and see if there

13  are ones that you recall.  Do you recall an amendment by

14  Lucio?

15  A.  I do, regarding --

16  Q.  Yes.  Can you explain what that was?

17  A.  That federally qualified health centers, and the bill

18  provides an exemption for hospitals -- or community clinics,

19  so that was adopted.

20  Q.  It was voted on by the House or was accepted by the

21  author?  Which one; do you recall?  Either way, it made it

22  into the final --

23  A.  It was adopted, yes.

24  Q.  -- Senate Bill 4?  What about an amendment by

25  Representative Moody?

1    A.  Yes.  Representative Moody offered an amendment to exempt

2    mental health facilities.

3    Q.  And the House ultimately adopted that amendment?

4    A.  That is correct.

5    Q.  An amendment by Neave, do you recall any amendment --

6    A.  I do remember an amendment that would extend to places of

7    worship.

8    Q.  And the House adopted that?

9    A.  Yes.

10   Q.  Oliveira, an amendment by Oliveira?

11   A.  Yes.  His amendment would allow proof of citizenship by

12   showing a Texas driver's license or identification.

13   Q.  Do you recall overall how many amendments were offered by

14   opponents of the bill that made it into Senate Bill 4?

15   A.  Ten or less.  I don't remember the exact number.

16   Q.  Let's talk a bit about an amendment that did not make it

17   into Senate Bill 4.  Do you recall an amendment that would

18   have stripped Senate Bill 4 down to just requiring compliance

19   with ICE detainers?

20   A.  I do.

21   Q.  How did you vote on that?

22   A.  I voted for it.

23   Q.  In your view, would such a bill have been constitutional?

24   A.  I don't know enough about ICE detainer compliance -- to be

25   able to provide an opinion.

1    Q.  Would you vote for a bill if you knew it was
2    unconstitutional?
3    A.  No.
4    Q.  You said that the legislature considered a sanctuary
5    cities bill in 2011?
6    A.  Yes.
7    Q.  At that time, had you heard of any local officials who
8    were deeming themselves to be a sanctuary city?
9    A.  I never heard to this day a definition of "sanctuary
10   city."  That was discussed at length during the debate of SB
11   4, if someone could define a sanctuary city, and no one has
12   been able to.
13   Q.  Were you aware at the time in 2011 of any local
14   jurisdictions who openly refused to comply with ICE detainers?
15   A.  I am not aware.
16   Q.  By the time this bill was debated on the House floor, were
17   you aware of any local officials who were refusing to comply
18   with lawful ICE detainers?
19   A.  No.
20   Q.  Were you aware that the Travis County sheriff was not
21   complying with all ICE detainers at the time you voted on this
22   bill?
23   A.  No.
24   Q.  Earlier, you referred to the term "illegals" being used on
25   the House floor.  Are you aware that that term is also used in

1    court opinions from the Fifth Circuit as recently as 2015?

2    A.  I have not read that --

3    Q.  You earlier referred to the number of witnesses who showed

4    up to testify against Senate Bill 4.  Is there a certain

5    number of witnesses you believe makes a bill discriminatory if

6    they show up and show their support against the bill?

7    A.  No.

8    Q.  You referred to Senate Bill 4 and the Calendars Committee.

9    Do you sit on the Calendars Committee?

10   A.  I do not.

11   Q.  To your knowledge, does the Calendars Committee debate the

12   substance of bills in an amendment?

13   A.  I don't know the procedure in the Calendars Committee.  I

14   know there is a procedure known as tagging a bill, in which

15   the members of the Calendars Committees are allowed to tag a

16   bill to delay its consideration on the House calendar.

17   Q.  Are you aware of the tagging procedure with bills that are

18   declared an emergency item?

19   A.  I am not.

20   Q.  Are you aware of how many hours this bill was debated on

21   the House floor?

22   A.  We started the day at 10:00 a.m. and I believe we

23   concluded around 4:30 a.m. the next day.

24   Q.  Are you aware of any other bills this session that were

25   debated for longer on the House floor?

1    A.  I don't know if it was longer, but the budget usually

2    takes around the same time.

3    Q.  Granted.  I'm sorry.  I have watched those debates.  Are

4    there any bills other than the budget that you recall being

5    debated for, say, over ten or 12 hours?

6    A.  This session or in the past?

7    Q.  This session.

8    A.  This session?  I don't recall any other.

9    Q.  Are there past sessions where you recall bills being

10   debated over ten or 12 hours on the House floor?

11   A.  The voter ID bill, redistricting, those are bills that all

12   took a long time.  Abortion bills also take a long time.

13          MR. STARR:  No further questions, Your Honor.

14          THE COURT:  Thank you.

15          Mr. Garza?

16          MR. GARZA:  Nothing further, Your Honor.

17          THE COURT:  All right.  Thank you.  You are excused,

18   Representative.  Thank you very much.

19          If you will call your next witness.

20          MR. SIEGEL:  The City of Austin will call Tom Wong.

21          THE COURT:  Okay.

22          COURTROOM DEPUTY:  Please raise your right hand.

23          (Oath administered to the witness.)

24          COURTROOM DEPUTY:  You may have a seat.  Thank you.

25          THE WITNESS:  Thank you.

```
 1                        *-*-*-*-*-*-*-*

 2                      DIRECT EXAMINATION

 3    BY MR. SIEGEL:

 4    Q.  Please state your name.

 5    A.  Tom Wong.

 6    Q.  And what is your profession?

 7    A.  Professor of political science at UC San Diego.

 8    Q.  And do you hold any other titles there?

 9    A.  I am also the director of the International Migration

10    Studies Program, Minorities --

11    Q.  And what is your educational background?

12    A.  I have a Ph.D. in political science, 2011.  I was a post

13    doctoral fellow at SMU, 2012.  And then started at UCSD,

14    2012-2013 academic year.

15    Q.  And as a professor at UCSD and -- director or director of

16    a minor, what are your duties?

17    A.  So as a professor, UCSD is a research university, so the

18    balance of my time is spent on researching.  As director of

19    the International Migration Studies Program, minor, I make

20    sure that undergraduates are taking the proper course work to

21    receive the minor.

22    Q.  And prior to your current positions, what was your

23    previous employment?

24    A.  I was a graduate student, so from undergrad to grad

25    schools, straight to post doc and the position at UCSD.
```

```
 1    Q.  And what is the focus of your research?
 2    A.  My research focuses on immigration politics and policies.
 3    Q.  And what have you published?
 4    A.  Two peer-reviewed books, one from Stanford University
 5    Press, another from Oxford University Press, and then several
 6    peer-reviewed journal articles, both chapters and reports.
 7    Q.  And as a part of a declaration you submitted in this case,
 8    did you provide a CV?
 9    A.  Yes, I did.
10    Q.  And is that CV accurate?
11    A.  Yes, it is.
12    Q.  And in addition to what you have published, do you have
13    any other research projects underway?
14    A.  Yes.  Several research projects underway.
15    Q.  And what are those?
16    A.  The main one is U.S. immigration politics in the 21st
17    century.  So the project identifies research gaps in different
18    areas of immigration policy at the federal level.
19    Q.  And do you consider yourself to be an expert?
20    A.  Yes, I do.
21    Q.  And what would be your fields of expertise?
22    A.  Immigration politics and policy.
23    Q.  And have you been retained as an expert in this case?
24    A.  Yes, I have.
25    Q.  Who retained you?
```

```
1    A.   The City of Austin.

2    Q.   And what was your assignment?

3    A.   My assignment was to evaluate data that spoke to three

4    paragraphs, in particular, of the City of Austin's complaint

5    related to the social effects of SB 4.

6    Q.   And have you formulated any opinions pursuant to this

7    assignment?

8    A.   Yes, I have.  Four main opinions.  The first is that the

9    implementation of SB 4 --

10        MR. DEANE:  Your Honor, I am going to object.  The

11   witness has not met the standards of Rule 26 nor the Daubert

12   case.  He has to identify how he -- what data he got.  He has

13   to identify methodology, and he has to, before he can start

14   espousing conclusions, he has to be certified by this Court as

15   an expert witness.

16        THE COURT:  All right.  If you will go into those

17   matters to certify him.

18        MR. SIEGEL:  Yes, Your Honor.  Thank you.

19   BY MR. SIEGEL:

20   Q.   Before you state your opinions, Professor Wong, what areas

21   did you look at in regard to Senate Bill 4?

22   A.   Yes.  So one of the first datasets that I looked at was

23   participation in WIC in the city of Austin, so the Women,

24   Infants and Children's program.  The data are for fiscal years

25   2013 through 2016, as well as for the months in fiscal year
```

1      2017 up to May 2017.

2              The WIC data speaks to paragraph 55 of the City of

3      Austin's complaint.  I analyzed that data using ordinary

4      least squares regression analysis.  So in other words, took

5      the 2013 to 2016 data to estimate WIC participation in the

6      city of Austin for fiscal year 2017.

7              So the OLS regression analysis is one of the most

8      widely used models in political science, and the analysis is

9      also robust, meaning it is the best result out of alternative

10     model specifications.

11     Q.  And what did your statistical analysis tell you?

12     A.  So with WIC participation, what the previous four fiscal

13     years would suggest is that in the city of Austin, there would

14     be just under 400,000 WIC participants.  Now, what we sort of

15     see from the fiscal year 2017 data is a very different trend.

16     So instead of the roughly 400,000 that are estimated, we are

17     going to see roughly a 21.9 percent decrease in WIC

18     participation for fiscal year 2017.

19     Q.  And what is WIC?

20     A.  Women, infants and children, so it is a program that

21     provides needed food and nutritional services for at-risk

22     women, infants and children.

23     Q.  And why is WIC important?

24     A.  WIC is administered by the United States Department of

25     Agriculture, USDA, and the USDA states very clearly that WIC

1    saves lives.  So when it comes to needed food and nutrition

2    services for at-risk women and children, what we are talking

3    about are indicators like decreased infant mortality.

4    Q.  And you say your statistical analysis told you that in

5    2017, WIC participation has dropped by over 21 percent?

6    A.  Yes.

7    Q.  And in addition to WIC data, did you review any other

8    types of information in looking at the public health impact?

9    A.  Yes.  So in addition to the WIC data, I also reviewed the

10   declarations submitted, as well as the statements, the

11   exhibits along with those declarations.

12   Q.  And, for example, did you look at the statements provided

13   by the Safe Lights?

14   A.  Yes, I did.

15   Q.  And the statement provided by the People's Community

16   Clinic?

17   A.  Yes, I did.

18   Q.  And the statement provided by Community Care?

19   A.  Yes, I did.

20   Q.  And how did those statements impact your analysis of the

21   public health impact?

22   A.  Yes.  So the data themselves are agnostic to reason, so

23   what we see in the data is a clear decrease in participation.

24   Now, the question for the analysis is what explains that

25   decrease in participation, and so what we see is that from

```
1    these different statements that were given that the fear of

2    deportation caused by the immigration --

3              MR. DEANE:  Your Honor, I am going to object.  There

4    is absolutely no foundation for the conclusion that he is

5    making now.  What he studied and what he is concluding to are

6    opposite.

7              THE COURT:  I will permit you to inquire into that

8    in cross-examination.

9              MR. DEANE:  Yes, Your Honor.

10             THE COURT:  Go ahead.

11             THE WITNESS:  So what we see from the statements are

12   several individuals attesting to the fact that in their day to

13   day, they are seeing fewer people come for services like WIC

14   because of the general immigration enforcement climate.  That

15   includes the ICE raids in Austin in February as well as SB 4.

16   BY MR. SIEGEL:

17   Q.  Did you notice anything in the data that showed that the

18   February ICE raids in central Texas impacted WIC

19   participation?

20   A.  Yes.  So what we can do with the data is look at where we

21   see differences in terms of the sort of rate of increase or

22   decrease of an effect.  And so we see a generally decreasing

23   trend with WIC participation, but it becomes a steeper

24   decrease in February 2017 onward.

25   Q.  And did you review any research related to this public
```

1   health impact?

2   A.   Yes.  So there is a long and growing body of literature,

3   peer-reviewed research, that shows that immigration

4   enforcement can have a chilling effect on health seeking among

5   undocumented immigrants, as well as service utilization,

6   including needed health services, among not just only

7   undocumented immigrants but also their U.S. citizen family

8   members, so you can imagine a mixed-status family with an

9   undocumented parent and a U.S. citizen child, the undocumented

10  parent being concerned about immigration enforcement actions

11  taking place at those sites and, therefore, not going to those

12  sites, even if the needed services are for themselves or for

13  their children.

14  Q.   And after reviewing the WIC data, conducting a statistical

15  analysis, reviewing witness statements and reviewing research,

16  did you come to an opinion as to whether immigration

17  enforcement affects public health?

18  A.   Yes.  I think the data are clear.  My opinion is that

19  there is public harm due to SB 4, and one of the

20  manifestations of that are negative health implications as a

21  result of the changed immigration enforcement climate due, in

22  part, to that immigration enforcement climate.

23  Q.   And if you had to summarize what the impacts of reduced

24  WIC participation are on public health, what would those

25  impacts be?

1    A.  So not only are we talking about for WIC, in particular,

2    you know, services for pregnant women, postpartum women,

3    infants and children, but part of what WIC does is keep

4    families healthier, which prepares them down the road.  For

5    example, children, when they are healthier, they perform

6    better in schools, per the USDA and WIC.

7         So when we think about the public health

8    implications of decreased WIC participation, it is not just

9    immediately to, for example, the pregnant woman who is not

10   receiving prenatal care, but we can also think about what

11   happens to those infants and the children as they get older.

12   Q.  And is your opinion concerning the negative public health

13   impact of immigration enforcement, is it limited to its effect

14   on undocumented immigrants?

15   A.  No, it is not.  There -- within this body of peer-reviewed

16   research, there are analogs, so when we think about previous

17   state and local immigration enforcement legislation, we can

18   think about things like Proposition 187 in California in 1994.

19   There is research from Proposition 187 in 1994 that showed

20   that tuberculosis patients were more likely to delay their

21   services -- sorry -- more likely to delay medical treatment

22   for fear that going to a physician would lead to an

23   immigration enforcement action.

24        And we know that something like tuberculosis, a

25   highly communicable disease, has public health implications

 1    for just not the individual and that person's family but for

 2    society, more generally.  There is also research on less

 3    Medicaid utilization among eligible U.S. citizen children of

 4    undocumented parents.

 5    Q.  Are you aware that Senate Bill 4 has an exemption for

 6    public hospitals?

 7    A.  Yes, I am.

 8    Q.  Does that exemption impact your analysis on the negative

 9    public health impact?

10    A.  So what -- research from Alabama's HB 56 shows that

11    despite having language about exemptions for healthcare

12    services, for example, related to communicable diseases, STDs,

13    there was still lower utilization among noncitizens in this

14    particular study.

15          So this study looks at Alabama's HB 56, 12 months

16    before, 12 months after, and looks specifically at those

17    services that were exempted in the letter of the law and

18    whether or not there was a decline in participation in the

19    utilization of those services among noncitizens, and the

20    conclusion, using county administrative data, was that there

21    was a decline.

22    Q.  Is it your opinion that in Texas some Texans will decline

23    to access public hospital services because of fear of

24    immigration enforcement?

25    A.  Yes.  Absolutely.

1    Q.  And in terms of public education, what information did you

2    look at?

3    A.  So public education speaks to paragraph 55 -- 54 of the

4    City of Austin's complaint.  The data that I was given looks

5    at attendance by school for the week following the ICE actions

6    in Austin in February of 2017.  I have the data from 2016 for

7    the comparable week, so a number of absences by school.

8            Using the data, number of absences by school,

9    controlling for other relevant factors available in the data,

10   for example, the total number of students at school, there is

11   a clear conclusion.  Can I state the conclusion from that

12   analysis?

13   Q.  So what did the data show?

14   A.  Thank you.  So what the data showed was that there was a

15   152-percent increase in absences in the 2017 week analyzed

16   when compared to the comparable 2016 week.  The data further

17   showed that in 2016, the percentage of Hispanic Latino

18   students enrolled out of school was statistically

19   insignificant as a predictor of school absences.

20           So in other words, in 2016, the percentage of

21   Hispanic Latino students in the school is not a determinant of

22   absences.  In 2017, what we see, and as submitted in my

23   declaration, is that as the Hispanic Latino population

24   increases, we see that absences also increases in a

25   statistically significant way.

1    Q.  And for your analysis of the public education data, did

2    you use the same methodology as the WIC data?

3    A.  Yes.  So for the public education data, it is ordinarily

4    squared regression analysis.  In my declaration, I also show

5    the results of several different model specifications.  One of

6    the concerns always is whether or not the result is

7    statistically significant because of the inputs that you sort

8    of feed into the model.  And so in the declaration, we see

9    that the results are robust across several model

10   specifications.

11   Q.  Why is student attendance important?

12   A.  So student attendance, we see in the literature that

13   school attendance matters for a number of different reasons.

14   Austin ISD in a 2014 -- in an evaluation of their 2014 cohort

15   finds that school attendance is one of the main determinants

16   of high school graduation.

17          In that same evaluation of the 2014 cohort, what

18   Austin ISD also found was that among those who graduated from

19   Austin ISD, a large majority attended colleges within 60 miles

20   of Austin and almost 90 percent attended colleges in the state

21   of Texas.

22          So not only is school attendance important for high

23   school graduation, but based on the data from Austin ISD, what

24   we are seeing is that to the extent that school attendance

25   diminishes, high school graduation decreases, then the city of

1    Austin and the state of Texas, more generally, loses out on

2    some of its college-educated and college-trained workforce.

3              There is an additional component in terms of school

4    funding as well.  As I understand it, school funding for

5    public schools is tied to attendance.

6    Q.  And in addition to the school attendance data, did you

7    look at any other information with regard to developing an

8    opinion regarding the impact of immigration enforcement on

9    public education?

10   A.  Yes.  So in addition to the data, there were declarations

11   and statements that were given.  One in particular I recall

12   comes from Education Austin, so that is the labor union that

13   represents employees across Austin ISD.

14             And so that one, in particular, is attesting to how

15   the raids themselves negatively impacted a number of different

16   things at the school.  So not just attendance, as parents were

17   sort of concerned about taking their children to school for

18   fear of an enforcement action happening there, but we also see

19   that teachers found it more difficult to teach while

20   potentially their students were worried about going home to,

21   you know, and finding that their parents were undocumented --

22   I mean, sorry -- deported.

23   Q.  As a part of your practice as a researcher, is it common

24   for you to rely upon statements of this nature?

25   A.  Yes.  Absolutely.  So when we think about cause and

1    effect, we also look for mechanism.  So mechanism is the

2    explanation for why.  Why does education relate to more

3    income?  All right?  That's the causal relationship.  But the

4    causal mechanism, what explains why, might be the skills that

5    one obtains at school.  It might be the particular major that

6    somebody chose.  And so what we want to do is take not just

7    the data but all of the available information and figure out

8    what that mechanism is.

9    Q.  And in addition to student attendance data, as well as

10   witness statements, did you review any literature in regard to

11   your opinion on the impact on public education?

12   A.  Yes.  There is also peer-reviewed literature that shows,

13   in particular, how being in a mixed-status family -- so an

14   undocumented student, U.S. citizen with undocumented

15   parents -- affects their performance in school.  So what we

16   see generally is a decline in economic performance, again, for

17   one of the reasons that I just mentioned.  It is very hard to

18   focus on school if you are worried about showing up at home

19   and your parents are deported.

20          There are also a broader range of educational

21   barriers that arise for the American citizen children of

22   undocumented parents, and so this also comes from one of the

23   statements that I reviewed, which is supported by the

24   peer-reviewed literature, that essentially one has to change

25   the day-to-day routine, and that change in day-to-day routine

1    is disruptive in a lot of different ways.

2              Sometimes students will act out in response to that.

3    Sometimes there are mental health implications, like increased

4    depression as a response to that.  In particular, what the

5    statement shows is that, well, one of these students had to

6    change their routine in terms of who was dropping off and

7    picking that student up from school, because their parents no

8    longer felt it was safe to do that.

9              MR. DEANE:  Your Honor, I am going to object to this

10   anecdotal testimony.

11             THE COURT:  Right.  I understand.

12             Anything else, Counselor?

13             MR. SIEGEL:  I am going to build up to one more

14   opinion, Your Honor.

15             THE COURT:  You are going to do what?

16             MR. SIEGEL:  I am going to build up, ask him to

17   state --

18             THE COURT:  Go ahead.

19             MR. SIEGEL:  Thank you, Your Honor.

20   BY MR. SIEGEL:

21   Q.  And after reviewing the data, the statements and the

22   literature, did you come to an opinion as to the impact of

23   February's increased immigration enforcement on public

24   education?

25   A.  Yes.

1    Q.  And what was your opinion?

2    A.  That the raids, in part, contributed to the decline in

3    school attendance.

4    Q.  And is your opinion limited to the impact on undocumented

5    students?

6    A.  No, it is not.

7    Q.  And so does it extend to U.S. citizens?

8    A.  Yes, it does.

9    Q.  Okay.  And finally -- and then I will pass the witness,

10   Your Honor -- in regard to public safety, did you look at any

11   data?

12   A.  Yes.  So with respect to public safety, this is an

13   analysis that comes from a Freedom of Information Act request,

14   so the data is from ICE, the government agency responsible for

15   interior immigration enforcement.  The data includes over

16   2,000 counties in the United States.

17          The data, in the data, ICE identifies counties as

18   being sanctuary or not sanctuary.  And so in this FOIA

19   dataset, what we essentially get is a definition of sanctuary

20   from ICE itself.

21          So what ICE is doing is saying, well, which counties

22   are accepting detainer requests and which ones are not?  Now,

23   what I did with the data is use that data to evaluate the

24   public safety implications of local cooperation with federal

25   immigration enforcement officials.

1          And so the hypothesis going into the analysis is

2     that when there is more partnership, then there is decreased

3     crime.  And so that is what we heard a lot about why it is

4     local law enforcement should cooperate with federal

5     immigration enforcement officials.

6          So using that data, using a technique called

7     coarsened exact matching -- which is the cutting edge when it

8     comes to matching; in other words, creating apples-to-apples

9     comparisons across what are, you know, very different

10    counties -- what we see is just the opposite.

11         What we see is that instead of sanctuary counties

12    having higher crime rates, we see that sanctuary counties have

13    lower crime rates, 35.5 fewer crimes per 10,000 people, and

14    that is statistically significant.

15    Q.  Did you look for research that might contradict your

16    findings?

17    A.  Yes.  Absolutely.  So as part of the research process,

18    what we try to do is speak to the literature.  So if we see

19    that there are conflicting findings, we want to be able to

20    find data, and administrative data is always the gold

21    standard, because it comes directly from the agencies

22    responsible for doing whatever it is we are researching.

23         And so in doing that research, there is little that

24    I know of, there is actually nothing that I know of that shows

25    that partnering with federal immigration enforcement officials

1    decreases crime.  The literature says just the opposite.

2    Q.  Based on your review of the literature and the data, do

3    you have an opinion as to the impact of the February ICE raids

4    on public safety in central Texas?

5    A.  Well, at least based on my evaluation of the sanctuary

6    data from ICE, I can conclude that there is no relationship

7    between being a sanctuary and higher crime rates.  The data

8    say just the opposite.  So I can conclude that if there is an

9    argument that partnering with ICE will benefit the public by

10   decreasing crime, the data do not share -- show that.

11   Q.  In regard to your opinion --

12           THE COURT:  Anything else, Counselor?

13           MR. SIEGEL:  One last question, Your Honor.

14           THE COURT:  Okay.

15   BY MR. SIEGEL:

16   Q.  With regards to your opinions concerning education, health

17   and safety, did you notice any particular impact on the

18   Hispanic community in central Texas?

19   A.  Yes.  So when we look at WIC participation in Austin ISD,

20   about eight in ten of those who participate in WIC are

21   Hispanic.  When we think about education across Austin ISD, we

22   are looking at roughly 60 percent being Hispanic.

23           MR. SIEGEL:  Nothing further.  Thank you.

24           THE COURT:  Counselor.

25                     *-*-*-*-*-*-*-*

```
 1                      CROSS EXAMINATION
 2   BY MR. DEANE:
 3   Q.  Good afternoon, Dr. Wong.
 4   A.  Hi.
 5   Q.  We have never met before; is that correct?
 6   A.  That is correct.
 7   Q.  And I looked at your CV, which was marked as Plaintiff's
 8   Exhibit 424, and I did not see that you've ever studied law;
 9   is that correct?
10   A.  That is correct.
11   Q.  And you have never studied statistics in mathematics
12   school or a business school?
13   A.  That is incorrect, I think.  Political science is now
14   quantitative, so a lot of the courses that we take are in
15   economics and statistics and in mathematics, as well as in
16   computer science.
17   Q.  Okay.  So follow me, then, and let's talk about multiple
18   regression theory.
19   A.  Okay.
20   Q.  The point of multiple regression theory is to arrive at
21   causation, correct?
22   A.  No, it is not.
23   Q.  It is to determine the factors of significance and reach a
24   conclusion from the data?
25   A.  Yes, but that is not causation.
```

1    Q.   Okay.  And in your case, there is absolutely nothing that

2    you've testified to today that has any data in which the

3    undocumented alien population is isolated from the citizen

4    population, correct?

5    A.   We don't have data about undocumented immigrants,

6    unfortunately, from a lot of these data sources.

7    Q.   It is a yes or no question, sir.

8    A.   Then, yes.

9    Q.   Okay.  So everything you testified to is not relevant to

10   our Senate Bill 4 issue of how the State of Texas treats its

11   peace officers in regard to undocumented aliens, correct?

12   A.   I don't think this is a yes or no answer, so I

13   respectfully wouldn't give you a yes or no answer here.  When

14   we think about SB 4 and its implications, what I was tasked to

15   do is look at a part of the City of Austin's complaint, which

16   is about the social effects of SB 4.  And so for what I was

17   tasked to do, my conclusions are very clear, that they will

18   have negative implications on not just undocumented immigrants

19   but on U.S. citizens as well for the city of Austin.

20   Q.   Because your data did not separate U.S. citizens from the

21   undocumented alien, correct?

22   A.   No.  I don't know if I follow you, but the data themselves

23   speak to the aggregate and that aggregate includes the U.S.

24   citizens, you know, again, includes undocumented immigrants,

25   and it includes LPRs.

```
1              What the testimony -- or what the statements that I
2    received attest to are how the aggregate data can be unpacked
3    to speak to the experiences of undocumented immigrants as well
4    as mixed-status families.
5    Q.  I will get to that anecdotal part in just a minute, but I
6    want to start off with the actual data that you obtained.
7    A.  Okay.
8    Q.  If the county attorney sat in that chair this morning and
9    told us under oath that the WIC data is unable to be unpacked
10   between the undocumented alien and the citizens in El Paso
11   County, was she telling us the truth?
12   A.  I don't recall that part of the testimony.
13   Q.  You don't recall when the Judge asked her how you could
14   separate the relevant portion for this hearing today, which is
15   the undocumented alien data from the citizen data?
16             MR. GARZA:  Objection.  Mischaracterizes the
17   testimony.
18             THE COURT:  I will permit it.  Go ahead.
19             THE WITNESS:  Well, if I understand the question
20   correctly, if we are trying to isolate the undocumented
21   immigrants or the -- you know, any particular subgroup within
22   the aggregate data, then what I was given is aggregate data on
23   WIC participation and that aggregate data shows a decline and
24   it shows a decline also by a particular WIC office.  The data
25   also shows that per those WIC offices, the larger decreases
```

1    are in those offices with larger Hispanic Latino populations.

2        So I don't know if you can isolate undocumented

3    immigrants, because I don't think WIC says, "Hey, are you

4    undocumented or not?"  But you can isolate the Hispanic Latino

5    population, and so that is about 80 percent of Austin's WIC

6    population.

7    Q.  Okay.  Dr. Wong, I would like you to please answer my

8    question.  My question was, in the WIC data, it does not

9    isolate the undocumented --

10   A.  No, it does not, no.

11   Q.  -- from the citizen; isn't that correct?

12   A.  Yes.  That's true.

13   Q.  So any conclusions or any simple regression, multiple

14   regression or least squares or any other method of

15   application, if the data going in is mixed, you are not going

16   to be able to isolate anything with the analysis?

17   A.  Yes.  And so I would respectfully say that in no way am I

18   saying that this entire decline is a function of undocumented

19   immigrants not participating in WIC.  What the data show is a

20   decline, undeniable decline.  Now, what explains that decline

21   is, in any opinion, explained in part by what I have read.

22   Q.  Well, let's talk about that, sir.

23   A.  Okay.

24   Q.  You have never been admitted as an expert witness in any

25   court in this nation, correct?

1    A.  No.  I am 35 years old and I am very excited to be in this

2    court today.

3    Q.  And no court --

4            (Laughter.)

5    BY MR. DEANE:

6    Q.  I am a little older, so I can't go to that one.  But there

7    is no court of law that has ever accepted you testifying, that

8    you took compound data, including citizen data and

9    undocumented alien data, and reached conclusions that only

10   apply to undocumented aliens; isn't that correct?

11           MR. SIEGEL:  I am going to object to

12   mischaracterization of the opinion.

13           THE COURT:  I will permit it.  Go ahead.

14   BY MR. DEANE:

15   Q.  Wait just a second.  If that is not correct, then what you

16   are saying is, everything you said was irrelevant, because all

17   we are talking about in Senate Bill 4 is undocumented aliens;

18   isn't that correct?

19           MR. SIEGEL:  Objection to the extent it calls for a

20   legal conclusion.

21           THE COURT:  No.  Go ahead.

22           THE WITNESS:  So my understanding is that SB 4 is

23   going to have implications beyond the undocumented.  That is

24   my understanding.

25

1    BY MR. DEANE:

2    Q.  Okay.  That's not what I asked, sir.  Did you read SB 4?

3    A.  Yes, I did.

4    Q.  And where does it say that it has anything to do with the

5    WIC program?

6    A.  So it actually will exempt the WIC program, so -- it is in

7    the text of the bill, I believe.  But when it comes to what SB

8    4 does, those exemptions, because the fact that undocumented

9    parents have U.S. citizen children and because all

10   individuals, regardless of status, are entitled to emergency

11   health services, I believe that is why those exemptions are

12   there, which is why, in my opinion, this is not just about the

13   effects on undocumented immigrants, but there are broader

14   effects beyond the undocumented themselves.

15   Q.  I think we beat that one to death.

16   A.  Okay.

17   Q.  Let me ask you, in paragraph 26, you tell us that you

18   talked to the manager of public health in Austin and wrote

19   down anecdotal remarks that he made; is that correct?

20   A.  Yes.

21   Q.  And is that how you did the other portions of your

22   analysis today?  You had anecdotal testimony supporting

23   statistics that combines both citizen and undocumented alien?

24   A.  No.  What I was looking for is the counter factual.  So

25   the anecdotes aren't, in and of themselves, important from a

1    scientific point of view.  The anecdotes, to the extent that

2    they combine to a pattern that speaks to the counter factual,

3    is how we then take data where we can identify correlation and

4    begin to talk about causation.

5    Q.  Okay.  But, Dr. Wong, what you actually did was you talked

6    to anecdotal remarks that were made by the people, such as the

7    Austin Health Department on the WIC issue, then in

8    paragraph 29 you tell us you looked at peer-reviewed studies.

9    You didn't actually make one.  You simply looked at them; is

10   that correct?

11   A.  For the -- yes, for WIC, yes.

12   Q.  Okay.  So you basically gave us a book report today and

13   made a conclusion based on your book report of what other

14   people did?

15   A.  I would disagree with that as well, because the analysis

16   of the actual WIC data, that is what sets this process in

17   motion.  So if I understand your line of questioning, there is

18   no denying that there is a decrease in WIC participation in

19   the data, and so the question here is what explains that

20   decline in participation.  And so in my opinion, based on what

21   I have read and based on the existing literature, then, in

22   part, the decline in participation is due to the changed

23   immigration enforcement policy.

24   Q.  Okay.  So we have the data that you looked at that makes

25   this citizen and noncitizen.  You have the anecdotal remarks

1   that people told you, which in law we call hearsay, and then

2   you have your book report of peer-reviewed literature.

3            Did you do anything else to reach your conclusions

4   today?

5   A.  Oh.  So the analysis of the data I would not underscore

6   itself.  I mean, the analysis of the data, in and of itself,

7   is a very heavy -- and the anecdotes and law as hearsay in

8   social science, it is evidence.  It is a different kind of

9   evidence, but it is a part of our craft.  And so, I mean, I

10  don't know how else to describe what it is I did.

11  Q.  Okay.  Why don't you follow the rules of procedure and

12  tell me the name of the methodology that allows you to do book

13  reports, anecdotal evidence and combine data with citizen and

14  noncitizen and reach conclusions that relate to noncitizen

15  undocumented aliens.

16  A.  It is the scientific method.

17            MR. SIEGEL:  Objection, Your Honor, just to the

18  harassing and argumentative language.

19            THE COURT:  No.  I will permit it.  Go ahead.

20            THE WITNESS:  It is the scientific method.

21  BY MR. DEANE:

22  Q.  You don't have a name for it?

23  A.  It is called the scientific method.  I don't know how else

24  to describe it.  So the statistical method itself that

25  explains the decrease -- should I continue?  I mean --

1    Q.   Okay.   The scientific method says you collect data, you

2    apply a method to the data and then you reach a conclusion,

3    right?

4    A.   Yes.

5    Q.   And what you did was you collected mixed data of others,

6    that include citizen and noncitizen, you then did anecdotal

7    testimony, you took what I call hearsay and then you did a

8    book report.

9         You are saying that is the scientific method?

10   A.   So the scientific method is taking the best available

11   data.   And here, what we have -- what I was given from the

12   City of Austin represents the best available data, that I am

13   aware of, to evaluate WIC participation over time.

14        Now, with -- I mean, we are talking about the

15   scientific method here, but what we do with the data is

16   actually sort of test hypotheses.   So the hypothesis here is

17   about the decline in participation, so the decline in

18   participation, just like a randomized, controlled trial, you

19   can assign individuals to control in treatment to test sort of

20   the latest and greatest cancer drug, and maybe it is

21   effective.

22        Maybe that is what the data show.   But you still

23   have to talk to people to make sure that they took the drug

24   before you can make your conclusion.   That is the entire

25   process that I have just laid out to you.

```
 1    Q.  Okay.  And that's all you can tell me, correct?

 2    A.  Beyond the scientific method, I don't know what else to

 3    tell you.

 4    Q.  Okay.  Well, let's look at your Austin ISD --

 5    A.  Okay.

 6    Q.  -- starting in paragraph 37.  What data did you look at

 7    there?

 8    A.  That is from Austin ISD, so we get absences by month -- I

 9    am sorry -- absences by school for the week of February -- I

10    believe it is 15th through 19th, 2017 and the comparable week

11    in 2016.

12    Q.  All right.  Are you familiar with PEIMS data?

13    A.  No, I am not.

14    Q.  And you are here testifying in this court that you looked

15    at Austin ISD data and made conclusions based on attendance,

16    on Austin ISD data; is that correct?

17    A.  Yes.

18    Q.  You didn't go to the Texas Education Agency, which is

19    where the Austin data has to actually be filed and be shown to

20    be correct or incorrect, and you didn't looked at the PEIMS

21    data from the TDC?

22    A.  I was given the data from the City of Austin, from Austin

23    ISD, as I attested to.

24    Q.  Who did you talk to at Austin ISD?

25    A.  I was in communication with counsel at the City of Austin,
```

1   with an administrator, I think, of data, analyst at Austin

2   ISD, who then gave the data.

3   Q.  So you didn't go to the state records of the Texas

4   Education Agency and get the official data for Austin ISD

5   records, correct?

6   A.  So the state data, I believe, is scraped into the Austin

7   ISD website, which means that it comes from the state, and

8   that's where the Hispanic Latino percentage of the population

9   of the school comes from.

10  Q.  Okay.  You are testifying under oath that if I looked on

11  PEIMS and I looked on Austin ISD, they are going to be exactly

12  the same?

13  A.  Yes, as far as -- yes, as far as I know, yes.

14  Q.  What do you base that on?  You tell us you didn't look at

15  PEIMS.

16  A.  So I base that on, I got the data from the City of Austin,

17  who told me that the data came from Austin ISD, and that is

18  where we have absences by school for the week in question in

19  2017 compared to the comparable week in 2016.

20  Q.  Okay.  Did Mr. Garibay give you any data?

21  A.  I believe that is the person at Austin ISD.  No.

22  Mr. Garibay, no.  I think that is the -- one of the people who

23  submitted a statement.

24  Q.  Are you telling the Court that you don't know the name of

25  the person who gave you the data in Austin ISD?

```
 1   A.  No, I do not.  I don't recall the name of the person in
 2   the e-mail thread.
 3   Q.  Okay.  Did you talk to him in person?
 4   A.  No, I did not.
 5   Q.  Okay.  Did it just come through the attorneys?
 6   A.  Yes, it did.
 7   Q.  Okay.  Did you do anything to verify that data?
 8   A.  Yes.  I went to the Austin ISD site, because I needed to
 9   get the Hispanic Latino percentage of the population.
10   Q.  Okay.  And other than look at the Austin ISD site, you did
11   not go to the State website?
12   A.  No.  But I am happy to, and the data should be the same
13   and the results would, therefore, be the same.
14   Q.  Now, when you were talking about the attendance records
15   and decline, you were talking about February of 2016 and
16   comparing it to February of 2017; is that correct?
17   A.  Yes.
18   Q.  And that was based on an ICE raid, as you call it, in the
19   week before in 2017?
20   A.  Yes.
21   Q.  Okay.  What relevance would that have to Senate Bill
22   4 today?
23   A.  Yes.  So what the ICE raids speak to is the changed
24   immigration enforcement context that SB 4 would represent.
25   And so when we think about SB 4, we have heard today that it
```

1    may or may not -- I am agnostic to it -- may or may not allow

2    a police officer to wake up and say, "I am going to raid some

3    place on any given day."

4            I am agnostic to that.  What I care about in the

5    data are how individuals perceive that changed immigration

6    enforcement context and how it may subsequently change their

7    behavior.  I mean, that is sort of the basis of what we do in

8    the social sciences, is try to understand how policy is going

9    to affect the decision making of individuals.

10   Q.  Okay.

11   A.  And so that is why the ICE raid was important.

12   Q.  Okay.  Let's try to focus now on, the data that you got

13   from Austin ISD did not separate the undocumented alien from

14   the regular citizens, correct?

15   A.  No, it did not.

16   Q.  Okay.  And the public safety data that you used and

17   testified to this Court was 2,492 counties --

18   A.  Yes.

19   Q.  -- worth of data; is that correct?

20   A.  Yes.

21   Q.  And that was in the reports that you obtained under the

22   Freedom of Information Act?

23   A.  Yes.  The Immigrant Legal Resource Center obtained that

24   data, filed with FOIA.

25   Q.  Okay.  Dr. Wong, how many counties are there in Texas?

```
 1    A.   I believe there are 254 counties in Texas.

 2    Q.   Okay.  And so your testimony to the Court is what is

 3    happening in 2,492 counties is extrapolated to Texas?

 4    A.   Yes.  And I believe you can't have it both ways.  You

 5    previously just said I didn't have enough data for you.  Now

 6    you are saying I have too much data for you.  So the 2,492

 7    counties represent over 90 percent of the total population.

 8    What we see in that data are generalized trends of how, you

 9    know, being a sanctuary locality can or may or may not affect

10    things like crime rates --

11    Q.   And I am just talking about the data at this point.

12    A.   Okay.

13    Q.   So what sanctuary cities in Texas did that data include?

14    A.   There are zero, so per ICE --

15    Q.   Just answer my questions.

16    A.   Zero.

17    Q.   I am just asking you --

18    A.   None.

19    Q.   So your data included no sanctuary cities in Texas.  Your

20    data included -- is it the whole nation?

21    A.   Yes, it is.

22    Q.   Okay.  And I think your attorney asked you about if you

23    were aware about the Senate Bill 4 exemption for public health

24    and safety, education and so forth?

25    A.   Yes.
```

1    Q.  And I believe you told the Court you were --

2    A.  Yes.

3    Q.  -- is that correct?  Are you aware of the Senate Bill

4    4 exclusions for witnesses and victims of crime not being

5    subject to it?

6    A.  Yes.  I heard that earlier today.

7    Q.  Okay.  And was that anywhere considered in your analysis?

8    A.  That -- the analysis, no.

9    Q.  Okay.  And is there any reason why you haven't given us a

10   factor of showing the potential rate of error in your analysis

11   to date in any of the datasets?

12   A.  No.  I am happy to.  So everything is significant at the

13   less than .01 level, which is beyond conventional standards,

14   so if you are asking about the range for the decline --

15   Q.  I am asking a very specific question, and my question was,

16   is there a reason that you didn't give the standard of error?

17   A.  No.

18           MR. DEANE:  Okay.  I believe that's it.  Thank you,

19   Your Honor.

20           Thank you, Doctor.

21           THE COURT:  Any -- hold on, Doctor.  Hold on.  If

22   you will take your seat.

23           MR. SIEGEL:  Very briefly, Your Honor.

24                    *-*-*-*-*-*-*-*

25                 REDIRECT EXAMINATION

```
 1    BY MR. SIEGEL:
 2    Q.  Professor Wong, is it fair to say that the City of Austin
 3    asked you to analyze the impact of immigration enforcement on
 4    all Texans, regardless of status?
 5    A.  Yes.
 6    Q.  And that you found a negative impact on increased
 7    immigration enforcement on public education, health and
 8    safety?
 9    A.  Yes.
10    Q.  And the data you looked at in regard to education and
11    health was correlated with February ICE raids?
12    A.  For education, yes; for health, yes.
13    Q.  Okay.  And are you able to predict whether Senate Bill
14    4 will have a similar negative impact?
15    A.  Yes.
16              MR. DEANE:  Objection, Your Honor.  No foundation.
17              THE COURT:  I will sustain that.  Move on.
18              MR. SIEGEL:  Nothing further, Your Honor.
19              THE COURT:  Counselor, anything?
20              MR. DEANE:  No further questions, Your Honor.  Thank
21    you.
22              THE COURT:  Okay.  I should tell you, you are the
23    first and only witness in my 23 years who has ever expressed
24    being happy being in this courtroom.
25              (Laughter.)
```

```
 1              THE WITNESS:  That's a big deal.  Thank you.
 2              THE COURT:  Call your next witness.
 3              MS. PERALES:  Thank you, Your Honor.  San Antonio
 4   plaintiffs call County Judge Nelson Wolff.
 5              THE COURT:  Okay.
 6              COURTROOM DEPUTY:  Please raise your right hand.
 7              THE WITNESS:  Yes.
 8              (Oath administered to the witness.)
 9              COURTROOM DEPUTY:  Please have a seat.  Thank you,
10   sir.
11                      *-*-*-*-*-*-*-*
12                      DIRECT EXAMINATION
13   BY MS. PERALES:
14   Q.  Good afternoon, Judge Wolff.
15   A.  How are you doing?
16   Q.  For the record, please state your name.
17   A.  I am Nelson Wolff.
18   Q.  And can you introduce yourself briefly to the Court.
19   A.  I was born here in San Antonio, south side of town at
20   home.  Lived here now almost -- I am 77.  So out of those 77
21   years, I have probably lived here a good 72.  I am a graduate
22   of St. Mary's Law School.  I've served as a state
23   representative, state senator, city councilperson, mayor of
24   San Antonio, and for the last 16 years as a Bexar County
25   judge.
```

```
 1    Q.  Have you had any jobs other than being an elected
 2    official?
 3    A.  Oh, yes.  I came from a business background.  We started a
 4    business in 1962 selling roofing off of street corners, on
 5    Southwest Military, built it into a major business.  Sold it
 6    in 1977 to a national corporation.  Started a natural food
 7    business in 1979, Sun Harvest Farms, built it into a large
 8    corporation.  Sold it to a national corporation in 1999.
 9    Q.  Do you consider yourself as having been a small
10    businessman?
11    A.  That's right.
12    Q.  Overall, how many years have you served in public office?
13    A.  I believe it is a little over 28 now.
14    Q.  And through your service in various public offices, are
15    you familiar with functions and capabilities of county
16    departments?
17    A.  Yes.
18    Q.  Are you also familiar, to some extent, with city
19    departments?
20    A.  Yes.
21    Q.  Can you describe for me briefly the demographics of Bexar
22    County?
23    A.  Well, I believe we are getting close to about a
24    million-nine people.  About 60 percent is Hispanic, about
25    nine percent African-American, about 28 percent Anglo, so we
```

1   are a majority minority city.

2   Q.  How many cities are in Bexar County?

3   A.  There are -- the city of San Antonio and 26 other cities

4   that we work with and meet with their mayors and their city

5   managers every quarter, and we have a close working

6   relationship with them.

7   Q.  Are you generally familiar with SB 4?

8   A.  Generally familiar.  A little bit more after today.

9   Q.  As county judge, do you have knowledge of the funds

10  available and the funds allocated to the Bexar County

11  Sheriff's Office?

12  A.  Yes.  Our operating budget, about 60 percent goes to the

13  sheriff's office, law enforcement detention services.

14  Q.  Do you also fund constables as a county?

15  A.  We do fund constables.

16  Q.  What is the capacity of the Bexar County jail?

17  A.  About -- we can hold about 4,500.  Today, our population

18  is way up.  We have got about 4,333 prisoners as of last

19  Friday.  A year ago, we had 550 less prisoners.  So we are

20  at -- right at capacity.

21          We have had to spend emergency appropriations of

22  about 2.5 million for overtime, and we will be facing a large

23  request from the sheriff's office for next year with a focus

24  on violent criminals.  That is our job, to protect the

25  citizens of Bexar County.  That is what we do.  That's our

1    business and that's what we want to stick to.

2    Q.  Do you have a sense of how many undocumented people there

3    might be in Bexar County?

4    A.  Based on the figures I have seen, there is some research,

5    I believe, that MALDEF has done, there are about 71,000

6    undocumented people in Bexar County.  Of that number, about

7    66,000 are Hispanic, 90-some-odd percent are Hispanic.  And

8    that is about as close as we can get on the estimates.

9    Q.  If more people start being held on detainers in the Bexar

10   County jail, what impact do you think that will have?

11   A.  There are two impacts from detainers, not just the jail.

12   There is a central magistration system, that we fund

13   practically all of it.  We pay for the judges, magistrate

14   judges.  We pay for our judicial services.  We pay for the

15   DA's office.  We pay for the sheriff's office.  We have people

16   there from our mental health department interviewing people to

17   see if we can send them for treatment, rather than getting --

18   having them go to jail.

19          So we have quite a large expense at central

20   magistration, which is where a lot of the detainers originate.

21   Then we do have the jail.  As of Friday, we have 159,000

22   people in jail that have detainers pending on them.

23   Q.  Are you familiar with the Trujillo lawsuit and the recent

24   decision involving Bexar County and the jail?

25   A.  Yes.  For the sixteen years I have been there, we have

1    always responded to INS with respect to the detainers.  We

2    have recognized them.  We have kept prisoners an additional --

3    well, I shouldn't say that.  They were already supposed to go

4    home, but we do keep them for another 48 hours.

5            And like I say, they originate sometimes at central

6    magistration.  We will -- (coughing in background) -- hold

7    them and they will send them to us.  So we do that.  It is

8    considerably expensive to do that.  They used to reimburse us

9    $500,000 a year, going back 11 years or so.  They reduced that

10   to 90,000.  We calculate that our cost has been about $22,

11   $23 million over the last 11 years with respect to holding

12   detainees.

13   Q.  And so is Bexar County being fully reimbursed by the

14   federal government for the costs associated with holding

15   people on detainers?

16   A.  No.  We have requested reimbursement.  I believe there is

17   some congressional action to try to pass a bill that would

18   help counties around the United States that are recognizing

19   the detainers and -- but I don't know what will happen to it.

20   Q.  And so if Bexar County is not fully reimbursed, who bears

21   the costs?

22   A.  Well, the local taxpayers bear the cost, and I hope they

23   are paying attention to this trial, because it is going to

24   come right out of their pockets.

25   Q.  Is Bexar County currently reevaluating its detainer

1    practices because of the Trujillo decision?

2    A.  Well, we have recognized the ICE detainers without any

3    specific attendance to the detaining forms that they send us,

4    but we are reviewing that now, in light of this Court's

5    decision a couple of weeks ago, I guess, that there needs to

6    be some substantial cause to hold that person for that

7    additional 48 hours, so we are going through the implications

8    of that ruling now.

9            But in the past, we have fully worked with INS.  We

10   work with them also at magistration, so there never has been

11   trouble between us and INS.  Now, the Court decisions are

12   going to maybe change that somewhat, and we are in the process

13   of trying to figure out how to handle that.

14   Q.  Is tourism a big industry in Bexar County?

15   A.  Yes.  It's one of our leading industries.  Yes, it is.

16   Q.  Can you describe some of the county revenue that comes

17   from tourism?

18   A.  Well, we get property tax from the hotel, as well as 1.75

19   percent of room nights that they spend, as well as from motor

20   vehicle rentals to tourists that come here.

21   Q.  Do you have any information about whether SB 4 is having

22   an impact?

23   A.  It is starting to have an impact --

24           MR. DEANE:  Your Honor, objection.  Lack of

25   foundation.  Calls for speculation.

```
 1                THE COURT:  If you will get that.
 2                MS. PERALES:  I believe I asked if he had any
 3   information.
 4                THE COURT:  Okay.  Go ahead.
 5   BY MS. PERALES:
 6   Q.  Do you have any information, Judge Wolff, with respect to
 7   the impact?
 8   A.  I don't yet.  I've just heard information from various
 9   retailers that their traffic from Mexico is down.  We will see
10   by the end of the year how much.
11   Q.  Did Bexar County pass a resolution with respect to SB 4?
12   A.  Yes, we did.
13   Q.  And who all voted on that in the past?
14   A.  On the Commissioners Court, it is myself and four
15   commissioners.  There are four Democrats and one Republican.
16   It passed unanimously.
17   Q.  And did that resolution say Bexar County would oppose SB
18   4 or any other measure requiring local enforcement of
19   immigration law?
20   A.  Yes, it did.
21   Q.  When Bexar County passes a budget and decides how much
22   money to put into one project or another, are you essentially
23   creating policy?
24   A.  Yes, it is.  I mean, the biggest impact of any government,
25   whether it is state, federal or local, is what you do with the
```

1   budget, and the budget is as much a policy decision as

2   anything else is.

3   Q.   And so, for example, a budget decision regarding whether

4   to build additional jails in Bexar County, would that be a

5   policy decision?

6   A.   That is a policy decision.

7   Q.   What does the word "endorse" mean to you?

8   A.   Endorsement means -- and I have done that a number of

9   times.  Endorsement means that you believe in a certain

10  policy.  You may believe in a candidate and endorse that

11  candidate, which I have done numerous times; some of them

12  Republicans, I might add.  I endorse various policies.  So

13  endorsement means that I have a right to say what I want to

14  say regarding any existing law or any change in a law or any

15  new law that would come along.

16  Q.   If SB 4 goes into effect, do you continue to maintain your

17  course of action of speaking out the way you have described?

18  A.   Well, there is a little chilling effect.  $25,000, I guess

19  I could be fined.  My wife is not crazy about that.  For any

20  violation I might make or they may determine that I violated,

21  I can be removed from public office.  I would feel very much

22  better about that if the Governor and the Lieutenant Governor

23  would have to pay a fine and be removed from office for

24  passing unconstitutional school finance bills,

25  unconstitutional voter restrictions --

```
 1                MR. DEANE:  Your Honor, I am going to objection.

 2                THE WITNESS:  -- unconstitutional redistricting, and

 3      hopefully this will be unconstitutional.

 4                THE COURT:  Okay.  All right.  Your next question.

 5      BY MS. PERALES:

 6      Q.  My next question, Judge Wolff, is whether you think

 7      immigration enforcement will come up in your next campaign.

 8      A.  Oh, I am sure it will.

 9                MR. DEANE:  Your Honor, I object to the relevance,

10      lack of --

11                THE COURT:  Freedom of speech.  Go ahead.

12      BY MS. PERALES:

13      Q.  With respect to speech on current immigration enforcement

14      practices --

15      A.  Yes.

16      Q.  -- which is something touched on in SB 4, do you expect

17      the topic of immigration enforcement to come up in your next

18      campaign?

19      A.  Oh, I am sure it will.  I was on a right-wing radio

20      station not too long ago and I know what they are saying.

21      Q.  Do you plan to speak on the topic or share your policy

22      positions on immigration enforcement in your next campaign?

23                MR. DEANE:  Objection, Your Honor.  Relevance.

24                THE COURT:  I will permit it.  Let's go.

25                THE WITNESS:  Well, like I say, there is a little
```

1   chilling effect there.  In my view, I don't think it is going

2   to stop me, but it is a real concern with respect to the

3   personal fine.  Being removed from office is, you know, not a

4   big deal, but the fine that you might have to pay personally

5   is a big deal, so it will have a little bit of a chilling

6   effect on what I would be able to say if this bill becomes

7   law.

8   BY MS. PERALES:

9   Q.  Are you aware of whether there has been any public

10  discussion of ICE officers coming into the County Courthouse?

11  A.  They do come to the County Courthouse.  There is concern

12  among some of the witnesses that do see ICE come in that they

13  may be deported or afraid to testify.  The district attorney

14  has told me of at least one case and the sheriff told me of

15  another, but you would need to talk to the district attorney

16  to get the direct quote from him as to what he said.

17  Q.  Could you see yourself speaking publicly on this topic of

18  ICE and how much they should be in the County Courthouse?

19  A.  I don't think we have any control of whether they come

20  into the courthouse or not.  I think that is their decision.

21  It does have some intimidation effects, but I think that is

22  their right, if they want to.

23  Q.  Can you see yourself sharing your views on that topic in

24  the future?

25  A.  Well, I guess we are getting to -- right into this First

1    Amendment deal.  And endorse, advocate various issues and

2    statements that I may make -- let's go back to your budget.

3    What if I, in endorsing the budget, said:  I am going to get

4    down to the lowest end, which is going to be the issue dealing

5    with undocumented, and I am going to zero it out.  Where do

6    you think I am going to end up?  Out of office?  $25,000?

7            What if I say:  Mr. Police Officer, Mr. Deputy,

8    Mr. Constable, people working in the office there at central

9    magistration, campus policeman, what if I were to say:  You

10   have a right under Senate Bill 4 to ask these questions but I

11   would tell you, in my opinion, that you should not do that.

12   You are going into uncharted water.  Just because somebody is

13   undocumented doesn't mean they are here illegal.

14           Even President Trump just the other day extended the

15   deferred adjudication on children.  We have got people

16   overstay visas.  There are 28 different visa laws that are

17   complicated.  There is pending -- people that are here for

18   sanctuary that they haven't got --

19           There are people with green cards that have not yet

20   been approved yet for an extension -- due to a permit.  This

21   is a very complicated law, and to throw all of us into that

22   and say we are going to enforce it and we are going to bring

23   up issues on that, I think we are in for a world of confusion.

24   Q.  And if you were to express those views to the constables

25   or the deputy sheriffs, what do you think the effect would be

1    under SB 4?

2    A.  I don't know.  I guess it is up to the Attorney General.

3              MR. DEANE:  Objection, Your Honor.  It calls for

4    speculation.

5              MS. PERALES:  I will move on.

6              THE COURT:  Okay.

7    BY MS. PERALES:

8    Q.  Are county law enforcement officers trained to enforce

9    federal immigration law?

10   A.  No, they are not, but -- no, they are not, and that

11   includes the detention officers.  I think we have something

12   like 1,400 personnel, give or take, in the sheriff's office.

13   The vast majority of them, a thousand or so, are detention

14   officers, but, of course, they can ask questions.

15             So if you said I am going to send these people to

16   get the -- I think they give a course in Virginia or

17   somewhere -- our county manager estimates that that alone

18   would cost a couple of million dollars.

19             Now, we are small potatoes.  We are small potatoes

20   compared to the city.  The city has 4,000 officers.  We are

21   not just talking law officers.  We are talking about the other

22   26 cities, the constables, people that are working for them.

23             So that, in and of itself, is an expense and that

24   person has to be replaced while he is gone.  And I don't know

25   whether you have to do that every year and keep it up because

```
 1    immigration laws change.

 2             So it will be expensive if we do that.  I am not

 3    saying we will, but if we do that, and there will be

 4    additional costs, and we will divert costs away from what we

 5    are primarily responsible to do, which is house violent

 6    offenders, apprehend them, make sure they have their rights in

 7    court and, if they are convicted, send them to prison; if not,

 8    then to release them.

 9             That is what our job is.  That is what law

10    enforcement's job is.  I am not a law enforcement guy.  Let me

11    tell you, the police chief is.  He has been there almost ten

12    years.  Our sheriff is.  They have both said this is a bad law

13    and will help -- hurt law enforcement.

14             MR. DEANE:  Your Honor, objection.  Hearsay.

15             MS. PERALES:  I will move on to the next question.

16             THE COURT:  Move on.  Sustained.  Let's move on.

17    BY MS. PERALES:

18    Q.  Judge, this is my last area of questioning.  What do you

19    believe the impact will be on the community in Bexar County of

20    SB 4 going into effect in terms of officer behavior?

21    A.  You know, we heard the statistics a while ago.  As we all

22    know, they can be turned several different ways.  We don't

23    have any statistics on that, but we do a lot of things out in

24    the community.

25             I know there are exemptions for coming to our Bexar
```

```
1    County hospital.  We have 7,000 people working for us there.
2    We have got several hundred people working for us in the
3    Center for Health Care Services.
4            We have funded something like 13 regional support --
5    we have health fairs.  We have bibliotech libraries that only
6    go into minority areas.  I don't know for sure, but if I was
7    undocumented, I would stay away from anything that the
8    government had anything to do with.  And if I was a family
9    member and had an undocumented person living with me, I would
10   also be a bit concerned about going to various functions.  But
11   I don't know.  I can't tell you that impact, but I think there
12   will be some.
13   Q.  Are you Anglo?
14   A.  I am Anglo.  Do you think they are going to stop me?
15   Huh-uh.
16           (Laughter.)
17   Q.  That was my last question, although I wasn't going to ask
18   it that way.  What do you believe will be the impact of SB 4
19   in terms of law enforcement officers attempting to identify
20   people to question on immigration status?
21   A.  That is important when you say that question.  It is not
22   just law enforcement officers.  It is way beyond that.  It is
23   any employees that we have also working for us.  Well, when
24   71,000 people here are undocumented and 66,000 of them are
25   Hispanic, it would stand to reason, without all of this fluffy
```

```
 1    language in the bill about no racial profiling, it would stand
 2    to reason that you would ask a Hispanic.  And, obviously, a
 3    Hispanic may have a little accent, a little darker skin.  I
 4    call that racial profiling and so does the sheriff and so does
 5    the police chief.
 6              MS. PERALES:  Thank you.  I pass the witness.
 7              THE COURT:  Counselor.
 8              MR. DEANE:  I have a couple of questions for him.
 9                        *-*-*-*-*-*-*-*
10                       CROSS EXAMINATION
11    BY MR. DEANE:
12    Q.  Good afternoon, sir.
13    A.  How are you?
14    Q.  Do you go by Mr. Wolff or Judge Wolff or how should I
15    address you?
16              MS. PERALES:  Call him "Judge."
17              THE WITNESS:  I don't know, but you may have to
18    address me as a former public official soon, but go ahead.
19              (Laughter.)
20    BY MR. DEANE:
21    Q.  Tell us your education.
22    A.  Tell you what?
23    Q.  Your education level.
24    A.  I graduated from high school.  I got a dual degree.  When
25    I got out of law school, I got a business degree as well as a
```

1    law degree from St. Mary's University in 1966.

2    Q.   Okay.  And have you practiced law?

3    A.   Very, very little.  I practiced a little bit of law for a

4    couple of years as we were building our business, so I had not

5    practiced law much.

6    Q.   Okay.  Is Bexar County currently complying with ICE

7    detainers?

8    A.   We are, and we always have.

9    Q.   Okay.  And under the Senate Bill 4, are you aware of the

10   new expedited release program, the seven-day program?

11   A.   Well, we hold them for 48 hours.  I don't know --

12   Q.   I am talking about SB 4, the seven-day release program

13   that is after they are convicted.  Maybe you are not familiar

14   with that.

15   A.   I am not familiar with that.  The only thing I am familiar

16   with is that we hold them for 48 hours after they are

17   sentenced or they are -- whether they have been convicted or

18   put on probation or whatever, we hold them 48 hours after

19   that.

20   Q.   Okay.  It is at Section 42.039 of the Code of Criminal

21   Procedure, SB 4, which is Exhibit 9 --

22   A.   Counselor, could you show me your paper so I can see what

23   that says?

24   Q.   Yes, sir.  It's Number 9 in the defendant's notebook right

25   in front of you.

```
 1    A.   Over here?  I am not sure where this is.  What page?

 2    Q.   It is tab number 9.

 3    A.   Number 9.  Okay.  I am on tab number 9.

 4    Q.   Okay.  Are you on --

 5    A.   I have got page 4.  I am on page 4.

 6    Q.   Okay.  And look for Article 42.039.

 7    A.   Article 42.  I don't want to take up a lot of time here

 8    fooling around.  I think I am getting close.  It is under

 9    Article IV; is that right?

10    Q.   Yes.  I am looking at 42.039.

11    A.   Okay.

12    Q.   Under the Code of Criminal Procedure there.

13    A.   Okay.  Okay.  I guess I got it.

14    Q.   Did you find it?

15    A.   I am on Article IV of Senate Bill 4, and I am looking at

16    4-A?  No?

17    Q.   Have you read Senate Bill 4 --

18    A.   Yes, I have.

19    Q.   -- before today?

20    A.   Yes, I have.

21    Q.   In Senate Bill 4, Article 42.039, "Completion of sentence

22    in federal custody."  Do you see that?

23    A.   Well, no, I don't.  Could somebody -- I don't see it here.

24    Oh.  42.  Tell me that again.  42 what?

25    Q.   It's 42.039.
```

```
1    A.   Okay.  I've got you.

2    Q.   And the title of it is "Completion of sentence in federal

3    custody."

4    A.   I've got you.  Okay.

5    Q.   You found it?

6    A.   Yes.

7    Q.   Okay.  And look under B there.  In a criminal case, it

8    says, described by Subsection (a), the Judge shall, at the

9    time of pronouncement of a sentence of confinement, shall

10   issue an order requiring the secure correctional facility in

11   which the defendant is to be confined and all appropriate

12   government officers, and so forth, to require the defendant to

13   serve in federal custody the final portion of the defendant's

14   sentence, and it says, not to exceed a period of seven days

15   following the facility's or the officer's determination that

16   the change in the place of confinement will facilitate the

17   seamless transfer of the defendant into federal custody.

18            Now, that is brand-new, isn't it?

19   A.   I don't know whether it is new or not.  It is in the bill.

20   I don't know --

21   Q.   It is not currently the law, is it?

22   A.   I guess not.  I don't know.

23   Q.   So the Senate Bill 4 will save the city considerable if

24   there is a seven-day limit on this confinement, correct?

25   A.   Well, we are only holding them for 48 hours.  We are not
```

1    holding them for seven days.

2    Q.  We are talking apples and oranges here, sir.  You are

3    trying to talk about something that is not related to this.  I

4    am asking you about Section 42.039 of the Code of Criminal

5    Procedure.  It is in Senate Bill 4.

6    A.  Well, I guess I just don't get it.  I mean --

7    Q.  You are not familiar --

8    A.  All we do, we only hold 48 hours.  We don't hold seven

9    days.  Anything that they do after that is their own expense.

10   Q.  All right.  Are you familiar with it or not?  That's all I

11   am asking.

12   A.  Well, I guess I am not familiar with it, the way you are

13   explaining it.

14   Q.  So you don't know if it will save you money -- okay.  I

15   will move on.

16          The cost of compliance with Senate Bill 4, are you

17   aware of the sections of 772.0073 of Senate Bill 4 that

18   provide for the grants that you can apply for --

19   A.  Oh, we apply for grants, and sometimes we get them and

20   sometimes we don't.  It is possible we could get some, but as

21   I say, right now, we still haven't been paid for the last 11

22   years that we have expended.

23   Q.  But in your testimony today, you haven't told the Court

24   anything about these grants, correct?

25          MS. PERALES:  Objection.  Mischaracterizes the

1    evidence.

2            THE WITNESS:  A grant is totally worthless unless it

3    is funded and unless I get it.

4            THE COURT:  I will permit -- the question is about

5    these grants in the bill, right?

6            MR. DEANE:  Yes, sir.

7            THE COURT:  Okay.  And your question about that is?

8    BY MR. DEANE:

9    Q.  Have you told the Court today about these grants?  He was

10   talking about the budget process, but he completely omitted

11   these grants.

12   A.  What grant?  It refers to grants, I agree with that, but

13   where is my money?

14   Q.  I am asking, sir, if you don't apply for it, obviously,

15   there is no money?

16   A.  Well, we have applied.

17   Q.  How long have you been a judge, did you tell us?

18   A.  Sixteen years.

19   Q.  Okay.  And if there are grants out there that are

20   available --

21   A.  Oh, we try to apply for most grants unless --

22   Q.  I am sorry.  We both can't talk at the same time.

23   A.  Excuse me.

24   Q.  And I will show you the same courtesy.

25   A.  Excuse me.  I am sorry.

```
1    Q.  So if there are grants out there, wouldn't it make sense
2    to hire somebody in your staff to start looking into getting
3    those grants?
4    A.  We do have someone on staff that does nothing but that.
5    Q.  Okay.  And Senate Bill 4, when it becomes effective on
6    September 1st, there are going to be more grants available, so
7    let me ask you this.  Has your grant guy started working on
8    applications under this new program?
9    A.  No, we haven't yet.  We are hoping it never goes into
10   effect.
11   Q.  So you are just --
12   A.  We haven't started working on it.
13   Q.  -- sitting still hoping the case will stop it --
14   A.  That's right.
15   Q.  -- and you are not going to apply?
16   A.  That's right.
17   Q.  Is that correct?
18   A.  That is correct.
19   Q.  And you are telling the taxpayers of Bexar County that if,
20   for some reason, the Court doesn't stop it, you are going to
21   be sitting there on September 1st with all of these extra
22   costs and you are taking no other actions to try to deal with
23   them; is that correct?
24   A.  Oh, if there is a grant available, we will ask for the
25   grant.  We will do that.
```

1    Q.  But you haven't.

2    A.  Well, it hasn't come into effect yet.  The only thing we

3    have asked for is reimbursement from federal funds with

4    respect to detainers.  That's the only thing we have right now

5    that is an expense.

6    Q.  I see.  And have you started finding a community outreach

7    program under 752.057 of Senate Bill 4?

8    A.  No, we have not.

9    Q.  Okay.  So any of the things that are in the statute that

10   are changing the way the criminal justice system operates in

11   Bexar County, it is fair to say that you haven't done anything

12   to prepare for that; is that correct?

13   A.  Well, I wouldn't say that.  We are looking at a number of

14   things.  We are mostly concerned about the effect of this

15   Court's ruling with respect to us holding people without

16   justification under detainers.  We are reviewing that right

17   now.

18           If the Senate bill does become effective

19   September 1, if there is a grant, and I don't know how much it

20   is or where it is, we will apply for it.  We will do a

21   community outreach, but only if this bill becomes effective,

22   we will start those things.

23   Q.  And you are familiar with the parts of Senate Bill 4 that

24   says if your officers are acting in good faith and if your

25   policy is made in good faith that you can be represented by

```
 1    the State and have the State pay for judgments, if there are

 2    any incurred?

 3    A.   Only if the Attorney General decides to do it.  If he

 4    decides not to, it is on our ticket.

 5    Q.   Okay.  But you are familiar with --

 6    A.   I am familiar with it.

 7    Q.   -- it is in Senate Bill --

 8    A.   I am familiar with it.

 9              MR. DEANE:  Thank you.

10              I pass the witness, Your Honor.

11              MS. PERALES:  No further questions, Your Honor.

12              THE COURT:  Okay.  Thank you, Judge.  You are

13    excused.

14              THE WITNESS:  Thank you.

15              THE COURT:  Okay.  Your next witness.

16              MS. PERALES:  The San Antonio plaintiffs call

17    Councilman Rey Saldana.

18              THE COURT:  All right.

19              COURTROOM DEPUTY:  Please raise your right hand.

20              (Oath administered to the witness.)

21              COURTROOM DEPUTY:  Please have a seat.  Thank you.

22                        *-*-*-*-*-*-*-*

23                     DIRECT EXAMINATION

24    BY MS. PERALES:

25    Q.   Are you ready, Councilman?
```

```
 1   A.  Yes, ma'am.

 2   Q.  Please state your name for the record.

 3   A.  Rey Saldana.

 4   Q.  And can you briefly give us an introduction to your

 5   background and your current employment?

 6   A.  Sure.  So I was born and raised here in San Antonio in the

 7   district that I represent now on the southwest side of San

 8   Antonio.  I have been elected in 2011 to my seat and reelected

 9   again in 2013, '15 and '17.

10   Q.  What district do you represent?

11   A.  District 4.

12   Q.  And in terms of City Council districts, what district did

13   you grow up in?

14   A.  I grew up in District 4.

15   Q.  What are the demographics of District 4?

16   A.  Sure.  So we are roughly over 120,000 residents.

17   Demographics, 80 percent, close to 83 percent are Hispanic or

18   Latino.  The balance, the rest is Anglo, Asian and

19   African-American.

20   Q.  Are some of your constituents immigrants?

21   A.  Yes.

22   Q.  Do some of your constituents live in mixed immigration

23   status families?

24   A.  Yes, mixed status, where there may be a father who is

25   undocumented, a mother who is a citizen, children who are
```

1    citizens.

2    Q.   What committees do you serve on for City Council?

3    A.   I chair the Audit Committee.  I have sat on the Governance

4    Committee and currently sit on the Metropolitan Planning,

5    Organization, and handle -- committee as well.

6    Q.   How many budget cycles have you participated in as a

7    member of City Council?

8    A.   So we are going into -- I will be going into my seventh.

9    We have adopted -- I have been part of adopting six budgets

10   since 2011.

11   Q.   What is the largest portion of the City of San Antonio's

12   budget devoted to?

13   A.   Very clearly, 66 percent goes to public safety, mixed

14   between police and fire, about 751 million.

15   Q.   How many police officers work for the City of San Antonio?

16   A.   We have approximately 2,400 police officers.

17   Q.   And in your work on Council, have you gained familiarity,

18   generally, with how the police department works?

19   A.   Yes.  Absolutely.  In fact, I have enjoyed getting to

20   learn the department not just going through budget processes

21   and having conversations with the police chief, but I have

22   gone on over a dozen police ride-alongs.  I have sat in on

23   in-service training with our police officers.  And we have

24   had, over the last six years, a number of instances where we

25   go out and we attend neighborhood association meetings

1    together, town hall forums, engage in community policing, so

2    it has been a broad spectrum of experience working with the

3    police.

4    Q.  Can you please tell the Court, what is a police

5    ride-along?

6    A.  Sure.  A police ride-along, it is one of the benefits of

7    being on the City Council.  In fact, a citizen can do this.

8    You request to ride on the passenger side of a police officer

9    in his vehicle.  And in my case, I patrolled my district

10   during two shifts.  I have done the late night, overnight

11   shift, they call the dog watch, and then the day shift on the

12   south side of San Antonio.

13   Q.  And through your contact with the police department and

14   the ride-alongs, have you generally developed familiarity with

15   police officers responding to calls, resolving and then

16   returning to the car to get the next call?

17   A.  Yes.  Absolutely.  And the job of our police officers, my

18   hat goes off to anyone -- and I will put our police department

19   up against any in the state.  But we call them to be social

20   workers.  We call them to be divorce mitigators.  We have come

21   to calls where, in many cases, we get stalled up and we will

22   spend 30 minutes working on a domestic violence case.

23           And the problem with, when we spend so much time on

24   specific cases, you go back to the vehicle and you see on your

25   laptop a call log of plenty of other calls for service that

1    are happening throughout the entire city.

2    Q.  And so in that instance that you are describing where a

3    police officer has taken some time on a matter and returns to

4    the car and sees perhaps six other calls, can you give me some

5    understanding of what the nature of those other calls might

6    be?

7    A.  Yes.  So some of them could be a domestic disturbance, a

8    burglary in progress or a burglary that happened, after the

9    fact.  We have had family violence cases.  Typically, on my

10   late-night ride-alongs, it has been violence and -- or

11   domestic abuse cases.  But those start to pile up, and with a

12   number -- a handful of officers out on the patrol beat, it is

13   really tough to catch up.

14   Q.  In the course of your service as a City Council member,

15   have you come to learn information about ICE interactions with

16   the municipal court?

17   A.  Yes, I have.  I have developed a relationship with the

18   head of our municipal court, Judge John Bull.  He informed me

19   about three years ago that there was a request for ICE to have

20   an office within the municipal court.

21          I was told by our municipal court judge that that

22   was a request he denied.  And subsequently, there have been

23   other requests to come into our municipal courtroom, which is

24   sort of disturbing to me to think about the normal

25   transactions that needs to happen in a municipal court.

```
 1              These are individuals paying traffic tickets, coming
 2    in to see about their children on truancy cases.  And for that
 3    reason, the judge reached out to me and explained to me the
 4    circumstances of the ICE communication.
 5    Q.  What was the chief municipal court judge's response to the
 6    request by ICE to come into the courtrooms?
 7    A.  Well, he was concerned that it would affect his ability to
 8    conduct business, normal city transactions, and his response
 9    was that he denied the request that came through.
10    Q.  Are you aware of any requests by ICE for access to the
11    municipal court case management system?
12    A.  I am.  In the same conversation with Judge Bull, he has
13    reported to me that they also wanted access to the case
14    management system at municipal court.
15    Q.  And what was the response of the chief judge of the
16    municipal court to ICE's request for access to the case
17    management system?
18    A.  He denied that request.
19    Q.  If the municipal court asked the Council, City Council to
20    make a policy on this issue of municipal court cooperation
21    with ICE, what would be your response?
22    A.  Well, I was satisfied with his direct action, but if it
23    had come to the point that we, as a City Council, needed to
24    consider, debate and discuss the issue, I would have been
25    happy to lead the cause to ensure that we do endorse and adopt
```

1   a policy that keeps ICE out of us conducting the business we

2   need to as a city.

3   Q.   Does San Antonio have a policy for its police department

4   regarding immigration enforcement?

5   A.   We do.   As of about a year and a half, approximately, I

6   can recall we had a conversation that was actually formalized

7   in our San Antonio police officer's handbook, the policy that

8   police officers would not inquire into a person's status.   The

9   idea behind that was to be very simple in our explanation to

10  the community that if somebody is wearing a San Antonio police

11  officer badge or uniform, they are there to interact with you

12  or perhaps talk to you about a specific crime or incident that

13  they have reported or seen, but they are not there to ask you

14  about status, so we came up with a policy about a year and a

15  half ago to formalize that in the City's handbook.

16  Q.   Does the policy also touch on whether police officers for

17  San Antonio can make arrests based on immigration status?

18  A.   It does.   It mentions that they would not make an arrest

19  based on immigration status.

20  Q.   Besides crime fighting in the police department, what

21  other city services are most important to your district's

22  residents?

23  A.   Sure.   So having served six years, in my experience, the

24  most important aspect of what do we is not only community

25  safety, public safety, but community health, making sure that

1   the community members have access to a number of the different

2   services that we provide, many at low cost.  I will give you

3   just a few examples.

4          The Department of Human Services is a department

5   within the City of San Antonio's organization.  What that

6   department does is, you can call if you are having trouble

7   with your bills in a month, can't pay this month.  We have a

8   utility assistance program, a hot line.  We have sort of a

9   policy.

10          If it is not written, I am not sure; it is formal

11   that we don't ask about status.  If somebody needs to keep

12   their lights on, it doesn't matter really who you are.  That

13   should be a benefit to everyone, access to Metro Health, which

14   is health screenings, immunizations.  We think that is a

15   benefit to the entire city.  And community outreach, that we

16   are interacting with a community who trusts us, to ensure that

17   we are doing our job in keeping the community healthy and

18   safe.

19   Q.  School is out for the summer.  Does San Antonio have any

20   programs for the summer for children?

21   A.  Yes.  Absolutely.  And this is one that sort of speaks to

22   me pretty personally, because I took advantage of them, but

23   also because I had interaction with community members about

24   the time that Senate Bill 4 was being discussed.  This was

25   a -- one of these mixed-status homes.  The mother was

1    undocumented, but she had four American children.  You could

2    tell she had a handful with those children that day that I saw

3    her at a town hall meeting.

4            I mentioned to her, I gave her a ride home, that she

5    had a park right across the street.  Summer was coming along.

6    And what we do with our summer programs, summer youth programs

7    is not only provide an original experience for young people

8    but also provide them with a free meal now that school is out.

9    So, yes, some programs are run by the Parks Department.

10   Q.  And did you say you participated in summer youth programs

11   when you were a young person?

12   A.  Yes.

13   Q.  They are in District 4?

14   A.  They are all over the city, including District 4.

15   Q.  Why is it important to provide a meal during the summer?

16   A.  Well, when you are in this line of work, you will identify

17   pretty quickly that some of the most vulnerable in your

18   community are oftentimes those who are less interactive with

19   the city, and what we try to do is provide a bridge and

20   provide an opportunity for folks to access resources, in this

21   case, a free hot meal that ends once the school lets out.  So

22   it is important for us that people, at the very least, have

23   the basic necessities, in this case, a hot meal, especially

24   for young people.

25   Q.  You mentioned earlier in your testimony that you have been

1    out with San Antonio Police Department officers to

2    neighborhood association meetings.  And can you explain what

3    is SAFFE, S.A. for Fear Free Environment?

4    A.   Sure.  SAFFE officers is what they are called, and they

5    are essentially a subgroup of officers whose sole job, day in

6    and day out, is to be proactive and build relationships with

7    the community members, so they are my right-hand person when

8    we are at neighborhood associations, at town halls.

9         We are having meetings within the community about a

10   specific issue; a crime takes place; we are at that block

11   having a get-together.  And in many cases, they know people by

12   name.  They know their stories.  They know situations in the

13   neighborhoods, and so they are a proactive community policing

14   force.

15   Q.   What is the benefit of having police officers at

16   neighborhood association meetings or engage in other

17   activities in the community with respect to public safety?

18   A.   Well, it is about communicating what is happening in the

19   dist -- not only in the district, but in those neighborhoods.

20   Police officers cannot be at all places at all times.  I say

21   the same thing about my work, that I rely on a community who

22   has their feet on the ground in their neighborhoods to be our

23   eyes and ears when things are going good but also when things

24   are going bad.

25        So communication with these officers, who they feel

1   a specific rapport with, is incredibly important to

2   maintaining community safety in our neighborhoods, just

3   generally in our city.

4            So when we can do those types of things without fear

5   of an officer who is asking about status, which is what the

6   subject is of today, it benefits the entire community.

7   Q.  Are SAPD officers trained to make immigration status

8   inquiries?

9   A.  No.

10  Q.  Are SAPD police officers trained to make immigration

11  determinations, review someone's documents and decide whether

12  they are here lawfully or not?

13  A.  No, they are not.

14  Q.  How would the implementation of SB 4, if it goes into

15  effect on September 1, affect police practices?

16  A.  Well, we will do our best on September 2nd, preparing for

17  what that day may be, but it goes back to the concept of, what

18  do you want the police force to be able to do?  If it is to

19  react to crime and solely to react to crime, then perhaps you

20  don't need to build a relationship with a police officer; your

21  community doesn't need to interact with them, unless they need

22  us.

23            In many cases, what we want to do is build a

24  relationship, a level of confidence that we have been able to

25  do over the last several decades in this city with our

1   community.

2           We think that after Senate Bill 4, that

3   September 2nd, what we will start to see is a chilling effect

4   within our community.  I have experienced these through calls

5   and folks asking me.

6           I have tried my best to explain it, to explain what

7   the world will look like, explain what your interaction with

8   the police officer will look like in both English and Spanish,

9   and it is complicated.  And as a policymaker, in trying to

10  solve problems, simplicity is important for our community.

11  Q.  Shifting away now from community impact to the behavior of

12  individual police officers themselves, you have been on

13  ride-alongs.  You have seen how police manage the flow of

14  work.

15          What do you believe that the impact will be of SB 4

16  on the way police officers carry out their duties?

17  A.  Well, our police officers, as I have said, are stretched

18  so thin already, and I have gone through so many budgeting

19  cycles where we have tried our best to make sure that we are

20  adding more police officers.  We are trying our best to fill

21  vacancies now.

22          So as it is, we are stretched with regard to

23  responding to violent crimes, property crimes, domestic abuse,

24  an issue that I hear about or I see when I have gone on my

25  ride-along.

```
 1              It will make that job much more difficult if we have

 2    to layer on top of that the jobs and responsibilities of

 3    federal ICE agents or federal agents asking and inquiring.

 4    Not only will it break up that bridge that we have established

 5    in the community, but it will make it very difficult for the

 6    police to do their job.

 7    Q.  If Policy 618 goes away because of SB 4, do you believe

 8    that there will be SAPD officers who take time out of their

 9    duties to conduct immigration questioning?

10    A.  Unfortunately, I do.

11    Q.  And what do you believe would be the consequences of that?

12    A.  I believe that if we have even just one instance where an

13    individual feels like they were questioned inappropriately or

14    targeted, which would be racial profiling, which I think is

15    hard to avoid in circumstances, especially in a demographic

16    district like the one I represent, it will have the exact

17    effect that we have all been discussing, which is that folks

18    will no longer be willing to interact, willing to build

19    relationships with the police officers, and when to report

20    crimes, and that has an effect not just on undocumented

21    immigrants but the neighbors who I live with.

22    Q.  How do you believe police officers, if they do decide to

23    question on immigration status, will identify individuals in

24    order to question them?

25              MR. MCCARTY:  Objection, Your Honor.  Calls for
```

```
1    speculation.

2              THE COURT:  I will permit the questioning.  Go

3    ahead.

4              THE WITNESS:  It has been very clear to me that if I

5    am patrol -- as they are patrolling our district that there

6    are specific things that officers look -- they are very

7    well-trained in how to identify dangers, things that somebody

8    who is a potential suspect may be.

9              I don't think that they are particularly trained in

10   how to identify somebody who may be undocumented, but what

11   will happen, as an error or mistake, is they will perhaps find

12   somebody who doesn't speak the language, perhaps find somebody

13   who speaks with an accent, doesn't have an ID or perhaps is

14   dark-skinned.  That is not just my speculation as much as the

15   real fear that I am hearing from the community.

16   BY MS. PERALES:

17   Q.  Do you have an opportunity as a city councilman to observe

18   revenue to the city through sales taxes?

19   A.  I do.

20   Q.  Have you observed any changes in sales tax revenue this

21   year, 2017?

22   A.  Yes.  We are coming up on our -- my seventh budget, coming

23   up in August and September, and we have seen that since

24   January, our sales tax have dipped, and sales tax represents a

25   quarter of our entire budget.  So when folks ask how we keep
```

1    our community safe, how we can add another police academy

2    graduating class, it is making sure that our revenues continue

3    to come in.

4    Q.   Have you had any conversations through your work as a city

5    councilman with other city employees or department heads

6    regarding the potential impact of SB 4 on tourism in San

7    Antonio?

8    A.   Yes, I have.  Since the passing of SB 4 and the signature

9    of SB 4, I have had meetings with the head of our convention

10   and the head of our Convention and Visitors Bureau visit San

11   Antonio.

12          They have discussed getting calls from concerned

13   groups who have canceled or withdrawn or considered canceling

14   or withdrawing in the future, and for a community like San

15   Antonio, where tourism is a huge part of --

16          MR. MCCARTY:  I'm sorry, Your Honor.  Objection.

17   This is hearsay within hearsay.

18          THE COURT:  I will permit it.  Go ahead.

19          THE WITNESS:  So this is directly from our heads of

20   directors who have told us of their concerns that SB 4 will

21   have on the backbone of our industry for the last seven

22   decades, which is tourism.

23   BY MS. PERALES:

24   Q.   Finally, what are the penalties on you for endorsing,

25   adopting or enforcing a policy that prohibits or materially

```
1   limits the enforcement of immigration law?
2   A.  So this is probably one of the most concerning to me as an
3   elected official and me as a person who communicates with
4   other members of my City Council and the mayor.  I don't make
5   as much as the county judge.  So $25,000, because I want to
6   consider writing an op ed and submitting it to the local
7   newspaper, or I want to make a statement against SB 4, and
8   statements that I don't believe are unfounded.
9        You know, I have had conversations with our police
10  chief, who tells me about what the best practices are.  So if
11  Senate Bill 4 passes as is, it could be very difficult for me
12  to withdraw my voice from a community that has given me my
13  seat to speak on their behalf, and my experience has been that
14  they have wanted me to speak up and be their voice.
15       Historically speaking, oftentimes, my side of town
16  never had that voice, so it is incredibly important that the
17  speech that I might have would be restricted in SB 4.  We need
18  to be able to speak our minds and speak our opinions; that
19  means we are endorsing through public statements or adopting
20  through our city budget.
21            MS. PERALES:  Thank you.  I pass the witness.
22            THE COURT:  Okay.  Thank you.
23            MR. MCCARTY:  No questions, Your Honor.
24            THE COURT:  No questions?  Okay.
25            Councilman, you are excused.  Thank you.
```

```
 1              If you will call your next witness.

 2              MS. PERALES:  San Antonio plaintiffs have no further

 3    witnesses.

 4              THE COURT:  Any other witness?

 5              MR. GELERNT:  No, Your Honor.

 6              MR. SIEGEL:  No, Your Honor.

 7              MR. GARZA:  No, Your Honor.

 8              THE COURT:  No?  Okay.  And does the State of Texas

 9    have any witnesses?

10              MR. MCCARTY:  We do not, Your Honor.

11              THE COURT:  Okay.  Well, then, let's move into the

12    oral argument concluding stage.  And who is going to be the

13    first?

14              MR. VERA:  The rebuttal, Your Honor?

15              THE COURT:  Yes.

16              MR. VERA:  I will go first, Judge.

17              THE COURT:  How many minutes do you have left?

18              MR. VERA:  I am sorry.

19              MR. GARZA:  So, Your Honor --

20              MR. VERA:  We are good on rebuttal, Judge.

21              THE COURT:  Okay.

22              MR. GARZA:  I am sorry.  Generally, it has been my

23    experience that plaintiffs open and close.  The State and the

24    United States have reserved time --

25              THE COURT:  Right.
```

```
1              MR. GARZA:  -- after hearing the witnesses.

2              THE COURT:  I understand.

3              MR. GARZA:  So I think we would prefer that they go

4    first and we go last.

5              THE COURT:  All right.  We can do that.  Let's go.

6              MR. STARR:  Brantley Starr for the defendants, Your

7    Honor.  We just want to touch on a few points.  We are not

8    going to take up all of our 37 minutes.  We don't need to.

9              THE COURT:  Okay.

10             MR. STARR:  Your Honor, I think we made clear that

11   there are two key claims here of preemption and --

12             THE REPORTER:  Counsel, you are exceeding the speed

13   limit.  If you want a clear record, you need to slow down.

14             MR. STARR:  I apologize.

15        Two key claims here, preemption, Fourth Amendment.

16   The preemption claim necessarily fails, because SB 4 doesn't

17   force any local law officer to do anything.

18        The Fourth Amendment claim fails because no one had

19   standing to assert a claim vicariously for someone else.

20        The remainder of their claims are all based on

21   speculation of what might happen if Senate Bill 4's rollout

22   goes poorly or someone uses discretion that Senate Bill 4

23   doesn't give.

24        I want to touch on a few points that the witnesses

25   made.  One is the question from the county judge on budgetary
```

1    constraints, that they have significant costs associated

2    with --

3              There is an early release mechanism in Senate Bill

4    4.  Local officials aren't currently aware of it, but it lets

5    inmates out up to seven days early, that they are letting them

6    into ICE custody.  That is unquestionably going to save money

7    on local budgets.

8              But when we talk about money and budgets, all of

9    this is addressed in harm, much of which has been talked about

10   today, but harm really is immaterial to this case, because if

11   they prove their case on a constitutional injury,

12   constitutional injury is presumed to be irreparable harm.

13   That has been the vast focus of the witnesses' testimony here

14   today.

15             THE COURT:  Right.

16             MR. STARR:  Your Honor, we have no further points on

17   the claims unless you have further questions.

18             THE COURT:  No, I don't.

19             What about from the United States?

20             MR. REUVENI:  I have one point to add.

21             THE COURT:  Yes.  Go ahead.

22             MR. REUVENI:  Thank you, Your Honor.

23             Just one quick point, as it did seem to come up

24   during the testimony earlier.  I just want to clarify the new

25   ICE policy effective April 2nd, 2017.

1          A detainer under this policy is never, as a general

2     matter, issued unless and until an individual is arrested for

3     an independent state law basis, and that would be a crime in

4     essentially every instance.

5          It is not a situation which ICE will issue a

6     detainer when there is a roadside stop or if there is a

7     question as to whether an arrest is appropriate.  So under the

8     new policy, a detainer from ICE is never issued unless and

9     until an arrest is made.

10          Nothing further.

11          THE COURT:  All right.  Thank you.

12          Let's begin with the plaintiff.  I will permit just

13     the five plaintiffs to make concluding arguments.

14          Go ahead.

15          MS. PERALES:  Your Honor, just with respect to

16     evidence, the San Antonio plaintiffs had some additional

17     documents that were redacted, copies of detainers received by

18     the Bexar County jail on the new form, because this became an

19     issue when the State and DOJ filed their briefs on Friday.

20          So we worked over the weekend and are preparing now

21     a custodian of records declaration to go with those detainers

22     so the Court can see exactly what is on these new detainer

23     forms.

24          THE COURT:  All right.  Have they been provided to

25     the State?

```
1              MS. PERALES:  We have not yet provided them to the

2    State, and we wanted to make sure that we would be able to put

3    those into evidence, in addition to everything else.

4              THE COURT:  I will permit that and then give the

5    State an opportunity to file whatever objection or concern

6    they may have with the document.

7              MS. PERALES:  Thank you, Your Honor.

8              THE COURT:  Okay.  Any concluding argument from you,

9    Ms. Perales?

10             MS. PERALES:  I believe Mr. Vera is going to go.  We

11   are going to go in order of the cases being filed.

12             THE COURT:  Okay.  Go ahead.

13             MR. VERA:  Thank you, Your Honor.  Just -- I have a

14   quick rebuttal.  And I think you had allotted 20 minutes, so I

15   am just going to take about five and Mr. Gelernt will finish

16   the rest.

17             Just in quick rebuttal, Judge, the State dances

18   around the issue of, it is not mandatory, when it is obvious

19   all over SB 4.  Again, I don't want to reiterate what the

20   federal government says.  I think the Court has said.  But

21   this notion that it is not attacking any single rule -- they

22   must have said that three or four times -- that is a complete

23   falsehood.

24             And it angers not only me but everyone that you have

25   seen testify today, including Representative Hernandez.  When
```

1   Mr. Trump spent six months attacking the Mexican people and

2   declaring war on the Mexican people, to build a wall on the

3   Mexico-U.S. border, and when he vowed to send roundups on the

4   Mexican community, on the immigrant community, he vowed to do

5   that, Congress wouldn't give him the money for that, wouldn't

6   give him money for his wall, so what did they do?

7          Now they have Governor Abbott with his roundup

8   squad, is what SB 4 will do, will build this roundup squad

9   across Texas to vow what they couldn't get out of the United

10  States Congress.

11         That is what SB 4 is about.  They can call it

12  whatever they want to.  They can leave out that magic word

13  saying "Mexican," but that is what they have done, Your Honor.

14         Mr. Gelernt will follow with the rest of the

15  rebuttal.  Thank you, Judge.

16         THE COURT:  Thank you.

17         MR. GELERNT:  Thank you, Your Honor.  I will just be

18  brief.  I just have a couple of discrete points.  One is just

19  a quick cleanup point on the question about the seven-day

20  transfer.

21         I just want to note what it says in the statute,

22  which is that the feds have to consent to taking the person

23  before state custody is over, so that is not an automatic

24  savings for the State.  It is only if the feds decide that

25  they are going to incur the costs and, obviously, we don't

1    know that they are going to incur the costs.

2             The second point I wanted to make, I think, is a

3    point that is an overarching point about what we have heard

4    today and about Texas and the U.S.'s position, is that you

5    asked them a number of pointed questions about what the

6    statute means and whether that will mean a line officer or

7    supervisor or a sheriff has to do a particular thing.  And a

8    lot of the answers were, "Don't worry.  We would never

9    prosecute for that."

10            Well, that is going to be cold comfort for people,

11   as you have heard in some of the live testimony, that is going

12   to be cold comfort for our clients and other police chiefs and

13   line officers and sheriffs and mayors and City Council people.

14   That cannot be the way the law works, when the penalties are

15   so severe.  It would also give an enormous discretion to the

16   Attorney General's Office.

17            So I think, given the penalties and given that they

18   are having to clear things up by saying, "Well, we are

19   ensuring the Court we would not prosecute in that particular

20   situation," essentially, what they are asking this Court to

21   do, then, is to almost provide a detailed blueprint of every

22   scenario in which they would or would not prosecute and having

23   them sign off on it and, obviously, that is not going to be

24   possible.

25            On the vagueness question, I just want to make three

1    discrete, quick points.  One is that there seems to be --

2    Texas seems to have the view that unless we show it would be

3    vague in every single respect, you could not on this facial

4    challenge strike it down on vagueness grounds.

5            That is wrong.  The Supreme Court has clarified that

6    recently in a 2015 opinion, Johnson v. the United States.  And

7    the cite is 135 Supreme Court, 2551, where they have said, no,

8    that is wrong.  To the extent that there were lower courts

9    thinking that they had to find 100 percent of the situations

10   would be vague, that is wrong.

11           And in terms of Texas saying that there are no

12   provisions that are vague, I think we have seen from the live

13   testimony, I think we have seen from the declarations that

14   terms like "materially limit" are necessarily vague.

15           And I would just point you to the case that we cited

16   in our brief, which is Krishna v. Eaves, where words like

17   "hamper" and "impede" were deemed to be too vague, where there

18   are severe penalties.  I mean, "materially limit" in this

19   context, combined with all of the other words, like "informal

20   practice," "informal policy" is going to be the same

21   situation.

22           Both the U.S. and Texas made a big deal of Arizona,

23   the Arizona case and the Supreme Court.  I just want to

24   address that briefly.  One point that Texas made was that the

25   Arizona statute also provided for penalties.  And that -- and

1  they pointed to 2(a)G.  I think it is actually G -- they

2  pointed to H.  I think it is actually G.

3          But in any event, those penalties hit on the agency.

4  They do not hit on individuals, so that is a very different

5  situation.  But in addition -- and the Supreme Court did not

6  actually address the penalties question, but the penalties

7  were very different.

8          In addition, the provision that was upheld is so

9  critically different because it required reasonable suspicion.

10  It did not simply allow an officer to ask for immigration

11  whenever he stops someone.  There had to be objective,

12  reasonable suspicion for him to start that inquiry.  So that

13  is very different.  Also, it had to be practical for him to do

14  it.

15          And the third thing goes to a question you asked a

16  number of people, which is:  Well, what does the officer do

17  with the information?

18          Well, Arizona was very clear.  It is get on the

19  phone to ICE.  Here, we have a situation where it is not clear

20  what they are going to do with the information, whether they

21  are going to get on the phone to ICE, whether they are going

22  to store it in the database and people in various cities

23  around Texas are going to be concerned about what the

24  information is doing, whether they are going to follow the

25  information on their own without calling ICE.

1          So I think for all of those reasons, Arizona is very

2     different.

3          Another discrete point is on the equal protection

4     claim.  I think there was some mention that the Supreme

5     Court's decision in Michigan v. Schuette only applied to race

6     relations.  That is wrong.

7          The Supreme Court rejected that and said it applies

8     to discrimination generally.  There was no way that the

9     document only applied to race relations.  And in any event, we

10    do believe that the protective policies that the localities

11    want to put into place here is to protect against racial

12    discrimination, but I just wanted to clear that up about the

13    Supreme Court case.

14         On the detainer question, I want to address very

15    briefly the U.S.'s point that, well, what do we want to do

16    here?  You know, what we are concerned with is that -- and I

17    mean, actually, I should step back.

18         We believe your decision was correct.  They

19    obviously do not believe it is correct, that there needs to be

20    probable cause of a crime.  But I want to address the sort of

21    more narrow alternative case, if the Court decides it is going

22    to go our way, to put in more than one rationale for why the

23    detainer provisions violate the Fourth Amendment, and that is

24    that there is not probable cause necessarily -- that the

25    cities, the localities are precluded from making a

1   determination about probable cause, and it is for a couple of

2   reasons.

3          First of all, there could be -- probable cause even

4   if the person has lawful immigration status, if the form is

5   not filled out correctly, because then there is not a correct

6   passing of information.

7          But the other problem is, that very often there is

8   just going to be uncertainty about what the person's status

9   is, because the local official may know that family.  He may

10  have some other reason.  They may have a document.  He is not

11  sure whether that proves lawful status.  If he is not sure, he

12  should not be authorizing an arrest that is an additional

13  detention for 48 hours.

14         He should have the ability to say:  No, I am not

15  going to authorize it.  SB 4 does not permit it.  It only

16  permits him to refuse to honor that detainer if he has proof

17  of lawful status.

18         Well, that is almost impossible for a local official

19  to be sure he has proof.  And, again, I would refer the Court

20  to the Bacon declaration, which sets out all of that

21  complexity about how he is not going to have proof.

22         And the last thing I would just end on, because I

23  know there were some atmospherics about, well, the executive

24  is here and he is saying we want this and Texas is saying --

25  you know, as sort of an initial point, I would just note

1    something the Court obviously knows, is that the

2    administration was on the other side in Arizona, so the

3    executive has taken a different position here.

4            But beyond that -- and I think the U.S. would

5    concede this -- Congress ultimately controls, and it is

6    congressional provisions that control preemption analysis, not

7    what the executive comes here and tells you.  Obviously, it

8    would have to go by what Congress enacted.

9            And in that respect, it is critical to look at, I

10   think, all of the provisions we have cited, particularly at

11   page 14 of our PI brief.

12           There are just numerous provisions that talk about

13   both the state and political subdivision and it being

14   voluntary whether they want to engage in something, and where

15   Congress didn't want it to be voluntary, they specifically

16   said so in 1373.

17           And so the U.S. and Texas said:  Well, the feds

18   don't care how you allocate power within the state.  Well,

19   that is simply not true.

20           Congress made a point in these provisions of saying

21   the state and a political subdivision, making it very clear

22   they were giving the choice to both the state and the

23   political subdivisions whether or not to engage in immigration

24   enforcement, and it was going to be voluntary for both of

25   them.

1              They didn't allow the state to just bigfoot the

2    cities and say:  You are now going to enforce immigration law.

3              Unless there are further questions, Your Honor,

4    thank you.

5              THE COURT:  No.  I have none.

6              The next plaintiff.

7              MR. GARZA:  Your Honor, I will not address the same

8    issues that my colleagues have addressed.

9              THE COURT:  All right.

10             MR. GARZA:   I will focus on other matters.  To

11   begin with, Your Honor, first, I would ask to move into

12   evidence Exhibits 201 through 218.  The defendants have only

13   objected to these exhibits on issues of relevance.  Clearly,

14   all of these exhibits --

15             THE COURT:  Okay.  I will give it whatever weight it

16   deserves.  Okay.  Go ahead.  Anything else?

17             MR. GARZA:  Yes.  The primary aspect or the primary

18   issue that I would like to address with the Court is the

19   question of preliminary injunction for -- in terms of the

20   likelihood of success, on the question of whether this bill

21   was adopted with a discriminatory intent.

22             As this Court knows, the standards for that look at

23   a number of issues that have been articulated by the Fifth

24   Circuit in the Veecee case and by the Supreme Court in the

25   Village of Arlington Heights case.

1            And the evidence in this case, I think, is extremely

2     strong.  Not only the testimony of Representative Hernandez

3     today, but also the declarations that have been submitted to

4     the Court as Exhibit 213 -- Fisher; 206, Representative Eddie

5     Rodriguez; 202, Representative -- Senator Jose Rodriguez.

6     Representative -- Exhibit 208, the exhibit list -- the witness

7     list of people who testified before the hearing, at Exhibit

8     No. 208.

9            The calendar minutes that show that this bill was in

10    calendars for less than an hour, 48 minutes, is Exhibit 209.

11    The House Journal that details the highly charged debate on

12    the House floor at Exhibit 210.

13           All of those things show most of the factors that

14    have been articulated by the Fifth Circuit and by the Village

15    of Arlington Heights and I think form the bases for a

16    likelihood of success on the merits.

17           The testimony of County Attorney Bernal, which

18    emphasized the relationship that they currently have with the

19    federal government in terms of enforcing requests and how that

20    is going to be changed as a result of SB 4, which was then

21    supported by the expert that was submitted by the City of

22    Austin, Dr. Wang, who talked about a DOJ study that showed in

23    Texas there was 100-percent compliance with federal

24    immigration law, as evaluated by the United States.

25           There was no purpose, there was no need for the

1      adoption of SB 4 to accomplish the goals that they were

2      articulating through that bill.

3              So with that, Your Honor, we would ask that this

4      Court grant the injunction that has been asked for by the

5      plaintiffs.  Thank you.

6              THE COURT:  Okay.  Let's talk about the venue

7      question that has been raised before.  Go ahead.

8              MR. GARZA:  So the venue question in this court, the

9      plaintiffs, the El Paso plaintiffs are joined in their lawsuit

10     by two organizations that have -- that are established here in

11     Bexar County, in San Antonio, with membership to those

12     organizations that will be directly affected by the provisions

13     of SB 4.

14             These organizations are community-based advocacy

15     organizations who do not restrict their membership to United

16     States citizens or legal residents.  Many of them are, in

17     fact, here undocumented.

18             And this is clearly the target of SB 4.  So we

19     believe we have standing in San Antonio through the joint

20     plaintiffs that we have in our --

21             THE COURT:  All right.

22             MR. MCCARTY:  Your Honor, can I address that?

23             THE COURT:  Yes.  Of course.

24             MR. MCCARTY:  Thank you, Your Honor.  The State of

25     Texas' position on venue in this case is very narrow.  We

1      suggest, Your Honor, that this is a pre-enforcement facial

2      challenge to a law that was enacted by the State legislature

3      and signed into law in Austin, Texas by the Governor.

4              The Texas Constitution makes it quite clear that the

5      seated government for the State of Texas is Austin, Texas,

6      that the residence of the governor is in Austin, Texas; and

7      certainly, the Attorney General and the other defendant here,

8      the Director of Public Safety for the State of Texas, are

9      based there.

10             In other words, all of the defendants reside in

11     Austin, Texas.  Furthermore, Your Honor, the State legislature

12     and the Governor signed the law into being in Austin, Texas.

13     We heard testimony today concerning legislature's acts from

14     one of the state representatives in Austin, Texas.

15             However, this is not a situation where events,

16     substantial events related to the enforcement, for instance,

17     of the law, which might be the case in an administrative

18     action, took place in a different place, in a different venue.

19     Here, it is very narrow.

20             And, Your Honor, just a point on the district versus

21     division issue, because I think that is something that

22     plaintiffs have made a lot of.  And it is this, Your Honor.

23     The United States, as a separate sovereign, has one locality,

24     Washington, D.C.

25             There have been cases, a Florida nursing home case,

1    for instance, Your Honor, in an administrative action, where a

2    case was brought in the Southern District of Florida instead

3    of the Northern District of Florida, where Tallahassee, the

4    state capital, is located, and the Fifth Circuit found that it

5    was acceptable because it was a large regional administrative

6    office involving that agency in the Southern District of

7    Florida.

8         Here, it is not the same.  It is very different.

9    And we have, instead, a judicial district, as this Court is

10   well aware, in the Western District of Texas that takes into

11   account a lot of geography.

12        And what plaintiffs argue in the district versus

13   division distinction is very simple.  They say Western

14   District of Texas, that's what matters, period, full stop.

15        Your Honor, I would suggest that it is somewhat

16   arbitrary to hold that the State of Texas, a separate

17   sovereign, can be sued anywhere in the Western District; in

18   other words, the State of Texas can be routinely sued in

19   Midland or El Paso because it is in the Western District of

20   Texas, where Austin is, but it can't be sued from Houston or

21   Dallas.  That doesn't make any sense.

22        THE COURT:  Okay.

23        MR. MCCARTY:  The State of Texas as a separate --

24   (coughing in background) -- is entitled to the same dignity

25   that the federal government has as a sovereign in Washington,

```
 1   D.C.
 2               THE COURT:  Okay.
 3               MR. MCCARTY:  That's all I have, Your Honor.
 4               THE COURT:  So what you are also saying is that if
 5   there is ever a constitutional challenge and there are only
 6   two or three defendants and all those officeholders are in
 7   Austin, the only venue that that case could be brought in is
 8   Austin?
 9               MR. MCCARTY:  Well, Your Honor, I think here, I am
10   not necessarily saying that.  I am saying here, this case
11   particularly is limited to pre-enforcement, facial challenge
12   to the constitutionality of the bill.  So if there is a
13   constitutional challenge, for instance, post-enactment, an
14   enforcement challenge or an as-applied challenge, it may be
15   that the substantial portion of the events arose somewhere
16   else.
17               THE COURT:  Okay.
18               MR. MCCARTY:  Okay?  That's a different situation
19   than what we have here.
20               THE COURT:  Okay.  Thank you.
21               The next plaintiff.
22               MS. PERALES:  Your Honor, the San Antonio
23   plaintiffs, we would like to move the admission of our
24   exhibits, Number 301 through 317.  We have disclosed to the
25   State Exhibits 318 and 319, and Exhibit 320 is the custodian
```

```
 1      of records exhibit that we are working on for the State.  I
 2      would move the admission of all of them, or in whatever manner
 3      the Court wants to take it.
 4              THE COURT:  Okay.  Any objection over here?
 5              MR. STARR:  Your Honor, we object on relevance
 6      grounds.
 7              THE COURT:  Okay.  Then I will give it whatever
 8      weight it deserves.
 9              Okay.  Anything else?
10              MS. PERALES:  Thank you.  Just one note with respect
11      to venue, Your Honor.  It was surprising to hear about a
12      pre-enforcement constitutional challenge being only
13      appropriate at the seat of government, and the specific
14      discussion about the United States, because just very
15      recently, the State of Texas sued the United States in the
16      Southern District of Texas, in Brownsville, Texas, and had its
17      case heard by Judge Hanen with respect to the President's
18      initiative known as deferred action for parents of American
19      citizens.
20              The State did not raise a venue concern with respect
21      to our lawsuit regarding HB 11, which was heard by Judge Ezra
22      last year.  And I also believe we are trying a redistricting
23      case in this Court also against the State of Texas.  So
24      perhaps it is just surprising and a new set of arguments in
25      light of everything that has come up to today.
```

1          With respect to a few final notes on this case, it

2     seems, having read the briefs of the Department of Justice and

3     Texas, and listening to the arguments today, that the strategy

4     with respect to SB 4 by the defendants, and those aligned with

5     them, is to weed away most of the statute, to either say that

6     terms in the statute don't mean what they plainly mean, such

7     as the word "endorse" or "enforcement assistance," to either

8     just say they don't mean what they mean or simply to ignore

9     chunks of the statute as well.

10          Throughout its statement of interest, the United

11    States consistently characterizes SB 4 as a statute about

12    sharing information.  We do have a federal statute about

13    sharing information, 8 USC 1373.

14          It says local jurisdictions cannot prevent their

15    employees from sharing immigration status information with the

16    federal government.

17          We already have that law.  And in that situation, SB

18    4 would have been completely redundant and irrelevant.  SB

19    4 is about a great deal more than what DOJ's statement of

20    interest says it is.  It is about more than information

21    sharing, which we can all agree, with respect to immigration

22    status, is legal and has been legal.

23          And it appears that the Department of Justice's

24    statement of interest essentially cedes all of the remaining

25    arguments about the remaining provisions of this statute.

1          The State of Texas similarly mischaracterizes SB

2     4 as simply permitting or authorizing local officers to

3     inquire about immigration status and never addresses any other

4     part of the statute.

5          So on closing, we wanted to make a point that Texas

6     cannot resolve the constitutional problems brought up by SB 4

7     by describing it other than what it is or by ignoring portions

8     of it.

9          It is undisputed that the state and local

10    cooperation scheme in federal law turns on federal supervision

11    and federal direction, and I believe it was the Department of

12    Justice that said here today that if a local officer went out

13    to enforce immigration law, not at the request of the federal

14    government, that it would be unconstitutional, but that is

15    exactly what SB 4 does, because it doesn't tie any of its

16    provisions to federal requests -- other than detainers --

17    federal training or federal direction.

18          Not only are local officers left unmoored to federal

19    discretion or federal requests, but because SB 4 ties the

20    hands of sheriffs, police chiefs and all policymakers to put

21    any kind of limits on their immigration inquiries and

22    enforcement activities, police officers now have nobody to

23    supervise them in these activities.

24          You know, Texas said today:  As the AG's Office, we

25    wouldn't go after that sheriff.  In the situation that was

1    presented by Council was that the sheriff just said:  You know

2    what?  Today we can't cooperate.  We don't have the resources

3    to cooperate with federal enforcement activities.  We have to

4    take a break today because we just don't have the people

5    power, the resources.

6           Well, putting aside the fact that that is testimony,

7    what if Chief McManus wakes up every day and says that he

8    doesn't have the resources and embodies that in policy?  That

9    is exactly what violates SB 4, and so these instances of

10   attempting to kind of read away or ignore or dismiss parts of

11   the statute are unavailing and have been unable to resolve the

12   constitutional issues raised by the plaintiffs.

13          Thank you.

14          THE COURT:  All right.  Anyone else?

15          MR. SIEGEL:  Thank you, Your Honor.  Brief

16   housekeeping on behalf of the El Cenizo plaintiffs, the Travis

17   County plaintiffs in Austin, we would like to move Plaintiff's

18   Exhibits 1 through 9, 101 and 401 and 429 into evidence.  I

19   believe there are objections to relevance.

20          THE COURT:  Any objections?

21          MR. STARR:  Object to relevance, Your Honor.

22          THE COURT:  Okay.  I will give it whatever weight it

23   deserves.

24          Anything else?

25          MR. SIEGEL:  Yes, Your Honor.  As to the home rule

 1      claim, the Texas response to the City's motion states the

 2      standard of review and that there must be a rational

 3      relationship between SB 4 and the asserted governmental

 4      interest.

 5              The State says public safety is their interest, but

 6      offers no evidence that SB 4 will make Texas safer.  And the

 7      plaintiffs offer a lot of evidence showing that SB 4 will

 8      break down the public trust, will cause victims to not report

 9      crimes, will cause witnesses to not come forward and will make

10      our communities less safe.

11              As to the Fourth Amendment, the City of Austin does

12      not operate our own jail, but we are concerned that SB 4 will

13      impact the tens of thousands of times each year that our

14      officers conduct a Terry stop.

15              Section 752.053(b)1 of SB 4 requires Austin to

16      prevent -- it prevents us from limiting the individual

17      officers from conducting an immigration inquiry of any person

18      subject to lawful detention.

19              Our police do this every day, dozens of times a day.

20      We conduct over 100,000 traffic stops each year.  Under the

21      Fifth Circuit's precedent, each time an Austin officer

22      prolongs the detention to investigate a person's immigration

23      status, we can be held liable for a violation of the Fourth

24      Amendment.

25              In other words, if we comply with SB 4, we will be a

1    target for Monell liability claims, because we will have a

2    policy, custom or practice of permitting unlawful

3    investigations.

4             Interestingly, the State's own evidence shows that

5    the Department of Public Safety does not permit its officers

6    to conduct immigration investigations unless there is a,

7    quote, reasonable suspicion of unlawful presence.

8             That same restriction, if DPS were subject to SB 4,

9    would be a violation of the law, because it is a policy

10   materially limiting immigration investigations.  This

11   admission, that by its plain language SB 4 will permit

12   unreasonable and unconstitutional detentions, supports

13   plaintiff's claims for injunctive relief.

14            And finally, as to the danger of imminent harm if SB

15   4 takes effect, the State and federal government have admitted

16   that they have targeted Austin, that they targeted Travis

17   County, because our voters elected a sheriff who promised to

18   only respond to detainer requests under certain conditions,

19   because Sheriff Hernandez vowed to honor the Fourth Amendment;

20   and because she indicated she would not needlessly expend

21   local resources on immigration enforcement, Governor Abbott

22   promised to hammer our community and ICE decided to conduct

23   retaliatory raids.

24            The transcript from Judge Austin's courtroom on

25   March 20, 2017 provides an extraordinary window into the

```
 1    concerted efforts of the Abbott administration and the Trump

 2    administration to stifle local control and to repress the

 3    policy preferences of Travis County voters.

 4           In Judge Austin's courtroom, a deportation officer

 5    with ICE admitted that the February operations in central

 6    Texas were as a result of Sheriff Hernandez's new policy.  As

 7    the record establishes, as Professor Wong's testimony

 8    highlights, those retaliatory operations had a tremendous

 9    negative impact on our community.

10           Students were prevented from attending school,

11    damaging their opportunity to obtain an education.  Low-income

12    mothers and children were deterred from accepting governmental

13    support, support that saves lives and ensures healthy births.

14    Our community was made less safe because victims of crimes

15    were scared to cooperate.

16           This evidence establishes that the immigrant

17    community was injured, that U.S. citizens were injured, that

18    public institutions were injured.  This testimony and evidence

19    establishes that Hispanic students and students who attend

20    predominantly Hispanic schools and low-income Hispanic

21    mothers, infants and children were subject to specific harms,

22    and these operations were just a snapshot of what life will be

23    like under SB 4.

24           As Governor Abbott indicated, he is willing to

25    hammer any community that opposes his policy preferences.
```

1          Under SB 4, there will be nothing to stop the

2     governor from calling a friendly federal administration,

3     continuing to seek ICE operations that harm immigrants, family

4     members of immigrants, Hispanic Texans and the broader

5     community.

6          In order to prevent such retaliation, to safeguard

7     the rights of our constituents, we ask this Court to issue

8     injunctive relief.

9          THE COURT:  All right.  Any other plaintiff?

10          MR. MCCARTY:  Your Honor, one other -- one matter.

11     I don't know that we have moved to admit our exhibits.  I

12     don't believe we had any objection, but defendants move to --

13          THE COURT:  And those are what numbers?

14          MR. MCCARTY:  Defendant's Exhibits 1 through 30.

15          THE COURT:  Okay.  Thank you.

16          MS. THOMAS:  Your Honor, the Travis County Sheriff's

17     Office and Travis County have taken steps to ensure a safe

18     community and to advocate for its constituents.  What is clear

19     today is that the version of SB 4 that the State reads and the

20     version that the plaintiffs have are very different.

21          And with that much confusion and the way the statute

22     is written, it is imperative that the Court enter a

23     preliminary injunction, in light of the irreparable harm that

24     is at stake.

25          With the criminal penalties and the removal statute

```
 1    in place, it is very difficult for electeds to know what they
 2    can and can't do.  And unfortunately, the way the AG reads it
 3    isn't enough solace for the elected officials.
 4           They know Governor Abbott's statements, that he is
 5    going to hammer them, and that is an unfortunate place to be
 6    with a statute like this, when the electeds don't know what
 7    they can and can't do.  And with that, Your Honor, we ask that
 8    the Court --
 9           THE COURT:  Okay.  Anyone else?  Anything else from
10    the State?
11           MR. STARR:  No.
12           THE COURT:  All right.  Then I will review the
13    briefs, the exhibits and, importantly, the law and render a
14    decision some time -- I should tell the parties that I will be
15    involved in the redistricting case that is before this Court
16    in July for six full days, and that may require immediate
17    attention, given the election cycles, that is, provided if the
18    plaintiffs should prevail.
19           And so I don't know exactly when this decision will
20    be issued, but the Court will be working extensively on it,
21    reviewing documents, reviewing the law.  And the Court is --
22    let me just say, I am very grateful to both sides for
23    excellent lawyers, excellent briefs.
24           It always makes the judge's decision-making easier,
25    not 100-percent easy, but easier when you have excellent
```

1    lawyers and excellent briefs.  The State's brief was very

2    lengthy and actually quite good.  And so with that, we will

3    be -- yes.

4                MS. PERALES:  Excuse me.  Your Honor, the San

5    Antonio plaintiffs had originally moved for a longer schedule,

6    and the Court gave us this schedule here because of the

7    Court's commitments, but suggested that if we were truncated

8    in the time we had to prepare our brief that we could do

9    post-hearing briefs.  I am not sure if that is still --

10               THE COURT:  Yes.  I am going to consider the time

11   schedule and be issuing an advisorial order, and if any party

12   wishes to submit an additional brief, we will consider that

13   and the schedule.

14               MS. PERALES:  Thank you, Your Honor.

15               THE COURT:  Okay.  Now, I know you are tied up with

16   redistricting also.

17               Anything else?

18               MS. PEDDIEE:  Excuse me, Your Honor.  On the

19   post-hearing briefs, when does the Court need those by?

20               THE COURT:  Well, that is what I am going to

21   consider and will get back with you.  Okay?

22               Thank you, and you all are excused.

23               *-*-*-*-*-*-*-*

24

25

1                              *–*–*–*–*–*–*–*

2      UNITED STATES DISTRICT COURT )

3      WESTERN DISTRICT OF TEXAS     )

4              I certify that the foregoing is a correct transcript

5      from the record of proceedings in the above-entitled matter.

6      I further certify that the transcript fees and format comply

7      with those prescribed by the Court and the Judicial Conference

8      of the United States.

9      Date signed:  July 1, 2017.

10

11                              /s/ Karl H. Myers

12                              _____
                                **KARL H. MYERS, CSR, RMR, CRR**
                                Official Court Reporter
13                              655 East Durango Blvd., Suite 315
                                San Antonio, Texas 78206
14                              (210) 244-5037

15

16

17

18

19

20

21

22

23

24

25