# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CITY OF EL CENIZO, TEXAS, *et al.*, | § | |
|     Plaintiffs | § | |
| | § | |
| | § | CIVIL ACTION NO. 5:17-cv-404-OLG |
| v. | § | |
| | § | |
| STATE OF TEXAS, *et al.*, | § | |
|     Defendants | § | |

**BRIEF OF AMICUS CURIAE VINCE RYAN, HARRIS COUNTY ATTORNEY
IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

I.  Statement of Interest of the Harris County Attorney's Office: S.B. 4 Creates
    Fundamental Conflicts for County Attorneys who are Obligated in Child Welfare
    Cases to Protect the Best Interests of Children and Preserve Family Unity. ...................... 2

II.  The Laws of Child Welfare Require that Children's Best Interests Come First,
     Regardless of the Immigration Status of the Children or Parents Involved. ...................... 5

III.  S.B. 4 Conflicts with the Federal and State Laws Applicable to Child Welfare
      Cases, Will Force County Attorneys to Violate their Duty to Prioritize Children's
      Best Interests, and Cause Irreparable Harm to Children in State Care ............................ 10

      A.  S.B. 4's sweeping language encompasses county attorneys' work in DFPS
          cases. ....................................................................................................................... 10

      B.  S.B. 4's unequivocal requirement that county attorneys assist in enforcing
          immigration laws conflicts with the mandates of the child welfare system,
          violating the constitutional rights of children and placing attorneys in an
          irreconcilable conflict. ........................................................................................... 12

      C.  Unless enjoined, S.B. 4 poses an immediate threat to the ethical duties of
          attorneys and more pointedly to the safety and constitutional rights of
          children. ................................................................................................................... 14

IV.  Conclusion ...................................................................................................................... 20

## INTRODUCTION

Vince Ryan, Harris County Attorney, submits this *Amicus Curiae* brief in support of the Plaintiffs' Motions for Preliminary Injunction.  Should S.B. 4 be allowed to take effect, serious and irreparable damage will be done to the children involved in our State's child welfare system. As County Attorney, it is my office's responsibility to represent the Texas Department of Family and Protective Services ("DFPS") when it is necessary for the State to petition for custody of children who have been subjected to abuse or neglect.  Federal and State law, and the policies set forth by DFPS, all provide that the primary goal of our child protection system is to serve the best interests of the children involved, and to prioritize efforts to rehabilitate and preserve the family unit, including by placing children with relatives and those close to a child's family, in order to lessen the trauma children experience when they are removed from their home.

Because of the breadth of the language of S.B. 4, its provisions encompass county attorneys who represent DFPS and who are ethically bound to pursue the best interests of children through efforts to reunify them with their families.  By mandating county attorneys cooperate in the enforcement of immigration laws — prioritizing immigration over other duties — S.B. 4 creates an irreconcilable conflict between the priority given by our State to the preservation of the family, and the requirement that county attorneys engage in efforts which will lead to deporting parents — including those of citizen children — and the destruction of families. Plainly, children will suffer as a result.

S.B. 4's harm to children will arrive in a variety of ways.  Immigrant communities who fear local government involvement with immigration enforcement will no longer come forward to report abuse in the first place, provide necessary information and evidence to protect children, or volunteer as relative or kinship placements to ensure children are not needlessly placed in foster care.  Unauthorized immigrant parents who are detained because of S.B. 4's enlistment of

a broad range of local officials and employees as federal immigration agents will no longer be able to participate in the services necessary to reunify them with their children.  Thus, children who are well-cared for will be forced into an already overburdened foster care system[1] only because their parents are undocumented and subject to detention and deportation proceedings initiated not by federal agents, but by local government actors.  As a result, children will remain in abusive circumstances, fewer children will be able to maintain ties to their families and communities, and more children will languish in the State's care.  For these reasons, and as set out more fully below, this Court should enjoin S.B. 4 from taking effect in order to prevent the irreparable and incurable trauma the bill will impose on the children involved in our State's child protection system.

I.      **Statement of Interest of the Harris County Attorney's Office: S.B. 4 Creates Fundamental Conflicts for County Attorneys who are Obligated in Child Welfare Cases to Protect the Best Interests of Children and Preserve Family Unity.**

The Office of the Harris County Attorney ("HCAO") provides legal representation to DFPS, elected officials, and employees in all civil matters in the largest county in Texas, with a population of approximately four and one-half million people. Harris County is also one of the most diverse counties in the United States, and includes significant immigrant communities from all over the world. Harris County is the most diverse metropolitan area in the United States.[2]

---

[1] The Court should take judicial notice of ongoing proceedings in the Southern District of Texas regarding the treatment of foster youth in the Texas system. *See M.D. v. Abbott*, Civ. A. No. 2-11-cv-84, 152 F. Supp. 3d 684, 823, 828 (S.D. Tex. 2015) (requiring a special master to assist in crafting a remedy to bring DFPS in compliance with the Constitution).

[2] Kinder Inst. for Urban Research, Rice University, *The 2012 Houston Education Survey:  Public Perceptions at a Critical Time*, at 7; Grantmakers Concerned with Immigrants and Refugees, *Stronger Together:  Immigrants, Refugees, and the Future of Texas*, at 2 (May 2016), *available at* http://www.immigrationresearch-info.org/report/other/stronger-together-immigrants-refugees-and-future-texas.

The Houston metropolitan area has more unauthorized immigrants than any area in Texas and the third most of any urban area in the country.[3]

Given the immigration patterns of the last few decades, the bulk of the unauthorized immigrants in Harris County are of working age, rather than children or young adults.[4] While 38% of 25-to-44 year olds in Harris County are foreign-born, only 14% of 16-to-18 year olds are foreign born.[5]  Of parents with at least one child under 18 in Harris County, 43% are immigrants or refugees.[6]

A significant portion of K-12 students have unauthorized immigrant parents.  For Texas, 13.4% of all K-12 students have unauthorized immigrant parents.[7]  Of those students nationally, as of 2014, 81% are U.S. born and thus citizens.[8]

Harris County also has a high proportion of U.S. citizen children of unauthorized immigrant parents.  In Harris County, 36% of unauthorized immigrants have at least one U.S. citizen child living at home.[9]  Immigrant communities include many children who are United States citizens and have parents and other adult relatives who are undocumented.  One-third of children in Texas have at least one immigrant parent, and at least 80% of these children are U.S.-

---

[3] Jeffrey S. Passel and D'Vera Cohn, Pew Research Center, *20 Metro Areas are Home to Six-in-Ten Unauthorized Immigrants in the U.S.*, (Feb. 2017), *available at* http://www.pewresearch.org/fact-tank/2017/02/09/us-metro-areas-unauthorized-immigrants/.

[4] Margie McHugh and Madeleine Morawski, Migration Policy Inst., *Immigration and WIOA Services:  Comparison of Sociodemographic Characteristics of Native- and Foreign-Born Adults in Harris County, Texas* (April 2016), *available a*t http://www.houstonimmigration.org/research/.

[5] *Id*. at 2.

[6] *Id*. at 7.

[7] Pew Research Center, *Children of Unauthorized Immigrants Represent Rising Share of K-12 Students* (Nov. 2016), *available at* http://www.pewresearch.org/fact-tank/2016/11/17/children-of-unauthorized-immigrants-represent-rising-share-of-k-12-students/.

[8] *Id*.

[9] Migration Policy Inst., *Profile of Unauthorized Population:  Harris County, Tx*., *available at* http://www.migrationpolicy.org/data/unauthorized-immigrant-population/county/48201.

born citizens.[10]  This pattern of unauthorized parents with U.S. citizen children is not surprising given that immigration from Mexico, the country of origin for the vast majority of immigrants in Texas, peaked in 2007 and has been declining since.[11]

Under the Texas Constitution and other laws of the State, the HCAO has the responsibility to represent the DFPS in child protection cases.  TEX. CONST. art. V, § 21; TEX. FAM. CODE ANN. § 264.009 (West 2015); TEX. GOV'T CODE § 45.201.  The HCAO files approximately 1,400 cases each year on behalf of DFPS, and currently provides legal representation to DFPS in close to 3,000 active cases involving roughly 4,600 children in the State's temporary or permanent care.  Throughout the course of each case, HCAO attorneys work closely with DFPS in its efforts to investigate allegations of child abuse and neglect, locate relatives or "kinship" care providers who might care for children during the pendency of these cases, and ensure that parents are provided with rehabilitative services in the effort to reunify families.  Moreover, in every case, as legal representatives, HCAO attorneys are ethically bound to advocate for DFPS in its obligation to provide for children's best interests and to preserve families where possible.

Given that S.B. 4 compels these same attorneys to cooperate in efforts which will lead to the deportation of parents or kinship caregivers, the separation of families, and further trauma to children, the new law presents clear conflicts with Federal and State laws, as well as DFPS's purpose as stated in its policies, which require efforts to protect children and to maintain the unity of their families without regard to their immigration status.  The HCAO therefore has a

---

[10] Grantmakers Concerned with Immigrants and Refugees, *Stronger Together:  Immigrants, Refugees, and the Future of Texas*, at 4 (May 2016) (analyzing Migration Policy Institute data), *available at* http://www.houstonimmigration.org/research/.

[11] *See* Passel, Jeffery S. and D'Vera Cohn, Pew Research Center, *Overall Number of U.S. Unauthorized Immigrants Holds Steady Since 2009:  Decline in share from Mexico mostly offset by growth from Asia, Central America and sub-Saharan Africa*, at 5 (Sept. 2016) (*See* Doc. 104, Order).

significant interest in precluding the application of S.B. 4 in order to protect against the irreparable harm it will do Texas children.

## II.     The Laws of Child Welfare Require that Children's Best Interests Come First, Regardless of the Immigration Status of the Children or Parents Involved.

The Federal and State laws which provide the purpose and structure of Texas' child protection process, along with the DFPS policies, dictate that the primary consideration in all cases is to serve the best interests of children, and that DFPS make efforts to preserve and reunify families. *See* 42 U.S.C. § 671(a)(15); TEX. FAM. CODE ANN. § 153.002 (West 2015); TEX. DEP'T. OF FAMILY & PROT. SERVS., CHILD PROTECTIVE SERVICES HANDBOOK § 1100 [hereinafter "CPS HANDBOOK"].[12]   Moreover, the priority given to children's best interests and family reunification applies to all children and families in the child welfare system, citizen and undocumented alike.

Texas' child protection process is controlled by federal law, which conditions funding for foster care and adoption assistance on Texas' compliance with federal mandates. *See* CPS HANDBOOK, §§ 1222-1225.  As Texas makes use of these funds, it is required as part of its child protection system to provide that "the child's health and safety shall be the paramount concern," and that "reasonable efforts shall be made to preserve and reunify families." 42 U.S.C. § 671(a)(15).   Additionally, as part of the State's plan for child welfare services, DFPS is required to implement a system, "designed to help children — where safe and appropriate, return to families from which they have been removed," and put in place a "preplacement preventive services program designed to help children at risk of foster care placement remain safely with their families . . . ."  42 U.S.C. § 622(b)(8).   And, in cases where a child is not placed with parents, DFPS is required to document at each hearing during the case, "the intensive, ongoing,

---

[12] The CPS HANDBOOK is available at https://www.dfps.state.tx.us/handbooks/.

and, as of the date of the hearing, unsuccessful efforts made by the State agency to return the child home or secure a placement for the child with a fit and willing relative . . . ."  42 U.S.C. § 675a(5).

DFPS's policies give effect to these priorities and expressly reference federal statutes which clarify that where protecting a child's safety is concerned, federal assistance and benefits, including reunification services in child welfare cases, may be provided to any person irrespective of their immigration status.  8 U.S.C. § 1611(b)(1)(D).  At its outset, DFPS's CPS HANDBOOK states:

> The purpose of the Child Protective Services program is to protect children and to act in the children's best interest. Through the program, the Texas Department of Family and Protective Services (DFPS) focuses on children and their families and seeks active involvement of the children's parents and other family members to solve problems that lead to abuse or neglect.

CPS HANDBOOK § 1100.  Moreover, with regard to children and families who are not United States citizens, DFPS's policy provides, "Child protection services, including investigative services, family-based safety services, substitute care services, and reunification services can be provided without regard to a parent, child, or youth's immigration status."  *Id.* at § 6710 *citing* 8 U.S.C. § 1611(b)(1)(D).  This federal law referenced by DFPS's policy states that programs, services, or assistance which are necessary for the protection of life or safety "such as . . . crisis counseling and intervention, and short-term shelter" — the same kinds of services provided to parents during child welfare cases — may be provided regardless of the recipient's immigration status.  8 U.S.C. § 1611(b)(1)(D).  Thus, federal law recognizes that protecting children and

ensuring their best interests are served through family preservation efforts come before the enforcement of immigration laws.[13]

State policies require case workers to determine the status of children in their care, not to deport foreign-born children, but to assist them in qualifying for services, gaining assistance from consulates, and beginning a path to citizenship.  CPS HANDBOOK §§ 6710 (citing 42 U.S.C. § 671(a)(27)), 6711 (Immigration Opportunities for Foster Children), 6712 (Impact of Citizenship and Immigration Status on Permanency); *see also* §§ 5830-5831 (foreign born children and notice to consulates), DFPS, *International and Immigration Issues Resource Guide*, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Menu/MenuCPSResource.asp.   While licensed foster parents or adoptive parents must have legal status, this criteria can be waived and does not apply to kinship placements.   *See* CPS HANDBOOK §§ 7226-7226.5 (regarding the Foster and Adoptive Home Development (FAD) program).

Similarly, Texas' laws which establish its child welfare process expressly provide that children's best interests come first, but make no provision indicating they apply differently where a child or parent is undocumented.   *See, e.g.,* TEX. FAM. CODE ANN. § 153.002 (West 2015) ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."). Additionally, at every step of Texas' child protection process, the Texas Family Code mandates adherence to the principle that family reunification best serves the child.[14]  If DFPS determines that removing a child from his or her home may be required following a report of abuse or neglect, one of the first things it must do is determine whether any relatives or "kinship"

---

[13] Similar values apply in the context of education.  *See Plyler v. Doe*, 457 U.S. 202, 219-20, 102 S. Ct. 2382, 2396, 72 L. Ed. 2d 786 (1982) (holding that, because children should not be punished for circumstances placed upon them by adults, their right to an education is unfettered by their immigration status).

[14] A chart summarizing the process of a typical child welfare case is attached to this brief.

caregivers are available to provide care for the child.[15]   TEX. FAM. CODE ANN. § 261.307 (West

2015).  And, before DFPS may remove a child it must prove there was an immediate danger to

the health or physical safety of the child, and that allowing the child to continue residing in the

home would be contrary to the child's welfare.  *See* TEX. FAM. CODE ANN. §§ 262.101, 262.102,

262.104 (West 2015) (providing the standards for removal of a child in an emergency).  Should

DFPS be required to remove a child, the law requires that the child be returned to the parents no

less than fourteen days later unless it is shown that DFPS made efforts to return the child home,

but that the danger persists.  TEX. FAM. CODE ANN. § 262.201 (West 2015).  Then, within the

next forty-five days, DFPS must create a family service plan in conference with the parents,

which specifies the steps required to return the child home and the rehabilitative services

necessary for the parents to provide the child with a safe environment.  TEX. FAM. CODE ANN.

§§ 263.101-102 (West 2015).

The law then requires the occurrence of periodic hearings in order to review the parents'

progress with their service plan and to determine whether the child may safely be returned to

their care.  TEX. FAM. CODE ANN. §§ 263.201-201, 263.305-306 (West 2015).  Sixty days

following the child's removal, the trial court must hold a Status Hearing at which it is required to

review DFPS's efforts to locate relatives as possible caregivers for the child, approve or amend

the family service plan created for the parents, and make findings as to whether the plan

"adequately ensures that reasonable efforts are made to enable the child's parents to provide a

safe environment for the child . . . ."  TEX. FAM. CODE. ANN. § 263.202 (West 2015).  And then,

at subsequent Permanency Hearings, held 180 days following removal and every 120 days

thereafter, the court must "return the child to the parent or parents if the child's parent or parents

---

[15] The Texas Family Code includes in this provision, "an individual who has a longstanding and significant
relationship with the child . . . ."  TEX. FAM. CODE ANN. § 264.751 (West 2015).

are willing and able to provide the child with a safe environment and the return of the child is in the child's best interest . . . ." TEX. FAM. CODE. ANN. §§ 263.304-.306 (West 2015). DFPS is required then to dismiss its suit after one year, unless it commences a final hearing or extraordinary circumstances warrant the continuation of the child in DFPS's temporary care. TEX. FAM. CODE ANN. § 263.401 (West 2015). Nowhere in the Texas Family Code does it indicate that the services provided by DFPS or the goal that it serve the best interests of children through family reunification are in any way conditioned on a child or a family legally residing in the United States.

This process demonstrates Texas' priority that children are best served by efforts to reunify them with their families without regard to the immigration status of the families involved. Additionally, the same legislature which enacted S.B. 4 affirmed its intent to prioritize children's families when it enacted Senate Bill 11.[16] S.B. 11, 85th Leg., R.S. § 18 (2017) (enacting TEX. FAM. CODE § 264.151). Section 264.151 declares the Legislature's intent that children be provided with community-based services with goals relating to, "the placement of children in each child's home community," "the provision of services to children in the least restrictive environment possible and, if possible in a family home environment," "the maintenance of contact between children and their families and other important persons," "the placement of children with siblings," "the provision of services that respect each child's culture," "the reunification of children with the biological parents of the children when possible," and "the promotion of placement of children with relative or kinship caregivers if reunification is not possible." *Id*. These provisions, too, make no indication that the priority of family reunification depends on the immigration status of the parents or children affected.

---

[16] S.B. 11 was part of a package of CPS reform bills prompted by the federal district court's ruling in *M.D. v. Abbott*. Citations to Family Code provisions in this brief are to the 2015 versions of the law unless the statute was substantively changed by the 2017 reform legislation.

Thus, the clear intent announced by both federal and state law, and as enunciated in DFPS policy, is that where child welfare and protection are concerned, the provision of the services necessary to give effect to children's best interests are not conditioned on their, or their parents', immigration status.   Rather, protecting children and ensuring their continued association with family is paramount.   Given this intent, S.B. 4 presents a clear and irreconcilable conflict with the laws pertaining to Texas' child welfare system, and allowing it to take effect will present significant ethical dilemmas for county attorneys who represent DFPS and do serious and irreparable harm to the children involved.

III.   **S.B. 4 Conflicts with the Federal and State Laws Applicable to Child Welfare Cases, Will Force County Attorneys to Violate their Duty to Prioritize Children's Best Interests, and Cause Irreparable Harm to Children in State Care**

Senate Bill 4 requires broad compliance with immigration enforcement efforts without regard for the federal and state laws which require that children's interests in safety and family reunification are prioritized. It therefore puts county attorneys, who are ethically bound to represent DFPS in its obligation to reunify families, in the position of cooperating with enforcement efforts which will lead to the deportation of parents or other caregivers and the separation and destruction of families.

A.   **S.B. 4's sweeping language encompasses county attorneys' work in DFPS cases.**

S.B. 4 defines a "local entity" as including "an officer or employee of . . . a county . . . including a . . . county attorney." Tex. S.B. 4, 85th Leg., R.S. § 1.01 (enacting TEX. GOV'T CODE § 752.053(a)) [hereinafter "S.B. 4"].   S.B. 4 then provides that local entities may not, "adopt, enforce, or endorse a policy under which the entity or department prohibits or materially limits the enforcement of immigration laws," including "as demonstrated by pattern or practice . . . ." *Id.* (enacting TEX. GOV'T CODE § 752.053).   "Policy" is defined broadly to include either a

formal written rule or "an informal, unwritten policy." *Id.* (enacting TEX. GOV'T CODE § 752.051). Moreover, a local entity may not prohibit or materially limit a "prosecuting attorney . . . who is employed by . . . the entity," from assisting or cooperating with a federal immigration officer, "including providing enforcement assistance." *Id.* (enacting TEX. GOV'T CODE § 752.053(b)(3)). The bill goes on to provide penalties for violating its provisions, including fines of up to $25,500 per day for continuing violations, as well as removing the County Attorney from office. *Id.* (enacting TEX. GOV'T CODE §§ 752.056-.0565). Thus, any county attorney who declines to engage with assisting in the enforcement of immigration laws or discourages colleagues from doing so in order to advocate for the best interest of the child and promote family unification — as child welfare laws mandate — would not be "providing enforcement assistance" and would be "adopt[ing], enforce[ing], or endors[ing] a policy" or engaging in a "pattern or practice" that "materially limits the enforcement of immigration laws." *See id.* (enacting TEX. GOV'T CODE § 752.053(a), (b)(3)).

Notably, Senate Bill 4 itself reflects a recognition that in certain contexts immigration enforcement efforts should not be required. It includes exemptions for hospital districts, health centers, religious organizations, and school districts, as well as for peace officers employed by these entities. *Id.* (enacting TEX. GOV'T CODE § 752.052). However, it makes no exception which would apply to children and families involved in the child welfare system. Rather, an amendment proposed on the House floor to exempt DFPS was rejected, along with dozens of other proposed amendments which were struck down en masse. *See* House Amd. No. 145, Tex. S.B. 4, 85th Leg., R.S. (2017); Tex. H.J. of Tex., 85th Leg. R.S., 1929, (Apr. 26, 2017) (Record Vote No. 460); *see also* Transcript of Preliminary Injunction Hearing at 163, June 26, 2017 (testimony of Rep. Ana Hernandez describing rejection of the Minjarez amendment). In

addition, the racial animus that later surrounded the enactment of S.B. 4 surfaced most notably on a bill regarding CPS and kinship placement demonstrating that the child welfare system was not immune from such animus during the legislative session.  *Id*. at 155-56.

> **B.** **S.B. 4's unequivocal requirement that county attorneys assist in enforcing immigration laws conflicts with the mandates of the child welfare system, violating the constitutional rights of children and placing attorneys in an irreconcilable conflict.**

On its face, Senate Bill 4's language is incompatible with the mandates of federal and state laws as they pertain to the child welfare system.  As set forth above, attorneys engaged in representing DFPS are obligated by law to prioritize children's best interests and family reunification without regard to immigration status.  As a result, where undocumented parents have demonstrated their ability to provide for their children, county attorneys are obligated to <u>not</u> pursue immigration enforcement efforts in the knowledge that doing so will separate families and harm children, rather than serve the best interest of the children.  Thus, by acting in compliance with the requirements of federal and state mandates, county attorneys will necessarily violate S.B. 4's prohibition against any "policy," formal or informal, or any "pattern" or "practice" which materially limits the enforcement of immigration laws.

S.B. 4's harm to children in the Texas child welfare system implicates the equal protection rights of the children whether they or a family member are undocumented.  *See Plyler v. Doe*, 457 U.S. 202, 215 (1982) (holding that undocumented children enjoy the same Fourteenth Amended equal protection rights as all children).  As in *Plyler*, here it is difficult to conceive of a rational justification for penalizing children — particularly those subjected to abuse and neglect — simply because they have a parent or other relative caregiver who is an unauthorized immigrant.  *See id*. at 220.  In the State's zeal to strike out against so-called Sanctuary Cities, it enacted a law of such breadth that any acts by county attorneys contrary to

immigration enforcement — whether undertaken in a misdemeanor criminal proceeding or in a civil matter such as a child welfare case — will be subject to S.B. 4's harsh enforcement mechanisms.

It is also difficult to imagine what justifiable state interest exists in the face of federal child welfare policies requiring states to pursue policies to protect the child's health and safety and pursue family reunification whenever possible.   The State's power to require county attorneys to act as S.B. 4 demands is further suspect given that the "States enjoy no power with respect to the classification of aliens." *Plyler*, 457 U.S. at 225.  While states may have some authority to act with respect to the undocumented, they do so when such action mirrors federal objectives and furthers a legitimate state goal.  *Id*.  But as explained above, when it comes to child welfare, federal policies conflict with S.B. 4.  There is simply no national policy that supports the State in denying children in the child welfare system equal protection under the law simply because their parent or another relative caregiver is an unauthorized immigrant. *See id*. at 227.

When an attorney is faced with a situation where continuing to represent a client would result in a violation of the rules of professional conduct or other law, the attorney "shall withdraw."  TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(a), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (Tex. State Bar R. art. X § 9).  But an attorney cannot withdraw if doing so would have a material adverse effect on the client's interest.   *Id*. at 1.15(b)(1).  At first glance, county attorneys could merely withdraw, but doing so would have an adverse effect on the client interest in protecting the best interest of the child and preserving families by depriving DFPS — and children — of counsel willing to advocate for the best interest of the child.  S.B. 4 places county attorneys in an unwinnable, untenable ethical bind.

Nor would withdrawing avoid a violation of S.B. 4 given the breadth of its language and penalties.  DFPS has the obligation to serve children's best interest regardless of who represents it.  Withdrawing from cases involving undocumented family members may in itself may implicate a pattern or practice.  Given that S.B. 4 defines as a violation any endorsement of any policy, formal or informal, including as expressed by pattern or practice, which limits the enforcement of immigration laws, it is unclear whether withdrawing from representing DFPS would itself be a violation of the law.

Finally, ethics should be heightened when children are involved.  *See Plyler*, 457 U.S. at 219-21 (discussing a special concern when children will bear the brunt of state action directed at punishing adults).  Because S.B. 4 would create an ethical conundrum in child welfare cases, it should be enjoined.

> **C.    Unless enjoined, S.B. 4 poses an immediate threat to the ethical duties of attorneys and more pointedly to the safety and constitutional rights of children.**

Once in custody, all children have a right to be free from state-imposed unreasonable risks of harm.  *M.D. v. Abbott*, 152 F. Supp. 3d 684, 696 (S.D. Tex. 2015) (finding the State of Texas violates the substantive due process right of children in foster care to be free from an unreasonable risk of harm including "a system where rape, abuse, psychotropic medication, and instability are the norm").  .  In addition, children have "a substantive due process right to be free from unreasonable and unnecessary intrusions into their emotional well-being."  *Id*. at 696-97 (citation omitted).  The trauma of being removed from the home and losing a parent or beloved relative caregiver as a result of immigration enforcement efforts is an irreparable harm which qualifies as such an intrusion into children's emotional well-being, implicating the violation of their constitutional rights.  Moreover, given the strain currently affecting this State's foster care

system, the increased numbers of children placed in foster care under S.B. 4 would impact all children in care.

Having represented DFPS in hundreds of cases each year, the HCAO is well aware of the specific harms done to children and families in the child welfare system when parents or other caregivers of children, including United States citizen children, are subject to detention and deportation proceedings.  Understanding these harms makes plain that prioritizing immigration enforcement in child welfare cases, as S.B. 4 would require, violates rather than protects the interests children have in safety, stability, and family unity.

First, DFPS relies heavily on Harris County residents and community members in order to protect children.  *See, e.g.,* TEX. FAM. CODE ANN. § 261.101 (West 2015) (requiring all persons in Texas to report abuse or neglect).  However, immigrant communities who fear local government attorneys' involvement with immigration enforcement efforts will no longer come forward to report abuse or neglect, to provide the information and evidence necessary to protect children, or to serve as relative or kinship placements for children who are in the State's care.[17] As a result, DFPS will have greater difficulty gathering evidence from community members who may have witnessed child abuse, and more children — regardless of their immigration status — will remain in abusive circumstances.  Moreover, when children are placed in DFPS's custody, more of them will be forced into foster care rather than remaining with family members or kindship caregivers because undocumented relatives will not step forward to help provide for them.

---

[17] *See* Seth Freed Wessler, *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System,* 55 (Applied Research Center 2011) (noting that undocumented relatives decline to come forward to care for children because they fear that interaction with the child welfare system will lead to their detention or deportation.) *available at* https://www.raceforward.org/research/reports/shattered-families.

Additionally, when parents are detained or deported, family reunification becomes impossible.  As detailed above, DFPS is required by law to provide parents with reunification services as part of a family service plan.  TEX. FAM. CODE ANN. §§ 263.101-.102 (West 2015).  This plan must include specific tasks and services for parents to complete in order to obtain reunification with their children.  *Id.*  In addition to these services, it is commonly required of parents that they attend regular visits with their children.  Moreover, a parent's failure to participate in the rehabilitative services or to visit their children provides a basis to terminate their parental rights.  TEX. FAM. CODE ANN. §§ 161.001(b)(1)(N), (O) (West 2015) (allowing parental rights to be terminated when a parent fails to participate in tasks for reunification, or for failing to maintain significant contact with their children).[18]  However, when parents are detained in association with deportation proceedings, they are precluded from participating in these required services and visits.[19]  Detained parents are difficult to locate, and are frequently transferred to detention centers far from their homes and communities.  Moreover, detention centers often do not offer the services required by DFPS's family service plan, nor do they provide for visitation with children.  As a consequence, parents who are detained become subject to the termination of their parental rights by virtue of their government detention rather than as a result of their conduct.  Consequently, children of detained parents will languish in foster care, be precluded from seeing their parents, and will be subject to the legal termination of their parent-child relationships without any evidence of parental wrong-doing.

---

[18] While 2017 amendments to this provision offer a "good faith effort" defense to failure to comply with the court's order, that amendment requires that the failure is "not attributable to any fault of the parent." Tex. H.B. 7, 85th Leg., R.S., § 12 (2017).  Most courts would likely find "any fault" to include undocumented status and deportation.

[19] *See id.* at 8, 38; Children's Bureau, *Issue Brief: Immigration and Child Welfare*, 5 (U.S. Department of Health and Human Services, Administration for Children and Families, 2015) *available at* https://www.childwelfare.gov/pubPDFs/immigration.pdf; American Immigration Council, *U.S. Citizen Children Impacted by Immigration Enforcement* (March, 2017) *available at* https://www.americanimmigrationcouncil.org/sites/default/files/research/us_citizen_children_impacted_by_immigration_enforcement.pdf.

As S.B. 4 broadly enlists local officials in immigration enforcement without regard to any traditional federal policy of prioritizing enforcement efforts on actual threats to public safety, children who are otherwise well-cared for by their parents will be forced into foster care simply because their parents are undocumented rather than as a result of any danger they caused to their children.  As detailed above, under normal circumstances DFPS is only authorized to take custody of a child when there is a danger to his or her physical health or safety which is caused by a parent.  *See* TEX. FAM. CODE ANN. §§ 262.101, 262.102, 262.104 (West 2015).  Danger may include circumstances in which children are abandoned or left without adequate adult supervision.  *See* TEX. FAM. CODE ANN. § 261.001(4) (West 2015).  Consequently, when parents are detained or deported, DFPS will be forced to take custody of their children, even in the absence of child abuse or neglect.  In counties where local authorities cooperate with federal enforcement efforts, as would be required under S.B. 4, foster children are approximately 30% more likely to have a parent detained or deported.[20]  The harm done to children and the child welfare system is significant.  Children suffer the trauma of family separation with little hope of reunification, visits and reunification services are precluded when parents are held in detention centers, and the State and its foster care system bear the increased costs of prosecuting these cases, and housing and safely caring for the children involved.  Notably, the vast majority of these children of unauthorized immigrant parents in Texas are United States citizens.

Immigration laws already can and do complicate child welfare cases and cause trauma to children of course either because someone has inserted immigration issues into a situation with a report to ICE or because of the prevalent and increasing fear in immigrant communities.  HCAO

---

[20] Wessler, *supra* note 4 at 27, 28; Joanna Dreby, *How Today's Immigration Enforcement Policies Impact Children, Families, and Communities: A View from the Ground*, 2 (Center for American Progress, 2012) *available at* https://www.americanprogress.org/wp-content/uploads/2012/08/DrebyImmigrationFamiliesFINAL.pdf.

has collected some recent examples from CPS cases the office has handled of immigration enforcement unnecessarily increasing the trauma and danger to children.

- A father was able to provide care for his three children when a court placed them with him based on a finding that the mother was unfit. When the mother subsequently reported the father to ICE (presumably as revenge), he was apprehended and detained, at which point DFPS was notified.  The father requested the three children be placed with his sister, but because of the children's behavioral issues and medical needs, she was unable to provide for their care.  The siblings were consequently split up and two of the three were placed in foster care.

- A father was provided with custody rights to his child in a CPS case. However, in a subsequent case involving a child born to the mother and thus a sibling to his child, he refused to come forward as a possible placement for the newly-born infant because he was afraid of being reported to immigration enforcement officials and deported.  The infant was, as a result, placed in foster care.

- A child's mother was deported, and she left the child with another couple in her community.  Subsequently, that couple was deported and the child was left with a third family.  DFPS became involved when it was reported the child was abused in this third home.  The child was ultimately placed in foster care.

- A mother was deported to Honduras.  She left her young minor daughter with two older half-sisters.  Over the course of at least two years, the half-sister caregivers were physically and emotionally abusive to the child and the child

ultimately came in to the custody of DFPS.  The child remains a ward of the State.

- A one-year old baby was removed from his mother after the mother was displaying erratic and destructive behavior.  The mother reported that the father is currently under an immigration hold, but HCAO has been unable to locate him through ICE.  The baby was placed in foster care as there were no other suitable relatives for placement.

- A newborn infant was removed from her mother upon birth because the mother was incarcerated.  There were two potential kinship placements for the baby; however, one relative could not be a placement because she lacked documentation.  Another relative was already caring for the mother's two older children, but the oldest child also did not have any legal documentation.  This particular relative feared participating with DFPS would negatively impact the undocumented child for whom she was caring.  As a result, the newborn was placed in foster care.

These examples highlight not only the irreparable trauma that children suffer, but also that by enlisting county attorneys who represent DFPS in efforts which lead to detention and deportation, S.B. 4 places them directly at odds with the federal and state mandates that they protect children's best interest and work toward family reunification.  All child welfare cases are unique and must be resolved based on the individual child's circumstances.  Should County attorneys prosecuting CPS cases instead be forced to engage in immigration enforcement, individual determinations of what is best for each child would be precluded.  County attorneys

should not be conscripted into the enforcement of immigration laws in direct conflict with their duty to Texas children.

## IV.      Conclusion

For the above reasons, S.B. 4 will do irreparable damage to this State's child welfare process, place county attorneys charged with representing DFPS in an irreconcilable conflict, and do further trauma to children who have been placed in the State's care.   Further, there is no legitimate state purpose in treating children who have an unauthorized immigrant parent or other potential care giver differently in child welfare cases.   These harms and the public's interest warrant granting the Plaintiffs' request for a preliminary injunction.

Respectfully submitted,

      /s/   Susan Hays
_____
SUSAN HAYS
State Bar No. 24002249
LAW OFFICE OF SUSAN HAYS, P.C.
P.O. Box 41647
Austin, Texas 78704
Telephone:  (214) 557-4819
Facsimile:  (214) 432-8273
hayslaw@me.com
*Counsel for the Office of the Harris County*
*Attorney*

## CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the foregoing pleading on all parties, or their attorneys of record, via the Court's ECF/CM system, in compliance with the Federal Rules of Civil Procedure, this 11th day of July, 2017.


_____/s/ Susan Hays_____
SUSAN HAYS

# Texas Child Welfare Case Progression

| Removal | 14 days | 60 days | 180 days | 300 days | 1 year |
|---|---|---|---|---|---|
| | **Adversary Hearing** | **Status Hearing** | **Permanency Hearing** | **Permanency Hearing** | **Final Hearing** |

Department required to inquire about relatives or kinship caregivers. TFC 261.307

Department develops service plan, with steps for reunification TFC 263.101-102

Department works with family to provide reunification services.

Department may only remove a child based on evidence showing there was an immediate danger to the child. **TFC: §§262.102-107**

Court shall return child to the parents unless there continues to be a danger. **TFC: §§262.201, 262.205**

Court approves service plan, which outlines the steps necessary for the family to be reunified. **TFC: §§263.101-02 263.201-202**

Court reviews progress of case and compliance with service plan, including the Department's efforts to locate relatives of the child for placement. The court must return the child if it is safe to do so, and determine a date by which the child may be returned. **TFC: §263.304-306**

Court must commence a final hearing within a year of removal, or dismiss the case. **TFC: §§263.101-02 263.201-202**

*"TFC" = Texas Family Code.