**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**



**F I L E D**

**AUG 3 0 2017**

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

| | |
|---|---|
| **CITY OF EL CENIZO, et. al.** | § |
| | § |
| Plaintiffs | § |
| | § |
| **v.** | § |
| | § |
| **STATE OF TEXAS, et. al.** | § |
| | § |
| Defendants | § |

**CIVIL NO. SA-17-CV-404-OLG**
**[Consolidated/lead case]**

# O R D E R

Pending before the Court are the El Cenizo Plaintiffs' Motion for Preliminary Injunction (docket nos. 24, 26, 154); San Antonio Plaintiffs' Motion for Preliminary Injunction (docket nos. 55, 77, 151, 158); El Paso County Plaintiffs' Motion for Preliminary Injunction (docket nos. 56, 149); City of Austin's Motion for Preliminary Injunction (docket nos. 57, 97, 103, 146); City of Dallas' Motion for Preliminary Injunction (docket no. 152); Travis County Plaintiffs' Motion for Preliminary Junction (docket nos. 58, 79, 148); City of Houston's Motion for Preliminary Injunction (docket no. 150); and Texas Association of Hispanic County Judges and County Commissioners' Motion for Preliminary Injunction (docket no. 144). Defendants have filed responses in opposition to all motions (docket nos. 91, 172). The United States has filed a Statement of Interest (docket no. 90); Harris County has filed an amicus brief and declaration in support of the motions (docket nos. 116, 166); and amici briefs have also been filed by the Major Cities Chiefs Association, Police Executive Research Forum, and United States Conference of Mayors (docket no. 165); The Anti-Defamation League (docket no. 125); the Immigration Reform Law Institute (docket no. 137); and The Episcopal Diocese of Texas, et. al. (docket no. 176). The Court held an evidentiary hearing on June 26, 2017. After considering the parties'

arguments and reviewing the evidence and the applicable law, the Court finds that Plaintiffs'

motions for preliminary injunction should be GRANTED as follows.

I.

Statement of the case

This case involves the constitutionality of Senate Bill 4, which relates to immigration

enforcement by local governmental entities, imposes duties and liabilities on certain persons in

the criminal justice system, provides civil penalties, and creates a criminal offense. SB 4 was

passed by the 85th Texas legislature and signed into law on May 7, 2017 and becomes effective

on September 1, 2017.[1] The full text of SB 4 is attached to this order. The City of El Cenizo and

LULAC filed this lawsuit on May 8, 2017 and other plaintiffs subsequently joined in the lawsuit

by intervention or consolidation.[2] Plaintiffs then moved for preliminary injunctive relief to enjoin

the implementation and enforcement of SB 4 before it becomes effective.

II.

Jurisdiction, Article III standing, and venue

The Court has jurisdiction over the claims in this lawsuit pursuant to 28 U.S.C. §§ 1331,

1343 and 1367. The Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C.

§§ 2201-02. The Court also has the equitable authority to enjoin enforcement of a state law that

conflicts with federal law. *Ex parte Young*, 209 U.S. 123, 155-156 (1908). Venue is proper in the

---

[1]Texas Legislature Online, Bill History for SB 4, *available at* http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=85R&Bill=SB4.

[2]*See* City of El Cenizo Plaintiffs' Second Amended Complaint (docket no. 31); City of San Antonio's First Amended Complaint (docket no. 174); El Paso County Plaintiffs' First Amended Complaint (docket no. 51); City of Austin's Complaint (docket no. 37); Travis County Plaintiffs' Complaint (docket no. 33); City of Dallas' Complaint (docket no. 96); City of Houston's Complaint (docket no. 139); Texas Ass'n of Hispanic County Judges and County Commissioners' Complaint (docket no. 142).

Western District of Texas, San Antonio Division. *See* docket no. 179.[3] The parties invoking federal jurisdiction "must show an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015). "The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Id.* Article III standing is apparent from the face of the pleadings in this case.

III.

Standard and process of review

To obtain a preliminary injunction, movants must establish each of the following four factors:

(1) a substantial likelihood of success on the merits;

(2) a substantial threat of irreparable injury if the injunction is not issued;

(3) the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and

(4) granting an injunction will not disserve the public interest.

*Texas v. U.S.*, 809 F.3d at 150. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Preliminary injunctions that would change, rather than

---

[3]Defendants challenged venue and sought transfer to the Austin division to consolidate this lawsuit with Civil Action 1:17-CV-425-SS. Subject matter jurisdiction was challenged in the Austin case, so the undersigned judge held the motion to transfer in abeyance. The Court held an evidentiary hearing on the preliminary injunction motions on June 26, 2017, but refrained from taking any action pending a decision on subject matter jurisdiction in the related case. The Austin case was dismissed for lack of subject matter jurisdiction on August 9, 2017 and consolidation was no longer an option. The undersigned judge denied the motion to transfer and consolidate on August 15, 2017, and then proceeded with consideration of the motions for preliminary injunction. The Court has also been occupied with Texas redistricting cases and issues this opinion under severe time constraints. Nevertheless, the Court has given careful consideration to all of the issues herein.

maintain, the status quo are generally disfavored and should not issue unless the facts and law

clearly favor the moving party. *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

Senate Bill 4 has not been implemented or enforced; thus, Movants are seeking to preserve, not

alter, the status quo. At the same time, Movants' request for preliminary injunctive relief is

timely and not premature. "A fundamental principle of preliminary injunctions [is that] [a]n

injunction is of no help if one must wait to suffer injury before the court grants it." *Texas v. U.S.*,

809 F.3d at 173 n.137 (citing *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001)). This

Court need not wait for an "early snapshot" of SB 4 enforcement before considering preliminary

injunctive relief. *Id.*[4] Given the limited purpose of a preliminary injunction, and given the haste

that is often necessary if the status quo is to be preserved, "a preliminary injunction is

customarily granted on the basis of procedures that are less formal and evidence that is less

complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395.[5] Ultimately, the decision to

grant preliminary injunctive relief rests in the sound discretion of the district court, and is "often

dependent as much on the equities of [the] case as the substance of the legal issues it presents."

*Trump v. Int'l Refugee Assistance Project*, __ U.S. __, 137 S.Ct. 2080, 2087 (2017).

---

[4]In *Texas v. U.S.*, 809 F.3d 134, the federal program called Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) was enjoined to prevent implementation. The Fifth Circuit determined that the states seeking to enjoin DAPA were "not required to suffer the injury of [the] legal impact before seeking an injunction." *Id.* at 173 n. 137.

[5]In fact, the Court may rely upon otherwise inadmissible evidence when considering a preliminary injunction. *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993); *Tex. Commerce Bank Nat'l Ass'n v. State of Florida*, 1997 WL 181532, at *4 (N.D. Tex. Apr. 9, 1997) (in a preliminary injunction proceeding, "the court may rely on hearsay evidence and may even give inadmissible evidence some weight"), *aff'd*, 138 F.3d 179 (5th Cir. 1998).

IV.

<u>Substantial likelihood of success on the merits</u>

At this early juncture in the case, movants are not tasked with showing that they *will* succeed on the merits, but they must show that they are *likely* to prevail on at least one of their claims at the merits stage of the proceedings. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs assert, *inter alia*, that SB 4, on its face and as applied, is preempted by federal law and violates the Supremacy Clause, the First Amendment, the Fourteenth Amendment, the Fourth Amendment, the Ninth Amendment, and the Tenth Amendment. They also assert that SB 4 violates Section 2 of the Voting Rights Act and the Texas Constitution's separation of powers, due course of law, freedom of speech, and home rule provisions. Because SB 4 does not take effect until September 1, 2017, the Court has limited its analysis to those claims that may be construed as facial challenges. There are numerous claims that the Court does not address, either because it is unnecessary to reach them or because they are "as applied" challenges. The Court's findings herein are preliminary, based on the "likelihood of success" standard, and may be revised at the merits stage of the litigation.

**Federal Preemption**

A.    Supremacy Clause

State law that conflicts with federal law is "without effect." *Maryland v. Louisiana,* 451 U.S. 725, 745-46 (1981) (quoting U.S. Const. art. VI, cl. 2; *McCulloch v. Maryland*, 17 U.S. 316, 427 (1819)). When reviewing constitutional challenges under the Supremacy Clause, courts must consider two cornerstones: First, courts must "start with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947).

Second, courts must consider "'[t]he purpose of Congress [as] the ultimate touchstone'" of preemption analysis. *Malone v. White Motor Corp.,* 435 U.S. 497, 504 (1978) (quoting *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103 (1963)). Congress's intent may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525 (1977).

  B. Three types of preemption

  When Congress has made clear it intends to occupy an entire field of regulation, any state regulation of that field will be expressly preempted. *Puerto Rico v. Franklin California Tax-Free Tr.,* ____ U.S.____,136 S. Ct. 1938, 1945 (2016). However, even without an express preemption provision, the Supreme Court has found that state law must yield to a congressional act in at least two circumstances. When Congress intends federal law to "occupy the field," state law in that area is preempted. *California v. ARC Am. Corp.,* 490 U.S. 93, 100 (1989) (describing field preemption); *see also United States v. Locke,* 529 U.S. 89, 115 (2000) (citation omitted). And, even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute. *Hines v. Davidowitz,* 312 U.S. 52, 66-67 (1941) (describing conflict preemption); *ARC America Corp.,* 490 U.S. at 100-01; *Locke,* 529 U.S. at 109. The Supreme Court has found state law to be preempted when it is impossible to comply with both state and federal law, *see, e.g., Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-43 (1963), and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67. Whether the state law presents a sufficient obstacle is a matter of judgment informed by examining the federal statute as a whole and identifying its purpose and intended effects. *Hines,* 312 U.S. at 67-68.

### 1. Express Preemption

Congress can expressly preempt state law by including a preemption clause in a statute making it clear it intends to occupy an entire field of regulation. *Franklin California Tax-Free Tr.*, 136 S. Ct. at 1945. Where a statute contains an express preemption clause, the court's task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's preemptive intent. *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 62-63 (2002). However, even inclusion of an express preemption clause in a statute does not bar the ordinary working of conflict preemption principles. *Id.* If a federal statute contains no express preemption provision, the state or local regulation will be sustained unless it conflicts with federal law or would frustrate the federal scheme, or unless the court discerns from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the state. *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 224 (1993).

### 2. Field Preemption

Field preemption precludes a state "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Congress's intent to occupy a field "can be inferred from a framework of regulation 'so pervasive ... that Congress left no room for the States to supplement it' or where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Matters left unaddressed, however, in a "comprehensive and

detailed" "scheme are presumably ... subject to the disposition" of state law. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994).

### 3.  Conflict Preemption

Conflict preemption, on the other hand, preempts state laws which make "compliance with both federal and state regulations ... a physical impossibility." *Florida Lime*, 373 U.S. at 142-43 (citations omitted). It also preempts state laws which stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Crosby*, 530 U.S. at 372-73. The test of whether both federal and state regulations may operate, or whether the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives. *Florida Lime*, 373 U.S. at 142.

### C.  Congress and Immigration Enforcement

To determine whether a state law conflicts with Congress's purposes and objectives, we must first ascertain the nature of the federal interest. *Crosby*, 530 U.S. at 372-73; *Hillman v. Maretta*, ___ U.S.___, 133 S. Ct. 1943, 1950 (2013). The Federal Government has broad, undoubted power over immigration which rests, in part, on its constitutional power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and on its inherent sovereign power to control and conduct foreign relations. *See Toll v. Moreno*, 458 U.S. 1, 10 (1982). Federal law specifies, among other things, categories of aliens who are ineligible to be admitted to the United States, 8 U.S.C. § 1182; requires aliens to register with the Federal Government and to carry proof of status, §§ 1304(e), 1306(a); imposes sanctions on employers who hire unauthorized workers, § 1324a; and specifies which aliens may be removed and the

procedures for doing so, § 1227. Removal is generally a civil matter, and one of its principal

features is the broad discretion exercised by immigration officials. Immigration and Customs

Enforcement (ICE), an agency within the Department of Homeland Security (DHS), is

responsible for identifying, apprehending, and removing those classified by the INA as

"deportable aliens." 8 U.S.C. § 1227(a); *Arizona*, 567 U.S. at 387.

  D.  Analysis

  1.    Preemption of the Entire Statute

First, the Court will address Plaintiffs' argument that SB 4 is preempted in its entirety.[6]

The City of Dallas argues that SB 4 should be preempted in its entirety because it authorizes

local enforcement of all immigration law. However, the City of Dallas has not shown that

Congress has entirely preempted state or local regulation in the field of immigration. In fact, the

Supreme Court has found that states may regulate certain matters related to immigration. *See,

e.g.*, *Arizona*, 567 U.S. at 400. Therefore, the Court finds that Plaintiffs have failed to show that

SB 4 is likely preempted in its entirety. The Court will proceed to analyze each challenged

provision of SB 4 to determine the likelihood that Plaintiffs will succeed on the merits of their

preemption arguments.

  In order to determine if any part of SB 4 is preempted, the Court must determine which

specific components of federal law conflict with the newly enacted state statute. *PLIVA, Inc. v.

Mensing*, 564 U.S. 604, 611 (2011) ("Pre-emption analysis requires us to compare federal and

state law"). Plaintiffs argue SB 4 conflicts with federal law in several ways. First, Plaintiffs argue

that SB 4 is preempted in its entirety because it "generally upsets the careful balance Congress

---

[6]Docket no. 152 at 11.

has struck between encouraging local assistance and preserving local discretion."[7] Second, Plaintiffs argue that SB 4's immigration status inquiry provision requires local officers to make immigration status determinations, thus invading the federal government's exclusive control of immigration.[8] Third, Plaintiffs claim SB 4's enforcement assistance requirements conflict with federal law. Plaintiffs argue that SB 4 is in conflict with 8 U.S.C. §§ 1357, 1373, and 1644.

The provisions of SB 4 codified at Tex. Gov't Code § 752.053(b) impose prohibitions against certain local policies relating to four topics: (1) immigration status inquiries (§ 752.053(b)(1)); (2) sharing and maintaining immigration status information (§ 752.053(b)(2)); (3) immigration enforcement assistance (§ 752.053(b)(3)); and (4) permitting immigration officers to enter local jails for immigration enforcement purposes (§ 752.053(b)(4)). Specifically, Section 752.053(b) prohibits local police departments and local entities from preventing their employees from:

(1) Inquiring into the immigration status of a person under a lawful detention or under arrest.

(2) With respect to information relating to the immigration status, lawful, or unlawful, of any person under a lawful detention or arrest, including information regarding the person's place of birth:

    a. Sending the information to or requesting or receiving the information from United States Citizenship and Immigration Services, United States Immigration and Customs Enforcement, or another relevant federal agency;

    b. Maintaining the information; or

    c. Exchanging the information with another local entity or campus police department or a federal or state governmental entity.

(3) Assisting or cooperating with a federal immigration officer as reasonable or necessary, including providing enforcement assistance.

(4) Permitting a federal immigration officer to enter and conduct immigration enforcement activities.

---

[7] Docket no. 24-1 at 13; Docket no. 152 at 11; and Docket no. 154 at 15.

[8] Docket no. 154 at 16.

The Court considers each challenged provision in turn to determine whether Plaintiffs have shown that they are likely to be preempted. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 611 (2011).

2.      Immigration Status Inquiries (Section 752.053(b)(1))

Section 752.053(b)(1) prevents supervising officials from exercising discretion over their employees regarding inquiries about the immigration status of a person who is under lawful detention or arrest. Section 752.053(b)(1) shares some similarities with Ariz. Rev. Stat. § 11-1051(B), which was enacted as Section 2(B) of SB 1070. The Arizona statute was reviewed by the Supreme Court in *Arizona v. United States*, 567 U.S. 387, 400 (2012). Section 2(B) provides:

> For any lawful stop, detention or arrest made by a law enforcement official … where reasonable suspicion exists that the person is an alien who is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the immigration status of the person[.] … Any person who is arrested shall have the person's immigration status determined before the person is released. The person's immigration status shall be verified with the federal government pursuant to [8 U.S.C. § 1373(c)].

The provision of SB 4 codified at Section 752.053(b)(1) provides that:

> [A] local entity or campus police department may not prohibit or materially limit a person who is a commissioned peace officer … a corrections officer, a booking clerk, a magistrate, or a district attorney, criminal district attorney, or other prosecuting attorney and who is employed by or otherwise under the direction or control of the entity or department from … inquiring into the immigration status of a person under a lawful detention or under arrest.

Plaintiffs argue there are crucial distinctions between Arizona's Section 2(B) and SB 4 that render SB 4 invalid even though the Supreme Court did not invalidate Section 2(B). For instance, Plaintiffs argue that SB 4 gives local officials, untrained in immigration enforcement and without supervision from federal officials, the power to question detainees about their immigration status regardless of whether the detainee is an enforcement priority under federal

guidelines. Plaintiffs argue that placing such power in the hands of local officers would interfere

with Congress's "deliberate effort to steer a middle path" in immigration enforcement and would

"obliterate the voluntary federal scheme and replace it with a system of unregulated

enforcement." *Crosby*, 530 U.S. at 380.[9] Plaintiffs also argue that empowering local officers to

make these inquiries conflicts with 8 U.S.C. § 1357(a), which establishes the power of a defined

group of federal officers to interrogate suspected aliens without a warrant. Plaintiffs' argument

raises issues of both field and conflict preemption. *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941).

a. <u>Field Preemption</u>

State or local regulations in a particular field are preempted if federal law so thoroughly

occupies the field "'as to make reasonable the inference that Congress left no room for the States

to supplement it.'" *Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 153 (1982). In

*Arizona* the Supreme Court recognized that, under Section 2(B), mandatory status inquiries and

verification by local enforcement officials would not necessarily consider federal enforcement

priorities, and that officers might make an inquiry "even in cases where it seems unlikely the

Attorney General would have the alien removed." *Arizona*, 567 U.S. at 412. Notwithstanding

these observations, the Supreme Court concluded that "if § 2(B) only requires state officers to

conduct a status check during the course of an authorized, lawful detention or after a detainee has

been released, the provision likely would survive preemption." *Id.* at 414 (noting further that

"[t]he accepted way to perform these status checks is to contact ICE). Since SB 4, like Section

2(B) of SB 1070, authorizes immigration status inquiries only within the context of a lawful

detention or arrest, the Court finds that Plaintiffs have not shown that it is likely field preempted.

---

[9]Docket no. 24-1 p. 26.

b. Conflict Preemption

Plaintiffs also claim that Section 752.053(b)(1) authorizes local officers to make warrantless inquiries about immigration status, in conflict with 8 U.S.C. § 1357(a)(1), which vests warrantless interrogation authority in a defined group of federal agents.[10] Plaintiffs also argue that this case is distinguishable from *Arizona* because it is not the scope of the detentions under SB 4 that raise constitutional concerns, but the grant to local officers of the authority reserved to federal agents under 8 U.S.C. § 1357(a)(1).[11] Plaintiffs therefore argue that Congress intended that only immigration officials—or local officers participating in immigration enforcement activities pursuant to 8 U.S.C. § 1357(g)—would be authorized to make immigration inquiries. However, in *Arizona*, the Supreme Court, confronted with similar statutory text,[12] found that Section (2)(B) should not be preempted at the pre-enforcement stage. *Arizona*, 567 U.S. at 414, 422 ("§ 2(B) of the Arizona law … adds nothing to the authority that Arizona law enforcement officers, like officers in all other States, already possess under federal law."). Notably, Section (2)(B) made immigration status inquiries mandatory, requiring that " a reasonable attempt *shall* be made, when practicable, to determine the immigration status of the person." By contrast, SB 4 does not mandate that immigration status inquires be made, but instead leaves the decision to make immigration inquiries at the discretion of local officers. Section (2)(B) also required that immigration status be verified with ICE. No parallel

---

[10]Docket no. 150 p. 23.

[11]Docket no. 150 p. 20-25.

[12]Section 2(b) require both that, as to persons placed under arrest, officers have "the persons immigration status determined before the person is released" and that "[t]he person's immigration status shall be verified with the federal government pursuant to [8 U.S.C. § 1373 (c)]." The Supreme Court concluded that "[t]he federal scheme leaves room for a policy requiring state officials to contact ICE as a routine matter" but did not explicitly discuss the Supremacy Clause implication of a state law requiring or authorizing immigration status inquiries directed to detainees, rather than to ICE.

requirement exists in SB 4, where a local officer can decide whether or not to inquire and whether or not to verify or share the information obtained with ICE. The Court cannot find that Plaintiffs are likely to succeed on the merits of their preemption arguments regarding Section 752.053(b)(1). The immigration status inquiry permitted under SB 4 could only take place during an already lawful detention or arrest.[13]  However, it is crucial for the Court to note that SB 4 only permits immigration status inquiries during an already lawful detention or arrest. Section 752.053(b)(1) permits an immigration status inquiry when a person is lawfully detained or arrested, but does not purport to authorize local officers to effect arrests or prolong detentions in order to inquire about or investigate immigration status. SB 4's immigration status inquiry provision does not create an independent ground for conducting a stop. Therefore under SB 4 an officer may not detain or arrest an individual for the sole purpose of making an immigration inquiry.

### 3.    Information Sharing (Section 752.053(b)(2))

Section 752.053(b)(2) prevents local entities and campus police departments from adopting, enforcing, or endorsing policies that would prohibit local officials from maintaining immigration status information or exchanging it with federal, state, or local government entities. Texas contends that this prohibition is "fully consonant with federal immigration statutes evincing a policy in favor of States sharing immigration-related information with the federal government."[14] Texas relies on the *Arizona* case for the proposition that consultation between

---

[13]The Fifth Circuit in *Muehler v. Mena*, 544 U.S. 93, 94 (2005) examined immigration inquiries during the course of a lawful detention and despite having ample opportunity to  hold immigration status inquiries by local or state officers are impermissible during an otherwise lawful detention, it did not hold so. Although in *Mena* the challenges were under the Fourth Amendment the Fifth Circuit held the immigration inquiry during a lawful detention was permissible.

[14]Docket no. 91 at 28.

federal and state officials is not only constitutional but "an important part of the immigration system." *Arizona*, 567 U.S. at 411. Texas further seeks to assure the Court that "SB 4 promotes [federal immigration power] by encouraging greater cooperation between state and local officials and the federal government."[15] The Court also notes the similarities between Section 752.053(b)(2) and 8 U.S.C. § 1373, which states in pertinent part:

> Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
>
> (1)   Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
>
> (2)   Maintaining such information.
>
> (3)    Exchanging such information with any other Federal, State, or local government entity.

Plaintiffs argue Section 752.053(b)(2) is preempted because it regulates the same activity as 8 U.S.C. § 1373 but in a different manner, because SB 4 eliminates local discretion regarding the sharing of information with ICE.[16] Plaintiffs' argument is one of conflict preemption, because they argue that implementation of Section 752.053(b)(2) would conflict with 8 U.S.C. § 1373.

### a.   Conflict Preemption

The Supreme Court's holding in *Arizona* indicates that, under the scheme established by Congress for communication of immigration status immigration, there is room for state and local participation. The Supreme Court noted that "[c]onsultation between federal and state officials is

---

[15]Docket no. 91 at 28.

[16]*Id.*

an important feature of the immigration system" and that Congress "has encouraged the sharing of information about possible immigration violations." *Arizona*, 567 U.S. at 411-12. The federal scheme thus leaves room for a policy requiring state and local officers to contact ICE as a routine matter. *Whiting*, 563 U.S. at 609-10. The Supreme Court further held that, "[c]onsultation between federal and state officials is an important feature of the immigration system. In fact, Congress has encouraged the sharing of information about possible immigration violations." *Id.* (citing 8 U.S.C. §§ 1357(g)(10)(A), 1373(c)).

The Supreme Court in analyzing Section 2(B) also recognized that while there are hypothetical situations in which Section 2(B) would be unconstitutional, there was a way for the statute to be read to comply with federal law. Here, because Plaintiffs make a facial challenge, it may "only succeed ... by establishing that no set of circumstances exists under which the Act would be valid, i.e., that the law is unconstitutional in *all* of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (emphasis added)). In *Arizona*, the Supreme Court concluded it was improper to enjoin Section 2(B) before the state courts had an opportunity to construe it and without some showing that enforcement of the provision in fact conflicted with federal immigration law and its objectives. *Arizona*, 567 U.S. at 416. Similarly here, this Court finds that under the Supreme Court's holding in *Arizona* it would be improper to enjoin Section 752.053(b)(2) at the pre-enforcement stage. However, the Court finds that the only permitted—but not required—action under SB 4 following an immigration inquiry is sharing and maintaining information. If for example, during a lawful stop an officer obtains information that the detained individual is undocumented, the officer may not arrest the individual or prolong the detention on this basis. However, under SB 4, officers are permitted—

again, not required—to share this information with ICE, or other appropriate federal agencies, or law enforcement entities. [17]

### b. Penalties

Plaintiffs also argue that Section 752.053(b)(2) is preempted because its information-sharing requirements are enforced  with penalties that Congress declined to impose.[18] Plaintiffs argue that adding a penalty provision to 8 U.S.C. § 1373 is exclusively within Congress's authority, and that Congress is currently considering whether to enact penalties for non-compliance with 8 U.S.C. § 1373.[19] Like SB 4, Section 2(B) of Arizona's SB 1070 included civil penalties for non-compliance. Ariz. Rev. Stat. § 11-1051(H).[20] Although the Supreme Court did not directly address the issue of penalties for non-compliance with information-sharing requirements of SB 1070, it did address penalty provisions attached to other sections of the Arizona statute and found them to be preempted because they either created penalties that interfered with Congress's intent or invaded a field occupied by the Federal Government. *Arizona v. United States*, 567 U.S. 387, 403 (2012) (state criminal penalties for violations of

---

[17]*See* p. 84-88  *infra.*

[18]Docket no. 154 at 16.

[19] Docket no. 154 at 17.

[20]Arizona's SB 1070 imposed both civil penalties against localities "that adopt[] or implement[] a policy that limits or restricts the enforcement of federal immigration laws, including 8 United States Code §§ 1373 and 1644," SB 1070 Section 2(B), Ariz. Rev. Stat. § 11-1051(H), and criminal penalties against aliens for failure to carry registration documents and those who applied for work when not authorized to work, SB 1070 Sections 3(A) and 5(C), Ariz. Rev. Stat. §§ 13-1509(A) and 13-2928(C). The provisions regarding civil penalties for localities in SB 4 and Arizona's SB 1070 are similar, although Texas's penalties are more severe. The Arizona statute provided for civil penalties of "not less than five hundred dollars and not more than five thousand dollars for each day that the policy has remained in effect after the filing of an action" challenging the policy. Ariz. Rev. Stat. § 11-1051(H). The penalty provisions of SB 4 authorize a civil penalty of "not less than $1,000 and not more than $1,500 for the first violation" and "not less than $25,000 and not more than $25,500 for each subsequent violation[,]" where "each day of a continuing violation . . . constitutes a separate violation[,]" plus the removal from office of any "person holding an elective or appointive office of a political subdivision of this state" that violates Section 752.053. SB 4 Section 1.01, Tex. Gov't Code §§ 752.056 and 752.0565.

federal laws regarding unauthorized employment and carrying registration documents preempted both because they "ignore[] the basic premise of field preemption—that States may not enter, in any respect, an area the Federal Government has reserved for itself" and also because "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted"). In contrast, the Supreme Court has allowed states to create additional penalties for conduct that violates federal law where the regulated conduct falls within the regulatory power reserved to the state, rather than within an "area of dominant federal concern." *Whiting*, 563 U.S., at 601, 604-05.

The crucial distinction between the penalties that were preempted in *Arizona* and those that were not in *Whiting* is that the preempted penalties were either attached to state regulation of matters that the Court found were reserved for Congress, or they conflicted with Congressional intent. SB 1070's penalties for failing to comply with its mandatory information-sharing requirements were not preempted in *Arizona*, and the Court found that the substantive requirement was not preempted either, because it did not intrude into an exclusively federal field and could operate in a manner that did not conflict with Congressional intent. *Arizona*, 567 U.S. at 412 ("Congress has done nothing to suggest it is inappropriate to communicate with ICE in these situations. Indeed, it has encouraged the sharing of information about possible immigration violations."). In light of the Supreme Court's holding in *Arizona*, and the similarity in the substantive requirements between Section 752.053(b)(2), 8 U.S.C. § 1373, and the information-sharing provisions of Arizona's SB 1070, the Court cannot conclude that Plaintiffs have shown a likelihood of success on the merits of their claim that Section 752.053(b)(2) is preempted.[21]

---

[21] The Court will address penalties as applied to other provisions of SB 4 below.

4.      Enforcement Assistance (Section 752.053(b)(3))

Plaintiffs argue that §752.053(b)(3) conflicts with federal law because it allows state

officials to perform the duties of immigration officers in a manner inconsistent with federal law

under 8 U.S.C. § 1357. Section 752.053(b)(3) prevents local entities from prohibiting or

materially limiting their employees from "[a]ssisting or cooperating with a federal immigration

officer as reasonable or necessary, including providing *enforcement assistance*." The INA, on the

other hand, sets forth a number of conditions that must be satisfied in order for state and local

officers to perform the functions of immigration enforcement officers. 8 U.S.C. § 1357(g).

8 U.S.C. 1357(g) states as follows:

> (1) Notwithstanding section 1342 of Title 31, the Attorney General may enter into
> a written agreement with a State, or any political subdivision of a State, pursuant
> to which an officer or employee of the State or subdivision, who is determined by
> the Attorney General to be qualified to perform a function of an immigration
> officer in relation to the investigation, apprehension, or detention of aliens in the
> United States (including the transportation of such aliens across State lines to
> detention centers), may carry out such function at the expense of the State or
> political subdivision and to the extent consistent with State and local law.
>
> (2) An agreement under this subsection shall require that an officer or employee
> of a State or political subdivision of a State performing a function under the
> agreement shall have knowledge of, and adhere to, Federal law relating to the
> function, and shall contain a written certification that the officers or employees
> performing the function under the agreement have received adequate training
> regarding the enforcement of relevant Federal immigration laws.
>
> (3) In performing a function under this subsection, an officer or employee of a
> State or political subdivision of a State shall be subject to the direction and
> supervision of the Attorney General.
>
> (4) In performing a function under this subsection, an officer or employee of a
> State or political subdivision of a State may use Federal property or facilities, as
> provided in a written agreement between the Attorney General and the State or
> subdivision.
>
> (5) With respect to each officer or employee of a State or political subdivision
> who is authorized to perform a function under this subsection, the specific powers
> and duties that may be, or are required to be, exercised or performed by the

individual, the duration of the authority of the individual, and the position of the agency of the Attorney General who is required to supervise and direct the individual, shall be set forth in a written agreement between the Attorney General and the State or political subdivision.

(6) The Attorney General may not accept a service under this subsection if the service will be used to displace any Federal employee.

(7) Except as provided in paragraph (8), an officer or employee of a State or political subdivision of a State performing functions under this subsection shall not be treated as a Federal employee for any purpose other than for purposes of chapter 81 of Title 5 (relating to compensation for injury) and sections 2671 through 2680 of Title 28 (relating to tort claims).

(8) An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law.

(9) Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection.

(10) Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State—

> (A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or

> (B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

These requirements include a written agreement between federal immigration enforcement and the local entity, which provides "a written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws"; requires that the local officer or employee "shall be subject to the direction and supervision of the Attorney General"; specifies

"the specific powers and duties that may be, or are required to be, exercised or performed by the individual, the duration of the authority of the individual, and the position of the agency of the Attorney General who is required to supervise and direct the individual"; and imposes other specific requirements. 8 U.S.C. § 1357(g).

At issue is whether 8 U.S.C. § 1357(g)(9) and (10) ought to be interpreted as affirmatively authorizing local immigration enforcement or merely imposing two limitations on the rest of subsection (g). First, 8 U.S.C. § 1357(g)(9) provides that subsection (g) does not "require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection." Second, 8 U.S.C. § 1357(g)(10) states that subsection (g) does not:

> require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State ... to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or ... otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

Plaintiffs argue that § 752.053(b)(3) conflicts with 8 U.S.C. 1357(g) in several ways. First, Plaintiffs claim that 8 U.S.C. § 1357(g), read as a whole, requires that local entities enter into written agreements with the Attorney General[22] before local law enforcement can systematically carry out the functions of immigration officers. Second, Plaintiffs argue that Section 752.053(b)(3) is preempted because it does not require local officials to act under the supervision and direction of the Attorney General and undergo training to perform the functions

---

[22]Although the functions of the former Immigration and Naturalization Service (INS) have been assumed by ICE and placed within DHS rather than the Department of Justice, *see, e.g., Silva v. United States*, 16-1870, 2017 WL 3399882, at *1 n.2 (8th Cir. Aug. 9, 2017), the Court continues to refer to the "Attorney General" in accordance with the INA's statutory text and the Supreme Court in *Arizona*, and because the distinction is not material to the issues in this case.

of immigration officers as required in 8 U.S.C. § 1357(g). Third, Plaintiffs argue that 8 U.S.C. § 1357(g)(10) should not be read in a way that negates the requirements imposed in the remainder of subsection (g).[23]

> ### a.   Formal Agreement, Training, and Oversight

Plaintiffs argue that SB 4 goes beyond authorizing immigration status inquiries and information sharing, and places immigration enforcement into the hands of local officials without also requiring that they meet the requirements established by Congress for local participation in immigration enforcement.[24] Plaintiffs have raised both field and conflict preemption arguments regarding immigration enforcement by local officials.

Plaintiffs argue that Section 752.053(b)(3) is distinguishable from Section 2(B) in *Arizona* because SB 4 empowers local officials to go beyond the local cooperation and information-sharing that the Supreme Court approved, and into the field of enforcing immigration law.[25] Plaintiffs argue that this distinction is evident from the structure of SB 4,

---

[23]Plaintiffs also argue 752.053(b)(3) is preempted because it requires cities to offer free services to the federal government, in conflict with 8 U.S.C. 1357(g)(6) and 31 U.S.C. § 1342. Docket no. 139. The Court does not find it necessary, at this juncture, to reach this claim.

[24]Docket no. 150 p. 19-23 (citing 8 U.S.C. § 1357(g)).

[25]DHS guidance also draws a clear distinction between cooperation and communication, noting that, while local policies prohibiting the sharing of immigration information are prohibited by the INA,

> In requiring cooperation, the INA thus requires that a state or local law enforcement officer who assists DHS officers in their enforcement of the immigration laws must at all times have the freedom to adapt to federal priorities and direction and conform to federal discretion, rather than being subject to systematic mandatory state or local directives that may be at odds with DHS. Although a similar lack of receptiveness to federal priorities might pervade even a system that gives officers discretion, any such state or local government-directed mandate would necessarily function as a parallel or contradictory direction, in competition with the Secretary's direction, as to how to enforce immigration law, thereby eroding the federal government's exclusive authority over immigration. … While any mandatory scheme raises these concerns, they are

which addresses local cooperation, information-sharing, and immigration enforcement in different subsections of Section 752.053(b). Finally, Plaintiffs argue that 8 U.S.C. § 1357(g)(10), contrary to Defendants' arguments, does not negate the specific requirements set out in the rest of subsection (g). Defendants, on the other hand, read the formal agreement requirements set out in Section 1357(g) as one of the permissible ways for localities to cooperate with immigration officials.

Defendants argue Section 1357(g) does not preempt other forms of local cooperation with federal immigration officials outside the context of a formal written agreement.[26] Defendants further argue "Congress could not have legislated a 'compulsory local role' in federal immigration enforcement, because that would be unconstitutional commandeering under the Tenth Amendment." Docket no. 91 p. 33 (internal citations omitted). The Court will address three issues raised by the parties' arguments: (1) first whether the State may enact regulation creating their own requirements—or lack thereof—for local officers to participate in immigration enforcement in light of 8 U.S.C. § 1357(g) (field preemption); (2) whether subsection (g)(10) can be read to create an exemption from the requirements outlined in § 1357(g)(1)-(5); and (3) whether SB 4's enforcement provision creates a different system for cooperation (conflict preemption).

---

particularly pressing where state or local mandates are codified because such codified laws are by their nature more difficult to adjust to and respond to changing priorities of the federal government.

*U .S. Dep't of Homeland Security ("DHS"), Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters* 9-10 (July 16, 2015) *available at* https://www.dhs.gov/publication/guidance-state-and-local-governments-assistance-immigration-enforcement-and-related.

[26]Docket no. 91 at 22.

i.    Field Preemption

Congress may "foreclose any state regulation in the area," irrespective of whether state law is consistent or inconsistent with "federal standards." *Oneok, Inc. v. Learjet, Inc.*, ___ U.S. ___, 135 S. Ct. 1591, 1595 (2015) (citing *Arizona*, 567 U.S at 401 (emphasis added)). In such situations, Congress has forbidden the State to take action in the field that the federal statute pre-empts. *Id*. Congress's intent to occupy a field "can be inferred from a framework of regulation 'so pervasive ... that Congress left no room for the States to supplement it' or where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona*, 567 U.S. at 399. The nature of the power exerted by Congress, the object sought to be attained, and the character of the obligations imposed by the law, are all important in considering the question of whether supreme federal enactments preclude enforcement of state laws on the same subject. *Hines v. Davidowitz*, 312 U.S. 52, 70 (1941).

Plaintiffs have argued Texas's regulation of immigration enforcement has impermissibly encroached upon a field that Congress exclusively reserved for the Federal government.[27] Plaintiffs argue the extensive requirements set out in 8 U.S.C. § 1357(g) which delineate the training, supervision, and certification requirements for local officials to participate in immigration enforcement, coupled with Section 1103(a)(10), extending local officials authority to enforce immigration laws in the event of an "imminent mass influx of aliens arriving off the coast of the United States"; and Section 1252c, granting local authority to arrest in criminal illegal reentry cases, "but only after the State or local law enforcement officials obtain

---

[27]Docket no. 151 at 12.

appropriate confirmation," makes clear Congress intended to prevent unilateral State involvement and State authorization of immigration enforcement.[28]

The Supreme Court's reasoning in *Hines* shed light on the factors courts should consider when analyzing preemption challenges. *Hines v. Davidowitz*, 312 U.S. at 70. First, courts ought to consider the nature of the power exerted by Congress. Here, Congress set out exacting requirements to be met before involving local officers in immigration enforcement. These requirements indicate Congress intended for the Federal Government—the Attorney General in particular—to provide oversight and direction to local officers.

Next, courts should consider the object Congress sought to obtain. *Hines*, 312 U.S. at 70. The requirements of 8 U.S.C. § 1357(g) indicate supervision and direction are a crucial component of immigration enforcement by local officials. As the Supreme Court has noted, "[d]iscretion in the enforcement of immigration law embraces immediate human concerns." *Arizona*, 567 U.S. at 396. Notably, 8 U.S.C. § 1357(g)(3) states "in performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the Attorney General." Thus, subsection (g)(3) makes clear that a local officer or employee of a state or political subdivision exercising authority granted under 8 U.S.C. § 1357(g) must be subject to the direction and supervision of the Attorney General. Subsection (g)(3) states in clear terms it applies to functions exercised under the entire subsection (g), including subsection (g)(10). Because subsection (g) grants enforcement authority it can be inferred Congress sought to ensure that the Attorney General and the Federal Government retained enforcement direction and discretion in all local enforcement efforts including those contemplated under subsection (g)(10).

---

[28]Docket no. 151 at 11.

Third, the Court ought to consider the character of the obligations imposed by 8 U.S.C. § 1357(g). Plaintiffs argue the requirement of formal agreements between the Attorney General and the State or locality illustrates the importance of Federal direction and supervision in immigration enforcement. Plaintiffs further argue the training and certification requirements in 8 U.S.C. § 1357(g) highlight the importance of creating uniform enforcement policies. In *Arizona* the Supreme Court reasoned that "authorizing state and local officers to engage in these enforcement activities as a general matter, [...] creates an obstacle to the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 410 (finding state law authorizing state officers to make warrantless arrests based on removability was preempted). In analyzing Section 6 in *Arizona*, the Supreme Court reasoned that "Federal law specifies *limited circumstances* in which state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408 (emphasis added). Further, "[t]here are significant complexities involved in enforcing federal immigration law." *Id.* The Supreme Court's analysis in *Arizona* made clear the importance of the supervising role of the Attorney General as well as the written certifications requirements. *Id.* at 409 (noting that "agreements reached with the Attorney General must contain written certification that officers have received adequate training to carry out the duties of an immigration officer"). Thus, the Court finds merit in Plaintiffs' argument that States should not be able to exempt themselves from the exacting requirements of 8 U.S.C. § 1357(g) by creating State regulation that circumvents such requirements. The Court further finds, after examining the federal statute as a whole and identifying its purpose and intended effects, that Plaintiffs have shown a likelihood that the federal interest in the field of immigration enforcement is so dominant that it may preclude enforcement of state laws on this subject and Tex. Gov't Code § 752.053(b)(3) is likely to be field preempted.[29]

---

[29]Congress's intent to preserve federal control over local participation in immigration

ii.     Conflict Preemption

Plaintiffs have also raised issues of conflict preemption. The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives. *Florida Lime*, 373 U.S. at 142.

Statutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the "total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions." *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 250 (1970) (citing *Richards v. United States*, 369 U.S. 1, 11 (1962)); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285 (1956); *United States v. Hutcheson*, 312 U.S. 219, 235 (1941)). Statutory interpretation requires courts to "rea[d] the whole statutory text, conside[r] the purpose and context of the statute, and consul[t] any precedents or authorities that inform the analysis." *Dolan v. Postal Service*, 546 U.S. 481, 486 (2006). An inquiry into statutory interpretation must consider "the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

The Court must therefore decide whether Section 1357(g)(10), when read in the context of the whole statute, creates a way for state and local police to "assist[] or cooperat[e] with a federal immigration officer" on a routine basis, circumventing the requirements Congress set out

---

enforcement is also evident from Section 1357(g)(10)'s reference to local officer "cooperat[ion]" in the "removal" of aliens not lawfully present. It is clear that state and local officers have no authority to remove an alien from the United States, or to institute or conduct removal proceedings. Congress's inclusion of this function among the four enforcement measures listed in Section 1357(g)(10) therefore suggests that they intended this "cooperation" to be subject to federal supervision and control, with the Secretary having the leading and primary role. *DHS Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters* 9 (July 16, 2015) *available at* https://www.dhs.gov/publication/guidance-state-and-local-governments-assistance-immigration-enforcement-and-related.

in 8 U.S.C. § 1357 (g)(1)-(5). If Section 1357(g)(10) can be read to permit this, it would be unlikely that Section 752.053(b)(3) would be conflict preempted. However, if Section 1357(g)(10) does not permit this, and no other provision of federal law authorizes this type of informal participation in immigration enforcement by individual officers, Section 752.053(b)(3) would frustrate the purpose of the training and supervision requirements set forth in Section 1357 (g).

To determine the intent of Congress, we first look to the statutory text. Section 1357(g) creates a comprehensive framework to permit local officials to perform the functions of immigration officers. The first requirement of this participation is that the Attorney General enter into "a written agreement" with "a State, or any political subdivision of a State[.]" 8 U.S.C. § 1357(g)(1). That agreement must include a "written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws." 8 U.S.C. § 1357(g)(2). Section 1357(g)(5) requires that the agreement set out the specific powers and duties to be exercised by the local officers or employees, the duration of their authority, and the details of their supervision by the Attorney General. And Section 1357(g)(10), even while appearing to excuse the requirement of an agreement, still requires that local or state officer or employee participation in "the identification, apprehension, detention, or removal of aliens" be in "cooperat[ion] with the Attorney General." 8 U.S.C. 1357(g)(10).

Defendants' proposed interpretation is that "§ 1357(g)(10) expressly contemplates the States' inherent authority to cooperate with the federal government in enforcing immigration laws[.]"[30] This argument conflates communication of immigration status information with

---

[30]Docket no. 91 at 30. DHS guidance on the topic makes clear that there are instances in which states are not required to seek affirmative advance authorization from the federal government for every

cooperation in immigration enforcement.[31] As the Court previously discussed, sharing of

immigration information is expressly addressed by 8 U.S.C. §§ 1373 and 1357(g)(10)(A). No

separate statute exists that describes the involvement of local or state officials in routine

immigration enforcement. The statute itself separates cooperation in sharing of information

Section 1357(g)(10)(A) and cooperation in enforcement in Section 1357(g)(10)(B). Defendants'

argument that the states possess "inherent authority" to carry out immigration enforcement is at

odds with the language of the INA, which contemplates the states, in the absence of a formal

agreement, may only "cooperat[e] with the Attorney General[.]" Subsection (g)(10)(B) allows

states to cooperate with the Attorney General absent a formal agreement; it does not place

routine enforcement authority in the hands of the states. [32]

The Supreme Court in *Arizona* recognized there is ambiguity in what constitutes

cooperation. *Arizona*, 567 U.S. at 410 ("[t]here may be some ambiguity as to what constitutes

cooperation under the federal law"). Such ambiguity is central to the determination of Plaintiffs'

likelihood of success on their conflict preemption argument regarding Section 752.053(b)(3).

Plaintiffs argue Texas cannot simply offer up local enforcement officials to routinely perform

---

act of assistance—but only where the assistance is part of a program that has been previously established by the federal government. The INA's requirement that the assistance rendered by state and local officers be cooperative or responsive to federal priorities and discretion likewise does not require affirmative authorization in advance or federal involvement in every single act of assistance. DHS may choose to confine its role simply to establishing a general program under which a state or local officer may act repeatedly in a manner that is consistent with that program and with the policy or direction set by the Federal Government as it relates to the program) *DHS Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters* 10 (July 16, 2015) *available at* https://www.dhs.gov/publication/guidance-state-and-local-governments-assistance-immigration-enforcement-and-related. The Federal Government's own interpretation of § 1357(g)(10) showcases the permissible ways of cooperation outside a formal agreement. The two permissible forms of state or local participation are:(1) through federally established programs, and (2) on a case-by-case basis.

[31]Docket no. 90 at 30-32.

[32]Defendants' argument that SB 4's does not target aliens or immigration law is unpersuasive. Although the mandates of SB 4 are directed at local officials, enforcement assistance is inexorably intertwined with Federal immigration law.

immigration enforcement and bypass the training, supervision, and certification requirements that Congress has established. DHS guidance illustrates that contemplated cooperation outside formal agreements comes in the form of pre-established programs or on a "case-by-case basis."[33] Further, the language of the statute indicates systematic cooperation should be at behest of the Attorney General rather than motivated by state law. In other words, there can be no routine mandatory system established when the Attorney General has not requested it and will not supervise local enforcement.

Defendants argue "Congress went right up to the line of what it could do without running afoul of the Tenth Amendment's anti-commandeering doctrine" and that "Congress's decision to encourage voluntary local cooperation could not have preempted State-enacted policies regulating—or even requiring—local cooperation."[34] The Court is not persuaded by this argument. Authority to regulate immigration enforcement rests with the Federal Government. *Arizona*, 567 U.S. at 444-45 (the Federal Government retains the discretion that matters most— that is, the discretion to enforce [federal immigration] law in particular cases). Texas cannot— through state law—expand the "limited circumstances" in which local enforcement officials may

---

[33]DHS guidance regarding state and local assistance in immigration enforcement states:

> As contemplated by [Section 1357(g)(10)], DHS has invited and accepted the assistance of state and local law enforcement personnel in a variety of contexts that lie outside of the written agreements provided for by paragraphs (1)-(9) of subsection 1357(g), such as through BESTs, the Criminal Alien Program, Fugitive Operations Task Forces, and Operation Community Shield. Moreover, state and local law enforcement officers render assistance to DHS on a case-by-case basis as immigration matters come to their attention in the performance of their regular duties.

*DHS Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters* 7 (July 16, 2015) *available at* https://www.dhs.gov/publication/guidance-state-and-local-governments-assistance-immigration-enforcement-and-related.

[34]Docket no. 91 at 33.

perform the functions of immigration officers. *Arizona* 567 U.S. at 387. It is not the role of the State or the Court to speculate about what Congress would do in the absence of the Constitution's limits on its authority. The Court cannot tailor its application of the Supremacy Clause based on such speculation.

Defendants argue that the INA "contemplates the States' inherent authority to cooperate [with the removal of aliens]."[35] However, the enforcement examples listed in Section 1357(g)(10)(B), which include "identification, apprehension, detention, or removal" make clear this subsection was not intended to be an independent grant of power to the states. Under Texas' interpretation, if subsection (g)(10) was a separate grant of state authority divorced entirely from the requirements listed in (g)(1)-(5), it would vest states with the right to apprehend and remove aliens without supervision and direction from the Federal Government. However, is clear that the removal of aliens is within the sole purview of the Federal Government, and that "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408. In *Arizona* the Supreme Court's stated "principal example" of these limited circumstances "is when the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government." *Id. See* 8 U.S.C. § 1357(g)(1).[36] Officers covered by these agreements are subject to the Attorney

---

[35]Docket no. 91 at 30.

[36]The Supreme Court further considered other statutes that permit local participation outside the agreement requirements of 8 U.S.C. § 1357(g). For example: § 1103(a)(10) permits local immigration enforcement in the event of an "imminent mass influx of aliens arriving off the coast of the United States"; and § 1252c provides local authority to arrest in criminal illegal reentry cases, but only after "appropriate confirmation from [ICE] of the status of such individual and only for such period of time as may be required for [ICE] to take the individual into Federal custody"). Section 1324(c) also provides local authority to arrest for the criminal offense of bringing in and harboring certain aliens. The Supreme Court's reasoning in *Arizona* makes clear the Court considered the grant of authority extended by Congress to state and local officers and found that unilateral enforcement was not contemplated. *Arizona*, 567 U.S. at 409.

General's direction and supervision. 8 U.S.C. § 1357(g)(3). Federal immigration law involves significant complexities, one of which is the determination of removability.[37] *See Padilla v. Kentucky*, 559 U.S. 356, 379-80 (2010) (Alito, J., concurring in judgment). For this reason, Congress has required that enforcement cooperation agreements under Section 1357(g) contain written certification that officers have received adequate training to carry out the duties of an immigration officer. *See* 8 U.S.C. § 1357(g)(2); 8 CFR §§ 287.5(c) (arrest power contingent on training), 287.1(g) (defining the training).[38]

Although the Supreme Court in *Arizona* did not address Section 1357(g)(10)(B) in the broad context of enforcement, it concluded there are "limited circumstances in which state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408-09. It would be paradoxical to conclude that, despite the exacting requirements set out in Section 1357(g), and despite the "limited circumstances" recognized by the Supreme Court, a state could establish its own cooperation scheme under which local officers and employees could routinely avoid the requirements imposed by Federal law. Although formal cooperation agreements are not always necessary, the Supreme Court drew a clear line distinguishing communication from enforcement cooperation. *Arizona*, 567 U.S. at 411-12 (discussing 8 U.S.C. § 1357(g)(10)(A)). The Supreme Court held that putting state officers in the position of holding aliens in custody for possible unlawful presence without federal direction or supervision would disrupt the federal

---

[37]This Circuit's own precedent recognizes the "significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable," an observation that reinforces the importance of the federal government's supervisory role over the limited contexts, including harboring, where the Attorney General has delegated arrest authority to state officers. *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 531 (5th Cir. 2013) (citing *Arizona*, 567 U.S. at 408). The Attorney General's supervisory role in immigration enforcement has been the cornerstone for delegation of immigration enforcement duties to local or state enforcement officers.

[38]*Arizona*, 567 U.S. at 409.

framework. *Arizona*, 567 U.S. at 413 ("The program put in place by Congress does not allow state or local officers to adopt this enforcement mechanism."). Similarly, this Court finds bypassing training, certification, and supervision and establishing a systematic local enforcement procedure would likely go against the program put in place by Congress. Therefore, the Court finds that Plaintiffs have shown that they are likely to succeed on the merits of their claim that Section 752.053(b)(3) is conflict preempted.

### Violation of Free Speech

The City of El Cenizo Plaintiffs, City of San Antonio Plaintiffs, El Paso County Plaintiffs, Travis County Plaintiffs, City of Dallas, City of Austin, and City of Houston allege that SB 4 violates the First Amendment, as applied to the states through the Fourteenth Amendment.[39] Plaintiffs' First Amendment challenge to SB 4 is three fold: the first is an overbreadth challenge; the second is a vagueness challenge; and the third is a viewpoint discrimination challenge.

A.     Standing to assert First Amendment claims

Defendants do not challenge Plaintiffs' standing to assert their First Amendment claims, and there is no impediment under the law that would foreclose their ability to bring such claims. The record shows that several named plaintiffs face an imminent threat of censorship and run a real risk of punishment under the terms of SB 4.[40] But even if the individual rights of these named plaintiffs were not implicated, the prudential limitations on standing are relaxed in the

---

[39]Houston and Dallas also assert that SB 4 violates article I, § 8 of the Texas Constitution. The Court does not find it necessary, at this juncture, to reach the claims under the Texas Constitution.

[40]Docket no. 57-14, El Cenizo Exh. 32-B (Public Statements of Governor Greg Abbott) ("I'm putting the hammer down ... Texas is not going to stand for it ... We are going to be asserting fines. We're going to be seeking court orders that could lead to putting these people behind bars, the officials who are violating their oath of office."). Although the threat is real, the plaintiffs have not and cannot be charged based on conduct that occurred prior to September 1 – the date that SB 4 takes effect.

First Amendment context. *LAPD v. United Reporting Pub. Corp.*, 528 U.S. 32, 38-39 (1999); *Maryland Secretary of State v. Joseph H. Munson Co.*, 467 U.S. 947, 954-58 (1984); *Broadrick v. Oklahoma*, 413 U.S. 601, 612-13 (1973); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006).

## B.    First Amendment protections

"Statements by public officials on matters of public concern must be afforded First Amendment protection." *Pickering v. Board of Education*, 391 U.S. 563, 574 (1968).[41] Public officials at the local level – whether elected, appointed, or otherwise employed – do not relinquish their First Amendment rights which they would otherwise enjoy as private citizens to comment on matters of concern. *Lane v. Franks*, __ U.S. __, 134 S.Ct. 2369, 2374 (2014); *Pickering*, 391 U.S. at 568. Local governmental policy on the enforcement of immigration laws is a matter of legitimate public concern.[42] Free and open debate on matters of public concern is a cornerstone of democracy and the core value protected by the First Amendment. Local elected officials, and persons who are appointed or employed by local governmental entities, are expected to engage in open, robust debate on such issues, as such debates lead to a more informed electorate. Local officials are well informed on how SB 4 and the enforcement of

---

[41]The *Pickering* line of cases arise from employer regulated speech. "The government as employer indeed has far broader powers [to regulate speech] than does the government as sovereign[.]" *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion); *James v. Collin County*, 535 F.3d 365, 379 (5th Cir. 2008); *see also City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) ("A governmental employer may impose certain restraints on speech of its employees that would be unconstitutional if applied to the general public"); *Scott v. Flowers*, 910 F.2d 201, 210 (5th Cir. 1990) ("the state as employer may restrict the speech of its employees in ways in which the state as sovereign may not restrict the speech of its citizens"). In this case, the State of Texas is the sovereign and not the employer, so a more demanding level of scrutiny is required.

[42]"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 134 S.Ct. at 2380 (citing *Snyder v. Phelps*, 562 U.S. __, 131 S.Ct. 1207 (2011)).

immigration laws affect local practice and policy, and must be able to speak out freely on such

issues without fear of penalty, reprisal, retaliation, and/or removal from office.[43] Censoring

officials would disserve the public interest and create a serious disconnect between local officials

and the communities they serve.

          C.      Facial challenge to overbreadth and vagueness

Plaintiffs assert that SB 4's blanket prohibition against any local government official or

employee endorsing any policy that would materially limit immigration law is unconstitutionally

vague, overbroad, and sweeping in coverage. In the First Amendment context, the facial

overbreadth and vagueness challenges are related in practice, yet analytically distinguishable.[44]

The courts have indicated a preference for addressing the overbreadth challenge first and, if that

fails, the vagueness challenge next. *Village of Hoffman Estates v. Flipside, Hoffman Estates,*

*Inc.*, 455 U.S. 489, 494-45 (1983); *Fairchild v. Liberty ISD*, 597 F.3d 747, 755-56 (5th Cir.

2010); *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009).

SB 4 states, in relevant part:

Sec. 752.053. POLICIES AND ACTIONS REGARDING IMMIGRATION ENFORCEMENT.

(a) A *local entity* or campus police department may not:

---

[43]"There is considerable value in encouraging, rather than inhibiting, speech by public employees. For government employees are often in the best position to know what ails the agencies for which they work. The interest at stake is as much the public's interest in receiving informed opinions as it is the employee's own right to disseminate it." *Lane*, 134 S.Ct. 2377 (citing *Churchill*, 511 U.S. at 674 (plurality opinion) and *San Diego v. Roe*, 543 U.S. 77, 82 (2004) (*per curiam* )); *see also Broadrick*, 413 U.S. at 619 ("Public discussion of local, state, national, and international affairs is grist for the First Amendment mill. Our decisions emphasize that free debate, uninhibited discussion, robust and wide-open controversy, a multitude of tongues, the pressure of ideas clear across the spectrum set the pattern of First Amendment freedoms.") (Douglas, J., dissenting).

[44]"[T]he vices of vagueness and overbreadth are not wholly separable, in the area of the first amendment ... when the Supreme Court has spoken of facial vagueness of statutes touching first amendment rights, it has seldom if ever, been referring to a constitutional vice different from the latent vagueness of an overbroad law." *The First Amendment Overbreadth Doctrine*, 83 Harv. L. Rev. 844, 873 (1970).

(1) adopt, enforce, *or endorse* a policy under which the entity or department prohibits or materially limits the enforcement of immigration laws ...

Sec. 752.051 DEFINITIONS. In this subchapter:

(2) "Immigration laws" means the laws of this state or federal law relating to aliens, immigrants, or immigration, including the federal Immigration and Nationality Act (8 U.S.C. Section 1101 et seq.).

(5) "Local entity" means:

(A) the governing body of a municipality, county, or special district or authority, subject to Section 752.052;

(B) an *officer or employee* of or a division, department, or other body that is part of a municipality, county, or special district or authority, including a sheriff, municipal police department, municipal attorney, or county attorney; and

(C) a district attorney or criminal district attorney.

(6) "Policy" includes a formal, written rule, order, ordinance, or policy *and an informal, unwritten policy.*

SB 4, attached hereto (emphasis added). This prohibition does not come without harsh

consequences for local officials, as reflected in the related enforcement provisions:

Sec. 752.055. COMPLAINT; EQUITABLE RELIEF.

(a) Any citizen residing in the jurisdiction of a local entity or any citizen enrolled at or employed by an institution of higher education may file a complaint with the attorney general if the person asserts facts supporting an allegation that the entity or the institution's campus police department has violated Section 752.053. The citizen must include a sworn statement with the complaint stating that to the best of the citizen's knowledge, all of the facts asserted in the complaint are true and correct.

(b) If the attorney general determines that a complaint filed under Subsection (a) against a local entity or campus police department is valid, the attorney general may file a petition for a writ of mandamus or apply for other appropriate equitable relief in a district court in Travis County or in a county in which the principal office of the entity or department is located to compel the entity or department that is suspected of violating Section 752.053 to comply with that section.

(c) An appeal of a suit brought under Subsection (b) is governed by the procedures for accelerated appeals in civil cases under the Texas Rules of Appellate Procedure. The appellate court shall render its final order or judgment

with the least possible delay.

Sec. 752.056. CIVIL PENALTY.

(a) A local entity or campus police department that is found by a court of law as having intentionally violated Section 752.053 is subject to a civil penalty in an amount: (1) not less than $1,000 and not more than $1,500 for the first violation; and (2) not less than $25,000 and not more than $25,500 for each subsequent violation.

(b) Each day of a continuing violation of Section 752.053 constitutes a separate violation for the civil penalty under this section.

(c) The court that hears an action brought under Section 752.055 against the local entity or campus police department shall determine the amount of the civil penalty under this section.

(d) A civil penalty collected under this section shall be deposited to the credit of the compensation to victims of crime fund established under Subchapter B, Chapter 56, Code of Criminal Procedure.

(e) Sovereign immunity of this state and governmental immunity of a county and municipality to suit is waived and abolished to the extent of liability created by this section.

Sec. 752.0565. REMOVAL FROM OFFICE.

(a) For purposes of Section 66.001, Civil Practice and Remedies Code, a person holding an elective or appointive office of a political subdivision of this state does an act that causes the forfeiture of the person's office if the person violates Section 752.053.

(b) The attorney general shall file a petition under Section 66.002, Civil Practice and Remedies Code, against a public officer to which Subsection (a) applies if presented with evidence, *including evidence of a statement by the public officer*, establishing probable grounds that the public officer engaged in conduct described by Subsection (a). The court in which the petition is filed shall give precedence to proceedings relating to the petition in the same manner as provided for an election contest under Section 23.101.

(c) If the person against whom an information is filed based on conduct described by Subsection (a) is found guilty as charged, *the court shall enter judgment removing the person from office.*

SB 4, attached hereto (emphasis added).

Plaintiffs' overbreadth and vagueness challenges to SB 4, and the endorsement prohibition in particular, come as no surprise. As reflected in the Senate Journal on the SB 4 floor debate, the Bill's author struggled to explain the meaning of the endorsement prohibition

but made clear that it was intended to be broad and sweeping:

> Senator Perry: Endorse –
>
> Senator Garcia – endorse, what's your intent here? What does endorse, it doesn't mean that they got to go through what we go through when we get endorsed. I mean, what is endorsing? I mean, it's just violating First Amendment rights.
>
> Senator Perry: It's a, it's a, it's a more deliberative term that says we are going to endorse, enforce, *support*, *identify with*, and it is, *it becomes part of our DNA, or culture to endorse that*, that we *believe enough in it to put our name on it*. So, that's basically the nomenclature, if you will. We get there through different ways, to, but that's just an emphasis of how much this is important to the State of Texas to do.
>
> Senator Garcia: So, if the sheriff or the police chief submits an opinion piece to their local paper about this topic and they pretty much say we really don't need it, just what many of the police, law enforcement officials said during the hearing, that it really does take away from their discretion, that they were elected to do the job, that they know what's best for the communities, and they don't really see that we need sanctuary cities, so is that endorsing a sanctuary policy that would put them out of office?
>
> Senator Perry: I would say it would be because it's *effectively creating a culture of contempt and noncompliance*.
>
> Senator Garcia: So, their free speech rights go out the window.
>
> Senator Perry: I don't know that that's a free speech issue if you've been elected to uphold the law. You don't get the right as a free speech to go out and not uphold the law.
>
> Senator Garcia: So, free speech goes out the window.
>
> Senator Perry: That's a different discussion, that's a different discussion for a different group.

Docket 56, Senate Journal, SB 4 Senate Floor Debate, 85th Legislature, February 7, 2017 (emphasis added); *see also* Declaration of Senator Jose Rodriguez, ¶ 30h ("At one point, the bill's author, Senator Charles Perry referred to what he called the 'wink wink' culture of County Sheriffs not enforcing immigration laws, and how that would be a violation of SB 4, without any explanation of how that would be enforced or addressed").

The State has suggested that perhaps the Court could just strike the word "endorse" from SB 4 to avoid any First Amendment violations. Docket no. 91, p. 59. However, the problem is not that simple and the Court cannot rewrite a law to conform it to constitutional requirements. *U.S. v. Stevens*, 559 U.S. 460, 481 (2010). The State has also suggested that the First Amendment should not apply to government officials acting in their official capacity. This argument is antithetical to the law. The State cites *Garcetti v. Ceballos*, 547 U.S. 410 (2006), for this proposition. That case has no application here. In *Ceballos*, an employee (assistant district attorney) sued his employer (the county) for alleged retaliation after questioning the credibility of a warrant affiant, recommending dismissal of the case, and then arguing with his superiors about it. That case involved employer discipline; this case does not. The State of Texas is not the employer of the local officers, employees, and officials targeted by SB 4. The State was acting as a sovereign, not an employer, when it passed SB 4. The State also cites article V, § 23 of the Texas Constitution, applicable to sheriffs, which notes that their "duties" shall be "prescribed by the Legislature." But sheriffs are elected county officials, not state employees, and statutorily prescribing their duties, on the one hand, and regulating their speech, on the other, are two very different things. This provision does not trump the First Amendment.

       1.      Overbreadth analysis

In a facial challenge to the overbreadth of a law, the Court's task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. *Village of Hoffman Estates*, 455 U.S. at 494. In doing so, the Court must determine what the statute covers and whether it reaches too far. *United States v. Stevens*, 559 U.S. at 474 (2010).

SB 4 prohibits endorsement of a policy, but does not define "endorse." The State could have defined the term, but it did not. Precisely what it means to "endorse" a policy and what type

of conduct could constitute an endorsement is not entirely clear. The State cites one Texas case,

*In re Hecht*, 213 S.W.3d 547 (2006), for the proposition that "endorse" could mean "authorize."

But the Special Court of Review in the *Hecht* matter reached the opposite conclusion. Without

reaching the First Amendment claim, the Court found a "substantial" difference between the

endorsement prohibition in the old Texas Code of Judicial Conduct and the authorization

prohibition in the new Texas Code. The Court explained that until 1974, there was no Code of

Judicial Conduct in Texas. In 1974, the Texas Supreme Court enacted the initial Code of Judicial

Conduct, which contained an "endorsement" prohibition. In 1976, the Texas Supreme Court

removed the endorsement prohibition from the Code. In 1990, the Texas Supreme Court

amended the Code to include an "authorization" provision to "protect cover" for judges. *Id.* at

560-62. After distinguishing the two provisions, the Court admonished the commission for

conflating the two:

> In effect, the commission has reinserted the heretofore rejected "endorsement"
> prohibition into Canon 5(2), thereby recasting the meaning of the "authorization"
> provision. In so doing, the commission has entirely ignored, if not dismissed, the
> importance of the pivotal term "authorized" in its pleadings, its evidence, and its
> arguments.
>
>                         * * *
>
> [I]f the Supreme Court had intended by its 1990 amendments to reinstate the 1974
> "endorsement" prohibition, it would have done so, but it did not. Instead, it used
> substantially different language by adding the "authorization" provision. We conclude the
> Texas Supreme Court intended for the 1990 amendment inserting the "authorization"
> provision into the Canon governing political activity to effect a substantial change, not
> simply a technical refinement, from the "endorsement" prohibition.

*In re Hecht*, 213 S.W.3d at 564-565. Ultimately, the question in the *Hecht* matter was whether

the justice "authorized the public use of his name and title to endorse his close friend, ... a

candidate for public office." *Id.* at 560. The Court found that under the authorization provision,

and "under the circumstances of [that] case," endorse (as applied to the justice's conduct) meant

more than spoken praise. At the same time, the Court acknowledged the many different

meanings that the term could have under different circumstances and under different codes of

conduct, including: support, approval, request, appeal, or announce, either orally or in writing.

*Id.* at 571-74.

To the extent that dictionaries provide guidance, "endorse" in the Merriam-Webster

Dictionary means "to approve openly – endorse an idea; to express support or approval of

publicly and definitely; to recommend."[45] In the Oxford Dictionary, "endorse" means to "declare

one's public approval or support of."[46] Thus, "endorse" could mean a recommendation,

suggestion, comment, or other expression in support of or in favor of an idea or viewpoint that is

generally conveyed openly or publicly.

Section 752.0565(b), the "removal from office" provision in SB 4, expressly states that

evidence of punishable conduct includes *a statement by the public officer*. And the State made

clear during oral argument that "there is an ongoing debate in this country about federal

immigration law, how it should be enforced, who it should be enforced against … [and] Senate

Bill 4 was passed specifically in response to a number of Texas localities *expressing their will*

…". Tr. 103:4-5; 106:3-5 (emphasis added).

Of course a statement or expression may be written or oral. And there are no time, place,

or manner restrictions in SB 4. Thus, any written or oral statement at any time, in any place, and

in any manner could be prohibited. For example, making statements during open/public or

closed/private meetings could be prohibited. Making statements to a newspaper could be

prohibited. Making statements to constituents could be prohibited. Making statements during

campaigns could be also prohibited. Thus, engaging in various forms of protected speech is

clearly sanctionable under SB 4.

---

[45] https://www.merriam-webster.com/dictionary/endorse

[46] https://en.oxforddictionaries.com/definition/endorse

SB 4 may even reach mere gestures. As the author of SB 4 noted, a "wink, wink" or a nod could be construed as an endorsement.[47] Or simply standing in support of a group such as MALDEF or LULAC when that group is making a public statement against SB 4 or in support of the type of local policies that it bans.[48] SB 4's author apparently believes that a city, county, or campus "culture" or "DNA" that is viewed as "hostile" to immigration enforcement could be construed as an endorsement.[49] There is a myriad of possible scenarios that could lead to punishment under SB 4, and these examples indicate the breadth and scope of the endorsement prohibition.

When construed in context with related provisions in SB 4, the scope of the endorsement prohibition expands even further. First, it imposes a burden on a long list of identified speakers, each of whom will need to self-censor their speech or face punishment: any governing body of a municipality, county, or special district or authority; any municipal police department; any campus police department; *any officer* of a division, department, or other body that is part of a municipality, county, or special district or authority; *any employee* of a division, department, or other body that is part of a municipality, county, or special district or authority; and *any local elected official* including any sheriff, municipal attorney, county attorney, district attorney, or criminal district attorney. *Compare* Tex. Gov't Code §§ 752.051(5), 752.053(a)(1) and *Erznoznik*

---

[47]The State has noted that undefined statutory terms should be given fair meaning in accord with the manifest intent of the lawmakers. The manifest intent of the lawmakers, as described by SB 4's author, was to make the endorsement prohibition broad and sweeping.

[48]Although the law is not yet in effect, the State already targeted and attempted to sue many local officials, MALDEF, and LULAC based at least in part on their public statements of disagreement with SB 4 mandates, which the State perceives as "hostile." *See* Docket no. 23, pp. 2-5, First Amended Complaint, *State of Texas v. Travis County, et. al.*, Civil Action No. 1:17-CV-425-SS (W.D. Tex. 2017).

[49]The Court will not try to explain what the author of SB 4 meant by "culture" or "DNA," but is simply referring to his statements to reflect the Legislature's overreach.

*v. City of Jacksonville*, 422 U.S. 215, 217 (1975) (overbroad ordinance applied to "all persons employed by or connected with drive-in theaters, [thus] the owners and operators [were] faced with an unwelcome choice: to avoid prosecution of themselves and their employees they [had to] either restrict their movie offerings or construct adequate protective fencing which may be extremely expensive or even physically impracticable").

Second, SB 4 targets speech that is not content neutral or unprotected under the First Amendment. Local governmental policy on the enforcement of immigration laws is a matter of legitimate public concern. SB 4 broadly defines "policy" to encompass a formal, written rule, order, ordinance, or policy and an informal, unwritten policy. If a county, municipal, or campus official, employee, or officer makes any statement or expression or engages in any type of conduct – at any time, in any place, or in any manner – that could evince approval, support, or favor for a policy that prohibits or materially limits the enforcement of immigration laws, he or she will be subject to the penalty provisions in SB 4. The regulated speech is by no means content neutral.[50] SB 4 permits speech on one side of the immigration policy debate, but not the other. A person who favors, supports, or recommends a policy that prohibits or materially limits the enforcement of immigration laws cannot express his/her ideas, thoughts, views, and beliefs without the real threat of punishment. But those who disfavor the same policy are not targeted by SB 4 and may freely speak about their feelings, thoughts, views, and beliefs. The First Amendment was meant to protect against this type of viewpoint discrimination. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Erznoznik*, 422 U.S. at 215 (1975)

---

[50]"Overbreadth scrutiny has generally been somewhat less rigid in the context of statutes regulating conduct in the shadow of the First Amendment, but doing so in a neutral, noncensorial manner." *Broadrick*, 413 U.S. at 614.

(quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)); *see also Stevens*, 559 U.S. at 468.

When a statutory provision explicitly regulates expression based on content, the provision is "presumptively invalid, and the Government bears the burden to rebut that presumption." *Stevens*, 559 U.S. at 468 (quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817 (2000)). The State's meager effort to defend the endorsement ban rings hollow. The State has not offered any viable suggestions as to how the endorsement ban could be narrowly construed and applied in a constitutional manner. The endorsement prohibition was intended to be sweeping in scope and breadth and it is not readily susceptible to a narrow or limiting construction.[51] As the author of SB 4 stated, "[w]e get there through different ways." The Legislature could have heeded the warnings and drafted SB 4 with more precision, but it did not. *See Erznoznik*, 422 U.S. at 217-18 ("Where First Amendment freedoms are at stake we have repeatedly emphasized that precision of drafting and clarity of purpose are essential."). Assuming *arguendo* that the Legislature had legitimate goals for immigration policy when drafting SB 4, banning constitutionally protected speech just because of its message is not one of them.[52] The overbreadth of SB 4's endorsement prohibition is substantial on its face and the threat or deterrence to constitutionally protected speech is real. The Court finds that Plaintiffs are likely to succeed on their overbreadth challenge under the First Amendment.

　　　　2.　　Vagueness analysis

For the sake of completeness, the Court also addresses vagueness of the endorsement

---

[51]*Stevens*, 559 U.S. at 481 ("[T]his Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction.") (quoting *Reno v. ACLU*, 521 U.S. 844, 884 (1997)).

[52]In *Stevens*, the Supreme Court found that animal cruelty is a legitimate concern, but a law banning portrayals or depictions was substantially overbroad in violation of the First Amendment. *Id.*

prohibition which overlaps to some extent with the Court's due process vagueness analysis in the

Fourteenth Amendment analysis.[53] The Court has determined that the endorsement prohibition

reaches a substantial amount of constitutionally protected conduct; however, even if it did not, it

may still be void for vagueness if it fails to establish a standard that provides fair notice and

sufficiently guards against arbitrary enforcement. The vagueness of an enactment makes a facial

challenge appropriate. *Chicago v. Morales*, 527 U.S. 41, 55 (1999).

> The Supreme Court in *Hoffman Estates* explained the standards for evaluating vagueness:
>
> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.

*Hoffman Estates*, 455 U.S. at 498 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09

(1972)). The Court went on to explain certain variables that impact the Court's application of this

standard:

> The degree of vagueness that the Constitution tolerates – as well as the relative importance of fair notice and fair enforcement – depends in part on the nature of the enactment.
>
> The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.
>
> Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

---

[53]The Court only addresses the vagueness of "endorse," but the endorsement prohibition is tied to other language, such as "materially limit," which the Court also finds impermissibly vague. *See infra.*

*Id.* at 498-99.

A more stringent analysis applies herein, leaving less tolerance for vagueness, because the endorsement prohibition threatens to inhibit the exercise of First Amendment rights and the punishment provisions triggered by an endorsement violation are harsh and quasi-criminal in nature. There are civil penalties per violation, up to $25,500.00, and each day of a "continuing violation" constitutes a separate violation.[54] And the Attorney General "shall file" a petition against a public officer ... "if presented with evidence, including evidence of a statement by the public officer," establishing probable grounds that the public officer violated [the endorsement prohibition]. If that public officer "is found guilty as charged, the court shall enter judgment removing the person from office." Tex. Gov't Code §§ 752.056, 752.0565. The civil penalties require "intentional" conduct; the removal from office provisions have no scienter requirement.

As discussed above, SB 4 prohibits endorsement of a policy, but does not define the type of conduct that would constitute an endorsement. The State could have defined the term "endorse," but it did not. Even the Bill's author struggled to explain the term when questioned about it. Thus, what it means to "endorse" a policy and what type of conduct could constitute an endorsement remains vague, ambiguous, and open to very different interpretations. The only guidance SB 4 gives is in the "removal from office" provision, which states that evidence of punishable conduct *includes* a statement by the public officer. But this language expands, rather than limits, sanctionable conduct and thus does not cure the vagueness problem with the endorsement prohibition. A person of ordinary intelligence has no guidance whatsoever as to what is prohibited and the endorsement provision could easily "trap the innocent by not

---

[54] "The government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression." *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 828 (1995).

providing fair warning." *Id.* at 498. At most, it tells local officials to be wary of any conduct that could be vaguely construed as an "endorsement" on the wrong side of the immigration policy debate.

The endorsement prohibition, on its face, leads to arbitrary and discriminatory enforcement. Even though a person of ordinary intelligence has no guidance whatsoever as to what is prohibited, § 752.055 allows "any citizen" residing in the jurisdiction of a local entity to file a complaint alleging that the endorsement prohibition has been violated. This will lead directly to review by the Attorney General. And while civil penalties require an "intentional" violation, there is still no guidance as to what type of conduct would constitute an intentional violation. Just as the legislators struggled to define "endorse," those enforcing the provision will engage in the same subjective interpretation. Prosecution to remove a local official from office will end up being selective, arbitrary, discriminatory, and in violation of First Amendment rights. The Court finds that Plaintiffs are likely to succeed on their vagueness challenge to the endorsement prohibition.

      3.     Viewpoint discrimination

Despite the vagueness and overbreadth of the endorsement prohibition, SB 4 makes one thing quite clear – one viewpoint on local immigration policy is banned and the opposite viewpoint is permitted. A person who "endorses" a policy that prohibits or materially limits the enforcement of immigration laws cannot express his/her ideas, thoughts, views, and beliefs without the real threat of punishment. But those who criticize, oppose, or speak out against a policy that prohibits or materially limits the enforcement of immigration laws are not targeted by SB 4 and may freely speak about their feelings, thoughts, views, and beliefs. This is the epitome of viewpoint discrimination.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828; *see also Los Angeles City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (the First Amendment "forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others"); *Erznoznik*, 422 U.S. at 215 (the government cannot use its power to restrict expression "because of its message, its ideas, its subject matter, or its content"); *Stevens*, 559 U.S. at 468 (same). The government may disagree with certain viewpoints, but they cannot ban them just because they are inconsistent with the view that the government seeks to promote. As the Supreme Court explained in *Rosenberger*:

> When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

515 U.S. at 829. SB 4 clearly targets and seeks to punish speakers based on their viewpoint on local immigration enforcement policy. "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828. The Court finds that Plaintiffs are likely to succeed on their viewpoint discrimination challenge under the First Amendment.

### Fourteenth Amendment – Vagueness

Plaintiffs argue that SB 4 Sections 1.01, 2.01, and 5.02, Tex. Gov't Code §§ 752.053(a)(1), (a)(2), and (b); Tex. Crim. Proc. Code Art. 2.251(a); and Tex. Pen. Code § 39.07, should be enjoined because they violate the Fourteenth Amendment's due process clause.[55] The provisions that Plaintiffs argue are unconstitutionally vague prohibit localities from adopting a "pattern or practice" that "materially limit[s]" the enforcement of immigration laws, or that

---

[55]Docket nos. 24-1 at 29-37; 56-1 at 27-31; 150 at 46-47; 154 at 23-25.

"materially limit[s]" peace officers from "assisting or cooperating" with a federal immigration officer "as reasonable or necessary[.]" Docket no. 24-1 at 31-36. Plaintiffs also argue that SB 4 defines the term "policy" in a way that "is circular and confusing"; requires localities to allow federal immigration officers to enter and "conduct enforcement activities ... to enforce federal immigration laws" in local jails without defining what "activities" the localities must permit; and permits localities to prohibit their officers from assisting or cooperating with federal immigration officers if the assistance of cooperation occurs at a "place of worship" without defining the term "place of worship." Docket no. 56-1 at 28-29. Plaintiffs further argue that SB 4's mandate that localities fulfill all ICE detainer requests is unconstitutionally vague because it fails to define the "immigration detainer request" with which localities must comply, or the "lawful immigration status" that can excuse compliance. Docket no. 24-1 at 36-37.

Defendants argue first that, because Plaintiffs assert a facial, preenforcement challenge to the validity of these provisions of SB 4, they are obligated to "show that the challenged provisions are invalid in *all* applications." Docket no. 91 at 52. Since Plaintiffs acknowledge that some of their policies would be invalidated under the provisions of SB 4 that they argue are unconstitutionally vague, Defendants argue that Plaintiffs cannot show that these provisions are "impermissibly vague in all [their] applications, including [their] application to the party bringing the vagueness challenge." Docket no. 91 at 53-54 (quoting *Clark*, 582 F.3d at 612-13). Defendants also argue that the terms that Plaintiffs challenge—"pattern or practice," "materially limit," "assisting or cooperating," "reasonable or necessary," "policy," enforcement "activities," "immigration detainer request," and "lawful immigration status"—are not vague because they are used in a host of other legal authorities and have specific contextual meaning within SB 4. Docket no. 91 at 56-59.

A.     Due Process Protections Against Vagueness

Section 1 of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const., amdt. 14, § 1. The "first essential of due process of law" is that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (applying Fifth Amendment due process; quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) (discussing Fourteenth Amendment due process)); *see also Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972). "Vague laws offend several important values": they may "trap the innocent by not providing fair warning" of what is prohibited; they "impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application"; and, when they "abut[] upon sensitive areas of basic First Amendment freedoms," they "inhibit the exercise of those freedoms" because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone[.]" *Grayned*, 408 U.S. at 109 (internal quotation marks omitted); *see also Beckles v. United States*, __ U.S. __, 137 S. Ct. 886, 894 (2017) (laws that "regulate persons or entities" must be "sufficiently clear that those enforcing the law do not act in an arbitrary or discriminatory way.").

Courts have "expressed greater tolerance of enactments" that impose only civil penalties, rather than those imposing criminal penalties or those "which can be characterized as quasi-criminal[,]" such as "significant civil and administrative penalties, including fines and license revocation[.]" *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001). Similarly, the vagueness of a prohibition may be mitigated by a scienter requirement. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008). "[A] plaintiff who engages in

some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Roark & Hardee LP*, 522 F.3d at 548; *see also United States v. Westbrooks*, 858 F.3d 317, 325 (5th Cir. 2017) (discussing *Johnson v. United States*, 135 S. Ct. 2551 (2015)).

      B.     Applicable Standard

      The Court addresses the vagueness of the "endorse" prohibition separately above, because the prohibition, in addition to raising due process concerns, inhibits the exercise of free speech. As to the other provisions, the Court begins by identifying the standard that governs the vagueness inquiry. The provisions being challenged are enforced by criminal and quasi-criminal penalties. SB 4's mandate that localities fulfill all ICE detainer requests is enforced by actual criminal penalties, SB 4 Section 5.02, Tex. Pen. Code §39.07, and the Court agrees with Plaintiffs that the penalties that enforce SB 4's prohibition against adoption or enforcement of policies that "materially limit" immigration law enforcement are severe enough to qualify as "quasi-criminal." These include civil penalties of between $1,000 and $25,500 per violation and removal from office of local elected and appointed officials found to violate the prohibition. SB 4 Section 1.01, Tex. Gov't Code §§ 752.056 and 752.0565. *Compare Bell*, 248 F.3d at 414-15, 422 (loss of facility license and civil penalties of up to $2,500 per day were "significant civil and administrative penalties ... which can be characterized as quasi-criminal"). The Court also notes that, while a criminal conviction for violation of SB 4's detainer compliance mandate and civil penalties for the adoption, endorsement, or enforcement of policies that materially limit immigration enforcement are subject to a scienter requirement, the removal from office penalty is not, and the scienter requirement that applies to the criminal and civil penalties does not require notice of proscribed conduct, but merely that the conduct that violated the prohibition be,

respectively, "intentional[]" or "knowing[]." SB 4 Sections 1.01 and 5.02, Tex. Gov't Code §§ 752.056(a) and 752.0565 (a); Tex. Pen. Code § 39.07. Since all of the provisions challenged on vagueness grounds are enforced by either criminal or quasi-criminal penalties, they should be invalidated as unconstitutionally vague unless the required or prohibited conduct is defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Women's Med. Ctr. of Nw. Houston*, 248 F.3d at 422.

C.    Standing to Assert Vagueness

The Court next considers Defendants' argument that, because Plaintiffs acknowledge that some of their current policies would be invalid under SB 4, they have "engage[d] in some conduct that is clearly proscribed" by SB 4 and therefore "cannot complain of the vagueness of the law as applied to the conduct of others." *Westbrooks*, 858 F.3d at 325; *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (discussing vagueness under the Fifth Amendment due process clause). The rationale for this limitation is simple: an individual who is punished for conduct that clearly violated a prohibition has no standing to complain about any marginal uncertainty about the reach of the prohibition as applied to others. *Parker v. Levy*, 417 U.S. 733, 756 (1974) (no authority supports claim "that one who has received fair warning of the criminality of his own conduct from the statute in question is nonetheless entitled to attack it because the language would not give similar fair warning with respect to other conduct"); *see also, e.g., United States v. Strunk*, 551 Fed. Appx. 245, 246 (5th Cir. 2014) (unpublished). Plaintiffs, however, have not engaged in conduct that is prohibited by SB 4 because SB 4, which has not yet taken effect, does not yet prohibit or require anything of anyone. Rather, Defendants argue that Plaintiffs lack standing to obtain a ruling on the vagueness of SB 4 because policies

that they in the past have adopted and enforced would have violated SB 4 had it been in effect at the time they did so. This argument would warp the sensible limit on standing to bring vagueness challenges into a bizarre prohibition barring a plaintiff from asserting a vagueness challenge if they had ever engaged in conduct that could have clearly violated a later enacted restriction.

In this case, the basis for Plaintiffs' standing to assert a vagueness challenge is not that they have been punished for violating a vague prohibition, but that, prospectively, they will be required to revise their departmental policies to conform to a new set of vague requirements, under a statutory regime that punishes noncompliant local officials with criminal and quasi-criminal penalties. In the event that SB 4 takes effect, Plaintiffs may elect to refrain from adopting policies that clearly violate SB 4's prohibition against limiting immigration enforcement, or from enforcing existing policies that clearly do so. But Plaintiffs can hardly refrain altogether from adopting or enforcing *any* policy regulating their police departments. It is on that basis that they have a due process interest in determining the contours of the prohibitions that SB 4 imposes, in order to have fair notice of whether any particular policy they might consider will subject them to SB 4's penalties.[56] And, as Plaintiffs note, SB 4 puts them "in a bind." On one hand, the adoption or enforcement of local policies that the State deems to "materially limit" immigration enforcement, or noncompliance with ICE detainer requests that the State determines to violate SB 4, will subject Plaintiffs to SB 4's criminal and quasi-criminal

---

[56] *Roark & Hardee LP*, 522 F.3d at 543 (all Plaintiff bar owners had standing where "some ... have been charged under the ordinance and all . . . face the real potential of immediate criminal prosecution"); *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 819 (5th Cir. 1979) (preenforcement vagueness challenge was appropriate where "we know that the allegedly unconstitutional statute interferes with the way the plaintiff would normally conduct his affairs"); *Diamond v. Charles*, 476 U.S. 54, 64 (1986) ("conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy'"); *Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1360 (10th Cir. 1981) ("No criminal prosecution . . . has commenced as a result of the enforcement of the Act. Nevertheless, the court record clearly shows that plaintiffs face real and genuine threats of prosecution under the Act so as to show the existence of an Article III case or controversy."); *see also Steffel v. Thompson*, 415 U.S. 452, 475 (1974).

penalties. But localities who err too far on the side of caution face risks as well: They may become liable for Fourth Amendment or other violations for wrongfully carrying out ICE detainer requests not required by SB 4 and not supported by probable cause of a crime, or for failing to adopt policies not prohibited by SB 4 that would have deterred officer misconduct. Docket no. 24-1 at 31. Nor is Plaintiffs' due process interest extinguished merely because some conduct can be imagined that would clearly violate the vague prohibition. *Johnson*, 135 S. Ct. 2560-61 ("although statements in some of our opinions could be read to suggest otherwise, our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp"; the "supposed requirement of vagueness in all applications is not a requirement at all, but a tautology[.]").

D. Analysis

The Court therefore proceeds to the merits of Plaintiffs' vagueness claims. As noted above, the provisions of SB 4 that Plaintiffs challenge may be subject to invalidation on vagueness grounds for either one of two independent reasons: First, if they fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibit; and second, if they authorize or even encourage arbitrary and discriminatory enforcement. *United States v. Escalante*, 239 F.3d 678, 680 (5th Cir. 2001) (citing *Chicago v. Morales*, 527 U.S. 41, 56 (1999)); *Roark*, 522 F.3d at 547. The Court considers each question in turn.

1. "Materially limit" is Vague on Its Face

To satisfy due process, the statute need not "delineate the exact actions" that a party must take to avoid liability; "[o]nly a reasonable degree of certainty is required." *Roark*, 522 F.3d at 552-53; *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952) ("few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen

variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions."). The Court agrees with Plaintiffs that SB 4's prohibition against local policies that "materially limit" immigration enforcement falls short of this standard. To begin with, the policies and practices implemented by localities inescapably must allocate finite and often scarce resources among departmental priorities, and policies or practices that might appear to have nothing to do with immigration enforcement may nonetheless place substantial limits on officers' participation in federal immigration enforcement efforts simply by allocating their time and resources elsewhere. Relying upon dictionary definitions of "material," Defendants argue that it narrows the scope of prohibited limits on immigration enforcement by specifying that the prohibited limits are only those that are "'substantial' as opposed to insignificant" and those with "a 'logical connection' between the action and the ... effect on enforcement of immigration law[.]" Docket no. 91 at 57 (quoting Webster's New International Dictionary 1392 (3d ed. 2002) and Black's Law Dictionary 1124 (10th ed. 2014)). Therefore, Defendants argue, "'simple, day-to-day decision[s] regarding how a city or county allocates its scarce police resources' are not a 'material[] limit' on the enforcement of immigration law" because such limits are only those that "address[] immigration law specifically, as opposed to routine police matters, and either prohibit[] immigration-law enforcement specifically or significantly limit[] that activity from its otherwise-prevailing scope." Docket no. 91 at 57 (quoting docket no. 24-1 at 33).

Defendant's limiting definitions of the prohibition's reach, however, are contrary to the text of the statute. SB 4 defines "policy" broadly to include both "formal written rule[s]" as well as "informal, unwritten policy[,]" and SB 4's prohibition against material limitations on immigration enforcement goes even further, also prohibiting any "pattern or practice [that] ...

materially limit[s] the enforcement of immigration laws." SB 4, Tex. Gov't Code §§ 752.051(6); 752.053(a)(2). An informal, unwritten policy, or a pattern or practice of allocating enforcement resources, does not "address" immigration law enforcement, or any other topic, except in terms of its impact. In the context of an allocation of finite, scarce resources, any decision about the resources expended on routine police matters also impacts the allocation of resources in at least some other areas. This prohibition leaves localities throughout Texas uncertain about whether they are required to allow their officers to patrol only border regions or areas where day laborers are active, respond to immigration-related tips, offer backup services to ICE enforcement teams, or reallocate resources to fulfill ICE requests for enforcement assistance. *Compare, e.g.*, docket no. 24-5 at ¶¶ 12-14; *United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.").

Defendants' definition of material limitations on immigration enforcement only serves to establish additional subjective standards and raise more questions, such as when a limitation crosses from being "insignificant" to "substantial," or what the "otherwise-prevailing scope" of local immigration enforcement is that may not be reduced. *Compare Johnson*, 135 S. Ct. at 2561 (standard based on deviation from "an idealized ordinary case" was vague because it "offers significantly less predictability than one '[t]hat deals with the actual, not with an imaginary condition other than the facts.'" (quoting *International Harvester Co. of America v. Kentucky*, 234 U.S. 216, 223 (1914)); *Williams*, 553 U.S. at 306 ("we have struck down statutes that tied criminal culpability to ... wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings."). And given the absence of a comprehensible standard for

policies or practices that "materially limit" immigration enforcement within the context of SB 4, it is irrelevant that similar language has been used to establish enforceable standards in the context of other statutory regimes or legal authorities. *Johnson*, 135 S. Ct. at 2561 (finding vagueness even though "dozens of federal and state criminal laws use [similar] terms").

These due process problems are compounded because, in addition to failing to provide fair notice of the prohibited conduct, these provisions "furnish[] a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure[.]'" *Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972)). The Court therefore concludes that Plaintiffs are likely to succeed on their claims that the portions of Section 1.01 that prohibit the adoption, enforcement, or endorsement of "a policy under which the entity or department ... *materially limits* the enforcement of immigration laws" and prohibits any "pattern or practice ... [that] *materially limit[s]* the enforcement of immigration laws" Tex. Gov't Code § 752.053(a)(1) and (2) are unconstitutionally vague because they fail to provide those to whom they apply a reasonable opportunity to understand the conduct being prohibited.

The Court reaches these conclusions based on the text of SB 4 alone. *Matal v. Tam*, 137 S. Ct. 1744, 1756 (2017); *United States v. Ramos*, 537 F.3d 439, 461-62 (5th Cir. 2008). However, the Court also notes that its vagueness concerns—particularly the concern about targeted enforcement against certain disfavored localities—are reinforced by both the statements of SB 4's supporters throughout its consideration, and by the State's actions since SB 4's enactment. In a Twitter post written days before SB 4 was reported out of committee and received its first vote in the Senate, Governor Greg Abbott linked his designation of "banning sanctuary cities" as an emergency item with a promise that "Texas will hammer Travis County."

Docket no. 57-14 at 19. Governor Abbott made similar comments during a radio interview days later, in which he boasted of "putting the hammer down" on Austin and Travis County, accused Travis County's sheriff of "breaching her oath of office ... breaching the rule of law[,]"[57] and stated that "I'm seeking legislation ... passed out of a Senate committee yesterday," under which "[w]e are going to be asserting fines" and "[w]e're going to be seeking court orders that could lead to putting these people behind bars, the officials who are violating their oath of office."[58] Docket no. 57-14 at 16. Plaintiffs have also submitted evidence that, following Sheriff Hernandez's announcement of her ICE detainer policy, Governor Abbott announced his decision to withhold $1.5 million of previously awarded and allocated grant funds that had been designated for "programs that were designed for victims of family violence, veterans, and other at-risk communities." Docket no. 35-2 at ¶ 10. Thereafter, Plaintiffs allege, Governor Abbott "directed his office to refuse all future Travis County grant applications[,]" including those unrelated to immigration matters, and following that directive, "Travis County's new grant applications for the 2017-2018 grant cycle have also been denied." Docket no. 35-2 at ¶ 11. During SB 4's floor debate, its sponsor, Senator Charles Perry, described the Bill's "endorsement" prohibition as targeting jurisdictions that "endorse, enforce, support, identify with

---

[57]These statements followed the announcement of Travis County Sheriff Sally Hernandez on January 20, 2017, that, effective February 1, 2017, she would "honor an ICE detainer request if the request is accompanied by a judicial warrant or court order for continued detention; [or] if the individual is convicted of certain felonies and if under [her] assessment or belief it is appropriate to hold the individual to ensure that justice is served." Docket no. 35-2 at ¶¶ 8-9.

[58]There is some indication in the record that state lawmakers may not have been the only ones to retaliate against Austin and Travis County for Sheriff Hernandez's policies. During a March 2017 hearing before United States Magistrate Judge Andrew Austin, ICE Deportation Officer Laron Bryant testified that he was aware that ICE had carried out enforcement raids in Austin as "a result of the sheriff's new policy[.]" Docket no. 57-17 at 26. Magistrate Judge Austin went on to note that, based on a briefing that an ICE supervisor had delivered to another magistrate judge, he understood that the ICE raids were prompted in part because "meetings that occurred between the [ICE] field office director and the sheriff didn't go very well[,]" although Agent Bryant testified that he was not aware of this, agreeing with Magistrate Judge Austin's comment that such information would be "above [his] pay grade." Docket no. 57-17 at 26-27.

... [where] it becomes part of our DNA, our culture to endorse" prohibitions or limitations on local participation in immigration enforcement. Docket no. 56-5 at 87. Senator Perry responded to a hypothetical scenario about SB 4's application to a sheriff or police chief who submitted an editorial to a newspaper arguing that participation by local police in federal immigration enforcement efforts would be harmful to local law enforcement effectiveness, stating that the editorial would subject the official to removal from office under SB 4 because it would "creat[e] a culture of contempt and noncompliance." Docket no. 56-5 at 87-88. And, hours after Governor Abbott signed SB 4 into law, Texas preemptively filed a lawsuit against several localities and civil rights groups, who were targeted by the State's lawsuit on the basis that they were "publicly hostile to cooperation with federal immigration enforcement." *Texas v. Travis County et al.*, 1:17-cv-425-SS, docket no. 1 at ¶¶ 3-5.

The fact that SB 4's passage was motivated in part by a political feud between local and state elected leaders, or that SB 4's author made sweeping characterizations of SB 4's purpose and effect during a heated floor debate, does not form the basis for the Court's ruling on vagueness. The Court recites this evidence only because it coincides with the conclusions that the Court has reached based on the text of SB 4: That SB 4's prohibition on policies or practices that "materially limit" enforcement of immigration laws is unconstitutionally vague because it ascribes criminal and quasi-criminal penalties based upon violations of an inscrutable standard, in a manner that invites arbitrary and discriminatory enforcement against disfavored localities. The Court therefore concludes that Plaintiffs are likely to succeed on their vagueness challenge to the "materially limit" provision in SB 4.

### 2.   Remaining Provisions

SB 4's vague and indeterminate *"materially limit"* prohibition contrasts with other provisions of the statute. The "materially limit" prohibition raises difficult questions for local policymakers regarding the line at which a limitation goes from being insubstantial to being "material" and thus prohibited. In contrast, SB 4's prohibition against local policies that *"prohibit ...* the enforcement of immigration laws" presents no such blurred lines. And the Court does not agree with Plaintiffs' argument that the reference to *"immigration laws"* is itself unconstitutionally vague: SB 4 supplies a definition for the term "immigration laws," which, though sweeping, is clear.[59] Likewise, the phrase *"pattern or practice,"* though not defined in SB 4, has a settled legal meaning in other contexts, and at this stage the Court finds nothing about the structure of SB 4 or its use within SB 4's context suggests that those meanings could not be ascribed to SB 4 by courts interpreting its reach.[60] Similarly, the Court finds at this stage that the "materially limit" prohibition at Tex. Gov't Code § 752.053(a) contrasts with the enumerated list of specific prohibited policies set forth in Section 752.053(b).[61] These include SB 4's prohibitions against local entities and campus police departments preventing their officers from inquiring into the immigration status of a person under a lawful detention or under arrest; sharing the information they obtain through those inquiries with ICE or other localities; or permitting

---

[59]SB 4 Section 1.01, Tex. Gov't Code § 752.051(2) (defining "immigration laws" to mean "the laws of this state or federal law relating to aliens, immigrants, or immigration, including the [INA].").

[60]Docket no. 91 at 57; *Duvall v. Dallas County, Tex.*, 631 F.3d 203, 208 (5th Cir. 2011) (discussing the *"Monell* test" for municipal liability under 42 U.S.C. § 1983, which permits liability on the basis of, *inter alia*, acts that are "sufficiently extended or pervasive . . . to prove an intended condition or practice.").

[61]However, the Court does find that the enforcement provision in Section 752.053(b) is preempted, as discussed above, and that the prohibition against policies that "materially limit" such enumerated practices is likely unconstitutional on vagueness grounds for the reasons set forth above.

ICE to enter and conduct enforcement activities in jails. SB 4 Section 1.01, Tex. Gov't Code § 752.053(b).[62] At this stage, the Court cannot conclude that Plaintiffs have shown a likelihood of success on their remaining facial challenges to the vagueness of Section 752.053(a)(1)-(2) and (b). Finally, in light of the Court's finding, below, that SB 4's detainer compliance mandate provisions likely violate the Fourth Amendment and should be enjoined for that reason, the Court does not reach Plaintiff's vagueness arguments with respect to those provisions.

### Fourth Amendment

Plaintiffs assert Fourth Amendment challenges to several provisions of SB 4, and have sought preliminary injunctive relief to prevent those provisions from taking effect.[63] These challenges are directed against language in Sections 1.01, 2.01, 5.02, and 6.01 of SB 4, Tex. Gov't Code § 752.053(b), Tex. Crim. Proc. Code Art. 2.13 and 2.251, and Tex. Pen. Code § 39.07, which, in pertinent part, require localities to allow peace officers and various other officials to ask arrested or detained individuals about their immigration status; require local entities to fulfill all ICE detainer requests; and enforce these requirements by imposing civil monetary penalties against local entities or campus police departments who limit immigration inquiries by their officers, removal from office against persons holding elective or appointed office who limit immigration inquiries by their officers, and criminal misdemeanor liability against a sheriff, chief of police, constable, or a person who has primary authority for administering a jail who knowingly fails to comply with an ICE detainer request.

Plaintiffs argue enforcement of these provisions would violate the Fourth Amendment by compelling local officials to comply with ICE detainer requests in the absence of probable cause.

---

[62] As noted *supra*, the endorsement prohibition is addressed separately.

[63] Docket nos. 31 at ¶¶ 39-42; 51 at ¶¶ 148-51; 96 at ¶ 61; 139 at ¶¶ 75-77; and 174 at ¶ 143.

Plaintiffs further argue enforcement of these provisions would prohibit local and campus police departments from adopting policies to prevent their officers from committing Fourth Amendment violations in the course of inquiring into a detainees' immigration status.[64] Defendants argue, as a preliminary matter, that Plaintiffs lack standing to assert the hypothetical Fourth Amendment claims of others—i.e., persons who would potentially face unlawful detention.[65] Defendants also argue that Plaintiffs may not assert a facial Fourth Amendment challenge to these provisions because "SB4 undisputedly has at least some valid applications and the risk to Plaintiffs in complying with SB4 is minimal."[66] Defendants further argue that Plaintiffs' Fourth Amendment claims will fail because probable cause to support local entities' fulfillment of ICE detainer requests will be supplied by the detainer request forms and the accompanying ICE administrative warrants, and the immigration inquiry provisions of SB 4 merely require the sort of local cooperation that was approved by the Supreme Court in *Arizona*, 567 U.S. at 408-10. Defendants also argue that the immigration inquiry provision of SB 4, Section 6.01, does not violate the Fourth Amendment because it would not authorize prolonging investigative stops to accommodate an immigration-status investigation, but "merely provides that local law enforcement agencies cannot prohibit such inquiries where they are otherwise consonant with the Fourth Amendment."[67]

---

[64]Docket nos. 24-1 at 39-43; 56-1 at 31-33; 77 at 41-44; 146 at 6-9; 148 at 7-9; 149 at 16-18; 151 at 20-24; 154 at 7-15.

[65]Docket no. 91 at 67.

[66]Docket no. 91 at 66.

[67]Docket no. 91 at 76.

A.     Standing

The Court begins by considering a threshold question: whether Plaintiffs have standing to

assert their Fourth Amendment claims. "As a general rule, 'Fourth Amendment rights are

personal, and may not be vicariously asserted.'" *United States v. Escamilla*, 852 F.3d 474, 485

(5th Cir. 2017) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). More broadly,

standing to assert any claim requires that the claimant have a "'personal stake in the outcome' of

th[e] litigation." *Bd. of Ed. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 241 n.5 (1968)

(quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). In some cases, however, courts have

recognized that government officials may have standing based on their "personal stake in the

outcome" of litigation where they challenge laws that would compel them to violate their oath of

office. *Allen*, 392 U.S. at 241 n.5; *Baker v. Wade*, 743 F.2d 236, 241 n.21 (5th Cir. 1984), *on

reh'g*, 769 F.2d 289 (5th Cir. 1985), *overruled on other grounds by Lawrence v. Texas*, 539 U.S.

558 (2003).[68] Defendants have not presented any authority to indicate that an official's interest in

avoiding violations of her oath of office is any less compelling where the alleged oath-violating

conduct involves infringement of constitutional rights that are personal to a third party.

However, an official's interest in abiding by her oath alone is not sufficient to establish

the injury required for standing. *Crane v. Johnson*, 783 F.3d 244, 253 (5th Cir. 2015). Injury and

---

[68]In *Baker*, the Fifth Circuit reviewed a district court's judgment that Section 21.06 of the Texas
Penal Code, which criminalized "deviate sexual intercourse," was unconstitutional. After the Texas
Attorney General, Mark White, declined to appeal the judgment, a county district attorney filed motions
to intervene and to set aside the judgment. A panel of the Fifth Circuit found that the county district
attorney's Article III standing was established because he "is bound by his oath of office to enforce the
State's laws" and "is also subject to a contempt citation should he violate the district court's mandate[,]"
743 F.2d at 241 n.21, but found that his intervention was not proper under Fed. R. Civ. P. 24, *id.* at 243-
44, and therefore did not reach the underlying constitutional question. The *en banc* Fifth Circuit reversed,
holding that the county district attorney did have standing and that his intervention was proper, 769 F.2d
at 291-92, and that the Texas statute criminalizing same-sex intercourse was constitutional, *id.* at 292. The
*en banc* Court's constitutional ruling was later abrogated by the Supreme Court's decision in *Lawrence v.
Texas*, 539 U.S. 558 (2003).

standing are lacking where a legal requirement to violate one's oath is enforced only by

"possible future" sanctions against the official. *Crane*, 783 F.3d at 254-55 (standing requires

injury that is "concrete and particularized" and "actual or imminent, not conjectural or

hypothetical"; a threatened future injury satisfies this requirement only if it is "certainly

impending"; "[a]llegations of *possible* future injury [are] not sufficient." (internal quotation

marks omitted)). For instance, in *Crane*, an ICE officer who believed that the exercise of

discretion permitted under the Deferred Action for Childhood Arrivals (DACA) program

violated his oath to uphold the laws of the United States had not shown a sufficient injury to

establish his standing when he showed that, after refusing to follow a superior's instruction to

defer action, he received "a non-disciplinary letter admonishing him for refusing to follow his

supervisor's instruction." *Crane*, 783 F.3d at 254 (noting that "Plaintiffs have provided no

evidence that any agent has been sanctioned or is threatened with employment sanctions for

detaining an alien and refusing to grant deferred action under DACA."); *see also Texas v. United

States*, 809 F.3d 134, 171 n.126 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (summarizing the

standing analysis in *Crane*), *aff'd by an equally divided Court, United States v. Texas*, 136 S. Ct.

2271 (2016).

In this case, Plaintiffs have advanced several arguments, analyzed below, in support of

their claim that SB 4 would compel them to violate their oaths of office by carrying out seizures

in violation of the Fourth Amendment. SB 4 imposes severe penalties on local officials who, in

violation of SB 4, refuse to fulfill what they believe to be unlawful requests for seizure by ICE,

or who seek to deter Fourth Amendment violations by regulating their officers' inquiries into the

immigration status of detainees. Those who fail to comply with SB 4's requirements face civil

penalties between $1,000 and $25,500, removal from office, and criminal misdemeanor

liability.[69] Unlike the discretionary enforcement prioritization policy in *Crane*, SB 4 leaves Plaintiffs no discretion, but flatly mandates that they engage in conduct they believe to be unconstitutional. And unlike the non-disciplinary letter of admonishment or the possibility of employment sanctions in *Crane*, SB 4's penalties for those who do not comply with its requirements are mandatory. The Court therefore finds that SB 4's mandates and penalties establish the standing of local officials who are subject to its requirements, including their standing to challenge the lawfulness of requirements that they believe violate the Fourth Amendment.

1. Mandatory compliance with ICE immigration detainer requests

The Court now proceeds to consider whether Plaintiffs have shown a likelihood of success on the merits of their facial Fourth Amendment challenge to SB 4's detainer compliance mandate and immigration status inquiry provisions. The Court notes at the outset that, in general, "a facial challenge is 'the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [statute being challenged] would be valid[.]'" *Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Although *Anderson* and *Salerno* did not arise within the Fourth Amendment context, the same reasoning about the limited viability of facial challenges to statutory enactments applies in Fourth Amendment cases. *See, e.g.*, *City of Los Angeles, Calif. v. Patel*, __ U.S. __ , 135 S. Ct. 2443, 2451 (2015). However, even though Plaintiffs' facial Fourth Amendment challenge faces a difficult burden, such challenges "are not categorically barred or especially disfavored[,]" and "precedents demonstrate not only that facial challenges to statutes

---

[69]SB 4 Sections 1.01, 5.01, 5.02, Tex. Gov't Code §§ 752.056, 752.0565, Tex. Pen. Code § 39.07, Tex. Loc. Gov't Code § 87.031(a), (c).

authorizing warrantless searches can be brought, but also that they can succeed." *Patel*, 135 S.

Ct. at 2449, 51 (quoting *Salerno*, 481 U.S. at 745, collecting cases).

The Fourth Amendment, which applies to the states through the Fourteenth Amendment, "protects [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Manuel v. City of Joliet, Ill.*, __ U.S. __, 137 S. Ct. 911, 917 (2017) (internal quotation marks omitted). To effect this protection, the Fourth Amendment "establishes the minimum constitutional 'standards and procedures'" that govern, *inter alia*, arrest and pretrial detention. *Manuel*, 137 S. Ct. at 917 (discussing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). The Fourth Amendment standard that governs in this context, which "represents a necessary accommodation between the individual's right to liberty and the state's duty to control crime[,]" is that "seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime." *Gerstein*, 420 U.S. at 112; *Manuel*, 137 S. Ct. at 917 (quoting *Bailey v. United States*, 568 U.S. 186, 192 (2013)). Because "the 'touchstone of the Fourth Amendment is reasonableness[,]'" the determination of probable cause is not fixed, mechanical, or uniform, but instead "emphasiz[es] the fact-specific nature of the reasonableness inquiry" in each case. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The Supreme Court "has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible." *Gerstein*, 420 U.S. at 112 & 113 n.12. The requirement of a judicial determination of probable cause only "whenever possible" is a "practical compromise" that, again, reflects an accommodation between the individual's liberty interest and the state's duty to control crime. *Gerstein*, 420 U.S. at 114. However, as the length of a seizure increases, the individual's liberty interests weigh more heavily, and a judicial determination of probable cause

becomes mandatory. *Gerstein*, 420 U.S. at 114; *Jones v. Lowndes County, Miss.*, 678 F.3d 344, 348 (5th Cir. 2012).

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens[,]" derived in part from the constitutional directive that the federal government "establish an uniform Rule of Naturalization[.]" *Arizona*, 567 U.S. at 394 (quoting U.S. Cost. art. I, § 8, cl. 4); *Kleindienst v. Mandel*, 408 U.S. 753, 765-66 & n.6 (1972) (noting that this authority is "inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government[.]"). Pursuant to this authority, Congress has enacted the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, a comprehensive statutory regime for the regulation of immigration and naturalization, which describes, *inter alia*, the authority of the Secretary of Homeland Security to arrest and detain certain aliens both with and without warrants.[70] 8 U.S.C. §§ 1226, 1231, 1357.

Section 1357(d)(3) refers to ICE's authority, "[i]n the case of an alien who is arrested by a Federal, State, or local law enforcement official for violation of any law relating to controlled substances," to "issue a detainer to detain the alien[,]"[71] and 8 C.F.R. § 287.7 establishes

---

[70]In its Statement of Interest, the United States notes that the executive's authority to issue administrative warrants to arrest and remove certain classes of aliens has long been recognized by Congress. Docket no. 90 at 19 n.7 (citing *Abel v. United States*, 362 U.S. 217, 233 (1960); Act of June 25, 1798, c. 58, §§ 1-2, 1 Stat. 571 (describing the authority of the President to order the arrest and removal of "all such aliens as he shall judge dangerous to the peace and safety of the United States, or shall have grounds to suspect are concerned in any treasonable or secret machinations against the government thereof[.]")).

[71]The United States explains that, although the INA does not "define detainers or provide language limiting their contemporary use," Section 1357(d)(3) codified the use of detainers within the context of controlled substance violations without limiting "the Executive's preexisting, broad detainer authority." Docket no. 90 at 18 & n.5 (citing *Comm. for Immigrant Rights of Sonoma Cnty. v. Cnty. of Sonoma*, 644 F. Supp. 2d 1177, 1199 (N.D. Cal. 2009)). The United States notes that, notwithstanding the lack of clear statutory authorization or guidance, use of such requests "dates back to at least the 1940s[.]" Docket no. 90 at 17-18 (collecting cases). In a case arising from a detainer request issued in 1991, the

guidelines for the use of detainers, which "serve[] to advise another law enforcement agency that

the Department seeks custody of an alien presently in the custody of that agency, for the purpose

of arresting and removing the alien." 8 C.F.R. § 287.7(a). Since April 2, 2017, ICE detainer

requests have been issued using DHS Form I-247A, accompanied by either a Warrant for Arrest

of Alien (Form I-200) or a Warrant of Removal (Form I-205). The updated detainer form and

warrant requirement reflect policy changes described in former DHS Secretary John Kelly's

February 20, 2017, Memorandum on "Enforcement of the Immigration Laws to Serve the

National Interest" and ICE Policy No. 10074.2, regarding "Issuance of Immigration Detainers by

ICE Immigration Officers."[72] As required by the updated ICE policy, the Form I-247A and

accompanying administrative warrant include a description of the basis for ICE's determination

of probable cause of removability, and requests that the receiving entity (1) notify DHS as early

as practicable before the suspected removable immigrant is scheduled to be released from

criminal custody; and (2) maintain custody of the subject for up to 48 hours beyond the time he

would otherwise have been released so that DHS can assume custody of him.[73] Docket no. 90 at

20-22; DHS Form I-247A.

---

Fifth Circuit described detainer requests as "an informal procedure in which the INS informs prison officials that a person is subject to deportation and requests that officials give the INS notice of the person's death, impending release, or transfer to another institution." *Giddings v. Chandler*, 979 F.2d 1104, 1105 n.3 (5th Cir. 1992).

[72]Memorandum from DHS Secretary John Kelly on Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017), *available at* https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf; ICE Policy Number 10074.2, *available at* https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf.

[73]Prior to a 2012 policy change, ICE detainers were sometimes issued at the outset of an immigration status investigation. Current ICE policy requires that the basis for probable cause of removability be communicated in the detainer request; establishes that probable cause of removability must be based on (1) a final order of removal, (2) the pendency of a final removal proceeding, (3) biometric confirmation of the alien's identity that matches records affirmatively indicating a lack of lawful immigration status, or (4) voluntary statements of the alien, or "other reliable evidence" that

The statutory authorizations of the INA, and the authority of the executive to arrest, detain, and order removal—though broad and long-recognized—are subject to the limits on the power of the federal government imposed by the Constitution. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (noting that the Supreme Court "ha[s] read significant limitations into ... immigration statutes in order to avoid their constitutional invalidation."). For instance, although Sections 1226(a) and 1357 make no mention of probable cause, but authorize federal arrest and detention upon "reason to believe" that an alien is removable and likely to escape before a warrant can be issued, courts have construed these provisions to authorize arrest and detention by federal immigration authorities only where they can show probable cause of removability. *See, e.g.*, *United States v. Varkonyi*, 645 F.2d 453, 458 (5th Cir. Unit A May 1981); *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) (collecting cases).

The INA also establishes a policy of comity between states and the federal government. Congress has established a scheme under which removable aliens who have been sentenced to periods of confinement by a state government are not removed until after their state-ordered confinement is complete. *See, e.g.,* 8 U.S.C. §§ 1226(c)(1), 1231(a)(4)(A) ("the [Secretary of Homeland Security] may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment"). The INA also contemplates state and local participation in federal immigration activities in certain limited and defined circumstances. For instance, under 8 U.S.C. § 1357(g), DHS may enter into formal, written, cooperative agreements with states and localities under which, "subject to the direction and supervision of the [Secretary][,]" state and local

---

indicates lack of lawful status or removability; and specifies that probable cause of alienage and removability for detainer purposes may not be based solely "on evidence of a foreign birth and the absence of records in available databases ('foreign-born-no match')." ICE Policy Number 10074.2 § 2.6. Additionally, prior to the 2017 ICE policy change, ICE detainer requests could either request pre-release notification without extending the detention of the subject, or request that the subject's detention be extended, but the current detainer form includes both requests in all cases. DHS Form I-247A; ICE Policy Number 10074.2 § 2.1.

officers who have been federally trained and qualified in immigration enforcement may perform

"a function of an immigration officer in relation to the investigation, apprehension, or detention

of aliens in the United States (including the transportation of such aliens across State lines to

detention centers)[.]" In the absence of a formal cooperation agreement under Section 1357(g),

the INA authorizes state and local law enforcement to make arrests for certain criminal law

violations that can also form the predicate for removability. *See, e.g.*, 8 U.S.C. §§ 1252c (felons

who have unlawfully returned to the United States),[74] 1324(c) (smuggling, transporting, or

harboring aliens); *see also Arizona*, 567 U.S. at 410, 412-13. The INA obligates ICE to respond

to any request by state and local officers for verification of citizenship or immigration status, and

prohibits states and localities from adopting laws or policies that "prohibit[] or in any way

restrict, any government entity or official from sending to, or receiving from, [ICE] information

regarding … citizenship or immigration status[.]" *Arizona*, 567 U.S. at 411-12; 8 U.S.C. §§

1226(d)(1)(A), 1373(a) and (c).

While ICE's authority to render removability determinations, arrest, detain, and remove

derives from the INA and the constitutional directive that the federal government "establish an

uniform Rule of Naturalization," the power of state and local law enforcement officers to

investigate, arrest, and detain derives from a different source. *See, e.g., Jacobson v.

Commonwealth of Massachusetts*, 197 U.S. 11, 25 (1905) (describing "power which the state did

not surrender when becoming a member of the Union under the Constitution[,]" which "must be

held to embrace, at least, such reasonable regulations established directly by legislative

enactment as will protect the public health and the public safety."); *see also generally Atwater v.*

---

[74]*But cf.* 8 U.S.C. § 1252c(a) (authorizing arrest and detention by state and local officials of felons who have unlawfully reentered the United States "only after the State or local law enforcement officials obtain appropriate confirmation from [ICE] of the status of such individual and only for such period of time as may be required for the Service to take the individual into Federal custody for purposes of deporting or removing the alien from the United States.").

*City of Lago Vista*, 532 U.S. 318, 326-45 (2001) (discussing reasonableness of warrantless misdemeanor arrest by Texas police in light of common law). The Texas Legislature has broadly empowered state and local law enforcement to "use all lawful means" to preserve peace within their jurisdictions, including by effecting warrantless arrests upon probable cause of certain criminal offenses. *See, e.g.*, Tex. Crim. Proc. Code Art. 2.12 (defining peace officers), 12.13 (duties and powers of peace officers, including, *inter alia*, to "interfere without warrant to prevent or suppress crime"), 14.01-14.04 (authority of peace officers to make warrantless arrests); Tex. Pen. Code § 1.03 ("Conduct does not constitute an offense unless it is defined as an offense by statute, municipal ordinance, order of a county commissioners court, or rule authorized by and lawfully adopted under a statute.").

In the immigration context, the INA authorizes state officers to make arrests for certain federal criminal law violations that may also form the predicate for removability. 8 U.S.C. §§ 1252c, 1324(c); *see generally United States v. Di Re*, 332 U.S. 581, 589-91 (1948) (absent federal statutory instruction, authority of state officers to make arrests for federal crimes is a matter of state law). But, since "the authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government[,]" states retain no inherent authority to effect arrests or detentions in immigration matters.[75] *Truax*, 239 U.S. at 42. Any enactment that would broadly empower state or local law enforcement officers to arrest or detain upon suspicion of

---

[75]The Supreme Court of Massachusetts recently observed that, while "[t]he assertion that [S]tate and local officials have inherent civil enforcement authority has been strongly contested in the academy, in police departments, and in the courts ... it is questionable whether a theory of 'inherent' or 'implicit' State authority continues to be viable in the immigration context after ... *Arizona*[.]" *Lunn v. Commonwealth*, 2017 WL 3122363 at *10 (Mass. 2017) (internal quotation marks and citations omitted); *but cf. Arizona*, 567 U.S. at 417 (Scalia, J., concurring in part and dissenting in part, arguing that "[a]s a sovereign, Arizona has the inherent power to exclude persons from its territory, subject only to those limitations expressed in the Constitution or constitutionally imposed by Congress."); *see also id.* at 455-59 (Alito, J., concurring in part and dissenting in part).

removability would likely be unconstitutional for the reasons explained by the Supreme Court in *Arizona*, 567 U.S. at 407, 413 (noting holding that state "may not authorize warrantless arrests on the basis of removability").[76]

Detention pursuant to an ICE detainer request is a Fourth Amendment seizure that must be supported by probable cause. *See, e.g., Arizona*, 567 U.S. at 413; *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015) ("Because [the detainee] was kept in custody for a new purpose after she was entitled to release, she was subjected to a new seizure for Fourth Amendment purposes—one that must be supported by a new probable cause justification."); *Cervantez v. Whitfield*, 776 F.2d 556, 560 (5th Cir. 1985) (reciting stipulation); *Santoyo v. United States*, 5:16-CV-855-OLG, 2017 WL 2896021, at *6 (W.D. Tex. June 5, 2017). Although both ICE and state and local officers may arrest and detain individuals without a warrant upon probable cause in certain scenarios, their respective authority to do so derives from different sources and serves different purposes, and the probable cause predicate that they must satisfy to effect such detentions in compliance with the Fourth Amendment therefore differs. The Supreme Court observed in the *Arizona* case that, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States" and that "[i]f the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Arizona*, 567 U.S. at 407; *see also Santos v. Frederick County Bd. of Com'rs*, 725 F.3d 451, 464 (4th Cir. 2013) ("the

---

[76]Defendants stress that, under current ICE policy, all detainer requests will be accompanied by an administrative warrant. The Court nonetheless discusses the state's warrantless arrest authority because the warrants referenced in the ICE policy, the DHS forms I-200 and I-205, state probable cause of removability rather than of a criminal offense, are not directed to state or local officials, and are not issued by a detached, neutral magistrate, but may be issued by any one of a broad array of ICE officers. *See* ICE Policy Number 10074.2 § 5.2; 8 C.F.R. §§ 241.2(a)(1) and 287.5(e)(2) (listing 31 categories of officials who may issue a Form I-205 Warrant of Removal and 52 categories of officials who may issue a Form I-200 Warrant for Arrest of Alien); *cf. United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 317 (1972) ("The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates.").

[Supreme] Court has said [in Arizona] that local officers generally lack authority to arrest individuals suspected of civil immigration violations."); *Mercado v. Dallas County, Texas*, 3:15-CV-3481-D, 2016 WL 3166306, at *7 (N.D. Tex. June 7, 2016) (discussing *Arizona* and *Santos*).

Defendants argue that, in every case where SB 4 requires a local jurisdiction to honor an ICE detainer request, the Fourth Amendment's requirements will be satisfied because the probable cause for the local jurisdiction to effect the requested seizure will be supplied by the information conveyed in the Form I-247A detainer request and accompanying administrative warrant. Docket nos. 90 at 39-40; 90 at 70-71. This argument conflates the distinct probable cause predicates that apply to detention by ICE and state and local police. *See, e.g., Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 465 (4th Cir. 2013) (noting that "[b]ecause civil immigration violations do not constitute crimes, suspicion or knowledge that an individual has committed a civil immigration violation, by itself, does not give a law enforcement officer probable cause to believe that the individual is engaged in criminal activity."); *Mercado v. Dallas Cty.*, 2017 WL 169102, at *7 (N.D. Tex. Jan. 17, 2017). In general, peace officers in Texas are authorized to "interfere without warrant to prevent or suppress crime[,]" Tex. Crim. Proc. Code Art. 12.13, and the probable cause finding that local officials must generally make in order to constitutionally detain—probable cause of a crime—reflects that purpose. ICE, on the other hand, detains individuals, and issues administrative warrants and detainer requests, upon finding "probable cause to believe that the subject is an alien who is removable from the United States." ICE Policy Number 10074.2 §§ 2.3, 3.3 (defining "probable cause"); *see also United States v. Varkonyi*, 645 F.2d 453, 458 (5th Cir. Unit A May 1981) (describing probable cause determination under former INA's arrest authority pursuant to 8 U.S.C. § 1357(a)).

Defendants argue that Plaintiffs cannot show that the detainer compliance provisions of SB 4 are unconstitutional in all applications because, as Plaintiffs do not appear to dispute, at least some detainer requests convey information that establishes probable cause of both removability and a criminal offense, under circumstances that would support application of the "collective knowledge doctrine."[77] Defendants also argue that Plaintiffs' arguments for facial invalidation of SB 4's detainer compliance requirements improperly rely upon hypothetical scenarios premised on possible violations of ICE procedure or ICE policies and practices that are no longer in effect—exactly the sort of hypotheticals that courts found insufficient to support the facial challenges in *Anderson* and *Salerno*.[78]

The Court does not agree. It is well-established that the Fourth Amendment requires an assessment of probable cause that is particularized as to both the subject of the search or seizure and as to "the facts and circumstances within the arresting officer's personal knowledge, or of which he has reasonably trustworthy information[.]" *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003) ("Probable cause is determined on the basis of facts available to the officer at the time of the arrest"); *Maryland v. Pringle*, 540 U.S. 366, 373 (2003) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."); *Wong Sun v. United States*, 371 U.S. 471, 479 (1963) ("The quantum of information which constitutes probable cause ... must be measured by the facts of the particular case."). And, while probable cause "may be supported by the collective knowledge of law

---

[77]Docket nos. 90 at 43-44 & 44 n.17; 91 at 71-72 (arguing that "even if it were true that 'ICE detainers do not always meet Fourth Amendment requirements of probable cause[,]' cases in which ICE detainers are backed by probable cause are fatal to plaintiffs' claim that SB4 is facially invalid.") (internal citation omitted); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008).

[78]Docket nos. 90 at 41-42; 91 at 72 (discussing "informal detention requests" and prior ICE policy under which detainers were sometimes not supported by probable cause of removability).

enforcement personnel who communicate with each other prior to the arrest[,]" the officer carrying out the seizure is not relieved of the obligation to assess the existence of probable cause—she may not, for instance, "disregard facts tending to dissipate probable cause." *Evett*, 330 F.3d at 688 (quoting *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988)).

However, SB 4 prohibits local officials from undertaking any particularized assessment of suspected criminality. Rather, it mandates that they effect a seizure simply because it was requested by ICE, who issues that request based upon suspicion that the subject of the request is removable, not based on suspicion of a crime. SB 4 imposes this mandate subject to a single exception: where the subject of the request "has provided proof that the person is a citizen of the United States or that the person has lawful immigration status in the United States, such as a Texas driver's license or similar government-issued identification."[79] Tex. Crim. Proc. Code § 2.251(b); Tex. Pen. Code § 39.07(c). Under SB 4, this assessment of immigration status must be made by local officials, who are generally not trained in the complex field of immigration status determinations, and who, if they are mistaken, face the risks of financial penalties, removal from office, and criminal prosecution by Defendants on the one hand, or wrongfully detaining a citizen or lawfully present immigrant, and any related liability, on the other.[80] More

---

[79]It is unclear from the text of SB 4 whether other means of proving citizenship aside from producing a government-issued identification would suffice to excuse local officials' noncompliance with a federal detainer request. However, since being present in the United States without citizenship or lawful immigration status is not a criminal offense, it is immaterial how SB 4 permits the subject of a detainer to prove their lawful status. Regardless of the methods of proof permitted, SB 4 requires local officials to disregard an assessment of probable cause of a crime, and replace it with an (arguably limited) assessment of probable cause of a civil offense.

[80]As Defendants emphasize, Section 3.01 of SB 4, Tex. Gov't Code § 402.0241, provides that the Attorney General shall defend localities, and the state will be liable for the expenses, costs, judgment, or settlement of claims, in some cases. However, this protection is subject to two conditions: First, the "executive head or governing body" of the local entity must request the Attorney General's assistance, and second, the Attorney General must make a determination "that the cause of action arises out of a claim involving the local entity's good-faith compliance with an immigration detainer request required by" SB 4.

fundamentally, the assessment of citizenship or lawful immigration status to be made by local officials is wholly unrelated to any degree of suspicion of a criminal offense, yet SB 4 makes it central to local officials' determinations of whether to carry out the seizure requested by federal immigration enforcement officials. As discussed above, ICE's authority to arrest and detain those they suspect are removable derives from the authority conferred upon them by Congress under the INA, and ultimately, under Section 8 of Article I of the Constitution. Defendants have not identified any provision of law—within the INA, Texas statute, or some other legal authority—that authorizes the local officials subject to SB 4 to arrest and detain for civil immigration violations, or to assess probable cause of removability. As noted above, the Supreme Court's holding in *Arizona* raises significant doubts regarding whether the state may do so.[81] *Arizona*, 567 U.S. at 413 ("Arizona may not authorize warrantless arrests on the basis of removability"). And, since local officials are not authorized or trained to assess probable cause of removability, they are not capable of making a particularized assessment of probable cause of removability in light of the information available to them at the time of the seizure, which includes any facts tending to dissipate probable cause. Despite this, the detainer compliance provisions of SB 4 require them to detain the subject of the federal detainer request for up to 48 hours. The Court agrees with Plaintiffs that these provisions likely violate the Fourth Amendment.

The Court further finds that these Fourth Amendment violations are common to all applications of these provisions of SB 4. SB 4 mandates that local officials effect seizures requested by ICE while prohibiting those officials from making an independent, particularized assessment of whether probable cause of a crime exists to support that seizure in every case in

---

[81]To the extent that Defendants argue that SB 4 itself provides this authorization, the argument fails for this reason.

which it applies. And, as discussed above, it effectively precludes consideration of facts tending

to dissipate probable cause of removability, by creating an exception to mandatory detainer

request compliance only where, in the assessment of a local law enforcement official, the subject

of the detainer "has provided proof that the person is a citizen of the United States or that the

person has lawful immigration status in the United States[.]" SB 4 Section 2.01, Tex. Crim. Proc.

Code Art. 2.251(b). These violations are present in every application of SB 4 regardless of

whether the hypothetical subjects of the resulting seizures would prevail in all cases challenging

their detention.[82]

　　The Court's focus on the manner in which SB 4 permits localities to assess probable

cause is appropriate for two reasons. First, unlike most Fourth Amendment cases, the basis for

the Court's subject matter jurisdiction in this case is the forward-looking interest of local

officials in avoiding violations of their oaths of office—not the interest of an individual who

seeks to suppress evidence or recover damages in connection with an unlawful search or seizure

that has already taken place. It is therefore appropriate for the Court's analysis to focus on the

manner in which SB 4 will regulate the process by which local officials make assessments of

probable cause, rather than engaging in speculation about the Fourth Amendment implications of

---

[82]In a case featuring analogous reasoning, the Supreme Court declined to order the exclusion of evidence that was obtained during a search conducted pursuant to a statute authorizing warrantless searches which, in a separate case, had been found facially in violation of the Fourth Amendment. *Illinois v. Krull*, 480 U.S. 340, 342 (1987). The Court reasoned that, while the exclusionary rule is intended to deter violations of the Fourth Amendment by police, excluding evidence obtained during a search authorized by an unconstitutional statute would not deter the legislature from enacting laws that violated the Fourth Amendment. *Krull*, 480 U.S. at 352. Rather, "a person subject to a statute authorizing searches without a warrant or probable cause may bring an action seeking a declaration that the statute is unconstitutional and an injunction barring its implementation." *Krull*, 480 U.S. at 354 & n.11. More recently, in *Patel*, the Court facially invalidated a municipal warrantless search ordinance that precluded the opportunity for precompliance review by a neutral decision maker that is required for an administrative search regime to be valid. *Patel*, 135 S. Ct. at 2452. The Court reached this conclusion even while acknowledging that, in the majority of cases, the subjects of the searches would not pursue such review, and in the majority of cases in which they did, officers could easily subpoena the records in question and that, "[g]iven the limited grounds on which a motion to quash can be granted, such challenges will likely be rare." *Patel*, 135 S. Ct. at 2453.

various hypothetical seizures that might take place as a result. Second, as a prospective matter, the process by which probable cause determinations are made cannot be distinguished from the reliability of those determinations, except by making a baseline assumption that, inevitably, probable cause of a crime must exist to support some seizures carried out by a locality complying with all ICE detainer requests. Defendants argue that we should do exactly that: Since there are at least some cases in which "ICE detainers are backed by probable cause," Defendants argue, Plaintiffs' facial Fourth Amendment challenge cannot proceed because SB 4 therefore must have "at least *some* valid applications[.]" Docket no. 91 at 66, 71-72. However, a similar argument was considered and rejected by the Supreme Court in *Patel*, where the Court noted that the logic of this argument "would preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches"—a conclusion that would be inconsistent with Supreme Court precedents that "demonstrate not only that facial challenges to statutes authorizing warrantless searches can be brought, but also that they can succeed." *Patel*, 135 S. Ct. at 2451 (rejecting argument that "facial challenges to statutes authorizing warrantless searches must fail because such searches will never be unconstitutional in all applications"). And, as discussed above, this argument misapprehends the proper focus of the Court's analysis. Since SB 4 will prohibit the particularized assessment of probable cause in every case in which it applies, it is immaterial that, in some hypothetical scenarios, probable cause might have been found to exist after the seizure was carried out. The interest of local officials who wish to avoid violating their oath to uphold the Constitution is that they not be required to carry out seizures predicated on deficient assessments of probable cause. The reasoning would be no different if a state statute required officials to arrest or detain random individuals on the basis of a coin toss. Such a requirement

would not be immune from facial constitutional challenge simply because the police would inevitably detain someone as to whom they could have found probable cause.

As in *Patel*, it is irrelevant that, in some cases, local officials may voluntarily honor ICE detainer requests. The record suggests that many Plaintiffs routinely honor at least some ICE detainer requests—cooperation that reflects their assessment that the requisite probable cause of a crime is present (or, alternatively, that reflects their own violations of the Fourth Amendment, *see Santoyo*, 2017 WL 2896021). As in *Patel*, however, such scenarios are not relevant because they involve voluntary conduct rather than an "application" of SB 4. *Patel*, 135 S. Ct. at 2451 (in assessing whether a law is "unconstitutional in all of its applications[,]" "the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct.").[83] SB 4 "applies" where it prohibits local officials from declining detainer requests that they do not wish to honor. Local officials in such cases may wish to disregard particular detainer requests for reasons of cost, concerns about compromising the effectiveness of their enforcement efforts, because they doubt the existence of probable cause to support the requested seizure, or for other reasons. Regardless of the reason, however, in every case in which SB 4

---

[83] The *Patel* Court's reasoning that a statute is not "applied" when an individual who would be subject to it voluntarily does what the statute would require was drawn in part from the Supreme Court's earlier reasoning in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992). In that case, the Court considered the facial validity of a statute that required women seeking an abortion to first notify their husbands. The statute's defenders argued that it should not be facially invalidated because most women voluntarily notify their husbands before seeking an abortion, and the law would therefore not impose an undue burden on their access to abortion services. They presented evidence that "only about 20 percent of the women who obtain abortions are married" and that "of these women about 95 percent notify their husbands of their own volition" and that therefore "the effects of [the statute] are felt by only about one percent of the women who obtain abortions." *Casey*, 505 U.S. at 894. The *Casey* Court rejected this argument, noting that because "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant[,]" "[t]he analysis does not end with the one percent of women upon whom the statute operates; it begins there." *Casey*, 505 U.S. at 894 ("we would not say that a law which requires a newspaper to print a candidate's reply to an unfavorable editorial is valid on its face because most newspapers would adopt the policy even absent the law."; citing *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974)).

prohibits a local official from declining a detainer request, it also prohibits that official from making the inquiry that state and local law enforcement are required to make under the Fourth Amendment: whether probable cause of a crime exists to support that seizure.

The Court is also not persuaded by Defendants' arguments that Plaintiffs' Fourth Amendment claims rely on hypotheticals regarding informal or defective ICE detainer requests. For instance, Plaintiffs argue that SB 4 would require state officials to honor informal telephonic detainer requests from ICE, detainer requests that are not supported by probable cause of removability, or ICE requests that local officials detain individuals for longer than 48 hours.[84] Defendants point out that such requests would violate current ICE policy, and argue that SB 4 would not penalize noncompliance with such requests even if ICE did issue them, and that a facial challenge premised on such hypothetical violations of ICE policy cannot prevail. Docket nos. 90 at 42; 91 at 72. Plaintiffs are correct that SB 4 does not limit its requirement of compliance with detainer requests to cases in which the detainer request is issued under current ICE policy, or using a Form I-247A.[85] The possibility that SB 4 could be applied to cause a constitutional deprivation by requiring compliance with a detainer request that lacks probable cause or seeks detention longer than 48 hours would not alone be sufficient enough to sustain a facial challenge, just as the hypothetical unconstitutional applications of the AFDC regulation in *Anderson* or the pretrial detention provision in *Salerno* were not sufficient to sustain facial challenges.[86] However, in this case, given the clarity of SB 4's detainer compliance commands,

---

[84]*See, e.g.*, docket no. 24-1 at 40-41; 56-1 at 32-33 & 33 n.33.

[85]SB 4 at Section 1.02, Tex. Gov't Code § 772.073(a)(2) (defining "Immigration detainer request" to mean "a federal government request to a local entity to maintain temporary custody of an alien, including a [Form I-247] document or similar or successor form.").

[86]In *Anderson*, the Supreme Court rejected a facial challenge to a California state law governing the composition of Assistance Units under the federal-state administered Aid to Families with Dependent

the Court need not resort to hypothetical speculation.[87] The Court finds, for the reasons discussed above, that an inadequate assessment of probable cause is certain to follow in every scenario in which SB 4 is applied, regardless of whether some applications of SB 4 might potentially be unconstitutional in other ways. The Court therefore concludes that Plaintiffs are likely to succeed on the merits of their claims that the provisions of SB 4 that require local entities to fulfill all ICE detainer requests (Sections 2.01 and 5.02, Tex. Crim. Proc. Code Art. 2.251, Tex. Pen. Code § 39.07) facially violate the Fourth Amendment.

### 2. Immigration Status Inquiries

The Court next considers the parties' arguments regarding the immigration inquiry provisions of SB 4.[88] The pertinent portion of Section 1.01, Tex. Gov't Code § 752.053(b), provides that local entities and campus police departments may not prohibit or materially limit a

---

Children (AFDC) program, even though under certain hypothetical applications the state law might violate federal AFDC guidelines. *Anderson*, 514 U.S. at 155 n.6 (declining to rule on the hypothetical scenario but observing that "an as-applied challenge that presented the . . . issue in a concrete factual setting might require a court to decide it[.]"). In *Salerno*, the Supreme Court was faced with a facial challenge to pretrial detention provisions of the Bail Reform Act of 1984, codified at 18 U.S.C. § 3142(e), which authorized pretrial detention of persons charged with certain serious crimes based upon a judicial finding that the detainee poses a danger to the community. The Court rejected the argument that these provisions violated the Fifth Amendment's due process clause, reasoning, *inter alia*, that the Act established sufficient procedural safeguards to limit the duration of pretrial detention, ensure the reliability of the judicial finding of danger to the community, and ensure that the detention would be imposed only in cases where the liberty interests of the detainee were outweighed by the government's interest in preventing crime by the detainee. *Salerno*, 481 U.S. at 747-51. Having found that the Bail Reform Act's "compelling regulatory purpose" and procedural protections "far exceed" and are "more exacting" than those found sufficient to ensure in other contexts that detention complied with due process, the Court then rejected the facial challenge to the adequacy of the Bail Reform Act's procedures—even while acknowledging that "they might be insufficient in some particular circumstances." *Salerno*, 481 U.S. at 751-52.

[87] *Compare, e.g., Sibron v. New York*, 392 U.S. 40, 59 (1968) (declining to "be drawn into . . . the abstract and unproductive exercise" of reconciling "the extraordinarily elastic categories" of a state warrantless search statute with the requirements of the Fourth Amendment); *and Payton v. New York*, 445 U.S. 573, 576 (1980) (finding that "the New York [warrantless arrest] statutes are not consistent with the Fourth Amendment").

[88] Sections 1.01 and 6.01, Tex. Gov't Code § 752.053(b) and Tex. Crim. Proc. Code Art. 2.13).

peace officer or various other law enforcement or prosecution officials from, *inter alia*,
"inquiring into the immigration status of a person under a lawful detention or arrest[.]" Section
6.01 amends the article of the Texas Criminal Procedure Code outlining the duties and powers of
peace officers to define the circumstances under which peace officers may question the victims
or witnesses of alleged criminal offenses regarding their nationality or immigration status. First,
Section 6.01 provides that such questioning is permitted only when "the officer determines that
the inquiry is necessary to investigate the offense; or [to] provide the victim or witness with
information about federal visas designed to protect individuals providing assistance to law
enforcement." Next, Section 6.01 clarifies that the preceding limitations do not prohibit peace
officers from "conducting a separate investigation of any other alleged criminal offense" and
questioning victims and witnesses of criminal offenses regarding their immigration status "if the
officer has probable cause to believe that the victim or witness has engaged in specific conduct
constituting a separate criminal offense."

  The cities of Austin, San Antonio, and Dallas argue that SB 4 immigration inquiries leave
them powerless to prevent inevitable Fourth Amendment violations by officers.[89] Defendants
argue that the immigration inquiries that SB 4 prohibits local entities from prohibiting or
"materially limit[ing]" will not constitute Fourth Amendment seizures because SB 4 "does not
require immigration-status investigation[s]" and does not authorize officers to initiate or prolong
arrests or detentions to inquire about immigration status, but only requires that such inquiries be
permitted "where they are otherwise consonant with the Fourth Amendment." Docket no. 91 at
76-77.

  In *Arizona*, SB 1070 included a provision, codified at Ariz. Rev. Stat. § 11-1051(B)
(Section 2(B)), that resembles in some ways the immigration inquiry provisions of SB 4. Section

---

[89]Docket nos. 57 at ¶ 32; 146 at 6-9; 151 at 23 & n.10; 152 at 27-28.

2(B) provides that, upon conducting a "lawful stop," state or local law enforcement officers are required to make a "reasonable attempt ... when practicable" to determine the person's immigration status, and that "[a]ny person who is arrested shall have the person's immigration status determined before the person is released." Ariz. Rev. Stat. § 11-1051(B). The Supreme Court, presented with arguments that Section 2(B) would require officers to delay the release of some detainees in order to complete immigration status verifications, noted that "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns." *Arizona*, 567 U.S. at 413. Nonetheless, the Court declined to invalidate Section 2(B) at the preenforcement stage because it "could be read to avoid these concerns" since "if § 2(B) only requires state officers to conduct a status check during the course of an authorized, lawful detention or after a detainee has been released, the provision likely would survive preemption— at least absent some showing that it has other consequences that are adverse to federal law and its objectives." *Arizona*, 567 U.S. at 414-15 (noting further that "[t]here is no need in this case to address whether reasonable suspicion of illegal entry or another immigration crime would be a legitimate basis for prolonging a detention, or whether this too would be preempted by federal law.").

SB 4's immigration inquiry provisions, unlike Section 2(B), do not mandate immigration inquiries, but merely authorize specified officials to conduct them and prohibit local entities from prohibiting or limiting them. However, while Section 2(B) imposed its mandate only upon law enforcement officials and agencies, SB 4 authorizes immigration inquiries by a far broader array of officials in addition to peace officers: corrections officers, booking clerks, magistrates, district attorneys, criminal district attorneys, or other prosecuting attorneys. Tex. Gov't Code § 752.053(b). While Section 2(B) required officers to "determine" immigration status—the

Supreme Court noted that "[t]he accepted way to perform these status checks is to contact ICE"—SB 4 authorizes officers, in addition to contacting ICE, to question the detainee about their immigration status.[90] And SB 4, like Section 2(B), does not authorize officers to initiate arrests, detentions, or *Terry* stops to inquire about immigration status, but permits such inquiries only as to those "under a lawful detention or under arrest[.]" Tex. Gov't Code § 752.053(b)(1). Most significantly, these provisions of SB 4, like Section 2(B), and unlike SB 4's mandate to fulfill all ICE immigration detainer requests, are susceptible to a wide array of constructions.

It is clear that a state law authorizing state and local law enforcement officers to initiate or prolong Fourth Amendment seizures in order to inquire or investigate immigration status would be invalid. *Arizona*, 567 U.S. at 413 ("it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision."). It is also clear, however, that questioning not supported by any quantum of suspicion does not violate the Fourth Amendment if it does not prolong an otherwise lawful detention.[91] *Muehler v. Mena*, 544 U.S. 93, 101 (2005) ("mere police

---

[90]Plaintiffs do not assert that the information-sharing requirements of SB 4 violate the Fourth Amendment, and the Court notes that the substance of these requirements appears to duplicate the INA's longstanding prohibition against local government measures that "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373; *see also Arizona*, 567 U.S. at 411-12 (noting that "Congress has made clear that no formal agreement or special training needs to be in place for state officers to 'communicate with the [Federal Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States.'" and discussing 8 U.S.C. §§ 1357(g)(10)(A) and 1373).

[91]Of course, depending upon the manner in which it is carried out, such questioning may have constitutional implications aside from the Fourth Amendment. *See*, docket no. 24-4 at ¶¶ 10-11 (opinion that "[w]ithout proper training, supervision, or resources, police will rely on racial proxies for immigration status and screen minorities and those who 'look' foreign[,]" creating a heightened risk of Fourth Amendment and Equal Protection violations); *United States v. Mata-Abundiz*, 717 F.2d 1277, 1279 (9th Cir. 1983) (holding that "in-custody questioning by INS investigators must be preceded by *Miranda* warnings, if the questioning is reasonably likely to elicit an incriminating response."); *United States v. Gonzalez-DeLeon*, 32 F. Supp. 2d 925, 928 (W.D. Tex. 1998) (adopting reasoning from *Mata-Abundiz*); *but cf. United States v. Arias-Rodriguez*, 636 Fed. Appx. 930, 932 (7th Cir. 2016)

questioning does not constitute a seizure"; "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." (internal quotation marks omitted)). While SB 4 clearly authorizes inquiries about immigration status within the context of "a lawful detention or ... arrest[,]" it is silent as to whether the arrest or detention may be prolonged in order for the officer to carry out the inquiry and undertake any of the other steps authorized by SB 4, such as sending or requesting information from ICE, or exchanging information with other campus, local, state, or federal police department or entity. Accordingly, like the Supreme Court in *Arizona*, the Court declines at this juncture to construe the inquiry provisions of SB 4 in a manner that would render them unconstitutional on their face. *Arizona*, 567 U.S. at 414 (citing *Fox v. Washington*, 236 U.S. 273, 277 (1915)).

    As the text of these provisions makes clear, SB 4 does not permit officers to initiate stops in order to inquire about immigration status, but requires that such inquiries be allowed only "of a person under a lawful detention or under arrest." Tex. Gov't Code § 752.053(b)(1). SB 4 requires that local entities allow officer inquiries into immigration status, but if the officer believes that the individual has answered dishonestly, or if the individual refuses to answer—or even if the individual tells the officer that they are undocumented—the Fourth Amendment does not permit SB 4 to authorize, and SB 4 does not require local entities to allow, officers to prolong the seizure in order to further investigate the individual's immigration status or to hold them for federal authorities. Rather, at the expiration of the time reasonably required to carry out the purposes of the initial stop, the officer is required to release the individual, regardless of whether he suspects or even knows that the individual is undocumented. *See generally Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *United States v. Santiago*, 310 F.3d 336, 341 (5th Cir. 2002)

(distinguishing *Mata-Abundiz*).

("A search and seizure must be reasonably related in scope to the circumstances which justified the stop in the first place. The officer should use the least intrusive means reasonably available to verify or dispel his or her suspicion in a short period of time." (internal citations omitted)). Beyond this, SB 4 merely requires that the officer be permitted (but not required) to share with ICE whatever information (however incomplete) he discovers during his immigration inquiry, either after releasing the individual or during the seizure, provided that this communication does not prolong the seizure. Notably, during the preliminary injunction hearing in this matter, the State of Texas advocated exactly this interpretation of the immigration inquiry provisions of SB 4.[92]

Plaintiffs argue that prohibiting officers from inquiring into immigration status serves valuable law enforcement objectives by ensuring that members of the community—including victims of and witnesses to crime who are themselves undocumented—are comfortable approaching the police with information they have regarding criminal activity. Plaintiffs argue that the value of this cooperation outweighs any benefit to be derived from permitting immigration inquiries, particularly where the constitutional limits that must be imposed on such inquiries result in ineffectual enforcement of civil immigration laws by state and local law enforcement. However, it is not the Court's role to take a position in a debate about law enforcement effectiveness and priorities. Since it is possible to construe the immigration inquiry provisions of SB 4 to avoid violating the Fourth Amendment, the Court is obligated to do so, particularly at this early stage in a preenforcement facial challenge to its validity. The Court

---

[92]Docket no. 143 at 114-15, 118 (Counsel for Defendants arguing that, under SB 4, "[t]here is no suggestion that [Texas police officers] can make arrests or detentions based on those inquiries. All they can do is make the inquiry"; SB 4 "does not allow for local law enforcement to continue to detain a person for any amount of time beyond their state lawful detention for a continued inquiry on federal immigration status.").

therefore finds that Plaintiffs have not shown, at this juncture, that they are likely to succeed on

the merits of their facial Fourth Amendment challenges to the immigration inquiry provisions.[93]

V.

Substantial threat of irreparable injury

The State essentially concedes that irreparable harm requirement is met:

> The State of Texas concedes, Your Honor, that if Senate Bill 4 is unconstitutional
> or a provision of it is severed by this Court or this Court finds it unconstitutional,
> if it is, and it would violate the constitutional rights of the public, then there is
> irreparable harm.

Tr. 113:3-7. The Court has found that certain provisions of SB 4 are field and conflict preempted

by federal law; thus, enforcing those provisions of SB 4 will interfere with the federal

government's authority to control immigration. The Court has also found that enforcing SB 4

will result in First Amendment violations. "The loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S.

347, 373 (1976); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir.

2012).[94] The Court has further determined that vague prohibitions in SB 4 violate due process

and create a real danger of arbitrary and discriminatory enforcement, which has already been

threatened.[95] And the Court has found that enforcement of the mandatory detainer provisions will

inevitably lead to Fourth Amendment violations.

---

[93]This finding, of course, is only preliminary. "As applied" challenges are not addressed herein.

[94]"If speech can be prohibited because, in the view of the Government, it leads to "moral decay" or does not serve "public ends," then there is no limit to the Government's censorship power." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 391 (2010).

[95]*See, e.g.*, docket no. 57-14, public statements of Governor Abbott ("I'm putting the hammer down … Texas is not going to stand for it … We are going to be asserting fines. We're going to be seeking court orders that could lead to putting these people behind bars, the officials who are violating their oath of office ... and if they fail to comply with the mandamus action they would be subject to going to jail.").

Federal courts at all levels have recognized that a violation of constitutional rights constitutes irreparable harm as a matter of law and no further showing of irreparable injury is necessary. *DeLeon v. Perry*, 975 F.Supp. 2d 632, 663 (W.D. Tex. 2014); *Cohen v. Coahoma County, Miss.*, 805 F.Supp. 406 (N.D. Miss. 1992).[96] But assuming *arguendo* that this legal presumption of irreparable injury did not apply, and the State did not concede to irreparable harm, the record is replete with evidence of the substantial threat of irreparable injury that will likely occur if SB 4 is implemented and enforced as written and in its entirety. Some of this harm is truly imminent, and some is arguably more remote, but the threat of irreparable harm is both real and substantial. The long list of probable harms in the absence of injunctive relief includes:

> Local officials, some of whom have decades of knowledge and vast experience in local government, have been threatened and fear that any action they take or statements they make could be used as grounds for harsh civil penalties and removal from office. *See* Tr. 89:4-7; docket no. 24, declarations of Tom Schmerber, Mario A. Hernandez, and Raul Reyes; docket no. 57-14, public statements of Governor Abbott ("I'm putting the hammer down … Texas is not going to stand for it … We are going to be asserting fines. We're going to be seeking court orders that could lead to putting these people behind bars, the officials who are violating their oath of office ... and if they fail to comply with the mandamus action they would be subject to going to jail."); docket no. 77, exhibit 1-N ("Gov. Greg Abbott … will seek new laws that would remove [Sheriff Hernandez] from office"), and declarations of William McManus and Rey Saldana (exhibits 4, 5); docket no. 56, declaration of J. Bernal; docket no. 58,

---

[96]*See also* 1A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995).

declaration of Sally Hernandez.[97]

Local officials will be prohibited from effectively guiding, supervising, and directing their employees, and allocating resources to address the most pressing public safety needs of the community. *See* Tr. 16:18-23; 73:16-18; 75:12-17; 90:14-17; docket no. 24, declaration of Tom Schmerber; docket no. 57, declaration of Brian Manley; docket no. 58, declaration of Sally Hernandez.

Employees on college campuses, where freedom of speech is vital, will be deterred from speaking out in favor of the type of local policies that SB 4 prohibits. *See* docket no. 77, exhibit 6.

Undocumented students on college campuses will be targeted under SB 4 because campus police departments are also subject to sanctions and penalties under SB 4. Thus, enrollment and attendance will be affected. *See* docket no. 77, exhibits 6, 11; docket no. 56, declaration of Senator Jose Rodriguez (referring to Gov. Abbott's attack on Texas State University as a so-called sanctuary campus).

Local officials and the Hispanic community anticipate racial profiling and increased frequency of ICE raids, which are tied to the objectives of SB 4. *See* Tr. 89:24-90:4; docket no. 56, declaration of J. Bernal; docket no. 57, declarations of Gregorio Casar and Brian Manley; docket no. 58, declaration of Sally Hernandez.

Undocumented immigrants, and U.S. citizens related to them, who are victims

---

[97]The Attorney General has made overtures about certain statements or conduct that it would not seek to prosecute. But veiled assurances are not enough. *See Stevens*, 559 U.S. at 480 ("Not to worry, the Government says … [t]he Government hits this theme hard, invoking its prosecutorial discretion several times. But the [Constitution] protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly … the Government's assurance that it will apply [the challenged statute] far more restrictively than its language provides is pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading").

of family violence, sexual assault, abuse, and stalking will be reluctant to come forward to report crimes because they will face removal from the country and separation from their families. *See* Tr. 13:4-17; 14:16-21; 86:4-13; 270:14-15; docket no. 58, declaration of Sally Hernandez.

Undocumented immigrants, and U.S. citizens related to them, will be reluctant to send their children to school, attend church, report housing problems, and seek health care, including prenatal care, because it will put members of their family at risk of removal. *See* Tr. 11:25-12:9; 182:7-21; 184:4-16; 270:10-13; docket no. 77, exhibit 8; docket no. 57, declarations of Gregorio Casar, S. Krieger, and S. Renteria.

Trust between local law enforcement and the people they serve, which police departments have worked so hard to promote, will be substantially eroded and result in increased crime rates. *See* docket no. 77, exhibit 7; docket no. 57, declarations of S. Adler and Brian Manley; docket no. 56, declaration of J. Bernal.

Local jurisdictions face severe economic consequences under SB 4, including civil penalties, the loss of grant money, the loss of conferences and conventions, the threat of future litigation, the loss of immigrant workers (who help drive state and local economic engines); and ensuing tax consequences. *See* docket no. 56, declaration of J. Bernal; docket no. 77, exhibits 14, 16; docket no. 158, declaration of Ramiro Cavazos; docket no. 57, declaration of S. Vivanco; docket no. 56, declaration of Senator Jose Rodriguez (referring to Gov. Abbott's threat to withhold criminal justice grants); docket no. 57-14, public statements of Governor Abbott ("I have withheld $1.5 million in governor grants to Travis County … We

are going to be asserting fines."); docket no. 57, declaration of B. Johnson.[98]

VI.

Balance of equities

The balance of equities, which explores the relative harms to the parties, tips heavily in Plaintiffs' favor. The State asserts that it has an interest in implementing and enforcing its enacted laws, but the protection of constitutional rights is paramount.[99] As the State concedes, local jurisdictions have been cooperating with federal immigration authorities for decades. Local cooperation, under the rubric of federal law, will not change. But the mandates, prohibitions, penalties, and sanctions under SB 4 impose substantial burdens on local entities that are not imposed under federal law. The burden on the State if SB 4 is not implemented and enforced in its entirety on September 1 does not even remotely compare with the concrete burdens that SB 4 imposes on local entities.[100] The mandates, penalties, and exacting punishments under SB 4 upset the delicate balance between federal enforcement and local cooperation and violate the United States Constitution for the reasons stated herein. These constitutional concerns clearly outweigh the State's interest in enforcing the prohibitions in SB 4. *See Georgia Latino All. for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1269 (11th Cir. 2012) ("Plaintiffs are under the threat of state prosecution for crimes that conflict with federal law, and we think enforcement of

---

[98]Financial losses, standing alone, would not be enough for a showing of irreparable harm, but the economic losses that localities suffer will be passed on to taxpayers and thus are adverse to the public interest, which factors into the balance of equities as well.

[99]*See DeLeon v. Perry*, 975 F.Supp. 2d at 664 (any harm that the State may experience from enjoining state officials from enforcing a challenged law is outweighed by the constitutional harm that plaintiffs and the public will likely suffer if the law is enforced).

[100]Despite the State's yearning for immediate enforcement, enjoining the enforcement of SB 4 until a final decision on the merits will benefit the State as well. If SB 4 is implemented, the State will begin spending public funds to enforce SB 4 against local entities that will also spend public funds to defend themselves. Both State and local entities will also need to expend public funds to defend against spin off litigation, including Fourth Amendment challenges.

a state law at odds with the federal immigration scheme is neither benign nor equitable.").

VII.

Public interest

The best interests of the public will be served by preserving the *status quo* and enjoining, prior to September 1, the implementation and enforcement of those portions of SB 4 that, on their face, are preempted by federal law and violate the United States Constitution.

On February 2, 2017, when SB 4 was being considered in the Senate, eight witnesses showed up to support SB 4 and over 1,600 witnesses showed up to oppose it. Docket no. 77, exhibit 1-D. The named plaintiffs in this lawsuit include five of the six largest cities in the State of Texas – Houston, Dallas, San Antonio, Austin, and El Paso – and their cumulative population exceeds six million people.[101] This is representative of the public opposition to SB 4 and the overwhelming public concern about its detrimental effect. The public interest in protecting constitutional rights, maintaining trust in local law enforcement, and avoiding the heavy burdens that SB 4 imposes on local entities will be served by enjoining those portions of SB 4 that the Court has preliminarily determined are preempted or are constitutionally invalid on their face. Again, this will merely preserve the *status quo* until the merits of Plaintiffs' claims are resolved.

In conclusion, the Court's role is limited to determining the constitutionality of a statute, not its wisdom or necessity. That is within the sole discretion and prerogative of the Legislature. There is overwhelming evidence by local officials, including local law enforcement, that SB 4 will erode public trust and make many communities and neighborhoods less safe. There is also ample evidence that localities will suffer adverse economic consequences which, in turn, harm the State of Texas. Indeed, at the end of the day, the Legislature is free to ignore the pleas of city and county officials, along with local police departments, who are in the trenches and

---

[101] https://www.tsl.texas.gov/ref/abouttx/popcity32010.html.

neighborhoods enforcing the law on a daily and continuing basis. The depth and reservoir of knowledge and experience possessed by local officials can be ignored. The Court cannot and does not second guess the Legislature. However, the State may not exercise its authority in a manner that violates the United States Constitution.

IT IS THEREFORE ORDERED that Defendants are ENJOINED from implementing and enforcing the following provisions of SB 4:

1. The enforcement provision in Tex. Gov't Code § 752.053(b)(3) and any action (including but not limited to corrective, disciplinary, retaliatory, or punitive action) under §§ 752.055, 752.056, and 752.0565 arising therefrom;[102]

2. The endorsement prohibition in Tex. Gov't Code § 752.053(a)(1), and any action (including but not limited to corrective, disciplinary, retaliatory, or punitive action) under §§ 752.055, 752.056, and 752.0565 arising therefrom;

3. The prohibition against adoption or enforcement of policies "that materially limit" the enforcement of immigration laws in Tex. Gov't Code § 752.053(a)(1), and any action

---

[102]As the Court previously discussed, Texas Government Code § 752.053(b)(1)-(2) addressing immigration status inquiries and sharing of immigration status information are not enjoined at this time. SB 4 permits—but does not require—that officers make an immigration status inquiry during the process of a lawful detention or arrest. ("A local entity... may not prohibit or materially limit [a local officer] from inquiring into the immigration status of a person under a lawful detention or arrest.") § 752.053. Further, SB 4 does not give local officers authority to stop or detain a person solely for the purpose of making an immigration inquiry, as such action would likely be unconstitutional. *Arizona*, 567 U.S. at 413 ("Detaining individuals solely to verify their immigration status would raise constitutional concerns"). Moreover, if during a lawful detention or arrest an officer obtains information that a detained or arrested individual is undocumented, he may not arrest the individual on this basis or prolong the detention. *Id.* If an officer obtains information that an arrestee/detainee is unlawfully present he may only—but is not required to—do one thing: share this information with ICE or other local entities. ("A local entity... may not prohibit or materially limit [a local officer] from "sending the information to or requesting or receiving information from USCIS or ICE... maintaining the information... or exchanging information with another local entity.") § 752.053. In sum, SB 4 gives local officers discretion to inquire and share information but it does not provide them with discretion to act upon the information that they may obtain.

(including but not limited to corrective, disciplinary, retaliatory, or punitive action) under §§ 752.055, 752.056, and 752.0565 arising therefrom;

4. The prohibition against a pattern or practice that "materially limits" the enforcement of immigration laws in Tex. Gov't Code § 752.053(a)(2), and any action (including but not limited to corrective, disciplinary, retaliatory, or punitive action) under §§ 752.055, 752.056, and 752.0565 arising therefrom;

5. The requirement that law enforcement agencies "comply with, honor, and fulfill" any immigration detainer request issued by United States Immigration and Customs Enforcement, Tex. Code Crim. Proc. Art. 2.251(a)(1), and any action (including but not limited to corrective, disciplinary, retaliatory, or punitive action) under Tex. Gov't Code §§ 752.055, 752.056, and 752.0565; Tex. Loc. Gov't Code § 87.031(c); and Tex. Penal Code § 39.07 arising therefrom.

The Court exercises its discretion to waive the requirement to provide security under Rule 65(c) of the Federal Rules of Civil Procedure. *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978) (the trial court "may elect to require no security at all").

SIGNED this 30 day of August, 2017.

ORLANDO L. GARCIA
CHIEF U.S. DISTRICT JUDGE