# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | |
|---|---|
| CITY OF EL CENIZO, TEXAS, MAYOR RAUL L. REYES of City of El Cenizo; MAVERICK COUNTY; Maverick County Sheriff TOM SCHMERBER, Maverick County Constable Pct. 3-1 MARIO A. HERNANDEZ; and LEAGUE OF UNITED LATIN AMERICAN CITIZENS, <br><br> *Plaintiffs*, <br><br> v. <br><br> TEXAS; GREG ABBOTT, in his official capacity as Governor of Texas; and KEN PAXTON, in his official capacity as Texas Attorney General, <br><br> *Defendants*. | No. 5:17-cv-404-OG <br><br> **MOTION FOR STAY PENDING APPEAL** |

## MOTION FOR STAY PENDING APPEAL

Defendants respectfully move for a stay pending appeal of this Court's preliminary injunction entered August 30, 2017 (ECF No. 189) (Order), from which a notice of appeal has been filed (ECF No. 190). Defendants respectfully request expedited consideration of this stay motion and a ruling by tomorrow, September 1, 2017, the day that the enjoined Senate Bill 4 (SB4) was set to take effect, because waiting longer to grant a stay pending appeal would cause irreparable injury to the State.

## STANDARD

Federal Rule of Civil Procedure 62(c) provides that "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction." Courts "consider four factors in deciding whether to grant a stay pending appeal: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013).

## ARGUMENT

Beginning with the final factors, a stay is justified here because enjoining a State's duly enacted laws necessarily causes irreparable injury to the State. *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers). It is for the State to judge the interests of public safety, and preventing the State from implementing a statute addressing "law enforcement and public safety interests . . . constitutes irreparable harm." *Id.*; *see also Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers) ("The presumption of constitutionality which attaches to [legislation] is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of applicants in balancing hardships.").

1

A stay of the injunction would also be in the public interest. SB4 furthers the same public interest recognized federally in the INA: facilitating cooperation between state/ local law enforcement and federal immigration officials. *See generally* 8 U.S.C. § 1357(g)(10)(B). Promoting the rule of federal and state law—not refusing to cooperate with enforcing the law when the federal government requests help, as plaintiffs wish—is a compelling public interest. *See Heckler v. Cmty. Health Servs. of Crawford Cty, Inc.*, 467 U.S. 51, 60 (1984) ("noting the interest of the citizenry as a whole in obedience to the rule of law"). And the Court's finding of irreparable harm rests on its finding of a violation of constitutional rights, which is mistaken. *See infra* pp. 3-7. State and local law-enforcement officials have been cooperating with federal immigration authorities across the nation for years, without irreparable harm to those officials. *E.g.*, Waybourn Decl. ¶¶ 6-10; Decl. of Steven McCraw (Exh. 3) ¶ 6-10. This is true even of the plaintiffs, who have long enforced detainer requests when the mood strikes them, based on their own policy preferences (such as the seriousness of the allegations against the detainee) that are irrelevant to the underlying constitutionality of the detentions. *See, e.g.*, ECF No. 58-1 (Hernandez Decl.) ¶ 26. There is thus no sound basis for finding irreparable harm from SB4's operation. The equities all favor granting a stay.

Defendants also are likely to succeed on the merits of their appeal, not only for the reasons stated in their opposition to plaintiffs' motions, which is incorporated herein, but also because the Court's preliminary-injunction order is seriously flawed:

1.  The Court erred in holding § 752.053(b)(3) preempted because the Court appears to have misunderstood what that section provides. That section does not contemplate, let alone authorize, state/local officials to engage in immigration enforcement outside the direction and control of federal officials. Rather, it merely *prohibits* local policies *categorically blocking* cooperation with federal authorities: SB4 thus prevents local policies *blocking* local officers from signing 8 U.S.C. § 1357 cooperation agreements with the federal government—which necessarily entail direction and control by federal officials. Of course, as this Court observed, some forms of local assistance to federal immigration authorities—like providing them information—will not require a § 1357 cooperation agreement. But nothing in SB4 provides that state/local officers *cannot* enter

into § 1357 cooperation agreements for other forms of assistance, such as enforcement. The Court's preemption ruling rests on this misapprehension of SB4.

2. The Court erred in holding that the term "endorse" in § 752.053 violates the First Amendment as overbroad and viewpoint discriminatory, and the Fourteenth Amendment's Due Process Clause as vague. The Court gave that term a broad meaning based on what it "could mean" (Order at 41) even though it is readily susceptible to a narrower construction that would resolve any doubt as to its constitutional validity: the dictionary definition, "to sanction." Webster's New International Dictionary 845 (2d ed. 1945); *accord* Webster's New World College Dictionary 480 (5th ed. 2016); *cf. In re Hecht*, 213 S.W.3d 547, 571 (Tex. Spec. Ct. Rev. 2006) (appointed by Tex. Sup. Ct.) (rejecting a broad definition of "endorsement" in a judicial ethics canon, consulting leading dictionaries, and holding that "endorse" means "more than mere support"). To "sanction," in turn, means "to ratify or confirm," or "to authorize or permit; countenance." Webster's New World College Dict. 1286. And a use of official power is required to ratify or authorize. So defined, "endorse" admits a readily susceptible legitimate application that obviates constitutional concerns. SB4 is designed to stop local law enforcement agencies from having policies that obstruct cooperation with federal immigration officials. Moreover, this construction resolves any vagueness or viewpoint-discrimination claim.

In any event, even if "endorse" is invalid, the Court erred as to the remedy. The Court's concerns stem from a single word in a disjunctive series of words: "endorse." The easily administered remedy, therefore, is to simply strike the word "endorse." The Court stated that it "cannot rewrite a law to conform it to constitutional requirements," Order at 39, but there is nothing to rewrite—all the Court has to do is strike the single word "endorse." The prohibition on remedial rewriting of statutes deals with *affirmatively writing new words into* a statute. *See, e.g.*, *Randall v. Sorrell*, 548 U.S. 230, 262 (2006). By contrast, a court must respect a statute's severability clause, and SB4 has a clear and strong one in § 7.01, making even a "word" of the statute severable. Any remedy for the challenges stemming from the word "endorse" can thus go no further than enjoining only enforcement of that single word. *See, e.g.*, *Leavitt v. Jane L.*, 518 U.S. 137, 139-40 (1996)

3

(per curiam) (holding that a federal court must preserve the valid scope of a state statutory provision to the greatest extent possible in accordance with state law on severability). Indeed, plaintiffs themselves recognized that, in light of SB4's severability clause, striking merely the word "endorse" would be the appropriate way to resolve any First Amendment concerns. *See* Preliminary Injunction Hr'g Tr. 51-53 (statements of counsel for El Cenizo).

      3.    The Court erred in holding plaintiffs likely to invalidate the term "materially limit" as unconstitutionally vague under the Fourteenth Amendment's Due Process Clause. A materiality standard is routine in the law. *See, e.g.*, Tex. R. Disciplinary Conduct R. 2.02 cmt. 6 ("Any such limitations which are material to the evaluation should be described in the report"); Fla. Stat. § 494.00165(1)(a) ("It is a violation of this chapter for any person to: . . . Advertise that an applicant shall have unqualified access to credit without disclosing the material limitations on the availability of such credit."). The ABA model rules on professional conduct even use the phrase "materially limit[]":

> Comments to the ABA version of this rule explain the policies underlying a rule against concurrent conflicts of interest. Absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, because a conflict that materially limits a lawyer's representation of her client, even absent direct adversity may hinder a lawyer's ability to "recommend or advocate all possible positions" for her clients.

*In re Congoleum Corp.*, 426 F.3d 675, 688 (3d Cir. 2005) (citation omitted); *see also id.* ("As the New Jersey rule [of professional conduct] specifies, the lawyer's own interests should not be permitted to have an adverse effect on, or otherwise materially limit, the representation of a client."); Model Rules of Prof'l Conduct rr. 1.7(a)(2), 1.10(a)(1) (Am. Bar Ass'n 2016). The Eighth Circuit has construed a similar "materially limit" phrasing in a Minnesota antidiscrimination law several times. *See, e.g.*, *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1034 (8th Cir. 2012) ("The [Minnesota Human Rights Act] defines disability in terms similar to those under the ADA, except that the former defines 'disability' as an impairment that 'materially limits' a major life activity. 'Materially limits' is a less stringent standard than 'substantially limits.' Analysis of a ADA claim applies

equally to a MHRA claim. (citing Minn. Stat. § 363A.03, subd. 12 (2005); *Loye v. Cnty. of Dakota*, 625 F.3d 494, 497 n.2 (8th Cir. 2010); *Kirkeberg v. Canadian Pac. Ry.*, 619 F.3d 898, 907 (8th Cir.2010); *Sigurdson v. Carl Bolander & Sons, Co.*, 532 N.W.2d 225, 228 (Minn. 1995)).

In any event, so long as there is a valid "core" meaning to the law, a preenforcement vagueness facial challenge must fail. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982) (a challenger "must prove that the enactment is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all."). The Court did not apply this required preenforcement vagueness facial standard. SB4 has an obvious valid core: its prohibition on sanctuary-city policies that limit the situations in which local entities or officials can collect and disseminate information regarding immigration status, which is the type of federal–state cooperation that this Court ruled was constitutional. *See* Order 11-17. That is precisely why the plaintiffs can so certainly claim that SB4 would apply to them. Under any standard, plaintiffs' pre-enforcement facial challenge fails when plaintiffs themselves engage in conduct they recognize is covered by SB4, or can identify means of compliance with SB4. Because the core of SB4's coverage through the phrase "materially limit" undoubtedly prohibits some of plaintiffs' own conduct, it is *facially* valid regardless of plaintiffs' arguments about how SB4 could hypothetically apply in other scenarios. *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 22 (2010); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 547 (5th Cir. 2008).

4. Lastly, the Court erred in holding that honoring ICE detainers violates the Fourth Amendment. If the Constitution allows Congress to authorize federal immigration officials to take aliens into custody based on civil removability grounds, then it makes no difference *for Fourth Amendment purposes* whether state officials carry out the first 48 hours of that detention at the behest of the federal government. If it is reasonable for federal officials to detain in those circumstances, the fact that state officials are doing so at the direct request at federal officials should make no difference in the Fourth Amendment analysis.

5

The central premise of Court's Fourth Amendment holding rested on a finding that federal officials' power to detain comes from a different source that state/local officials' power to detain. Order at 71-73, 76. Where a source of government power comes from, though, is not determinative of whether a Fourth Amendment seizure is reasonable. Instead, the Court's reasoning appears to improperly conflate preemption concepts with Fourth Amendment concepts.

In all events, even addressing preemption concepts inapposite to a Fourth Amendment claim, state and local officials' power to detain in this situation does not just derive from common-law police powers, as this Court suggested. Order at 70-71. The Texas Legislature has authorized Texas peace officers to carry out immigration detainers issued by federal authorities. *See* Tex. Code Crim. Proc. arts. 2.12-2.13, 2.251. In that respect, the state and local officials' power to detain here comports with the same statute that gives federal officials the power to detain: the INA. 8 U.S.C. § 1357(g)(10)(B) expressly contemplates state authority to detain for federal immigration violations so long as it is not a "unilateral decision of state officers," but is instead done at the federal government's direction. *See Arizona v. United States*, 567 U.S. 387, 410 (2012) ("[A] federal statute permit[s] state officers to 'cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.' There may be some ambiguity as to what constitutes cooperation under the federal law; but no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable *absent any request, approval, or other instruction from the Federal Government*." (citing 8 U.S.C. § 1357(g)(10)(B) (emphasis added)). If the States gave up certain aspects of their common-law police powers in this area upon joining the Union, thereby submitting to federal preemption (via the Supremacy Clause) by duly enacted congressional statutes, then the INA leaves no doubt that Congress restored any powers to the States that it previously preempted.

SB4, in turn, merely ensures that officials cooperate with detentions under the express "request, approval," and "instruction" of federal immigration officials, which comports with *Arizona*'s endorsement of cooperation under the guidance of federal officials, *id.*, as well as Fifth

6

Circuit precedent, *see, e.g.*, *Mays v. Sudderth*, 97 F.3d 107, 113 (5th Cir. 1996) (authority to comply with facially valid court order); *Duckett v. City of Cedar Park*, 950 F.2d 272, 280 (5th Cir. 1992) (authority to comply with facially valid warrant). Unlike part of Arizona's law at issue in *Arizona v. United States,* SB4 does not independently authorize "police [to] stop someone based on nothing more than possible removability"; so the Supreme Court's observation that "the usual predicate for an arrest is absent" in that scenario is unavailing here. *Arizona*, 567 U.S. at 407. *Arizona*'s preemption holding did not strip state officials of their power to constitutionally detain removable aliens consistent with the Fourth Amendment. *See id.* at 410 (contemplating States honoring federal ICE detainer requests: "allow[ing] federal immigration officials to gain access to detainees held in state facilities"); *Atwater v. City of Lago Vista*, 532 U.S. 318, 328-32 (2001) (noting constables' common-law inherent authority to arrest); *United States v. Phillips*, 834 F.3d 1176, 1181 (11th Cir. 2016); *accord Locke v. United States*, 11 U.S. (7 Cranch) 339, 348 (1813) ("probable cause" meant a belief "made under circumstances which warrant suspicion," without distinguishing criminal and civil offenses).

## CONCLUSION

Defendants respectfully request that, by September 1, 2017, the Court stay its preliminary-injunction order pending appeal.

Respectfully submitted this the 31st day of August, 2017.

    KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

MICHAEL C. TOTH
Special Counsel to the First Assistant Attorney General

ANDREW D. LEONIE
Associate Deputy Attorney General

AUSTIN R. NIMOCKS
Associate Deputy Attorney General

*/s/Darren McCarty*
DARREN MCCARTY
Special Counsel for Civil Litigation
Texas Bar No. 24007631
darren.mccarty@oag.texas.gov

DAVID J. HACKER
Senior Counsel

Office of Special Litigation
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
(512) 936-1414
(512) 936-0545 Fax

*ATTORNEYS FOR TEXAS*

**CERTIFICATE OF CONFERENCE**

On August 31, 2017, Defendants conferred by email with counsel for the Plaintiffs' groups. The following Plaintiffs responded that they were opposed to the relief requested herein:

Travis County;
City of San Antonio;
City of El Paso;
City of El Cenizo;
Harris County Attorney's Office;
City of Dallas;
Texas Association of Hispanic County Judges and County Commissioners; and
City of Houston.

*/s/Darren McCarty*
DARREN MCCARTY

**CERTIFICATE OF SERVICE**

I, Darren McCarty, hereby certify that on this the 31st day of August, 2017, a true and correct copy of the foregoing document was transmitted using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/Darren McCarty*
DARREN MCCARTY