UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CITY OF EL CENIZO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | CIVIL NO. 5:17-CV-404-OLG |
| v. | § | [Consolidated/Lead case] |
| | § | |
| THE STATE OF TEXAS, et al., | § | |
| *Defendants.* | § | |

## CONSOLIDATED PLAINTIFFS EL PASO COUNTY, ET AL.'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

At stake in this case is whether the Texas legislature may pass a discriminatory law that strips civil rights protections for Latinos and Latin American immigrants, while penalizing local governments who uphold these rights pursuant to the U.S. Constitution. Consolidated Plaintiffs El Paso County, et al. respectfully file this response to Defendants' Motion to Dismiss ("MTD"), Dkt. 297. The Court should deny Defendants' Motion because the pleadings demonstrate that the organizational, government officials, and jurisdictional Plaintiffs face specific, concrete, and redressable harms to their constitutional rights under SB 4. Contrary to Defendants' argument, all defendants are properly named. Similarly, there is no merit to Defendants' Motion under Rule 12(b)(6), because, in almost seventy-five paragraphs in the Third Amended Complaint ("TAC"), Dkt. 292, Plaintiffs' amply support their claims and meet the Rule 12(b)(6) standard.

### FACTUAL AND PROCEDURAL BACKGROUND

On May 7, 2017, after an extremely anomalous legislative process, Governor Abbott signed Texas Senate Bill 4 ("SB 4") into law. For decades, local governments in Texas have sought a balance between their duty to protect and respect constitutional rights and their duty to enforce the laws, finding effective ways to prevent discrimination. But SB 4—passed at a heightened moment of anti-immigrant rhetoric relying on racial stereotypes—upended that balance. The bill strips local

1

governments of their supervisory powers to prevent discrimination, penalizes perceived disobedience to federal immigration priorities, and silences officials from dissenting.

The Fifth Circuit previously refused to issue a preliminary injunction against SB 4 in a pre-implementation, facial challenge, although the court also ruled that the law's "endorse" provision violates the constitutional rights of elected officials. *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 185 (5th Cir. 2018). Now, on remand, consolidated Plaintiffs challenge the constitutionality of the unconsidered provisions of SB 4 and the law in its application. Defendants have now moved to dismiss the Third Amended Complaint. For the reasons set forth below, the Motion should be dismissed and the parties permitted to proceed with discovery.

## STANDARD OF REVIEW

A motion to dismiss for lack of subject-matter jurisdiction should only be granted if the court is certain that the plaintiffs cannot prove any set of facts in support of their claims entitling them to relief. *Wagstaff v. United States Dep't of Educ.*, 509 F.3d 661, 663 (5th Cir. 2007).

Dismissal under Rule 12(b)(6) is unwarranted when a plaintiff pleads sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" where the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In applying the plausibility standard, a plaintiff's allegations must be accepted as true. *Iqbal*, 556 U.S. at 662, 677–78; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (pleading burden applies to question of standing at pleading stage). "The plausibility standard is not akin to a 'probability requirement'" and asks merely for "more than a sheer possibility" that a plaintiff's injuries are fairly traceable to the defendant's actions. *See Iqbal*, 556 U.S. at 678 (citation omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [a court may] presume that

general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation omitted).

## ARGUMENT

### I.      El Paso County and the El Paso Officials Have Standing to Sue Defendants

Defendants argue that El Paso County and its officials lack standing because the County is a political subdivision of the State. MTD at 1 (incorporating Dkt. 279). Defendants are mistaken.

"Although some circuits have followed a per se rule that political subdivisions may not sue their parent states under any constitutional provision, that is not the rule in this circuit." *Donelon v. Louisiana Div. of Admin. Law*, 522 F.3d 564, 567 n.6 (5th Cir. 2018). In the Fifth Circuit, courts ask whether the plaintiff is "so closely identified with the state government, and so thoroughly controlled by the body [it is] suing that the litigation amounts to a suit by the state against itself." *Rogers v. Brockette*, 588 F.2d 1057, 1065 (5th Cir. 1979). Applying that test, the Fifth Circuit held in *Rogers* that a local school board had standing to sue Texas state education authorities. *Id.* The court recognized that the school board had independent powers, including the power "to make contracts," "to levy and collect taxes," to obtain property by eminent domain," to "sue and be sued," and "generally to manage and govern the public free schools of the district." *Id.* (internal quotation marks omitted). Moreover, "[t]he members of the local boards are elected by the people of the district, not appointed from above." *Id.* at 1065–66. *Rogers* concluded that the board seemed "likely to have a mind of its own" and was "sufficiently independent of the State of Texas to bring this suit." *Id.* at 1066.

Here, the County possesses all the powers mentioned in *Rogers*—and many more. *See, e.g.*, Tex. Local Gov't Code § 111.039 (granting counties the power to levy taxes); *id.* § 261 (power to acquire property through eminent domain); *id.* § 262 (power to make contracts). El Paso County has the constitutional and statutory authority to set policies and regulations, as well as administer

programs for its residents in certain areas, including administering its county judicial system, and providing health and social services to many county residents regardless of their national origin, and in some instances regardless of immigration status. El Paso County also adopts its own budget, has its own funds, can levy taxes, and elects its own representatives.

In sum, there can be no doubt that the El Paso Plaintiffs "have a mind of [their] own," so they are "sufficiently independent of the State of Texas to bring this suit." *Rogers*, 588 F.2d at 1066.

County officials also have standing. The heart of the El Paso Plaintiffs' claims is that SB 4 places them in an impossible bind. On the one hand, they took an official oath to defend the United States Constitution.[1] On the other hand, being forced to comply with SB 4's draconian requirements, or face stringent penalties, will injure the El Paso Plaintiffs. Refusal to comply with SB 4 subjects the Sheriff to "removal from office" and "criminal sanction," including imprisonment. TAC ¶ 11. SB 4 limits his discretion and ability to adopt policies necessary "to ensure the public safety of the residents of El Paso." *Id.* Similarly, County Attorney Jo Anne Bernal faces the threats of removal from office and civil penalties for violating SB 4. TAC ¶ 13.

Both the Sheriff and County Attorney are elected by residents of the County. *Id.* § 85.001. The funding and the budget for the El Paso County Attorney is established by the County Commissioners' Court, but the County Attorney is autonomous in its hiring of assistant county attorneys and investigators and other staff. The County Attorney also sets policy on how it will handle a variety of cases affecting families and children such as juvenile crime, child and elder abuse, mental health, and family violence. The office also enforces environmental and health laws, such as illegal dumping, clean air, and water violations. Finally, one of its most important services are Protective Orders for victims of family violence, collection of hot checks, and prosecution of

---

[1] *See* Tex. Local Gov't Code § 85.001(c); Form 2204—Oath of Office, *available at* https://www.sos.state.tx.us/statdoc/forms/2204.pdf.

deceptive businesses and juvenile crime. County residents, many times regardless of their immigration status, qualify to receive this free legal assistance.

Similarly, while the funding and budget for the El Paso County Sheriff is derived from the El Paso County Commissioners, the El Paso County Sheriff is autonomous in its hiring and supervision of Deputies and other staff and in supervising and managing the County Jail.

The Supreme Court has held that local officials have standing to challenge unconstitutional laws in their official capacities when they are in such an untenable position. In *Board of Education v. Allen*, a Board of Education and officials in their official capacity sued the State of New York alleging that a state law violated the First and Fourteenth Amendments. 392 U.S. 236, 238, 240 (1968). The New York courts had struggled over whether the Board had standing to sue the State, given that the Board was a political organization of that state. *Board of Ed. v. Allen*, 27 A.D.2d 69, 71 (N.Y. S. Ct. App. Div., 1966). But the Supreme Court resolved the issue. The challenged law placed the Board "in the position of having to choose between violating their oath [to defend the Constitution] and taking a step—refusal to comply with [the challenged law]—that would be likely to bring their expulsion from office . . . ." *Board of Ed.*, 392 U.S. at 242 n.5. Therefore, the Court had "no doubt" that the Board had standing. *Id.*

The same logic applies here. Like the law in *Allen*, SB 4 hinders the ability of the county officials to carry out their duties. They therefore have standing to challenge SB 4.

## II.     TOPEF and MOVE Have Standing

### A.     TOPEF and MOVE Have Organizational Standing

Plaintiffs TOPEF and MOVE both properly allege organizational standing, otherwise known as standing in their own names.[2] *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). An organization "can establish standing in its own name if it meets the same standing test

---

[2] Plaintiffs do not claim "associational standing," so there is no need to address Defendants' arguments against that theory.

that applies to individuals": (1) injury in fact; (2) causation; and (3) redressability. *Id.*; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

### 1.   TOPEF and MOVE Plausibly Allege Injury in Fact

Defendants primarily argue that Plaintiffs have failed to allege an injury in fact. The Fifth Circuit has held that "an organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999). If a defendant's actions "perceptibly impair" an organization in its provision of services, "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). While an injury-in-fact must be "concrete and particularized" and "actual or imminent," *Lujan*, 504 U.S. at 560, "it need not measure more than an identifiable trifle," *OCA-Greater Houston*, 867 F.3d at 612 (citation omitted).

TOPEF and MOVE are organizing groups that serve communities of color within both the general population and on college campuses to promote social, racial, and economic justice for working people and to build power in underrepresented youth communities. TAC ¶¶ 14–22. Both organizations allege injury in fact in the forms of (1) having to devote resources to counteract SB 4; and (2) having their right to associate with Latino members of the communities they serve impaired. First, Plaintiffs have sufficiently alleged a concrete injury through the devotion of resources to counteract Defendants' unlawful practices.[3] *See, e.g.*, *Richardson et al.*, 5:19-cv-00963-OLG, Doc. 41, slip op. at 10 (W.D. Tex. Aug. 7, 2019) (allegations that organizational plaintiff had to "expend 'additional resources' when 'providing instruction and support on mail-in ballots' in order to counteract the State's [mail-in ballot] policies" were adequate to plead concrete injury).

---

[3] TAC ¶ 16 (TOPEF "conduct[ed] 'know your rights' presentations, …[gave] out 'know your rights' cards[,] applied for and obtained grants for projects related to SB 4 and immigration issues[, and] organized rallies against SB 4."); TAC ¶ 20 (MOVE conduct[ed] 'know your rights' trainings and activities to raise awareness about SB 4 on college campuses…[,] co-found[ed] and participate[d] in a coalition designed to combat the effects of SB 4…[,] and dedicate[d] multiple staff members and dozens, if not hundreds, of hours toward these and similar efforts.").

Second, TOPEF and MOVE are injured in fact because SB 4 "mak[es] Latinos more hesitant to interact with the police" and creates a "fear of racial targeting," resulting in Latinos being fearful of participating in TOPEF's and MOVE's public organizing activities. TAC ¶¶ 17, 21. This chilling effect burdens TOPEF's and MOVE's First Amendment right to associate. *See, e.g., United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, SA-17-CV-1242-XR, 2018 WL 3017366, at \*17–18 (W.D. Tex. June 15, 2018); *Am. Fed'n of Gov't Employees Local 1 v. Stone*, 502 F.3d 1027, 1032–33 (9th Cir. 2007).

### a.    TOPEF and MOVE Have Alleged Injury to More Than "Abstract" Social Interests

Defendants first argue that TOPEF and MOVE have suffered injury only to an "abstract," legally incognizable interest in "advocacy" or "political influence." MTD at 5–6. Defendants conflate the articulation of a mission with the injury-in-fact requirement. The injuries to TOPEF and MOVE are not their motivations, mission, or goals, but rather the diversion of resources to counteract the effects of SB 4 and the burden on their right to associate.

In *OCA-Greater Houston v. Texas*, the Fifth Circuit held that an organization whose mission was to "advocating for and protecting and advancing the rights of Chinese Americans and Asian Pacific Americans" had established standing where it had "redirected some of its efforts and resources toward educating its members and other members of the public about" how to avoid the consequences of a law that allegedly violated the Voting Rights Act. 867 F.3d 604, 609 (5th Cir. 2017). Here, TOPEF's and MOVE's mission statements are similar,[4] and both organizations have redirected resources to counteract the effects of an allegedly unconstitutional law. *See* footnote 3, *supra*. Plaintiffs' allegations are therefore sufficient to show that their injuries constitute more than a

---

[4] TOPEF's mission is to "promote social, racial, and economic justice for all Texans," with a particular emphasis on Black and Latino working class communities. TAC ¶ 14. MOVE's mission is to "build[] political power in underrepresented youth communities through civic engagement, leadership development, and progressive issue advocacy." TAC ¶ 19.

setback to their "abstract" social interests. *See Richardson*, 5:19-cv-00963-OLG, Doc. 41, slip op. at 10–11 & n.5 (W.D. Tex. Aug. 7, 2019).

### b.   SB 4 Directly Conflicts with TOPEF's and MOVE's Missions

Defendants argue that Plaintiffs' injuries are self-inflicted and therefore cannot be the basis for standing. MTD at 6. Contrary to Defendants' assertions, SB 4 is in direct conflict with both TOPEF's and MOVE's organizational missions. TAC ¶¶ 14–15, 19. As discussed in greater detail below, TOPEF and MOVE allege that SB 4 (1) was passed with a discriminatory anti-immigrant, anti-Latino animus; and (2) disparately impacts the Latino community in the form of racially-motivated police stops, ICE detainers, deportations, and a marked decrease in the community's willingness to report crimes. TAC ¶¶ 26–90. SB 4 has directly caused Latinos to be less willing to participate in TOPEF's and MOVE's organizing activities. TAC ¶¶ 17, 21.

These allegations are sufficient to demonstrate that TOPEF's and MOVE's missions are in direct conflict with SB 4. *See, e.g.*, *Fowler*, 178 F.3d at 361–62 (holding plaintiff raised dispute of material fact as to whether organizational mission to "increase the political power of low- and moderate-income people" was in direct conflict with Louisiana's failure to implement voter registration laws); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc) (finding an organization dedicated to "strengthen[ing] and expand[ing] the work of local day laborer organizing groups" demonstrated "frustration of purpose" where an ordinance "discouraged both employees and employers from participating in hiring transactions" and "prevented day laborers from making their availability to work known").

### c.   *City of Kyle* Does Not Preclude TOPEF's and MOVE's Injuries

Defendants next argue that Plaintiffs' expenditures cannot constitute injury because TOPEF and MOVE "'have not identified any specific project that [they] had to put on hold or otherwise curtail in order to respond to'" SB 4 and because their current efforts are "routine" activities. MTD

at 9–10 (quoting *City of Kyle*, 626 F.3d at 238). Defendants misstate Plaintiffs' allegations and mischaracterize *City of Kyle*.

First, TOPEF and MOVE have identified specific projects put on hold to mitigate SB 4's effects. TOPEF has diverted resources from projects to end (1) family separations; (2) the recent change in the public charge criterion for U.S. admissibility; and (3) the expansion of private immigration detention centers across Texas. TAC ¶ 16. MOVE has diverted resources from projects to organize and rally students and register more students to vote. TAC ¶¶ 19–20.

Second, contrary to Defendants' assertion, simply because TOPEF's and MOVE's efforts to counteract SB 4 fall within the scope of their missions does not make those efforts incognizable as injuries. *See City of Kyle*, 626 F.3d at 238. Rather, "an organization suffers an injury in fact when a statute compel[s] it to divert more resources to accomplishing its goals." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (internal quotation marks omitted). For example, in *OCA-Greater Houston*, the Fifth Circuit rejected the exact same argument Defendants make here, recognizing that even though one of the primary missions of the plaintiff-organization was "promot[ing] civic participation and provid[ing] civic education," it had demonstrated injury in fact because it was forced to expend resources on further educating voters to counteract the voting-access law in that case. 867 F.3d at 609, 612. The operative question is whether an organization "went out of [their] way to counter the effect of" the challenged law, to "mitigat[e] its real-world impact on . . . the public" by taking actions "that consumed [the organization's] time and resources *in a way they would not have been spent absent the Texas law*." *Id.* at 612 (emphasis added). In this case, TOPEF's and MOVE's time and resources have been consumed in a way they would not have spent absent SB 4, and they have therefore alleged cognizable injuries. [5]

---

[5] Defendants also assert that TOPEF cannot complain of an injury because, by obtaining grant funding to counteract SB 4, TOPEF "improved [its] budgetary conditions" and expended "*additional*" rather than "*diverted*" resources. MTD at 9 (emphasis in original). This argument is incorrect for multiple reasons.

Finally, Defendants fail to mention that *City of Kyle* was decided after a bench trial, not at the pleading stage.[6] There, importantly, the level of evidence required at the trial stage far exceeds that necessary for the "plausibility" standard here.

### 2.      TOPEF and MOVE Have Plausibly Alleged Causation and Redressability

As to causation, Defendants assert that the allegation that SB 4 has made Latinos fearful of participating in TOPEF's or MOVE's activities "rel[ies] on a highly attenuated chain of possibilities" constituting implausible "speculation." MTD at 7–8 (citation omitted). Defendants' objections on this front are misplaced.

Accepting TOPEF's and MOVE's allegations as true, there is more than a "sheer possibility," *see Iqbal*, 556 U.S. at 678, that a discriminatory bill with disparate impact would deter Latinos from participating in TOPEF's and MOVE's activities, as Plaintiffs have alleged. *See, e.g., United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, SA-17-CV-1242-XR, 2018 WL 3017366, at *18 (W.D. Tex. June 15, 2018) (rejecting defendant's argument that plaintiffs had shown only an "attenuated" link by alleging that defendant's actions

---

First, TOPEF has made numerous expenditures to counteract SB 4; the use of related grant money is but one. TAC ¶ 16. Second, TOPEF had to "apply[] for and obtain[]" these grants, which required TOPEF staff to devote time and effort that could have been spent elsewhere—a resource expenditure which itself constitutes an injury. *See Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014). Third, TOPEF obtained these grants "for projects related to SB 4 *and* immigration issues." TAC ¶ 16 (emphasis added). The additional resources were not exclusively for SB 4 and could have been used on other activities if TOPEF had not needed to divert those resources because of the adoption of SB 4.

[6] Defendants repeatedly rely on the D.C. Circuit's statement that "the expenditure of resources on advocacy is not a cognizable Article III injury." *See, e.g.*, MTD at 8 (quoting *Turlock Irr. Dist. v. F.E.R.C.*, 786 F.3d 18, 24 (D.C. Cir. 2015)). To the extent the Court finds the D.C. Circuit's reasoning persuasive, that court limited the reach of its statement to advocacy that "takes place through litigation or administrative proceedings." *Turlock*, 768 F.3d at 24. Furthermore, the *Turlock* court's language is in reference to so-called "pure issue-advocacy" injury, *i.e.*, where an organization can allege "no injury other than injury to its advocacy," as opposed to injury to its activities. *See Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005) (cited in *Turlock*, 768 F.3d at 24). Plaintiffs have alleged more than injury to advocacy taking place through litigation or administrative proceedings and have also alleged injury to their activities, not merely their pure interest in a particular subject.

chilled union members' First Amendment rights). If Defendants believe there is a different, singular reason for this reduced turnout, they may pursue that evidence in discovery.

Finally, Defendants do not contest that an injunction prohibiting the enforcement of SB 4 would redress Plaintiffs' injuries. Accordingly, Plaintiffs have met their burden for Article III standing.

### B.  Plaintiffs Have Plausibly Alleged Claims on their Own Behalf

Defendants assert that Plaintiffs may not bring the Equal Protection Clause ("EPC") claims at issue here because they seek to vindicate the rights of third parties not before the court. MTD at 10–12. Defendants are incorrect.

#### 1.  Plaintiffs Bring EPC Claims on their Own Behalf

##### a.  The El Paso Plaintiffs

As to the El Paso Plaintiffs, a "law compelling persons to discriminate against other persons because of race" is a "palpable violation of the Fourteenth Amendment." *Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963). Where a plaintiff, like the El Paso Plaintiffs here, is the direct target of a discriminatory law that regulates their behavior, due to their association with the class of people discriminated against, the plaintiff may assert an EPC claim under 42 U.S.C. § 1983 in their own right. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620 (1996) (individuals and municipalities brought EPC challenge on the basis of gender against the state for passing a law repealing municipal ordinances that established anti-discrimination protections for LGBT individuals).

##### b.  TOPEF and MOVE

TOPEF and MOVE may bring EPC claims in their own right because they have directly suffered discrimination-based harm that falls within the EPC's zone of interests.

A corporation may bring a racial discrimination-based claim in its own right, irrespective of any corporate racial identity, when its injury falls within the "zone of interests" protected by the law

it seeks to invoke. *White Glove Staffing, Inc. v. Methodist Hosps. of Dallas*, 947 F.3d 301 (5th Cir. 2020). In that case, the plaintiff-corporation sued under 42 U.S.C. § 1981 because the defendant had terminated a contract with the plaintiff due to racial animus towards the plaintiff's African-American employee. *Id.* at 307 (citation omitted). "Rather than assume that racial identity is a predicate to discriminatory harm," the Fifth Circuit approached "the problem by assuming that, if a corporation can suffer harm from discrimination, it has standing to litigate that harm." *Id.* at 305–06 (citation omitted). This reflected the principle that "[a] party may suffer a legally cognizable injury from discrimination even where that party is not a member of a protected minority group" so long as it falls within the "zone of interests" protected by the law being asserted. *Id.* (citation omitted).

The Fifth Circuit rejected the defendant's argument that the plaintiff-corporation's claim fell outside 42 U.S.C. § 1981's zone of interests merely because the plaintiff "alleged discrimination . . . against [the African-American employee], not [the corporation] itself." *Id.* at 307. The court also rejected the contention that the plaintiff was attempting to litigate the rights of its employee, instead finding that it had stated a racial discrimination claim in its own right. *Id.* at 307–08 & n.4.

The same reasoning applies here. "[P]urposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981," *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003).[7] Both TOPEF and MOVE allege that they have been concretely injured by the operation of a racially discriminatory law. "[T]he purpose of the [EPC] . . . is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citation omitted). TOPEF's and MOVE's claims are directly related to the purposes of the EPC and permitting their claims would advance the goals of racial equality that the EPC seeks to achieve. *See, e.g.*, *Mercado Azteca, L.L.C. v. City of Dallas*, 2004 WL 2058791, at

---

[7] *See also Mescall v. Burrus*, 603 F.2d 1266, 1271 (7th Cir. 1979) ("The relationships of §§ 1981 and 1983 to the Fourteenth Amendment are so close . . . that we believe the use of each section must be guided by the principles announced by the Supreme Court for application of the Fourteenth Amendment to discrimination cases.").

*6 (N.D. Tex. Sept. 14, 2004) (Texas company that served Hispanic communities could sue under 42 U.S.C. § 1983 for violation of EPC because it "suffered direct harm as a result of [Dallas'] allegedly discriminatory actions").[8] Additionally, TOPEF and MOVE were "established for the very purpose of advancing minority interests," particularly those of the Latino community, bringing their claims of direct racial discrimination-based harm even more squarely within the EPC's zone of interests. *See, e.g.*, *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 7094–06 (2d Cir. 1982) (Friendly, J.) (permitting non-profit corporation founded to serve minority communities harmed by discriminatory acts to assert EPC claims in its own right).

### 2.     Plaintiffs Have Standing to Bring EPC Claims

Defendants argue that Plaintiffs lack standing because their claims derive from third parties not before the Court. MTD at 10–12. Defendants are incorrect. As stated above, it is well-settled that an organizational plaintiff meets all standing requirements so long as it can show (1) injury in fact; (2) causation; and (3) redressability. *See OCA-Greater Houston v. Texa*s, 867 F.3d 604, 610 (5th Cir. 2017); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). As explained above, Plaintiffs meet all three prongs and therefore have standing.

Third-party standing, as that phrase is used in Supreme Court precedent, is not applicable here. A plaintiff utilizes third-party standing when they bring a claim on behalf of a third person, not, as here, where the plaintiff themselves have suffered their own cognizable injury. *See Kowalski v. Tesmer*, 543 U.S. 125, 125–26 (2004). The Supreme Court has long permitted organizations to bring civil rights claims if the organization suffers a separate, concrete injury resulting from the violations. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 ((1982) ("[C]oncrete and demonstrable

---

[8] *See also Hassoun v. Cimmino*, 126 F. Supp. 2d 353, 368 (D.N.J. 2000) (corporate plaintiff could maintain 42 U.S.C. § 1983 EPC claim where it was harmed by anti-Semitic animus towards its shareholders); *Chicago Miracle Temple Church, Inc. v. Fox*, 1994 WL 176189, at *1–2 (N.D. Ill. May 6, 1994) (church could bring EPC claim under § 1983 where defendant refused to sell its building because its congregation was African-American).

injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.").

Moreover, the fact that both the Fifth Circuit and the Supreme Court have found standing without addressing the third-party doctrine shows that both organizational and associational analyses are proper. *See Crawford v. Marion Cty. Election Bd. v. Marion*, 553 U.S. 181, 189, n.7 (2008) (agreeing with appellate court that political party had standing to challenge state law on constitutional grounds; no discussion of third-party standing); *see also Ass'n of Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 360–61 (organization had standing to assert violations of the National Voter Registration Act).[9]

## III.   The State and Governor Are Proper Defendants

Defendants argue that the State of Texas and Governor Abbott are not proper defendants. MTD at 10 (incorporating Dkt. 279 at 4–7). Contrary to their arguments, the State and Governor are not immune from suit.

---

[9] Even though Plaintiffs need not show third-party standing, they can in this case. A party may bring a third party's claim where "the party asserting the right has a close relationship with the [third party] who possesses the right [and] there is a hindrance to the possessor's ability to protect his own interests." *Sessions v. Morales-Santana*, 137 S.Ct. 1678, 1689 (2017) (citations omitted).

First, the El Paso Plaintiffs have a "close relationship" because they provide "health and social service to many county residents regardless of their national origin," represent a community that is 82% Latino, and have been "leader[s] in the fight against discrimination of all types for decades, with a special focus on protecting the civil rights of its immigrant communities." TAC ¶ 7. Similarly, TOPEF and MOVE are non-profits specifically dedicated to combatting the sort of social and racial injustice reflected in laws like SB 4, which impacts both their and Latino community members' right to associate. Plaintiffs and the Latino community members they serve therefore possess a "congruence of interests," including "a common interest in eliminating racial discrimination," that makes it "appropriate" for Plaintiffs "to raise the rights of" those community members. *See Powers v. Ohio*, 499 U.S. 400, 413–14 (1991).

Second, those members of the community face a "hindrance" in protecting their own interests. SB 4 has a chilling effect on many members of the Latino community because they fear publicly organizing, being racially profiled, and becoming targets of local law enforcement. TAC ¶¶ 17, 21. Those members would be "understandably reluctant to engage in the allegedly protected activity for fear of prosecution or other penalty." *See Eulitt ex rel. Eulitt v. Maine, Dept. of Educ.*, 386 F.3d 344, 352 (1st Cir. 2004) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). This is a sufficient "hindrance" to justify permitting Plaintiffs to litigate these community members' rights in federal court. *See, e.g., Young Apts., Inc.*, 529 F.3d at 1043.

First, Texas is not immune from suit because SB 4 explicitly waives the State's sovereign immunity. *See* Tex. Gov't Code Ann. § 752.056(e) ("*Sovereign immunity of this state* and governmental immunity of a county and municipality to suit *is waived and abolished* to the extent of liability created by this section.") (emphasis added). Because of this explicit waiver of immunity, the State is a proper defendant and the inquiry may stop there.

Second, Governor Abbott is a proper defendant. Under the *Ex parte Young* doctrine, "a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 102 (1984). Therefore, "a state official in his or her official capacity, when sued for injunctive relief," is considered to be "a person under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989)). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017) (internal quotation marks omitted). Plaintiffs satisfy this straightforward inquiry because their Complaint alleges ongoing violations of the United States Constitution and seeks prospective declaratory and injunctive relief. TAC ¶ 127.

To fit within the *Young* exception, the named officer must have "some connection" with the enforcement of the challenged law. *Young*, 209 U.S. at 157. The Fifth Circuit remains undecided as to what that "connection" entails exactly. *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). But the court has made clear that the "some connection" requirement is "designed to ensure [the] defendant is not merely being sued as a representative of the state." *Air Evac EMS*, 851 F.3d at 517 (internal quotation marks and citation omitted).

Governor Abbott is sufficiently connected to the enforcement of SB 4 to remain in this lawsuit. First, as described, Governor Abbott's statements reveal his "demonstrated willingness" to

enforce SB 4. *Okpalobi v. Foster*, 244 F.3d 405, 417 (5th Cir. 2001). He voiced his intent to use SB 4 against counties that he perceives are not cooperating with federal immigration authorities. TAC ¶ 51. In a statement about Sheriff Sally Hernandez's alleged refusal to enforce federal immigration law, Governor Abbott expressed his intent to enforce SB 4 against county officials such as Plaintiffs in this lawsuit. *Id.*

Second, the Governor has a direct role in enforcing SB 4 through his ability to fund it. The Governor's office administers a "criminal justice division" that distributes state funds for law enforcement purposes. Tex. Gov't Code § 772.006. SB 4 directs that division to establish a "competitive grant program to provide financial assistance to local entities to offset costs related to . . . enforcing immigration laws" and "fulfilling immigration detainer requests." *Id.* § 772.0073(b). SB 4 additionally authorizes the criminal justice division to establish procedures and criteria to administer those grants. *Id.* § 772.0073(c). In other words, the Governor—through his criminal justice division—directly enforces SB 4 by rewarding and funding local law enforcement agencies who comply with SB 4.

Given the Governor's ability to enforce SB 4, Plaintiffs' injuries are traceable to the Governor's actions. The Governor is thus a proper Defendant.

## IV.    Each of Plaintiffs' Claims Is Likely to Succeed

### A.    Plaintiffs Plausibly Allege that SB 4 Was Passed with Discriminatory Intent in Violation of the Equal Protection Clause

Defendants argue that Plaintiffs' facial Equal Protection claim fails due to (1) lack of standing; (2) failure to sufficiently allege facts that show discrimination; and (3) the possibility of an obvious alternative explanation that makes implausible the claim of discrimination. MTD at 11–13. Defendants' first claim is incorrect because TOPEF and MOVE have organizational standing to bring a facial Equal Protection claim, as addressed in Part II, *supra*.

Defendants' second and third arguments fail because Plaintiffs provide factual allegations far beyond the low threshold required to survive a motion to dismiss. While Plaintiffs must, as they amply do, provide plausible allegations, the Supreme Court and the Fifth Circuit have repeatedly affirmed a low factual threshold is appropriate in "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry . . . ." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977); *see also Veasey v. Abbott*, 830 F.3d 216, 230–31 n.12 (5th Cir. 2016) (rejecting the "clearest proof rule" as it would overturn *Arlington Heights*).

### 1. Plaintiffs Assert Non-Conclusory Facts that Meet the *Arlington Heights* Factors to Show Discriminatory Intent

Plaintiffs provide ample facts to meet all five *Arlington Heights* factors to show discriminatory intent. These factors are "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 267–68); *see also Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (affirming the use of direct and circumstantial evidence in these factors to find discriminatory intent).

"When a plaintiff opts to rely on the *Arlington Heights* factors . . . the plaintiff need provide very little evidence . . . to raise a genuine issue of fact . . . ; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder." *Rollerson v. Port Freeport*, 2019 WL 4394585, at *6 (S.D. Tex. Sept. 13, 2019) (internal quotation marks and citations omitted) (appeal filed). In more than sixty paragraphs, Plaintiffs allege non-conclusory facts that, taken in light most favorable to Plaintiffs, raise sufficient questions about legislative intent to make dismissal inappropriate. TAC ¶¶ 26–101. Defendants appear to concede that Plaintiffs met three *Arlington*

*Heights* factors, showing suspect events, substantive departures, and legislative history. Defendants suggest that Plaintiffs did not provide sufficient facts to show only two of the five factors: (1) a history of discrimination; and (2) departures from normal procedures. MTD at 12–13. Defendants are incorrect about both factors.

First, Plaintiffs detail facts that illustrate how SB 4 arose from a long history of discrimination, the recently-charged anti-immigrant movement, and erroneous, racially-charged statements. Each is sufficient to meet the first *Arlington Heights* factor. *See Hunter v. Underwood*, 471 U.S. 222, 228–29 (1985) (enacting legislation as "part of a movement" to discriminate against minorities is circumstantial evidence of discriminatory intent); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 684–86 (W.D. Tex. 2017) (holding discriminatory intent can be shown by Texas's "long, well-documented history of discrimination," official actions of discrimination such as "police antipathy," and private statements); *see also Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 277 (E.D. N.Y. 2018) (citing to Fifth, Sixth, and Ninth Circuits' consensus that "racially charged language" can be sufficient "evidence that official action was motivated by unlawful discriminatory purpose" to prevent dismissal).

Second, Plaintiffs factually show how SB 4's passage deviated from a normal legislative path.[10] TAC ¶¶ 55–68. Defendants seem to agree on this point, but imply the irregularities were normal for bills "prioritized by state leaders." MTD at 13. However, the Texas legislature handles "many pressing matters of great importance to Texas" that do not result in "legislative irregularities." *Veasey v. Abbott*, 830 F.3d 216, 238–39 (5th Cir. 2016) (finding "numerous and radical procedural departures," such as the speed, suspension of rules, cutting debate short, and passing

---

[10] *See* Declaration of State Senator José Rodríguez Dkt. 56-5, ¶¶ 20, 22 (declaring it was "extremely rare" for a bill with "overwhelming opposition to be passed without any consideration given to the concerns expressed," happening only twice before with bills found unconstitutional); Declaration of State Representative Eddie Rodriguez, Dkt. 56-4, ¶¶ 23, 36 (stating that, in fourteen years as a representative, he did not "recall a senate bill moving so quickly and spending such a short time in Calendars" or a calendar rule "being defeated, being reconsidered, and then being verified, when the outcome was never in question.").

resolutions contrary to the legislature's rules). While SB 4's priority level is a factual question, even high priority bills are suspect when, as Defendants concede occurred, the legislative process has many irregularities.

### 2. Plaintiffs Sufficiently Show that a Plausible Reason for the Passage of SB 4 was to Discriminate Against Latinos and Latin American Immigrants

Plaintiffs' "complaint may only be dismissed in light of an 'obvious explanation' when the defendant's explanation is *so convincing* that the plaintiff's explanation is rendered implausible." *In Re Houston Regional Sports Network, L.P.*, 547 B.R. 717, 739 (Bankr. S.D. Tex. 2016). As the "plausibility standard is not akin to a probability requirement," this Court "need not determine whether any possible legitimate reason . . . is more or less probable than the illegitimate reason alleged . . . ." *Zaragoza v. Tabachin, Inc.*, 2012 WL 6131027, at *4 (W.D. Tex. Nov. 05, 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Defendants suggest that discriminatory intent is implausible for four reasons: (1) the Court must "infer" discriminatory intent as Plaintiffs have not met the "clearest proof" standard; (2) the State can present a facially neutral reason for the bill; (3) the bill includes an (unenforceable) prohibition on discrimination; and (4) the bill's stripping of supervisory powers is presumptively reasonable. MTD at 12–13. Again, Defendants are incorrect on all fronts.

To Defendants' first point, Plaintiffs reiterate their *Arlington Heights* argument: The Fifth and Eleventh Circuits have explained that the need for the "clearest proof" to establish discriminatory intent "gravely misstates the law" and "turns a blind eye to the realities of modern discrimination." *Lewis v. Governor of Alabama*, 896 F.3d 1282, 1296 (11th Cir. 2019) (citing *Veasey v. Abbott*, 830 F.3d 216, 231 n.12 (5th Cir. 2016)). Defendants argue that SB 4 is not designed to discriminate because it does not affect private individuals. MTD at 12. But in a discriminatory intent challenge, the question is not whether the bill regulates individuals, but whether the bill has "racially disparate effects." *Lewis v. Ascension Parish School Bd.*, 662 F.3d 343, 349 (5th Cir. 2011). As Plaintiffs showed, TAC ¶¶ 80–90,

where an "ostensibly neutral" law has a "disproportionate effect" on a protected class that "can be traced to a discriminatory purpose," the court should strictly scrutinize the law. *Id.* (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)).

Secondly, the presence of a strong State interest does not obviate the possibility of discriminatory intent. The practice of "cleverly cloak[ing]" discriminatory intent against people of color, particularly immigrants, in the "guise of propriety" has been a tactic recognizable to courts for more than a century. *See Lodge v. Buxton*, 639 F.2d 1358, 1373 (5th Cir. Unit B 1981); *see also Yick Wo v. Hopkins*, 118 U.S. 356 (1886). SB 4 meets the *Arlington Heights* test to show discriminatory intent.

To Defendants' third point, SB 4's prohibition on discrimination is a fig leaf to cloak the discriminatory intent underlying the bill. MTD at 7; Tex. Gov't Code § 752.054. The provision provides no enforceability, accountability, or resources whatsoever to address discrimination. Federal law requires the State to provide real protection against harassment and discrimination to non-citizens. *See* Lucas Guttentag, *The Forgotten Equality Norm in Immigration Preemption: Discrimination, Harassment, and the Civil Rights Act of 1870*, 8 DUKE J. CONST'L L. & PUB. POL'Y 1, 27, 41 (2013). Instead, SB 4 strips away proven and effective tools that local governments rely on to stop discrimination.

Lastly, and contrary to Defendants' suggestion, that a law that strips local supervisory discretion is *not* as reasonable as policies that permit local supervisory discretion. MTD at 13. In *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338, 355, a private company gave discretion to local supervisors; here, SB 4 established a uniform policy to prohibit the discretion of local supervisors, creating a uniform ban on local government's discretion to combat discrimination in traffic stops and detainers. The *Dukes* Court also found that "giving discretion to lower-level supervisors" in private business can be the basis of a discrimination claim, but chose not to find one for the class

certification in that case. *Id.* In short, Defendants' arguments reinforce that SB 4 was plausibly designed to hide discriminatory intent.

**B.     Plaintiffs Plausibly Allege that in Application, SB 4 is Used to Discriminate on the Basis of Race, National Origin, and Gender in Violation of the Equal Protection Clause**

Much as they do in response to Plaintiffs' facial challenge, Defendants argue that Plaintiffs' as-applied claim fails due to (1) lack of standing; and (2) failure to sufficiently allege facts that show discrimination. MTD at 14. Defendants' first argument is incorrect because Plaintiffs have standing to bring an as-applied Equal Protection claim, as addressed in Part II, *supra*.

Defendants' second argument fails because Plaintiffs already provided factual allegations to sustain an as-applied challenge at this early motion to dismiss stage. Specifically, Plaintiffs allege Defendants have unconstitutionally discriminated against Latinos and Latin American immigrants, particularly men, and cite evidence of extensive disparate impact on these groups in policing statistics and the use and impact of ICE detainers in Texas as a result of SB 4's implementation. TAC ¶¶ 80–90, 98–101, 124. Although "[i]n order to establish a valid Equal Protection claim, a party must show more than a disproportionate impact" in order to ultimately prevail on a claim, *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir. 1992), "[i]mpact[...] may provide an important starting point" in this analysis. *Vill. of Arlington Heights*, 429 U.S. 252, 266. Plaintiffs have therefore met the pleading standard outlined in *Iqbal* and similar Fifth Circuit cases, so dismissal at this point would be inappropriate. *Iqbal,* 556 U.S. at 678; *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 315–18, 320 (5th Cir. 2019) (reversing dismissal of equal protection and other claims).

Defendants' merits argument also fails because Defendants mischaracterize the nature and extent of Plaintiffs' factual allegations. Defendants claim that Plaintiffs include only a single allegation that SB 4 has caused discriminatory policing acts in multiple jurisdictions since its implementation in its current form on May 8, 2018. MTD at 14 (internal quotation marks omitted).

However, Defendants ignore the numerous examples of disparate impact in policing and the issuing of ICE detainers on Latinos and Latin American immigrants in Texas, particularly men, in the years following SB 4's enactment, which Plaintiffs have identified. *See* TAC ¶¶ 80–90, 98–101, 124.

Moreover, Plaintiffs have not stated additional facts regarding their as-applied challenge only because most of the facts required to prove Plaintiffs' claims are in the possession of Defendants, who ultimately remain responsible for SB 4's implementation and enforcement. Plaintiffs have alleged enough facts at the pleadings stage, and they may obtain additional data regarding their claims through discovery.

### C.    Plaintiffs Plausibly Allege a Violation of the First Amendment

#### 1.    Plaintiffs' Free Speech Claim Is Likely to Succeed

Defendants argue that Plaintiffs' First Amendment claim should fail because Plaintiffs lack standing to challenge the "endorse" provision of SB 4, and because Plaintiffs must show "a credible threat" of "certainly impending" prosecution to meet the requirements for standing. MTD at 15–16. Defendants argue that Plaintiffs have no credible threat of impending prosecution because the Attorney General has not enforced the "endorse" provision of SB 4. *Id.* Defendants' arguments fail.

First, a defendant's "voluntary cessation of allegedly illegal conduct does not moot a case." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). Instead, a defendant in this position must show that it is "absolutely clear [that] the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Here, far from making it "absolutely clear" that they do not intend to enforce the "endorse" provision of SB 4, Defendants brought a lawsuit against TOPEF and other consolidated Plaintiffs seeking a declaratory judgment that SB 4 was valid under the First Amendment, among other Constitutional provisions. *See Texas v. Travis County*, No. 1:17-cv-425, ECF 23 ¶¶ 10, 210, 308–20 (W.D. Tex. May 31, 2017) (claiming specifically that city officials "publicly endorse" policies

contrary to SB 4). Therefore, Defendants have shown their willingness to enforce SB 4 and Plaintiffs have alleged imminent enforcement. Even a single prosecution can warrant a "credible threat of prosecution." *Apodaca-Fisk v. Allen*, No. EP-19-CV-00259-DCG, 2020 WL 156585, at *11 (W.D. Tex. Jan. 13, 2020); *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat") (emphasis in original).

Second, a plaintiff may also show that they have a "credible threat of prosecution" by showing that they have engaged in protected speech in the past and intend to do so again in the future. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15–16 (2010). Here, as in *Holder*, the El Paso Plaintiffs have in the past engaged in protected speech, namely, in adopting and endorsing a county policy that explicitly prohibited the Sheriff's Department from enforcing civil immigration laws. *See* Part D, *infra*; *see also Starr v. Cty of El Paso*, Settlement Agreement, Cause No. 06 CA 0188-PRM (W.D. Tex. July 21, 2006) (settlement agreement binding on all parties). Since then, both Sheriff Wiles and County Attorney Bernal have enforced that policy as a part of their official responsibility to enforce county policies, including their respective duties to ensure the public safety of and obtain legal protections for county residents. *See* TAC ¶¶ 11–13. The El Paso Plaintiffs have also alleged an intent to engage in this protected speech in the future, which they illustrate clearly in this lawsuit in their request for a declaration that El Paso County, its officials, and its policies comply with state law, including SB 4. *See* TAC ¶ 129; Part D, *infra*. Thus, El Paso Plaintiffs have alleged an intention to engage in protected speech, as they continue to fulfill their responsibilities as county officials. *See* TAC ¶¶ 11–13, 129.

### 2.      SB 4 Affects the Right to Peaceably Assemble

Defendants next argue that SB 4 does not affect the right to peaceably assemble. MTD at 17. Again, Plaintiffs have alleged sufficient facts to show that SB 4 does affect this right.

First, and contrary to Defendants' argument, SB 4 deters peaceful assembly, that deterrence is more than incidental, and it affects more than those without lawful immigration status. MTD at 17. SB 4 in fact affects TOPEF's and MOVE's core free speech rights and ability to protest SB 4. This deterrence affects the entire Latino and Latin American immigrant community that TOPEF and MOVE serve. Indeed, community members from TOPEF and MOVE are afraid to participate in organizational activities for fear of being targeted for "*looking* 'foreign.'" TAC ¶ 93 (emphasis added). In other words, SB 4 deters TOPEF and MOVE community members not only along lines of immigration status, but also race and national origin.

Moreover, even if SB 4 deterred only people without lawful status, those people would still have First Amendment protections. Defendants misleadingly cite to *United States v. Portillo-Munoz* for the proposition that the term "the people," as included in the First Amendment, does not extend to those without lawful immigration status. MTD at 17. As an initial matter, however, *Portillo-Munoz* relates to the Second Amendment, not the First. 643 F.3d 437, 439 (5th Cir. 2011). Additionally, while the *Portillo-Munoz* majority writes that the term "the people" in the *Second* Amendment refers only to those with lawful status, the Supreme Court has not defined "the people" in other Amendments so narrowly. Rather, it has considered whether a person has (1) established presence within the United States; and (2) developed substantial connections to the United States. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).[11]

---

[11] Similarly, while the majority in *Portillo-Munoz* notes that the term "the people" as it is used in the Second Amendment refers to a different group of people than those referred to by the same term in the First and Fourth Amendments, the Supreme Court has not necessarily taken the same view. *See Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (stating that 'the people,' as protected by the First, Second, and Fourth Amendment, "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"). Following this precedent, therefore, even TOPEF and MOVE community members without lawful status would have a right to First Amendment protections, as they are present within the U.S. and have a sufficient connection to this community.

Finally, while Defendants claim that peaceable assembly rights belong to individuals, SB 4 ultimately affects TOPEF's and MOVE's right to peacefully assemble. When SB 4 deters individual community members from peaceably assembling, it directly harms TOPEF's and MOVE's ability to carry out the protests, rallies, and other organizing efforts that take place in the public square, and which further these organizations' missions. TAC ¶¶ 16–17, 20–21, 93.

### 3. Plaintiffs Have Plausibly Alleged Unconstitutional Retaliation

Defendants claim finally that Plaintiffs have not plausibly alleged unconstitutional retaliation. MTD at 18. Again, Defendants are incorrect. First, the filing of the State's lawsuit against TOPEF and other consolidated Plaintiffs was retaliatory: rather than turning to the court to resolve a violation of law, "Texas stated plainly that it sued TOPEF because the organization challenged the constitutionality of SB 4." TAC ¶ 96.

Second, and again in contrast to Defendants' argument, MTD at 18, Plaintiffs need not claim that Defendants are likely to file a lawsuit in the future to be entitled to prospective relief. While past exposure to illegal conduct does not necessarily warrant prospective relief, it supports a present case or controversy. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974). This is especially true where past conduct is paired with the prospect of future conduct. *See Apodaca-Fisk v. Allen*, No. EP-19-CV-00259-DCG, 2020 WL 156585, at *11 (W.D. Tex. Jan. 13, 2020) (finding "a credible threat of prosecution" where "Texas [was] actively prosecuting individuals under [the law] and…Defendants did not disavow prosecution if Plaintiff engaged in his intended course of conduct"). Here, the State has prosecuted Plaintiffs in the past, and has yet to state affirmatively that it will not do so again in the future. *See* TAC ¶¶ 95–97.

In fact, while the Austin lawsuit was ultimately dismissed, it was dismissed without prejudice, so Defendants could bring a retaliatory suit against Plaintiffs again either in response to this litigation or similar future litigation. *See Texas v. Travis County*, No. 1:17-cv-425, ECF 74, 75 (W.D.

Tex. May 31, 2017). Defendants' unconstitutional conduct here is substantially different from that in *Lyons*, where the unconstitutional conduct would have arisen *only if* at least one additional condition were met. *See, e.g., City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (finding the chance of plaintiff facing illegal chokehold again depended on plaintiff being stopped for a traffic or other violation by particular police officers). Here, Plaintiffs' protected speech itself could trigger an unconstitutional action at any time. *See* TAC ¶ 114–19.

### D.  Declaratory Judgment Is an Appropriate Remedy

The El Paso Plaintiffs face harm sufficient to make the claim justiciable and the dismissal of declaratory relief would undermine principles of federalism, fairness, and efficiency. Declaratory judgment in this case is appropriate as "a milder alternative to the injunction remedy." *Robinson v. Hunt Cty., Tex.*, 921 F.3d 440, 450 (5th Cir. 2019) (internal citation omitted).

As addressed in Part II, *supra*, this claim is justiciable because (1) Plaintiffs have standing; (2) sovereign immunity does not bar such a claim; and (3) Plaintiffs continue to suffer and are at substantial risk of future injuries. *See Ironshore Specialty Ins. Co. v. Tractor Supply Co.*, 624 F. App'x. 159, 163 (5th Cir. 2015). Without injunctive relief, El Paso County and officials face an impossible situation where they must decide to comply with either SB 4 or a settlement agreement protecting federal civil rights.[12] To comply with a settlement agreement in federal litigation arising from civil rights violations, the El Paso Plaintiffs must prohibit officers from asking about immigration status; yet SB 4 imposes employment termination and civil penalties of $25,000 a day for having such a policy. TAC ¶¶ 37–40.

---

[12] Along with damages and attorneys' fees, the settlement agreement requires the El Paso Sheriff's Department to "memorialize in writing its policy" to prohibit enforcing civil immigration law and provide training for its peace officers on the "limits of their authority" with regard to civil immigration law. The Agreement is "binding on each and every party" along with their successors. *Starr v. Cty of El Paso*, Settlement Agreement, Cause No. 06 CA 0188-PRM (W.D. Tex. July 21, 2006).

The Fifth Circuit applies a seven-factor test to guide whether a district court should decide or dismiss a declaratory action. *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590–91 (5th Cir. 1994).[13] SB 4's purpose is to mandate compliance with federal immigration priorities, intertwining state and federal interests. The federal nature of this claim and the factors listed in *Trejo* weigh in favor of the court exercising its jurisdiction to grant declaratory relief. "The presence of federal law questions must always be a major consideration weighing against surrender of federal jurisdiction" and is "especially important when there is no pending state court proceeding to which the federal district court can defer." *Sherwin-Williams Co.*, 343 F.3d at 396, 400 ("[F]ederalism and comity concerns weigh in favor of the federal court exercising its discretion to decide [a] case" when it may do so in a single forum and resolve the possibility of "inconsistent state and federal court judgments."). The Fifth Circuit affirmed that a court can issue declaratory judgments for situations that are "highly fact-intensive" that involve state law, including those involving First Amendment questions. *Id.* at 396.

Finally, in determining dismissal of declaratory relief claims, a court must assess not just federalism, but also the two other *Trejo* principles of fairness and efficiency. A declaratory action would promote fairness and efficiency, permitting the El Paso Plaintiffs to avoid "a multiplicity of lawsuits" in a convenient forum under Texas and federal law without any inequities to Defendants. *Travelers Ins. Co. v. Louisiana Farm Bureau Federation Inc.*, 996 F.2d 774, 777 (5th Cir. 1993); *see also*

---

[13] These factors are "'(1) whether there is a pending state action in which all of the matters in controversy may be fully litigated, (2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant, (3) whether the plaintiff engaged in forum shopping in bringing the suit, (4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist, (5) whether the federal court is a convenient forum for the parties and witnesses, (6) whether retaining the lawsuit would serve the purposes of judicial economy,' …and. . . [(7)] whether the federal court is being called on to construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending." *Id.*

*Ironshore Specialty Ins. Co. v. Tractor Supply Co.*, 624 F. App'x 159, 167 (5th Cir. 2015) ("One of DJA's purposes is to allow potential defendants to resolve a dispute without waiting to be sued . . . .").[14]

The State may have a strong interest in enforcing federal priorities, but immigration and civil rights—the core laws in dispute—are fundamentally federal powers and interests. A declaratory judgment is "appropriate when it will terminate the controversy giving rise to the proceeding." *El Paso Cty., Tex. v. Trump*, 407 F. Supp. 3d 655, 659 (W.D. Tex. 2019) (citing Fed. R. Civ. P. 57 Advisory Committee's 1937 note) (internal quotation marks omitted) (appeal filed).

## CONCLUSION & PRAYER

As shown above, Plaintiffs' Third Amended Complaint meets and exceeds the pleading requirements of the Federal Rules of Civil Procedure and Plaintiffs have standing to bring each of their claims. Without local governments' civil rights protections, Latinos and Latin American immigrants, communities and the organizations that work to end discrimination against Latinos these communities confront new forms of discrimination due to SB 4. Defendants' Motion to Dismiss should be denied in its entirety.


Respectfully submitted,

By: /s/ Emma Hilbert


**GARZA GOLANDO**                      **TEXAS CIVIL RIGHTS PROJECT**

Jose Garza                                              Mimi Marziani
Attorney-In-Charge                               State Bar No. 24091906
garzpalm@aol.com                               mimi@texascivilrightsproject.org

---

[14] Defendants imply that they seek a *Burford* abstention, which is not warranted as immigration enforcement is not a matter of pure State policy. MTD at 20. The *Burford* abstention is "the exception, not the rule" and is "disfavored as an abdication of federal jurisdiction." *Aransas Project v. Shaw,* 775 F.3d 641, 649, 653 (5th Cir. 2014) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989)) (finding that the federal interest in interstate birds overcame the state's important water management interest).

State Bar No. 07731950
Martin Golando
martin.golando@gmail.com
State Bar No. 24059153
115 E. Travis St., Ste. 1235
San Antonio, Texas 78205
(210) 892-8543

Attorneys for Plaintiffs EL PASO COUNTY;
and RICHARD WILES, SHERIFF OF EL
PASO COUNTY; JO ANNE BERNAL,
COUNTY ATTORNEY OF EL PASO
COUNTY, in their official capacity

Emma Hilbert
State Bar No. 24107808
emma@texascivilrightsproject.org
1405 Montopolis Dr.
Austin, Texas 78741
T: (512) 474-5073

Efrén C. Olivares
State Bar No. 24065844
efren@texascivilrightsproject.org
1017 W. Hackberry Ave.
Alamo, Texas 78516
T: (956) 787-8171

Attorneys for Plaintiffs TEXAS
ORGANIZING PROJECT EDUCATION
FUND and MOVE TEXAS

## CERTIFICATE OF SERVICE

I certify that, on April 8, 2020, I filed the foregoing Consolidated Plaintiffs El Paso County, et al.'s Response to Defendants' Motion to Dismiss via the Court's ECF/CM system, which will serve a copy on all counsel of record.

*Emma Hilbert*
Emma Hilbert