**FILED**

September 15, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ NM _____

DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| CITY OF EL CENIZO, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **LEAD NO. SA-17-CV-00404-OLG** |
| | § | |
| STATE OF TEXAS, *et al.*, | § | |
| Defendants. | § | |

## ORDER

Before the Court are four motions to dismiss—three filed by Defendants Greg Abbott, Ken Paxton, and the State of Texas, and one filed by Defendants City of Rowlett, Michael Godfrey, Jason Welk, and Brandon Rickman—pursuant to Rule 12(b)(1) and (b)(6). (*See* Dkt. No. 279; Dkt. No. 291; Dkt. No. 297; Dkt. No. 302.) Plaintiffs have responded (*see* Dkt. No. 290; Dkt. No. 300; Dkt. No. 307; Dkt. No. 311), and Defendants have replied (*see* Dkt. No. 295; Dkt. No. 312; Dkt. No. 314; Dkt. No. 315). After careful consideration of the briefing, the record, and the applicable law, the Court enters the following Order.

## BACKGROUND

This case involves the constitutionality and application of Texas's 2017 Senate Bill 4 (SB4), which prohibits sanctuary city policies by local governmental entities. To that end, SB4 imposes duties and liabilities on certain persons in the criminal justice system, provides civil penalties, and creates a criminal offense. *See* TEX. GOV'T CODE § 752.051, *et seq*. SB4 was passed by the 85th Texas Legislature, signed into law on May 7, 2017, and became effective on September 1, 2017. Prior to SB4's effective date, various Texas cities, counties, and local officials filed suit in the San Antonio Division seeking to enjoin its enforcement.

SB4's immigration-enforcement provisions, *see* Gov'T § 752.053(a)–(b), consist of general and specific prohibitions applicable to local entities[1] and campus police departments. In general, pursuant to subsection (a), the entity or department may not "adopt, enforce, or endorse a policy" or maintain any "pattern or practice" that "prohibits or materially limits the enforcement of immigration laws." *Id.* § 752.053(a)(1)–(2). Subsection (b) lists specific activities that the entity or department may not "prohibit or materially limit," such as (1) "inquiring into the immigration status" of lawfully detained individuals, (2) sharing immigration-status information with federal agencies, and (3) "assisting or cooperating with a federal immigration officer as reasonable or necessary, including providing enforcement assistance." *Id.* § 752.053(b)(1)–(3).

SB4's ICE-detainer mandate, *see* TEX. CODE CRIM. P. art. 2A.060,[2] requires law enforcement agencies to "comply with, honor, and fulfill" ICE detainers[3] when the agency has custody of an individual subject to a detainer request. TEX. CODE CRIM. P. art. 2A.060(a). The mandate has one exception: if an individual has "provided proof that the person is a citizen of the United States or . . . has lawful immigration status . . . such as a Texas driver's license or similar government-issued identification," law enforcement agencies are relieved from compliance with SB4's ICE-detainer mandate. TEX. CODE CRIM. P. art. 2A.060(b).

---

[1]SB4 defines "local entity" as "(A) the governing body of a municipality, county, or special district or authority, subject to [§] 752.052; (B) an officer or employee of or a division, department, or other body that is part of a municipality, county, or special district or authority, including a sheriff, municipal police department, municipal attorney, or county attorney; and (C) a district attorney or criminal district attorney." Gov'T § 752.051(5)(A)–(C).

[2]The Court notes that the ICE-detainer mandate was originally codified at TEX. CODE CRIM. P. art. 2.251 and recodified at TEX. CODE CRIM. P. art. 2A.060 effective January 1, 2025.

[3]"An ICE detainer is a written request to state or local officials, asking them (1) to notify the Department of Homeland Security (DHS) as soon as practicable before an alien is released and (2) to maintain custody of the alien for up to 48 hours beyond the preexisting release date so that DHS may assume custody." *El Cenizo*, 890 F.3d at 174. Since 2017, ICE must make this request using Form I-247A accompanied by a signed administrative warrant. The form states that DHS has determined that there is probable cause that the subject of the request is a removable alien, and ICE officers check one of four boxes on the form to indicate the basis for probable cause. *Id.*

SB4's penalty provisions provide for enforcement of SB4 by the attorney general through civil and criminal penalties. *See, e.g.*, GOV'T §§ 752.055, .056, .0565; TEX. PENAL CODE § 39.07. Specifically, "[a]ny citizen residing in the jurisdiction of a local entity or any citizen enrolled at or employed by an institution of higher education may file a complaint with the attorney general," alleging by sworn statement "that the entity or the institution's campus police department has violated [§] 752.053." GOV'T § 752.055(a). If determined to be valid, "the attorney general may file a petition for a writ of mandamus or apply for other appropriate equitable relief" in state court. *Id.* § 752.055(b). If a violation is found, local entities are subject to civil penalties in an amount between $1,000 and $1,500 for the first violation, and between $25,000 and $25,500 for each subsequent violation. *Id.* § 752.056(a)(1)–(2). And if presented with evidence that a public officer has violated the enforcement provisions, the attorney general must file an enforcement action. *Id.* § 752.0565(b). If determined to have violated the law, public officers are subject to removal from office. *Id.* § 752.0565(c). Finally, certain officials' failure to comply with the ICE-detainer mandate constitutes a misdemeanor offense. *See* PENAL § 39.07(a)–(c).

## I.   PROCEDURAL HISTORY

The El Cenizo Plaintiffs—i.e., the City of El Cenizo, El Cenizo Mayor Raul L. Reyes, Maverick County, Maverick County Sheriff Tom Schmerber, Maverick County Constable Mario A. Hernandez, and Texas State League of United Latin American Citizens—initiated this case on May 8, 2017. (*See* Dkt. No. 1.) Several other plaintiffs subsequently joined in the lawsuit by intervention or consolidation, seeking to enjoin enforcement of SB4.

During the preliminary injunction stage, the Court "limited its analysis to those claims that may be construed as facial challenges," finding a substantial likelihood of success on the merits existed for plaintiffs' challenges to § 752.053(b)(3)'s assistance-cooperation provision under the

Supremacy Clause; to § 752.053(a)(1)'s "endorse" prohibition under the First and Fourteenth Amendments; to § 752.053(a)(1)–(2)'s "materially limits" prohibitions under the Fourteenth Amendment; and to Article 2.251's ICE-detainer mandate under the Fourth Amendment. (*See generally* Dkt. No. 189.) The State Defendants appealed the injunction, and the plaintiffs cross-appealed the denial of broader injunctive relief.

On May 8, 2018, the Fifth Circuit affirmed the injunction in part, vacated it in large part, and remanded with instructions to dismiss the vacated injunction provisions. *See City of El Cenizo v. Texas*, 890 F.3d 164, 173, 191–92 (5th Cir. 2018) (upholding SB4 in its entirety except for the application of the endorsement prohibition to elected officials). Accordingly, on remand, the Court limited the injunction to application of the "endorsement" prohibition, GOV'T § 752.053(a)(1), to elected officials "and any action (including but not limited to corrective, disciplinary, retaliatory, or punitive action) under" § 752.055 (Complaint; Equitable Relief), § 752.056 (Civil Penalty), and § 752.0565 (Removal from Office) arising therefrom. (Dkt. No. 241); *see* GOV'T §§ 752.053, .055, .056, .0565.

Following remand, in 2019, because "none of the parties ha[d] taken steps to proceed with this litigation," the Court ordered the plaintiffs to advise which claims they still intended to pursue in light of the Fifth Circuit's opinion. (Dkt. No. 241.) In response, the El Cenizo Plaintiffs, the Travis County Plaintiffs, the City of Houston, and the City of Dallas jointly filed an unopposed motion to voluntarily dismiss their claims. (Dkt. No. 260.)

## II.    THE REMAINS OF THE SUIT

The City of Austin filed its First Amended Complaint in Intervention on December 19, 2019, seeking declaratory and injunctive relief. (Dkt. No. 273.) The San Antonio Plaintiffs filed their Second Amended Complaint on January 16, 2020, asserting seven causes of action and

seeking, inter alia, declaratory and injunctive relief. (Dkt. No. 282.) The El Paso County Plaintiffs filed their Third Amended Complaint on February 24, 2020, asserting five claims for declaratory and injunctive relief. (Dkt. No. 292.)

### A. Parties

The following summary of the remaining parties includes certain relevant factual allegations from their respective complaints, which the Court accepts as true for purposes of the motions to dismiss. *See Crane v. Johnson*, 783 F.3d 244, 250–51 (5th Cir. 2015) (jurisdiction); *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 181 (2024) (merits).

#### 1. Local Jurisdictions

Plaintiff City of Austin is a "home-rule" city in the State of Texas that employs over 16,000 people. (Dkt. No. 273 ¶ 5.) Austin alleges that its elected officials and unelected employees are harmed by SB4's "endorse" provision because it constitutes an impermissible content-based restriction on speech. (*Id.* ¶ 30–32.)

Plaintiff City of San Antonio is a "home rule" municipality organized under the laws of the State of Texas. (Dkt. No. 282 ¶ 4.) Plaintiff Bexar County, which encompasses San Antonio and surrounding cities, is organized under the laws of the State of Texas. (*Id.* ¶ 8.) San Antonio alleges that it has been injured as a result of an SB4 enforcement action. (*Id.* ¶ 4.) San Antonio and Bexar County allege that they face drained resources through forced compliance, and substantial civil penalties for noncompliance, with SB4. (*Id.* ¶¶ 4, 8.) They additionally allege that they face damage suits under 42 U.S.C. § 1983 for violating the constitutional rights of individuals in San Antonio and Bexar County. (*Id.*)

Plaintiff City of El Paso is a "home rule" municipality with "the constitutional and statutory authority to set policies and regulations, and to administer health and social service programs for

its residents, including those residents that are immigrants." (*Id.* ¶ 9.) El Paso alleges that it faces

injury in the form of drained resources through forced compliance with SB4; substantial civil

penalties, along with mandamus actions and injunctions, for noncompliance with SB4; and liability

in damages suits for violating the constitutional rights of its citizens. (*Id.*)

Plaintiff El Paso County is a legal subdivision of Texas with "the constitutional and

statutory authority to set policies and regulations, as well as administer programs for its residents

in certain areas, including administering its county judicial system, and providing health and social

services to many county residents regardless of their national origin." (Dkt. No. 292 ¶ 7.) El Paso

County alleges that it faces injuries from SB4 in the form of substantial civil penalties, along with

the threat of mandamus and injunction actions, for noncompliance with SB4 and that it has suffered

injury in the form of budget uncertainty due to SB4's unclear standards. (*Id.* ¶¶ 8–10.)

### 2. Local Officials

Plaintiff William McManus is the San Antonio police chief and "establishes and enforces

policies and practices for the SAPD and provides information and advice to city officials regarding

public safety and policing practices." (Dkt. No. 282 ¶ 5.) McManus alleges that SB4 limits his

speech and makes the accomplishment of his job duties more difficult. (*Id.* ¶ 145.) He further

alleges that he faces a risk of fines, prosecution, and removal from office. (*Id.* ¶ 143.)

Plaintiff Ana Sandoval is the San Antonio City Councilmember for District 7,[4] "elected by

her constituents to advocate on their behalf, including advocating for policies that protect public

safety and reduce racial profiling." (*Id.* ¶ 6.) Sandoval's policymaking and political speech include

"speaking publicly against SB4 itself and current immigration enforcement and policies" and

"introducing city ordinances that would limit compliance with" SB4. (*Id.*) Sandoval alleges that

---

[4] The Court notes that Ana Sandoval is no longer the city councilmember for District 7.

SB4 abridges her freedom of speech and that she faces "heavy fines and removal from office for speaking critically" of SB4, which "greatly diminishes" her ability to fully represent her constituents. (*Id.*)

Plaintiff Celestino Gallegos, as the San Antonio Immigration Liaison,[5] "coordinates community-based organizations, stakeholder groups, and nonprofit and interfaith organizations to . . . connect members of San Antonio's immigrant community to services." (*Id.* ¶ 7.) Gallegos was nominated for the position of immigration liaison by the San Antonio City Manager and confirmed by the City Council. (*Id.*) He alleges that SB4 infringes on his speech and constitutional interest in the ability to perform the duties of his job. (*Id.* ¶ 149.) He alleges that he faces a risk of fines, prosecution, and removal from office. (*Id.* ¶ 155.)

Plaintiff Oscar Ugarte brings suit in his official capacity as the El Paso County Sheriff.[6] (Dkt. No. 292 ¶ 11; *see* Dkt. No. 259 at 1 n.1.) The El Paso County Sheriff is "responsible for the enactment and enforcement of El Paso County's law enforcement policies and practices, including those governing compliance with Texas law and federal immigration detainers." (Dkt. No. 292 ¶ 11.) He alleges that he faces removal from office for violating SB4's endorse provision and criminal sanctions for failing to honor detainer requests. (*Id.*) Finally, he alleges that SB4 greatly diminishes his "authority and discretion to administer the law and to ensure the public safety of the residents of El Paso." (*Id.*)

---

[5] The Court notes that the San Antonio Plaintiffs have not advised, and the Court is unable to ascertain, whether Gallegos still holds this position.

[6] The Court notes that Richard Wiles no longer holds the position of El Paso County Sheriff. Oscar Ugarte was elected to the position in 2024 and is therefore substituted as a plaintiff in this case pursuant to Rule 25. *See* FED. R. CIV. P. 25(d) (providing that "when a public officer who is a party in an official capacity . . . resigns, or otherwise ceases to hold office while the action is pending . . . [t]he officer's successor is automatically substituted as a party").

Plaintiff Christina Sanchez brings suit in her official capacity as the County Attorney for El Paso County.[7] (*Id.* ¶ 12; *see* Dkt. No. 259 at 1 n.1.) The El Paso County Attorney is an elected official and responsible for enforcing Texas law regardless of the victim's immigration status. (Dkt. No. 292 ¶¶ 12–13.) Sanchez alleges that she faces removal from office for potential violations of SB4, which "may include" endorsing a policy that limits the enforcement of immigration laws. (*Id.* ¶ 13.) She alleges that she faces the threat of civil penalties and budget uncertainty due to the necessity of training for county employees regarding SB4's requirements and federal immigration enforcement. (*Id.*)

### 3. Advocacy Groups

Plaintiff Texas Association of Chicanos in Higher Education (TACHE) is "a statewide professional association committed to the improvement of educational and employment opportunities for Latinos and Chicanos in higher education." (Dkt. No. 282 ¶ 10.) Plaintiff La Union del Pueblo Entero (LUPE) is "a community union that provides social services, English classes, and helps communities organize to advocate for better living conditions." (*Id.* ¶ 11.) LUPE has over 8,000 members, most of whom are Latino and some are immigrants without legal status in the United States. Plaintiff Workers Defense Project (WDP) is "a membership-based organization that works to enable low-income workers to achieve fair employment through education, direct services, and strategic partnerships." (*Id.* ¶ 12.) WDP's members include many Latino individuals and some immigrants without legal status in the United States. San Antonio Plaintiffs TACHE, LUPE, and WDP bring claims on behalf of their members.

Plaintiff Texas Organizing Project Education Fund (TOPEF) is "an education organization that promotes social, racial[,] and economic justice for all Texans by conducting strategic, year-

---

[7]The Court notes that Jo Ann Bernal retired from her position as El Paso County Attorney, and Christina Sanchez was elected to the position in 2024. *See supra* n.6.

round community organizing, focusing efforts within working class neighborhoods in San Antonio, Houston, and Dallas." (Dkt. No. 292 ¶ 14.) TOPEF "is incorporated in . . . and keeps its principal place of business" in San Antonio. (*Id.*) Plaintiff MOVE is a "grassroots, nonpartisan, nonprofit organization that builds political power in underrepresented youth communities through civic engagement, leadership development, and progressive issue advocacy." (*Id.* ¶ 19.) MOVE "is incorporated in . . . and keeps its principal place of business" in San Antonio. (*Id.*) El Paso County Plaintiffs TOPEF and MOVE sue based on their own injuries.

### 4. Individuals

Plaintiffs Maria Valladarez and Armando Simon are a married couple residing in Arlington, Texas, who allege that they were detained by officers in Rowlett, Texas in 2019 based on their suspected immigration statuses. (Dkt. No. 282 ¶ 13.)

### 5. Defendants

The "State Defendants" are: (1) the State of Texas; (2) Greg Abbott, in his official capacity as Governor of Texas; and (3) Ken Paxton, in his official capacity as Attorney General of Texas.

The "Rowlett Defendants" are: (1) the City of Rowlett; (2) Michael Godfrey, in his official capacity as the Rowlett Chief of Police;[8] (3) Officer Jason Welk, in his individual capacity; and (4) Officer Brandon Rickman, in his individual capacity.

### B. The City of Austin's First Amended Complaint in Intervention

In its First Amended Complaint in Intervention, the City of Austin challenges SB4 against the State Defendants, asserting that SB4 violates the First Amendment by penalizing the protected speech of its elected officials and unelected employees. (Dkt. No. 273 ¶ 30.)

---

[8]The Court notes that William Brodnax has retired and Michael Godfrey is substituted in as a defendant pursuant to Rule 25. *See supra* n.6.

Austin's mayor and city council have adopted resolutions expressing the City's objective to welcome and support "immigrants and all communities, regardless of race, religion, ethnicity, status, or national origin" by, for example, providing social services to Austin's immigrant communities. (*Id.* ¶ 23.) Prior to and since SB4's enactment, several of Austin's elected officials publicly expressed their opposition to the law and the negative impact it would likely have on the Austin community. (*Id.* ¶ 24.)

In November 2018, Attorney General Paxton sued to enforce SB4 against the City of San Antonio, its city manager, and police chief, claiming that San Antonio and its officials had "endorsed" a policy proscribed by SB4 in adopting an SAPD procedure.[9] (*Id.* ¶ 27.) The procedure dictates that SAPD officers will not detain or arrest individuals based on the fact or suspicion that they are in the United States illegally and will not refer persons to ICE unless the person has a federal deportation warrant. (*Id.*) Austin "similarly expects that the State could bring such an action" against it and its employees based on actions or the Austin Police Department's policies concerning, for example, inquiring into immigration status or assisting people seeking to obtain U-visas." (*Id.* ¶ 28.) The City therefore alleges that it faces a credible threat of enforcement of restrictions on speech. (*Id.*)

The State Defendants move to dismiss Austin's sole claim in this case. (Dkt. No. 279.)

## C. The San Antonio Plaintiffs' Second Amended Complaint

The 11 "San Antonio Plaintiffs" are the City of San Antonio, the City of El Paso, Bexar County, McManus, Gallegos, Sandoval, TACHE, LUPE, WDP, Valladarez, and Simon. In the Second Amended Complaint, they assert seven causes of action based on the Supremacy Clause,

---

[9]*Paxton v. McManus, et al.*, D-1-GN-18-007133 (345th Jud. Dist. Ct., Travis County).

the First Amendment, the Fourteenth Amendment, and the Fourth Amendment against the State and Rowlett Defendants. (*See* Dkt. No. 282 ¶¶ 179–222.)

Against the State Defendants, McManus, Gallegos, Sandoval, and TACHE assert claims for violations of the First Amendment; San Antonio, El Paso, and Bexar County assert claims for substantive and procedural due process violations under the Fourteenth Amendment; TACHE, LUPE, and WDP assert equal protection claims under the Fourteenth Amendment; and Valladarez and Simon assert that SB4 violates the Fourth Amendment as applied to them. The State Defendants move to dismiss all of the San Antonio Plaintiffs' claims or, in the alternative, request a more definite statement. (Dkt. No. 291.)

Against the Rowlett Defendants, Valladarez and Simon assert claims under the Supremacy Clause and pursuant to 42 U.S.C. § 1983 for alleged violations of the Fourth Amendment related to their detentions in Rowlett.[10] They seek prospective relief in the form of a declaration that they maintain an unconstitutional policy or custom of detaining individuals based on their real or perceived immigration status and an injunction prohibiting the Rowlett Defendants from implementing or enforcing this custom or policy. They also seek compensatory and punitive damages. (Dkt. No. 282 at 55–56.) The Rowlett Defendants request dismissal of all claims. (Dkt. No. 302.)

### D. The El Paso County Plaintiffs' Third Amended Complaint

The five El Paso County Plaintiffs are El Paso County, Ugarte, Sanchez, TOPEF, and MOVE. They filed their Third Amended Complaint on February 24, 2020, asserting free-speech and equal-protection claims for violations of the First and Fourteenth Amendments and seeking declaratory and injunctive relief against the State Defendants. (*See generally* Dkt. No. 292.)

---

[10]No other plaintiffs bring claims against the Rowlett Defendants. (Dkt. No. 282 ¶ 173.)

Specifically, as to their First Amendment claims, Ugarte and Sanchez assert that SB4 violates their free-speech rights; TOPEF and MOVE assert that SB4 unconstitutionally chills their right to public assembly; and Ugarte and TOPEF assert that the State Defendants retaliated against them by filing a malicious enforcement action in the Austin Division.[11] (*See id.* ¶¶ 107–19.)

The State Defendants seek dismissal of all claims asserted by the El Paso County Plaintiffs. (Dkt. No. 297.)

## DISCUSSION

For the reasons below, the State Defendants' Motion to Dismiss the City of Austin's First Amended Complaint in Intervention (Dkt. No. 279) will be granted; their Motion to Dismiss the San Antonio Plaintiffs' Second Amended Complaint (Dkt. No. 291) will be granted in part and denied in part; their Motion to Dismiss the El Paso County Plaintiffs' Third Amended Complaint (Dkt. No. 297) will be granted; and the Rowlett Defendants' Motion to Dismiss the San Antonio Plaintiffs' Second Amended Complaint (Dkt. No. 302) will be granted in part and denied in part.

## I.    JURISDICTION

Rule 12(b)(1) permits a court to dismiss a complaint for lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). "[A] claim is properly dismissed for lack of subject matter jurisdiction when a court lacks statutory or constitutional authority to adjudicate the claim." *Sanchez v. Bexar Cnty. Sheriff's Off.*, 2021 WL 3598286, at *2 (W.D. Tex. Mar. 30, 2021) (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)). Defects in a court's subject-matter jurisdiction can be raised by a party at any time, and, if the issue of subject-matter jurisdiction is not raised by a defendant, the court has a duty to raise it sua sponte. *See* FED. R. CIV. P. 12(h)(3).

---

[11]*Texas, et al. v. Travis County, et al.*, 17-CV-00425-SS (W.D. Tex.—Austin Division).

For a court to have subject-matter jurisdiction over a particular claim, the plaintiff must have standing to assert that claim. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Article III standing requires: (1) an injury in fact—i.e., harm that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical—(2) causation—i.e., a fairly traceable connection between the injury and the alleged misconduct—and (3) redressability—i.e., the likelihood that a favorable decision will remedy the alleged injury. *Id.* Plaintiffs, as the ones invoking federal jurisdiction, bear the burden of establishing these elements "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. Thus, at the pleading stage, "the plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012).

"In determining whether the court has subject matter jurisdiction, [the court] must accept as true the allegations set forth in the complaint." *Crane v. Johnson*, 783 F.3d 244, 250–51 (5th Cir. 2015) (internal citation omitted). The Court may resolve a Rule 12(b)(1) motion "based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Flores v. Pompeo*, 936 F.3d 273, 276 (5th Cir. 2019) (quoting *Robinson v. TCI/US W. Commc'ns Inc.*, 117 F.3d 900, 904 (5th Cir. 1997)).

### A. Sovereign Immunity

In their motions, the State Defendants contend that the Eleventh Amendment requires dismissal of all claims asserted against Texas. (Dkt. No. 279 at 4–5; Dkt. No. 291 at 6; Dkt. No. 297 at 10.) They are correct: Texas, as a sovereign entity, "may not be sued without its consent." *Williams on Behalf of J.E. v. Reeves*, 954 F.3d 729, 735 (5th Cir. 2020); *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011) ("Sovereign immunity is the privilege of the sovereign to not

13

be sued without its consent."). Here, sovereign immunity jurisdictionally bars each plaintiff's suit against Texas, as Texas has not waived its immunity and Congress has not abrogated it. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("This jurisdictional bar applies regardless of the nature of the relief sought."); *Quern v. Jordan*, 440 U.S. 332, 345 (1979) (reaffirming that § 1983 does not abrogate state sovereign immunity); *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015) (same).

As to State Defendants Abbott and Paxton, "state sovereign immunity [also] precludes suits against state officials in their official capacities." *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024). "The legal fiction of *Ex parte Young*, however, provides an exception to Eleventh Amendment sovereign immunity in the subset of cases to which it applies." *Id.* (citation modified); *see Ex parte Young*, 209 U.S. 123, 167 (1908). The *Ex parte Young* exception permits "a litigant [to] sue a state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Reeves*, 954 F.3d at 736; *see Reed v. Goertz*, 598 U.S. 230, 234 (2023); *Quern*, 440 U.S. at 337 ("[A] federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law."). For this exception to apply, "(1) [the] plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege an ongoing violation of federal law; and (3) the relief sought must be properly characterized as prospective." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (citation modified).

"To be a proper defendant under *Ex parte Young*, a state official must have some connection with the enforcement of the law being challenged." *Ogg*, 105 F.4th at 325 (citation modified). "The required connection is not merely the general duty to see that the laws of the state are implemented, but the particular duty to enforce the statute in question and a demonstrated willingness to exercise

that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (citation modified). Here, SB4

expressly provides for enforcement by the attorney general. GOV'T §§ 752.055 & .0565. "Where

a state actor . . . is statutorily tasked with enforcing the challenged law and a different official is

the named defendant, [the *Ex parte*] *Young* analysis ends." *City of Austin v. Paxton*, 943 F.3d 993,

998 (5th Cir. 2019); *see Okpalobi v. Foster*, 244 F.3d 405, 414 (5th Cir. 2001) (en banc).

Accordingly, Governor Abbott is an improper defendant for plaintiffs' challenges to the

constitutionality of SB4 because he has not been specifically tasked with its enforcement. *See*

*Austin*, 943 F.3d at 998 (citing *Morris*, 739 F.3d at 742).

Because Attorney General Paxton, on the other hand, has been "statutorily tasked with

enforcing" SB4, he has the requisite "duty to enforce the statute in question." *Morris*, 739 F.3d at

416. Paxton has also "demonstrated [a] willingness to exercise that duty," *id.*, by initiating SB4

enforcement actions against, inter alia, San Antonio and El Paso County. (*See* Dkt. No. 273 ¶ 27;

Dkt. No. 282 ¶¶ 134–156; Dkt. No. 292 ¶¶ 95, 114–19.) Plaintiffs contend, inter alia, that SB4's

"endorse" provision violates the free-speech clause of the First Amendment (*see* Dkt. No. 273

¶ 30; Dkt. No. 282 ¶¶ 182–88; Dkt. No. 292 ¶¶ 107–19) and have thus alleged an ongoing violation

of federal law. *See Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

Finally, the relief sought against Paxton is declaratory and injunctive (*see* Dkt. No. 273 at 9; Dkt.

No. 282 at 54; Dkt. No. 292 at 31), which can properly be characterized as prospective. *See*

*McCarthy ex rel. Travis*, 381 F.3d at 412; *see also Green Valley*, 969 F.3d at 471.

Accordingly, sovereign immunity bars all of Plaintiffs' claims against Texas and Governor

Abbott, but their claims against Attorney General Paxton are permitted by the *Ex parte Young*

exception.[12] The State Defendants' Motions (Dkt. No. 279; Dkt. No. 291; Dkt. No. 297) will therefore be **GRANTED** to the extent they seek dismissal of all claims asserted against Texas and Abbott under Rule 12(b)(1).

### B. Local Jurisdictions

The plaintiff local jurisdictions—i.e., Austin, San Antonio, El Paso, Bexar County, and El Paso County—challenge SB4 under the First and Fourteenth Amendments.[13] The State Defendants move to dismiss all claims by these city and county plaintiffs on the grounds that, as creatures of the state, they have no standing to challenge the validity of SB4, a state statute lawfully enacted by their creator. (*See* Dkt. No. 279 at 2–3; Dkt. No. 291 at 1–2; Dkt. No. 297 at 1–2.) The Court agrees.

Even though Paxton is the proper defendant for this suit—and capable of being sued under *Ex parte Young*—it is well established that "suits against state officers in their official capacities, rather than their personal capacities, are treated as suits against the state entity itself." *Kermode v. Univ. of Miss. Med. Ctr.*, 496 F. App'x 483, 488 (5th Cir. 2012). "Being but creatures of the State, municipal corporations have no standing to invoke . . . the provisions of the Fourteenth

---

[12]The Rowlett Defendants mistakenly contend that Valladarez and Simon's requests for declaratory and injunctive relief against Officers Welk and Rickman—who are sued in their individual capacities—are barred by the Eleventh Amendment. (*See* Dkt. No. 302 at 13.) As officers of a political subdivision—as opposed to the State itself—neither Welk nor Rickman could be entitled to sovereign immunity even if they had been sued in their official capacities. *See Tercero v. Tex. Southmost Coll. Dist.*, 989 F.3d 291, 297 (5th Cir. 2021) ("The bar of the Eleventh Amendment to suit in federal courts . . . does not extend to counties and similar municipal corporations or other political subdivisions.") (citation modified). And because they were sued in their individual capacities, neither Welk nor Rickman could have been entitled to sovereign immunity even if they were state officials. *See Kermode v. Univ. of Miss. Med. Center*, 496 F. App'x 483, 491 n.7 (5th Cir. 2012) ("Because a suit against an officer sued in his or her individual capacity is not a suit against the state itself, sovereign immunity is not a defense in such individual-capacity suits."). Although their requests for prospective relief against the officers are not barred by sovereign immunity, Welk and Rickman, as mere agents of a municipality, are not in any position of authority to enforce SB4.

[13]San Antonio also appears to assert a claim for violation of the excessive fines clause of the Eighth Amendment. (Dkt. No. 282 ¶ 209.)

Amendment . . . in opposition to the will of their creator." *Coleman v. Miller*, 307 U.S. 433, 441

(1939); *see City of Trenton v. New Jersey*, 262 U.S. 182, 188 (1923); *Town of Ball v. Rapides Par.*

*Police Jury*, 746 F.2d 1049, 1051 n.1 (5th Cir. 1984).

The Court is aware that the Fifth Circuit has entertained the possibility that a political

subdivision may sue its parent state in limited circumstances. *See Rogers v. Brockette*, 588 F.2d

1057, 1070 (5th Cir. 1979). But, as it has stated since, *Rogers* represents "the anomalous, if not

unique, position that a political subdivision might have standing to challenge state laws that

allegedly violate the *Supremacy Clause*." *Donelon v. La. Div. of Admin. L. ex rel. Wise*, 522 F.3d

564, 567 (5th Cir. 2008) (emphasis added); *see Bd. of Levee Comm'rs of the Orleans Levee Bd. v.*

*Huls*, 852 F.2d 140, 143 (5th Cir. 1988) (describing *Rogers* as having "dealt only with the

theoretical possibility that a city has standing to sue its state" without actually granting relief to a

city); *City of Hugo*, 656 F.3d at 1257 (describing the exception outlined by *Rogers* as allowing

suits by a political subdivision against its parent state "only when Congress has enacted statutory

law specifically providing rights to municipalities"); *see, e.g.*, *United States v. Texas*, 719 F. Supp.

3d 640, 658–59 (W.D. Tex. 2024) (finding that El Paso County was not barred from suing Texas

under the Supremacy Clause) (citing *Rogers*, 588 F.2d at 1070), *aff'd on other grounds*, 144 F.4th

632 (5th Cir. 2025); *City of Alpine v. Abbott*, 730 F. Supp. 2d 630, 633 (W.D. Tex. 2010). The Court

will not extend *Rogers*' anomalous reasoning here.

"A political subdivision . . . is a subordinate unit of government created by the State to

carry out delegated governmental functions" and, thus, "has no privileges or immunities under the

federal constitution which it may invoke in opposition to the will of its creator." *Ysursa v. Pocatello*

*Educ. Ass'n*, 555 U.S. 353, 363 (2009) (quoting *Williams v. Mayor of Balt.*, 289 U.S. 36, 40

(1933)). "[A] city or county cannot challenge a state statute on federal Constitutional grounds."

*Appling Cnty v. Mun. Elec. Auth. of Ga.*, 621 F.2d 1301, 1308 (5th Cir. 1980), *cert. denied*, 449 U.S. 1015 (1980); *Harris v. Angelina Cnty.*, 31 F.3d 331, 339 (5th Cir. 1994) ("We have previously held that state subdivisions, such as counties and municipalities, cannot assert constitutional claims in federal court against their creator, the state itself, or other state political subdivisions."); *accord Okanogan Sch. Dist. #105 v. Superintendent of Pub. Instruction for State of Wash.*, 291 F.3d 1161, 1163 (9th Cir. 2002) (holding that "political subdivisions of a state may not challenge the validity of a state statute in federal court").

In sum, cities and counties "have no standing to invoke . . . the provisions of the Fourteenth Amendment . . . in opposition to the will of their creator." *Coleman*, 307 U.S. at 441. And because the protections in the bill of rights are only enforceable against the states via the Fourteenth Amendment, a creature of the state cannot sue its creator to enforce any of the first ten amendments to the United States Constitution. *See Timbs v. Indiana*, 586 U.S. 146, 150 (2019) ("[T]he Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States."); *Hous. Indep. Sch. Dist. v. Tex. Educ. Agency*, No. 1:19-CV-684-LY, 2019 WL 6894474, at *5 (W.D. Tex. Dec. 18, 2019) (concluding that political subdivisions of a state are not protected by and therefore barred from bringing a claim under the due process clause of the Fourteenth Amendment); *Alpine*, 730 F. Supp. 2d at 633. Accordingly, the local jurisdiction plaintiffs have no standing to sue based on alleged violations of the First or Fourteenth Amendments.[14]

The State Defendants' Motion to Dismiss the City of Austin's First Amended Complaint in Intervention (Dkt. No. 279) will therefore be **GRANTED** and Austin's claim dismissed pursuant to Rule 12(b)(1); their Motion to Dismiss the San Antonio Plaintiffs' Second Amended Complaint

---

[14]San Antonio thus also lacks standing to bring its Eighth Amendment claim, if any. *See supra* n.13.

(Dkt. No. 291) will be **GRANTED IN PART** in that the claims asserted by San Antonio, El Paso, and Bexar County[15] will be dismissed pursuant to Rule 12(b)(1); and their Motion to Dismiss the El Paso County Plaintiffs' Third Amended Complaint (Dkt. No. 297) will be **GRANTED IN PART** in that the claims asserted by El Paso County will be dismissed pursuant to Rule 12(b)(1).

### C. Local Officials

The plaintiff local officials—i.e., San Antonio Plaintiffs McManus, Gallegos, and Sandoval, and El Paso County Plaintiffs Ugarte and Sanchez—bring constitutional challenges to SB4 under the First and Fourteenth Amendments. Specifically, McManus, Gallegos, Sandoval,[16] Ugarte, and Sanchez challenge SB4 under the free speech clause of the First Amendment, and Ugarte and Sanchez additionally challenge SB4 under the equal protection clause of the Fourteenth Amendment. Paxton seeks dismissal of their claims on the grounds that they cannot assert official-capacity constitutional challenges that the cities and counties themselves are unable to bring against their creator. (Dkt. No. 291 at 2; Dkt. No. 297 at 1–2.) In other words, Paxton's argument goes, a suit by a local official in his or her official capacity is effectively just an impermissible suit by the local entity itself.

The Court will first address the local officials' standing to bring claims in their official capacities and then turn to whether McManus, Gallegos, and Sandoval have established standing to bring individual-capacity claims.

---

[15]To the extent the San Antonio Plaintiffs (other than Valladarez and Simon) purport to re-urge their preemption-based challenge to SB4 against the State Defendants, the Fifth Circuit has already held that SB4 is not facially preempted by federal immigration law, and they have failed to identify any application of SB4's provisions that conflicts with federal law. As such, even assuming arguendo that they had asserted the same claim for violation of the Supremacy Clause, this claim would fail on the merits.

[16]It is unclear which of the claims in the Second Amended Complaint are asserted by McManus, Gallegos, and Sandoval. The Court will infer only that these San Antonio Plaintiffs bring the First Amendment challenge to SB4 based on the "endorsement" prohibition.

### 1. Official Capacity Claims

The Fifth Circuit has recognized that a suit by a state official—such as an agency head or the governor—challenging a state law in federal court "creates a situation where the state is essentially suing itself." *Donelon*, 522 F.3d at 568 (holding that Louisiana Commissioner of Insurance lacked standing to assert constitutional challenges to state statute); *see Finch v. Miss. St. Med. Ass'n*, 585 F.2d 765, 771 (5th Cir. 1978) (holding that Governor of Mississippi lacked standing). And "when a state is essentially suing itself, there is no case or controversy." *Donelon*, 522 F.3d at 568 (citation modified). As such, state officials can only challenge the constitutionality of a state statute in their individual capacities. *Donelon*, 522 F.3d at 566 ("[S]tate officials lack standing to challenge the constitutional validity of a state statute when they are not adversely affected by the statute, *and their interest in the litigation is official, rather than personal*.") (emphasis added) (citing *Cnty. Ct. of Braxton Cnty. v. W. Va. ex rel. Dillon*, 208 U.S. 192, 197 (1908)); *El Cenizo*, 890 F.3d at 186 ("[I]t is not enough for public officials to assert as an 'injury' the violation of their oaths of office where no adverse [personal] consequences would occur.") (citing *Bd. of Educ. v. Allen*, 392 U.S. 236, 241 n.5 (1968)). Because "the challenge by a public official interested only in the performance of his official duty will not be entertained," state officials may only challenge the constitutionality of a state statute against the state where they are personally harmed. *Donelon*, 522 F.3d at 567 (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936)).

Similarly, an official capacity suit by a local police chief or sheriff is tantamount to a suit by the city or county itself. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity . . . . the real party in interest is the entity."). And, under the local subdivision line of cases, a city or county

cannot challenge the constitutionality of a statute enacted by its creator.[17] Paxton thus contends that, regardless whether the city and county officials have suffered the sort of personal harms contemplated in the aforementioned cases, they cannot have standing to challenge SB4 in their official capacities. (*See* Dkt. No. 291 at 2–3; Dkt. No. 297 at 2.)

In response, the San Antonio and El Paso County Plaintiffs point the Court to the Fifth Circuit's reliance on *Board of Education v. Allen* in this case to hold that the local officials had standing to press their facial Fourth Amendment challenges to SB4's ICE-detainer mandate.[18] (*See* Dkt. No. 300 at 6; Dkt. No. 307 at 5); 392 U.S. at 241 n.5; *El Cenizo*, 890 F.3d at 185–86. However, as Paxton correctly points out, the Fifth Circuit's reliance on *Allen* was ostensibly premised on the assumption that the plaintiff local officials had sued in their individual capacities. *See El Cenizo*, 890 F.3d at 186 ("[P]laintiff government officials have a sufficient '*personal* stake' to press their

---

[17]*See supra* Discussion Section I.B; *Coleman*, 307 U.S. at 441 ("[M]unicipal corporations have no standing to invoke . . . the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator."); *Appling Cnty.*, 621 F.2d at 1308 ("[A] city or county cannot challenge a state statute on federal Constitutional grounds."); *accord Williams v. Corbett*, 916 F. Supp. 2d 593, 598 (M.D. Pa. 2012) ("It is illogical to presume that an officer suing in an official capacity on behalf of a political subdivision might have greater standing to maintain a lawsuit than would the political subdivision that official represents."), *aff'd sub nom. Williams v. Governor of Pa.*, 552 F. App'x 158 (3d Cir. 2014); *cf., e.g., Tercero v. Tex. Southmost Coll. Dist.*, 989 F.3d 291, 296 (5th Cir. 2021) ("The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations or other political subdivisions.") (citation modified).

[18]The Court notes that the San Antonio Plaintiffs' response in this regard is wholly inadequate. (*See, e.g.*, Dkt. No. 300 at 6–7.) They first spend two sentences summarizing *Allen* and then conclude, in general terms, that McManus, Gallegos, and Sandoval "allege that they would violate the Constitution if they follow SB4 and risk fines and removal from office if they refuse to" do so. (Dkt. No. 300 at 6.) And then they move on to summarily refute the premise for Paxton's argument, asserting that "McManus, Sandoval, and Gallegos do not proceed solely in their official capacit[ies]" and, ergo, Paxton's argument "fails on [that] point alone." (*Id.* at 6–7.)

claim . . . . [as they] face criminal penalties[19] . . . and expulsion from office[20] if they disobey [SB4] . . . [a]nd if they comply . . . [it] could expose [them] to damage suits.[21]") (emphasis added); *cf. Donelon*, 522 F.3d at 566 ("[S]tate officials lack standing to challenge the constitutional validity of a state statute when they are not adversely affected by the statute, *and their interest in the litigation is official, rather than personal*.") (emphasis added). Thus, to the extent the plaintiff local officials assert that SB4 violates their own constitutional rights under the free speech clause of the First Amendment, their reliance on *Allen* to bring an official-capacity suit is misplaced.

And for the same reasons, Ugarte and Sanchez do not have standing to bring their Fourteenth Amendment claims in their official capacities. Even if they had brought this claim in their personal capacities, neither Ugarte nor Sanchez have established standing to challenge SB4 under the equal protection clause of the Fourteenth Amendment, as neither has demonstrated that they are personally "injured by its operation." *Donelon*, 522 F.3d at 567. Rather, they contend that SB4 "hinders" their ability, as county officials, "to carry out their duties." (Dkt. No. 307 at 5.) Their "interest in the litigation is official, rather than personal" and their claims are, in effect, challenges by "public official[s] interested only in the performance of [their] official dut[ies]."

---

[19]The plaintiff local officials' failure to comply with SB4's ICE detainer mandate "is a Class A misdemeanor." TEX. PENAL CODE § 39.07. In Texas, Class A misdemeanors are punishable by, inter alia, "confinement in jail for a term not to exceed one year." *Id.* § 12.21(2). While McManus, Gallegos, Sandoval, Ugarte, and Sanchez are all individually capable of being confined in a jail, their *offices*—San Antonio Chief of Police, Immigration Liaison, San Antonio City Council, El Paso County Sheriff, and El Paso County Attorney—are decidedly not.

[20]Similarly, *see supra* n.19, while McManus, Gallegos, Sandoval, Ugarte, and Sanchez are individually capable of being removed from their respective offices, their offices themselves are obviously not so capable.

[21]If the plaintiff local officials were to be sued in their official capacities, the suit would be one against their offices—not them. *See Graham*, 473 U.S. at 165; *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 483 (5th Cir. 2000) ("[A] § 1983 suit naming defendants only in their 'official capacity' does not involve personal liability to the individual defendant.").

*Ashwander*, 297 U.S. at 348. Accordingly, Ugarte and Sanchez lack standing to bring their Fourteenth Amendment claims.[22]

Accordingly, these claims must be dismissed because city and county officials do not have standing to bring First or Fourteenth Amendment challenges to a state statute in their official capacities. The State Defendants' Motion to Dismiss the El Paso County Plaintiffs' Third Amended Complaint (Dkt. No. 297), and their Motion to Dismiss the San Antonio Plaintiffs' Second Amended Complaint (Dkt. No. 291), will therefore be **GRANTED IN PART** to the extent they request dismissal of all official-capacity plaintiffs' claims pursuant to Rule 12(b)(1) for lack of standing.

### 2. Individual Capacity Claims

Because the San Antonio Plaintiffs respond that McManus, Sandoval, and Gallegos do not solely bring official-capacity claims (*see* Dkt. No. 300 at 6), the Court turns to whether they have standing to bring personal-capacity claims. *See Harmon v. Dall. Cnty.*, 294 F. Supp. 3d 548, 570 (N.D. Tex. 2018) (When the relevant capacity has not been specified, as here, the Court looks to "the substance of the complaint, the nature of relief sought, and statements in dispositive motions *and responses*.") (emphasis added), *aff'd*, 927 F.3d 884 (5th Cir. 2019), *as revised*, (July 9, 2019).

---

[22]"A litigant 'raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.'" *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013) (quoting *Lujan*, 504 U.S. at 573–74); *see Jackson v. City of Hous.*, 143 F.4th 640, 646 (5th Cir. 2025) ("[T]his rule against general grievances applies with as much force in the equal protection context as in any other.") (citation modified). "At the same time, though, plaintiffs can (and often do) file suits in which they represent the interests of a larger group of persons because they are *among* those individuals who have demonstrated 'disadvantage to themselves.'" *Jackson Mun. Airport Auth. v. Reeves*, No. 3:16-CV-246-CWR-ASH, 2025 WL 1489235, at *11 (S.D. Miss. May 23, 2025) (finding standing for mayor and city councilmembers, who brought suit in their *individual* capacities, to bring equal protection challenge to state law based on allegation "that they live in the affected jurisdiction and, by that residency, have been personally injured") (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)).

McManus, Gallegos, and Sandoval, as plaintiffs, "constantly bear[] the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."), *cert. denied*, 536 U.S. 960 (2002). But, aside from the ad hoc assurance that they are also suing in their individual capacities, their response offers no argument in support of finding injury in fact, causation, and redressability. (*See* Dkt. No. 300 at 6–7.) Instead, the San Antonio Plaintiffs conclude that Paxton's request for dismissal fails simply because they did not solely bring suit in their official capacities. (*Id.* at 7.) Their obligation to assure the Court of its jurisdiction demands more than this. Accordingly, to the extent that McManus, Gallegos, or Sandoval assert anything more than their speech-based challenge to SB4 in their personal capacities, those claims will be dismissed for lack of standing. *See Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 825 (5th Cir. 2022) ("It is not [the Court's] job to conjure up possible theories that could carry a litigant's burden.") (citation modified).

Their "First Amendment claims, however, are another matter," as "standing rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024) (citation modified), *cert. denied sub nom. Nat'l Press Photographers Ass'n v. Higgins*, 145 S. Ct. 140 (2024). And the Fifth Circuit, in affirming the injunction, held that the "endorse" provision facially was unconstitutional as it "prohibits elected officials from endorsing a policy under which the entity or department prohibits or materially limits the enforcement of immigration laws." *El Cenizo*, 890 F.3d at 185 (citation modified); *see also Inst. for Free Speech v. Johnson*, No. 24-50712, 2025 WL 2104354, at *3 (5th Cir. July 28, 2025) ("[I]t is not hard to sustain standing for a pre-enforcement challenge in cases involving political

speech.") (citation modified); *Umphress v. Hall*, 133 F.4th 455, 464 (5th Cir. 2025) ("[W]hen dealing with pre-enforcement challenges to . . . statutes that facially restrict expressive activity . . . courts will assume a credible threat of prosecution in the absence of compelling contrary evidence."). The Court finds that McManus and Gallegos[23] have standing to continue challenging SB4 under the First Amendment in their personal capacities.

Any claims brought by Sandoval in her personal capacity, however, are no longer justiciable, as she is no longer a city councilmember and, thus, no longer faces a risk of fines, criminal prosecution, removal from office, or limitations on her core political speech as an elected local official. Indeed, her claims against Paxton were only permissible in the first place, pursuant to the *Ex parte Young* exception, because she sought prospective relief. *See Ogg*, 105 F.4th at 325. Accordingly, she may not continue in this lawsuit to redress past grievances.

The State Defendants' Motion to Dismiss the San Antonio Plaintiffs' Second Amended Complaint (Dkt. No. 291) will therefore be **GRANTED IN PART** as to Sandoval's speech-based claims brought in her personal capacity which will be dismissed pursuant to Rule 12(b)(1), and the Motion will be **DENIED IN PART** as to any personal-capacity claims brought by McManus and Gallegos.

### D. Advocacy Groups

The plaintiff organizations—i.e., TACHE, LUPE, WDP, TOPEF, and MOVE—assert various challenges to SB4. The Court first addresses San Antonio Plaintiffs TACHE, LUPE, and WDP's alleged associational standing to bring derivative claims on behalf of their members and

---

[23]The Court will assume that Gallegos is still San Anotnio's Immigration Liaison and, therefore, will proceed to the merits on his First Amendment challenge to the "endorse" provision.

then will turn to El Paso County Plaintiffs TOPEF and MOVE's alleged organizational standing to bring claims based on their own injuries.

### 1. Associational Standing

Based on the San Antonio Plaintiffs' Second Amended Complaint, TACHE, LUPE, and WDP assert equal protection claims on behalf of their members, while TACHE additionally asserts two First Amendment challenges to SB4 on behalf of its members.[24] Paxton requests dismissal, arguing that TACHE, LUPE, and WDP have failed to demonstrate associational standing to bring these claims. (*See* Dkt. No. 291 at 3–4.)

"Associational standing" is derivative of the standing of an organization's members, "requiring that they have standing and that the interests the association seeks to protect be germane to its purpose." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)). To plead associational standing, an organization must allege that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat'l Religious Broad. v. Fed. Commc'ns Comm'n*, 138 F.4th 282, 290 (5th Cir. 2025) (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996)).

---

[24]It is not readily apparent which claims are asserted by TACHE, LUPE, and WDP in the San Antonio Plaintiffs' pleading. It is clear, however, that TACHE asserts a free speech claim on behalf of its members and that it is the only plaintiff asserting the academic freedom claim. (*Id.* ¶¶ 189–90.)

Additionally, as the State Defendants note, LUPE and WDP allege that they are "injured as an organization by SB4" (Dkt. No. 282 ¶¶ 11–12, 176). Such conclusory allegations, however, are not entitled to the presumption of truth, and, regardless, neither LUPE nor WDP argue organizational standing in their response (*see* Dkt. No. 300 at 7–8; *see also* Dkt. No. 291 at 4 n.1; Dkt. No. 312 at 6 n.4).

In the Motion, Paxton contends that TACHE, LUPE, and WDP's failure to identify by name any individual member who would have standing to sue is fatal to their ability to demonstrate associational standing. (Dkt. No. 291 at 3.) Indeed, it is ordinarily true that, "an organization suing as representative must include at least one member with standing to present, in his or her own right, the claim (or type of claim) pleaded by the association." *Funeral Consumers All., Inc. v. Serv. Corp. Intern.*, 695 F.3d 330, 344 (5th Cir. 2012) (citation modified); *see Brown Grp.*, 517 U.S. at 555. However, "the participation of individual association members is not normally necessary when an association seeks prospective or injunctive relief for its members." *Nat'l Religious Broad.*, 138 F.4th at 290–91 (citation modified); *see Brown Grp.*, 517 U.S. at 546. But actual participation aside, "plaintiff-organizations" will not have associational standing unless they "make specific allegations establishing that at least one identified member ha[s] suffered or w[ill] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Such allegations may be sufficient, however, without requiring that any member be specifically named.[25] With these considerations in mind, and as explained above, the Court finds that, with the exception of TACHE's free speech claim, neither TACHE, LUPE, nor WDP have shown that they have standing under an associational theory.[26]

---

[25] *See Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing."); *c.f., e.g., Summers*, 555 U.S. at 499 (reviewing evidentiary record in support of entry of nationwide preliminary injunction); *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 236–37 (5th Cir. 2010) (reviewing evidentiary record following a bench trial); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 728 F. Supp. 3d 394, 405–06 (N.D. Tex. 2024) (evaluating evidence to support associational standing at preliminary injunction stage).

[26] *See Perez*, 45 F.4th at 825 ("It is not [the Court's] job to conjure up possible theories that could carry a litigant's burden.") (citation modified).

### a. TACHE

TACHE asserts that SB4 inflicts the following injuries on its members: (1) limitations on their policies and speech; and (2) increased risk of racial profiling and unwarranted questioning and detention of community college students and employees by campus police. (Dkt. No. 282 ¶¶ 10, 177.) Because these injuries are pleaded "under the associational injury theory" they "must be sufficient to confer standing to the individual members to sue in their own right." *Tenth St. Residential Ass'n v. City of Dall.*, 968 F.3d 492, 501 (5th Cir. 2020) (citing *Am. Physicians*, 627 F.3d at 550). "That, in turn, requires [the Court] to consider the individual members' alleged injuries—which must be concrete, particularized, and actual or imminent." *Deep S. Ctr. for Env't. Just. v. U.S. Env't. Prot. Agency*, 138 F.4th 310, 320 (5th Cir. 2025) (citation modified). This inquiry "often turns on the nature and source of the claim asserted." *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017) (citation modified). "Because different claims protect against different injuries, an injury in fact for one claim may not constitute an injury in fact for a[nother]." *Jackson*, 143 F.4th at 645–46. Thus, the Court separately considers TACHE's standing for each of its claims.

### i. Free Speech

The Court begins with, and finds that TACHE has standing to assert, its First Amendment challenge to SB4 on behalf of its members. TACHE alleges that its members include "elected officials of community college districts; administrators, counselors, professors, staff and students at four-year and community colleges; and institutional members such as community colleges and universities throughout Texas." (Dkt. No. 282 ¶ 10.) TACHE alleges that its members are injured by SB4's limitations on their policies and speech. (*Id.*) These allegations are sufficient at this stage.

First, TACHE's allegation that SB4 inflicts limitations on its members speech is sufficient to establish a cognizable injury. Based on the Second Amended Complaint, TACHE's members

include individuals who would be directly impacted by SB4 (i.e., "elected officials[27] of community college districts"). *See* Gov't § 752.051(5); *El Cenizo*, 890 F.3d at 184 ("The state concedes that [the] 'endorse' provision does not pass constitutional muster as applied to *elected officials*.") (emphasis added). Thus, TACHE's allegations establish that at least certain of its members have a cognizable injury, and that is enough at this stage. *See Nat'l Infusion Center Ass'n v. Becerra*, 116 F.4th 488, 497 (5th Cir. 2024) ("To invoke associational standing, . . . [the organization] must identify at least one member that has suffered or will suffer harm.").

Second, TACHE's purpose—improving "educational and employment opportunities for Latinos and Chicanos in higher education"—is germane to the interests of the elected members' free-speech interests it seeks to protect. (Dkt. No. 282 ¶ 10.) Finally, "the participation of individual association members is 'not normally necessary when an association seeks prospective or injunctive relief for its members,'" as TACHE does here. *Nat'l Religious Broad.*, 138 F.4th at 290–91 (quoting *Brown Grp.*, 517 U.S. at 546); *see City of El Cenizo v. State*, 264 F. Supp. 3d 744, 775 (W.D. Tex. 2017) (observing that "the prudential limitations on standing are relaxed in the First Amendment context"), *aff'd in part, vacated in part on other grounds sub nom. City of El Cenizo, Tex. v. Texas*, 890 F.3d 164 (5th Cir. 2018).

Accordingly, because TACHE has associational standing to assert this speech-based injury based on the presence of elected officials amongst its members, the State Defendants' Motion (Dkt No. 291) will be **DENIED** to the extent it requests dismissal of TACHE's claim for violation of the free speech clause of the First Amendment under Rule 12(b)(1).

---

[27]Assuming, of course, that they were to bring any potential suits in their individual capacities. *See, e.g.*, *El Cenizo*, 890 F.3d at 187 (noting that elected officials could be *personally* exposed "to damage suits"); *Graham*, 473 U.S. at 165 ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity . . . . [and] is *not* a suit against the official personally, for the real party in interest is the entity.").

### ii. Academic Freedom

Next, TACHE asserts an academic freedom claim under the First Amendment on behalf of its members. (*See* Dkt. No. 282 ¶¶ 189–91.)

"[A]cademic freedom . . . does not tolerate laws that cast a pall of orthodoxy over the classroom." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). The Supreme Court "has emphasized that academic freedom is a special concern of the First Amendment," *Coal. for Indep. Tech. Rsch. v. Abbott*, 706 F. Supp. 3d 673, 687 (W.D. Tex. 2023) (citation modified), and "has also long supported the rights of public employees, [who] as 'citizens do not surrender their First Amendment rights by accepting public employment,'" *id.* (quoting *Lane v. Franks*, 573 U.S. 228, 231 (2014)).

TACHE alleges that SB4 "restricts the ability to control who teaches, what subjects are taught, and how those subjects are taught at Texas institutions of higher education." (Dkt. No. 282 ¶ 177.) In the Motion, Paxton argues that TACHE fails to identify any provision of SB4 that would affect those interests—i.e., what and how subjects are taught and by whom. (Dkt. No. 291 at 11.) TACHE does not address this in its response: in one pithy paragraph it simply asserts that an academic freedom right "has long been recognized" and, therefore, any argument for dismissal necessarily fails. (Dkt. No. 300 at 13.) The Court disagrees. "The burden of proof for a Rule 12(b)(1) motion is on the party asserting jurisdiction," *Ogg*, 105 F.4th at 319, and a single, conclusory remark does not suffice to carry that burden.

Accordingly, TACHE has not demonstrated that it has standing to assert an academic freedom claim on behalf of its members. Accordingly, the State Defendants' Motion (Dkt No. 291) will be **GRANTED** to the extent it requests dismissal of this claim under Rule 12(b)(1).

### b. Equal Protection Claims

Finally, to the extent that TACHE, LUPE, and WDP assert equal protection claims under the Fourteenth Amendment on behalf of their members (*see* Dkt. No. 282 ¶¶ 216–22), none have demonstrated standing to do so.

Aside from the speech-based injury discussed above, TACHE asserts that SB4 inflicts on its members an increased risk of racial profiling and unwarranted questioning and detention of community college students and employees by campus police. (Dkt. No. 282 ¶¶ 10, 177.) LUPE and WDP similarly allege that SB4 injures their members by causing (1) deterred interaction with law enforcement agencies for fear of immigration-related questioning and detention; and (2) increased racial profiling by individual police officers. (*Id.* ¶¶ 10–12.) LUPE and WDP additionally allege that SB4 results in violations of their members' constitutional rights due to mandatory enforcement of immigration detainers. (*See id.* ¶¶ 10–12, 175.)

"[T]o have standing to bring an equal protection claim, a plaintiff must have suffered an injury that stemmed from unequal treatment." *Jackson*, 143 F.4th at 646. "The Supreme Court has 'repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power.'" *Id.* (quoting *United States v. Hays*, 515 U.S. 737, 743 (1995) (collecting cases)). "Even if a governmental actor is discriminating on the basis of race, the resulting injury accords a basis for standing only to those persons who are *personally denied equal treatment* by the challenged discriminatory conduct." *Jackson*, 143 F.4th at 646 (citation modified). Neither TACHE, LUPE, nor WDP have alleged that any of their members have actually personally been denied equal treatment as a result of any provision of SB4. And while Article III's injury requirement can also be satisfied by imminent injuries, imminence is not established by "claims based on injuries grounded in mere speculation."

*Deep S. Ctr.*, 138 F.4th at 320. A mere prediction that there will be an increase in the risk of racial profiling, deterred interactions with law enforcement, and unwarranted immigration-related interrogations or detentions, is "conjectural or hypothetical" words—i.e., does not amount to an injury in fact for Article III purposes. *See id.* (quoting *Lujan*, 504 U.S. at 560); *see also Risk*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) ("[*P*]*ossibility* of loss or injury.") (emphasis added).

None of these organizational plaintiffs has established associational standing to bring an equal protection claim on behalf of their respective members. Accordingly, the State Defendants' Motion (Dkt No. 291) will be **GRANTED** to the extent it requests dismissal of TACHE, LUPE, and WDP's equal protection claims under Rule 12(b)(1) for lack of standing.

### 2. Organizational Standing

The Court now turns to Paxton's request for dismissal of El Paso County Plaintiffs TOPEF and MOVE for lack of standing. Paxton argues that neither TOPEF nor MOVE have established an injury-in-fact sufficient to give them standing to challenge SB4 under the First Amendment and the Fourteenth Amendment based on their own alleged injuries. (*See* Dkt. No. 297 at 4–10.)

"Organizational standing" is not derivative of the standing of an organization's members. *OCA-Greater Hous.* 867 F.3d at 610 (citation modified). Under "limited . . . circumstances, Article III permits organizations 'to sue on their own behalf for injuries they have sustained,'" *Deep S. Ctr.*, 138 F.4th at 318 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)), if they can "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024). In the Third Amended Complaint, TOPEF and MOVE assert that SB4 violates their rights to public assembly under the First Amendment and that it "discriminates against [them] on the basis of race,

national origin, and gender" in violation of the equal protection clause of the Fourteenth Amendment. (Dkt. No. 292 ¶ 122.) TOPEF additionally asserts a First Amendment retaliation claim based on the declaratory judgment action filed against it in the Austin Division. (*Id.* ¶¶ 114–19.) The Court first addresses standing to assert their common claims and then turns to TOPEF's standing to bring the latter.

TOPEF is "an education organization that promotes social, racial[,] and economic justice for all Texans." (Dkt. No. 292 ¶ 14.) Its goal is "to transform Texas into a state where working people of color have the power and representation they deserve." (*Id.* ¶ 15.) To that end, TOPEF focuses its efforts on "conducting strategic, year-round community organizing . . . within working class neighborhoods," to, for example, rally in support of minority-oriented legislation. (*Id.* ¶¶ 14–15.) In response to SB4, TOPEF has diverted its resources to "directly counteract" the law's effects. Namely, TOPEF has conducted "know your rights" presentations, organized rallies against SB4, and expanded its immigration program to more effectively tackle local and statewide immigration issues. (*Id.* ¶ 16.) This, TOPEF alleges, has impaired its ability to focus on other projects, such as advocacy related to broader federal immigration issues. (*Id.*) TOPEF additionally alleges that SB4 directly impairs its mission by "making Latinos more hesitant to interact with the police" and, thus, "affecting their power and willingness to organize" in TOPEF's activities. (*Id.* ¶ 17.)

MOVE is an organization "that builds political power in underrepresented youth communities through civic engagement, leadership development, and progressive issue advocacy." (*Id.* ¶ 19.) Its efforts focus primarily on voting rights, particularly those of minority communities, and it "registers thousands of students to vote" each year. (*Id.*) As a result of SB4, MOVE alleges that it has likewise diverted funds and modified its priorities to address the "needs of Latino students" by conducting "know your rights" training to raise awareness about the law. (*Id.* ¶ 20.)

MOVE alleges that it would ordinarily focus its attention on voting-rights-related advocacy but has been forced to "pivot" as an organization and direct resources toward countering SB4's effects. (*Id.*) MOVE also alleges that SB4 directly impairs its mission and ability to carry out its activities by stifling the willingness of Latino youth to engage in its organizational activities due to their hesitancy "to interact with police." (*Id.* ¶ 21.)

In response to the Motion, TOPEF and MOVE contend that they have plausibly alleged all the elements for standing to sue on their own behalf based on their alleged injuries-in-fact—namely, (1) the devotion of resources to countering SB4 and (2) the impairment of their right to associate with Latino members of the community. (Dkt. No. 307 at 6.)

These injuries are not cognizable under Article III. First, the devotion of resources to oppose SB4 will not suffice as an injury: TOPEF and MOVE "cannot spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." *Hippocratic Med.*, 602 U.S. at 394; *see Deep S. Ctr.*, 138 F.4th at 318 (holding that *Hippocratic Med.* rejected the idea that organization's having "redirected resources to conducting research, preparing comments, lobbying . . . and creating an 'education campaign'" to oppose Louisiana and EPA's actions could suffice for standing). Second, their allegation that SB4 impairs their advocacy efforts by affecting the willingness of Latino members of the community to organize "does not work to demonstrate standing." *Hippocratic Med.*, 602 U.S. at 394. "Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct." *Id.* (citation modified). Rather, the organization "must show far more than simply a setback to [its] abstract social interests." *Id.* (quoting *Havens*, 455 U.S. at 379); *see Deep S. Ctr.*, 138 F.4th at 318 ("Only in the

rarest cases can organizations demonstrate standing by showing a defendant's action interferes with their activities."). TOPEF and MOVE have not done so here.

Further, TOPEF and MOVE predicate this theory of standing on their prediction that Latino members of their organization will be more "hesitant" to organize. (Dkt. No. 292 ¶¶ 17, 21.) As the Court explained above, while Article III permits claims based on imminent injuries, it "bars claims based on injuries grounded in mere speculation." *Deep S. Ctr.*, 138 F.4th at 320. Assuming the truth of their allegation—that SB4 has made their Latino members hesitant to participate—the alleged injury from a lack of members organizing would nevertheless remain purely "conjectural or hypothetical." *Id.*; *see Hesitant*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) ("[*S*]*low* to act or proceed.") (emphasis added). Indeed, TOPEF and MOVE admit in their pleadings that part of their response to SB4 has been to *organize rallies* against SB4. (Dkt. No. 292 ¶ 16.) There are no factual allegations from which the Court can reasonably infer that SB4 "creates a chilling effect upon peaceable assembly" because "members from both TOPEF and MOVE are afraid to participate" in their organizational activities "for fear of being targeted for looking 'foreign' and being asked to produce proof of citizenship by campus or local police." (Dkt. No. 292 ¶ 93.) SB4 authorizes inquiries into a person's immigration status only when they are already lawfully detained. *See* GOV'T § 752.053(b)(1) ("[A] local entity or campus police department may not prohibit or materially limit . . . inquiring into the immigration status of a person *under a lawful detention or under arrest*.") (emphasis added); *id.* § 752.051(4) ("'Lawful detention' means the detention of an individual . . . for the investigation of a criminal offense."). By definition, then, peaceable assembly would not result in immigration-related inquiries.

Finally, the Court turns to TOPEF's sole remaining claim based on the declaratory judgment action Paxton filed against it and others in the Austin Division—namely, that Paxton

engaged in unconstitutional retaliation for TOPEF's participation in this lawsuit. (Dkt. No. 292 ¶¶ 95–96, 114–19.) In support, TOPEF alleges that there was no basis for its inclusion in that lawsuit, as the complaint "did not allege any actions or omissions by TOPEF" but, rather, Paxton "stated plainly that [he] sued TOPEF because [it] challenged the constitutionality of SB4." (*Id.* ¶¶ 96–97.) As Paxton points out in the Motion, however, the Austin lawsuit has long been dismissed, and TOPEF has only sought prospective relief against Paxton in his official capacity pursuant to *Ex parte Young*. (*See* Dkt. No. 297 at 18; Dkt. No. 292 ¶¶ 25, 129.) In short, TOPEF has not demonstrated that the past harm it suffered from having to defend against a now-dismissed retaliatory lawsuit would be redressable by an injunction against SB4. *See, e.g.*, *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (analyzing First Amendment retaliation claim in the context of a § 1983 suit for damages ); *Mills v. City of Bogalusa*, 112 F. Supp. 3d 512, 516 (E.D. La. 2015). Thus, because there is no prospective relief available to TOPEF to remedy its past injury that resulted from Paxton's misconduct, this claim must be dismissed.

Accordingly, the State Defendants' Motion (Dkt. No. 297) will be **GRANTED** to the extent it requests dismissal of all claims asserted by TOPEF and MOVE in the Third Amended Complaint under Rule 12(b)(1) for lack of standing.

### E. Valladarez and Simon

#### 1. Fourth Amendment Challenge to SB4

In the Second Amended Complaint, San Antonio Plaintiffs Valladarez and Simon bring one claim against the State Defendants, asserting that SB4 violates the Fourth Amendment as applied to them. (*See* Dkt. No. 282 ¶¶ 194–96; *see also* Dkt. No. 300 at 8.) Paxton seeks dismissal, arguing that neither has demonstrated standing to seek prospective relief based on their past detentions in Rowlett. (*See* Dkt. No. 291 at 4–6.) The Court agrees.

Valladarez and Simon have not alleged a "sufficient likelihood of future injury" to seek injunctive or declaratory relief related to SB4. *Hippocratic Med.*, 602 U.S. at 381. "Plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) (quoting *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (alterations omitted)). Although past wrongs lend support to the likelihood of a future injury, they "do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Crawford*, 1 F.4th at 375 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 (1983)). Here, Valladarez and Simon never allege that their detention was pursuant to SB4's ICE-detainer mandate or any of the immigration-enforcement provisions.[28] Therefore, any injuries arising from their detentions in Rowlett are not fairly traceable to SB4's allegedly unconstitutional provisions and, thus, not redressable by an injunction against Paxton. *See Hippocratic Med.*, 602 U.S. at 380 ("The second and third standing requirements—causation and redressability—are often flip sides of the same coin.") (citation modified). Enjoining enforcement of SB4 would not serve in any way from preventing the city from violating constitutional rights that have nothing to do with SB4. Therefore, they have not plausibly alleged an injury in fact under Article III.

The State Defendants' Motion (Dkt. No. 291) will therefore be **GRANTED** to the extent that it seeks dismissal of Valladarez and Simon's only claims against Paxton under Rule 12(b)(1) for lack of standing.

---

[28]Thus, even if they had standing, this claim would not have survived dismissal under Rule 12(b)(6). Additionally, to the extent that Valladarez and Simon challenge SB4 as applied to them on Fourth Amendment grounds, their allegations fail to state a viable claim against Paxton for the same reason.

### 2. Supremacy Clause Challenge to Rowlett Policy or Custom

Valladarez and Simon also assert against the Rowlett Defendants a challenge to the Rowlett Police Department's alleged official policy or custom, which is maintained "pursuant to SB4," on preemption grounds. (Dkt. No. 282 ¶ 181.) The Rowlett Defendants likewise challenge Valladarez and Simon's standing to assert this claim, contending that Valladarez and Simon have not plausibly alleged any possibility of future injury for purposes of obtaining prospective relief or facts supporting the redressability aspect of their challenge under the Supremacy Clause. (*See* Dkt. No. 302 at 10–13.) The Court agrees.

As mentioned above, "plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Crawford*, 1 F.4th at 375 (citation modified). Here, Valladarez and Simon allege that they were detained in 2019—while visiting another city an hour away—pursuant to a custom or policy that is preempted by federal law.[29] (*See* Dkt. No. 282 ¶¶ 13–14, 157, 171, 181.) And although a past wrongful detention can lend support to the likelihood of a future injury, it "do[es] not in [itself] amount to that real and immediate threat of injury necessary to make out a case or controversy." *Id.* (citation modified).

Because they have not alleged facts from which the Court can infer "any imminent or concrete threat of enforcement or prosecution," Valladarez and Simon have not demonstrated standing to bring this claim. *McCraw*, 90 F.4th at 795. Accordingly, the Rowlett Defendants'

---

[29]The Court notes that, even assuming they had standing to assert it, the Fifth Circuit has already foreclosed this claim by entailment. Specifically, the Fifth Circuit has already held that SB4 is not preempted by federal law, *see El Cenizo*, 890 F.3d at 177, yet Valladarez and Simon's argument hinges on their allegation that the City of Rowlett's policy is nothing more than compliance with SB4, which they claim is preempted because the city does not have a 287(g) agreement with federal immigration authorities pursuant to 8 U.S.C. § 1357(g)(10). (Dkt. No. 282 ¶ 169.) As the Rowlett Defendants correctly point out in their response, the Fifth Circuit has already held—in this very case—that "[§] 1357 . . . expressly allows cooperation in immigration enforcement outside those agreements." *El Cenizo*, 890 F.3d at 177.

Motion (Dkt No. 302) will be **GRANTED** to the extent it requests dismissal of Valladarez and Simon's Supremacy Clause claim under Rule 12(b)(1) for lack of standing.[30]

## II.    MERITS

Dismissal is also proper if the complaining party fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Claims may be dismissed under Rule 12(b)(6) "on the basis of a dispositive issue of law," *Neitzke v. Williams*, 490 U.S. 319, 326 (1989), or a plaintiff's failure to allege in the complaint "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 555 (2007). A claim has facial plausibility when the well-pleaded facts allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In ruling on a Rule 12(b)(6) motion, "the Court assumes the truth of well-pleaded factual allegations and reasonable inferences therefrom." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 181 (2024) (citation modified). Legal conclusions couched as factual allegations, however, are not entitled to the assumption of truth. *Twombly*, 550 U.S. at 555; *Papasan v. Allain*, 478 U.S. 265, 286 (1986). The Court's inquiry in this posture is limited to (A) the facts set forth in the complaint; (B) documents attached to the complaint; (C) matters of which judicial notice may be taken; and (D) documents attached to the motion that are referred to in the complaint and are central to the plaintiff's claims. *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

---

[30]Additionally, *see supra* n.29, it is unclear whether they can bring this claim at all. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) ("[T]he Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action.") (citation modified); *Jones v. Rockwall Cnty.*, No. 3:20-CV-02523-X (BT), 2021 WL 9781798, at *4 (N.D. Tex. Dec. 16, 2021) ("[T]o the extent that Jones is asserting a claim pursuant to the Supremacy Clause, such a claim is also legally frivolous because the Supreme Court has "'wholly rejected the theory that a private cause of action arises out of the Supremacy Clause.'") (quoting *Tex. Voters Alliance v. Dall. Cnty.*, 495 F. Supp. 3d 441, 462 (E.D. Tex. 2020)), *report and recommendation adopted*, No. 3:20-CV-02523-X-BT, 2022 WL 16680805 (N.D. Tex. Nov. 3, 2022).

### A. First Amendment

The remaining First Amendment claims are asserted by San Antonio Plaintiffs McManus, Gallegos, and TACHE based on SB4's "endorse" provision.

All speech-based challenges to SB4 brought by non-elected officials—i.e., McManus and Gallegos—will be dismissed. *El Cenizo*, 890 F.3d at 184–85 ("[N]on-elected officials and employees . . . may well be obliged to follow the dictates of SB4 as 'government speech.'") (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.")).

Accordingly, the State Defendants' Motion (Dkt. No. 291) will be **GRANTED** as to San Antonio Plaintiffs McManus and Gallegos's First Amendment claims, which will be dismissed pursuant to Rule 12(b)(6). TACHE's claim on behalf of its elected members that SB4 violates the free speech clause will proceed.

### B. Fourth Amendment

Valladarez and Simon assert a § 1983 claim against Officers Welk and Rickman on the ground that they were unlawfully detained based on their real or perceived immigration statuses in violation of the Fourth Amendment (*see* Dkt. No. 282 ¶¶ 164–65), along with a *Monell* claim against the City of Rowlett and Chief Godfrey. (*see id.* ¶¶ 170–73). *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

In the Second Amended Complaint, Valladarez and Simon allege that in April 2019, they drove to Rowlett in response to a Craigslist post advertising a free television. (Dkt. No. 282 ¶ 157.) They both knocked loudly on the seller's door, per the putative seller's instructions, and Valladarez

rang the doorbell, but no one came to the door. (*Id.* ¶ 158.) Instead, "a man inside the house" called 911 to report that someone was outside knocking on his door again because of the fake Craigslist ad. (*Id.* ¶ 159.) Shortly thereafter, a woman drove out from behind the house, and, in response to her inquiry, Simon showed her the Craigslist ad. The woman told him to wait, returned to her car, and made a phone call. (*Id.* ¶ 160.)

Minutes later, Officers Welk and Rickman arrived in response to the 911 call. Simon explained, in "broken English," the reason they were knocking so loudly, and then the officers requested identification. (*Id.* ¶ 161.) Simon gave them his Mexican matricula consular,[31] and Valladarez handed over her Honduran passport. A records check followed, quickly revealing that neither Valladarez nor Simon had any criminal warrants. (*Id.* ¶ 164.) Nevertheless, the officers instructed them to remain in their vehicle. (*Id.* ¶¶ 162, 164.) "After more than an hour," the officers "contacted ICE," and the detention continued until an ICE officer arrived and ultimately arrested Valladarez on a civil immigration warrant. (*Id.* ¶ 165.) Officers Welk and Rickman continued to detain Simon while "they questioned him about his children and their school." (*Id.* ¶ 166.) Neither Valladarez nor Simon were cited for any offense related to their trip to Rowlett. (*Id.* ¶ 168.)

### 1. Qualified Immunity

Officers Welk and Rickman invoke qualified immunity (Dkt. No. 302 at 17), which shifts the burden to plaintiffs "to demonstrate the inapplicability of the defense." *Lincoln v. Turner*, 874 F.3d 833, 847 (5th Cir. 2017). Because "qualified immunity is an *immunity from suit*, not merely a defense to liability," *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021), a defendant's

---

[31]"A Matricula Consular Identification Card is an ID card issued to Mexican nationals living in the United States." *Maria S. for E.H.F. v. Doe*, 267 F. Supp. 3d 923, 947 (S.D. Tex. 2017) (citing U.S. Gov't Accountability Off., GAO-04-881, *Border Security Identification Cards Accepted within United States, but Consistent Federal Guidance Needed* 5 (2004), http://www.gao.gov/new.items/d04881.pdf (last visited Sept. 2, 2025)).

request for qualified immunity should be considered at the "earliest possible stage of litigation," *Bakutis v. Dean*, 129 F.4th 299, 307 (5th Cir. 2025).

To survive a motion to dismiss based on qualified immunity, a plaintiff must "allege[] facts sufficient to plausibly show that (1) the defendant's conduct violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged misconduct." *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). And just as a plausible constitutional violation is essential to overcome qualified immunity, it is likewise essential to a *Monell* claim. *See Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017) ("[E]very *Monell* claim requires un underlying constitutional violation.") (citation modified).

Before their encounter with Valladarez and Simon, Officers Welk and Rickman had responded to a similar 911 call at the same residence earlier that day. While this would seem to negate any basis for reasonable suspicion of criminal activity on Valladarez and Simon's part, "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . ask to examine the individual's identification . . . and request consent to search . . . as long as the police do not convey a message that compliance with their requests is required." *Florida v. Bostick*, 501 U.S. 429, 435–36 (1991) (citations omitted). Moreover, questioning "relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004) (quoting *INS v. Delgado,* 466 U.S. 210, 216 (1984) (citation modified)); *see Delgado*, 466 U.S. at 216 ("While most citizens will respond to a police request, the fact that people do so . . . without being told they are free not to respond, hardly eliminates the consensual nature of the response."). Accordingly, Valladarez and Simon's initial

interaction with Welk and Rickman, during which they provided their identification, was a consensual interaction.

But while the interaction began as consensual, it evolved into an involuntary detention when the officers ordered Valladarez and Simon "not to move and to remain in the[ir] . . . truck," during which time the officers "kept the[ir] identification documents." (Dkt. No. 282 ¶ 164); *see Florida v. Royer*, 460 U.S. 491, 503 (1983) (holding that consensual encounter escalated into a seizure where police "had [suspect's] identification" and he "was never informed that he was free to [leave]"); *United States v. Macias*, 658 F.3d 509, 525 (5th Cir. 2011) (concluding that a reasonable person would not feel free to leave when an officer has kept their identifying documents); *United States v. Cavitt*, 550 F.3d 430, 439 (5th Cir. 2008) ("[A]n officer's retention of identification documents suggests coercion."). And this involuntary detention occurred after Officers Welk and Rickman had already confirmed that neither Valladarez nor Simon had any criminal warrants. (Dkt. No. 282 ¶ 164.) Thus, at no point prior to the initially voluntary encounter's becoming a seizure did Officers Welk and Rickman discover anything that would have provided them with reasonable suspicion, let alone probable cause, to justify the detention. Accordingly, Officers Welk and Rickman committed an unreasonable seizure in violation of Valladarez and Simon's Fourth Amendment rights.

The Court also finds that this prolonged detention was a violation of clearly established law. "Qualified immunity operates to ensure that before they are subjected to suit, [public officials] are on notice their conduct is unlawful." *Babinski v. Sosnowsky*, 79 F.4th 515, 520 (5th Cir. 2023) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). In many instances, a plaintiff must "identify a case in which an officer acting under similar circumstances was held to have violated the Constitution and explain why the case clearly proscribed the conduct of that individual officer."

*Cope v. Cogdill*, 3 F.4th 198, 205 (5th Cir. 2021) (citation modified). However, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Wetherbe v. Tex. Tech Univ. Sys.*, 138 F.4th 296, 305 (5th Cir. 2025).

Here, Valladarez and Simon argue that, at the time of their detention by Welk and Rickman, the law was clearly established that local police officers "cannot constitutionally detain or arrest individuals based on suspected immigration status without statutory authorization or a federal request." (Dkt. No. 311 at 11, 20.) In support, they cite *Arizona v. United States* for the proposition that "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns." *See* 567 U.S. 387, 413 (2012). The constitutional concerns contemplated by the Supreme Court were that immigration-related fishing expeditions could measurably prolong an otherwise justified detention, such that it evolves into an unreasonable seizure. *See id.* (first citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for [a] traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."); and then citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission")); *see also Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (Ginsburg, J.) (holding that routine traffic stops become unreasonable seizures when measurably prolonged beyond time required to complete mission justifying the stop to allow a drug sniffing dog to arrive on the scene and perform a free air search). Whether to summon a K9 unit or an ICE agent, the principle that an otherwise lawful detention may not be unreasonably prolonged for purposes unrelated to the mission that initially justified the detention is clearly established. *See Hope*, 536 U.S. at 739; *Wetherbe*, 138 F.4th at 305; *Babinski*, 79 F.4th at 520.

Thus, Officers Welk and Rickman had fair notice that they could not continue to detain Valladarez and Simon, after all reasonable suspicion had dissipated, to allow an ICE agent time to arrive.

Accordingly, because Valladarez and Simon have plausibly alleged a constitutional violation, and because Officers Welk and Rickman are not entitled to qualified immunity, the Rowlett Defendants' Motion (Dkt. No. 302) will be **DENIED** as to Valladarez and Simon's § 1983 claims against Officers Welk and Rickman.

### 2. *Monell* Liability

Municipal liability under § 1983 has three elements: (1) an official policy or custom; (2) a policymaker who can be charged with actual or constructive knowledge of the policy or custom; and (3) a violation of a constitutional right whose "moving force" is the policy or custom. *Guerra v. Castillo*, 82 F.4th 278, 290 (5th Cir. 2023) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)); *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Here, although Valladarez and Simon have plausibly-pleaded a Fourth Amendment violation, the Court agrees with the Rowlett Defendants that the Second Amended Complaint fails to allege any official policy or custom, or that it was the "moving force" behind the constitutional violation. (*See* Dkt. No. 282 ¶¶ 170–73.)

An official policy or custom may be shown in any of three ways: (a) a written policy statement, ordinance, or regulation; (b) a persistent, widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy; or (c) under rare circumstances, a single act done by an official or entity with "final policymaking authority." *Sweetin v. City of Tex. City*, 48 F.4th 387, 392 (5th Cir. 2022); *see Webster*, 735 F.2d at 841. The Second Amended Complaint contains no facts from which the Court can infer the existence of any official policy or a widespread custom. At most, Valladarez and Simon have alleged a single

incident—namely, this one—but this is insufficient to demonstrate a policy or custom because neither Welk nor Rickman have final policymaking authority. *See Sweetin*, 48 F.4th at 392.

The Rowlett Defendants' Motion (Dkt. No. 302) will therefore be **GRANTED** as to Valladarez and Simon's *Monell* claims, which will be dismissed pursuant to Rule 12(b)(6).

## CONCLUSION

The State Defendants' Motion to Dismiss the City of Austin's First Amended Complaint in Intervention (Dkt. No. 279) is **GRANTED**, and Austin's claim is **DISMISSED** pursuant to Rule 12(b)(1).

The State Defendants' Motion to Dismiss the San Antonio Plaintiffs' Second Amended Complaint (Dkt. No. 291) is **GRANTED IN PART** as follows:

- all claims against Texas and Governor Abbott are **DISMISSED** pursuant to Rule 12(b)(1);

- all claims by the City of San Antonio, the City of El Paso, and Bexar County are **DISMISSED** pursuant to Rule 12(b)(1);

- all official-capacity claims asserted by McManus and Gallegos are **DISMISSED** pursuant to Rule 12(b)(1);

- all claims asserted by Sandoval are **DISMISSED** pursuant to Rule 12(b)(1);

- all claims asserted by LUPE and WDP are **DISMISSED** pursuant to Rule 12(b)(1);

- TACHE's academic freedom and equal protection claims are **DISMISSED** pursuant to Rule 12(b)(1);

- all claims asserted by Valladarez and Simon are **DISMISSED** pursuant to Rule 12(b)(1); and

- all individual-capacity claims asserted by McManus and Gallegos are **DISMISSED** pursuant to Rule 12(b)(6).

The Motion is **DENIED IN PART** as to TACHE's claim that SB4 violates the free speech clause of the First Amendment.

The State Defendants' Motion to Dismiss the El Paso County Plaintiffs' Third Amended Complaint (Dkt. No. 297) is **GRANTED**, and the El Paso County Plaintiffs' claims are **DISMISSED** pursuant to Rule 12(b)(1).

The Rowlett Defendants' Motion to Dismiss the San Antonio Plaintiffs' Second Amended Complaint (Dkt. No. 302) is **GRANTED IN PART** as follows:

- Maria Valladarez and Armando Simon's Supremacy Clause claims are **DISMISSED** pursuant to Rule 12(b)(1); and

- their *Monell* claims against the City of Rowlett and Chief Godfrey are **DISMISSED** pursuant to Rule 12(b)(6).

The Motion is **DENIED IN PART** as to the § 1983 claims against Officers Welk and Rickman.

The remaining parties shall confer and submit joint proposed scheduling recommendations no later than **Wednesday, October 15, 2025**.

It is so **ORDERED**.

**SIGNED** this _____ day of September, 2025.

ORLANDO L. GARCIA
United States District Judge